## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

DAVID MADISON CAWTHORN,   )
      )
      Plaintiff,   )
      )
vs.   )    CASE NO. 6:16-cv-02240-JA-GJK
      )
AUTO-OWNERS INSURANCE   )
COMPANY,   )
      )
      Defendant.   )
_____ )

### DEFENDANT'S NOTICE OF FILING DEPOSITION TRANSCRIPT OF JAMIE BILLOTTE MOSES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, AUTO-OWNERS INSURANCE COMPANY ("Auto-Owners"), by and through its undersigned counsel hereby give notice of filing the deposition transcript and exhibits of Jamie Billotte Moses taken on August 10, 2017 in support of Defendant's Motion for Summary Judgment.

### CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2017, I electronically filed the foregoing with the Clerk of the Court in the U.S. District Court, Middle District of Florida, Orlando Division, by using the CM/ECF system, which will send a notice of electronic filing to:

**William A. Bonner, Esquire**
*abonner@colson.com*
**Roberto Martinez, Esquire**
*bob@colson.com*
**COLSON HICKS EIDSON**
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
*eservice@colson.com;*
*claudia@colson.com*
*Attorneys for Plaintiff*

**Stephen A. Marino, Jr., Esquire**
*smarino@ypl-law.com*
**Michal Meiler, Esquire**
*mmeiler@ypl-law.com*
**VER PLOEG & LUMPKIN, P.A.**
301 E. Pine Street, Suite 790
Orlando, FL 32801
*smcgee@ypl-law.com*
*Co-Counsel for Plaintiff*

*/s/ Peter C. Vilmos*
**S. Greg Burge**        (Florida Bar # 0743770)
Email: *gburge@burr.com*
Secondary: *mkillian@burr.com*
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Tel:    205-251-3000
Fax:    205-458-5100

**Peter C. Vilmos**        (Florida Bar # 75061)
Email: *pvilmos@burr.com*
Secondary: *nwmosley@burr.com*
BURR & FORMAN LLP
200 S. Orange Avenue, Suite 800
Orlando, FL 32801
Tel:    407-540-6600
Fax:    407-540-6601

**Forrest S. Latta**        (admitted *pro hac vice*)
Email: *forrest.latta@burr.com*
Secondary: *pgrove@burr.com*
BURR & FORMAN LLP
11 North Water Street, Suite 22200
Mobile, AL 36602
Tel:    251-344-5151
Fax:    251-344-9696

*Attorneys for Defendant*
*Auto-Owners Insurance Company*

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 6:16-CV-2240-Orl-28GHK


DAVID MADISON CAWTHORN,

     Plaintiff,

vs.

AUTO-OWNERS INSURANCE COMPANY,

     Defendant.
_____/


VIDEOTAPED DEPOSITION OF

JAMIE BILLOTTE MOSES

(1-175)

Taken on Behalf of the Plaintiff

DATE TAKEN:    August 10, 2017

TIME:          1:05 p.m. - 4:54 p.m.

PLACE:         Burr Forman
               200 South Orange Avenue
               Orlando, Florida


Examination of the witness taken before:

Lance W. Steinbeisser, RPR CSR FPR
Certified Stenographer

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

Page 2

APPEARANCES FOR THE PLAINTIFF

William A. Bonner, Esquire
COLSON HICKS EIDSON
255 Alhambra Circle
Penthouse
Coral Gables, Florida 33134
(305) 476-7400
abonner@colson.com


APPEARANCES FOR THE DEFENDANT

Peter C. Vilmos,Esquire
BURR & FORMAN LLP
200 South Orange Avenue, Suite 800
Orlando, Florida 32801
(407)540-6600
pvilmos@burr.com


ALSO PRESENT

Brian Ferreira, videographer

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

```
                                                   Page 3

 1                    I N D E X

 2   WITNESS                                   PAGE

 3   JAMIE BILLOTE MOSES
     Direct Exam By Mr. Bonner                    4
 4   Cross-Exam By Mr. Vilmos                   125
     Redirect Exam By Mr. Bonner               148
 5

 6   PLAINTIFF'S EXHIBITS              MARKED FOR ID

 7      94     email chain                        7
        95     email, Bates FR 185               16
 8      96     email, Bates FR 301-302           36
        97     letter, FR 28                     41
 9      98     letter, 8/11/16                   41
        99     email, 8/18/14                    46
10     100     letter, 6/26/15                   49
       101     email, Bates 189                  60
11     102     email, Bates FR 178               61
       103     letter, 8/26/14                   63
12     104     email, Bates FR 119               79
       105     letter, 3/12/15                  159
13     106     email, Bates AO 675-677           95
       107     letter, Bates FR 27               96
14     108     email, Bates FR 491-492          105
       109     email, Bates 386-387             164
15

16   DEFENDANT'S EXHIBITS              MARKED FOR ID

17       1     email composite                 132
         2     email composite                 137
18       3     email, 8/23/16                   140
         4     email composite                 144
19       5     email chain, 00123              145

20   (Exhibits attached hereto.)

21   Certificate of Oath ....................Page 172
     Reporter's Deposition Certificate .......Page 173
22   Errata Sheet ...........................Page 174
     Read Letter ............................Page 175
23

24

25
```

Page 4

1              THE VIDEOGRAPHER:  Here begins the

2         videotaped deposition of Jamie Moses in the

3         case styled David Madison Cawthorn versus

4         Auto-Owners Insurance Company.  Today's date

5         is August 10, 2017.  The time is 1:05 p.m.

6              Will the parties please identify

7         themselves for the record.

8              MR. BONNER:  I'm Allen Bonner on behalf

9         of Madison Cawthorn.

10             MR. VILMOS:  Peter Vilmos for

11        Auto-Owners Insurance Company.

12             THE VIDEOGRAPHER:  The court reporter

13        may swear in the witness.

14   Thereupon--

15              JAMIE BILLOTTE MOSES

16   was duly administered the oath:  Do you swear or

17   affirm that the testimony you are about to give in

18   this cause will be the truth, the whole truth and

19   nothing but the truth?

20             THE WITNESS:  Yes, sir.

21                DIRECT EXAMINATION

22   BY MR. BONNER:

23        Q.   Ms. Moses, thank you for coming here.

24             Can you please state your name for the

25   record.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 5

1          A.    Jamie Billotte Moses.

2          Q.    And where do you work?

3          A.    I'm at Holland & Knight.

4          Q.    And you're an attorney?

5          A.    Yes, sir.

6          Q.    And you've been an attorney for how many

7   years?

8          A.    20 -- since 1994; so 23.

9          Q.    What is your connection to the lawsuit

10  that was styled Madison Cawthorn versus Bradley

11  Ledford and Bob Ledford RV & Marine?

12         A.    I was retained by Auto-Owners to

13  represent Bradley Ledford in the litigation.

14         Q.    And what did you do to prepare for your

15  deposition today?

16         A.    I didn't really prepare.  I wanted to,

17  but I didn't because of my daughter's mouth

18  surgery.  But I know that you sent me a flash drive

19  of documents, and I quickly looked at them to just

20  see the class of documents that were produced.

21               And then Mr. Corso from my prior law

22  firm, which is where I was when I was working on

23  this case, sent us three emails -- I think three or

24  four Tuesday night.  And so Wednesday -- Tuesday

25  night I kind of looked at it, and then Wednesday

Madison Cawthorn v. Auto-Owners Insurance          Jamie Billotte Moses | 8/10/2017

Page 6

1   morning we got one email with everything, and I

2   just got a general idea of what was in there.  I

3   did not get a chance to look at every page,

4   unfortunately.

5        Q.   And I know you spoke with me a couple of

6   times before --

7        A.   Mm-hmm.

8        Q.    -- this deposition.

9        A.   Mm-hmm.

10       Q.   Did you speak with anyone else?

11       A.   I spoke to Forrest Latta -- is that a

12  name in here?  Forrest called me, I believe, in

13  November of last year.  I just started at Holland &

14  Knight and got this call.  And we spoke briefly,

15  like there's been a lawsuit filed, you might be

16  called as a witness.  That was it.

17            And then I believe Mr. Vilmos has called

18  me once or twice just with an update -- nothing

19  real substantive -- like I think they might take

20  your depo -- you know, nothing major.

21       Q.   You stated earlier that you were

22  retained by Auto-Owners to represent Bradley?

23       A.   Yes, sir.

24       Q.   You were retained on approximately

25  August 8, 2014?

Madison Cawthorn v. Auto-Owners Insurance          Jamie Billotte Moses | 8/10/2017

Page 7

1        A.    If that's what something reveals.

2              (Plaintiff's Exhibit 94 was marked for

3        identification.)

4   BY MR. BONNER:

5        Q.    I'm going to show you what we'll mark as

6   Exhibit 94.  And this is just an email dated

7   August 8, 2014, between you and -- well, it's an

8   email chain that includes an email from you to

9   Ms. Pamela McLean.

10       A.    Okay.  It looks like it started on

11  August 6.

12       Q.    Okay.

13       A.    Okay.

14       Q.    Based on that email, somewhere between

15  August 6 and August 8 you were formally retained by

16  Auto-Owners?

17       A.    You know, it may have been a couple days

18  before that because I think in here she writes "We

19  aren't that formal."  Like I mention in this

20  letter, I was waiting for a formal retainer letter,

21  and I never got it.  So maybe -- early August or

22  late July.

23       Q.    Okay.  So we'll just say you were

24  retained by Auto-Owners either in late July or

25  early August 2014?

Page 8

1        A.    Yes, sir.  I'm sorry.

2        Q.    Final judgment was entered in the case

3   against Bradley Ledford on December 20, 2016?

4        A.    I have no idea.  I know it was after I

5   left Fisher Rushmer, which was November 1st, 2016.

6        Q.    You said it was which date?

7        A.    I left Fisher Rushmer on November 1st,

8   2016, and I know that they -- I don't believe the

9   final judgment was entered until after I left.

10       Q.    I think that's right.  And I'm not

11  asking you this as a test for memory.  I want to

12  show you the document just because I'm going to ask

13  a series of questions that involve the end date of

14  December 20th --

15       A.    Okay.

16       Q.    -- 2016.  And if I've got the wrong end

17  date --

18       A.    Okay.

19       Q.    -- I'll correct my question.

20             I apologize for not having it teed up

21  right away.  Here we are.  This has previously been

22  marked as Exhibit 80.

23             Peter, I only have one copy, and this is

24  actually a file copy of the exhibit.

25             THE WITNESS:  Do you need to see it?

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

```
                                                          Page 9
  1            All right.

  2   BY MR. BONNER:

  3        Q.   Will you confirm for me what Exhibit 80

  4   is?

  5        A.   It says "Final Judgment," and it's

  6   signed by the judge.

  7        Q.   And what's the date of the final

  8   judgment in Exhibit 80?

  9        A.   December 20, 2016.

 10        Q.   Okay.  And that appears to be the final

 11   judgment for the case styled Cawthorn versus

 12   Bradley Ledford and Bob Ledford RV & Marine?

 13        A.   It appears to be.  I just have no

 14   firsthand knowledge of this.

 15        Q.   You've never seen it before?

 16        A.   Huh-uh.  I don't think so.  And if it

 17   was produced with everything that we just got a

 18   couple days ago, that may have been the first time

 19   I've seen it if it was in there.

 20        Q.   Okay.  It's not a memory test.  It's

 21   really just the date.

 22        A.   Okay.

 23        Q.   Can you tell me what a reservation of

 24   rights letter is?  Just assume that you're speaking

 25   to the jury.
```

Page 10

1          A.    Okay.   In my experience, the insurance

2    company advises the insured of those grounds under

3    which it could possibly deny coverage, and it might

4    do so later under the reservation of rights.   But

5    they continue to defend the uninsured under the

6    reservation of rights.

7          Q.    And the reason I made you or asked you

8    to --

9          A.    Okay.

10         Q.    -- say what it was is I wanted to

11   confirm that prior to December 20, 2016,

12   Auto-Owners, to your knowledge, never issued a

13   reservation of rights letter to Bradley Ledford?

14         A.    I was not aware of one.

15         Q.    And between when you were retained in

16   late July or early August 2014 and the entry of

17   this final judgment that I showed you, December 20,

18   2016, Auto-Owners never told you that Bradley

19   Ledford had breached any of the policy provisions?

20         A.    Not that I'm aware of.

21         Q.    Again, this is just with respect to your

22   personal knowledge.   So I understand that

23   Auto-Owners might have done things that you're not

24   aware of.

25              So you have no personal knowledge of

Page 11

1   them ever notifying you that Bradley Ledford was in

2   breach of the policy under which you've been

3   retained?

4        A.   Correct.  And he also had private

5   counsel from day one.  So I don't know if any

6   discussions occurred between Auto-Owners and Mick

7   Callahan.

8        Q.   Good.

9             And Mick Callahan was Mr. Ledford's

10  private counsel; correct?

11       A.   Yes.  Yes, he was.

12       Q.   I mean there was a hesitation there.

13  You don't --

14       A.   He represented Bradley, but I don't know

15  who he was working for.

16       Q.   Between August 8, 2014 -- well, actually

17  let me stop there.

18            Did Mr. Callahan assist you in any way

19  during the defense of the case?

20       A.   He was intimately involved, yes.

21       Q.   When you say he was intimately involved,

22  right now all I'm asking about is with respect to

23  the defenses that you later were able to identify

24  for Mr. Bradley Ledford.

25            Did he assist in any of those defenses?

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

Page 12

1      A.   You know, in the beginning I couldn't

2  even talk to Bradley except through Mick.  So, yes,

3  in even developing the defenses to raise, I was

4  going through Mick to get to Bradley.

5           Mick was intimately involved in meeting

6  with experts.  At some point in time, Mick would

7  even take credit for pursuing the third party.  So

8  Mick was very involved.

9      Q.   The third party you refer to is the

10 construction company?

11     A.   Uh-huh.

12     Q.   I don't want to get ahead of ourselves,

13 because there are certain things that we'll talk

14 about later.

15           But getting back to Mick Callahan, I

16 know that he was involved in the settlement

17 discussions.  Do you agree?

18     A.   Oh, he was -- he was the settlement

19 discussions.

20     Q.   Precisely.

21           And I'm actually just trying to lock

22 down whether or not he was involved in things

23 outside of the settlement discussions.

24     A.   Oh, from day one.

25     Q.   And you described some of the things

Page 13

1    that he was involved in as the retention and

2    meeting with experts?

3         A.   He didn't retain them, but -- well, he

4    suggested some we should talk to.  He -- you know,

5    I want to be real careful, because I don't believe

6    Mr. Ledford has waived any privileges, so --

7         Q.   Please don't waive -- I mean don't --

8         A.   He's participated in discussions

9    regarding experts, which one we liked better, what

10   we wanted experts to focus on.  Mick was intimately

11   involved.

12        Q.   And did Mr. Callahan also assist in

13   identifying potential defenses for Bradley Ledford?

14   You've identified one --

15        A.   Yeah, he --

16        Q.   -- the concrete construction company.

17        A.   Yeah, he played a role.

18        Q.   And I've reviewed the files that have

19   been produced by your former firm, and there are

20   emails in here that led me to believe that he

21   played a role, and that's why I asked you.

22        A.   Okay.

23        Q.   Now, when you say you don't know who he

24   was working for, can you explain that?

25        A.   I just -- sometimes I didn't know what

Page 14

1    team Mick was on.  We would have a discussion, and

2    then suddenly your partner Joe knew about the

3    contents of the discussion.

4            I just -- I never knew -- all I knew is

5    I had to go through Mick to deal with Bradley,

6    because those were my marching orders from Mick via

7    David Ledford.  But there were times when I

8    wondered whose side he was on.

9        Q.   And I suppose very early on in this case

10   you -- probably in 2014 you became aware of issues

11   that predated you in this case?

12           MR. VILMOS:  Object to the form.

13   BY MR. BONNER:

14       Q.   It is vague.  Do you want me to --

15       A.   Yeah, be more specific.

16       Q.   Prior to mediation in 2016, Mick

17   Callahan wrote a letter to Auto-Owners that

18   described bad faith allegations.

19           Did you ever see that letter?

20       A.   I don't -- I don't think I did.

21       Q.   Were you aware that there had been some

22   conversations between Mr. Callahan and members at

23   Auto-Owners about whether or not Auto-Owners'

24   actions on this case were appropriate prior to your

25   involvement in this case?

Page 15

1          A.    I am not aware of discussions or the

2     contents thereof.  I knew there was an issue that

3     was trying to be raised, but Mick didn't say to me:

4     Well, I told Auto-Owners this or -- sorry, Brian, I

5     hit my -- I told Auto-Owners this or I told

6     Auto-Owners that.  I don't know the substance of

7     any discussions.  I just knew there was an issue.

8          Q.    Right.

9                I think early on -- and I can track it

10    down if you want to see the email -- but maybe in

11    September 2014 he asked you for a contact person at

12    Auto-Owners?

13         A.    Yes.  I remember that.

14         Q.    And at the time of that request to you,

15    were you aware then that he was trying to speak to

16    Auto-Owners about some prelawsuit issues?

17         A.    I was aware that someone was trying to

18    make an extra-contractual liability claim against

19    Auto-Owners.  I was aware of that.

20         Q.    And you were aware of that back in

21    September 2014?

22         A.    When he asked me to talk to someone,

23    yes.  I think when I was originally retained, no.

24    But I think he asked me for the name of someone to

25    talk to at Auto-Owners.

Page 16

1      Q.   Yes, and that's my impression too from

2   the reading that there was no discussion initially

3   about any of these bad faith allegations when you

4   were retained.   It was only when Mick Callahan

5   raised them that you became aware of them?

6      A.   Oh, yeah.   Auto-Owners said nothing,

7   nothing.   It was Mick who said I need to --

8   basically, I need to talk to Auto-Owners.   Can you

9   give me a name?

10          (Plaintiff's Exhibit 95 was marked for

11      identification.)

12   BY MR. BONNER:

13      Q.   Yes.   And I'm going to show you -- I

14   didn't plan on using this, and I'll show it to you

15   anyway.

16          But let me show it to you, Peter, first.

17   I'll marked it as Exhibit 95.

18          Ms. Moses, can you identify Exhibit 95

19   for me?

20      A.   It appears to be an email that I wrote

21   on August 20th to Pamela McLean and then her reply

22   on August 21st.

23      Q.   Right.

24          And the only reason I show you this

25   email, Ms. Moses, is for the date.

Page 17

1        A.    Yeah.

2        Q.    The date is approximately or it is

3   September 20th?

4        A.    August 20th.

5        Q.    August 20th.

6              So it was probably around August 20th

7   that you first became aware of some of the bad

8   faith issues that Mr. Callahan was raising?

9              MR. VILMOS:   Object to form.

10       A.    I really don't know.  This is the

11  written -- what's the word of it?  This is when it

12  was in writing.  Maybe Mick said something a couple

13  days before.  I don't know.

14  BY MR. BONNER:

15       Q.    Sure.  Sure.  I'll just use

16  "approximately."

17       A.    Okay.

18       Q.    Approximately around the date of this

19  email, either several days before or possibly more,

20  that's when you first became aware of the bad faith

21  issues?

22       A.    I think so.

23       Q.    All right.

24       A.    You know, it wasn't really, you know, I

25  wouldn't get involved in that as defense counsel,

Page 18

1    so...

2         Q.   And I understand that, and let me go

3    ahead and ask you.

4              Once you became aware of those issues,

5    you tried to avoid being involved in them?

6         A.   Oh, yes, at all costs.

7         Q.   And you've told me that informally many

8    times.

9         A.   And it's in my letters.

10        Q.   And it's in the letters --

11        A.   Yes.

12        Q.   -- that's right.

13             So let me just get back to a series of

14   questions that I started with.

15        A.   Sure.

16        Q.   I asked you a bit ago about a

17   reservation of rights letter.

18             Prior to December 20, 2016, did

19   Auto-Owners ever tell you that Bradley Ledford was

20   in breach of a policy provision?

21        A.   No.

22        Q.   Between when you were retained in this

23   case and the entry of the final judgment on

24   December 20, 2016, did Auto-Owners ever tell you

25   that it would stop paying Bradley's defense costs

Page 19

1    because he was in breach of a policy provision?

2         A.    No.

3         Q.    And, in fact, to your knowledge,

4    Auto-Owners did pay your defense costs through the

5    end of the lawsuit?

6         A.    Yes, I believe so.  I only say "believe

7    so" because I left Fisher Rushmer, and I don't know

8    what happened to my bills after I was gone.  But I

9    assume there's not an issue.

10        Q.    And you're aware of no failure to pay on

11   the part of Auto-Owners with respect to your

12   defense bills?

13        A.    I am not aware of any.

14        Q.    If I wanted absolute confirmation, I

15   should ask your old firm?

16        A.    Yes, yes.

17        Q.    Okay.  Between the date you were

18   retained and the date of the final judgment,

19   December 20, 2016, Auto-Owners never sent you a

20   document under the claims administrative statute or

21   sent Bradley a document with the claims

22   administrative statute saying that there was a

23   breach of policy defense that they would be

24   potentially be raising?

25        A.    I can't speak for what they sent to

Page 20

1    Bradley, but for me, no.

2          Q.    You're aware of no letter under the

3    claims administrative statute that Auto-Owners sent

4    with respect to Bradley Ledford's actions in the

5    case styled Cawthorn versus Bradley Ledford and Bob

6    Ledford RV & Marine?

7          A.    I am not aware of such letter.

8          Q.    Now, the policy under which you were

9    retained, you'll agree with me or do you agree with

10   me that it had a provision that obligated it to

11   defend Bradley Ledford against the lawsuit that had

12   been filed by Madison Cawthorn?

13         A.    Yes.

14         Q.    And it was under that duty to defend

15   that you were retained?

16         A.    Yes.

17         Q.    That duty to defend required Auto-Owners

18   to defend Bradley; true?

19         A.    I feel like I'm no longer a fact

20   witness.

21         Q.    Okay.  Well, I'll stop.

22         A.    You know --

23         Q.    Just based on your understanding.  And

24   this is not meant to bind Auto-Owners or anyone

25   else.

Page 21

1          Your understanding of your retention was
2     that Auto-Owners controlled the defense?
3             MR. VILMOS:  Object to the form.
4        A.   Auto-Owners provided the defense.  I
5     wouldn't say controlled.
6     BY MR. BONNER:
7        Q.   Okay.  Your understanding was that
8     Auto-Owners controlled settlement decisions?
9             MR. VILMOS:  Object to the form.
10       Leading.
11       A.   I just -- settlement decisions or
12    discussions?
13    BY MR. BONNER:
14       Q.   I said "decisions."
15            If you have an answer for one or the
16    other, please feel free to explain your answer.
17    That's fine.
18       A.   I just don't -- that's -- you know, as a
19    defense attorney, I just don't look at it that way.
20    I know the other side does.  But that's just not
21    the way I look at it.  They don't control
22    settlement discussions.  They don't -- I mean
23    there's a limit to their policy, but they don't
24    control settlement decisions.  Obviously, in this
25    case a decision was made that Auto-Owners didn't

Page 22

1    control.

2         Q.   And I think where you're coming from is

3    that when you're hired as a defense attorney,

4    you're representing Bradley Ledford?

5         A.   Yes.

6         Q.   You're not representing Auto-Owners?

7         A.   Correct.

8         Q.   That's not to say that you don't have

9    some fiduciary obligations to Auto-Owners?

10        A.   Right.

11        Q.   Because you do --

12        A.   Correct.

13        Q.   -- right?

14             You have to report to Auto-Owners;

15   correct?

16        A.   Correct, yes, sir.

17        Q.   But Auto-Owners, not Bradley Ledford,

18   made the decision to retain you; correct?

19        A.   Yes, but I believe -- you know, the

20   insureds have to agree to that.

21        Q.   Right --

22        A.   It's mutually agreeable counsel.

23        Q.   Right.

24             And Bradley could have said I don't --

25   not that he would have --

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

                                                              Page 23

 1        A.    Yeah.

 2        Q.    -- but he could have said, you know, I

 3   want somebody else; right?

 4        A.    Right, correct, he could have or his

 5   father could have, yes.

 6        Q.    And then Auto-Owners could have said:

 7   You know, Bradley, I know you want this other

 8   person, but we don't agree to that person.  Let's

 9   find somebody we mutually agree to.

10        A.    Whatever the policy says.  Every policy

11   is written differently.

12        Q.    And so the policy does vest certain

13   rights in Auto-Owners?

14        A.    Yes.

15        Q.    And you mentioned before that there's a

16   policy limit in the insurance policy?

17        A.    Yes.

18        Q.    Okay.  And I suppose that's relevant

19   because Auto-Owners has an obligation to provide a

20   defense until the policy limits are exhausted?

21             MR. VILMOS:  Objection.  Leading.

22        A.    I don't know what the --

23             MR. VILMOS:  It calls for a legal

24        analysis.  She's here as a fact witness.

25        A.    And I don't know what the policy said.

Page 24

1    They may have had to defend to the end regardless

2    of the exhaustion of limits.  I just don't know

3    what this policy said.

4    BY MR. BONNER:

5         Q.   Whether or not there was a limit to

6    their duty to defend, it would be determined by

7    policy language --

8         A.   Yes.

9         Q.   -- right?

10             And if the policy language called for, I

11   guess, a perpetual defense or a defense through the

12   end of all appeals, that would dictate the extent

13   of Auto-Owners' obligation to defend?

14             MR. VILMOS:  Object to the form.  Again,

15        it asks her to interpret an insurance policy

16        she said she was unfamiliar with.

17             You can answer the question if you

18        understand it.

19        A.   The policy can provide for that.  I've

20   seen insurance companies go beyond their

21   obligations under a policy.

22   BY MR. BONNER:

23        Q.   Oh, yeah, I've absolutely have seen

24   Auto-Owners -- sorry -- Auto-Owners, other

25   insurance companies go beyond a defense obligation.

Page 25

1      A.    Yeah.

2      Q.    Would you agree that the defense

3  obligation, as controlled by the policy, if the

4  policy says it ends, if an insurance company

5  chooses to go beyond it, that's up to the insurance

6  company?

7      A.    Sure.

8      Q.    If they voluntarily decide to give more

9  benefits than what the contract calls for, it's

10  voluntary, I guess?

11          MR. VILMOS:   Object to the form.

12      A.    Really -- it depends on the language of

13  the policy, but yes.

14  BY MR. BONNER:

15      Q.    In other words, it's not contractually

16  obligated if it's more than what the policy calls

17  for?

18      A.    It just depends what the policy says.

19      Q.    Before December 20, 2016, did

20  Auto-Owners ever instruct you not to have

21  settlement discussions with Mr. Cawthorn?

22      A.    With -- you mean his counsel, because I

23  would never speak with Mr. Cawthorn, individually.

24      Q.    Absolutely.  So let me restate the

25  question in a way that you'd be better able to

Page 26

1    answer it.

2              Before the entry of the final judgment,

3    December 20, 2016, is it true that Auto-Owners

4    never instructed you not to have settlement

5    discussions with Joe Kalbac?

6         A.   I was --

7              MR. VILMOS:   Object to the form.   Sorry.

8         A.   I'm sorry.

9              I was never instructed not to have

10   settlement discussions with Mr. Kalbac.

11   BY MR. BONNER:

12        Q.   Are you aware of any instructions to

13   Bradley or Mr. Callahan that took place before

14   December 20, 2016, from Auto-Owners telling either

15   Mr. Callahan or Bradley not to engage in settlement

16   discussions with Mr. Kalbac?

17        A.   No, I'm not aware.

18        Q.   And when settlement demands are made or

19   settlement offers are made through Mr. Kalbac to

20   Bradley -- I don't want to trample a privilege --

21   but you have an obligation to communicate those to

22   your client?

23        A.   Any settlement discussions or offers

24   would have been communicated to my client.

25        Q.   And you also have an obligation to

Page 27

1    communicate those to Auto-Owners?

2          A.    Of course.

3          Q.    And when you communicate them to

4    Auto-Owners, did you ask for instructions following

5    receipt of the settlement offer?

6          A.    That presupposes there was a settlement

7    offer.

8          Q.    Did Auto-Owners ever tell you that by

9    merely discussing settlement with Mr. Kalbac that

10   Bradley would be in breach of his insurance policy?

11         A.    No.

12         Q.    Are you aware of any communications to

13   either Bradley or Mr. Callahan from Auto-Owners

14   prior to December 20, 2016, in which Auto-Owners

15   informed either Bradley or Mr. Callahan that

16   settlement discussions with Mr. Kalbac would be a

17   breach of the policy?

18         A.    I am not aware of such discussions.

19         Q.    Prior to December 20, 2016, did

20   Auto-Owners ever inform you that Bradley was, in

21   its view, in breach of the cooperation clause?

22         A.    No.

23         Q.    And prior to December 20, 2016, did

24   Auto-Owners ever inform you that in its view

25   Bradley was in breach of the consent to settle

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 28

1    clause of the insurance policy?

2         A.    No.

3         Q.    Are you aware of any communications from

4    Auto-Owners to any other person in which it

5    expressed the view that Bradley was in breach of

6    the policy's cooperation clause or consent to

7    settle clause?

8         A.    No.

9         Q.    Between the date where you were retained

10   in this case and December 20, 2016, are you aware

11   of any time that Bradley failed to do something

12   Auto-Owners requested of him?

13        A.    I really need to clarify.

14             After October 31st, I had -- of 2016, I

15   had no involvement in this case whatsoever.

16   Because it stayed with my prior firm.

17             So I realize now, after a half an hour

18   of questioning, that we keep going to

19   December 20th, but I wasn't involved after

20   October 31st.  And so up until the day I left

21   Fisher Rushmer -- now I can answer that question.

22   And what was it, again?

23        Q.    I'll actually let you clarify all that

24   prior testimony.

25             You have no personal knowledge with

Madison Cawthorn v. Auto-Owners Insurance                 Jamie Billotte Moses  |  8/10/2017

Page  29

1    respect  to  the  events  that  happened  on  this  claim

2    between  October  31,  2016,  and  December  20,  2016?

3          A.    The  only  thing  I'm  aware  of  is  Mr.  Corso

4    asked  me  about  a  hearing  he  was  invited  to  attend,

5    and  he  wasn't  really  aware  of  what  the  hearing  was

6    about  and  how  we  should  handle  it,  and  that's  when

7    I  immediately  --  I  think  that's  when  I  filed  my

8    notice  of  non-representation  because  things  were

9    still  going  on.    That's  the  only  thing  I  am  aware

10   of  is  that  hearing  that  he  was  supposed  to  attend.

11         Q.    And  your  substantive  involvement  with

12   the  Cawthorn  versus  Ledford  matter  ended  on

13   October  31st,  2016?

14         A.    Yes.

15         Q.    I'm  just  trying  to  clarify.

16         A.    Yeah,  yeah,  yeah,  yeah.

17         Q.    You  made  a  point  and  now  I'm  trying  to

18   make  it  nice  and  clear.

19         A.    Yeah.    Although  I  played  little-to-no

20   role  in  all  of  the  settlement  discussions.    So

21   substantively  I  stopped  quite  a  bit  back  from

22   October.    But  October  31st  was  my  last  date  at

23   Fisher  Rushmer,  and  Auto-Owners  was  a  Fisher

24   Rushmer  client.

25         Q.    During  your  involvement  in  defending

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

                                                              Page 30

1    Brad Ledford, did Bradley do everything that
2    Auto-Owners requested of him, to your knowledge?
3            A.   Oh, yeah.
4                 MR. VILMOS:   Object to the form.
5            A.   Yes.
6    BY MR. BONNER:
7            Q.   So during the period of time that you
8    represented him, Bradley answered all the discovery
9    he was asked to answer by Auto-Owners?
10           A.   He -- well, we need to be clear.  I mean
11   Auto-Owners didn't ask him to answer discovery;
12   that would have come from me.  So Bradley did
13   everything I asked of him.
14           Q.   Did Auto-Owners ask Bradley to do --
15   well, strike that.  I don't want to get into a
16   privilege.
17                You're not aware of anything he did that
18   was uncooperative with Auto-Owners?
19           A.   I'm not aware.
20           Q.   And, as you said, he did everything you
21   asked him to do?
22           A.   Yes.
23           Q.   So you're of the opinion that Bradley
24   assisted you with the defense when he was asked to
25   do something?

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                          Page 31

1          A.   Yes, he was engaged in his defense of

2    himself.

3          Q.   And he never interfered with your

4    ability to present his defense?

5          A.   No.

6          Q.   And did Auto-Owners ever alert you that

7    it needed Bradley to be more cooperative in some

8    aspect?

9               MR. VILMOS:   Object to the form.

10         A.   No.

11   BY MR. BONNER:

12         Q.   And it never sent you some sort of

13   notice saying Bradley's doing this and we need him

14   to do something different?

15         A.   No.

16         Q.   I don't want you to reveal privilege.

17         A.   Okay.

18         Q.   So if you don't feel you can answer this

19   question without doing so, just tell me.

20         A.   Okay.

21         Q.   Had Auto-Owners told you that Bradley

22   had done something that potentially violated his

23   policy, is that something you would have

24   communicated to Bradley?

25              MR. VILMOS:   Object to the form.  It

Page 32

1           creates a hypothetical.

2      BY MR. BONNER:

3           Q.    If you can answer it.

4           A.    It is hypothetical, because that was

5      never said to me by Auto-Owners, but, of course, I

6      would have to tell my client if he was doing

7      anything which would jeopardize his insurance

8      coverage for this claim.  But that's not a factual

9      reality in this case.

10          Q.    Well, right.

11                During the course of your involvement on

12     the claim, Auto-Owners never told you that Bradley

13     was doing something that jeopardized his coverage

14     under the policy?

15                MR. VILMOS:  Objection.  Leading.

16          A.    Correct, Auto-Owners did not.

17     BY MR. BONNER:

18          Q.    I think you told me this earlier.  I

19     think you said it in response to different

20     questions, but I'll restate it here.

21                Mick Callahan, Bradley's personal

22     lawyer, was the lawyer primarily involved in all

23     settlement discussions with Mr. Kalbac?

24          A.    Yes.

25          Q.    Auto-Owners never informed you that it

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 33

1    viewed Mr. Callahan's conduct as potentially

2    breaching the policy's duty to cooperate, did it?

3         A.   No.

4         Q.   And Auto-Owners never told you that it

5    viewed Mr. Callahan's conduct as potentially

6    violating the policy's consent to settle clause?

7         A.   No.

8         Q.   In your experience as an attorney, I

9    assume there's been other cases where an insured is

10   defended under the policy yet retains a personal

11   lawyer, as Bradley did here with Mick Callahan?

12        A.   Yes, I have had to work with personal

13   counsel before.

14        Q.   You said you've had to work.  I hope

15   it's not always onerous.

16        A.   No, it's not always onerous.

17        Q.   Once again, the policy afforded coverage

18   to Bradley up to $3 million.  I don't think that's

19   in dispute in this case.

20             But anything above $3 million would be

21   extra-contractual liability?

22             MR. VILMOS:  Objection.  Compound.

23        A.   Well, I think it also covers

24   Mr. Ledford's business, not just Bradley --

25

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

```
                                                      Page 34
  1   BY MR. BONNER:
  2          Q.    That's true.
  3          A.     -- and the policy limits are what the
  4   policy limits are.
  5          Q.    When an insured person faces liability
  6   in excesses of policy limits, I've seen excess
  7   letters that have been sent out before.  Do you
  8   know what an excess letter is?
  9          A.    I don't know what -- these aren't the
 10   facts of this case.  I don't know what you mean by
 11   an excess letter, and I want to make sure I'm not
 12   answering questions about something I'm not sure
 13   what you mean.
 14          Q.    That's totally fine, and you're right;
 15   it's not a fact in this case.
 16              Actually, the next question I wanted to
 17   ask you is:  Are you aware of an excess letter
 18   having been sent to Bradley Ledford?  So let me
 19   back that out.
 20              Are you aware of any correspondence that
 21   Auto-Owners sent to Bradley that informed him that
 22   he potentially faced liability in excess of
 23   $3 million?
 24          A.    I'm not -- I'm not aware of something
 25   like that --
```

Page 35

1      Q.    Okay.

2      A.    -- meaning I just -- I haven't seen it,

3    and I don't think it's in my file at Fisher

4    Rushmer.

5      Q.    And there was a purpose for me asking

6    you that which is:  In the letters I've seen,

7    typically what's written is you face excess

8    exposure.  If you want to speak to a lawyer about

9    that, you know, that's one of your options.  And in

10   this case -- strike that.

11          Well, what I want to ask you is:

12   Mr. Callahan was performing that function in this

13   case?

14     A.    I don't -- I can't say that.  I don't

15   know if someone wrote a letter like that and that's

16   why he was hired.  I have no idea.  It could have

17   gone to Mr. Ledford.  I don't know.

18     Q.    And that's actually an assumption I

19   wasn't asking -- I don't want you to make.  I

20   understand it could have been sent to someone else

21   and not to you.

22     A.    No, I meant someone other than Bradley.

23   It could have been sent to his father as the

24   primary policyholder.

25     Q.    Sure, sure.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

```
                                                    Page  36
 1               What I'm really driving at is

 2     Mr. Callahan's responsibility in part involved

 3     representing Bradley Ledford with respect to his

 4     extra-contractual liability.

 5               MR. VILMOS:  Object to the form.

 6          A.   I don't know.  I didn't see an

 7     engagement letter.

 8     BY MR. BONNER:

 9          Q.   Sure.

10               But when matters of extra-contractual

11     liability were raised to you -- for example, to

12     Mr. Kalbac in his demand letter -- you did not

13     involve yourself in those letters?

14          A.   I don't even know what demand letter

15     you're talking about.

16          Q.   Then I really should show you a letter.

17          A.   Yeah.

18               (Plaintiff's Exhibit 96 was marked for

19          identification.)

20     BY MR. BONNER:

21          Q.   We'll mark this one as Exhibit 96.

22               Do you recall receiving Exhibit 96?

23          A.   I recall the email from Mr. Callahan,

24     yes.

25          Q.   And it discusses a proposed settlement
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 37

1    and assignment agreement from Mr. Kalbac?

2         A.    It discusses that, yes.

3         Q.    And you received this email that's

4    reflected in Exhibit 96 on August 8, 2016 -- on or

5    about --

6         A.    Yeah.

7         Q.    -- this date, August 8, 2016?

8         A.    Yes.

9         Q.    With respect to the --

10        A.    My only concern is it appears I

11   forwarded it Tuesday morning at 3:00 a. -- or

12   11:00 a.m.  So that may have been when I actually

13   got it.  I don't know why.  So...

14        Q.    Right.  And I'm not trying to trip you

15   up on the date.  You got it.

16             Really, all I'm getting at is:  At one

17   point in time, I guess, in this case, Mr. Kalbac

18   forwarded a settlement proposal that included

19   Bradley Ledford that contemplated liability above

20   $3 million?

21        A.    Well, it appears he forwarded it to

22   Mr. Callahan who then forwarded to Mr. Orr and

23   myself.

24        Q.    That's fair.  Sure.

25             But regardless, the proposal was not for

Page 38

1   Mr. Callahan or for you; it was ultimately for

2   Mr. Ledford?

3          A.    Which Ledford?

4          Q.    Bradley.

5          A.    Let's see.

6          Q.    Well, it might have been actually to

7   both Bradley and Bob Ledford RV.

8          A.    I haven't read this -- you know, this is

9   a year ago.  But it looks like they're offering Bob

10  Ledford something -- or requesting that Bob Ledford

11  get out of the case for 3 million.  I don't see

12  anything with respect to -- or a specific number

13  with respect to Bradley.

14         Q.    Right.

15               And I apologize because this email that

16  I've shown you doesn't have the attachment.

17         A.    Right.

18         Q.    I do have, I think, in here that

19  agreement.  I'm happy to show it to you, but let me

20  see if I can ask you a question that doesn't

21  require you or you can answer --

22         A.    Okay.

23         Q.    -- just to save the paper and the time.

24         A.    Okay.

25         Q.    Were you ever made aware of a settlement

Page 39

1    demand that was made by Mr. Kalbac that involved

2    liability in excess of $3 million?

3          A.   I don't even think -- and I could --

4    when I got this email, I don't believe I even read

5    Kalbac's letter in detail because of the way

6    Mr. Callahan worded his email.  You know -- I know

7    you-all have how I responded, and I immediately

8    responded the way I did.  I -- I can't even tell

9    you, as I sit here today, what Mr. Kalbac's letter

10   said specifically.

11         Q.   That's fair.

12              And, as you said, I have a letter here.

13   We'll go ahead and admit this, because I think it

14   corresponds to what you just said --

15         A.   Okay.

16         Q.   -- where you wrote to Ms. McLean on

17   August 11 of 2016 -- I've got one for you here.

18   Well, let me stop.

19              Let me know when you've finished reading

20   that letter.

21         A.   Okay.

22         Q.   And what is that letter?

23         A.   There's something in between here,

24   because I believe I wrote Mr. Callahan almost -- or

25   very quickly.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                        Page 40

1           But this is a letter to Pamela McLean,

2    who I dealt with at Auto-Owners, advising her that

3    there were settlement discussions going on and that

4    I asked Mr. Callahan and Mr. Holcomb, who

5    represented Bob Ledford's RV, to contact her to

6    address the settlement offer.

7           Q.   And the purpose of doing that was to

8    exclude yourself from having to be involved in the

9    settlement negotiation?

10          A.   Yes, because -- what was presented based

11   on what Mr. Callahan presented involved many

12   scenarios.  It wasn't just Joe coming to me and

13   saying, Hey, we'll take X million to go away.  That

14   I could have presented.  It wasn't that.  There

15   were a bunch of other contingencies just based on

16   what Mr. Callahan said, and I did not feel I could

17   be involved as insurance defense retained counsel.

18          Q.   Right.

19          Because you have a fiduciary duty to

20   Auto-Owners on the one hand and one to Bradley

21   Ledford on the other, and in this proposal those

22   two interests were in conflict?

23          MR. VILMOS:  Objection.  Leading.

24          A.   I just -- it was too convoluted, you

25   know.  You get settlement demands that say we'll

Page 41

1    take X-amount and you just pass -- not just pass

2    them on, but you pass them on for the insurer to

3    evaluate.  I remember this one having "if this,

4    then that; if not this, then that."  You know what

5    I mean?  Just too much.

6                 (Plaintiff's Exhibit 97 was marked for

7         identification.)

8                 (Plaintiff's Exhibit 98 was marked for

9         identification.)

10   BY MR. BONNER:

11        Q.   And you referred to something missing.

12             I'm going to show you Exhibit 98.  This

13   is a letter dated on the same day.  Can you

14   identify Exhibit 98 for me?

15        A.   Yeah, it's a letter from me, dated

16   August 11, to Mick Callahan and John Holcomb.

17        Q.   Is this the letter that you were

18   referring to a moment ago when you said there was

19   an additional letter on that date?

20        A.   Yes.

21        Q.   And you can just confirm for me with

22   both -- I think you have 97 and 98 in front of you.

23   Those are both accurate representations of the

24   letter that you sent?

25        A.   Yes.

Page 42

1     Q.    Okay.  Thank you.

2     A.    I still -- I don't -- never mind.

3     Q.    Was there anything inappropriate with

4   Bradley retaining personal counsel in this case?

5     A.    No, no.

6     Q.    Based on your observations, did

7   Mr. Callahan ever fail to cooperate with

8   Auto-Owners in any requests that you're aware of?

9     A.    I'm not aware of any requests from

10  Auto-Owners to Mr. Callahan to be able to answer

11  that question.

12    Q.    That's fine.

13          Did you ever observe any conduct by

14  Mr. Callahan that impeded your ability to defend

15  Bradley?

16    A.    Did I observe any conduct by

17  Mr. Callahan --

18    Q.    I can make that a better question.

19    A.    Okay.

20    Q.    Did Mr. Callahan ever impede your

21  ability to defend Bradley?

22    A.    As I mentioned earlier, I do feel there

23  were times that things that were discussed amongst

24  defense counsel and even defendants was relayed to

25  Mr. Kalbac through Mr. Callahan, or at least it was

Page 43

1  incredibly coincidental.  So there were times when

2  I was concerned what was being relayed to

3  plaintiff's counsel.

4      Q.   Can you --

5      A.   Can't give you an example.

6      Q.    -- give me a specific example?

7      A.   I can't -- I just know there were times

8  when I was like, Wow, whose team is he on?  But I

9  just -- I can't remember.  I just remember feeling

10  that way.

11      Q.   Okay.  It would be important just

12  because of how my case is progressing if you can

13  recall at some point during this deposition a

14  specific instance --

15      A.   And give it to you.

16      Q.   Yes.

17      A.   I'll try.

18      Q.   If you can.  And if you cannot --

19      A.   Yeah, just...

20          I feel like I got an email from Joe that

21  said:  It has come to my attention that you plan to

22  do XYZ, and I was like:  Wow, how do you know

23  that's what we planned to do, but I can't remember

24  what it was.

25      Q.   Did Auto-Owners ever communicate a view

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                              Page 44

1    to you that Mr. Callahan had done something

2    inappropriate during the defense of this case?

3         A.    No.

4         Q.    Did Auto-Owners ever alert you to its

5    view that Mr. Callahan's conduct on behalf of

6    Bradley Ledford was a breach of one of the policy's

7    provisions?

8              MR. VILMOS:  Asked and answered.

9              You can answer it again.

10        A.    I don't know if Auto-Owners ever had

11   that view.  And you said, "Did they ever

12   communicate its view?"  So, no.  I don't know if

13   that was how they felt, and they didn't tell me

14   that.

15   BY MR. BONNER:

16        Q.    Right.  Okay.

17              I said:  Did they ever communicate its

18   view, because recently we had testimony in another

19   case that discussed, you know, several breaches

20   that Auto-Owners now contends to place in the

21   period of time in which you represented

22   Mr. Ledford.

23        A.    In another case?

24        Q.    In this case.

25        A.    Oh, in this case.  Well, I'll not aware

Page 45

1    of that, so...

2         Q.   Right.

3              And my question is -- I am.  So when I

4    asked the question:  Did Auto-Owners communicate to

5    you that Bradley Ledford had breached the policy in

6    some way during your time representing him, I'm

7    just searching to see if they ever communicated

8    that view to you.

9         A.   No, sir.

10        Q.   I've got to ask these questions.

11        A.   Sure.

12        Q.   Do you have any cases currently with

13   Auto-Owners?

14        A.   No, sir.

15        Q.   How many cases have you been retained by

16   Auto-Owners in the course of your career, if you

17   can --

18        A.   This was my only one.  Auto-Owners works

19   predominantly with Dawson Orr in the State of

20   Florida.

21        Q.   So apart from the Cawthorn-Ledford

22   matter, you've never been retained by Auto-Owners

23   in another case?

24        A.   Correct.

25        Q.   While you were representing Mr. Ledford,

Page 46

1   did Auto-Owners ever give you instructions about

2   what to do in terms of exploring settlement

3   opportunities?

4        A.   When I was first retained, I was asked

5   to reiterate Auto-Owners' offer to pay the policy

6   limits.  It was very early on, and it was rejected

7   very early on.

8        Q.   I'm going to try and make your life easy

9   by --

10        A.   It would take more than this depo, my

11   friend.

12             (Plaintiff's Exhibit 99 was marked for

13        identification.)

14   BY MR. BONNER:

15        Q.   Here, I'm going to show you what I'll

16   mark as Exhibit 99.  If you can identify Exhibit 99

17   for me, please do.

18        A.   Sure.

19             I can't -- it looks like it came from

20   Mick Callahan's file, because he's directing

21   someone to add it to correspondence.  But in that

22   is an email from me to Mick that said:  I just

23   wanted to let you know I spoke with plaintiff's

24   counsel, and he confirmed he is not accepting the

25   tender.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

Page 47

1      Q.   First of all, the email reflected in

2    Exhibit 99 that's dated August 18, 2014, at

3    2:04:12 p.m., that's an email you authored;

4    correct?

5          A.   Yes, sir.

6      Q.   And on or about August 18, 2014,

7    Mr. Kalbac and you had a conversation in which he

8    rejected the $3 million settlement offer?

9          A.   I don't think it was verbal.  I think

10   there's an email exchange.  Maybe I'm -- no, I just

11   spoke.  I'm sorry.  I said I spoke with plaintiff's

12   counsel.

13             I feel maybe I emailed him tendering it,

14   and maybe he called me and said, no.

15     Q.   That's fine.

16         A.   And if it says "I spoke," I spoke with

17   him, because I'm pretty precise.

18     Q.   Fair enough.

19             I'm really more concerned about the

20   date.

21             Do you agree that the date of the

22   communication you had with Mr. Kalbac in which he

23   rejected the settlement offer was on or before

24   August 18, 2014?

25         A.   It would be on or before August 18th.

Page 48

1        Q.   Once again, I asked you the question.   I

2    was trying to make it easier on you for the dates,

3    because I can appreciate that this is hard.   I'm

4    going to take these exhibits.   Just let me know if

5    you need anything back.

6        A.   Sure, sure, sure.

7        Q.   So apart from the instructions you

8    received from Auto-Owners to convey the settlement

9    offer of $3 million in August 2014, Auto-Owners

10   never gave you any further instructions with

11   respect to settlement negotiations?

12       A.   I can't remember.   I really -- I

13   can't -- you know there were discussions at

14   mediation, which I believe all of that would be

15   protected.   I don't remember -- I don't remember

16   that.

17       Q.   Okay.   Can you confirm that Auto-Owners

18   never instructed you not to explore settlement

19   opportunities for Bradley Ledford?

20       A.   I was not instructed to not explore

21   settlement.

22       Q.   And you're not aware of any

23   communication from Auto-Owners to either

24   Mr. Callahan or Bradley directly instructing either

25   of them not to explore settlement possibilities

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 49

1    with Mr. Kalbac or Mr. Cawthorn?

2         A.    I am not aware.

3         Q.    And Auto-Owners never alerted you that

4    exploring settlement possibilities with

5    Mr. Cawthorn or Mr. Kalbac, in its view, breached

6    the cooperation clause of the policy?

7              MR. VILMOS:   Asked and answered.

8         A.    No.

9              (Plaintiff's Exhibit 100 was marked for

10             identification.)

11   BY MR. BONNER:

12        Q.    I know that this is -- you're having to

13   conjure up things that happened years and years

14   ago.  So I'm going to show you this exhibit, which

15   we'll mark as 100.  And I only have a couple

16   questions about it.  There you are.

17             Let me give one to you, Peter.

18             This is a letter from Mick Callahan to

19   you on or about June 26, 2015.

20        A.    I have to say, I have a real problem

21   with what's been produced from Mr. -- I assume this

22   came from Mr. Callahan.  It didn't come from my

23   file --

24        Q.    It does not appear to have come --

25        A.    -- and includes Mr. Ledford, Mr. Holcomb

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                              Page 50

 1    Mr. Orr, and Bradley Ledford.

 2              I am not aware of Mr. Ledford waiving

 3    any sort of privileges in this case, and I can't

 4    even believe this was produced let alone I'm going

 5    to be asked about it.  I'm really uncomfortable

 6    with that.

 7         Q.   That's fine.

 8         A.   Sorry.

 9         Q.   No, no --

10         A.   I mean you've told me Bradley waived

11    certain ones, and I'm aware that Auto-Owners has

12    waived certain others, but I've never been told

13    Mr. Ledford has waived any privileges -- David

14    Ledford.

15         Q.   David Ledford on behalf of Bob Ledford

16    RV & Marine.

17         A.   Correct.

18         Q.   I don't want you to invade any

19    privilege.

20         A.   Okay.

21         Q.   And insofar as you view that as

22    privileged, we'll move on.

23         A.   Okay.

24         Q.   That's fine.

25         A.   Okay.

Page 51

1          Q.    I'm trying to think of a way of asking

2     this in a way that doesn't cause any privilege

3     concerns.

4          A.    Okay.   Try.

5          Q.    If it does, just tell me --

6          A.    Okay.

7          Q.    -- try again; okay?

8          A.    Okay.

9          Q.    You're not going to offend me.

10               During the course of your representation

11    of Mr. Ledford, throughout that entire period, were

12    there times where you considered settlement

13    opportunities -- considered making a settlement

14    offer?

15               MR. VILMOS:   Objection.   Compound.

16          A.    Yes.

17    BY MR. BONNER:

18          Q.    Did you have discussions with

19    Auto-Owners regarding those occasions where you

20    considered making a settlement offer?

21          A.    I think I can cut to the chase of this

22    without invading privilege.

23               At one point in time, a proposal for

24    settlement was contemplated.   I communicated that

25    to Auto-Owners and was immediately told not to

Page 52

1    pursue that -- not by Auto-Owners but by personal

2    counsel.

3         Q.   And did Auto-Owners ever respond to the

4    proposed settlement offer?

5         A.   They didn't have an opportunity to,

6    because I was immediately told that was not an

7    option anymore.

8         Q.   I suppose you communicated that

9    immediately to Auto-Owners?

10        A.   I believe I called Ms. McLean and said,

11   "Disregard my email."

12        Q.   Thank you.

13             Apart from that occasion, was there any

14   other occasion in which you were involved in making

15   a settlement offer or discussing making a

16   settlement offer to Mr. Cawthorn?

17        A.   Through his counsel Mr. Kalbac?

18        Q.   Through his counsel Mr. Kalbac.

19        A.   I don't -- not until mediation.

20        Q.   Now, with respect to mediation, Bob

21   Ledford RV & Marine was represented by Michael Orr;

22   correct?

23        A.   And Mr. Holcomb.

24        Q.   And Mr. Holcomb; correct?

25        A.   Yes, sir.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                          Page 53

1        Q.   I will represent to you that Mr. Orr's

2   deposition has not taken place -- and I'm not

3   trying to ask you any questions about his work

4   product or anything.

5             He did write a letter that's been

6   produced to us by Auto-Owners that was a

7   premediation letter.

8        A.   Okay.

9        Q.   Okay?  I'll show it to you --

10       A.   Sure.

11       Q.   -- but not because I actually have

12  substantive questions.  I really want to know if

13  you did something on this.  And this has been

14  previously marked as Exhibit 89.  I just have the

15  one copy.

16       A.   You've seen this?

17            MR. VILMOS:  I've seen --

18  BY MR. BONNER:

19       Q.   It was produced by Auto-Owners, but you

20  can show it to him.

21       A.   Did I do a premediation report...

22       Q.   I'll represent to you I haven't seen

23  one, if you had it.

24       A.   Hmm, it's interesting, because that's

25  pretty standard for me.  Unless we decided,

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 54

1    potentially -- the only explanation for that would

2    be because I very much write a premediation

3    report -- that maybe Mr. Orr and I decided that we

4    needed just to send one that was comprehensive.

5              Really, that would be weird if I hadn't

6    done one, but maybe -- maybe it's because Michael

7    and I decided he would do it.

8         Q.   Okay.  I ask you that because

9    Auto-Owners produced to me this report.  I asked if

10   there were any other reports.  I didn't get any

11   other reports.  I've now got the production from

12   your firm.  I didn't see any reports.  So you're

13   the last person I need to query about this.

14        A.   Yeah, yeah, I understand.  Hmm.  It

15   would be odd that I didn't do one.  But maybe

16   again -- maybe that was a let's just have one voice

17   going to Auto-Owners.  I don't know.

18        Q.   I would make a request that if there's

19   anything you can do to identify --

20        A.   Sure.

21        Q.   -- whether you made one or not --

22        A.   I'll look.

23        Q.   If you'd look.  And just send me an

24   email and let me know.

25        A.   Okay.  I'll have to go to Fisher Rushmer

Page 55

1    to access.  But I know they would have produced it

2    if it was in there.  They produced everything else,

3    it seemed like.

4         Q.   I agree.  Like I said, you're kind of

5    the last loose end.

6         A.   Okay.

7         Q.   If you can tie it up for me.  It makes

8    no difference to me one way or the other.  If you

9    did have one, I would want to ask you some

10   questions about it.

11        A.   Sure.

12        Q.   You know, this document, the one that I

13   just showed you that was marked as 89, I believe it

14   does discuss a settlement proposal plan at

15   mediation, and I want to show it to you because it

16   is possible that you did have that conversation

17   with Mr. Orr.

18        A.   Okay.

19        Q.   If you'll look at the bottom of page 12

20   and 13 and just read the paragraph that starts on

21   12 and goes to 13.

22        A.   So start with "Although this report..."?

23        Q.   Yeah, I think so.

24             MR. VILMOS:  What number is that?

25             MR. BONNER:  This is 89.

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

Page 56

1    BY MR. BONNER:

2          Q.    And the only question I have for you

3    with respect to 89 is:  Does that refresh your

4    recollection as to whether or not you did one or

5    two reports?

6          A.    It doesn't.  I'm sorry.  Maybe Michael

7    will -- you said his depo is not being scheduled or

8    it is?

9          Q.    It's scheduled for the 30th of this

10   month.

11         A.    Okay.  Maybe he'll remember, because I

12   always do a mediation report.  But, again, we were

13   working together on this, and maybe I said,

14   Michael, why don't you write it.  I don't think I

15   reviewed it or anything, but I just don't remember.

16         Q.    And I'll represent it's not authored by

17   you --

18         A.    Correct.

19         Q.    -- so.

20               At any rate, I asked you before if you

21   can just try to confirm one way or the other --

22         A.    Sure.

23               Does the cover email suggest I was

24   copied?  Am I in anything on the email?

25         Q.    No, it does not represent that you were

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                              Page 57

1    copied.

2          A.    Okay.

3                MR. BONNER:   How long have we been

4          going?

5                THE VIDEOGRAPHER:   Just about an hour.

6    BY MR. BONNER:

7          Q.    Are you okay?   I'm actually making very

8    good progress.

9          A.    I want to check my phone for one second

10   and make sure my daughter --

11         Q.    Let's take --

12         A.    No, no, there's no text.   We're good.

13         Q.    With respect to the settlement proposal

14   that you rescinded from Auto-Owners, what was the

15   reason that you presented it to Auto-Owners?

16         A.    That is invading into --

17         Q.    Okay.

18         A.    This was a defense discussion with

19   Mr. Ledford and his counsel.   And, again, I don't

20   think he's waived anything.

21         Q.    Okay.   As a general matter, when you are

22   retained by an insurance company to defend an

23   insured, is it fair to say you always give notice

24   of the settlement offer to the insurance company?

25   Once again, if you can't answer it --

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 58

1          A.    If I had received a settlement demand,

2     of course, I would give it to the insurance

3     company.   If I'm making an offer as a defendant, it

4     normally comes from the insurance company.

5          Q.    Right.

6                So let me rephrase it so that I capture

7     what you just said.

8          A.    Okay.

9          Q.    In the course of your normal practice as

10    when you defend insureds for an insurance company,

11    do you always seek approval from the insurance

12    company before making a settlement proposal to the

13    claimant?

14         A.    Oh, of course.

15         Q.    Okay.   Thank you.

16               And why do you do that?

17         A.    Because they're paying it.

18         Q.    And, in fact, you're obligated, correct,

19    to get their authorization before making a

20    settlement proposal on behalf of the insured?

21               MR. VILMOS:   Object to the form.

22         A.    Obligated, it depends if you mean

23    ethically or professionally, but you need to get

24    the permission of the person who would be writing

25    the check to be able to offer the amount they'd be

Page 59

1  writing the check for.

2  BY MR. BONNER:

3      Q.    Thank you.  I think that's all I need to

4  know.

5          After Auto-Owners retained you, I

6  believe it requested that you prepare an initial

7  report; correct?

8      A.    Yes.

9      Q.    And I think that was on one of the

10 documents that we've already admitted.

11     A.    The request was or the -- because I know

12 the report hasn't been produced.

13     Q.    No, not yet, but I'll show it to you in

14 a minute.

15     A.    Okay.

16     Q.    I'm showing you Exhibit 94.

17          Exhibit 94 is an email chain.

18     A.    Uh-huh.

19     Q.    Can you confirm that there's an email to

20 you from Ms. McLean?

21     A.    Yes, on August 7th.

22     Q.    Thank you.

23          And that August 7th email, will you

24 confirm that on or about August 7, 2014, Ms. McLean

25 asked you to provide her with an evaluation on

```
                                                  Page 60
 1    liability and damages?

 2         A.    Yes.

 3         Q.    This was an initial evaluation?

 4         A.    Mm-hmm, mm-hmm.

 5         Q.    Based solely on the information you had

 6    at the time that this request was made?

 7         A.    Yes.

 8              (Plaintiff's Exhibit 101 was marked for

 9         identification.)

10    BY MR. BONNER:

11         Q.    Okay.  I'm going to show you something

12    that we'll mark as Exhibit 101.

13              Can you identify Exhibit 101 for me?

14         A.    It starts as an email from me on

15    August 14th to Pamela, and then her response.

16         Q.    Okay.  The subject matter of

17    Exhibit 101 --

18         A.    -- is Ledford.

19         Q.    -- is the Ledford.

20              But your inquiry to Ms. McLean is,

21    quote, "What is the status of the automobile

22    involved in the accident?"

23         A.    Yes, yes, that's what I asked.

24         Q.    I believe you were later advised that

25    the car was destroyed?  If you recall.
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

```
                                                     Page 61
 1          A.   Well, she wrote back, "I believe it has

 2    been destroyed."

 3               (Plaintiff's Exhibit 102 was marked for

 4          identification.)

 5    BY MR. BONNER:

 6          Q.   And I'm going to show you another

 7    email -- and you can keep that one in front of you,

 8    just in case you need to refer to it for any

 9    reason.

10               We'll mark this email as 102.  This is

11    an email chain between you and Ms. McLean that

12    begins on August 18th and concludes on August 20,

13    2014.

14               Can you identify Exhibit 2 for me?

15          A.   Beyond what you just said it was?

16          Q.   Can you confirm that you received and/or

17    sent the messages on Exhibit 102?

18          A.   I believe I sent that email, and she

19    told me to go ahead, and I said thank you.

20          Q.   Item 3 on the email dated August 18,

21    2014, do you agree it states that, "Based on what

22    you reported to me, the car was destroyed; but in

23    the event it is not, an inspection of it would be

24    wise"?

25          A.   That's what I wrote.
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                            Page 62

1          Q.   In connection with your defenses that

2     you prepared for Bradley, one of the defenses that

3     you identified was a defense of comparative fault?

4          A.   Mm-hmm.

5          Q.   Is that yes?

6          A.   Yes.  Yes.

7               I should know better.

8          Q.   It's all right.

9               This defense was based on testimony of

10    Bradley Ledford that Mr. Cawthorn had his feet on

11    the dashboard of the vehicle?

12         A.   Well, it wouldn't be testimony because

13    there would be no depos by this time.

14         Q.   Strike that.

15              The defense of comparative fault in

16    August of 2014, as you understood it to be, was

17    based on the notion or theory that Mr. Cawthorn had

18    his feet on the dash of the vehicle, in part?

19         A.   Well, I just want to make sure.  I don't

20    think Bradley has waived any privilege with respect

21    to me.

22         Q.   That's true.

23         A.   So I need to know if I know that through

24    a source other than Bradley, and I believe I do; so

25    I can answer that.

Page 63

1              Yes, the comparative was based upon his

2       feet being on the dash and him going to sleep and

3       reclining back.

4              Q.    And --

5                    MR. VILMOS:   Him who?

6                    THE WITNESS:   Madison Cawthorn.

7       BY MR. BONNER:

8              Q.    If you'll give me one moment.

9              A.    Sure.

10                   (Plaintiff's Exhibit 103 was marked for

11             identification.)

12      BY MR. BONNER:

13             Q.    Okay.  Now would be an opportune time

14      for me to give you Exhibit 103, which is the

15      initial report dated August 26, 2014.

16             A.    Okay.

17             Q.    Can you confirm that the exhibit in

18      front of you marked 103 is a report that you

19      authored?

20             A.    It looks like my initial report and my

21      signature.

22             Q.    Okay.  If you turn to page 3, above

23      the -- or second paragraph --

24             A.    Yes.

25             Q.    -- it's discussing a theory of

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                        Page 64

1    comparative negligence on behalf of Mr. Cawthorn;

2    correct?

3          A.   Well, I'm -- yeah -- I don't actually

4    say "comparative" in there.  I just discuss what

5    some of the doctors said about Madison.

6          Q.   Right.

7               And really what I'm driving at is, as of

8    August 2014, one of the defenses you are

9    investigating was a defense -- and correct me if I

10   misstate -- that Mr. Cawthorn had his feet up on

11   the dashboard of the vehicle at the time of the

12   collision, that his seat was reclined, and that the

13   impact of the airbag contributed to his injury?

14         A.   Yes.  I believe he described it himself

15   as being twisted like a pretzel -- Madison did.

16         Q.   Mr. Cawthorn did?

17         A.   Mr. Cawthorn did, so yes.

18         Q.   Right.

19              So he had three potential elements that

20   were relevant to that defense, at least three.

21              One, that the seat was reclined; true?

22         A.   True.

23         Q.   One, Madison Cawthorn's feet were on the

24   dashboard; correct?

25         A.   Yes.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 65

1        Q.    And another element was that the airbag

2   deployed, I guess, underneath Madison's feet?

3        A.    Yes, but I don't -- yes.

4        Q.    Okay.  All right.  So you still have

5   those documents in front of you.

6              When you wrote to Ms. McLean your email

7   saying if the vehicle is still available -- and I'm

8   paraphrasing -- it would be wise to inspect it?

9        A.    Yes.

10       Q.    I believe it's Exhibit 102.

11       A.    Uh-huh.

12       Q.    Do you have 102 in front of you?

13       A.    Yes.

14       Q.    Bradley was later deposed -- I don't

15  remember if it was 2015 or 2016.  But in his

16  deposition, he recalled the airbags deployed;

17  correct?

18       A.    I believe so, yes.

19       Q.    And there was an accident report in this

20  case, which I have here as Exhibit 6.  I'll show it

21  to you, previously marked.

22              And do you recall reviewing the accident

23  report in this case?

24       A.    Yes.

25       Q.    Did you observe the notation on the

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

Page 66

1   accident report under Madison Cawthorn's name as

2   the passenger that stated that the airbag did not

3   deploy?

4        A.   I remember reading that and -- yes.

5        Q.   So I guess there was an inconsistency

6   between the accident report and what Mr. Ledford

7   would later testify to?

8        A.   Yeah, but I think the officer testified

9   that she just couldn't tell because it was so

10  burned up or something.  I think there was some

11  logical explanation.

12       Q.   I think that the vehicle was completely

13  burned out.  That was what you understood; correct?

14       A.   It was pretty -- pretty bad.

15       Q.   My point is when you made the request to

16  inspect the vehicle, was it in part to get the data

17  from the black box recorder?

18       A.   Wow, I really don't know what any of

19  this has to do with this subsequent lawsuit, but I

20  don't think I'm going to discuss what was in my

21  mind in planning the defense for my client.

22       Q.   That's fine.

23            I said before I don't want to get into

24  an area where -- and if you claim a privilege,

25  that's fine.  We'll claim a privilege.

Page 67

1          A.    Okay.

2          Q.    Based on Exhibit 6, 2014, do you agree

3    that you cannot rule out that the airbag did not

4    deploy, based on Exhibit 6?

5               MR. VILMOS:   Object to the form.

6          A.    Can I agree it cannot -- can't rule it

7    out.  If we only had Exhibit 6, I would think you

8    couldn't rule it out.  I think after her testimony

9    you could rule it out and all the witnesses you

10   could rule it out.

11   BY MR. BONNER:

12         Q.    Now, if you could confirm with the black

13   box recorder that the airbag deployed and that the

14   accident report notation was incorrect, would that

15   be evidence that would have been helpful to Bradley

16   Ledford's defense?

17               MR. VILMOS:   Objection.  It calls for a

18         hypothetical.

19         A.    I lost my microphone -- sorry, sorry.

20               Say that again.  If I could confirm

21   what?

22   BY MR. BONNER:

23         Q.    Let me see if I can say it more simply.

24               Do you agree that if the black box

25   recorder confirmed that the airbags had, in fact,

Page 68

1   deployed that that would confirm Bradley Ledford's

2   testimony?

3        A.   That would be one piece of evidence that

4   confirmed Bradley Ledford's testimony.  But I

5   believe several witnesses confirmed Bradley

6   Ledford's testimony.

7        Q.   And Mr. Kalbac, in his conversations

8   with you, did he ever relay to you his theory that

9   Mr. Ledford was not being truthful?  And I'm not

10  asking you to opine upon the strength of this case.

11  I just want --

12       A.   No.  Mr. Kalbac made it clear at every

13  opportunity -- to the point of mama bear getting

14  defensive for my client -- that he did not believe

15  my client, to the point of being inappropriate in

16  depos.  So, yes, he conveyed every chance he could

17  that he did not believe my client.

18       Q.   And the only reason I conjured up these

19  things, which is not to get back to those

20  depositions which I know you don't want to

21  relive --

22       A.   I do not.

23       Q.   -- but the expectation was if this case

24  went to trial, there was going to be a dispute --

25  maybe a winning one, maybe a losing one -- about

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 69

1    Mr. Ledford's testimony?

2          A.    Yes -- about the airbag?

3          Q.    About the airbag.

4          A.    Yeah, I believe that that --

5          Q.    There was going to be --

6          A.    There was going to be a suggestion that

7    the airbags did not go off.  I don't think it would

8    be one that would be accepted by the jury.

9              I mean Maddy said himself that the

10   airbags pushed his legs the way they did.  So I

11   think that would be hard to get around, but --

12         Q.    There was going to be a dispute in the

13   trial, as far as you can tell from your discussions

14   with Mr. Kalbac, about whether or not the airbags

15   deployed?

16             MR. VILMOS:  Objection.  It misstates

17       the testimony.

18         A.    I've got to be honest with you.  It's

19   not like Joe and I sat down and he's like I think

20   Bradley's a liar and dah-dah dah-dah dah.  It's

21   just the way he asked questions in depositions you

22   could tell that that was an issue -- was to at

23   every opportunity challenge Bradley's credibility.

24   BY MR. BONNER:

25         Q.    And there was another issue, I guess,

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                                    Page 70

1    with respect to the vehicle not related to the

2    airbag about its collision with the concrete

3    barrier alongside the highway.

4         A.    Yes.

5         Q.    In addition to potentially downloading

6    black box data, would the vehicle have had physical

7    markings that would have allowed you to assess the

8    impact of the vehicle with the concrete barrier?

9         A.    Would a vehicle that hit a concrete

10   barrier have markings?  Of course.

11        Q.    And had you had access to those

12   markings, you would have provided them to your

13   accident reconstruction expert?

14        A.    Yeah.  They did have pictures, though.

15   I think the pictures were pretty good.

16        Q.    There were definitely pictures that

17   Mr. David Ledford took?

18        A.    I think others took them too.

19        Q.    If you have --

20        A.    No, no, no.  I mean you've seen the

21   pictures.  But one of the witnesses testified that

22   he's the one that went to the lot and took

23   pictures.

24        Q.    I think that was --

25        A.    Yeah, there was someone, because he went

Page 71

1   to get a suitcase or something.

2          Q.    My understanding was that David Ledford

3   had an employee or something --

4          A.    Maybe, yeah.

5          Q.    -- who took a picture.  But,

6   unfortunately, my knowledge is very much

7   secondhand; so don't take my word on it.

8          A.    Okay.

9          Q.    And, to your knowledge, can you recall

10  any other source of photographs?

11         A.    I think one of the -- a couple witnesses

12  took pictures.

13         Q.    At the scene?

14         A.    Yeah, so --

15         Q.    The pictures that you had you supplied

16  to your accident reconstruction expert?

17         A.    Of course.

18         Q.    And the theory was -- and I don't think

19  this goes into a privilege because I think it was

20  stated in the pleadings, but correct me if I'm

21  wrong.

22              The theory was that the positioning of

23  the concrete barriers was inappropriate?

24         A.    The fact of where they were, not

25  necessarily were they in a straight line or were

Page 72

1    they angled but the fact of where they were on the

2    property, yes, was inappropriate.

3         Q.   So the theory was that the construction

4    company responsible for the placement of the

5    concrete barriers was negligent in placing them

6    where they were?

7         A.   Yes.

8         Q.   And had the construction company not

9    negligently placed the concrete barriers where they

10   were, the accident wouldn't have been as bad?

11        A.   I don't think the accident would have

12   happened.

13        Q.   Okay.  So the defense was, had the

14   construction company not negligently placed the

15   concrete barriers where they were, there would not

16   have been an accident?

17        A.   Correct.

18        Q.   If there was no accident, Mr. Cawthorn

19   would not have sustained any injuries?

20        A.   Correct.

21        Q.   So this was a defense that would have

22   either reduced or relieved Mr. Ledford from

23   liability?

24        A.   Correct.

25        Q.   And had the car been available, had it

Page 73

1    been available, it would have been something that

2    your accident reconstruction expert looked at in

3    connection to this defense?

4         A.   Actually, no.  With respect to the

5    placement of the concrete barriers, the car is

6    irrelevant.

7         Q.   Did you view the negligence of the

8    construction company as being both a complete

9    defense to liability and potentially a situation

10   where there would be comparative fault?

11             MR. VILMOS:  Objection.  Form.

12        Compound.

13        A.   Comparative.

14   BY MR. BONNER:

15        Q.   Well, diminished like a Fabre sort of

16   situation.

17             And I told you before, I'm not very good

18   with this personal injury stuff.

19        A.   Well, they wouldn't be Fabres because

20   they were parties that were in there.  I believe

21   that that was definitely something that would have

22   reduced Bradley's and Mr. Ledford's exposure in

23   this case.

24        Q.   Right.  That's what I was getting at.

25             In the event that it was not a complete

Page 74

1    defense, it was something that could potentially

2    diminish Bradley Ledford and Bob Ledford RV &

3    Marine's damages to Mr. Cawthorn?

4         A.   Yes.

5         Q.   Okay.  In the course of your 24 years of

6    practice, when you've been retained to defend an

7    insured in an automobile accident, is it typical

8    for you to inspect the vehicle?

9              MR. VILMOS:  Object to the form,

10        "typical."

11        A.   Me personally, no.

12   BY MR. BONNER:

13        Q.   Well, not you personally but perhaps the

14   habit to investigate it.

15        A.   It really depends on the facts of the

16   case.

17        Q.   Do you agree that the airbags should

18   have deployed in an accident such as this one?

19             MR. VILMOS:  Object to the form.

20        A.   Oh, I really can't speak to that.  I

21   don't know velocities and -- I don't know at what

22   time an airbag is supposed to go off.  I would

23   really be out of school answering that.

24   BY MR. BONNER:

25        Q.   That's fair.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

```
                                                    Page  75

 1              But  for  things  like  velocity,  that

 2      information  would  be  contained  in  the  black  box

 3      recorder?

 4           A.    I  have  no  idea.

 5                MR.  VILMOS:   Object  to  the  form.

 6      BY  MR.  BONNER:

 7           Q.    If  there  had  been  evidence  in  this  case

 8      that  the  airbag  mechanism  had  not  deployed  when  it

 9      should  have,  do  you  agree  that  would  be  indicative

10      of  a  defect  in  the  airbags?

11                MR.  VILMOS:   Objection  to  the  form.   It

12               calls  for  a  hypothetical.   It  misstates  the

13               testimony  of  this  case.

14                You  can  answer  the  question  if  you

15               understand  it.

16           A.    And  I  can't  answer  that.

17      BY  MR.  BONNER:

18           Q.    Okay.   Had  there  been  a  potential

19      defense  for  Bradley  that  some  or  all  of  Madison's

20      injuries  were  caused  by  something  the  manufacturer

21      did,  I  assume  you  would  have  pursued  it?

22                MR.  VILMOS:   To  the  extent  this  calls

23               for  her  mental  impressions,  she's  already

24               said  she's  not  going  to  invade  the

25               attorney-client  privilege.
```

Page 76

1          To the extent you can answer, go ahead.

2      A.    It's just such a hypothetical that

3  wasn't considered in this case.  It just -- hadn't

4  even explored a defect with the airbags.

5  BY MR. BONNER:

6      Q.    Were you ever given notice from

7  Mr. Kalbac about an expoliation defense?

8      A.    Oh, expoliation defense.

9      Q.    Expoliation defense.  Thank you.

10          Was that ever discussed by him to you?

11      A.    He brought it up quite a bit.

12      Q.    Did he ever tell you why he thought that

13  the vehicle should have been preserved?

14      A.    I'm sure he did, but I can't remember

15  the specifics right now.  But, you know, Joe

16  thought everything should have been done

17  differently, everything.  So I'm sure he told me

18  many times, but, yeah, I wasn't involved when it

19  was time to make that decision.

20      Q.    And that's clear.  I mean this vehicle

21  was destroyed months before you were retained, I'll

22  represent to you.

23      A.    Okay.

24      Q.    And it's not with respect to something

25  you didn't do.  This would be an issue probably

Page  77

```
 1   with Auto-Owners before you came along.

 2        A.   Sure.

 3             MR. VILMOS:   Object to the form.

 4   BY MR. BONNER:

 5        Q.   I consent to striking all of what I just

 6   said.  I'm just trying to position the witness

 7   where she is.

 8        A.   I've gotcha.

 9        Q.   But do you recall or do you have no

10   recollection, one way or the other, if Joe Kalbac

11   communicated to you his view that there was

12   potentially a product defect in the car?

13        A.   Did Joe communicate product defect --

14   no.  I feel that whenever Joe was talking about the

15   car and where it was was just the inability to even

16   see if there was a defect, not that he thought

17   there was one, just we don't have a car to inspect.

18   See what I'm saying?  There is a distinction.  I

19   don't recall him telling me we think there was a

20   defect in the car.

21        Q.   So he never addressed a specific defect

22   with you?

23        A.   Or even if there was one.

24        Q.   His query, as you understood it, was:  I

25   want to inspect the car as a general matter for a
```

Page 78

1    potential defect?  And if I misspeak, correct me.

2        A.    You know, I -- no.  I got the impression

3    Joe just -- it was just a convenient issue to be

4    able to raise.  You know what I mean?  Like I

5    don't -- he never said to me substantively:  Well,

6    we really think that XYZ was wrong, and we need to

7    know that because that might have been the cause of

8    the accident.

9            It was just they destroyed the vehicle

10   after -- you know, they don't know who destroyed

11   it.  But it was more accusatory than investigative,

12   in my impression.

13            MR. VILMOS:  Mr. Bonner, we've been

14        going about an hour and a half, if you want

15        to take a couple minutes.

16            MR. BONNER:  We can do whatever you

17        want.  I can keep going.  Do you need a

18        break?  We can take a break.

19            MR. VILMOS:  Let's take a couple

20        minutes.

21            THE VIDEOGRAPHER:  Going off the record.

22        The time is 2:29.

23            (Break from 2:30 p.m. to 2:34 p.m.)

24            THE VIDEOGRAPHER:  Back on the record.

25        The time is 2:33.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 79

1   BY MR. BONNER:

2        Q.    Well, the good news is, Ms. Moses, I can

3   lose some of these exhibits --

4        A.    Okay.

5        Q.    -- but I do have a quick question.

6        A.    Sure.

7             (Plaintiff's Exhibit 104 was marked for

8             identification.)

9   BY MR. BONNER:

10       Q.    This is going to be marked as

11  Exhibit 104.  I'm showing you it not because I have

12  a lot of questions but just because I need to ask

13  you about whether you had any involvement with the

14  decision by Auto-Owners to tender a $10,000 med pay

15  check in approximately May 2015.

16       A.    Man, I don't even -- I don't even

17  remember this, because I would notice she spelled

18  his name wrong.  I don't remember this, so I played

19  no role in the decision.

20       Q.    Thank you.

21             You have no recollection of receiving

22  the email that's marked 104?

23       A.    No.  And did that -- that came from

24  Fisher Rushmer's file; so it's in there.  I just

25  don't remember it.  And maybe -- maybe Michael

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

Page 80

1   answered her before I even got it.  You know what I
2   mean?
3           Q.    That's fine.
4           A.    I don't know.
5           Q.    And you don't have any recollection
6   whatsoever about having any discussions with
7   someone at Auto-Owners about med pay?
8           A.    No, not at all.
9           Q.    See, I told you not all my questions are
10  hard ones.  Some of them are just tying up loose
11  ends.
12          A.    Loose ends.  I get it.
13          Q.    Do you still have your report still in
14  front of you or -- you have my accident report.
15  Can I have the accident report back?
16          A.    Yes.  And I have this -- my initial
17  August 2014 report.
18          Q.    And what's the exhibit number of that
19  report?
20          A.    103.
21          Q.    Okay.  So you're looking at Exhibit 103?
22          A.    Yes, sir.
23          Q.    Based on the information you had on
24  approximately August 26, 2014, the information you
25  provided in Exhibit 103 was accurate?

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

```
                                                        Page 81
   1          A.    Yes, based on what I knew at the time.
   2          Q.    And you sent it to Pamela McLean at
   3    Auto-Owners on or about August 26, 2014?
   4          A.    Yeah, and I will tell you, it is my
   5    practice.  If it doesn't go out that day, a whole
   6    new letter gets written.  I'm a stickler about
   7    dates; so it was sent on the 26th.
   8          Q.    Did Ms. McLean ever give you
   9    confirmation that she received it?
  10          A.    Oh, I don't know.  If there's not an
  11    email in there -- because I sent it via email.  So
  12    if -- you don't have an email that says "Thanks for
  13    your update" or anything like that?
  14          Q.    I do not.
  15          A.    Okay.  Then maybe she didn't.
  16          Q.    And that's why I asked you about this is
  17    because we never got a copy of this -- the exhibit
  18    marked 103 from Auto-Owners.
  19          A.    Really?
  20          Q.    So I -- is it possible that you sent it
  21    and she did not receive it?
  22          A.    Well, anything is possible, but my
  23    assistant would have sent this, and she -- if we
  24    got a bounce back or anything, she would have let
  25    me know.  And I don't recall having a problem
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

                                                                Page 82

1    communicating with Auto-Owners.

2         Q.   And do you know if she ever responded to

3    you -- Ms. McLean -- in response to the report you

4    prepared in Exhibit 103?

5         A.   I think we probably would have talked on

6    the phone.  She probably would have called me.

7         Q.   You do not have an independent

8    recollection of talking to Ms. McLean on the phone

9    about Exhibit 103?

10        A.   Well, not a -- I would like to talk to

11   you about your August 26, 2014, letter.  Did we

12   talk on the phone about my thoughts of this case

13   and all that?  Yes.  So...

14        Q.   If Ms. McLean had not received the

15   initial report that she had asked for in the

16   earlier emails that you saw earlier today, would

17   you have had a conversation with her about that?

18             MR. VILMOS:  Object to the form.

19        Hypothetical.

20        A.   If she didn't know I even sent one, I

21   doubt we would talk about the fact she didn't get

22   it.  So I really can't answer that.  But I will

23   tell you there were no complaints from Auto-Owners

24   about my lack of information providing to them.

25   So -- did I say that right?

Page 83

1    BY MR. BONNER:

2         Q.   I understood the gist.

3         A.   Okay.  Yeah, there were no complaints

4    that they weren't being advised or kept up to date.

5         Q.   And did Auto-Owners ever request another

6    report from you other than the one marked as

7    Exhibit 103?

8         A.   I think in one of these letters she

9    asked for monthly updates.

10        Q.   Okay.  And you prepared monthly updates

11   as requested?

12        A.   Well, there was so much going on.  She

13   was probably getting something weekly from me.

14        Q.   And I will represent to you -- and I'm

15   not going to show you them because I don't need

16   to -- there were many deposition reports from the

17   Fisher Rushmer file.

18        A.   Uh-huh.

19        Q.   And do you recall seeing those when you

20   reviewed the file?

21        A.   I recall seeing "Enclosed please

22   find" -- blah, blah, blah, yes.

23        Q.   Was there ever another comprehensive

24   report authored by you as opposed to a monthly or a

25   deposition report?

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 84

 1        A.    Nothing as long as this.

 2        Q.    Nothing as long as the report --

 3        A.    The initial.

 4        Q.    -- that you prepared as Exhibit 103?

 5        A.    I don't think there was.  I don't recall

 6   seeing that.

 7        Q.    If you'll turn to page 4 of your initial

 8   report.  In the very first sentence --

 9        A.    Yeah.

10        Q.    -- it says, "With all of that said, this

11   is obviously a significant case.

12        A.    Yes.

13        Q.    Now, if this violates a privilege, just

14   tell me, and I'll move on.

15              But what did you mean when you said this

16   was obviously a significant case?

17        A.    Well, I don't think it violates a

18   privilege.  We have a 17-year-old boy who's

19   potentially paralyzed from the waist down for the

20   rest of his life.  That's significant.

21        Q.    Okay.  And at the end of the paragraph

22   on page 4 of Exhibit 103, it says that the exposure

23   in this case could certainly reach eight figures;

24   correct?

25        A.    That's what I wrote.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 85

1           I do note that I didn't discuss the

2    potential exposure of the construction company,

3    though, because I was not aware of it.

4           Q.   And at the time of this report in 2014,

5    you hadn't conducted any discovery?

6           A.   Correct.

7           Q.   And over the course of 2014 through

8    2016, obviously things changed?

9           A.   Yes.

10          Q.   In paragraph 4, you also characterize

11   the case as -- if you'll look at the first or the

12   second sentence.

13           "With clear liability and only a slight

14   potential to argue comparative fault on behalf of

15   the plaintiff."

16           When you learned of the construction

17   company, that was another potentially liable party;

18   correct?

19          A.   Yes.  And, as the case went on, we

20   learned a lot about Madison.  We had a lot of

21   things we would have argued at trial.  My opinion

22   of this case actually got better from the defense

23   perspective the longer we litigated it.  I don't

24   think I would have said clear liability had I

25   written this letter two years later.

Page 86

```
 1          Q.    Two years later.
 2                At the point two years later, when this
 3    case eventually settled, by that time you had
 4    identified the construction company as another
 5    potentially liable --
 6          A.    Yes.
 7          Q.    -- or at fault party?
 8          A.    Yes.
 9          Q.    So Bradley was no longer the only
10    potentially liable party, in your view?
11          A.    Yes.  And I think the comparative on
12    Madison got greater as the case went on.
13          Q.    When you say "greater," it got stronger?
14          A.    Stronger, yes.  Sorry.  Stronger.
15          Q.    And that would be the argument that he
16    was sitting reclined with his feet on the dash?
17          A.    Yes, yes.
18          Q.    Were there any other aspects to the
19    comparative fault defense apart from the three
20    we've identified before:  That the seat was
21    reclined, the testimony that Madison's feet were on
22    the dashboard, and that the airbag deployed?
23          A.    I just don't think Madison was going to
24    make the impression to the jury that everybody
25    thought he would.
```

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses  |  8/10/2017

Page 87

1        Q.    Okay.

2        A.    So that contributes to whether the jury

3    would be incredibly sympathetic about him.

4        Q.    You didn't think Mr. Cawthorn would be a

5    sympathetic -- I don't want to put words in your

6    mouth.

7        A.    Sure.

8        Q.    You don't think he would make a good

9    witness?

10        A.    Oh, no, no.  I didn't say that.

11            MR. VILMOS:  Object to the form.

12        A.    I didn't say that.  I just think when I

13    first heard the case, it concerned me greatly.

14    When I got to know the parties and how they will

15    come off to a jury, I wasn't as impressed with

16    Madison Cawthorn as I was when I first heard about

17    this case.

18    BY MR. BONNER:

19        Q.    Okay.

20        A.    Now, whichever way the jury went, that's

21    a different story.  But, remember, we spent every

22    other week together for two years.

23        Q.    Fair enough.

24            In 2016, did this case still pose the

25    potential for a very large verdict against Bradley

Page 88

1    Ledford, if you can answer without invading a

2    privilege?

3              A.    Yes.   I mean you have a paraplegic, you

4    have Colson Hicks; yes, there was a risk.

5              Q.    Okay.   When you and I have spoken on the

6    phone, I advised you, I think, about a conversation

7    that's documented actually here in the materials

8    somewhat that you may have had with Mick Callahan

9    regarding the final judgment that was ultimately

10   entered?

11             A.    You told me Mick said that that

12   conversation happened.

13             Q.    Right.

14                   So was there ever a conversation between

15   you and Mr. Callahan about the consent judgment?

16             A.    Mick berated me to come up with a

17   number.   And despite repeated statements that that

18   was not my role, Mick wanted -- wanted a number.

19             Q.    Okay.

20             A.    So I don't think there was the

21   conversation he's relayed or will relay that there

22   was.   But we did talk, but it was more of a:   Mick,

23   you know I can't go there kind of conversation.

24             Q.    Well, you know, I've told you before

25   that I need to know what you said.   If there is a

Page 89

```
 1   privilege, you tell me.
 2           Can you tell me from your own words what
 3   the conversation was that you had with
 4   Mr. Callahan?
 5        A.   What I remember more was, you know, what
 6   do you think is a possible defense range.  I
 7   remember him getting testy with me that it was part
 8   of my obligation to give him a number, which is
 9   what Mick would do.
10           And, you know, him just -- you know --
11   give me a number, give me a number, give me a
12   number.  And, you know, I didn't feel I was in a
13   place I could do that.
14           I think he asked me is there a potential
15   for 15 to 30 million -- that was his -- was there a
16   potential for 15 to 30 million.  Well, at that
17   point, we had already gone to mediation, and I
18   believe the number put up without pain and
19   suffering was 15 million.
20           So the obvious answer is is there a
21   potential that can be boarded at trial?  Sure.  Do
22   I think it's going to be awarded?  No idea.  You
23   see what I'm saying?  It was like that.  It was
24   that kind of -- but I never said to Mick, oh, this
25   is a $30 million case, this is a $15 million, this
```

Page 90

1    is a $500 million case.  I didn't say anything like

2    that.

3          Q.   And I don't think Mr. -- I don't know.

4    Mr. Callahan hasn't been deposed, but I don't think

5    he's going to -- his recollection was that you had

6    said something as definitive as what you just said

7    there at the end that this is a $30 million --

8          A.   Yeah, I didn't -- definitely didn't say

9    that.

10         Q.   -- or a $500 million case?

11         But just to confirm what you do recall

12    saying, you recall Mick Callahan asking you if the

13    case went to trial if the potential verdict could

14    be between $15 million and $30 million; correct?

15         MR. VILMOS:  Objection to the form.

16    BY MR. BONNER:

17         Q.   And correct me if I misstate.

18         A.   Yes.  But Mick never asked me what I

19    thought of the potential exposure of Madison in

20    comparative, and he never asked me what I thought

21    the jury might do with respect to the third-party

22    defendant.

23         That -- and I do remember being

24    surprised like why isn't he exploring that with me.

25    If he's so adamant that I've got to give him a

Page 91

1    number, why isn't he discussing with me that

2    number?  But we didn't.

3        Q.   Okay.  He did not ask you for an opinion

4    on what you thought the jury would assess for

5    comparative fault on behalf of Mr. Cawthorn?

6        A.   Correct.  I don't remember discussing

7    that with Mick at this alleged call we had.

8        Q.   And Mr. Callahan also did not discuss

9    with you your view of what the jury would assess

10   the construction company; correct?

11       A.   Yeah, I don't remember that -- him even

12   being interested in that discussion.

13       Q.   Did you believe you would get a defense

14   verdict for Bradley if you want went to trial --

15       A.   Do I think there was a possibility?  I

16   mean all the stars would have to be aligned.

17   Madison would have to make a horrible impression.

18   The jury would have to hate the construction

19   company.

20            I mean it would have to align perfectly

21   for us to maybe get Bradley absolved or maybe the

22   jury feeling sorry for Bradley so only pop and Bob

23   Ledford's RV.  You know what I mean?  We knew it

24   would be difficult, incredibly difficult.  But like

25   I said, I went from a clear liability to there's a

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 92

1    lot of issues in this case after two years.

2         Q.   Okay.  It would be extremely difficult

3    to get a defense verdict completely exonerating

4    Bradley --

5         A.   It would be difficult.

6         Q.   -- based on what you knew in 2016?

7         A.   Defense work is tough.  It would be

8    difficult -- it would be difficult.  I don't think

9    impossible, but I think it would be diff -- like I

10   said, everything had to be aligned.

11        Q.   And in terms of the potential damages

12   that could be awarded, I assume you're still of the

13   position that you didn't actually come up with a

14   number.  It was Mick Callahan who suggested you the

15   range?

16        A.   I thought that was his number, because I

17   just kind of was like, wow, where did -- you know.

18        Q.   And I think you've said before that you

19   told him before he presented you with that range,

20   you told him many times that you did not feel

21   comfortable -- don't let me put words in your

22   mouth.  It's not comfortable.  But you did not have

23   an estimated potential damages figure in mind?

24        A.   No.  That's not my role as defense

25   counsel when we're discussing an insurance company

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 93

1    basically being set up.  That is not my role to

2    participate in that -- sorry.  I'm touching my

3    microphone -- and I did not feel that I could be

4    involved in that.  So --

5         Q.   So in the course of your representation

6    of Mr. Ledford, you never evaluated the range of

7    damages that you thought Mr. Ledford could be found

8    liable for if the case went to trial?

9         A.   No, I wouldn't say that.  There were

10   discussions with Mr. Orr.  You know, we defended

11   this case together.  We spoke with all of our

12   experts together.

13             We had thoughts on the exposure in the

14   case, but it was not my role to participate in the

15   consent judgment and how it was going to be used

16   later against Auto-Owners.

17        Q.   Okay.  Can you reveal, without revealing

18   a privilege, what you believe the exposure to be to

19   Bradley Ledford?

20        A.   Frankly, I can't -- I don't have a

21   number now.  I know they asked at mediation for a

22   very significant number just for the meds and the

23   lifecare plan.  It was very significant.  Forget

24   pain and suffering, which would have been much more

25   than that.  So, you know, the -- the potential for

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 94

1    what you-all were going to ask for was significant.

2         Q.   Well, let me strike you there.

3              Before you say you-all --

4         A.   I meant your firm, Colson Hicks.  You

5    know, my biggest fear in this case is that Ervin

6    was going to try it.  So --

7         Q.   And that is a consideration that has to

8    go into --

9         A.   Yes.

10        Q.   -- whether or not you want to try a

11   case; correct?

12        A.   Well, I mean you have to know the

13   plaintiff's firm is willing to go all the way.

14             And I respect Colson Hicks a great deal,

15   mainly because of my personal relationship that I

16   had with Ervin and knowing the quality of his

17   partners.

18             So, you know, there was no doubt you-all

19   would try this case.  Other law firms would not

20   have invested the expense to try it.  I had no

21   doubt you-all would.  That's an important factor as

22   a defense attorney.

23        Q.   And one of the factors, I suppose, in

24   assessing Mr. Ledford's potential exposure was that

25   if the case would get tried, you predicted that the

Page 95

1    plaintiffs would have a vigorous case?

2        A.    You would put on a vigorous case, yes.

3              (Plaintiff's Exhibit 106 was marked for

4        identification.)

5    BY MR. BONNER:

6        Q.    You've mentioned it a couple times.  I

7    want to show you Exhibit 106, which includes an

8    email from you to Ms. McLean.

9              You've mentioned a couple of times the

10   damages figures that were presented before

11   mediation.  Will you confirm that Exhibit 106

12   includes the damages figures that you were provided

13   prior to mediation?

14       A.    From Joe?  Yes, yeah.

15       Q.    And those are damages figures that were

16   put together by Dr. Raffa?

17       A.    Yes.

18       Q.    At the time you communicated the figures

19   to Ms. McLean, did you also communicate to

20   Ms. McLean any judgment with respect to whether

21   they were too high or too low?  I doubt you said

22   they were too low.

23             But did you communicate any assessment

24   to her about the economic damages that the report

25   described?

Page 96

1          MR. VILMOS:  Object to the form.

2      A.   I didn't tell her -- well, everybody

3  knows Raffa.  I mean you know you're going to get a

4  huge damage demand.  I mean it's guaranteed.  So I

5  think she knows that as well.  But I didn't say to

6  her, you know, this guy's a hack or I didn't say

7  this guy is the best in the world.  I didn't

8  provide that analysis to her.  Do you see what I'm

9  saying?

10 BY MR. BONNER:

11     Q.   Yeah.  Did you -- okay.

12     A.   Because I don't think Raffa is a hack.

13 I don't want that on the record.  That's not what

14 I'm saying.  I didn't say either way.

15          (Plaintiff's Exhibit 107 was marked for

16      identification.)

17 BY MR. BONNER:

18     Q.   Here's a letter that we'll mark as

19 107 -- and I know you don't think Dr. Raffa is a

20 hack.

21     A.   No, no, no.

22     Q.   And I should have just given you this

23 letter, and I apologize.  I was trying not to use

24 it.

25          First of all, Exhibit 107 is a letter

Page 97

1  that you sent from -- authored by you to

2  Ms. McLean, dated January 6, 2015?

3       A.    Um-hum.

4       Q.    You do describe one of the plaintiff's

5  experts as a hired gun?

6       A.    That's what he's known for.  Yes.

7            MR. VILMOS:  Do you have a copy for me?

8  BY MR. BONNER:

9       Q.    Oh, sorry, yeah.

10           But Dr. Raffa you do not describe in

11  that context --

12      A.    No.

13      Q.    -- correct?

14      A.    No.

15      Q.    You describe --

16      A.    That's why I didn't want it to be taken

17  that way.

18      Q.    Right.

19           And now I'm just trying to clarify.

20           You reported to Ms. McLean that

21  Mr. Raffa doesn't seem to lean either pro defense

22  or pro plaintiff?

23      A.    No.  Correct.

24      Q.    Okay.

25      A.    But when he needs to come up with large

Page 98

1    numbers, he can do so.

2         Q.   Okay.  So you knew going into -- if this

3    case was tried, the economic damages were going to

4    be $12 million or higher, based on Dr. Raffa's

5    report; correct?

6         A.   Yes.

7         Q.   And I think you said before, that

8    doesn't include noneconomic damages?

9         A.   Correct.

10        Q.   And just because you brought it up,

11   would you explain to a person who doesn't know what

12   noneconomic damages are?

13        A.   Pain and suffering.

14        Q.   And those could be very high as well?

15        A.   Yes.

16        Q.   Would they potentially exceed the

17   economic damages.

18        A.   It --

19        Q.   It depends?

20        A.   Well, but and some plaintiffs' attorneys

21   use a calculus like if the economics are X P&S --

22   pain and suffering should be, you know, two times

23   X, three times X.  Yes, the requested amount could

24   be large, very large.

25        Q.   And one of the potential outcomes, if

Madison Cawthorn v. Auto-Owners Insurance                      Jamie Billotte Moses | 8/10/2017

                                                                        Page 99

1    this case were tried, would be that the jury could

2    assess noneconomic damages higher than the economic

3    damages?

4         A.   It could.

5         Q.   So that's one of the risks that Bradley

6    Ledford was facing?

7         A.   Yes.

8         Q.   And one of the risks he was facing was

9    that noneconomic damages could be a multiple of the

10   economic damages?

11        A.   Yes.

12        Q.   The decision to settle -- sorry.

13             Strike that.

14             I lost my spot.

15        A.   That's okay.

16        Q.   All right.  I think you said a moment

17   ago that you still, to this day, don't have a firm

18   opinion on what Bradley Ledford's potential

19   exposure would have been had he gone to trial?

20        A.   Correct.  Because like I don't know

21   about subsequent surgeries.  I don't know if he's

22   at maximum -- if Maddy is.  I don't know if he's

23   improved.  I don't know if it's gotten worse.  I

24   don't know if he ended up doing that Harvard

25   schooling he said he was going to do.  I mean I

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 100

```
 1   just don't know what happened after we stopped
 2   talking.
 3           Q.   Sure.
 4           A.   You know I don't know if the case got
 5   better.  I don't know if the case got worse.
 6           Q.   Based on the information you knew at the
 7   time, the time you ceased to represent Bradley,
 8   even then you didn't have in your own mind -- and
 9   correct me if I misstate this -- a firm idea of
10   Bradley's potential exposure?
11           A.   I mean --
12                MR. VILMOS:  Object to the form.  It
13           misstates the testimony.
14           A.   I knew -- no.  Strike that.
15                I believed Bradley's exposure -- or the
16   defendants' exposure was definitely more than the
17   3 million policy limits.  So the exact number, no.
18   BY MR. BONNER:
19           Q.   And my understanding of the conversation
20   you described to me involving you and Mr. Callahan
21   was that at the time of that conversation, you did
22   not have a range of potential damages in mind
23   facing Bradley Ledford?
24                MR. VILMOS:  Object to the form.  It
25           misstates the testimony.
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                        Page 101

1          A.   Yeah, I don't -- I don't know if that's

2     what I said.

3     BY MR. BONNER:

4          Q.   Okay.

5          A.   What I said was I -- the way I look at

6     Mick's handwritten note, it's a suggestion that 15

7     to 30 was my idea.  That's all I've said today is:

8     No, it wasn't my idea.

9          Q.   At the time you had the conversation

10    with Mr. Callahan, did you have a different range

11    of damages in mind?

12         A.   I hadn't made a range --

13         Q.   That's --

14         A.   -- because I wasn't part of those

15    discussions.  Do you see what I'm saying?

16         Q.   Yes.

17         A.   It wasn't -- I wasn't asked to opine

18    what the range was.  Basically Mick said was:  Is

19    15 to 30 possible?  It's possible.

20         Q.   And that's exactly what I was trying to

21    get at is that you did not have in your mind a

22    range?

23         A.   I had not sat down and thought about,

24    you know, look at Raffa's report and how could we

25    attack it or -- you know, we just hadn't.

Page 102

1    We went to mediation.  It failed.  The

2  case got quiet, and then suddenly it's heated up

3  again.

4    Q.   And when I asked you a moment ago when I

5  said that even today you don't have a range in

6  mind, what I was trying to get at is not that

7  things had changed.  It was that you've never gone

8  through the process and looked at Raffa's report

9  and thought about the ways you would have attacked

10  it and ever come up with the range that

11  Mr. Callahan had asked you to come up with --

12    A.   I did not.  I did not.

13    Q.   Right.  Okay.

14    When you spoke to Mr. Callahan, was

15  Mr. Orr also on the phone with you?

16    A.   No.  I don't remember Michael being a

17  part of it -- this -- no.

18    Q.   Did you ever assess a percentage that

19  you thought you would obtain for comparative fault

20  in this case?

21    A.   I thought there was a possibility a jury

22  could do a third, a third, a third.

23    Q.   And when you said you thought there was

24  a possibility the jury could do a third, a third, a

25  third, correct me; do you mean assess one-third

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

```
                                                      Page 103
 1    fault to Madison, one-third fault to Bradley, and
 2    one-third fault to the construction company?
 3          A.    Yeah.   And when I say Bradley, I mean
 4    the defendants.
 5          Q.    Bradley and his father's company --
 6          A.    -- father, as the owner of the car.
 7          Q.    Did you think it was likely that you
 8    would get that outcome?
 9                MR. VILMOS:   Object to the form.
10          A.    I can't --
11                MR. VILMOS:   Hypothetical.
12          A.    Yeah, I can't say likely, not likely.
13    BY MR. BONNER:
14          Q.    And I'm not trying to get you to say
15    something that's not -- you know what was in your
16    mind in 2016 better than I do, at least, with the
17    passage of time.
18          A.    Yes.   I hope so.   I hope so.
19          Q.    So if the closest you ever came was I
20    thought it was possible, if that's your testimony,
21    then --
22          A.    No, I -- oh, God, like --
23                MR. VILMOS:   Objection to form.  She's
24          already testified she doesn't know what would
25          happen, and now you're asking her that what
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                    Page 104

 1          she doesn't know is going to happen is
 2          likely.  I think that's badgering.
 3          A.   I really can't -- I can't say how deep
 4   my conviction was in the possibility.
 5   BY MR. BONNER:
 6          Q.   Okay.  All right.  Let me show you a
 7   document that was previously marked in another
 8   exhibit as Plaintiff's Exhibit 52.  This is a
 9   letter from Pamela McLean to Mick Callahan with you
10   cc'd, dated September 3, 2016.  Can you confirm
11   that?
12          A.   It is September 3, and I am cc'd.
13          Q.   Do you recall receiving this letter?
14          A.   I don't remember it today, and it's
15   really weird.  Gosh, I feel so bad.  I can't even
16   remember my old post office box number at Fisher
17   Rushmer.  So I can't even confirm that's the
18   actual -- did Fisher Rushmer produce this letter to
19   you, do you know?
20          Q.   You know, I think they did, but I didn't
21   use that copy because I had -- I had it previously
22   marked.
23          A.   I'm just curious.
24          Q.   I'm 90 percent sure, but don't kill me
25   if I'm mistaken.  I don't have it in front of me.

```
                                                Page 105

 1              MR. VILMOS:  Is there a question

 2         pending?

 3    BY MR. BONNER:

 4         Q.   First of all, do you know if you

 5    received this document?

 6         A.   I probably did.  I'm not going to say --

 7    I probably did.  The language sounds familiar.

 8              (Plaintiff's Exhibit 108 was marked for

 9         identification.)

10    BY MR. BONNER:

11         Q.   Do you know if you took any actions upon

12    receiving a copy of this email?  I'll represent to

13    you -- and I've got a few things here where it

14    looks as though you discussed this with Mick

15    Callahan.

16              Here, I'll show you what we'll mark as

17    Exhibit 108, and you can let me know if 108

18    refreshes your recollection at all.

19              Exhibit 108, for the record, is an email

20    chain with several emails dated September 7, 2016,

21    that involve Mick Callahan, Michael Orr, John

22    Holcomb, and you, Ms. Moses; correct?

23         A.   Yeah.

24              I'm really surprised that this was

25    produced by Fisher Rushmer, but -- Mr. Ledford's
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 106

1    not on it.  That's probably why.  Okay.

2              I'm sorry.  What was your question,

3    Mr. Bonner?

4        Q.   Just if that refreshed your recollection

5    as to whether or not you received the letter from

6    Ms. McLean or ever saw it, that's dated

7    September 3, 2016?

8        A.   Well, if I didn't get it from her, it

9    appears I got it from Mick.  So...

10       Q.   And I'm not going to ask you about all

11   of the things that you might have talked about with

12   regards to the consent judgment -- or sorry, the

13   settlement agreement.

14             Do you recollect, though, one way or the

15   other, or can you confirm that you at least had

16   some conversations with Mick Callahan regarding the

17   terms of the settlement agreement?

18       A.   What I discussed with Mick -- I won't

19   say several.  I won't say a lot.  My big issue was

20   that Bradley was protected.  That's all I cared

21   about, that a judgment wouldn't be collected

22   against him, that he didn't waive any

23   attorney-client privilege.

24             I was concerned for Bradley.  I mean I

25   had an 18-year-old client.  I was really concerned

Page 107

1    for Bradley.  And so my discussions with Mick were

2    for protecting Bradley.

3         Q.   Did some of your suggestions get

4    incorporated into the ultimate settlement

5    agreement?

6         A.   I believe I felt the -- yeah, I think

7    with respect to the privilege and Bradley not

8    waiving communications with me -- I was insistent

9    upon that.  And I believe I was insistent upon

10   something about Mick being there to represent

11   Bradley if Bradley was ever deposed or anything,

12   because I didn't think Auto Club --

13        Q.   Auto-Owners.

14        A.   -- I didn't think Auto-Owners would

15   provide me to help Bradley out in a depo or

16   something.  And so I wanted there to be some

17   protections, you know, that like Mick would be

18   there for Bradley.

19        Q.   So you made those suggestions to be

20   incorporate --

21        A.   I did.  I believe I did.  And I think

22   you have those.  I could have sworn.

23        Q.   I suspect I do.

24        A.   Yeah.

25        Q.   I told you before I didn't want to go

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 108

1    through each one --

2          A.    Yeah.

3          Q.    -- individually.

4          A.    Yeah.

5          Q.    So let me ask you just a couple of

6    questions to tie it up.  I think that's all I'll

7    need is --

8          A.    Okay.

9          Q.    Can you confirm that you made

10   suggestions to Mick Callahan on behalf of Bradley

11   for changes to the settlement agreement to protect

12   Bradley?

13         A.    Yes.

14         Q.    And can you confirm that that those

15   changes were integrated into the agreement?

16         A.    I believe they were.

17         Q.    Do you have the Exhibit 54, I believe,

18   in front of you -- 52, excuse me, that was

19   previously marked, the letter of September 3?

20         A.    Yeah.

21         Q.    I'll take the rest of these back.

22               You might not have a recollection, but

23   if you do recall:

24               Upon receiving this letter, did you

25   interpret this letter as objecting to Bradley's

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

```
                                          Page 109
 1   continued negotiation of a settlement agreement
 2   with Mr. Cawthorn that involved a consent judgment?
 3        A.   No, I didn't see it as an objection to
 4   that.
 5        Q.   There's a statement on Exhibit 52 that
 6   says, "As to a future consent judgment, that will
 7   be up to Bradley, Miss Moses, and you" -- you
 8   meaning Mick Callahan; correct?
 9        A.   Mm-hmm, yes.
10        Q.   Do you recall reading that?
11        A.   I recall being surprised at that
12   statement.
13        Q.   Okay.  You were surprised why?
14        A.   That she included me in discussions
15   regarding a consent judgment.
16        Q.   Okay.  Did you construe that as giving
17   permission to Bradley to negotiate the consent
18   judgment?
19        A.   No, I don't think it's permission.  I
20   think it's do what you want at your own risk.
21   That's how I construed this letter.
22        Q.   I don't want to invade privilege, so let
23   me see if I can ask this in a way --
24             Did Auto-Owners advise you that it
25   viewed Bradley's participation in negotiating a
```

Page 110

1    consent judgment as a breach of the policy?

2        A.   No.  You've asked me that before.

3        Q.   Sorry if I did.

4        A.   No worries.

5        Q.   It's probably because it's the best way

6    I can think of asking the question I want to ask

7    without invading the privilege.

8        A.   Sure.

9        Q.   Did this letter, in your view, alert

10   Bradley that Auto-Owners viewed his negotiation of

11   a consent judgment as a breach of the consent

12   clause of his policy?

13       A.   No -- no.  I don't think so.

14       Q.   Did you view -- well --

15       A.   Go ahead.

16       Q.   Do you stand by your answer?

17       A.   Yeah.  Yes.

18       Q.   And your answer was:  No, you did not

19   view this letter, the September 3rd letter, as

20   communicating to Bradley that his continued

21   negotiation of a consent judgment violated the

22   consent to settle clause of the policy?

23       A.   Correct.

24       Q.   Likewise, nothing in the September 3,

25   2016, letter, in your view, communicated to Bradley

Page 111

1    that he was in violation of the policy's duty to

2    cooperate clause by continuing to negotiate a

3    consent judgment?

4         A.   I don't see that in this letter.

5         Q.   And you did not interpret it as meaning

6    that; correct?

7         A.   I did not, no.

8         Q.   You did not view the September 3, 2016,

9    letter as an attempt by Auto-Owners to assert its

10   right to veto the settlement proposal that had been

11   proposed by Mr. Kalbac?

12             MR. VILMOS:   Objection to form.

13        Leading.

14        A.   I don't even know what that means, a

15   right to veto a settlement proposal.  I don't --

16   BY MR. BONNER:

17        Q.   You disagree that Auto-Owners had a

18   right to veto --

19        A.   No, no, no.  I just don't even know what

20   you mean by that.  Like I don't know what you mean

21   by settlement proposal.  Are you talking a proposal

22   for settlement or are you talking --

23        Q.   Let me get rid of the wording because it

24   seems like -- and I'm not trying to be tricky.

25        A.   No, no.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                              Page 112

1          Q.   I'll be honest with you, I'm trying to
2    be just right.  So let me see if I can word it a
3    different way.
4          A.   Sure.
5          Q.   Nothing in this letter informed Bradley
6    not to continue settlement negotiations involving
7    the consent judgment?
8               MR. VILMOS:  Object to the form.
9          Leading.
10         A.   This letter said to me we've got
11   3 million in policy limits.  Anything you do above
12   that is at your own peril.  That's -- you know what
13   I mean?  It's 3 million in coverage.  The rest is
14   up to you guys.
15   BY MR. BONNER:
16         Q.   In fact, once $3 million in limits are
17   exhausted, Auto-Owners' obligation to Bradley
18   expires?
19         A.   No, no, no.  It said we'll keep
20   defending you, so I didn't -- I didn't -- it says
21   right there in that letter.  Right?
22         Q.   Right.
23         A.   Am I reading --
24         Q.   No, no, you're right.
25              The letter says we will keep defending

Page 113

1    you.

2         A.    Mm-hmm.

3         Q.    Do you know one way or the other whether

4    the policy -- I think you said you didn't -- you

5    said the policy determines Auto-Owners'

6    obligations --

7         A.    Yes --

8         Q.    -- correct?

9         A.    -- I did say that.

10        Q.    And I think we talked about those two

11   hours ago that the policy would determine whether

12   or not Auto-Owners had an obligation to continue

13   defending Bradley after the limits were paid?

14        MR. VILMOS:   Object to the form.

15   Compound.

16        A.    The policy would define that, and I also

17   said that insurance companies sometimes go beyond

18   even what their policy says.

19   BY MR. BONNER:

20        Q.    Right.

21        So with respect to whether Auto-Owners

22   was contractually obligated, you would defer to

23   what the policy says?

24        A.    Yes.

25        Q.    To the extent that Auto-Owners agreed to

Page 114

1    defend and it was outside of what the policy

2    required, sometimes insurance companies go beyond

3    what's required of the contract; right?

4         A.   Yes.

5         Q.   I'm going to show you what's been

6    previously marked as Exhibit 44.  I don't know

7    if -- sorry, 54.

8              This letter appears to have been

9    forwarded to you by Mr. Callahan, and it's a letter

10   from Melinda Pitman at Auto-Owners.

11             Do you recall receiving --

12        A.   Let me look at it real quick.

13        Q.   -- the letter from Ms. Pitman?

14        A.   Hmm.  It's not ringing a bell, but I'm

15   copied on it; so I must have received it.

16        Q.   Do you recall undertaking any action

17   upon receiving that email?

18        A.   No.  At this point in time, Mick was

19   driving the bus.

20        Q.   Had Auto-Owners written in either

21   Exhibit 52 or Exhibit 54 that it viewed Bradley's

22   negotiation of a settlement that included a consent

23   judgment as a breach of the policy, would you have

24   advised Bradley against entering it?

25             MR. VILMOS:  Object to the form.

Page 115

1      Hypothetical.

2      A.   If I felt Bradley was doing something --

3   well, I would have expected Mick Callahan, who was

4   taking over at this point, to be advising his

5   client, because he was advising him on everything

6   else.

7   BY MR. BONNER:

8      Q.   And --

9      A.   So I may have said, Hey, Mick, have you

10  told Bradley this -- if that happened.   These

11  letters don't say that.

12     Q.   Right, they do not say that they view

13  the negotiation of the settlement agreement as a

14  violation of the policy; correct?

15     A.   Correct.

16     Q.   And one of the reasons I bring that up

17  is just when an insured violates the policy, that

18  can be a defense to coverage under the policy;

19  correct?

20     A.   Correct.

21     Q.   And it can void the right of the insured

22  to have a defense?

23     A.   Correct.

24     Q.   One of the provisions in the settlement

25  agreement -- I don't know if you recall -- but it

Page 116

1    had to deal with what would happen if the agreement

2    was construed by a court as unenforceable against

3    Auto-Owners.

4                MR. VILMOS:  Just object to the form to

5           the extent she said that she was gone from

6           the firm at the time the agreements were

7           entered.

8    BY MR. BONNER:

9           Q.   Do you recall that part of the

10   settlement agreement --

11          A.   That provision I don't remember.  I just

12   don't remember right this moment.

13          Q.   Oh, gosh.  This is not a memory test.

14   And what I'm doing right now is just -- so you

15   know, I'm trying to see if there's something that

16   actually talks about it, because then I'll show it

17   to you and say does this refresh your recollection.

18               One of the emails I recall had to do

19   with the request that you made that the settlement

20   agreement not include a waiver of your

21   attorney-client privilege?

22          A.   Yes.

23          Q.   And you correct me or you tell me if you

24   remember this or not.

25               Do you recall telling to Mick Callahan

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

Page 117

1    that one of your concerns was if the file was

2    turned over to plaintiff's counsel and your

3    thoughts and legal strategies were disclosed and

4    the case ended up having to come back under this

5    settlement provision calling for it to come back,

6    you were concerned that it would put Bradley

7    Ledford at a disadvantage?

8            A.    That sounds about right.

9            Q.    Okay.

10           A.    I mean I didn't want my, you know,

11   discussions with our experts and all that to now be

12   in the hands of plaintiff's counsel.

13           Q.    Right.

14                 So with respect to that reverter, I want

15   to tie this back to what I was asking you about

16   previously.  A breach of the policy can be a breach

17   of the insurance company's obligation to defend the

18   insured.  I think you said that.

19                 So did you have an understanding that

20   Bradley breached the policy by entering into the

21   consent judgment that he would jeopardize his

22   ability to have a defense if ever this case came

23   back pursuant to the settlement agreement clause?

24           A.    I did not -- I did not go through that

25   mental gymnastics.  I left it to Mick Callahan to

Page 118

1   advise Bradley as to the risks associated with

2   entering into a consent judgment.

3        Q.   You have no idea -- or if you do, please

4   so state -- what Mike Orr's evaluation of liability

5   or chances for a defense verdict were in this case?

6            MR. VILMOS:   Objection to the form.

7        A.   Anything I know would be in the confines

8   of a privileged communication, because it related

9   to his client David, who I don't think has waived

10  any privileges.

11  BY MR. BONNER:

12       Q.   I'll represent to you that Bradley

13  Ledford signed the settlement agreement on

14  September 29, 2016.

15       A.   Okay.

16       Q.   I don't need you to affirm that date,

17  but I am going to ask you some questions about that

18  date --

19       A.   Sure.

20       Q.   -- as sort of the bookend.

21            I also told you the judgment was entered

22  on December 20th of 2016.

23       A.   Yes.

24       Q.   Once again, I don't need you to confirm

25  that.  I'm just going to use that date --

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

                                                         Page 119

1          A.    Sure.

2          Q.    -- also as a bookend.

3                Were you aware that the settlement

4     agreement or can you confirm that the settlement

5     agreement between Bradley and Mr. Cawthorn was

6     contingent upon Bob Ledford's RV & Marine settling

7     for $3 million?

8          A.    I believe the payment of the 3 million

9     was a contingency of the settlement.

10         Q.    Because it was also a very important

11    aspect of the settlement for Bradley, wasn't it?

12               MR. VILMOS:   Object to the form.

13    BY MR. BONNER:

14         Q.    You know what?  I withdraw that, because

15    that invades a privilege.  I'll withdraw it.

16               But under the terms of the settlement

17    agreement, if Auto-Owners didn't pay the $3 million

18    to settle out Bob Ledford's RV & Marine, the

19    settlement agreement was null and void?

20         A.    Let me think.  Hmm.  I would have to

21    look at the agreement.  You mean could Bradley have

22    just entered a consent judgment and Joe kept

23    litigating against Bob Ledford RV --

24         Q.    No, no, no --

25         A.    -- because the 3 million wouldn't be

```
                                              Page 120
  1   paid?

  2         Q.   I've confused you with a bad question.

  3         A.   Okay.

  4         Q.   Let me restate it.

  5              No, no, no, Bradley Ledford would not

  6   have agreed to a consent judgment if his father's

  7   company had not secured a release; correct?

  8         A.   Oh, you're definitely invading my

  9   privilege with him on that one, yeah.  Now I

 10   understand what you're asking, and yeah.

 11         Q.   Under the terms of the settlement, if

 12   Bob Ledford RV & Marine was not released, the

 13   settlement agreement was not enforceable?

 14              MR. VILMOS:  I think she's asked you to

 15         see the documents if you're --

 16         A.   Yeah, I am -- yeah.

 17   BY MR. BONNER:

 18         Q.   I'm not trying to hide it.  I am trying

 19   to --

 20         A.   I do know that this was supposed to end

 21   it all, so...

 22         Q.   I apologize for the delay.

 23         A.   No worries.

 24         Q.   I'm showing you what's previously been

 25   marked as Exhibit 81 -- actually, let me see if I
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                            Page 121

1   can direct you to a particular part --

2        A.    Sure.

3        Q.    -- because it's 12 pages or something

4   like that.

5              Okay.  Good.  If I direct your attention

6   to Exhibit 81 -- and I only have one copy, Peter,

7   but feel free to look on.

8              Page 4, the entire paragraph B, which

9   continues to page 5, and it's actually the last

10  sentence of paragraph B that's most important.

11       A.    Oh, well, that's what it says.  There

12  you go.

13       Q.    All right.  So I'll reask the question.

14  I should have shown you the exhibit four questions

15  ago.

16       A.    That's okay.

17       Q.    I apologize, Peter.

18             Under the terms of the settlement

19  agreement which is before you as Exhibit 81, if a

20  release was not secured in favor of Bob Ledford's

21  RV & Marine in exchange for payment of Auto-Owners'

22  $3 million policy limits, the settlement agreement,

23  Mr. Ledford's agreement to enter into a consent

24  judgment was null; true?

25             MR. VILMOS:  Object to the form to the

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 122

1          extent that the document speaks for itself.

2          But --

3          A.   It was a condition precedent, but I now

4    remember there's a word missing in this paragraph,

5    and the word is "against," and I believe I brought

6    that to Mick's attention several times.  The

7    completion of payment release and dismissal of the

8    claims against Defendant RV and the dismissal of

9    third-party defendants is a condition precedent to

10   the consent judgment agreement herein.

11          So I think it speaks for itself, but

12   that does sound like the consent judgment is

13   conditioned upon RV getting out.

14   BY MR. BONNER:

15          Q.   Right.

16          And RV was to get out by payment of

17   Auto-Owners' $3 million policy limit?

18          A.   Yes.

19          Q.   And there is actually a reason why I

20   asked you this colloquy of questions --

21          A.   Okay.

22          Q.   -- which is after Bradley Ledford signed

23   the agreement, which is memorialized in 81, on

24   September 29, 2016, Auto-Owners never told you that

25   it viewed his signature on Exhibit 81 as a breach

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 123

1    of the policy?

2          A.    I was not advised of that, but frankly,

3    I think they would have advised Mick Callahan of

4    that if they had that opinion, just so you know; so

5    ask him.

6          Q.    You're not aware of them ever advising

7    anyone after September 29th, 2016, that Bradley

8    Ledford's signature on Exhibit 81 was a violation

9    of a policy provision?

10         A.    I'm not aware of that.

11         Q.    Do you know or can you confirm that

12   Auto-Owners paid $3 million to settle out Bob

13   Ledford RV & Marine after that settlement agreement

14   was executed by Bradley Ledford?

15         A.    I believe it did, because the case was

16   dismissed.

17         Q.    Correct.

18               Between September 29, 2016, and

19   September 20, 2016, did Auto-Owners issue a

20   reservation of the rights letter based on an

21   allegedly breach of the consent to settle provision

22   referencing Bradley Ledford's signature on

23   Exhibit 81?

24         A.    Between September 29th and October 31st

25   when I left the firm, no.

Page 124

1      Q.   To your knowledge, after September 29th,
2   2016, did Auto-Owners give notice under the claims
3   administrative statute that it viewed Mr. Ledford's
4   signature on Exhibit 81 as a breach of the policy?
5      A.   I am not aware of that.
6      Q.   To your knowledge, after September 29,
7   2016, did Auto-Owners stop paying for either
8   Bradley Ledford or Bob Ledford RV & Marine's
9   defense?
10      A.   I'm not aware.
11      Q.   After September 29th of 2016, did
12   Auto-Owners withdraw its defense of Bradley?
13      A.   I am not aware of that.
14      Q.   And, to your knowledge, after
15   September 29, 2016, until present day, has anyone
16   ever told you -- apart from me -- that Auto-Owners
17   contends that Bradley's signature on Exhibit 81 of
18   the settlement agreement violated any of the
19   policy's conditions?
20      A.   I believe I've only heard that from you.
21           MR. BONNER:  Okay.  I've got no further
22      questions.
23           THE WITNESS:  Okay.
24           MR. BONNER:  Thank you so much,
25      Ms. Moses.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 125

1          MR. VILMOS:  Let's take a break for some
2      follow-up questions.
3          THE VIDEOGRAPHER:  Going off the record.
4      The time is 3:30.
5          (Break from 3:32 p.m. to 3:42 p.m.)
6          THE VIDEOGRAPHER:  Back on the record.
7      The time is 3:41.
8                 CROSS-EXAMINATION
9  BY MR. VILMOS:
10         Q.   Good afternoon, Ms. Moses.
11         A.   Good afternoon.
12         Q.   I appreciate your stamina today.  We're
13 going to follow up on a couple of topics that
14 Mr. Bonner raised, and I have a couple of other
15 questions.
16              After you were hired, did you ever
17 become aware of a time that the plaintiff Cawthorn
18 was willing to settle for $3 million?
19         A.   No.  No, no, no.
20         Q.   Did Joe Kalbac or anybody on behalf of
21 the plaintiff ever indicate to you a prior
22 willingness to settle for $3 million?
23         A.   You mean even prior to my involvement?
24         Q.   Yes, ma'am.
25         A.   No.  That was never communicated to me.

Page 126

1        Q.    Do you know if prior to filing the
2    lawsuit Mr. Kalbac or anybody on behalf of the
3    plaintiff Madison Cawthorn ever agreed to accept
4    $3 million in exchange for releases against Bradley
5    Ledford and Bob Ledford's RV?
6        A.    That was not communicated to me.
7        Q.    You're not aware of that?
8        A.    No.
9        Q.    Would the opposite of that have been
10   true?  Did Mr. Kalbac ever express to you that he
11   never put out a $3 million offer before he rejected
12   the $3 million that Auto-Owners tendered?
13            MR. BONNER:  Objection to the form.
14       A.    Did Joe tell me -- my understanding was
15   by the time it was in suit -- well, I never got the
16   impression this was ever able to be settled for
17   $3 million.  Does that answer the question?
18   BY MR. VILMOS:
19       Q.    Yes.
20       A.    Okay.
21       Q.    Do you know if Joe Kalbac or anybody on
22   behalf of the plaintiffs ever told Auto-Owners that
23   it had hired an attorney before they actually filed
24   suit?
25       A.    I am not aware of that.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 127

1      Q.   Did you know Mick Callahan before this

2    case?

3      A.   No -- I think, you know, he's an ABOTA

4    guy, American Board of Trial Advocates, and

5    Mr. Fisher was involved, my former boss.  And so I

6    may have known -- I may have met Mick at a bar

7    meeting or something, but I didn't have a case with

8    him, and I wouldn't have been able to say, Hey,

9    Mick.  But for some reason he looked familiar to me

10   the first time I met him.

11     Q.   Is it your understanding that he was

12   primarily a plaintiffs lawyer or a defense counsel?

13     A.   I always thought he was a plaintiffs

14   attorney.

15     Q.   You testified that there were times in

16   this case when you wondered whose side Mick

17   Callahan was on.

18     A.   Yes.

19     Q.   When did you begin to wonder whose side

20   Mick Callahan was on?  How long into this case?

21     A.   Pretty early on.

22     Q.   And when you say you began to wonder

23   whose side he was on, what exactly are you

24   implying?

25     A.   Well, I'm not implying anything except

Page 128

1    that I just wondered if what I was saying was being

2    relayed to plaintiff's counsel.  I always worried

3    about that.

4         Q.   Do you believe that plaintiff's counsel

5    and the independent counsel that Bob Ledford's RV

6    and Bradley Ledford hired were working together to

7    get an arrangement where they could go after

8    Auto-Owners for an excess judgment?

9              MR. BONNER:  Objection.  Form.

10        Speculation.

11        A.   I can't speak for John Holcomb because

12   I -- I just -- no, I don't think there was some big

13   scheme, but I thought it was very odd the way this

14   case played out, really odd.  Mick being retained

15   to represent Bradley seemed odd.  I would think

16   there are well-known defense attorneys in this

17   state, and if someone was going to recommend a

18   really good defense attorney, it wouldn't have been

19   Mick Callahan.

20   BY MR. VILMOS:

21        Q.   Because Mick Callahan was a plaintiffs

22   lawyer?

23             MR. BONNER:  Objection.

24        A.   I thought he was a plaintiffs lawyer,

25   and I thought he was also a bad-faith guy.  And so,

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 129

1    you know, I think when you think of topnotch

2    defense attorneys in this state, Mick's name is not

3    who comes to the top.  I don't know why -- and my

4    understanding is John Holcomb recommended Mick.  So

5    it just seemed odd to me.  It really did.

6                Now, whether there was some grand scheme

7    from day one, I doubt that, but I don't know.

8    BY MR. VILMOS:

9        Q.   Was Auto-Owners always willing to pay

10   the $3 million in this case?

11       A.   My understanding, yes.

12       Q.   Since your involvement?

13       A.   Since my involvement, yes.

14       Q.   Can you tell me more specifics about

15   your suggestion to put a $3 million proposal for

16   settlement in and Mr. Callahan's reaction?

17       A.   Well --

18            MR. BONNER:  Objection.

19       A.   -- that really gets into discussions

20   with Mr. Ledford -- a strategy with respect to

21   defending the case.  And all I know is when I

22   communicated it, I was immediately told that I was

23   to withdraw that suggestion, that that strategy was

24   no longer going to be pursued.

25

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

```
                                                         Page 130
  1    BY MR. VILMOS:
  2         Q.    And you did withdraw that suggestion?
  3         A.    Yes.
  4         Q.    Because your client was Bradley Ledford?
  5         A.    Well, I didn't withdraw it because my
  6    client was Bradley.  I withdrew it because
  7    Bradley's personal counsel told me to.
  8         Q.    You mentioned that with regard to the
  9    settlement agreement, Mick Callahan was always --
 10    your words -- driving the bus?
 11         A.    Yes.
 12         Q.    Was he also driving the bus with regard
 13    to the defense?
 14         A.    No, no, no.  And he would make sure that
 15    he -- you know, he would be overly involved, and
 16    then we'd get an email that says you're responsible
 17    for the defense, not me.  There was always that
 18    follow up CYA email after an extensive amount of
 19    involvement.
 20              But no, Michael and I found the experts.
 21    Michael and I met with the experts, but he was in
 22    on every discussion.  He read every report.  He
 23    approved CVs.  He provided theories on things.
 24    And, in fact, he even went so far as to take credit
 25    for coming up with the case against Condotte, which
```

Page 131

1    was all Michael Orr.

2          Q.   Based on your review of the file when

3    you initially got involved --

4          A.   Oh, yeah, August of '14.

5          Q.   I presume it took you a little while to

6    get up to speed with what had happened before your

7    involvement?

8          A.   Well, no, because I didn't review the

9    file for -- do you mean like their claims file?  I

10   wasn't provided that.  I was provided the complaint

11   and a little bit of information, so -- and I spoke

12   with Michael, and anything he had I reviewed.

13         Q.   So from the questioning this morning, it

14   appears that your initial involvement with

15   Auto-Owners came several days before the tender of

16   the $3 million limits; is that accurate?

17         A.   The -- I mean I think they tendered it a

18   long time before I got involved.  I don't know.  I

19   think.  But I got involved, and then I was

20   subsequently asked to ask if Mr. Kalbac would take

21   it.

22         Q.   Do you see anything that Auto-Owners did

23   to in any way delay its evaluation or payment of

24   this claim?

25              MR. BONNER:  Objection.  Lack of

Page 132

1          foundation.

2              A.    I'm not aware of anything before I got

3      involved, because I was not involved.  And, you

4      know, Pamela didn't explain anything to me about

5      what happened.  I was not given any of those

6      details.  But almost immediately after I was

7      retained I was asked to see if Joe would take the

8      3 million.

9      BY MR. VILMOS:

10             Q.    And it was always your impression that

11     Auto-Owners would offer its full policy limits if

12     at any time a settlement offer came to --

13             A.    Oh, yeah.

14             Q.    -- release both parties in exchange for

15     that amount?

16             A.    Yes.

17             Q.    Do you know why Mick Callahan was so

18     adamant that you come up with an amount for the

19     consent judgment?

20             A.    I don't know.

21                   (Defendant's Exhibit 1 was marked for

22             identification.)

23     BY MR. VILMOS:

24             Q.    I'm going to show you what I've marked

25     as Moses No. 1 --

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 133

1        A.    Okay.

2        Q.    -- and ask you to look that over and

3   explain on the record what you think it is.

4        A.    It's a series of emails on September 8,

5   2016.

6        Q.    Between you and Mr. Callahan, and it

7   looks like Mr. Michael Fox Orr and John Holcomb are

8   copied?

9        A.    Yeah.  And I assume -- it says "Jamie

10   Moses file"?

11        Q.    That would be the Fisher Rushmer file.

12        A.    Really?  Okay.

13             MR. BONNER:  For the record, Ms. Moses,

14        we each Bates stamped the same production

15        because Fisher Rushmer did not Bates stamp

16        it.

17             THE WITNESS:  That FR on the bottom was

18        not from Fish -- that was you guys, okay.

19             MR. BONNER:  That was plaintiff's Bates

20        stamp, and what you have before you is

21        defendant's Bates stamp.

22        A.    So, yes, I -- this is an email exchange

23   between Mick Callahan, Michael Fox Orr, John

24   Holcomb, and myself.

25

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 134

1   BY MR. VILMOS:

2       Q.   In the last response, which is the top

3   of the first page, that appears to be an email

4   correspondence at 2:21 p.m., September 8, 2016,

5   from you to Mr. Callahan.  It says "Michael

6   Callahan."  That's the Mick Callahan you've been

7   referring to?

8       A.   Yes.

9       Q.   This paragraph relates to the fact that

10  you seem to be conveying that you, quote, cannot

11  participate in the negotiations as to the amount of

12  the consent judgment, end quote.  The amount is

13  emphasized with an underline.

14          Is this consistent with your

15  conversations with Mick Callahan?

16          MR. BONNER:  Objection.  Form.

17      A.   Yes.  I felt that Pamela when she wrote

18  that letter that said as for the consent judgment,

19  that's up to you, Bradley, and Jamie.  She's saying

20  the propriety of doing it, that's up to you guys.

21          Mick seemed to think that that meant

22  that I'm supposed to give him a number as to value,

23  and there's no way that's what that letter meant,

24  and there's no way I could do that.

25

Page 135

1   BY MR. VILMOS:

2        Q.   And it's your testimony that you never

3   did it?

4        A.   Correct.

5        Q.   Is it your testimony that Auto-Owners

6   didn't consent to Mr. Ledford's entry into the

7   settlement agreement and consent judgment?

8        A.   I didn't say that.

9             MR. BONNER:  Objection to form.

10       A.   I didn't say they didn't consent.  I

11  didn't say they did consent.

12  BY MR. VILMOS:

13       Q.   Do you have an opinion on that?

14            MR. BONNER:  Objection.  It calls for

15       speculation.  Actually, it calls for legal

16       analysis.

17       A.   I really -- I don't think they would

18  consent to a $30 million judgment, so...

19  BY MR. VILMOS:

20       Q.   And you don't think they did in this

21  case?

22            MR. BONNER:  Objection.  Form.

23       A.   No one asked them, "Can Bradley do

24  this?"

25

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

Page 136

1   BY MR. VILMOS:

2        Q.   I believe you testified earlier that it

3   the was your job in this case to defend Bradley

4   Ledford?

5        A.   That was my role, yeah.

6        Q.   And I believe you made a reference that

7   as a mama bear, you actually got very protective of

8   him at times during this process?

9        A.   I did.  I did.

10       Q.   And I believe you testified that

11  Auto-Owners never impinged your ability to defend

12  Bradley in this case?

13       A.   Oh, never.

14       Q.   They never constrained you with regard

15  to your expenses or anything in that regard?

16       A.   No, never.

17       Q.   You said you weren't aware of the

18  language in the insurance contract at issue here,

19  but whether or not there was an ongoing duty to

20  defend Bradley Ledford after the dismissal of Bob

21  Ledford's RV and the payment of the policy limits,

22  you're aware that Auto-Owners agreed to continue to

23  pay defense costs?

24       A.   I believe that's what our --

25            MR. BONNER:  Objection.

Page 137

1          THE WITNESS:  Sorry.

2          MR. BONNER:  It mischaracterizes her

3     testimony.

4     A.   I believe that's what Pam McLean's

5     letter says -- one of the prior exhibits.

6     BY MR. VILMOS:

7     Q.   And after Auto-Owners paid Bob Ledford's

8     RV the $3 million policy limits in exchange for a

9     release from the plaintiff, did you from the time

10    of the payment of that money to the time you left

11    Fisher Rushmer, did you see Auto-Owners in any way

12    withdrawing their defense?

13    A.   I don't know when the money was paid.  I

14    can't recall that.  But as long as I was at Fisher

15    Rushmer, which was until October 31st, 2016, I was

16    retained defense counsel and wasn't told to stop

17    working, anything like that.

18    Q.   Do you know who came up with the

19    structure of the settlement in this case?

20    A.   I thought the agreement was initially

21    written by Joe Kalbac.  I feel like -- and then

22    Mick forwarded it to Mike and I saying, Here's a

23    proposed agreement from Joe, and that's when I said

24    I couldn't participate.

25          (Defendant's Exhibit 2 was marked for

Page 138

1           identification.)

2    BY MR. VILMOS:

3           Q.   I'm going to mark as Moses Exhibit 2an

4    email dated August 25, 2016, from Mick Callahan to

5    Michael Fox Orr, copying you, Brad Ledford, David

6    Ledford, John Holcomb, and Sherri LaFerrara, whom I

7    believe works at the Mick Callahan law firm.

8                I'm going to show it to you for

9    identification.

10          A.   Wow.  This should not have been

11   produced, in my opinion.

12          Q.   Because of its inclusion of David

13   Ledford?

14          A.   Oh, and Bradley.  I mean this is

15   completely attorney-client amongst the

16   defendants -- or not completely, because there's a

17   letter from Joe that starts it all.  But I think

18   this is -- should not have been produced.  But I

19   wasn't consulted by my prior firm as to the

20   production; so I'm going to walk a really fine line

21   here.

22          Q.   And I respect that, and that's fine.

23               I'm going to direct you to the second to

24   last paragraph in this correspondence on page 1.

25          A.   Okay.

Madison Cawthorn v. Auto-Owners Insurance                 Jamie Billotte Moses | 8/10/2017

Page 139

1       Q.    And it starts with the word "Jamie."

2       A.    Mm-hmm.

3       Q.    And then in the second sentence, it

4  starts, "She does not in any way have to discuss or

5  be involved in the merits of any ECL claim for

6  amounts above policy limits just because she

7  evaluates the claim and makes a recommendation

8  regarding the consent judgment in terms of the

9  likely outcome at trial," end quote.

10          Do you know what Mick Callahan meant by

11  that?

12          MR. BONNER:  Objection.  It calls for

13       speculation.

14       A.    No.  All I know is I would get lectured

15  by Mick when I wouldn't do what he wanted, and

16  that's part of this.

17  BY MR. VILMOS:

18       Q.    And ECL is "extra-contractual

19  liability"?

20       A.    I believe so.  I think that's how he

21  defined it throughout this entire case.

22       Q.    You mentioned earlier that you thought

23  Mick Callahan was a bad-faith guy.  Do you mean a

24  bad-faith plaintiffs attorney?

25          MR. BONNER:  Objection.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 140

1          A.    I think he might do a little bit of
2     both, but I've always thought Mick was on the
3     plaintiff's side.
4               (Defendant's Exhibit 3 was marked for
5          identification.)
6     BY MR. VILMOS:
7          Q.    I'm going to show you what I've marked
8     as Moses 3, and I will tell you it seems to be a
9     letter from you to Joe Kalbac at Colson Hicks,
10    dated August 23, 2016, copying Mick Callahan.
11         A.    Mm-hmm.
12         Q.    The second paragraph starts with, "I
13    cannot get involved in the settlement discussions,
14    given how they were presented to me by Mick
15    Callahan."
16              Do you remember how they were presented
17    to you by Mick Callahan and what that meant?
18         A.    He forwarded an email that had -- I
19    believe it was an email or a letter -- that had
20    multiple if not this, then that, then whatever.
21    And it wasn't just a we'll take X-amount and go
22    away.  There were contingencies, and, you know, we
23    might let -- it was very convoluted and would
24    require negotiations with plaintiff's attorney.
25    And so that's why I felt I couldn't get involved.

Page 141

1    I couldn't just relay the offer.  There were

2    things -- it was too intricate.

3         Q.   So in your defense of Bradley Ledford,

4    you had made it clear that you were not going to

5    negotiate the terms of the consent judgment except

6    insofar as to protect Bradley's interests?

7         A.   Yes, yes, and I wouldn't even negotiate

8    the terms.  I reviewed it and relayed to Mick the

9    provisions of the agreement -- not related to the

10   amount but the other provisions of the agreement

11   that concerned me with respect to Bradley.

12        Q.   Do you recall, without seeing any

13   documents, what your concerns were?

14        A.   I think I said earlier it was the

15   involving -- that he didn't waive the

16   attorney-client privilege with me and that if

17   Bradley was to be approached later for testimony or

18   anything that his personal counsel would defend him

19   in those actions.  I believe those were two of the

20   issues that concerned me, and I think there's an

21   email that says that.

22             And then there were just errors in it.

23   As an appellate lawyer, I'm a bit of a grammar and

24   all that kind of nerd, and I did just, in general,

25   recommend changes to the grammar and the syntax and

Page 142

1  the spelling and things like that, and we saw they

2  stayed in there, so...

3       Q.   Did it get to a point in these

4  negotiations where you felt that Mick Callahan was

5  essentially telling you to back off and let him

6  take control?

7       A.   No, no -- I wouldn't say that, no.  It

8  was -- no, he didn't tell me to back off, because I

9  kept saying I can't be involved.  He was trying to

10 pull me in -- I need an amount for you.  I need you

11 to evaluate the claim.  I need an amount.  You must

12 give me an amount.  You're failing your client by

13 not giving me an amount -- you've seen the language

14 he used with me.  So it wasn't "back off."

15      Q.   Was he worried that your involvement

16 might blow up the settlement?

17      A.   No -- I have no idea what Mick was

18 worried about.  I think Mick's effort was to try to

19 get me involved to add credibility to the consent

20 judgment.

21      Q.   You agree that there came a time when

22 you essentially said what you had to say and

23 thereafter withdrew your further comments?

24      A.   No, no.  I think -- I think Mick made

25 the call, threw out 15 to 30.  Once I said "I think

Page 143

1   that's a risk" -- you know, that number -- they

2   could put up that number, he was done.  He got what

3   he wanted.  Defense counsel has blessed this.

4   That's how I assumed he portrayed it.

5          Q.    It's your testimony you never blessed

6   any number?

7          A.    No.

8          Q.    And he never discussed with you the

9   liability of other parties?

10         A.    Yeah, we didn't go through a breakdown

11  of what he thought I thought would be the

12  apportionment of liability.

13         Q.    And it's your testimony today that you

14  thought it was a possibility at trial that either

15  Bradley Ledford or Bob Ledford's RV or both could

16  have been less than 50 percent liable in this

17  case --

18         A.    Yes.

19         Q.    -- on a comparative liability basis?

20         A.    Well, when you add the third party, yes,

21  yeah.

22         Q.    Then there really would have been four

23  parties.  It would have been potentially a third to

24  the construction company, a third to Madison, and

25  some division between Bob Ledford's RV and Bradley;

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

                                                      Page 144

 1    correct?

 2              MR. BONNER:   Objection.

 3         A.   Potentially, or -- you know -- yeah, or

 4    25, 25, 25.   I mean there was -- I felt like it

 5    wasn't going to be a 100 percent against the

 6    defendants.

 7              (Defendant's Exhibit 4 was marked for

 8         identification.)

 9    BY MR. VILMOS:

10         Q.   I'm going to show you what I've marked

11    as Moses No. 4, just to see if that refreshes your

12    recollection as to what was happening on

13    September 22, 2016.

14         A.   Oh, okay.   Should no -- under no

15    circumstances should this have been produced,

16    absolutely none.   I mean it's attorney-client

17    privileged.   Under no circumstances should that

18    have been produced.

19              And that came from Fisher Rushmer?

20         Q.   Yes, ma'am.

21         A.   Wow.

22              This must have been in the one file I

23    couldn't open up from David.

24              MR. BONNER:   I have no idea.   You mean

25         from David --

Madison Cawthorn v. Auto-Owners Insurance                     Jamie Billotte Moses | 8/10/2017

Page 145

1               THE WITNESS:  Corso.

2               MR. BONNER:  Corso?

3               THE WITNESS:  Yeah.

4               MR. BONNER:  Just because you're on the

5          video, I want to make clear that you're not

6          looking over at me and insinuating that I --

7          A.   No, no, no, no.  I'm sorry.

8               This should not have been produced.

9     This is clearly Mick, Michael, David Ledford,

10    Bradley Ledford.  I mean this is -- yeah.

11              So you have it, do what you want with

12    it, but I don't feel I can answer questions.

13              (Defendant's Exhibit 5 was marked for

14         identification.)

15    BY MR. VILMOS:

16         Q.   That's fine.  I won't ask any.

17              Just to close up the loop, this is an

18    email chain dated September 7, 2016.

19         A.   Okay.

20         Q.   The top email on that page is from you

21    to Mick Callahan, copying Michael Fox Orr and your

22    legal assistant?

23         A.   Yes.

24         Q.   And it says in the second sentence of

25    the first paragraph, "All of us need to be on the

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 146

1    same page with respect to the settlement of these

2    claims, especially given how the settlement

3    agreement might affect our mutual client."

4              Do you know who you referred to there?

5         A.   God, Fisher Rushmer produced this too.

6    Unbelievable.  Wow.

7              I don't -- I don't remember what I was

8    referring to with this, honestly, about being on

9    the same page.  Hmm.  I apologize that I don't

10   remember that.  It wouldn't be about amount.  I

11   don't think it would be about amount, because I

12   refused to discuss that.

13        Q.   No, I presume this was about the things

14   other than the amount that you were concerned with

15   with your comments.

16             Do you know if Bradley Ledford waived

17   his privilege with regard to your file?

18        A.   He did not.  He did not.  I thought in

19   the settlement agreement Bradley did not waive.

20   What he waived is, I think, based on what you sent

21   me, Mr. Bonner, was anything that involved

22   Auto-Owners and Bradley and me, he waived that, I

23   thought.

24             But if it was just me and Bradley, he

25   had not waived that.  And Mick is an extension of

```
                                              Page 147
 1   Bradley.  And with Michael Orr, I had a joint

 2   defense, and his client David had a privilege,

 3   so...

 4             MR. VILMOS:  Let's take a quick break.

 5             THE WITNESS:  Sure.

 6             THE VIDEOGRAPHER:  Going off the record.

 7        The time is 4:12.

 8             (Break from 4:13 p.m. to 4:23 p.m.)

 9             THE VIDEOGRAPHER:  Back on the record.

10        The time is 4:22.

11   BY MR. VILMOS:

12        Q.   Do you know who ultimately suggested the

13   $30 million consent judgment number?

14             MR. BONNER:  Objection.  It

15        mischaracterizes the evidence.

16        A.   I don't remember if there was a number

17   in the very first draft that came from Mr. Kalbac.

18   I don't know.

19             And I do remember -- I feel like

20   discussing is a lower number of possibility and I

21   was told no, but I don't know -- I don't know if it

22   was Mick.  I don't know if it was Joe.  I really

23   can't remember, but the very first consent

24   agreement said if it was 30 million put in there by

25   Joe Kalbac.
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

                                                                    Page 148

1    BY MR. VILMOS:

2         Q.   Do you know if Mick Callahan or Joe

3    Kalbac ever asked Auto-Owners to execute the

4    consent judgment?

5         A.   I don't know.

6         Q.   Do you know if Auto-Owners refused to

7    execute the consent judgment?

8         A.   I don't know if they were asked to, so I

9    don't know if they refused.

10             MR. VILMOS:  Thank you for your time.

11             Subject to any follow-up from

12        Mr. Bonner's follow-up, I think I have no

13        further questions.

14             THE WITNESS:  Okay.

15             MR. BONNER:  Let's go off the record for

16        just a second for me to go back around.

17             THE VIDEOGRAPHER:  Going off the record.

18        The time is 4:24.

19             (Break from 4:25 p.m. to 4:26 p.m.)

20             THE VIDEOGRAPHER:  Back on the record.

21        The time is 4:26.

22                      REDIRECT EXAMINATION

23    BY MR. BONNER:

24        Q.   All right.  Ms. Moses, thank you for

25    bearing with us.

Page 149

1        A.    No worries.

2        Q.    During examination by counsel, there

3   were some questions about events that happened

4   preceding your involvement with the case.

5              So the accident happened on April 3,

6   2014; correct?

7        A.    I believe so, the 3rd or 4th.

8        Q.    The 3rd or 4th.

9              And you were involved either in late

10  July or early August 2014?

11       A.    Correct.

12       Q.    So there was a period there of three to

13  four months in which you were not involved?

14       A.    Correct.

15       Q.    Fair to say you have no personal

16  knowledge of what happened during those three to

17  four months that you were not involved in the case?

18       A.    The only thing I know is what I learned

19  through depositions -- you know, so if a witness

20  said I saw this, I saw that, I know what that

21  information.

22       Q.    You yourself have no personal knowledge,

23  though, regarding the events that transpired

24  between April 3, 2014, and the end of July/

25  beginning of August 2014, when you were retained?

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

```
                                                        Page 150

    1        A.    Correct.

    2              MR. VILMOS:   Object to the form.

    3        Personal knowledge.

    4   BY MR. BONNER:

    5        Q.    Now, there were some comments about Mick

    6   Callahan.

    7        A.    Yeah.

    8        Q.    With respect to his practice, you don't

    9   have any personal knowledge of what percentage of

   10   his cases are defense cases or plaintiff's cases;

   11   true?

   12        A.    I don't have an exact percentage, but

   13   Mick talks a lot.  So you get a lot of war stories

   14   with Mick, an exorbitant amount of war stories.

   15              And so I heard about all of his big wins

   16   and his big this and his big that and -- you know

   17   what I mean?  You hear a lot about it.  And so my

   18   impression is that he was more plaintiffs oriented

   19   than defendant.

   20        Q.    Did he tell you that he was an expert

   21   witness in a bad-faith case in Orlando in 2016 as

   22   an expert witness for Allstate?

   23        A.    He may have.  I mean I'm serious when I

   24   say Mick tells a lot of stories.

   25              And so he may have said, well, I'm going
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

Page 151

1    to be a witness for Allstate or something.  He may

2    have.

3         Q.   Now, you also mentioned that your

4    understanding was that John Holcomb was the person

5    who recommended to the Ledfords that they retain

6    Mick Callahan for Bradley Ledford; correct?

7         A.   I thought that's what the connection

8    was, because Holcomb is over in Tampa, and Mick's

9    in St. Pete -- you know, they're West Coast guys.

10        Q.   I'll represent to you my understanding

11   from this case is that John Holcomb brought in Mick

12   Callahan.

13        A.   Oh, okay.  So I was right.  Okay.

14        Q.   And I believe that the Ledfords -- if I

15   misstate, I apologize --

16        A.   Okay.

17        Q.   -- but I believe that the Ledfords have

18   actually testified to that effect.

19        A.   Okay.

20        Q.   Now, your understanding was John Holcomb

21   was retained first by the Ledfords?

22        A.   I thought so.

23        Q.   Did you ever have any direct

24   conversations with John Holcomb as to why he

25   brought Mick Callahan in to defend Bradley?

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

                                                              Page 152

1        A.    No.   I never would have asked that

2    either.

3        Q.    And did Mick Callahan ever tell you why

4    he had been hired to defend Bradley?

5        A.    He did make some comment about because

6    of his expertise.

7        Q.    Okay.  Right.

8             I think what it was was John Holcomb

9    said, Hey, I think you know more about the issues

10   in this type of case than I do.

11            MR. VILMOS:  Object to the form.

12       A.    I didn't get the impression it was about

13   the defense of the case.  I thought it was his

14   expertise and bad-faith claims, so...

15   BY MR. BONNER:

16       Q.    I'm going to show you something that's

17   previously been marked as Exhibit 21, and I --

18   you're not addressed on this.  Okay?

19       A.    Okay.

20       Q.    So, first of all, I want to ask you

21   about some factual positions that are taken in this

22   email that's marked as Exhibit -- sorry, 21.  The

23   exhibit is an email between John Holcomb and Mike

24   Orr, and you'll see it's been Bates stamped.  It

25   was produced by Auto-Owners.

Page 153

1          So what I want to direct your attention

2     to is the two arrows that appear on Exhibit 21.

3          A.   Can I ask who is Denise Devlin?  I'm

4     sorry.  I'm not allowed to ask questions.

5          Q.   I don't mind you asking me a question --

6          A.   Is she with Auto-Owners?

7          Q.   I don't know off the top of my head.

8     But tell me when your attention -- when you've

9     found the two errors that appear on Exhibit 21.

10         A.   Yeah, I can see them.  I can see them.

11         Q.   Did anyone ever communicate to you that

12    the Ledfords had been told the policy limits had

13    been extended to Mr. Cawthorn prior to the date of

14    that email, August 5th, 2014?

15         A.   Okay.

16              "Mr. Ledford advised me that he was told

17    by Auto-Owners that the policy limits had offer to

18    settle this tragic case.  He said both the

19    underlying policy -- he said he had no question" --

20              It was my understanding that before the

21    lawsuit was filed, Auto-Owners had tendered its

22    policy limits.

23         Q.   Did Auto-Owners ever show you this

24    email, which I'm showing you as Plaintiff's 20,

25    August 6th 2014?

Madison Cawthorn v. Auto-Owners Insurance                   Jamie Billotte Moses | 8/10/2017

                                                                   Page 154

1        A.    Did Auto-Owners show me this?

2        Q.    That's correct.

3        A.    No.

4        Q.    You'll notice that this is an email that

5   purports to extend authority to make a $3 million

6   settlement offer in the Cawthorn versus Ledford

7   case.

8              MR. VILMOS:   Objection.  It misstates

9        the document.

10       A.    I have no idea what this is.

11  BY MR. BONNER:

12       Q.    Okay.

13       A.    Never seen it.

14       Q.    Now, I bring this up because if you look

15  on August 7th, there was another correspondence by

16  Auto-Owners.  This was previously marked as

17  Exhibit 22.

18             Have you ever seen this correspondence

19  which is from Ms. McLean at Auto-Owners to Joe

20  Kalbac?

21       A.    I'm copied on it.  Yeah.

22       Q.    So you had seen this letter, dated

23  August 7, 2014, which purports to make a settlement

24  offer to Mr. Cawthorn to release his claims against

25  Bradley Ledford and Bob Ledford RV & Marine in

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

Page 155

1    exchange for payment of $3 million?

2         A.   I mean they copied me on it.  Yeah.  I

3    believe the health carrier was USAA or something.

4         Q.   His health carrier was USAA; true?

5         A.   Yeah, yeah.

6         Q.   If you'll hand this back to me.

7              Now, this is not a memory test, and if I

8    had an exhibit to show you, I would, but I don't.

9         A.   Okay.

10        Q.   Were you ever presented with another

11   document that offered $3 million to Mr. Cawthorn or

12   his counsel which purported to -- in exchange for a

13   release of the Ledfords, Bob Ledford RV & Marine

14   and Bradley Ledford, that's dated before August 7,

15   2014?

16        A.   No, because I wasn't involved before

17   that time.

18        Q.   So you don't know what happened or

19   didn't happen with respect to settlement offers

20   before August 7, 2014?

21        A.   I don't have written documentation of

22   what happened.

23        Q.   And, just to be clear, the exhibit I

24   showed you in 21 includes a request by John Holcomb

25   to Mike Orr for copies of correspondence that would

Page 156

1    show that a settlement offer had been made.

2         A.    It does say, you know, "If the policy

3    limits have been offered, please provide me with

4    copies of this."

5         Q.    And if you turn back to Exhibit 22, we

6    have attached a copy of that lien notice, the

7    letter reads.  After receiving this notice, we do

8    feel we have the documentation necessary to tender

9    the insured's coverage to your client.

10              Does that suggest to you that they

11   tendered the coverage to Mr. Cawthorn before

12   August 7, 2014?

13        A.    I have no idea.

14              MR. VILMOS:  Object to the form.

15        A.    No idea.

16   BY MR. BONNER:

17        Q.    And I bring this up just because you've

18   characterized Mick Callahan as you not knowing

19   where his royalties lied perhaps -- and if I'm

20   putting words in your mouth, take them out.

21              But when you made those comments, were

22   you aware of any of these allegations that stem

23   from Exhibits 21, 20, and 22?

24              MR. VILMOS:  Object to the form.

25        A.    I made those comments today.  So

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

                                                        Page 157

1    obviously I was aware of those letters.

2    BY MR. BONNER:

3         Q.   You were or were not aware of those

4    letters?

5         A.   Well, I'm copied on them.  I wasn't

6    aware of John Holcomb's, but I was copied on this

7    letter.

8         Q.   But you were not aware of John Holcomb's

9    requests for proof that --

10        A.   No, I was not aware of that.

11        Q.   And you were not aware that the Ledfords

12   apparently believed that the policy limits had been

13   offered sometime prior to August 7, 2014.

14             MR. VILMOS:   Objection to the form.

15        A.   My -- that says the Ledfords thinks they

16   were offered before, and my memory of someone

17   saying something was that the policy limits had

18   been offered before this.

19   BY MR. BONNER:

20        Q.   Now that you have had a chance to

21   refresh your recollection with Exhibit 22, which

22   doesn't appear to be consistent with a prior offer

23   of $3 million having been made, do you affirm, is

24   it still your belief that someone told you that an

25   offer before --

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

Page 158

1        A.    Oh, yeah, someone has said they've been
2    trying to give them this money for a long time.
3        Q.    Was that Ms. McLean?
4        A.    No, no, no, no.  No, no, no, no.  She
5    didn't talk about -- no.
6        Q.    Was it Ms. Pitman?
7        A.    I don't even know who Ms. Pitman is.
8    Sorry.  I don't know who she is.
9        Q.    And I'm not trying to be tricky.  She's
10   a legal officer that was working with Ms. McLean.
11       A.    No, I don't even know who she is.
12       Q.    And actually, I think her name appears
13   on one of the exhibits I showed you.
14       A.    Right, right, right.  And I think her
15   sticker, doesn't it say Melinda --
16       Q.    It's Melinda Pitman?
17       A.    Yeah.  You deposed her apparently.
18       Q.    That's right.
19       A.    No.  I think maybe Mr. Ledford said
20   or --
21       Q.    Right, because Mr. Ledford believed --
22       A.    Right.
23       Q.    -- that they had been offered.
24             Okay.  So were you aware that the day
25   after receiving this inquiry from John Holcomb,

```
                                              Page 159
 1   Auto-Owners retained bad-faith counsel?
 2        A.   No.  Of course, I wouldn't be aware of
 3   that.
 4        Q.   They had bad-faith counsel before they
 5   even extended the offer as Exhibit 22?
 6        A.   I would not be aware of that.
 7        Q.   All right.  I want to shift gears.
 8        A.   Okay.
 9             (Plaintiff's Exhibit 105 was marked for
10        identification.)
11   BY MR. BONNER:
12        Q.   Now I am going to get a chance to use
13   Exhibit 105.
14        A.   Good.  You can sleep well tonight.
15        Q.   I can.
16             It's a letter from March 12, 2015,
17   between you and Mick Callahan, and it's talking
18   about defense strategy.
19        A.   And who produced this?
20        Q.   Mr. Callahan.
21        A.   Can't believe he did.
22             MR. VILMOS:  Do you have a copy for me?
23   BY MR. BONNER:
24        Q.   Yes, I'm going to give it to you.
25             I don't have any substantive questions
```

Page 160

1    about this, but I do -- well, I have one, which is:

2              You agree with me, consistent with your

3    testimony earlier today, that Mr. Callahan was

4    involved in trying to find defenses to liability

5    for Mr. Ledford, Bradley Ledford?

6         A.    Yeah.

7         Q.    And Exhibit 105 is emblematic of some of

8    those efforts?

9              MR. VILMOS:  Objection to the form.

10   BY MR. BONNER:

11        Q.    I'll strike it, because "emblematic" can

12   be tricky.

13        A.    Yeah, I'm trying to figure out what it

14   means.

15        Q.    And I'm not trying to be tricky.

16        A.    Sure.

17        Q.    The letter marked as Exhibit 105

18   represents one of the efforts that Mr. Callahan

19   made to advance defenses on behalf of Bradley

20   Ledford.

21        A.    Mick was hot and cold.  One minute it

22   was, "Defense is completely up to you guys.  I

23   can't get involved in the defense of that."

24              On the other hand, we would get letters

25   like this.  He would just:  Boo, he would do this,

Madison Cawthorn v. Auto-Owners Insurance          Jamie Billotte Moses | 8/10/2017

Page 161

1    he would come in, he would come out.  So I don't

2    doubt that he would write a letter asking us all

3    these questions.

4         Q.   But the questions that are reflected in

5    Exhibit 105 are aimed at protecting Bradley Ledford

6    from liability in the lawsuit?

7         A.   Oh, I don't -- no, no, I don't read this

8    this way.  I don't read it that way.  This is Mick

9    saying, you know, I'm going to ask you guys all

10   these questions to see if you're doing your job.

11        Now, don't get me wrong.  They're about

12   defense issues, and I am not suggesting that Mick

13   did anything to jeopardize the defense or interfere

14   with the defense at all.  I am not saying that.

15        But my only comment is that Mick would

16   be hot or cold.  Sometimes the defense was

17   completely my responsibility, and that the next

18   time he was involved with question after question

19   after question.

20        And sometimes Joe Kalbac would say

21   things that I believe he could only ever have known

22   through Mick.

23        Q.   Okay.

24        A.   Now, whether Mick felt that was

25   advancing Bradley's defense and protecting Bradley,

Page 162

1   maybe he did.

2        Q.   Let me just circle back to a couple

3   things you said there, because they're important.

4        A.   Sure.

5        Q.   Do you agree that Mick Callahan never

6   did anything to prejudice Bradley Ledford's

7   defense?

8        A.   Oh, if he was telling Joe things, I

9   think it would affect Bradley's defense, but we

10  never went through with a trial with this case, so

11  I don't know.

12       Q.   Did Mick Callahan ever interfere with

13  the defense of Bradley Ledford?

14       A.   No, I wouldn't say that.  No, no.

15       Q.   And I think you said that if Mick

16  Callahan made disclosures to Joe Kalbac, it's

17  possible he did so to advance Bradley Ledford's

18  interest?

19       A.   He may justify it that way and say,

20  yeah, this is helping Bradley.  I don't know.

21       Q.   Back to the settlement agreement.  You

22  were asked whether or not Auto-Owners consented to

23  the settlement agreement, and I thought you

24  testified -- and correct me if I'm mistaken --

25       A.   Sure, I will.

Page 163

1       Q.    -- that you said they were never asked

2    to consent.

3       A.    I am not aware of this document being --

4    I know I didn't send it.  I am not aware of Mick or

5    anybody sending it to Pamela McLean or anyone

6    they've been dealing with saying we would like you

7    to bless this.

8       Q.    Can you rule out that Mick Callahan sent

9    it to Auto-Owners?

10            MR. VILMOS:  Object to the form.

11      A.    I have no idea what he did.  I have not

12   seen anything.

13   BY MR. BONNER:

14      Q.    And what I'm saying is:  Are you saying

15   that I haven't seen anything; so the answer is no,

16   he didn't send it; or are you saying that I haven't

17   seen anything; so it's possible he sent it; I just

18   don't know?

19            MR. VILMOS:  Objection.  Compound.

20      A.    It's kind of both of those things.  I

21   mean Mick was asked to produce everything, and

22   goodness knows if he had written a letter like that

23   to Auto-Owners, I think he would produce it.

24   BY MR. BONNER:

25      Q.    All right.  This was --

Page 164

1        A.    Maybe you'll find out in his depo.

2        Q.    Exactly.

3              You were presented this document by

4    counsel, and you identified it as privileged a

5    moment ago.  This has an additional communication.

6              But actually, what I really want to look

7    at is Joe Kalbac's email to you.

8        A.    Okay, which wouldn't be privileged; so I

9    can talk about it, obviously.

10       Q.    Well, my follow-up might be, so don't

11   give me too much credit.

12       A.    Let me see.

13             (Plaintiff's Exhibit 109 was marked for

14             identification.)

15   BY MR. BONNER:

16       Q.    Exhibit 109, the email from Joe Kalbac

17   to you, do you recall receiving it?

18       A.    Okay.  It started with...

19             Okay.

20       Q.    May I just look at it one second,

21   because I don't have a copy in front of me.

22       A.    And there's something weird about that

23   email because --

24       Q.    About Joe's email to you?

25       A.    Well, there's Joe's email, and then

Page 165

1  apparently I write to whom I don't know.  "Who are

2  you dealing with at Auto-Owners?"  There's no "to"

3  here.  I don't understand this part.  There's

4  something funky going on here.  And then there's

5  what I consider to be a privileged communication

6  from Mick Callahan to the rest of us.

7          So I'm assuming this was to Mick because

8  it says, No one at Auto-Owners ever responded to

9  me, but I don't know why something is missing here.

10 That's really weird.

11      Q.   And, you know, this is not an exhibit

12 that I had intention --

13      A.   Intended to use?

14      Q.   Yeah.  And I appreciate the problem that

15 you're pointing out.

16          I do want to ask you that upon

17 refreshing recollection with the content of Mick

18 Callahan's email to you at the top of this page --

19      A.   Okay.

20      Q.   -- do you agree that Mick Callahan

21 indicated to you at some point that he had

22 discussed the settlement proposal with someone at

23 Auto-Owners?

24      A.   No.  This one says no one at Auto-Owners

25 ever got back to him.

Page 166

1    Q.   So that he had tried -- I'll rephrase my

2  question.

3          Do you agree that Mick Callahan at some

4  point after receiving Joe Kalbac's settlement

5  demand letter at some point indicated to you that

6  he was trying to speak to someone at Auto-Owners

7  about the demand?

8    A.   I am not -- I am not going -- ask him.

9  I have no idea.

10         MR. BONNER:  That's fine.  I have no

11      more questions on this document.

12         Let's go off the record for a minute.  I

13      do want to go through this and see if I have

14      a document that actually would have the

15      information that I'm looking for that it was

16      forwarded to Auto-Owners.  I might not have

17      that with me.  I didn't bring it with me.

18         THE VIDEOGRAPHER:  Going off the record.

19      The time is 4:46.

20         (Break from 4:47 p.m. to 4:50 p.m.)

21         THE VIDEOGRAPHER:  Back on the record.

22      The time is 4:49.

23  BY MR. BONNER:

24    Q.   I'm showing you what's previously been

25  marked as Exhibit 82.  This is a letter from Mick

Page 167

1    Callahan to Ms. McLean on which you're not copied;

2    correct?

3          A.   Correct.

4          Q.   It does reference a letter that I

5    believe you were shown earlier today, stating that

6    you did not want to be involved in discussions

7    concerning the consent judgment proposal that

8    Mr. Kalbac had proposed on August 8, 2016.

9          A.   Okay.

10         Q.   Did I characterize your letter

11   correctly?

12         A.   It was more than just didn't want to get

13   involved.  I felt I ethically couldn't.

14         Q.   And in response to that, it appears that

15   Mr. Callahan has omitted you from the

16   correspondence he sent to Auto-Owners immediately

17   after --

18         A.   Apparently, yeah.

19         Q.   Now, you said you never even opened the

20   consent judgment proposal that Mr. Kalbac had --

21         A.   No, no, no, I didn't say I -- well --

22         Q.   Please correct me if I've put words in

23   your mouth.

24         A.   I hate to say I didn't open it, because

25   I had to look at it to be concerned about it.  So I

Page 168

1    don't want to say I didn't open it, but I just

2    immediately responded that, whoa, this is not

3    something I can get involved in.

4         Q.   And I just wanted to verify.  You had

5    said something on the cross-examination about the

6    judgment amount.

7              Do you have a specific recollection of

8    what the proposed consent judgment amount would be

9    in against Bradley Ledford, Mr. Kalbac's original

10   settlement proposal?

11        A.   I'm don't remember.  That's why I'm

12   trying -- I don't know who proposed -- how they got

13   to the number 30.

14        Q.   If I were to suggest to you that his

15   initial proposal was $33 million, would you agree

16   that's what he proposed?

17        A.   If you represent to me that that's what

18   he proposed, I'll take your word for it.

19        Q.   I don't know if I like that answer.

20   Maybe I should find --

21        A.   No, no, no.  I just can't remember the

22   number, but, boy, that makes sense that that's

23   eventually what was agreed to.

24        Q.   Well, eventually what was agreed to

25   was --

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses | 8/10/2017

                                                        Page 169

1          A.    30.

2          Q.    -- was 30?

3          A.    Yes.

4          Q.    And the original consent proposal

5    actually encompassed both Bob Ledford RV &

6    Marine --

7          A.    Right.

8          Q.    -- and Bradley Ledford; correct?

9          A.    That -- I can't remember.

10         Q.    I'll leave that as it is.  I'll let

11   somebody else clean up --

12         A.    Okay.

13         Q.    -- because you said you don't recall

14   what the exact amount was?

15         A.    Correct, I do not.

16         Q.    It's possible it was 33.  It's possible

17   it was 30.  You don't remember?

18         A.    Correct.  Correct.

19         Q.    And if it was subsequently negotiated

20   from 33 to 30, you have no knowledge of how that

21   happened?

22         A.    Correct.

23         Q.    Okay.  If that happened, you would defer

24   to Mick Callahan to explain how that negotiation

25   happened?

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

                                                           Page 170

1          A.    Yes.

2          Q.    And eventually the consent of the

3     settlement agreement no longer included Bob Ledford

4     RV & Marine as a party to the agreement as well?

5          A.    Correct, except for the condition that

6     they had to be dismissed and all that.

7          Q.    Okay.  Ms. Moses --

8          A.    Yes, sir.

9          Q.    -- if you could please find out about

10    the mediation report --

11         A.    Sure.

12         Q.    -- whether or not it existed.

13               And I've got no further questions.

14               MR. VILMOS:  Thank you for your time.

15               THE WITNESS:  Oh, thanks.

16               MR. VILMOS:  You obviously have the

17         opportunity to read, or you can waive that

18         right.

19               THE WITNESS:  Do I have to come visit

20         you, Lance?  No.

21               I would like to read it if you guys are

22         now telling me I'm going to be a witness at

23         trial.  I'd like to read it.

24               MR. BONNER:  I think you should read it.

25               THE VIDEOGRAPHER:  Going off the record.

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

Page 171

1        The time is 4:53.

2            (The reading and signing of this

3        deposition was not waived.)

4            (This deposition was concluded at

5        4:54 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

Page 172

1

2                          CERTIFICATE OF OATH

3

4      STATE OF FLORIDA        :

5                                :SS.

6      COUNTY OF MIAMI-DADE :

7

8               I, Lance W. Steinbeisser, Registered

9         Professional Reporter, Notary Public, State

10        of Florida, certify that JAMIE BILLOTTE MOSES

11        personally appeared before me on the 10th of

12        August, 2017.

13

14              Signed this 15th day of August, 2017.

15

16

17

18

19        _____

20        LANCE W. STEINBEISSER, RPR CSR FPR
          Notary Public, State of Florida at Large
21        My Commission Number:  GG064258
          Expires:  May 4, 2021

22

23

24

25

T: 305.632.4464              Steinotype, Inc.              www.Steinotype.com

Madison Cawthorn v. Auto-Owners Insurance                Jamie Billotte Moses | 8/10/2017

Page 173

1          REPORTER'S DEPOSITION CERTIFICATE

2

3          I, Lance W. Steinbeisser, Registered

4     Professional Reporter, do hereby certify that

5     I was authorized to and did stenographically

6     report the deposition of JAMIE BILLOTTE

7     MOSES; that a review of the transcript was

8     requested; and that the transcript, pages 1

9     through 171, is a true record of my

10    stenographic notes.

11          I FURTHER CERTIFY that I am not a

12    relative, employee, attorney, or counsel of

13    any of the parties, nor am I a relative or

14    employee of any of the parties' attorney or

15    counsel connected with the action, nor am I

16    financially interested in the action.

17

18          Dated this 15th day of August, 2017, at

19    Miami, Florida.

20

21

22

23    _____

      LANCE W. STEINBEISSER, RPR CSR FPR

24    Certified Stenographer

25

```
                                                        Page 174
 1                         ERRATA SHEET

 2            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

 3     RE          :     CAWTHORN VS. AUTO-OWNERS
       DEPONENT    :     JAMIE BILLOTE MOSES
 4     TAKEN       :     AUGUST 10, 2017

 5     Page #      Line #            Change            Reason

 6     _____    _____

 7     _____    _____

 8     _____    _____

 9     _____    _____

10     _____    _____

11     _____    _____

12     _____    _____

13     _____    _____

14     _____    _____

15     _____    _____

16     _____    _____

17     _____    _____

18     _____    _____

19     _____    _____

20     _____    _____

21

       Under penalties of perjury, I declare that I have
22     read the foregoing document, and that the facts
       stated in it are true.
23

24     _____    _____
                Signature                 Date

25
```

Madison Cawthorn v. Auto-Owners Insurance                    Jamie Billotte Moses  |  8/10/2017

```
                                                  Page 175

  1                    STEINOTYPE, INC.
                     Stenographic Services
  2                  1140 Northeast 86 Street
                      Miami, Florida 33138
  3                      (305)632-4464

  4   August 15, 2017

  5   Jamie Billotte Moses
      via:  Jamie.moses@hklaw.com
  6
      RE:  CAWTHORN VS. AUTO-OWNERS
  7   DEPO OF:  JAMIE BILLOTE MOSES
      TAKEN:  August 10, 2017
  8
  9   Dear Ms. Moses:

 10        This letter is to advise that the transcript
      of your deposition has been completed and is
 11   available for review.  Please contact our office at
      (305)632-4464 to make arrangements for reading and
 12   signing.

 13        It is suggested that the review of this
      transcript be completed within 30 days of your
 14   receipt of this letter.

 15        In the event other arrangements are made,
      please send us a list of any and all corrections
 16   and/or changes, noting page and line numbers, and
      the reason for such changes, so that we can furnish
 17   respective counsel with a copy.

 18        The original of this transcript has been
      forwarded to the ordering party, and your errata,
 19   once received, will be forwarded to all ordering
      parties for the inclusion in the transcript.
 20
 21                     Sincerely,
 22
                       Lance W. Steinbeisser, RPR FPR CSR
 23                    Steinotype, Inc.

 24   cc:  (Copy to all counsel)

 25
```