## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| DAVID MADISON CAWTHORN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )      CASE NO. 6:16-cv-02240-JA-GJK |
| | ) |
| AUTO-OWNERS INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

### DEFENDANT'S NOTICE OF FILING DEPOSITION TRANSCRIPT OF ROGER CAWTHORN IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, AUTO-OWNERS INSURANCE COMPANY ("Auto-Owners"), by and through its undersigned counsel hereby give notice of filing the deposition transcript and exhibits of Roger Cawthorn taken on May 2, 2017 in support of Defendant's Motion for Summary Judgment.

### CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2017, I electronically filed the foregoing with the Clerk of the Court in the U.S. District Court, Middle District of Florida, Orlando Division, by using the CM/ECF system, which will send a notice of electronic filing to:

**William A. Bonner, Esquire**
*abonner@colson.com*
**Roberto Martinez, Esquire**
*bob@colson.com*
**COLSON HICKS EIDSON**
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
*eservice@colson.com;*
*claudia@colson.com*
*Attorneys for Plaintiff*

**Stephen A. Marino, Jr., Esquire**
*smarino@ypl-law.com*
**Michal Meiler, Esquire**
*mmeiler@ypl-law.com*
**VER PLOEG & LUMPKIN, P.A.**
301 E. Pine Street, Suite 790
Orlando, FL 32801
*smcgee@ypl-law.com*
*Co-Counsel for Plaintiff*

*/s/ Peter C. Vilmos*
**S. Greg Burge**          (Florida Bar # 0743770)
Email: *gburge@burr.com*
Secondary: *mkillian@burr.com*
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203
Tel:    205-251-3000
Fax:    205-458-5100

**Peter C. Vilmos**          (Florida Bar # 75061)
Email: *pvilmos@burr.com*
Secondary: *nwmosley@burr.com*
BURR & FORMAN LLP
200 S. Orange Avenue, Suite 800
Orlando, FL 32801
Tel:    407-540-6600
Fax:    407-540-6601

**Forrest S. Latta**          (admitted *pro hac vice*)
Email: *forrest.latta@burr.com*
Secondary: *pgrove@burr.com*
BURR & FORMAN LLP
11 North Water Street, Suite 22200
Mobile, AL 36602
Tel:    251-344-5151
Fax:    251-344-9696

*Attorneys for Defendant*
*Auto-Owners Insurance Company*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO: 6:16-cv-02240-JA-GJK

DAVID MADISON CAWTHORN,

        Plaintiff,

Vs.

AUTO-OWNERS INSURANCE
COMPANY,

        Defendant.

_____/

VIDEOTAPED
DEPOSITION OF:     ROGER CAWTHORN

DATE TAKEN:      May 2, 2017

TIME:          FROM 10:44 a.m. TO 2:55 p.m.

PLACE:        Offices of Burr & Forman, LLP
                201 North Franklin Street
                Suite 3200
                Tampa, Florida 33602

TAKEN BY:       The Defendant

REPORTED BY:    Christine Risher, RPR
                Court Reporter, Notary Public

```
 1    A P P E A R A N C E S:

 2    ROBERT MARTINEZ, ESQUIRE
      W. ALLEN BONNER, ESQUIRE
 3    OF:    The Law Firm of Colson Hicks Eidson
             255 Alhambra Circle, Penthouse
 4           Coral Gables, Florida 33134
             Telephone: 305-476-7444
 5           Mr. Martinez: Bob@colson.com
             Mr. Bonner: Abonner@colson.com
 6
             APPEARING ON BEHALF OF THE PLAINTIFF
 7
      S. GREG BURGE, ESQUIRE
 8    PETER C. VILMOS, ESQUIRE
      OF:    Burr & Forman, LLP
 9           200 South Orange Avenue
             Suite 800
10           Orlando, Florida 32801
             Telephone: 205-251-3000
11           Gburge@burr.com

12           APPEARING ON BEHALF OF THE DEFENDANT

13

14    ALSO PRESENT:
      Larry Tambini, Videographer
15    Forrest Latta, Esquire

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                          C O N T E N T S

                                                      PAGE:

2

   TESTIMONY OF ROGER CAWTHORN

3

   Direct Examination by Mr. Burge...................    6
4  Cross-Examination by Mr. Martinez................  127
   Redirect Examination by Mr. Burge................  130
5  Certificate of Oath..............................  137
   Certificate of Reporter..........................  138
6  Errata Sheet.....................................  139
   Witness Review Letter............................  140

7

                        DEFENDANT'S EXHIBITS

8

   Number       Description

9

   Exhibit 1    Handwritten Note.....................   54
10 Exhibit 2    Halifax Health - Insurance
                Information Form.....................   59
11 Exhibit 3    Florida Traffic Crash Report.........   60
   Exhibit 4    5/27/14 Letter from Auto-Owners
12              to Roger and Priscilla Cawthorn.......   64
   Exhibit 5    Authorization for Release of
13              Medical Information..................   69
   Exhibit 6    6/11/14 E-Mail from Ms. McLean
14              Re: Bob Ledford's RV................   75
   Exhibit 7    6/11/14 E-Mail from Ms. McLean
15              Re: Bob Ledford's RV................   80
   Exhibit 8    6/30/14 E-Mail from Ms. McLean
16              Re: Bob Ledford's RV................   99
   Exhibit 9    6/12/14 E-Mail from Blake Meadows
17              To Dean Colson Re: Friend in
                Need of an Attorney.................  101
18 Exhibit 10   Release of All Claims...............  123
   Exhibit 11   Settlement and Assignment
19              Agreement...........................  123

20

21

22

23

24

25

Page 4

1                    - - - - -

2              S T I P U L A T I O N S

3          It is hereby agreed and so stipulated by and

4      between the parties hereto, through their

5      respective counsel, that the reading and signing

6      of the transcript are not expressly waived by the

7      Deponent.

8                    - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                  - - - - - - -

 3           VIDEOGRAPHER:  Good morning.  Here begins

 4      the videotaped deposition of

 5      Timothy Roger Cawthorn.  It is being taken in the

 6      matter of Case Number 6:16-cv-02240-JA-GJK,

 7      David Madison Cawthorn versus Auto-Owners

 8      Insurance.

 9           And today's deposition is being held at Burr

10      & Forman, LLP, 201 North Franklin Street in

11      Tampa, Florida.

12           Today's date is May 2nd, 2017, and the time

13      is approximately 10:47.  My name is Larry

14      Tambini, I'm the videographer.  Our court

15      reporter today is Christine Risher.  And at this

16      time, will counsel please introduce themselves.

17           MR. BURGE:  Yeah.  I'm Greg Burge, and I'm

18      one of the lawyers for Auto-Owners Insurance

19      Company.

20           MR. VILMOS:  Peter Vilmos for Auto-Owners.

21           MR. MARTINEZ:  Good morning.  My name is

22      Bob Martinez.  I'm with the law firm of Colson

23      Hicks Eidson, and I'm here today with my

24      colleague, Allen Bonner, and we represent the

25      plaintiff, Madison Cawthorn, and we're today also
```

Page 6

1          as counsel for the witness, Roger Cawthorn.

2               VIDEOGRAPHER:  And will the court reporter

3          please swear in the witness.

4               COURT REPORTER:  Do you swear the testimony

5          you are about to give will be the truth, the

6          whole truth, and nothing but the truth?

7               THE WITNESS:  I do.

8  THEREUPON,

9                    ROGER CAWTHORN,

10 having been first duly sworn, was examined and testified

11 as follows:

12                    DIRECT EXAMINATION

13 BY MR. BURGE:

14   Q.  All right, Mr. Cawthorn, we met before the

15 deposition.  I'm Greg Burge.  I'm one of the lawyers for

16 Auto-Owners here to ask you some questions today about

17 this lawsuit that your son as filed against Auto-Owners.

18 Do you understand that?

19   A.  Yeah, I do.

20   Q.  Okay.  I know you have given one deposition

21 before in the underlying case, which was given about

22 just slightly over a year ago.  It was given back on, I

23 think, April the 26th of 2016; do you remember that?

24   A.  Yes.

25   Q.  Okay.  You probably are aware of the rules.  But

Page 7

1    just to make sure you understand them, if you'll let me

2    finish my question before you answer, it will be a lot

3    easier for the court reporter, and we want her to get it

4    right, and you and I don't speak over each other.

5         Sometimes I ask my questions slowly, so you want

6    to just make sure I'm finished, and I'll try not to talk

7    over you, okay?  Is that fair?

8    A.   Very good.

9    Q.   And if you don't understand any of my questions,

10   and -- just tell me, and I'll try to rephrase them, all

11   right?

12   A.   Yes.

13   Q.   Okay.  First of all, give us your -- your home

14   address, please.

15   A.   59 Covered Bridge Drive.

16   Q.   Is that Covered Bridge?

17   A.   Covered, two words, and the bridge is not

18   covered.

19   Q.   And that is in?

20   A.   Flat Rock, North Carolina.

21   Q.   And you had been in that location for how long?

22   A.   Five years.

23   Q.   Okay.  Now, what have you done to prepare for

24   your deposition today, if anything?  I don't want you --

25   I know you -- the lawyers have indicated that they are

Page 8

1    representing you in this deposition.  I don't want you

2    to tell me about talking with them.

3         But if you -- what I'm talking about is if you

4    looked at any documents, any photographs, anything that

5    you reviewed in preparation?

6    A.   I just prayed.  No.

7    Q.   So you have not gone back and reviewed your

8    previous depositions?

9    A.   I did, yes.  I did look at -- because I had some

10   deposition -- I just looked at a part where -- I forget

11   the dates -- when my son was still at Halifax, and we

12   were just getting ready to go to Shepherd's, so that was

13   around April -- in May or June area, is the part of the

14   depo I read.

15   Q.   Okay.  Let me make sure I'm -- you did review it,

16   but you only reviewed a portion of it --

17   A.   Yes --

18   Q.   -- that included the time frame of when your son

19   was leaving Halifax?

20   A.   That's correct.

21   Q.   Okay.  And what was the -- the substance of the

22   questions in the section that you reviewed?

23   A.   If I had a conversation with David Ledford about

24   insurance, and if my son and the conversations that my

25   son, David -- Madison would have had, is the gist of it.

1    Q.   Okay.  And after your review of that portion of

2   the deposition, was there anything in that deposition on

3   that subject that was inaccurate?

4    A.   There was not.

5    Q.   Okay.  So if you had a chance to change it, you

6   wouldn't change it?

7    A.   There is nothing I would change.

8    Q.   Okay.  Is -- were there any other sections of the

9   deposition that you reviewed at all?

10    A.   There is not.

11    Q.   Okay.  Were there any -- did you review any of

12   the exhibits to that deposition?

13    A.   No.

14    Q.   Have you reviewed any of the other depositions

15   that were taken in the underlying case?

16    A.   I have not.

17    Q.   Okay.  So is it fair to say that the -- the

18   universe of documents that you've reviewed in

19   preparation for this deposition is the one section of

20   your prior deposition that you've told me about?

21    A.   That's correct.

22    Q.   Okay.  Now, let me -- first of all, tell me a

23   little bit about you.  Where are you from?

24    A.   Well, I -- my father was in the military, so I

25   grew up kind of in different places, but my home has

1   been in Hendersonville, North Carolina for the last 27,

2   28 years, so that's where I'm from, so...

3      Q.  So did -- is that where you, like, went to high

4   school?

5      A.  I went to high school a county over in Buncombe

6   County for two years.  And prior to that, I went to high

7   school at Camp Lejeune, North Carolina.

8      Q.  Okay.  And that was when your -- your dad was in

9   the service then?

10     A.  That's correct, yes.

11     Q.  Okay.  Was he in the Marine Corp?

12     A.  Yes.

13     Q.  You were also in the Marine Corp --

14     A.  I was.

15     Q.  -- at some point?

16     A.  Yes.

17     Q.  What about your wife?  Where is your wife from?

18     A.  She is from Hendersonville.

19     Q.  Okay.  And what year did you all marry?

20     A.  1990.

21     Q.  1990.  And what was her maiden name?

22     A.  McMinn.

23     Q.  How do you spell that?

24     A.  M-c-M-i-n-n.

25     Q.  Okay.  Is she related to any McMinns in

1   Birmingham?

2       A.   I do not think so.

3       Q.   Okay.  Give me the benefit of your educational

4   background, please, college -- I mean after high school.

5       A.   United States Marine Corp.

6       Q.   And how long were you in the Marine Corp?

7       A.   Four years.

8       Q.   And those years would have been what?

9       A.   1979 through 1983.

10      Q.   And you would have graduated from high school

11  what year?

12      A.   1978.

13      Q.   And what was -- what did you do in the Marine

14  Corp?

15      A.   Field radio operator.

16      Q.   And once you got out after four years, did you

17  stay in the reserves?

18      A.   I did not.

19      Q.   Okay.  And you were honorably discharged?

20      A.   I was.

21      Q.   Were you ever injured at any point during the

22  Marines?

23      A.   I was not.

24      Q.   So when you got out of the Marines in 1983, tell

25  me what you did then.

Page 12

1    A.   I worked a little bit at a grocery store packing

2  house, it's a little -- it's called Ingles.  I don't

3  think they have these around here, but -- and then I

4  sold cars for a couple of years.

5        And then I -- there is a Roses store that's kind

6  of like a Kmart.  They claimed bankruptcy five years

7  after I was there.  I was the assistant manager for

8  Roses.

9        And then after that I worked with Rockwell

10  International that builds truck axles.  And then after

11  that I started a business, and it was called -- medical

12  supplies for home oxygen.

13        And when I sold that, then I became financial

14  advisor with Edward Jones, and I've been doing that for

15  the last 17 and a half years.

16    Q.   All of those jobs and businesses that you

17  referenced, were all of those done in and around

18  Hendersonville, North Carolina?

19    A.   Yes.

20    Q.   Tell me about -- what did you do at Rockwell?

21    A.   Assembly, assembled truck axles.

22    Q.   Okay.

23    A.   Assembly line.

24    Q.   And you said you started a business that was a

25  medical supply business?

Page 13

1    A.  That's correct.

2    Q.  What was it called?

3    A.  OxyMed, O-x-y-M-e-d.

4    Q.  Tell me a little bit about that.  What was --

5    what was its business?

6    A.  People recovering at home that needed home oxygen

7    or hospital beds or bathroom supplies for ADA people.

8    Q.  Did you operate that business as a corporation or

9    was it a partnership or --

10   A.  A corporation, S Corp.

11   Q.  And was it a North Carolina corporation?

12   A.  That's correct.  Yes.

13   Q.  And did you have more than one location?

14   A.  Only one.

15   Q.  And how many employees did you have?

16   A.  Just myself.

17   Q.  And was that a -- were the services that you

18   provided, were those health insurance reimbursable

19   services?

20   A.  Mainly Medicare, yes.

21   Q.  Okay.

22   A.  And Medicaid.

23   Q.  Of course, for that I suppose you had to have a

24   provider number --

25   A.  Yes.

1    Q.  -- all of that?

2    A.  Yes, I did.

3    Q.  And did you handle all of that on your own for

4    that business?

5    A.  I did, yes.

6    Q.  And how long did that business operate?

7    A.  Five years.

8    Q.  And then you mentioned that you sold it.  Tell me

9    about that.  Who was it sold to?

10   A.  I don't remember the name of the corporation.

11   Q.  Did they come to you about buying it?

12   A.  There were two corporations that wanted to buy my

13   company.  They were trying to move into the

14   Hendersonville area, and at the same time Medicare was

15   changing how they compensated for home medical

16   equipment.  So I thought it would be --

17   Q.  For the good -- for the good or the worst for

18   your business?

19   A.  For the worst for me.  They were going to cut pay

20   40 percent, and it took 60 percent to run my company,

21   and I lived off the other 40 percent.  So that's why I

22   decided to sell the company.

23   Q.  So it --

24   A.  It was -- the company was headquartered out of

25   Charleston, South Carolina, and, a, it may have been,

1   like, HMS or something, the initials.

2          So I sold to them as a cash deal, and I stayed

3   with them for two years to introduce them to my doctors

4   and people I knew, and after that I was out of business.

5       Q.  Did you have to sign a noncompete?

6       A.  Yes.

7       Q.  Did you review that yourself, a noncompete, or

8   did you hire counsel to review it?

9       A.  I just reviewed it myself.

10      Q.  You said that you used a 40/60 percent figure.

11  Let me make sure I understand what you're saying.

12          Are you saying that for the company to operate

13  the way you were operating it, you needed to have

14  60 percent reimbursement from Medicaid, or were you

15  saying -- just tell me what you're saying.  I didn't

16  quite understand that.

17      A.  Revenue on receipt?

18      Q.  Yes.

19      A.  So if I got $100, it took $60 to put back into

20  the business.

21      Q.  Okay.  So the --

22      A.  At 40 percent --

23      Q.  It was about -- yeah, 60 percent overhead.  Is

24  that what you're saying?

25      A.  That's what I'm saying, yes.

1     Q.   Okay.  And you're saying when Medicaid decided

2     that they were going to cut back on their reimbursement,

3     then that, of course, effected the math?

4     A.   Medicare.

5     Q.   Medicare was going to cut back?

6     A.   Yes.

7     Q.   Okay.  So you worked with them for two years, and

8     then did you go straight to -- is it Edward Jones?

9     A.   I did.

10    Q.   Okay.  Tell me how you made that transition, what

11    -- how you ended up going with Edward Jones?

12    A.   My wife used to be a stockbroker, and she stopped

13    -- she quit being a stockbroker in 1993.  So when I sold

14    my business, you know, six months before I left working

15    with, I think it was called HMS.

16         I'm trying to decide what I'm going to do.  I did

17    not want to be a traveling salesperson.  And the Lord

18    just laid on my heart that I could be a stockbroker.

19         And I talked to a neighbor who worked with

20    A.G. Edwards as a manger of A.G. Edwards in town, and he

21    told me that Edward Jones has the best training program,

22    and that I should go take a look at them.

23    Q.   And what year did you receive the training from

24    Edward Jones?

25    A.   2000.

Page 17

1    Q.  Let me ask you about your wife a minute.  You

2  mentioned her being a stockbroker.  You all were married

3  in 1990 --

4    A.  That's correct.

5    Q.  -- you said?  And I saw in her deposition that at

6  some point she worked at Morgan Keegan in the main

7  office in Memphis?

8    A.  Yes.

9    Q.  Okay.  Is that where she started with

10  Morgan Keegan?

11    A.  Yes.

12    Q.  Okay.  And -- so did you all move to Memphis for

13  her to work at Morgan Keegan?

14    A.  We did.

15    Q.  Okay.  And did you work while you were in

16  Memphis?

17    A.  Kind of -- yes, I did have a job.

18    Q.  What did you do there?

19    A.  I was a manager of a mine for -- it's a boat

20  company.  They made Jon boats.  I don't remember the

21  name of the company.  I was only there about four

22  months.

23    Q.  Okay.

24    A.  So we were in Memphis for nine months.

25    Q.  For nine months?

Page 18

1    A.  Right.

2    Q.  And that would have been in the calendar year of

3    '93?

4    A.  Yeah.  I recollect -- yes.

5    Q.  Okay.

6    A.  Yeah.

7    Q.  Did the two of you live anywhere after you got

8    married outside of Memphis other than in North Carolina?

9    A.  We did not.

10   Q.  Okay.  And then your first child, which is

11   Zachary?

12   A.  That's correct.

13   Q.  He was born what year?

14   A.  1991.

15   Q.  So he was roughly three or four years old when

16   you all were in Memphis?

17   A.  Two or three.

18   Q.  And, then, why did you all leave Memphis?

19   A.  Too much crime.

20   Q.  And where did you go from Memphis?

21   A.  Back to Hendersonville.

22   Q.  And then when you got back, did your wife

23   continue to work as a stockbroker?

24   A.  She did for six, seven months or so, something

25   like that.

1    Q.   And who did she work for?

2    A.   I don't recall the -- it was an independent guy.

3    Q.   And what did you do when you got back to

4  Hendersonville?

5    A.   I worked temporary at -- back at Rockwell until I

6  at this got involved with the -- it's called Ameriquip.

7  I delivered home oxygen for that company, and that's

8  where I learned how to have a medical supply company,

9  and then I started my own.

10    Q.   Okay.  So you delivered for an existing company?

11    A.   Yes.

12    Q.   What was the name of that company?

13    A.   Ameriquip, A-m-e-r-i quip.

14    Q.   You're saying quick?

15    A.   quip.

16    Q.   quip, q-u-i-p?

17    A.   Yes.

18    Q.   Okay.  So, currently, you have been with

19  Edward Jones for -- since 2000, so roughly 17 years?

20    A.   That's correct, yes.

21    Q.   Okay.  When you first went to work for

22  Edward Jones -- well, let me back up and go at it

23  backwards.

24         As we sit here today, what is your current

25  position with Edward Jones?

Page 20

1    A.  Financial advisor.

2    Q.  And is that your title?

3    A.  That is my title, yes.

4    Q.  Okay.  So what are some of the other titles that

5    they have at Edward Jones?  I mean, is there a -- is

6    there a broker?  Is there a -- I mean, are there any

7    other names for what you all do other than financial

8    advisor?

9    A.  There is not.

10   Q.  So just tell me, sort of in a thumbnail sketch,

11   what you do on a daily basis as a financial advisor,

12   today I'm talking about?

13   A.  I help a lot of retirees and pre-retirees

14   maintain their income, life-style, or pass wealth to

15   their next generation or with their trust, whether it's

16   to trustees or their favorite charity.

17   Q.  And did you -- as part of that current job

18   dealing with retirees, do you buy and sell securities?

19   A.  I do.

20   Q.  And do you have people that are retired that are

21   dependent on, for instance, an account that you manage

22   for their retirement income?

23   A.  I do not personally manage it.  We have charter

24   financial analysts, and we have an investment policy

25   committee at the home office that would manage accounts.

Q. So you would not be making any decisions about what stocks to either sell or buy in --
A. Recommendations -- I'm sorry. I didn't mean to talk -- I make recommendations.
Q. Recommendations to the -- to the account holder?
A. Yes.
Q. Okay. And these people that will have these accounts, when they come in and deal with you, is there some sort of an account agreement that they sign with Edward Jones?
A. Edward Jones has legal documentation, yes.
Q. And when one of these retirees comes in to see you to open a new account, do you go over that documentation with them?
A. I do.
Q. And -- so you understand the documentation, what it says and how to advise those retirees about it?
A. I understand most of it, yes.
Q. Okay. You've been -- you've been there 17 years, I mean, I guess you've seen a lot of them maybe?
A. Yes.
Q. What about any -- and I'm talking about currently. What about -- did you give any advice to people as far as either saving or managing college expenses for children?

Page 22

1      A.   I do.

2      Q.   What -- tell me about that.   What do you do in

3   that line?

4      A.   Guide them towards 529 Plans.

5      Q.   And what is a 529 Plan?

6      A.   It's a college saving plan that different states

7   have set up.

8      Q.   And does North Carolina have one of those?

9      A.   I haven't used it, yes -- yeah.

10      Q.   Why don't you use it?

11      A.   We are not a preferred -- they are not a

12   preferred -- there is not a preferred fund family with

13   Edward Jones that the State of North Carolina has.

14           So it's, like, Franklin Templeton.   And I'm not

15   100 percent sure, but their state may be, like,

16   Virginia.   So a 529 Plan doesn't have to be in the State

17   of North Carolina.

18      Q.   So what you mean by that is the State of North

19   Carolina and their 529 Plan, they have not selected an

20   Edward Jones fund that's, quote, one of their preferred

21   funds?

22      A.   They -- they do not have a -- the State of North

23   Carolina doesn't have a fund, itself, that a financial

24   firm can use.   An individual can go to the state itself

25   and invest in the North Carolina 529 Plan.

Page 23

1    Q.  Okay.

2    A.  But you're doing it on your own.  So people come

3    to us, they want advice and guidance.

4    Q.  What about, and I'm talking about currently, do

5    you have any involvement that you do with any of your

6    customers in the way of either giving advice or using

7    any annuities at all?

8    A.  We do talk about annuities.

9    Q.  And did you ever advise them, equal, depending on

10   who they are, whether they should be in them or out of

11   them or give them any advice about it?

12   A.  I do.

13   Q.  And you understand how annuities work?

14   A.  I do.

15   Q.  Are you pretty familiar with most of the

16   annuities that are out there and available for either

17   retirees or pre-retirees?

18   A.  I am.

19   Q.  Tell me about the -- you mentioned something

20   about passing wealth to the next generation.  I thought

21   you said something about a trust.  Did I hear you right?

22   A.  Yes.  I don't set up trusts.  We use a -- an

23   attorney.  We use a team approach.  I'm not an

24   accountant, so we use CPAs.  If the client has an

25   attorney, we'll talk to their attorney, if they do not

Page 24

1    then we'll recommend a state attorney.

2       Q.  So as part of your work with somebody involving a

3    trust -- I mean, obviously you don't draft the trust

4    documents.

5       A.  I do not.

6       Q.  Okay.  But do you recommend to people whether or

7    not a trust is a -- a valid and desirable vehicle for

8    them to use to transfer wealth to the next generation?

9       A.  I leave that up to the attorney and their client.

10      Q.  So you don't make a recommendation one way or the

11   other about that?

12      A.  I do not.

13      Q.  Okay.  Now going back from the address that you

14   gave me, the 59 Covered Bridge, Flat Rock, just take me

15   back to the residences that you have lived at, say, in

16   the last 15 years?

17      A.  Previous to that was in the same neighborhood.

18   It was 99 Village Green, Village Green Drive, Flat Rock,

19   or 109 maybe.  And prior to that it was in Sky Top

20   Farms, which would have been Hendersonville, North

21   Carolina.

22      Q.  Sky Top Farms.  Is that, like, a subdivision or

23   an area or something?

24      A.  Yes.  And the name of the road was Sky Top Farms.

25      Q.  It's what?

Page 25

1    A.  The name of the road was Sky Top Farms.

2    Q.  Okay.  And that was in Hendersonville?

3    A.  Yes.

4    Q.  So give me some time frames on that.  You've been

5    at the Flat Rock, 59 Covered Bridge for roughly five

6    years?

7    A.  Yes.

8    Q.  Which would put us back to 2012, roughly?

9    A.  Correct.

10   Q.  Okay.

11   A.  So the one -- it's not 99 Village Green, it's

12   109, and we were there for two years.

13   Q.  Which would put us back to roughly 2009 or maybe

14   2010?

15   A.  '10, 2010.

16   Q.  Okay.  And then before that, where were you?

17   A.  Sky Top Farms.

18   Q.  And how long were you at Sky Top?

19   A.  Five years.

20   Q.  And what about prior to that?

21   A.  I only lived there for 14 years, and I can't

22   remember the address right now.

23   Q.  Oh, you had a place that you lived for 14

24   straight years?

25   A.  Yes.  Oh, my goodness...

Page 26

1     Q.  And it was in Hendersonville --

2     A.  Carlton Terrace.

3     Q.  Carlton Terrace?

4     A.  Yes.  I lived there for 14 years.

5     Q.  All right.  Now we were talking about -- you were

6  giving me some things that you did in your job, and I

7  intentionally had asked you, currently, what you do in

8  your job.

9         Looking backwards, how long has that description

10  that you've given me of the things that you do in your

11  job, how long has that been constant, looking backwards?

12     A.  In 2008 is when I became a financial advisor.

13     Q.  Okay.

14     A.  Prior to that -- so from 2000 until 2002 -- 2007,

15  we were called IRs, investment representatives, where I

16  would have just been a stockbroker.  I was not licensed

17  to be a financial advisor.

18     Q.  Okay.  So tell me what you -- so the change

19  occurred in 2008?

20     A.  Yes.

21     Q.  Okay.  And what did you do prior to 2008?  Your

22  title was a stockbroker?

23     A.  That's correct.

24     Q.  What did you do as a stockbroker?

25     A.  If somebody wanted to buy a stock or a mutual

Page 27

1    fund or an annuity, I was the go-between person between

2    them and the company.  I really could not give advice.

3        Q.  Okay.  So they might have an account with

4    Edward Jones.  So tell me, what did you do?  Would you

5    recommend to the client that certain stocks either be

6    sold or bought, or -- just kind of help me with that

7    when you said a go-between, between them and the

8    company?

9        A.  Well, we had -- again, we had Charter Finance and

10   it was at the home office, and they followed -- we

11   followed about 250 different companies.

12        And we either -- at Edward Jones we have a buy,

13   hold or sell, and I would give that information to the

14   client and let them make the decision.

15        Q.  Okay.  But as -- but as far as being the actual

16   broker, that was not you, or was it you?

17        A.  I was the broker, yes.

18        Q.  Okay.  So you could actually sell and buy inside

19   of that account various stocks, bonds, whatever?

20        A.  Yes.

21        Q.  And, then, you would be listed on the

22   Edward Jones account statement?  If I was your customer,

23   you would be listed as my stockbroker?

24        A.  That's correct.

25        Q.  And what is the license that you had to have to

Page 28

1    be a stockbroker?

2        A.   A Series 7.

3        Q.   Okay.  And it looks like -- and you've been a

4    Series 7 general securities representative since October

5    of 2000?

6        A.   That's correct.

7        Q.   That's when you took the exam?

8        A.   Yes.

9        Q.   And then it looks like you took a uniform

10   securities agent state law examination in 2000 as well?

11       A.   That's correct.

12       Q.   And what was that license for?

13       A.   To sell insurance.

14       Q.   Okay.  And what type of insurance -- if you did,

15   what type of insurance did you sell after you received

16   that license?

17       A.   I can sell life insurance or annuities.

18       Q.   Okay.  So give me your best definition of what an

19   annuity is, what that means to somebody that doesn't

20   know.

21       A.   An annuity is an insurance product.  You have

22   mutual funds, and the -- the insurance company will

23   package mutual funds together, and they will put a

24   guarantee on your -- it depends on the annuity, but they

25   will put a guaranteed death benefit on your principal,

Page  29

1    or you can get one that has an income rider that they'll

2    guarantee a certain amount of percentage off of a

3    certain dollar amount.

4         With that insurance company taking those mutual

5    funds, and they are called sub-accounts once they put

6    them in that, the mutual -- the annuity will charge you

7    a fee for that.

8         So the fees are a little higher than just buying

9    a mutual fund because of the -- they call it an M&E fee,

10   which is mortality and expense.  That just means if you

11   put $100,000 in, your heirs will never get less than

12   $100,000, because that's the death benefit, that's the

13   M&E.

14        And if you were to buy a mutual fund, you pay a

15   fee for that.  Since you're buying an annuity, that

16   annuity company is going to add a little bit more fee on

17   there, somewhere around 1 percent for that M&E product,

18   because it is an insurance product.

19   Q.   And did you sell those annuities?

20   A.   I have sold some, yes.

21   Q.   Okay.  What are -- what were some of the

22   companies that were offering the annuities that you sold

23   them for?

24   A.   MetLife, Protective, Lincoln, Transamerica, AIG,

25   Prudential.

Page 30

1    Q.   And what about life insurance?  That license

2  allows you to sell life insurance?

3    A.   Yes.

4    Q.   Did you sell it?

5    A.   A MetLife policy.

6    Q.   Any other ones that you wrote or that you -- well

7  I guess we're -- were you considered, for instance, if

8  you wrote or suggested a MetLife policy, were you

9  considered an agent for MetLife?

10    A.   Yes.

11    Q.   Any other ones that you --

12    A.   I haven't sold any others.

13    Q.   Is that sort of an isolated event, MetLife, or is

14  that just one that you routinely did when you were

15  selling life insurance?

16    A.   I don't sell much life insurance.  I don't focus

17  on life insurance in my practice.

18    Q.   Is more -- is -- are annuities more of a focus?

19    A.   I do not sell annuities now.

20    Q.   Now or -- or back then?

21    A.   I -- I do not sell annuities now.

22    Q.  Okay.

23    A.   I -- I don't like annuities --

24    Q.  Okay.

25    A.   -- personally, so --

1     Q.   Okay.  But you did at one time?

2     A.   Yes.

3     Q.   Okay.  And when somebody would come in and if you

4  recommended an annuity, and there was a company that was

5  offering the annuity, of course there would be an

6  annuity contract --

7     A.   Yes.

8     Q.   -- right?  And, generally, did you get the

9  contract from the company --

10     A.   Yes.

11     Q.   -- to supply to the -- to the client?

12     A.   I'm the agent, yes.

13     Q.   Okay.  And before you recommended an annuity, did

14  you generally explain to the client what it was, how it

15  would work, what the fees were?

16     A.   Yes, draw it on a grease board.

17     Q.   Okay.  And then when you get the contract back,

18  would you generally meet with the client and go over the

19  contract and what it was?

20     A.   Within three days, yes.

21     Q.   Tell them to put it with their important papers

22  and hang onto it.

23     A.   Yes.

24     Q.   Did you all, generally, keep a copy of it at

25  Edward Jones?

1     A.  No.

2     Q.  The -- what is a -- have you ever held a position

3  where you were an accredited asset management

4  specialist?

5     A.  Yes, I have that.

6     Q.  What -- what is that title?

7     A.  Just like it sounds.  You have to take a -- a

8  short course and then a test, and you just become -- you

9  learn about risk tolerance and peoples' time frames and

10  how to really balance a portfolio well for somebody.

11     Q.  When did you take that exam to do that?

12     A.  2007 or 2008, I think.

13     Q.  And does that -- do you still have that

14  designation?

15     A.  I do.

16     Q.  And what does that allow you to do different

17  than --

18     A.  Nothing.

19     Q.  Nothing?  Is it a, more or less, just an acronym

20  that you put beside your name?  Is that -- it doesn't

21  really give you any additional licenses?

22     A.  It does not.  It's just an acronym.

23     Q.  Okay.

24     A.  An AMS.

25     Q.  But it's -- there are -- there is training and

Page  33

1    stuff that goes along with it that you learn, the things

2    that you just mentioned to me?

3        A.   Yes, and you have to renew it once a year.

4        Q.   Okay.  And is that still current with you?

5        A.   Yes.

6        Q.   And has it been current since whenever you took

7    that exam?

8        A.   It has been.

9        Q.   Okay.  Let me ask you this.  The -- on your FINRA

10   report it shows that you have 24 state licenses?

11       A.   Yes.

12       Q.   Tell me about that.  What -- what is your

13   involvement in those -- all of those states where you

14   hold a license?

15       A.   People move, or a client, an elder client that I

16   have may pass away and their children live in a

17   different state, or you have people that live four or

18   five months where I do, but their home state was

19   wherever.  So you have to be licensed in their home

20   state to conduct business.

21       Q.   So if they move from North Carolina to Florida,

22   for instance, but they want you to continue to handle

23   the account, then you have to be licensed in Florida?

24       A.   Yes, I do.

25       Q.   And what is the process that you have to go

Page 34

1    through to get that license?

2        A.  Just go online to our corporate office and ask to

3    be licensed there.  If it's insurance, sometimes the

4    state requires you to take a little exam.  But in most

5    cases you pay a fee, because the test we took was

6    throughout all 50 states.

7        Q.  Very similar?

8        A.  Yes.

9        Q.  Okay.  Do you remember of your 24-state licenses,

10   do you know how many requires you to take an additional

11   exam?

12       A.  I do not.  Just for -- that would be for the

13   insurance side, not for securities or anything.

14       Q.  So the --

15       A.  Not to cover the Series 7 or the Series 66, you

16   have to take an additional exam for that state.

17       Q.  Right.  In other words, you don't have to be a

18   state specific, is what you're saying?

19       A.  Correct.

20       Q.  As long as you've got the Series 7, I mean, you

21   can still, as far as those transactions go you can

22   represent somebody in another state?

23       A.  As long as I'm licensed, yes.

24       Q.  As long as you're licensed, right.  Okay.

25           Let me ask you this.  In your financial

Page 35

1   disclosures under the FINRA there is a disclosure that's

2   entitled a compromise and a short sale.

3      A.   Yes.

4      Q.   What is that?

5      A.   I thought I could get into the housing, and step

6   up and buy more house than I could afford and then sell

7   it in five to seven years and take the profit and buy

8   another house, but it didn't work out that way.

9      Q.   What was the -- was the -- what was the address

10   of that house?

11      A.   That was the Sky Top Farm address.   That may have

12   been the 99 Sky Top Farm.   I think they've changed the

13   name of the road since then also.

14      Q.   So did you buy that house, what, in 2007, '06?

15      A.   Probably in 2005 or '06.

16      Q.   At the top of the market?

17      A.   Just about, yes.

18      Q.   And then was it -- was that house in foreclosure?

19      A.   You had to make it go into foreclosure to do a

20   short sale.

21      Q.   So it was in foreclosure when it was short-saled

22   out of there?

23      A.   I did not do a foreclosure, but I was instructed

24   to do a short sale it has to go to -- they have to title

25   as foreclosure, so they told me I had to miss three

Page 36

1    payments.

2         Q.  And who was the -- who held the mortgage on that

3    property?

4         A.  I do not recall.  I would have to look back.

5    Because -- I think they had it with -- it was a local

6    mortgage rep I went through, and then they sold it to

7    somebody else, and then somebody else bought it.  I

8    don't recall the name or the companies.

9         Q.  So when you -- you got out of that house, then

10   you would have gone to the -- was that the 103?

11        A.  109 --

12        Q.  109?

13        A.  -- and rented that for two years.

14        Q.  Okay.  And then the Carlton Terrace where you

15   were there 14 years would have been prior to Sky Top

16   Farms?

17        A.  Yes.

18        Q.  And was that a direct move from there to Sky Top?

19        A.  Yes.

20        Q.  I'm assuming you've never filed for bankruptcy.

21        A.  I have not.

22        Q.  Let me ask you this.  Is -- roughly, when was it

23   that your wife stopped working completely and became a

24   stay-at-home mom, what year, roughly?

25        A.  1995 area.

Page 37

1    Q.  Now your first son, Zachary, was he homeschooled?

2    A.  Yes.

3    Q.  And did he graduate in a homeschool program, or

4    did he graduate from an actual high school?

5    A.  Homeschool program.

6    Q.  And what -- what relationship was that with the

7    Christian Academy?

8    A.  There was -- for his courses that he needed to

9    take, he would have -- and I don't remember the courses,

10   but he would have had to drive to Brevard, which is

11   about 45 minutes from my house, and then he had to drive

12   to West Asheville, which is about 30 minutes, and then

13   he had to drive someplace else.  So he had to go to

14   three different places.

15        The Asheville Academy had those programs there,

16   and they -- we reached out to them, and Zachary could go

17   there, but graduate as a homeschooler.

18   Q.  Okay.  I think I'm right about this.  I thought I

19   read in his deposition, that was given in the underlying

20   case, that he said he graduated from Christian Academy

21   in 2009.

22   A.  Yes.

23   Q.  So was that accurate?  He would have graduated

24   from Christian Academy?

25   A.  Under a homeschool.

Page 38

1    Q.  A certificate of some sort?

2    A.  Yes.

3    Q.  Is that the way that works?

4    A.  That's the way it worked, yes.

5    Q.  Okay.  So you get a certificate that may have

6    Christian Academy on it, but it's got some homeschooled

7    designation?

8    A.  I think it has the homeschool designation.

9    Q.  Okay.  And was he homeschooled his entire school

10   career?

11   A.  He was.

12   Q.  What, if any, role did you play in the

13   homeschool?

14   A.  Not much.

15   Q.  Your wife did most of that?

16   A.  Yes.

17   Q.  The reason I ask that, is it -- is it -- I think

18   I read in your wife's deposition that, at least with --

19   in Madison's case, that you all generally had breakfast

20   together in the mornings, you went to work, you came

21   home at lunchtime, you all had lunch together, you were

22   generally home by 5:00 in the evening, each evening.

23       So I was curious whether any of that time that --

24   if you were involved in any of the home schooling,

25   whether it was, maybe, certain classes or anything like

1    that?

2         A.   I was not.

3         Q.   Okay.  And is she accurate about that, if that

4    was her testimony, that's generally the way that --

5         A.   Accurate?

6         Q.   Yeah.

7         A.   Yes.

8         Q.   Was that your usual, I'll say, habit of daily

9    routine, at least when Madison was being homeschooled?

10        A.   Even when Zachary was, yes.

11        Q.   Okay.  Now let me ask you -- I want to turn to a

12   different subject, and I want to ask you some questions

13   about Madison.  And, by the way, where is Madison today?

14        A.   He is at college in Purcellville, Virginia.

15        Q.   And that college is?

16        A.   Patrick Henry.

17        Q.   And how long has he been going to Patrick Henry?

18        A.   This is his second semester.

19        Q.   So he would have started in the fall --

20        A.   That's correct.

21        Q.   -- of '16?

22        A.   That's correct.

23        Q.   Okay.  And what is Patrick Henry, is that a

24   liberal arts college, or what -- how do you describe

25   that?

Page 40

1     A.   It's a private Christian-Based college.

2     Q.   When you say Christian based, I understand what

3  that means.  Is it associated with any religious

4  affiliation, meaning, Baptist, Methodist, Catholic,

5  anything like that, a specific religion?

6     A.   No.  Just Christian beliefs.

7     Q.   And how is he enjoying that?

8     A.   Oh, he is liking it nice now, yeah.

9     Q.   And what -- is he working at all anywhere?

10     A.   He is not.

11     Q.   Okay.  And what are his sources of income,

12  currently?

13     A.   It was me, but then he has that -- he received

14  that settlement, so he -- he is living off of the

15  settlement.

16     Q.   All right.  Is he receiving any sort of financial

17  aid at school?

18     A.   He is not.

19     Q.   And has he paid for the tuition to go to college?

20     A.   He has.

21     Q.   And what about Zachary, did you pay his college

22  tuition or did he pay it?

23     A.   I did.

24     Q.   And did you pay that out of cash, or did you

25  borrow the money to pay it?

1    A.  Cash.

2    Q.  I know that after Madison's accident I saw some

3  testimony from you that you had used some money from

4  your retirement plan to pay for at least a portion of

5  some renovations that were done on your home; is that

6  accurate?

7    A.  Yes, it is.

8    Q.  Were you reimbursed for that?

9    A.  I was.

10   Q.  And was that out of Madison's settlement?

11   A.  It was, yes.

12   Q.  What was that amount, please?

13   A.  I don't remember.

14   Q.  You don't have to give it to me by the penny,

15  just give me a rough number.

16   A.  I have to think about that a minute.

17           MR. MARTINEZ:  If you're guessing, I'd

18       prefer you didn't.

19   A.  I'd be guessing.  I don't recall.

20  BY MR. BURGE:

21   Q.  Well give me within $10,000, if you can.

22   A.  I can't.

23   Q.  You can't?  You can't tell me whether --

24   A.  I have a record of it.  I could look and get back

25  with you, but I don't know what the dollar amount is.

Page 42

1    Q.   You don't know whether it was 10 or 50 sitting

2    here today?

3    A.   It's more than that, but I don't know, so I'm not

4    going to -- I'm not going to guess.

5    Q.   Was it over 100?

6         MR. MARTINEZ:   Objection; asked and

7         answered.

8    BY MR. BURGE:

9    Q.   You can answer the question if you know if it was

10   over 100, if you don't --

11   A.   I'm sorry.  I'm going to tell you one more time,

12   I don't know.  I'm not going to guess.  If you want to

13   get back, I can pass it to my attorney, and then they

14   can tell you the exact dollar amount.

15   Q.   That would be -- that would be great --

16   A.   Okay.

17   Q.   -- if you're willing to do that for us.

18   A.   Yeah.

19   Q.   Let's go back.  I want to talk to you a minute

20   about, and I'm not going to go through your entire

21   deposition because I've read what you had to say in the

22   past --

23   A.   Good.  Thank you.

24   Q.   -- about discovering about the accident and this,

25   that and the other, about what went on.

Page 43

1        It looks to me like, from what you've said

2   previously, at least from -- within 24 hours or so of

3   this accident that you were pretty much with Madison for

4   an extended period of time while he was in Halifax, and

5   while he was at Shepherd's, and then probably even after

6   that, I suppose, right?

7     A.   Yes.

8     Q.   And I guess he came back from Shepherd's and came

9   and lived with you and your wife?

10    A.   Correct.

11    Q.   And you all were living in someplace temporarily

12   until the house could get worked upon?

13    A.   Yes.

14    Q.   And you were there, I think, while he was with

15   Halifax for the entire time, I guess?

16    A.   Yes.  I was out of work for five months.

17    Q.   And -- which means that you were there pretty

18   much with him when he was with -- at Shepherd's as

19   well --

20    A.   Yes.

21    Q.   -- is that right?

22    A.   Correct.

23    Q.   Okay.  In reading your deposition, in reading

24   everybody, I've read your wife's deposition, your son's

25   deposition, Madison's deposition, and let me ask you

Page 44

1    this.

2         During the time that he was at Halifax, was it

3    your understanding that the medical providers there had

4    placed him into a medical coma?

5    A.   I -- I don't recall they put him in a coma.

6    Q.   Was he heavily medicated?

7    A.   He was.

8    Q.   And I think one of the things that I think you

9    said in your previous deposition was that you really

10   couldn't have much of a conversation with him while he

11   was there because he was such a -- in such a sedated

12   state.  Was that your view of it at that time?

13              MR. MARTINEZ:  Why don't we just take a

14        break?

15              MR. BURGE:  Do you want to take a break?

16        Yeah, let's take a break.

17              (A recess was taken from 11:39 until 11:49.

18              MR. BURGE:  Can you read my last question

19        back, please?

20              COURT REPORTER:  (Question read back.

21   A.   Yes.

22   BY MR. BURGE:

23   Q.   Another thing that your wife had testified to and

24   I'm asking you if this was true in your sense of being

25   there, is that she testified that it was weeks before he

Page 45

1  could communicate, and that he was -- he would get very

2  irritated if you were not singing gospel songs to him or

3  reading scripture to him while he was at Halifax; is

4  that true?

5      A.  That's correct.

6      Q.  Madison has testified that he had some

7  neuroplasticity damage.  Is that your understanding as

8  well?

9      A.  He had a lot of things wrong with him, so, yes.

10     Q.  Well that was his term that he used, and I think

11 that is a -- that is a mental injury.

12         And he was talking about in the context of he was

13 never really clearheaded until, almost, he was leaving

14 Shepherd's in Atlanta, and he assessed it and said it

15 was because of this neuroplasticity problem.  Is that

16 your understanding as well?

17             MR. MARTINEZ:  Object to the form of the

18         question.  Do you want the question read back?

19             THE WITNESS:  Yes.

20             COURT REPORTER:  (Question read back.

21     A.  I'm not a doctor, so I don't know the terms that

22 doctors would use, but he was out of it, yes.

23 BY MR. BURGE:

24     Q.  Okay.  Well, I mean, would you agree with him if

25 he says that, at least his testimony then was, that it

Page 46

1  was near the end of his term at Shepherd's before he was

2  clearheaded?

3     A.  Yes.

4     Q.  Okay.  But that -- that specific term,

5  neuroplasticity, do you have any recollection of

6  speaking with any physicians that sort of use that term

7  in that context?

8     A.  My wife dealt with the physicians and doctors, I

9  didn't deal with that part of it.

10    Q.  Okay.  So she was more responsible for that than

11 -- than you were?

12    A.  Yes.

13    Q.  And is it also true that it was not until he was

14 at Shepherd's, or some time, until he was able to

15 realize that he might be permanently paralyzed?

16             MR. MARTINEZ:  Was there a question?

17             MR. BURGE:  That's the question.

18             MR. MARTINEZ:  Can you have the question

19      read back, please?

20             COURT REPORTER:  (Question read back.

21    A.  That's when he -- when got with the specialist

22 there that helped -- what do you call the specialist?

23 The people that help with -- I can't even think of what

24 you call the --

25 BY MR. BURGE:

Page 47

1    Q.  That's okay.  Don't beat yourself up over the

2  name.

3    A.  Yeah.

4    Q.  But it was somebody there at Shepherd's, is what

5  you're saying?

6    A.  Yes.

7    Q.  Okay.  Now is it -- is it still true, I think you

8  said this in your prior deposition, but I want to make

9  sure it's accurate still.

10       UnitedHealthcare, have they paid all of his

11  medicals outside of deductibles, as far as you know?

12    A.  They have.

13    Q.  Is he still insured by them?

14    A.  He is.

15    Q.  And is he -- do you know anything about how long

16  he is going to be able to be insured by them?

17    A.  Under the current law, until you're independent

18  and age 27.

19    Q.  Okay.  So there isn't anything, as far as you

20  know, special about his disability or anything that

21  might give him any additional time other than that?

22    A.  Not that I know of.

23    Q.  Okay.  Is he receiving any other sort of

24  assistance, either Social Security, Medicare, Medicaid,

25  anything else?

Page 48

1    A.  He did receive Social Security, but I do not know

2    if he is receiving that now.

3    Q.  Okay.  All right.  Let me -- let me ask you a

4    couple of things on another topic for a moment.

5        What -- in your household, who is the person that

6    deals with your insurance?

7    A.  I do.

8    Q.  And do you -- are you the one that deals with

9    your automobile insurance, homeowners insurance, those

10   type things?

11   A.  I do.

12   Q.  And do you do that through an agent?

13   A.  I use USAA.

14   Q.  USAA.  And that's an insurance company that we

15   know is -- is -- insures a lot of veterans, right?

16   A.  That's correct.

17   Q.  Okay.  And do you get some special rate with them

18   if you're a veteran?

19   A.  I don't know if it's any...

20   Q.  You don't know?

21   A.  No.  You have to be a veteran or a family member

22   of a veteran to be insured with them.

23   Q.  Okay.  And do you deal with them directly, or do

24   you deal with them through an agent?

25   A.  Telephone, Internet.

1     Q.   Okay.  So you manage your account online?

2     A.   It's insurance.  I mean, there is really no

3  management of it.

4     Q.   Well, I mean, you can change your limits --

5     A.   Yes.

6     Q.   -- if you want to or add an additional insured or

7  something like that --

8     A.   Correct.

9     Q.   -- I suppose?

10     A.   Yes.  Online.

11     Q.   Okay.

12     A.   Yes.

13     Q.   And is that who your coverage was with back in

14  2014?

15     A.   Yes.

16     Q.   And was Madison, was he insured under your

17  policy?

18     A.   Yes.

19     Q.   And at the time of his accident, did he still

20  have the Honda, or did he have a truck at that time?

21     A.   He had a GMC truck.

22     Q.   And was it insured under the USAA policy?

23     A.   It was.

24     Q.   And how many other vehicles did you have under

25  that policy?

Page 50

```
 1      A.  A total of four.

 2      Q.  And did you have your homeowners as well with

 3  them?

 4      A.  I do not.

 5      Q.  Did you have homeowners with someone else?

 6      A.  Yes.

 7      Q.  Who is that with?

 8      A.  The agent's name is Debbie Ours, O-u-r-s.

 9      Q.  O-u-r-s.  And who is the company that insures the

10  home?

11      A.  I just pay the bill.  I don't know.

12      Q.  Well, do you remember who you pay your bill to?

13      A.  It's on auto draft.  I don't recall the name of

14  the company.

15      Q.  Well Debbie O-u-r-s, is that an agency?

16      A.  She is an agent, and they go out and try to find

17  the best rate, so it's multiple insurance companies they

18  look through, and I do not recall the name of the

19  insurance company.

20      Q.  Well what is the -- what is the business that she

21  does, the name of the business she does business under?

22      A.  I have no idea.

23      Q.  How did you find her and deal with her?

24      A.  Steve Ours, her husband, is a friend of mine.

25      Q.  Steve Ours.  And what does Steve do?
```

Page 51

1    A.  Semiretired, a little construction job, handyman

2    stuff on the side.

3    Q.  Now is North Carolina, is that a mandatory

4    liability state?

5    A.  I think so.

6    Q.  You understand what I'm talking about?

7    A.  If you have a loan on something, yeah, yes.

8    Q.  Okay.

9    A.  Yeah, for auto insurance, you have to have

10   liability, yes.

11   Q.  Well, let me break that down a minute.  You seem

12   to think it's related only if you have a loan on

13   something?

14   A.  No.

15   Q.  Okay.

16   A.  No.  If you have an automobile, you have to have

17   liability insurance, yes.

18   Q.  And you have to show proof of insurance when you

19   get your tag and title and all that?

20   A.  Yes.

21   Q.  Okay.  Is there minimum limits in North Carolina?

22   A.  That I do not know.

23   Q.  What is the limits that you carry?

24   A.  One million.

25   Q.  And when did you start carrying a million?

Page 52

1    A.   After the accident.

2    Q.   What did you carry before that?

3    A.   I think it was 100 and 300, something like that.

4    Q.   You're pretty sure about that?

5    A.   Pretty close.

6    Q.   And is the million, is that still with USAA?

7    A.   That's correct.   The uninsured, underinsured

8    rider is what it's called for the million.

9    Q.   For the million.   What is the underlying

10   liability coverage?

11   A.   I think it's 100/300.

12   Q.   300.   Now, let's say, in the last ten years, have

13   you or any of your -- your sons or your wife been in any

14   type of automobile accident where there was an insurance

15   claim made outside of this wreck we're talking about

16   here?

17   A.   Yeah, Zachary had a wreck.   Madison had a fender

18   bender with US -- you know, self.   So USAA had to pay

19   for that.

20        Zachary had a -- a wreck.   I don't know if I was

21   with USAA then.   I don't think I was with USAA when he

22   had his wreck.

23   Q.   Was he at fault?

24   A.   Oh, yeah.

25   Q.   Was he sued?

Page 53

1    A.   No.

2    Q.   Was there a claim made?

3    A.   It was an automobile accident, so I would imagine

4    so.  Insurance companies dealt with it.

5    Q.   Was there anybody injured in the accident?

6    A.   There was not.

7    Q.   So it was strictly just property damage?

8    A.   That's correct.

9    Q.   And what, if any, role did you play in that?  Did

10   you deal with the insurance companies to get that claim

11   resolved?

12   A.   Just called our insurance company and let them

13   know that Zachary had an automobile accident, with the

14   adjuster.

15   Q.   And do you remember who the company was that you

16   had with them?

17   A.   That was through Debbie Ours, so I don't recall

18   the name, sorry.

19   Q.   So did she do your car before you went to USAA?

20   A.   Yes.

21   Q.   But now it's just the homeowners?

22   A.   That's correct.

23   Q.   What about a homeowners' claim?  Have you ever

24   had a fire, had a claim of any sort under a homeowners

25   policy?

Page 54

1      A.  I have not.

2      Q.  Madison, you said, had a fender bender.  Was that

3   a -- an accident that was his fault?

4      A.  Yes.

5      Q.  Was there any claim made in that case?

6      A.  I really don't recall.  There was a police report

7   I made.  I don't recall if I paid or USAA paid.  I'm

8   going to say USAA paid.  I think there was a claim.  It

9   was just a small --

10      Q.  Anybody hurt?

11      A.  No.

12      Q.  What is your recollection about what happened?

13      A.  Zach -- Madison was merging onto U.S. 74, and the

14   guy in front of him stopped, and so he just hit him,

15   just a small, I mean a...

16      Q.  Thought he was pulling out --

17      A.  Yes.

18      Q.  -- kind of thing?

19      A.  Yes.  Just very small damage.

20      Q.  All right.  Let me -- Mr. Cawthorn, I'm going to

21   show you a document that we're going to mark as Exhibit

22   1 to your deposition.

23          Let me get you to take a look at Exhibit Number

24   1, and on that exhibit, is any of that your handwriting?

25                (Defendant's Exhibit 1 marked for

Page 55

1          identification.)

2     A.   It looks like an 800 number where the Greenville,

3     South Carolina is, maybe.

4     Q.   Anything else?

5     A.   No.

6     Q.   Do you recognize the handwriting?

7     A.   For the whole thing, or just the bottom?

8     Q.   No, do you recognize -- you say the bottom you

9     think is yours.  Do you recognize any of the writing on

10    the rest of the document?

11    A.   I know where this came from, if that's what

12    you're asking me.

13    Q.   We can start with that if you like that question

14    better.  We'll start with that, and maybe that will help

15    us get through it.  What --

16    A.   David Ledford, this was his insurance

17    information.

18    Q.   Is that something that he provided you?

19    A.   Yes.

20    Q.   And up there at the top of that, call 4/9/14, do

21    you know what that is referencing?

22    A.   A date.

23    Q.   Is it your presumption that that's when someone,

24    perhaps Mr. Ledford, had called about this information?

25              MR. MARTINEZ:  Objection as to form.

Page 56

1      A.  I don't know.  I don't know what David did.

2  BY MR. BURGE:

3      Q.  Do you remember -- did this -- did Mr. Ledford

4  give you this note?

5      A.  He did.

6      Q.  Okay.  Do you remember when he gave it to you?

7      A.  I do not.

8      Q.  I'm making the presumption that it was sometime

9  after April the 9th, but do you have any knowledge as to

10 whether that -- can you give us any ideas as to when

11 that would have been?

12             MR. MARTINEZ:  Objection as to form.

13     A.  I don't recall.

14 BY MR. BURGE:

15     Q.  What is that?

16     A.  I don't recall.

17     Q.  Okay.  I saw in your previous deposition that

18 Mr. Ledford had given you $10,000 --

19     A.  He did.

20     Q.  -- is that right?

21     A.  That's correct.

22     Q.  And did he give you that by check?

23     A.  That I don't recall.

24     Q.  Do you think it may have been cash, $10,000?

25     A.  I think it was a check.

Page 57

1     Q.  Do you know if he gave you this form, an

2   association would have given you the check?

3     A.  I don't think so.

4     Q.  Okay.  Well when the -- when you made the

5   notation down there at the bottom, 1-800 or pound 800,

6   it looks like, 437-0511, what is your recollection about

7   that notation that you made?

8     A.  I would just be speculating.  I don't know.

9     Q.  Well, what do you think you may have been doing

10  there?

11           MR. MARTINEZ:  Objection; asked and

12        answered.

13     A.  It would be a guess.

14  BY MR. BURGE:  I don't know.

15     Q.  You just don't know?

16     A.  I don't recall.

17     Q.  You don't know why you would have written that

18  number, Greenville, South Carolina.

19     A.  I do not.

20     Q.  When you got this note, did you make a call to

21  this lady, Pamela McLean that's listed on here?

22     A.  At some point I did call, yes.

23     Q.  And did you understand, when you got this note,

24  that Auto-Owners out of Ocala was going to be handling

25  it, and there was a woman named Pamela McLean that would

Page 58

1    be handling the claim?

2        A.  When I received this note?

3        Q.  Yes.

4        A.  I did not.

5        Q.  What did you think this note -- why did you think

6    he was giving you that note?

7        A.  I called USAA with this information.

8        Q.  Okay.  Why did you think that Mr. Ledford gave

9    you the note?

10       A.  To call USAA and give them the information

11   because there was an automobile accident.

12       Q.  Okay.  Give your insurance company, USAA?

13       A.  Yes.

14       Q.  And did you call them?

15       A.  I did.

16       Q.  And what did you tell them.

17       A.  I gave them this information, and that -- the

18   situation my son was in with the accident.

19       Q.  And did you talk with USAA on more than one

20   occasion while your son was in Halifax?

21       A.  I don't think so.

22       Q.  So you think the one and only call to them was

23   when you called and gave them the information that's on

24   Plaintiff's [sic] Exhibit Number 1?

25       A.  Yes.

Page 59

1      Q.  Do you remember who you may have talked to with

2   USAA?

3      A.  A name?  No.

4              COURT REPORTER:  I have a correction.  You

5          said Plaintiff's Number 1.  Did you mean Defense?

6              MR. BURGE:  Defense Number 1.  I got

7          confused in the excitement.

8   BY MR. BURGE:

9      Q.  Is there any -- anything else about Defendant's

10  Exhibit Number 1, other than what you and I talked

11  about, as far as your memory of when you got it, who may

12  have been around when you got it, any other light you

13  can shed on it for us?

14              MR. MARTINEZ:  Objection as to form.

15     A.  No.

16  BY MR. BURGE:

17     Q.  Okay.  All right.  Let me show you what we'll

18  mark as Defendant's Exhibit Number 2.  Mr. Cawthorn do

19  you recognize Exhibit Number 2?

20              (Defendant's Exhibit 2 marked for

21          identification.)

22     A.  I do not.

23     Q.  Okay.  Is there -- any of that writing on Exhibit

24  Number 2 that's yours?

25     A.  There is not.

Page 60

1    Q.  Do you know if there is -- any of that writing on

2  there is your wife's?

3    A.  It is -- it is not.

4    Q.  Do you have any idea whose writing this is?

5    A.  I do not.

6    Q.  Okay.  This is, it looks like -- this is a

7  Halifax Health, it's got, patient's name, Bradford --

8  Bradley Ledford on here.  But as far as you know, you

9  don't recognize this writing from anybody that you know?

10    A.  It has nothing to do with us.

11    Q.  Okay.  Let's take a look at Exhibit Number 3.

12          (Defendant's Exhibit 3 marked for

13          identification.)

14          MR. MARTINEZ:  Let me staple these.

15          MR. BURGE:  Okay.

16  BY MR. BURGE:

17    Q.  Mr. Cawthorn, this is a copy of the accident

18  report.  It says what it says.  I really don't want to

19  ask you, necessarily, about the report.

20          I do want you to look on page 4 of the exhibit.

21  There is some handwriting at the bottom of that page,

22  and I'll ask you if that is your writing?

23    A.  It is not.

24          MR. MARTINEZ:  This page here.  Bates Number

25          01306?

Page 61

1          MR. BURGE:  Actually, 1305 is what I want to

2      start with.

3   A.  It's not my writing, no.

4   BY MR. BURGE:

5   Q.  Do you recognize that writing?

6   A.  I do not.

7   Q.  All right.  The next page, 1306, at the bottom of

8   that form, do you recognize any of that writing?

9   A.  I do not.

10  Q.  It's not yours or your wife's or anybody that you

11  know?

12  A.  It is not.

13  Q.  Okay.  At any time while your son was at Halifax

14  and/or at the hospital in Atlanta, did you keep any

15  notes or take any notes about events that were going on?

16  A.  I did not.

17  Q.  Do you know if your wife did?

18  A.  I do not, no.

19  Q.  You don't know?

20  A.  That's what I said.

21  Q.  Okay.  And you've never had a conversation with

22  her as to whether or not she did do that?

23  A.  I told her she needs to write a book, but I don't

24  recall if she took notes.

25  Q.  Okay.  What did you tell her she ought to write a

Page 62

1   book about?

2       A.   Everything that happened, all the blessings that

3   happened.  We sat down and tried to memorize things and

4   jot it down so that we would remember, but I don't know

5   if she took notes or not.

6       Q.   She hadn't taken you up on the book offer yet?

7       A.   No.

8       Q.   All right.  Let's talk about Auto-Owners a

9   minute.

10          When was the -- what is your recollection of when

11  the first time that you ever talked with someone from

12  Auto-Owners?

13      A.   When I called Auto-Owners.  I told USAA, I gave

14  them the information, they called me back and said they

15  could not handle the claim, and then they said that I

16  should contact, since I haven't been in contact with

17  Auto-Owners, that I should contact that number.

18      Q.   And did you do that shortly after you heard from

19  them?

20      A.   Yes.

21      Q.   And do you remember who you spoke with?

22      A.   It was a woman.  That's all.

23      Q.   On how many occasions did you speak with somebody

24  from Auto-Owners?

25      A.   One time.

Page 63

1    Q.   Just once?

2    A.   Yes.

3    Q.   Okay.  I had read what you said in your previous

4    deposition about your conversation with someone from

5    Auto-Owners and your communication with them.

6    A.   Yeah.

7    Q.   And my understanding is as part of your review to

8    prepare for this deposition, you did not reread that

9    portion of your deposition?

10   A.   I do not recall reading it.

11   Q.   Okay.

12   A.   No.

13   Q.   Do you have a recollection of what you said in

14   that previous deposition about your communication with

15   Auto-Owners?

16   A.   Maybe not 100 percent, but I recollect what I --

17   we had -- what a phone conversation was about, yes.

18   Q.   Okay.  And how long was that phone conversation?

19   A.   I don't know the time limit.

20   Q.   Well, can you give me an estimate?  Was it 10

21   minutes, 20, 30, anything like that?

22   A.   I'm not going to guess.

23   Q.   Was it as short as five?

24   A.   I have no idea.

25   Q.   Was it on your cell phone?

Page 64

1      A.  Yes.

2      Q.  And have you got the same cell phone now that you

3  had then?

4      A.  The same number, yes.

5      Q.  What is that number, please?

6      A.  828-606-5821.

7      Q.  And do you have the same carrier?

8      A.  Verizon.

9      Q.  And was that the carrier back in '14?

10     A.  Yes.

11     Q.  And is that in your name?

12     A.  Yes.

13     Q.  So was it -- is it Timothy Roger?

14     A.  That's correct.

15     Q.  Would that be the name the account is in?

16     A.  Yes.

17     Q.  All right.  Let me -- let's see here.

18  Auto-Owners I'll show you what we'll mark as Exhibit

19  Number 4.  Just take a look at that letter, if you

20  would, Mr. Cawthorn.

21             (Defendant's Exhibit 4 marked for

22          identification.)

23     A.  Okay.

24     Q.  Do you remember receiving that letter from

25  Auto-Owners?

1    A.  Particularly, no.

2    Q.  But you can see who it's addressed to, right?

3    A.  Yes.

4    Q.  And do you see down here where it says:  Dear

5  Mr. and Mrs. Cawthorn, this letter shall serve to follow

6  up on our letter of April the 17th, 2014.  Do you

7  remember receiving that letter?

8    A.  I do not.

9    Q.  Have you gone back and seen that you did, in

10  fact, received it?

11    A.  I have not.

12    Q.  Have you looked for it?

13    A.  I wouldn't have a copy of it.

14    Q.  Why is that?

15    A.  In April, right after the accident, my main focus

16  was on Madison.  I had people from the hospital coming

17  up wondering how they were going to get paid.  My only

18  concern was for Madison.

19        And if I talked to anybody or signed forms, it

20  would be release forms for the doctors.  I signed a lot

21  of forms.  And so I don't remember, particularly, one

22  letter.  There were a lot of forms signed.

23        And if I talked to somebody, all I wanted was to

24  hear a prayer, just pray for Madison.  So, again, just

25  what I received prior to this or after, I don't know.

Page 66

1    Q.  Okay.  So you don't know, one way or the other,

2    whether or not there was a letter dated April the 17th,

3    2014 sent to you about Madison's accident from

4    Auto-Owners?

5    A.  There is the letter.  It probably was.  But I

6    don't know when I received it either.

7    Q.  Well did you have anybody -- while you were there

8    in Florida, did you have anybody checking your mail at

9    home watching after your mail for you?

10   A.  We received a lot of mail at Halifax and in

11   Shepherd's.

12   Q.  But did you have anybody at your home address

13   watching your mail that you received?

14   A.  People would go by and get our mail and send it

15   to us, yes.

16   Q.  Did they bring it to you down in Halifax?

17   A.  Somebody would, yes.

18   Q.  Okay.  So you have no recollection of anybody

19   bringing you a letter from Auto-Owners that was dated

20   April the 17th, 2014?

21   A.  I do not.

22   Q.  And is that your correct address on this letter,

23   May the 27th, 59 Covered Bridge Drive, Flat Rock,

24   North Carolina 28731?

25   A.  It is.

Page 67

1    Q.   And that's -- that was your permanent residence?

2    A.   That's correct.

3    Q.   Okay.  When you look at this letter -- let me get

4    you to take a look at a portion of it.

5         It says down here in the second paragraph, it

6    said:  I did receive the medical authorization that was

7    forwarded, and thank you for same.  Unfortunately, the

8    hospital is being difficult about releasing the records.

9         First, they would not release them until your son

10   had been discharged, and now they object to the

11   authorization as it was signed as parent of the patient.

12        According to the records department, being that

13   your son is over 18, they need him to sign the

14   authorization.  As such, we've included one for his

15   signature.

16        Have I read that accurately?

17   A.   Yes, you have.

18   Q.   The next sentence says:  Mr. Ledford carries

19   quite a bit of insurance coverage that would no doubt

20   benefit your family in this very difficult time.

21        As soon as I am able to obtain the records, we

22   will be able to bring the insurance portion of this

23   matter to a conclusion.

24        Have I read that correctly?

25   A.   Yes.

Page 68

1    Q.   Then at the bottom it says:  Again, I hope that

2    your son continues to improve.  I have left my cell

3    phone number below, which you are free to call at any

4    time.

5         Have I read that accurately?

6    A.   Yes.

7    Q.   Now, do you remember signing a medical

8    authorization form prior to the date of this letter and

9    sending it in to Auto-Owners?

10   A.   I've signed a lot of release forms, yes.

11   Q.   Well, I'm asking about specifically Auto-Owners.

12   A.   Specifically, I don't recall the fact that I

13   signed this particular form and sent it to Auto-Owners.

14   Q.   Well, if there had been a particular form

15   included in a letter of April the 17th, 2014 that

16   contained an authorization with -- that has your

17   signature on it, it would be your presumption that you

18   had gotten it and that you had signed it?

19             MR. MARTINEZ:  Let me have that read back,

20        please.

21             COURT REPORTER:  (Question read back.)

22             MR. MARTINEZ:  Objection as to the form,

23        lack of foundation.

24   BY MR. BURGE:

25   A.   Let me show you what we're going to mark as

Page 69

1    Exhibit Number 5.  Here is a copy.

2              (Defendant's Exhibit 5 marked for

3         identification.)

4              MR. MARTINEZ:  Thank you.

5              MR. BURGE:  It's actually a two-sided form.

6         Here you go.  Here is your -- you all -- the copy

7         I gave you has got the --

8              MR. MARTINEZ:  Yep.

9              MR. BURGE:  -- fax at the top, but for my

10        question, it's not really an issue of what I want

11        to ask him about.

12   BY MR. BURGE:

13      Q.  Do you see at the bottom of that form on page 1

14   of 2 a signature there?

15      A.  I do.

16      Q.  And is that your signature?

17      A.  It is.

18      Q.  And you signed it David M. Cawthorn?

19      A.  Yes.

20      Q.  Okay.  And is that your name?

21      A.  It is not.

22      Q.  Okay.  But you circled that you are the parent?

23      A.  That is correct.

24      Q.  Okay.  And that's dated April the 29th of 2014?

25      A.  It is.

Page 70

1    Q.   Okay.  Do you remember signing this form, sir?

2    A.   Again, I don't remember signing one particular

3    form.  I've signed a lot of forms.  So I don't -- I did

4    sign this form, yes.

5    Q.   Okay.  So if Auto-Owners had sent you a letter

6    containing this form on April the 17th, 2014, and we

7    have this form with your signature on it on April the

8    29th of 2014, can you presume from that that you had

9    gotten the letter on the 17th --

10             MR. MARTINEZ:  Objection.

11   Q.   -- and the associated authorization form?

12             MR. MARTINEZ:  Objection; assumes facts not

13        in evidence.  Object to form.

14   A.   I can't presume.  I don't know.

15   BY MR. BURGE:

16   Q.   Is there any other location where you would have

17   gotten a form from Auto-Owners Insurance Company other

18   than them sending it to you either by mail or fax or

19   E-mail?

20   A.   No.

21   Q.   As far as you knew, there was nobody at

22   Auto-Owners at Halifax Hospital, right?

23   A.   I never met anybody from Auto-Owners at Halifax

24   Hospital.

25   Q.   And when we look at this letter of the 27th,

Page 71

1    which is -- what did you all do with it?

2            MR. MARTINEZ:  I put it right here.

3    BY MR. BURGE:

4       Q.  She makes reference in here, in the third

5    paragraph, that she, in fact, received the medical

6    authorization form forwarded, thanked you for it.

7            She then explains, unfortunately the hospital is

8    being difficult because it was signed as a parent, and

9    that they wanted your son, who is over 18, to sign the

10   authorization.  Do you see her talking about that?

11      A.  I do, but that's out of my control.

12      Q.  The form that you signed, that's Exhibit Number

13   5, of course was the one executed by you as the parent,

14   right?

15      A.  Yes.

16      Q.  Okay.  Now when you received this letter, did you

17   at any time take this authorization form that was

18   attached to it and ask Madison to execute it so that the

19   insurance company could get his records?

20           MR. MARTINEZ:  Objection; assumes facts not

21           in evidence.

22   BY MR. BURGE:

23      Q.  Did you --

24      A.  I guess if you'd looked at the medical records

25   you'd know his state.  The biller was dying on a bed.

Page 72

1   He couldn't communicate under heavy medication, and I

2   just -- I'm going to tell you, frankly, that's a

3   ridiculous question.

4       Q.  He wasn't capable of signing it, couldn't have

5   signed it, couldn't have possibly have understood

6   anything about it, and that's why you didn't ask him; is

7   that accurate?

8           MR. MARTINEZ:  Objection.

9   BY MR. BURGE:

10      Q.  Is that accurate, Mr. Cawthorn?

11      A.  Just give me a second.  You've got to understand.

12  He was -- he was dying on that bed.  Madison wasn't

13  worried about insurance.  So you're -- that's accurate,

14  yes.

15      Q.  Okay.  Thank you.

16      A.  So, apparently, it looks like I did what I needed

17  to do for the insurance company.  It has my signature,

18  as parent.

19          Auto-Owners didn't step up to the plate and do

20  what they should have done.  That's why we're sitting

21  here today.

22          And I'm having to go through these ridiculous

23  questions about my son signing a form when he is on a

24  hospital bed dying.

25      Q.  Yes, sir.  I understand your position.

Page 73

1    A.  If Auto-Owners would have done what was correct

2   and had been transparent, we wouldn't be sitting here

3   today.

4    Q.  And what do you say -- what was correct, sir, in

5   --

6    A.  Stepped up and done what they were supposed to

7   do.

8    Q.  Which was what?

9    A.  Contact us and not give me a runaround and tell

10  me not to hire an attorney.

11   Q.  Okay.  That's what you think they should have

12  done?

13   A.  They -- yeah.  I pay my insurance so that if

14  something happens they take care of it.  I don't have to

15  -- reach out to me and have to get attorneys, I just

16  take care of it.

17   Q.  Okay.  My question, though, has to do with simply

18  whether you had tried to get Madison to sign the forms;

19  am I right?

20   A.  And the answer is, he could not sign the form.

21   Q.  Okay.

22       MR. MARTINEZ:  Let me just -- let's just

23       take a little break here a second.

24       MR. BURGE:  Yeah.  Why don't we do that, and

25       we'll get the lunch brought in.  How about that?

Page 74

1              MR. MARTINEZ:  Sure.

2              (A lunch recess was taken from 12:31 until

3         1:04.)

4    BY MR. BURGE:

5      Q.  All right.  Mr. Cawthorn, back to Exhibit

6    Number 4, which is the letter from Auto-Owners talking

7    about the authorization.

8         At that time period, of course May 27th of 2014,

9    you, yourself, did not have a copy of the Halifax

10   medical record did you?

11     A.  I did not.

12     Q.  Okay.  Did you, at any time after receiving this

13   letter, go to Halifax and inform them that the insurance

14   company needed the records, that your son was not

15   capable of signing the authorization, and could there be

16   anything done for them to give you access to the

17   records?

18             MR. MARTINEZ:  Let me have the question read

19        back please.

20             COURT REPORTER:  (Last question read back.)

21             MR. MARTINEZ:  Object to the form of the

22        question, assumes a fact not in evidence, and

23        it's also compound.

24   BY MR. BURGE:

25     Q.  You can answer it.

Page 75

1    A.   I did not go back to Halifax.  I don't recall

2    speaking to anybody there about it.

3    Q.   Okay.  Thank you.  Do you remember if you shared

4    this information in this letter with your wife?

5    A.   I don't remember receiving the letter.

6    Q.   Okay.  I'm going to show you what we'll mark as

7    Exhibit Number 6.  These are all the same thing.  They

8    look a little different the way they're printed out.

9    But --

10                 MR. MARTINEZ:  I think it's just -- let me

11          make an objection.  I think it's part of the

12          string, isn't it?

13                 MR. BURGE:  Well, I've got every string in

14          separately, yeah, so we're going to look at all

15          of them.

16                 (Defendant's Exhibit 6 marked for

17          identification.)

18   BY MR. BURGE:

19    Q.   Mr. Cawthorn, take a minute and read that

20   document, if you would, please.

21                 MR. BURGE:  Is that Number 7 that we marked?

22                 MR. MARTINEZ:  Six.

23                 MR. BURGE:  Six.  Okay.  Thank you.

24   BY MR. BURGE:

25    Q.   Okay.  Thank you.  Mr. Ledford [sic], is that

Page 76

1   your E-mail address -- excuse me, Mr. Cawthorn, is that

2   your E-mail address on that E-mail?

3       A.   That is not my E-mail address.

4       Q.   Whose E-mail address is that?

5       A.   McLean --

6            MR. MARTINEZ:  Excuse me for one second.  I

7            think we're looking at different documents here.

8       A.   Yeah, I don't --

9            MR. MARTINEZ:  Excuse me for one second.

10           MR. BURGE:  Just read it and make sure it's

11           the same, Bob.

12           MR. MARTINEZ:  You know, it's the format

13           that's different here what you gave me.

14           MR. BURGE:  Well, I understand, but --

15           MR. MARTINEZ:  So what you gave me is not a

16           copy of what my client has for some reason.

17           MR. BURGE:  Well it didn't start out, it was

18           a pleasure speaking with you?

19           MR. MARTINEZ:  Not the E-mail portion of it.

20           MR. BURGE:  Oh, his doesn't show the E-mail?

21           MR. MARTINEZ:  No, it's different.

22           MR. BURGE:  Oh, okay.  Well, then, let's

23           just swap it then.

24           MR. MARTINEZ:  So do you want to --

25           MR. BURGE:  We'll make a copy of it.  But

Page 77

1         let's -- at the end we'll do it, but just so that

2         we can all look at it.   Stick that one on that

3         one.

4              MR. MARTINEZ:   Okay.   So that the record is

5         clear, the Exhibit 6 is Bates Number

6         Cawthorn-8000001.

7              MR. BURGE:   Yeah.   And if you want to take

8         this as your Number 6, it's got the entire title

9         up there, you're welcome to use that one.

10             MR. MARTINEZ:   Okay.

11             MR. BURGE:   And we'll make a copy of it

12        after we get through.

13   BY MR. BURGE:

14     Q.   Mr. Cawthorn, take a look at that E-mail.   Is

15   that E-mail address up there not the one for

16   Pamela McLean that the other one is.   Is that your

17   E-mail address?

18     A.   It is.

19     Q.   Okay.   And how long has that been your E-mail

20   address?

21     A.   Many years.

22     Q.   And do you still have that same address?

23     A.   I do.

24     Q.   And it looks like the E-mail says -- it appears

25   -- does yours say at the top that -- well, hold on.

Page 78

1    Let's look at what the contents says first.

2         It says:  It was a pleasure speaking with you

3    this morning regarding your son's accident.  Attached is

4    the letter we discussed with the medical authorization

5    included.  Upon receipt of the signed release, I will

6    obtain the records from the hospital so that we can

7    bring this matter to a conclusion.

8         As I said, please call me with any questions.  My

9    cell phone number is -- and she gives a number.

10        Have I read that accurately?

11   A.  You did.

12   Q.  Okay.  And do you have any reason to dispute that

13   you received this E-mail?

14   A.  I do not.

15   Q.  And if you are correct that you spoke with her

16   one time, can we assume that it was on June the 11th,

17   2014?

18   A.  We can, yes.

19   Q.  And did you understand, from reading that E-mail,

20   that -- what they were requesting from you?

21   A.  Medical authorization.

22   Q.  You understood that when you read it?

23   A.  It's pretty self-explanatory, yes.

24   Q.  Okay.  And do you have a current recollection of

25   receiving this?

Page 79

1    A.   I mean, it's not clear as a bell, but...

2    Q.   Well, the reason I ask that is in your previous

3    deposition you said that you didn't remember ever

4    E-mailing with Auto-Owners.

5    A.   Right.  So -- I mean, it's here, and after going

6    through the other deposition, it's probably fresh in my

7    mind.

8         But, no, I don't remember receiving E-mails or

9    dates that I spoke with Auto-Owners and things like

10   that.  So, apparently, I spoke to her on June 11th.

11   Q.   Okay.  And do you remember that your son had

12   transferred up to Shepherd's on May the 8th of 2014?

13   A.   I knew it was in May, yes.

14   Q.   So by June the 11th he had been at Shepherd's for

15   roughly four or five weeks?

16   A.   Yes.

17   Q.   Okay.  And on June the 11th, 2014, you did not

18   have a copy of the Halifax records?

19   A.   I did not.

20   Q.   And you did not have a copy of the Shepherd's'

21   records?

22   A.   I did not.

23   Q.   Okay.  Have you ever had a copy of those records?

24   A.   No.

25   Q.   Okay.  Now let's take a look at what we'll mark

Page 80

1    as Number 7.  These are all identical, so we won't have

2    any issue with these.

3           Would you review that exhibit for us, please?  Do

4    you recognize that E-mail, Mr. Cawthorn?

5                 (Defendant's Exhibit 7 marked for

6                 identification.)

7    A.   I do.

8    Q.   Okay.  Do you remember receiving it?

9    A.   I -- I don't remember receiving it, but I see

10   that I answered it.  I mean, I just...

11   Q.   Let me ask you this.  You see down there at the

12   bottom, the very bottom of this string, at 11:58 you

13   actually initiate the E-mail to Pamela McLean, right?

14   A.   Maybe that was an answer to the other one.

15   Q.   That's what my presumption is, yeah.

16   A.   Yeah.

17   Q.   Okay.  And, of course, at the time you answer it,

18   you understood that she was a representative of

19   Auto-Owners, which was Mr. Ledford's insurance company,

20   right?

21   A.   I knew it was the insurance company, yes.

22   Q.   And it says here, you say to her:  I see that

23   this letter states we will be able to bring the

24   insurance portion of this matter to a conclusion.

25           You have that in quotation marks, right?

Page 81

1      A.  Yes.

2      Q.  And you say:  Not sure what it meant by that.  My

3  son will have bills from other places, doctors,

4  surgeons, therapists and others from Florida and here in

5  Georgia, also for his long-term care for years to come,

6  so I would think there will be a lot more bills to be

7  paid.  Again, the conclusion part of what?  Thank you.

8          I read that accurately?

9      A.  Yes, you did.

10      Q.  So when you wrote that, did you have any

11  understanding at all as to what Ms. McLean was referring

12  to in Defendant's Exhibit Number 6, and her E-mail to

13  you?

14      A.  I'm sorry, can you repeat that question?

15      Q.  Yeah.  What was your understanding about her

16  E-mail, Defendant's Exhibit Number 6?

17      A.  Uh-huh.  Yeah.  Like I stated, to conclusion of

18  what.

19      Q.  You didn't know what she was talking about.  Is

20  that what you're saying?

21      A.  It sounded like to me in -- following the phone

22  conversation, giving me the runaround and what -- it

23  sounded like, to me, she just wanted to pay the bills

24  that were up to date, and then release her client, and

25  Auto-Owners and the Ledfords would be free and clear.

Page 82

1    Q.   Okay.  So you took, from the conversation, that
2  you thought Auto-Owners just wanted to pay the medical
3  bill from Halifax, or, whatever, and get you to sign a
4  release and move on?
5    A.   That's correct.
6    Q.   Is that what you -- is that what you thought?
7    A.   Yes.
8    Q.   In all your years of being a financial planner --
9    A.   I'm not a planner, an advisor.
10   Q.   Advisor.
11   A.   There's a difference.
12   Q.   In all the years that you've been an insured
13  under insurance policies, did that -- did that makes
14  sense to you if that's what Auto-Owners was trying to
15  do?
16        MR. MARTINEZ:  May I have the question read
17     back?
18        COURT REPORTER:  (Question read back.)
19        MR. MARTINEZ:  Object to the form of the
20     question, compound.
21  BY MR. BURGE:
22   Q.   You can answer the question.
23   A.   It sounded like I was getting the runaround from
24  the insurance company.
25   Q.   Well, you keep using that term, runaround.  What

Page 83

1    are you talking about?  What is the runaround here that

2    you keep referring to?

3        A.  I asked her what the amount of the check would be

4    in the phone conversation, and she would say, let us get

5    the bills, or something like that, to pay for that, and

6    then my clients will be free and clear, or whatever

7    terminology she used there.

8            And we had that conversation of -- that's about

9    three or four times, and then she told me not to hire an

10   attorney.

11           After that I did not trust her anymore.  And they

12   told me not to hire an attorney, and that I was going to

13   seek an attorney's advice.

14       Q.  And what did -- what else did she say in that --

15   anything else that you can remember in that conversation

16   that she said?

17       A.  No.

18       Q.  She just said, don't hire an attorney?

19       A.  Yes.

20       Q.  And that was it?

21       A.  Well, don't hire an attorney because they'll take

22   most of it, or part of it, or half of it or something.

23       Q.  Well, did you ask her about that?  What are you

24   talking about?  What do you mean by that?

25       A.  No.  I've already asked her, three or four times,

Page 84

1    what the amount of the check would be.

2       Q.  Okay.  Well, you're talking about the check to

3    the hospital.  Is that what you felt they wanted to pay,

4    was the bills initially, and then get a release --

5             MR. MARTINEZ:  Objection --

6       Q.  -- the check you were referring to?

7             MR. MARTINEZ:  -- asked and answered.

8    BY MR. BURGE:

9       Q.  And you already said that you thought they were

10   going to try to pay the hospital bill and get you a

11   release and move on.  So were you asking what was the

12   check to the hospital was going to be?

13      A.  I was asking what the check would be.

14      Q.  The check amount to who, for the bill to the

15   hospital?  Isn't that what you said --

16      A.  To my son.

17            MR. MARTINEZ:  Hold on a second.  Hold on.

18            He started to answer and you asked a question.

19            You're not being rude, it's just you're stepping

20            on each other.  So maybe we can have --

21   BY MR. BURGE:

22      Q.  Let's just go back, because I think you're

23   telling me something that I hadn't heard before.

24            I thought you said earlier when I asked you, and

25   you thought that they were going to pay the bill for the

Page 85

1    hospital at Halifax and then get you to sign a release,

2    and that they would be done with it.  I thought that's

3    what you testified to earlier.  If I'm wrong, then tell

4    me where I'm wrong.

5            MR. MARTINEZ:  Hold on a second.  Let me

6        have that question read back, please.

7            MR. BURGE:  Hold it.  You're asking for

8        every one of them to read back.  There is nothing

9        wrong with the form of the question.

10           MR. MARTINEZ:  Mr. Burge, sir, your

11       questions are compound.  You repeat your

12       questions, and when you asked it again you were

13       repeating the same question that you asked

14       before, and they are compound and they are very

15       confusing.

16           So, we want to get a truthful record here --

17           MR. BURGE:  Well, if the witness can tell me

18       whether it's confusing or not --

19           MR. MARTINEZ:  Well, the witness is not a

20       lawyer.

21           MR. BURGE:  Yeah, but the witness, if he

22       understands the question, he's entitled to answer

23       it.

24           MR. MARTINEZ:  All I've asked is that we

25       have the question read back to see whether he can

Page 86

1      understand it.

2              MR. BURGE:  Okay.

3              MR. MARTINEZ:  That's all.

4              MR. BURGE:  Well, he didn't say he didn't

5      understand it.

6              MR. MARTINEZ:  But I'm his lawyer.

7              MR. BURGE:  Which --

8              MR. MARTINEZ:  I'm his lawyer, Mr. Burge.

9              MR. BURGE:  I know.  But you don't get to

10     tell him what he understands and what he doesn't.

11             MR. MARTINEZ:  I don't understand the

12     question.  I just want to hear the question again

13     to see whether he understands it.

14             MR. BURGE:  I don't think he said he

15     misunderstood it.  If you could read it back.

16             COURT REPORTER:  (Question read back.)

17  A.  All right.  I'll say it one more time.

18         On the phone conversation she said to me to sign

19  this release so my clients can be free and clear.

20         Again, I don't know if that's the proper

21  terminology she used, but that's how I understood it.

22  We need to get the medical records so we can pay these

23  bills.

24         And I said, how much will the check be for?  We

25  need to sign this release so that my clients can be free

Page 87

1    and clear, and we'll take care of these bills.

2         Again, how much -- I said how much will the check

3    be for.  She said the same thing.  One more time, we

4    need to sign the release so my clients can be free and

5    clear, we'll pay these bills, and don't hire an attorney

6    because they will take most of it, or half of it,

7    whatever the conversation was, and at that point was

8    when we ended the conversation.

9    Q.  All right.  I think I'm understanding what you're

10   saying.  So what release was she wanting you to sign,

11   the one that she sent for the medical records?

12   A.  I guess.  I don't know what release she meant.  I

13   didn't -- you know, I'm not an insurance person.  I sell

14   annuities, that's not auto and casualty insurance.  I

15   lost trust.

16        My mind is on my son's recovery and you're trying

17   -- somebody is trying to use this terminology that's

18   confusing to a person.  All it took was a straight

19   answer.

20        When I heard that the third or fourth time when

21   they told me not to hire an attorney, I lost trust in

22   her at that point.

23   Q.  Let's take a look at Exhibit Number 5 again.

24   Exhibit Number 5, when you signed that did you

25   understand that you were signing a document on behalf of

Page 88

1    the insurance company so that they could seek the

2    records of your son, Madison?

3        A.   Yes.

4        Q.   Okay.   Then when you received the letter of the

5    27th, Exhibit Number 4 --

6              MR. MARTINEZ:   Objection; misstates the

7         record, assumes a fact not in evidence.

8    BY MR. BURGE:

9        Q.   When you look at that letter in the middle of the

10   page when she says that she received the authorization,

11   but that the hospital would not accept it to release the

12   records, and that she needed one signed by your son, did

13   you understand what that meant?

14       A.   I don't remember seeing this letter.

15       Q.   Okay.   Well when you sent her the E-mail, which I

16   guess is, what, Number 7, down at the bottom where it

17   says, I see that this letter states we will be able to

18   bring the insurance portion of this matter to a

19   conclusion.   I'm not sure what is meant by that.   My son

20   will have bills from other places, doctors, surgeons,

21   therapists, others from Florida and here in Georgia,

22   also for his long-term care for years to come.   So I

23   would think there would be a lot more bills to be paid.

24   Again, the conclusion part of what?

25              Now what was this release that you say she wanted

Page 89

1  you to sign to get her client free and clear?  What are

2  you talking about?

3      A.  I have no idea --

4      Q.  Okay.

5      A.  -- what, I mean, where is it at.  Where is a copy

6  of what she wanted me to sign in this.

7      Q.  Well, when she sent you the first E-mail didn't

8  she tell you, attached is the letter that we discussed

9  with the medical authorization?

10     A.  Is there a letter attached to this?

11     Q.  I think there was, I mean, I don't have it, but I

12  expect there was.

13          MR. MARTINEZ:  Why don't we just put for the

14      record that Exhibit 6, which is Bates Number

15      Cawthorn AO 00001 is an E-mail with reference to

16      an attachment, but there is no attachment to that

17      E-mail as part of Exhibit 6.

18  BY MR. BURGE:

19     Q.  Well, when you responded in the E-mail to her,

20  what does your first letter say -- what does your first

21  sentence say?

22     A.  I see that this letter states that we will be

23  able to bring the insurance portion of this matter to a

24  conclusion.

25     Q.  And does that letter of the 27th, does it say

Page 90

1    that anywhere in that letter?

2        A.   I don't see a letter.  All I see is her E-mail,

3    and on her E-mail it says we can bring this matter to a

4    conclusion.  So maybe it's a misquote saying letter.

5    Maybe I should have said E-mail.  Because you can look

6    at your form there, Number 6, I do not see an

7    attachment.  I don't know what attachment you're talking

8    about.  I'm going by what she wrote me, and I responded

9    to this in an E-mail.

10       Q.   Okay.  So now you're saying that it wasn't a

11   letter?

12       A.   I have no idea if it was a letter.

13       Q.   Well, you say it's a letter in your E-mail,

14   right?  You say, I notice the letter says -- I see that

15   the letter states?

16       A.   I don't see a letter though.

17       Q.   Okay.

18            MR. MARTINEZ:  Do you have any -- do you

19       have an exhibit with the attached letter,

20       Mr. Burge?

21            MR. BURGE:  I don't, Bob.

22            MR. MARTINEZ:  All right.

23            MR. BURGE:  I mean, this is the letter, and

24       that's what I think --

25            MR. MARTINEZ:  But is it part of the

Page 91

1          attachment?  In other words --

2                MR. BURGE:  It's not part of the attachment,

3          but I'm just asking him what remembers about it.

4     A.   Yeah, I don't remember --

5   BY MR. BURGE:

6     Q.   You say there wasn't a letter, then --

7     A.   I don't remember a letter.

8     Q.   Okay.  Do you remember the E-mail?

9                MR. MARTINEZ:  Objection; asked and

10         answered.

11    A.   I remember the conversation.

12  BY MR. BURGE:

13    Q.   Okay.  You don't remember the E-mail?

14    A.   Not really.  I mean, it's here, so apparently it

15  was there, but I don't -- I don't remember, like, yes,

16  this is -- this was not my focus.

17    Q.   Okay.  So then the next, it looks like she

18  responds about an hour later, and she says to you, the

19  payment that we would -- the payment we make would be in

20  a lump sum for release of our insured.  It would be for

21  you to disburse.  The payment would be made to your son

22  for use at his discretion.  Period.

23              Have I read that accurately?

24    A.   Uh-huh.

25    Q.   Did you understood [sic] what that meant?

Page 92

1      A.  I did not.

2      Q.  Did you --

3      A.  There is no clarification of what that means.

4      Q.  Did you pick up the phone and call and ask her

5   what it meant?

6      A.  I did not.

7      Q.  Were you curious as to what it meant.

8      A.  I was not.

9      Q.  The words say there would be a lump sum.  Do you

10   understand what a lump sum is?

11     A.  I do.

12     Q.  That would be for you to disburse, payment would

13   be made to your son for his discretionary use.

14     A.  A lump sum of what amount?

15     Q.  Well you asked her that, the next thing you ask,

16   right, in the E-mail?  How much would the check be for?

17     A.  I don't know if I responded -- oh, okay, yeah, I

18   see that now.  I didn't see that before.  How much will

19   the check be for.  Yeah.

20     Q.  And what did she respond?

21     A.  There is $3-million in coverage, but what does

22   that mean.

23     Q.  Did you call her and ask what it meant?

24     A.  I did not.

25     Q.  Did you talk with your son about this issue?

Page 93

1     A.  I would have, yes.

2     Q.  Did you tell him I've heard from the insurance

3  company they are talking about having a check to you, a

4  fund, it may be $3-million.  Did you discuss that with

5  him?

6            MR. MARTINEZ:  Object to the form of the

7            question; assumes facts not in evidence.

8     A.  I don't remember the exact words, but we would

9  have had a discussion, yes.

10  BY MR. BURGE:

11     Q.  And what did you, what do you think you said to

12  him about it?

13     A.  Probably that the insurance company gave us a

14  runaround and told us not to hire an attorney.

15     Q.  Did you speak with him about the $3-million

16  figure and that they were discussing writing a check for

17  -- to him to use at his discretion?

18            MR. MARTINEZ:  Object to the form of the

19            question.

20     A.  This -- that's not a clarification of what the

21  check amount would have been for.

22  BY MR. BURGE:

23     Q.  Did you pick up -- were you even curious to even

24  know?  If you didn't understand this, were you even

25  curious enough to pick up the phone and call her and ask

Page 94

1    her?

2              MR. MARTINEZ:  Objection; asked and

3         answered.

4    BY MR. BURGE:

5      Q.  You can answer.

6      A.  Again, why would I call them back again?

7      Q.  Is that, no, you didn't call them back?

8      A.  I did not call them back.

9      Q.  Did you talk with your wife about it?

10     A.  I would imagine we just spoke about it, yes.

11     Q.  Do you know what you told her about it?

12     A.  The same thing.  That they gave us the runaround.

13   She gave our -- she gave us the runaround and wouldn't

14   give a specific answer.  And it sounds like in this

15   E-mail they still just wanted to pay the bills, and --

16   what's the terminology -- release of our insured.

17     Q.  Where is -- where are you talking about from

18   them, the reference about the bills?

19     A.  Payment we made you in a lump sum for release of

20   your -- in release of our insured.

21          Prior to that, upon the receipt of the signed

22   release, I'll obtain a record from the hospital so we

23   can bring this matter to a conclusion.

24     Q.  Okay.

25     A.  So it just sounds like to me she just wanted to

Page 95

1    pay the bills that are up to date, and the insurance

2    would be free and clear.

3         If she would not have said don't hire an

4    attorney, I may have had more trust in them.  But that

5    right there ended it, the trust in Auto-Owners.

6    Q.  Of course there is nothing in this E-mail about

7    hiring an attorney, is there?  Do you see any mention of

8    that?

9    A.  Nope.  But I know in the conversation that I had

10   with her.

11   Q.  So in your -- your conversation with them was,

12   you say -- tell me exactly what you say she said to you.

13             MR. MARTINEZ:  Objection; asked and

14        answered.

15   A.  I've already said that five or six times.

16   BY MR. BURGE:

17   Q.  Well, I want you to tell me again the best you

18   can remember what she said about an attorney.

19             THE WITNESS:  Do I got to keep repeating

20        this?

21             MR. MARTINEZ:  Let me have the question read

22        back, please?

23             COURT REPORTER:  (Question read back.)

24   A.  She said, do not hire an attorney because they'll

25   take -- and I don't remember the last part, but they'll

Page 96

1    take most of it.

2       Q.   Okay.  How much did the attorneys take of the

3    $3-million?

4              MR. MARTINEZ:  Objection; I'm instructing

5         you not to answer.

6              MR. BURGE:  It's not attorney/client.

7              MR. MARTINEZ:  What's the relevance?

8              MR. BURGE:  The relevance is we're entitled

9         to know that.

10             MR. MARTINEZ:  You're entitled to know the

11        arrangement that the Cawthorns had with our law

12        firm?

13             MR. BURGE:  Well, we're entitled to know

14        what the fee was and what was taken out of --

15             MR. MARTINEZ:  How was that relevant?

16             MR. BURGE:  Well, it's relevant because,

17        Bob, you've taken the consent judgment for

18        $30-million, one thing is.

19             And so the amount of money that Cawthorn

20        actually got out of the total thing is going to

21        go towards that $30-million.

22             MR. MARTINEZ:  I'm going to instruct him not

23        to answer.  I'm going to take it up with the

24        court.

25             MR. BURGE:  Okay.

Page 97

 1    BY MR. BURGE:

 2       Q.   Are you going to follow your lawyer's advice?

 3              MR. MARTINEZ:   Of course he is.   Next

 4         question, please.

 5              MR. BURGE:   I'm entitled an answer to that.

 6              MR. MARTINEZ:   Mr. Burge --

 7              MR. BURGE:   Mr. Martinez --

 8              MR. MARTINEZ:   -- I'm here as -- I'm here as

 9         his lawyer.   He is going to follow my

10         instructions.

11              MR. BURGE:   Can I ask him that?

12              MR. MARTINEZ:   He is going to say yes.

13              MR. BURGE:   Okay.

14              MR. MARTINEZ:   That's kind of a silly

15         question.   Please move on.

16              MR. BURGE:   Why don't we just ask him.   He

17         can answer yes, and then we've got it clear as a

18         bell for the record and we won't have to worry

19         about it.

20              MR. MARTINEZ:   You're not going to

21         manipulate my client, sir.   I'm not going to do

22         that to yours, and that's kind of a silly

23         question.

24              He is going to follow my instructions.   Your

25         client would follow your instructions.   I would

Page 98

1          never ask a question like that.

2               MR. BURGE:  Well, you're free to anytime you

3          want to ask --

4               MR. MARTINEZ:  I would not do it, but thank

5          you for the indulgence.

6    BY MR. BURGE:

7      Q.  Mr. Cawthorn, was there anybody else, after you

8    got this E-mail from Pamela McLean, besides your son and

9    your wife that you would have talked about -- about this

10   $3-million in coverage, and this statement in here about

11   that the payment would be made to your son for use at

12   his discretion?

13     A.  I do not recall.

14     Q.  Okay.  Do you remember -- you don't remember if

15   you called maybe your friend, Steve Ours, who had a wife

16   that dealt with insurance, or any insurance friend,

17   anybody like that?

18     A.  I did not.  After USAA told me that they would

19   not handle it because it's an automobile insurance, I

20   didn't contact any other insurance company.

21     Q.  Tell me -- tell me again.  I'm not following what

22   you're saying about what USAA said.  What did they say

23   again?

24     A.  That they could not, you know, when you get in an

25   automobile accident, both insurance companies deal with

Page 99

1    each other.

2        Q.  All right.

3        A.  And they wouldn't be involved in this since my

4    son wasn't driving, so I couldn't rely on their help.

5        Q.  I understand.  And that was because they said

6    that your son was not the driver of the vehicle?

7        A.  Yes.

8        Q.  Did you -- let me show you what we'll mark as

9    Exhibit Number 8.  Do you recognize that E-mail,

10   Mr. Cawthorn?

11               (Defendant's Exhibit 8 marked for

12               identification.)

13       A.  I don't recognize it, but I imagine I received

14   it.  Apparently I received it, yes, but I don't

15   recognize it.

16       Q.  It's got your correct E-mail address on it?

17       A.  It does.

18       Q.  Okay.  It's dated June the 30th, 2014; is that

19   right?

20       A.  That's the date on here, yes.

21       Q.  Okay.  Which would have been, what, a couple of

22   weeks after you and Ms. McLean had had your E-mail

23   exchange?

24       A.  Yes.

25       Q.  Back on June the 11th, so a little more than two

Page 100

1    weeks had passed, right?

2      A.  Yes.

3      Q.  Okay.  And it says here, just wanted to send you

4    a quick note regarding the medical authorization that I

5    sent to you.  As soon as I receive that I will be able

6    to get the medical records from Halifax Medical Center.

7    Hope your son is doing well and continues to improve.

8    Pamela McLean.

9         Have I read that accurately?

10     A.  You have.

11     Q.  Okay.  Did you respond in any fashion to her

12   about this E-mail?

13     A.  Apparently we got the medical authorization

14   signed and sent it to Auto-Owners, but I don't know if I

15   responded to this or not.

16     Q.  Which medical authorization are you referencing

17   now?

18     A.  I guess the one that I signed and sent to her

19   that she's thanking me for this medical authorization

20   from Halifax.

21     Q.  Okay.  Are you talking about the one that you

22   signed way back in April?

23     A.  I have no idea.  I don't know.  I'm just

24   referencing this note.  So apparently I signed a medical

25   authorization, because it says she received it.

Page 101

1    Q.  And doesn't she say, as soon as I receive it?

2    A.  Let me see.  Just wanted to send you a quick note

3  regarding the medical authorization I sent to you.  Oh,

4  no, my misunderstanding.  I read this wrong.  I thought

5  she said she received it, so, no.  No, I don't recognize

6  it.  Sorry.

7    Q.  Okay.

8    A.  I read it wrong.

9    Q.  That's all right.  Let's just go back to the

10  original question.  I think we can finish it pretty

11  quickly.

12    A.  Okay.

13    Q.  When you got this on June the 30th, 2014, did you

14  make any response at all to Auto-Owners?

15    A.  I don't recall.

16    Q.  Okay.  You just don't know whether you called her

17  or whether you sent her an E-mail or anything like that

18  at all?

19    A.  I know I wouldn't have called, but I don't know

20  if I responded to this or -- I don't recall.

21    Q.  Okay.  All right.  Let's take a look at Exhibit

22  Number 9.

23          (Defendant's Exhibit 9 marked for

24          identification.)

25          (Mr. Latta enters the room.)

Page 102

1      Q.   Take a moment and read that to yourself,

2   Mr. Cawthorn.  Have you had a chance to read that?

3      A.   Uh-huh.

4      Q.   What is the date of that, please?

5      A.   June 12th, 2014.

6      Q.   Would that be the day after your exchange with

7   Pamela McLean about the $3-million policy limits?

8      A.   According to the dates, yes.

9      Q.   Okay.

10     A.   I don't -- I don't know anything about

11  $3-million.  The policy limits said $3-million, but

12  there was no check offered for $3-million.

13     Q.   But I'm referring to her E-mail where --

14     A.   On June 11th?

15     Q.   On June 11th where you asked her how much will

16  the check be, and she said there's a $3-million policy

17  limit?

18              MR. MARTINEZ:  Hold on a second.  Objection.

19  BY MR. BURGE:

20     Q.   Or you can read exactly what it says.

21     A.   It says there's $3-million in coverage.

22     Q.   Okay.  And what's your question to her on the

23  E-mail?

24     A.   I didn't have a question.

25     Q.   Yeah, you did.  There was a question to her

1   before she says that.

2       A.   Oh, how much would the check be for.   That's not

3   an answer.

4       Q.   And she said?

5       A.   $3-million in coverage.

6       Q.   Coverage.   Right.

7       A.   So that's a big difference there.

8       Q.   So this E-mail that we're looking at from

9   Blake Meadows to Dean Colson was one day after that

10  E-mail exchange with Ms. McLean, right?

11      A.   After I was told not to hire an attorney, yes.

12      Q.   But it was the day afterwards, right?

13      A.   That correct.

14      Q.   Now in between that E-mail exchange with

15  Ms. McLean and speaking with your son and your wife

16  about the information in the exchange, did you speak

17  with Blake Meadows about it?

18      A.   I did not, no.

19      Q.   Do you know who spoke with Blake Meadows about

20  it?

21      A.   It was probably my wife.   I think she reached out

22  or -- I'm not 100 percent sure, so, no, I don't know if

23  it was Madison, because Madison is friends with

24  Blake Meadows, so he may have reached out.   So I don't

25  know.

Page 104

1    Q.   Blake Meadows was the son of the

2    Congressman Meadows?

3    A.   Mark Meadows, yes.

4    Q.   And that's the same Congressman that your son,

5    Madison, had worked for?

6    A.   Yes.   After the accident, yes.

7    Q.   After the accident?

8    A.   Yes.

9    Q.   Is he the same Meadows that had written the

10   letter to the Naval Academy?

11   A.   Yes.

12   Q.   And were your son and Blake Meadows friends?

13   A.   They were debate partners, and Blake is older

14   than Madison, so --

15   Q.   Is Blake Meadows -- was he -- was he sort of in

16   the homeschool group?

17   A.   Yes.

18   Q.   Is that how he knew him?

19   A.   Yes.

20   Q.   And do you know how Blake Meadows knew

21   Dean Colson?

22   A.   No.

23   Q.   Did you know this E-mail was going out?

24   A.   I did not.

25   Q.   And it's your testimony you, at no time, spoke

1    with Blake Meadows about this issue?

2        A.  Correct.

3        Q.  Okay.  Let's take a look and see what he says

4    here, it says:  Dear Mr. Colson, I hope this finds you

5    well.  I appreciated getting to chat with you during my

6    law school decision.  I thought you might like to know

7    that I decided to go to Emory Law as a Woodruff Fellow.

8    I will be starting this August.  I am sure I'll be

9    calling you for a lot more advice throughout the

10   process.

11        I also want to ask you for some advice.  A

12   close-family friend was involved in a serious car crash

13   that nearly killed him.  It's uncertain if he will ever

14   walk again, and, frankly, it's a miracle that he even

15   survived the crash.

16        The family is already starting to run into some

17   issues with the insurance balking on payments and are

18   interested in retaining an attorney to make sure their

19   son gets the care he needs.

20        The crash occurred in Florida.  The car insurance

21   is based out of South Carolina, and his health insurance

22   is based out of North Carolina.  He is being treated in

23   Georgia.

24        I'm not sure exactly where that would place the

25   case or if that impacts the case whatsoever.  Is it the

Page 106

1    type of case your firm is interested in, or is there

2    anybody you would refer them to.  In either case, I'm

3    sure they would appreciate your advice.  Take care and

4    God bless.  Sincerely, Blake Meadows.

5           Have I read that accurately?

6    A.  Yes.

7    Q.  Tell me, outside of your wife and your son, who

8    else are the possible people that Blake Meadows would

9    have gleaned this detail and knowledge about the issues

10   in this case from?

11   A.  I have no idea.

12   Q.  Are those the only two you would know of, would

13   be your wife --

14   A.  That I spoke to?

15   Q.  No, no.  I'm asking you in the -- else in the

16   realm of possible people are there that Blake Meadows

17   could have spoken to and received the kind of detail

18   that's in this E-mail about this incident, outside of

19   your wife or your son?

20   A.  No.

21   Q.  So is it your belief that he would have spoken to

22   either your wife or your son to obtain this information?

23   A.  Yes.

24   Q.  Okay.  And is it your belief that that would have

25   been information that you had told your son and/or your

1   wife?

2       A.   I don't understand the question.

3       Q.   Yeah.   The information that's in this E-mail, do

4   you think that information is items that you would have

5   told your wife and your son?

6            MR. MARTINEZ:   Object to the form of the

7       question.

8       A.   I still don't get your question, that he was in a

9   car crash and almost died in it?

10  BY MR. BURGE:

11      Q.   Well, specifically I'm talking about this section

12  in here.   It says, the family is already starting to run

13  into some issues with the insurance balking on payments.

14      A.   Yeah.   All right.

15      Q.   Is that something that you would have told your

16  wife or your son?

17      A.   Well, not in those terms.   But they understood

18  that I was getting the runaround, and they told us not

19  to hire an attorney.

20      Q.   Okay.   Now at some point in time did an attorney

21  come to visit in Atlanta at Shepherd's?

22      A.   Yes.

23      Q.   And who was that?

24      A.   Joe Kalbac.

25      Q.   When was it that he came to Atlanta?

1     A.  Sometime in June.

2     Q.  Do you know about when in June?

3     A.  I do not.

4     Q.  Do you know if it was, like, the next day, like

5  the 13th, 14th?

6     A.  I was focused on Madison's recovery, and so I

7  didn't really keep up with days.  I wasn't working, it

8  was just day-to-day taking care of Madison.

9         So I don't -- I really don't know the date.  I'm

10  sure it's in the records somewhere, or Joe, I'm sure he

11  has it.  But I couldn't tell you if it was two days

12  after this or two weeks after this.

13     Q.  Okay.  Well if the lawsuit was filed 14 days

14  after this --

15     A.  Okay.

16     Q.  -- on June 26th, does that help you in regard to

17  timing?

18     A.  Is that a Monday?

19     Q.  I don't know what the day is.

20     A.  Yeah.  So, I'm sorry, I don't either.

21     Q.  I'm just trying to give you a reference to see if

22  that helps you when about when it was.

23     A.  Well, let's say it was around that time, then.

24     Q.  Okay.

25     A.  Give or take a day or two --

 1     Q.  Okay.

 2     A.  -- because I don't know.

 3     Q.  It must have been sometime within that 14-day

 4  period?

 5     A.  It must have been.

 6     Q.  Okay.  And did you meet with Mr. Kalbac?

 7     A.  Priscilla, Madison and I met with Joe Kalbac,

 8  yes.

 9     Q.  Okay.  Did -- was he employed by your son on that

10  occasion?

11     A.  He was.

12     Q.  Okay.  And did he sign a contract with

13  Mr. Kalbac?

14     A.  I'm pretty sure he did.

15     Q.  Did you review it for him?

16     A.  We would have reviewed it as a family, yes.

17     Q.  Okay.  You and your wife and Madison?

18     A.  Madison, yes.

19     Q.  And was Madison the only one that executed it?

20     A.  Executed what?

21     Q.  The contract, employing the lawyers?

22     A.  Do you mean that okayed hiring the attorneys?

23     Q.  You generally have to hire a lawyer in writing --

24     A.  Okay.

25     Q.  -- in Florida if it's on a contingency fee basis.

1      A.  I guess so, yes.

2      Q.  And you get to be provided certain rights of the

3    client?

4      A.  I imagine so, yes.

5      Q.  Do you remember seeing any of that?

6      A.  Again, there was a lot of forms signed.  I don't

7    recall which form, but I know he hired and obtained

8    Joe Kalbac.  So legal documentation and all that, I'm

9    sure their firm has it.

10     Q.  But that was signed by your son, it wasn't signed

11   by you and your wife?

12     A.  I'm 99 percent sure Madison signed it.

13     Q.  Because he was --

14     A.  I don't -- I didn't sign it as a parent, so, no,

15   we wouldn't have signed it, I guess.

16     Q.  He was of age, it was his case, he was the one

17   that had been injured, right?

18     A.  Yes.  He had a much clearer -- he was not on as

19   many medications at that time, so he could think of it

20   clearer at that time.

21     Q.  When did -- well, let me ask you this.  These

22   exhibits here, Exhibit Number 7 and Number 8, those

23   E-mails from you.  Did you provide that evidence to

24   Mr. Kalbac?

25     A.  I don't remember sitting there and pulling up the

Page 111

1    evidence or showing him -- no, I don't recall.  I don't

2    know where he got this.

3        Q.  Well when you say you don't recall, are you

4    saying it didn't happen, or are you saying you just

5    don't know, or --

6        A.  I don't know.

7        Q.  You don't know whether you provided him that

8    evidence or not?

9        A.  That's correct.

10       Q.  Okay.

11       A.  Because I don't remember if I did.

12       Q.  Do you have any recollection that you printed out

13   that evidence --

14       A.  No.

15       Q.  -- in anticipates of him coming?

16       A.  No.

17       Q.  You don't remember or --

18       A.  No, I know that didn't happen.

19       Q.  That didn't happen.  Okay.  When was the last

20   time that you had seen those E-mails prior to today?

21       A.  I believe at my last deposition, somewhere back

22   there, a year and a half ago.

23       Q.  A year ago you said you didn't have any E-mails

24   from Auto-Owners in that deposition, so I don't know,

25   I'm asking you.  When was the last time you saw those

1  E-mails?

2      A.  I don't recall.  Somebody printed them off

3  somewhere, so I don't know.

4      Q.  Did -- when was the first time that you became

5  aware that Auto-Owners had sent checks for $3-million on

6  behalf of your son to the lawyer that represented him?

7  When did you become aware of that?

8      A.  I don't recall the date.

9      Q.  And did Madison tell you that?

10     A.  I would imagine he did.

11     Q.  Did he tell you why he wasn't willing to accept

12  the $3-million?

13     A.  I really don't recall.

14     Q.  Well, did he ask you or counsel, Dad, should we

15  accept this $3-million?

16     A.  I would imagine we had a conversation, but after

17  we hired the attorneys, it's off our plate and we'll let

18  it play out in court.

19     Q.  Well, let me ask you about that.  You understood

20  that it would have been your son's decision whether to

21  accept the funds or not.

22     A.  Yeah, not my decision, that's correct.

23     Q.  Right.

24     A.  Because it's David Madison Cawthorn suing, not

25  me.

Page 113

1    Q.  Right.

2    A.  Yes.

3    Q.  But you're his dad, you have some financial

4    experience.  Did he seek your advice about what he

5    should do?

6    A.  It was Madison's decision.

7    Q.  And did he tell you why he did not accept and

8    would not accept the $3-million?

9    A.  I don't recall.  You'd have to ask Madison.

10   Q.  Now in early August of 2014, were you all back in

11   North Carolina?

12   A.  Somewhere around that time, yeah.

13   Q.  And was the renovations of your home taking place

14   then?

15   A.  The beginning stages.

16   Q.  So you think the work had started by that time?

17   A.  I think we were -- people were lining up to

18   volunteer and help out.  I think -- I don't think it

19   started at that point.

20   Q.  Okay.  And at that point in time I guess Madison

21   was still -- still recovering?

22   A.  Still is today, yes.

23   Q.  Okay.  And I don't guess he was working anywhere

24   then, was he?

25   A.  No.

Page 114

1    Q.  Okay.  Did he have any source of income at that

2   point in time?

3    A.  Medicare.

4    Q.  Medicare?

5    A.  Social Security --

6    Q.  Okay.

7    A.  -- paid him a little bit.

8    Q.  And was he also getting Medicare along with that,

9   or was he still on United?

10    A.  Still on United.

11    Q.  Or was there any -- do you think there was some

12   Medicare supplementation?

13    A.  No, there's not.

14    Q.  Not at that time?

15    A.  No.  Medicaid would have just paid for a little

16   bit of rehab, I forget, 11 hours or something like that.

17    Q.  Okay.  All right.  At -- at any time since this

18   case has been going on, have you, yourself, ever made

19   any demand on Auto-Owners?

20    A.  Myself?  No.

21    Q.  Yeah.

22    A.  I have not.

23    Q.  Did you, yourself, ever make any offer to

24   Auto-Owners?

25    A.  I have not.

Page 115

1       Q.   At any time did you ever notify Auto-Owners of

2  the hiring of Mr. Kalbac?

3       A.   Myself?  No.

4       Q.   Yes.  Do you know if your son ever notified them

5  of the hiring of Mr. Kalbac?

6       A.   As far as I know, no, he did not.

7       Q.   Now at some point in time we know that this --

8  there was a -- at least a partial resolution of this

9  case, right?

10      A.   Meaning what?

11      Q.   Meaning that your son decided to accept the

12  $3-million.

13           MR. MARTINEZ:  You're talking about the

14      underlying case?

15           MR. BURGE:  The underlying case, yeah.  The

16      underlying lawsuit.

17      A.   Are you talking about the settlement he just

18  received?

19  BY MR. BURGE:

20      Q.   Right.

21      A.   Yes.

22      Q.   Right.  The $3-million that they offered back in

23  August of 2014.  At some point in 2016, he accepted the

24  $3-million from Auto-Owners, and I understand there was

25  some additional money from some other defendants.

Page 116

1              MR. MARTINEZ:  Objection; compound question.

2   BY MR. BURGE:

3      Q.  You can answer it.

4      A.  Yes.

5      Q.  Okay.  When was it, if ever, did your son Madison

6   tell you that he had decided to accept the $3-million

7   Auto-Owners?

8      A.  I don't know.

9      Q.  Did he tell you that before the settlement was

10  finalized?

11     A.  No.

12     Q.  He never asked you about that advice or --

13     A.  No, it was his decision.

14     Q.  -- sought your counsel about it or anything like

15  that?

16     A.  Did not.

17     Q.  Did he ever speak with you about the offers that

18  were made by the other defendants?

19     A.  I heard about them in mediation or whatever we

20  were in.

21     Q.  Don't tell me about mediation.  I'm just asking

22  you about -- you and conversations with you and your

23  son.

24     A.  No.

25     Q.  Okay.  So your son didn't -- didn't seek your

1    guidance and counsel on the offer that was being made by

2    the other defendants?

3        A.   No -- no, he did not.

4        Q.   Okay.  And he didn't seek your advice and counsel

5    about when he decided to accept the $3-million from

6    Auto-Owners?

7        A.   He did not.

8        Q.   Okay.  What was the total amount of the

9    settlement between all of the defendants?

10                  MR. MARTINEZ:  Let me object and instruct

11            you not to answer.

12                  MR. BONNER:  May I state on the record

13            here --

14                  MR. BURGE:  Sure.

15                  MR. BONNER:  -- because we've answered on

16            interrogatories that revealed that the settlement

17            with the other defendants are subject to a

18            confidentiality agreement.  We are more than

19            happy to disclose the amount of that settlement.

20                  But we have sought a protective order.  As

21            you know, it's been denied, we're still up in the

22            air about this?  We --

23                  MR. BURGE:  Well, we're entitled to know it.

24                  MR. BONNER:  Well, I agree, and I would like

25            to disclose it to you.  We just have to make sure

Page 118

1           there is confidential protections in place.

2               MR. BURGE:  Well, we can put the

3           confidential protections, but we can either know

4           it now or bring him back later.

5               MR. BONNER:  No, no, no.  I'm suggesting

6           that because the protective order has not been

7           entered by the court, that we agree on the record

8           now that all the prescriptions surrounding the

9           protective order apply to the answer of this

10          question.

11              MR. BURGE:  I think that's fine.  We'll go

12          along with that.

13              MR. MARTINEZ:  So that portion of the

14          transcript would have to be separated, so we

15          don't include it with the rest of the transcript.

16              COURT REPORTER:  You can instruct me about

17          that later.

18  BY MR. BURGE:

19     Q.  All right, Mr. Cawthorn, do you know what the

20  total amount of the settlement is or was?

21              THE WITNESS:  Do I answer that?

22              MR. BONNER:  You can answer that.  It's

23          subject to protection.

24              MR. MARTINEZ:  If you know.

25     A.  Total dollar amount?  $3-million from

Page 119

1    Auto-Owners, and I'm really not 100 percent sure.  I'm

2    going to say $3-million from -- whoever the other people

3    are involved in the --

4                    MR. MARTINEZ:  Are you guessing?

5                    THE WITNESS:  Yes.  Yes, I'm sorry.

6                    MR. BURGE:  Well, I think we're entitled to

7           know what the exact number is.

8                    MR. MARTINEZ:  We'll cooperate with you.

9                    MR. BONNER:  I'm not disagreeing.  We've

10          stated that we --

11                   MR. BURGE:  I don't want to play any games

12          here talking about what it is, because I don't --

13                   MR. BONNER:  We've agreed, that's on the

14          record, I can represent to you that it's

15          $3-million subject to the confidential

16          protections that we've all been talking about.

17   BY MR. BURGE:

18      Q.  Mr. Cawthorn, whatever settlement funds that your

19   son got out of that, are those being managed by anyone?

20      A.  Yes.

21      Q.  Are you managing them?

22      A.  I am not.

23      Q.  Who is managing them?

24      A.  Edward Jones is.

25      Q.  Okay.  And is your son involved in the

1    management, Zachary?

2        A.   Yes.

3        Q.   Okay.   Is he the broker for that?

4        A.   He is the financial advisor, yes.

5        Q.   Financial advisor.   Okay.   Has there been any

6    sort of trust set up at all where there is any type of

7    trust documents?

8        A.   Yes.

9        Q.   Okay.   Do you know what the trust is called?

10       A.   No.

11       Q.   Is it -- do you know what kind of trust it is?

12       A.   Not really.

13       Q.   Okay.

14       A.   The legal term, no.

15       Q.   Okay.

16       A.   I do not.

17       Q.   It's not a special needs trust, is it?

18       A.   There is a special needs trust set up also.

19       Q.   Okay.   That's a component of it?

20       A.   Yes.

21       Q.   Okay.

22            MR. BURGE:   Now -- do you want to do it now?

23       Whey don't we do it now.   We might as well.

24            (A recess was taken from 1:59 until 2:10.)

25   BY MR. BURGE:

Page 121

1      Q.   Okay.  Mr. Cawthorn, let me go back to the E-mail

2   string that we've been referring to, and if I just

3   referred to it as the E-mail string between you and

4   Pamela, do you understand what I'm referencing?

5      A.   Yes.

6      Q.   Do you know if you ever forwarded those E-mails

7   to anyone?

8      A.   I don't recall.

9      Q.   Whether you did one way or not?

10     A.   Yeah.  I don't recall if I forwarded them or

11  copied them, I don't -- I don't recall.

12     Q.   Okay.  Back to the issue about the settlement

13  that we were talking about.  The -- the release that was

14  signed by your son releasing Bob Ledford's RV & Marine,

15  did you at any time review that release?

16     A.   Not for him, no.

17     Q.   Well, did -- did you at any time review it --

18     A.   No.

19     Q.   -- period?

20     A.   I couldn't tell you what's in it, no.

21     Q.   Okay.  And I assume by that that Madison did not

22  ask you to review it or seek your advice about it?

23     A.   He did not.

24     Q.   Okay.  And do you know if you've met -- ever even

25  seen it before?

Page 122

1      A.   I don't -- I don't think I've seen it, no.

2      Q.   Okay.   Now this document that we know of, it's

3  out there, that's entitled settlement and assignment

4  agreement, do you know what that -- what I'm referring

5  to when I say that?

6      A.   I do not.

7      Q.   Okay.   Do you know that your son ever signed a

8  settlement assignment agreement along with Bradley

9  Ledford?

10     A.   I don't know.

11     Q.   You don't know?

12     A.   (Nods head.)

13     Q.   Did your son ever seek your guidance about that

14 or ask you about that?

15     A.   He did not.

16     Q.   Okay.   I'll go ahead and mark this as 10 and --

17 just for completeness while we're on the subject.

18          Take a look at Exhibit Number 10, Mr. Cawthorn.

19 I'll represent to you that that is a release of all

20 claims that was executed by your son Madison --

21     A.   Okay.

22     Q.   -- from November the 16th, 2016 in exchange for

23 the $3-million from Auto-Owners releasing Bob Ledford's

24 RV & Marine.

25          And so we're clear, that's the release that

1    you're not sure you've ever seen, and you didn't review

2    or weren't asked to review it before it was executed?

3              (Defendant's Exhibit 10 marked for

4         identification.)

5    A.   Now that I see it, I have not seen this before.

6    Q.   Okay.  But you note up there at the top that it's

7    only releasing Bob Ledford's RV & Marine?

8    A.   I don't know what that means.

9    Q.   Okay.  Well, did you know that your son did not

10   release Bradley Ledford?

11   A.   No, I did not.

12   Q.   Did you have a discussion with him at any time

13   about the fact that he was not going to release

14   Bradley Ledford?

15   A.   I did not.

16   Q.   Did you know it before today?

17   A.   I did not, no.

18   Q.   Okay.  Let me show you Exhibit Number 11.  Is

19   that your son's signature on the back page of that?

20             (Defendant's Exhibit 11 marked for

21        identification.)

22   A.   It looks like it, yes.

23   Q.   And is it your testimony that you've never seen

24   this document before?

25   A.   That's correct.

Page 124

1    Q.  And you were never aware that there was a

2  settlement agreement and assignment agreement executed

3  between your son and Bradley Ledford?

4    A.  I knew the case was being settled, but I've never

5  seen this form, no.

6    Q.  But you didn't -- but you also, until today, did

7  not know that your son didn't release --

8    A.  Oh, I did not know that.

9    Q.  Okay.

10    A.  Bradley, no, I did not know that.

11    Q.  Well, did you know that he had taken a

12  $30-million judgment against him?

13    A.  I know there is a pending lawsuit, yes.

14    Q.  Well, I'm not talking about a pending lawsuit,

15  I'm talking about this judgment here.  Did you know that

16  your son had taken a $30-million judgment against

17  Bradley?

18    A.  I guess he did.

19    Q.  Okay.  Were you involved at all in arriving at

20  the figure of $30-million?

21    A.  I was not, no.

22    Q.  Did you have any knowledge at all as to how the

23  figure of $30-million was arrived at?

24    A.  I do not know.

25    Q.  Have you ever had any discussions with your son

1    about the $30-million figure and how it was arrived at?

2        A.   I have not.

3        Q.   Now at any time did you ever have any

4    conversations at all with Bradley Ledford and/or his

5    father about insurance coverage in this case?

6        A.   I have not, did not.

7        Q.   Not at any time?

8        A.   Except when he handed me that insurance

9    information.   Coverage, no.

10       Q.   Okay.   You never asked him how much he had or

11   anything like that?

12       A.   Nothing like that.

13       Q.   No discussion at all?

14       A.   None.

15       Q.   Okay.   And you didn't have any discussions such

16   as that with Bradley?

17       A.   No.

18       Q.   Okay.   And do you know whether or not your son

19   had any discussion with either one of them about it?

20       A.   I do not know that.

21       Q.   Okay.   And you were present at your son's

22   deposition in the underlying case?

23       A.   Yes.

24       Q.   Do you remember what he said about that in his

25   deposition?

Page 126

1    A.  I do not.

2    Q.  Were you ever present when there was any

3  discussion by your lawyers, where you were present,

4  where there was a discussion by any of your lawyers with

5  either a lawyer named Mick Callahan or a lawyer with the

6  last name Holcom where there were discussions about this

7  lawsuit, insurance, anything like that?

8    A.  None that I recall, no.  Those names are not

9  familiar to me.

10    Q.  Okay.  You don't recognize any of those names?

11    A.  I do not.

12         MR. BURGE:  I'm going to take about five

13       minutes.  I think I'm about through.

14         (A recess was taken from 2:19 until 2:39.)

15  BY MR. BURGE:

16    Q.  Mr. Cawthorn, we'll try to wrap it up here.  Do

17  you know of, at any time, any point in time, that anyone

18  on your behalf or your son's behalf affirmatively told

19  Auto-Owners that they would accept $3-million in

20  coverage in exchange for releasing Ledford's RV and

21  Bradley Ledford?

22         MR. MARTINEZ:  Object to the form of the

23       question.

24  BY MR. BURGE:

25    Q.  You can answer.

Page 127

1    A.  I do not.

2              MR. BURGE:  Thank you, sir.  That's all I

3         have.

4              MR. MARTINEZ:  Let's go off the record.

5              (A discussion was held off the record from

6         2:39 until 2:40.)

7                     CROSS-EXAMINATION

8    BY MR. MARTINEZ:

9    Q.  Mr. Cawthorn, good afternoon, sir.

10   A.  Good afternoon.

11   Q.  Mr. Cawthorn, did your son, Madison's medication

12   change after he was transferred to Shepherd's?

13   A.  Yes, it did.

14   Q.  Could you please tell the members of the jury how

15   so?

16   A.  They came in and lowered him off of his narcotics

17   to get him off of the opioids so he wouldn't become

18   addicted to them.  So it was about the first week they

19   started lowering his dosages.

20   Q.  And what affect did that reduction in the dosage

21   have on Madison, on his mental state?

22   A.  We could have conversations with Madison, he

23   could understand more, and it's also when he realized

24   that he was paralyzed and would be in a wheelchair the

25   rest of his life.

Page 128

1   Q.  All right, sir.  And -- let me be specific now.

2   By -- by around the end of -- of May, approximately a

3   little bit less than two months after the accident, how

4   would you describe your son Madison's state-of-mind?

5   A.  It was a lot clearer.  Very -- a lot clearer than

6   it was because, again, he was off the narcotics.

7   Q.  When you -- when you say it was a lot clearer,

8   can you be more specific, sir?

9   A.  Well, I'll say he could understand your

10  conversations more and communicate and have a better

11  understanding of what was going on, and they wanted him

12  to be clear so he could start his rehab.

13  Q.  And did they begin his rehab at that point in

14  time?

15  A.  It was right around the end of May, yes.

16  Q.  Okay.  And what kind of rehab did he do?

17  A.  Just learning how to live in a wheelchair,

18  transferring from a wheelchair to a car.  Transferring

19  from a wheelchair -- how to take showers.  How to dress

20  yourself.  How to cook for yourself, things like that.

21  Q.  Now let me -- let me change to another topic,

22  okay?  I want to direct your attention to June 11th,

23  June 11th, 2014, all right, sir?

24      You have stated in your examination that on

25  June 11th you spoke with Pamela McLean, do you remember

1   that?

2     A.  Yes.

3     Q.  Before you spoke with Ms. McLean on June 11th,

4   did you know the policy limits of the Auto-Owners

5   insurance policy?

6     A.  I did.

7     Q.  And how did you know that, sir?

8     A.  When USAA called me back they told me the policy

9   limit of Auto-Owners.

10     Q.  So when you spoke to Ms. McLean on June 11th,

11   what was the purpose of that conversation?  What was --

12   what was your reason for calling her?

13     A.  I wanted them to issue a check so that we could

14   take care of Madison.

15     Q.  Did you tell her that?

16     A.  I asked her what the check amount would be.

17     Q.  Did she answer you?

18     A.  Not really, no.

19     Q.  Let me show you an exhibit.  This will be Exhibit

20   Number 7, and Exhibit Number 7 has four E-mails.  At the

21   bottom it's one from you to her, and then there is one

22   from her to you, and then we go higher up, it's from you

23   to her, that's at 2:08 p.m.

24     A.  Yes.

25     Q.  All right.  And one at the very top is from her

1    back to you at 2:16 p.m.  Do you see these four E-mails?

2       A.  Yes.

3       Q.  Okay.  So I want to direct your attention to

4    Exhibit 7, the E-mail that is sent by you to Ms. McLean

5    at 2:08 p.m., do you see that one?

6       A.  Yes.

7       Q.  Okay.  Could you please read that out loud to the

8    members of the jury?

9       A.  How much would the check be for.

10      Q.  Why did you ask her that, sir?

11      A.  I wanted a $3-million check issued.

12      Q.  And what was her response.

13      A.  Her response is there is $3-milion in coverage.

14      Q.  Did she ever answer you directly, sir?

15      A.  She did not.

16          MR. MARTINEZ:  Thank you, sir.  I have no

17      further questions.

18          MR. BURGE:  Real briefly.

19          (Discussion held off the record at 2:44

20      until 2:45.)

21                  REDIRECT EXAMINATION

22   BY MR. BURGE:

23      Q.  Mr. Cawthorn, tell me when it was, because I

24   already asked you about conversations with USAA, tell me

25   when it was that USAA told you that there was $3-million

1    in coverage with the Auto-Owners' policy?

2        A.  That would have been our second conversation, but

3    I do not remember the date.

4        Q.  Well, give me an idea of the date.

5        A.  The date would have been close to -- is it --

6    June 11th when I first contacted Auto-Owners.

7        Q.  And why were you talking to USAA then?

8        A.  Again, I reached out to USAA because they are my

9    auto insurance, and it's my understanding that if you

10   have an automobile accident, your automotive insurance

11   deals with the other automobile insurance company.

12       Q.  I thought you told us previously that when you

13   got the notification from Mr. Ledford, that you called

14   USAA and gave them that exact information.  That was

15   Exhibit 1 to your deposition.

16       A.  That's correct.  I called USAA and gave them the

17   Auto-Owners information, and then later USAA called me

18   back and that's when they told me they could not help me

19   with that since my son is not driving.  And that I

20   should con -- if Auto-Owners has not contacted me, I

21   need to contact them, and they did inform me that their

22   limit was $3-million.

23       Q.  And then in the E-mail that you just referenced,

24   the string between you and Pamela McLean, is there

25   anywhere on that E-mail where you said to Pamela McLean,

Page 132

1   I know there is $3-million in limits, and I want you to

2   send me a check for $3-million, and I'm willing to

3   release Ledford's RV and Bradley Ledford?

4       A.  I didn't have to ask for the $3-million.

5       Q.  Why didn't you?

6       A.  They should have just issued the check.  I asked

7   four times, and it's even in writing right here, how

8   much will the check be for.

9       Q.  And what did she say?

10      A.  It was not a clear answer.  The answer is there

11  is $3-million in coverage.

12      Q.  Okay.  Well you knew the answer, though.  You

13  knew there was $3-million in coverage, right?

14      A.  That was just not a straight answer, sir.  I did

15  not understand, and I did not trust Ms. McLean at that

16  time.

17      Q.  You knew that $3-million, though, when you had

18  this E-mail exchange, you knew there was $3-million in

19  coverage, right?

20      A.  I did know that, yes.

21      Q.  Yes.  You never told Ms. McLean that there was

22  $3-million in coverage, right?

23      A.  It's not my responsibility.

24      Q.  But again, my question is you never told her, did

25  you?

Page 133

1      A.   It's not my responsibility.

2      Q.   You never told her, did you.

3      A.   I'm going to say it one more time.  It's not my

4  responsibility to tell an insurance person what their

5  job is.

6      Q.   Okay.  I'm asking you to answer my question.  My

7  question isn't what her job was, my question is did you

8  tell her that you knew that there was $3-million in

9  coverage?

10              MR. MARTINEZ:  Objection; it's been asked

11          and answered.

12              MR. BURGE:  He hasn't answered it.

13              MR. MARTINEZ:  Objection; it's been asked

14          and answered.

15      A.   I answered it as best I can, and that's the

16  answer you're getting.

17      Q.   Read the E-mail.  Is there anywhere in there that

18  you tell her that there's $3-million in coverage?

19      A.   Let me ask you this.  Is there anywhere in there

20  that she tells me that there is a $3-million check they

21  are going to send my son to take care of him for the

22  rest of his life?

23      Q.   Is there anywhere in there where you tell her

24  that you know there is $3-million in coverage?

25      A.   She didn't answer the question.

Page 134

1    Q.  Knowing that there was $3-million in coverage?

2    A.  I knew there was $3-million in coverage.

3    Q.  And knowing that you wanted a check for

4    $3-million in coverage, did you ever tell her I want you

5    to send me a check for the $3-million in coverage?  Did

6    you ever tell her that?

7    A.  It's not my responsibility to tell her how much

8    the check should be issued for.  I cannot make demands

9    on a company.

10   Q.  Sure you can.  You've never made a demand on an

11   insurance company before?

12           MR. MARTINEZ:  Objection; it's been asked

13        and answered.  It's argumentative.  Let me have

14        the question read back please.

15           COURT REPORTER:  (Question read back.)

16   BY MR. BURGE:

17   Q.  Let me ask you this, Mr. Cawthorn.  Is it your

18   testimony that if a check had been written on June the

19   11th for $3-million, you had the authority and would

20   have been willing to release Bradford -- I mean

21   Ledford's RV and Bradley Ledford?  Is that what you're

22   saying?

23   A.  I'm saying when I called the first time, and they

24   would have said here's -- our limit is $3-million to

25   take care of your son, we would have accepted the

1   $3-million.

2       Q.  On June the 11th?  On June the 11th, 2014?

3       A.  On June the 11th, after our conversation with her

4   and she told me not to hire an attorney, I would not

5   have trusted her at that point.

6       Q.  Okay.  So after June the 11th, 2014, the case

7   could not be settled for $3-million; is that what you're

8   saying?

9       A.  Nobody came and offered $3-million.  She should

10  have said we'll give you a $3-million check, even came

11  to Halifax or she should have came to Shepherd's where

12  somebody said and here is the $3-million to take care of

13  your son, and thank you very much.

14      Q.  After a telephone conversation with you when she

15  says, according to you, you can't hire a lawyer, after

16  that point in time you didn't trust her, you were not

17  going to accept the $3-million in coverage?

18          MR. MARTINEZ:  Objection; asked and

19          answered, and it's also compound.

20  BY MR. BURGE:

21      Q.  You can answer it, sir.

22      A.  After the conversation, if she would have came

23  and offered $3-million before we -- I would have

24  probably taken it, because I knew that was the limit.

25      Q.  Well, what change between then and --

Page 136

1     A.  Nobody offered $3-million.

2     Q.  Did your financial or your son's financial

3   condition improve between June of 2014 and August of

4   2014?

5     A.  It did not.

6              MR. BURGE:  Thank you, sir.

7              MR. MARTINEZ:  I have no further questions.

8          We won't waive.  We will not waive.  We want to

9          read it.

10             COURT REPORTER:  Are you ordering this, sir?

11             MR. BURGE:  Yes, we are ordering it.  Bob,

12         good to see you.

13             COURT REPORTER:  Mr. Martinez, copy?

14             MR. MARTINEZ:  Yes, can you mail an

15         E-transcript, can you send that too?

16             COURT REPORTER:  Yes.

17             MR. MARTINEZ:  Four on a page.

18             (The deposition concluded at 2:55 p.m.)

19

20

21

22

23

24

25

Page 137

1                   CERTIFICATE OF OATH

2

3   STATE OF FLORIDA
    COUNTY OF HILLSBOROUGH
4

5      I, Christine Risher, RPR, Notary Public, State of

6   Florida, do hereby certify that on May 2, 2017,

7   ROGER CAWTHORN (identification verified via driver's

8   license) personally appeared before me and was duly

9   sworn.

10     WITNESS my hand and official seal this 5th day of

11  May, 2017.

12

13

14
                    _____
15                  Christine Risher, RPR
                    Notary Public - State of Florida
16                  Commission No: GG 025409
                    Commission Expires: December 26, 2020
17

18

19

20

21

22

23

24

25

Page 138

1                    CERTIFICATE OF REPORTER

2
     STATE OF FLORIDA
3    COUNTY OF HILLSBOROUGH

4        I, Christine Risher, RPR and Notary Public, do hereby

5    certify that I was authorized to and did

6    stenographically report the foregoing deposition of

7    ROGER CAWTHORN; that the review of the transcript was

8    requested; and that the foregoing Pages 5 through 136,

9    inclusive, are a true and complete record of my

10   stenographic notes.

11       I further certify that I am not a relative or

12   employee of any of the parties, nor am I a relative or

13   counsel connected with the parties' attorneys or counsel

14   connected with the action, nor am I financially

15   interested in the outcome of the action.

16       DATED this 5th day of May, 2017.

17

18

19                    _____
                      Christine Risher, RPR
20                    Notary Public - State of Florida

21

22

23

24

25

Page 139

1      ERRATA SHEET
  DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
2
  IN RE:  David Cawthorn vs. Auto-Owners Insurance
3  CASE NO:  6:16-cv-02240-JA-GJK
  DATE:   May 2, 2017
4  DEPONENT: ROGER CAWTHORN

5  PAGE: LINE:  CORRECTION:   REASON FOR CHANGE:

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  Under penalties of perjury, I declare that I have read
  the foregoing document and that the facts stated in it
21  are true.

22

23  _____   _____
  Date        ROGER CAWTHORN

24

25

Page 140

R&S - May 8, 2017

ROBERT MARTINEZ, ESQUIRE
The Law Firm of Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, Florida 33134 33134

In re:  May 2, 2017 Deposition of ROGER CAWTHORN
David Cawthorn vs. Auto-Owners Insurance

Dear Mr. Martinez:

   This letter is to advise that the transcript for the
above-referenced deposition has been completed and is
available for review.  Please contact our office at
(800)275-7991 to make arrangements for read and sign or
sign below to waive review of this transcript.

   It is suggested that the review of this transcript be
completed within 30 days of your receipt of this letter,
as considered reasonable under Federal Rules; however,
there is no Florida Statute to this regard.

   The original of this transcript has been forwarded to
the ordering party, and your errata, once received, will
be forwarded to all ordering parties for inclusion in
the transcript.

                    Sincerely,

                    Christine Risher, RPR, Court Reporter
                    Orange Legal

Cc:  [Courtesy copy all ordering parties]

Waiver:

I, _____, hereby waive the reading & signing
of my deposition transcript.

_____        _____

Deponent Signature              Date

*Federal Civil Procedure Rule 30(3)/Florida Civil

Procedure Rule 1.310(e)