# Exhibit A
Deposition of
Pamela Torres McLean

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 6:16-CV-2240-Orl-28GHK


DAVID MADISON CAWTHORN,

      Plaintiff,

vs.

AUTO-OWNERS INSURANCE COMPANY,

      Defendant.
_____/


VIDEOTAPED DEPOSITION OF

PAMELA TORRES MCLEAN

Volume I (Pages 1-112)

Taken on Behalf of the Plaintiff

DATE TAKEN:  May 11, 2017

TIME:         9:35 a.m. - 4:53 p.m.

PLACE:        Burr Forman
              200 South Orange Avenue
              Orlando, Florida


Examination of the witness taken before:

Lance W. Steinbeisser, RPR CSR FPR
Certified Stenographer

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 2

APPEARANCES FOR THE PLAINTIFF

William A. Bonner, Esquire
Roberto Martinez, Esquire
COLSON HICKS EIDSON
255 Alhambra Circle
Penthouse
Coral Gables, Florida 33134
(305) 476-7400
abonner@colson.com
bob@colson.com


APPEARANCES FOR THE DEFENDANT

Peter C. Vilmos,Esquire
BURR & FORMAN LLP
200 South Orange Avenue, Suite 800
Orlando, Florida 32801
(407)540-6600
pvilmos@burr.com


APPEARANCES FOR THE DEFENDANT

Forrest S. Latta, Esquire
BURR & FORMAN LLP
11 North Water Street, Suite 22200
Mobile, Alabama 35203-5201
(251)345-8212
flatta@burr.com


ALSO PRESENT

Paul Singletary, videographer

David Madison Cawthorn v. Auto-Owners Insurance Company          Pamela McLean | 5/11/2017

                                                              Page 3

1                         I N D E X

2    WITNESS                                            PAGE

3    PAMELA TORRES MCLEAN
     Direct Exam By Mr. Bonner                            4
4    Cross-Exam By Mr. Vilmos                           285

5

6    PLAINTIFF'S EXHIBITS                     MARKED FOR ID

7       56     Claims Handling Guide                     29
        57     claims notes                              85
8       58     email, 4/7/14                             98
        59     Notice of Occurrence/Claim                99
9       60     email, 4/8/14                            100
        61     fax cover letter                         134
10      62     letter, 4/17/14                          137
        63     ISO Claimsearch Match Report             140
11      64     Facebook page                            167
        65     Consent to Release                       188
12      66     Claims Fax Transmittal                   194
        67     email, 6/11/14                           218
13      68     email, 6/30/14                           219
        69     Optum Fax                                222
14      70     email, 7/14/14                           224
        71     letter, 7/14/14                          225
15      72     letter, 7/22/14                          241
        73     special claims authorization             253
16      74     Claim Payment                            262

17

18   (Exhibits attached hereto.)

19

20   Certificate of Oath ....................Page 290
     Reporter's Deposition Certificate .......Page 291
21   Errata Sheet ...........................Page 292
     Read Letter ...........................Page 293

22

23

24

25

Page 4

```
 1              THE VIDEOGRAPHER:  This is the video

 2         deposition of Pamela McLean taken on 11 May

 3         2017.  We're going on the record at 9:35 a.m.

 4         If counsel will state their appearances for

 5         the record and the court reporter will swear

 6         in the witness so we may proceed.

 7              MR. BONNER:  Allen Bonner and Bob

 8         Martinez appearing on behalf of Madison

 9         Cawthorn.

10              MR. VILMOS:  Peter Vilmos, Burr Forman,

11         for Auto-Owners.

12              MR. LATTA:  With Forrest Latta from Burr

13         Forman.

14  Thereupon--

15                   PAMELA TORRES MCLEAN

16  was duly administered the oath:  Do you swear or

17  affirm that the testimony you are about to give in

18  this cause will be the truth, the whole truth and

19  nothing but the truth?

20              THE WITNESS:  I do.

21                   DIRECT EXAMINATION

22  BY MR. BONNER:

23         Q.  Ms. McLean, thank you for coming today.

24              Can you please state your full name for

25  the record, please.
```

Page 5

1          A.    Pamela Torres McLean.

2          Q.    Okay.  And what is your office address?

3          A.    1700 Southeast 17th Street, Suite 210,

4    in Ocala, Florida.

5          Q.    And you're currently employed with

6    Auto-Owners?

7          A.    Yes.

8          Q.    Have you given a deposition before?

9          A.    Yes.

10         Q.    How many times?

11         A.    Five or six.

12         Q.    Have any of those involved insurance bad

13   faith claims?

14              MR. VILMOS:  Objection to form.

15         A.    No.

16   BY MR. BONNER:

17         Q.    The prior times that you've testified

18   have involved insurance matters?

19         A.    Yes.

20         Q.    We are here in the suit of Madison

21   Cawthorn versus Auto-Owners.  It involves an

22   accident that took place in 2014.

23              What did you do to prepare for your

24   deposition today?

25         A.    I reviewed the claim file and met with

Page 6

1      Peter.

2           Q.    What is in the claim file?

3           A.    A chronology of written and oral

4      correspondence -- well, written correspondence and

5      oral -- notes of oral conversations.

6           Q.    When you say the claims file, are you

7      referring to the claims diary?  I have a copy of

8      one that we were provided that was previously

9      marked as Exhibit 2.

10          A.    That's only one part of the claim file.

11          Q.    What additional parts of the claims file

12     did you review?  Here, I'll show you Exhibit 2, so

13     we're on the same page.

14          A.    The entire file, it includes copies of

15     the policies.

16              MR. MARTINEZ:   Excuse me for one second.

17              (Discussion held off the record.)

18     BY MR. BONNER:

19          Q.    Sorry.  You were saying the additional

20     documents.  There's correspondence?

21          A.    Yes.  There's correspondence, there's a

22     loss notice, copies of the policies, the police

23     report.

24          Q.    Okay.  And there's documents that

25     postdate November 10th, 2014; correct?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 7

1          A.    Yes.

2          Q.    Did you happen to see any of the

3    documents that are contained in the home office

4    legal file?

5          A.    No.

6          Q.    Apart from the claims file, do you have

7    any personal notes from this matter?

8          A.    No.

9          Q.    Is there a separate log that keeps track

10   of either telephone calls or communications that

11   you might have of witnesses or claimants in a case

12   like this?

13         A.    No.

14         Q.    The only log is the claims diary that's

15   before you in Exhibit 2?

16         A.    That's correct.

17         Q.    Have you worked for any other insurance

18   companies other than Auto-Owners?

19         A.    Yes.

20         Q.    Please tell me.

21         A.    Fortune Insurance Company.

22         Q.    When did you work for Fortune?

23         A.    1991, for a couple of years.

24         Q.    Okay.  Did you start with Auto-Owners

25   after working at Fortune?

Page 8

1          A.    No.

2          Q.    Where did you work next?

3          A.    I went to -- my husband went to law

4     school in Gainesville, and I worked at Eckerd while

5     going back to school, and then I worked for an

6     independent adjusting agency before coming to

7     Auto-Owners in 1998.

8          Q.    What was the name of the independent

9     adjusting agency?

10         A.    Sewell, Todd & Broxton.

11         Q.    Were you an independent adjuster?

12         A.    Yes.

13         Q.    And you worked at Fortune, what was your

14    job position?

15         A.    General claims adjuster.

16         Q.    What type of claims did you handle?

17         A.    Mostly -- well, entirely automobile, a

18    couple of life claims, I guess.

19         Q.    Auto liability claims?

20         A.    Yes.

21         Q.    Were they also casualty claims?

22         A.    Yes.

23         Q.    So you did a little bit of a both?

24              MR. VILMOS:   Can we go off the record

25         for just a minute?  I have something in my

Page 9

1           office -- real quick.

2                    MR. BONNER:  Sure.

3                    THE VIDEOGRAPHER:  We're off the record

4           at 9:40.

5                    (Break from 9:40 a.m. to 9:43 a.m.)

6                    THE VIDEOGRAPHER:  Back on the record at

7           9:43.

8                    MR. BONNER:  Okay.  We're back on the

9           record.

10                   Just, counsel, you've provided me with a

11          document that was not disclosed previously in

12          discovery.  I'm going to mark this as an

13          exhibit but later, and we'll address it when

14          it comes up, when it's appropriate to do so.

15   BY MR. BONNER:

16          Q.   Ms. McLean, you were just telling me

17   about your time at Fortune.  You said you handled

18   both casualty and liability claims?

19          A.   That's correct.

20          Q.   Did you handle represented and

21   unrepresented claims?

22          A.   Yes.

23          Q.   And did you handle claims limited to a

24   specific amount that was at issue or a policy limit

25   at issue?

David Madison Cawthorn v. Auto-Owners Insurance Company          Pamela McLean | 5/11/2017

Page 10

1           A.    No.

2           Q.    Okay.   At Auto-Owners, what is your

3     current title?

4           A.    Assistant manager.

5           Q.    And in 2014 what was your title?

6           A.    Senior claim rep specialist.

7           Q.    And what previous titles did you hold,

8     if any?

9           A.    Senior claim representative and branch

10    claim representative.

11          Q.    Okay.   What were your duties as senior

12    claim representative?

13          A.    To investigate coverage liability and

14    damages of claims that were more serious in nature

15    than just the average fender-bender.

16          Q.    Approximately how many claims were you

17    handling at any one time in 2014?

18          A.    A wild guess be around 200.

19                MR. VILMOS:   Yeah, don't guess.   If

20          there's --

21          A.    I'm sorry.   I don't know exactly.

22                MR. VILMOS:   That's okay.   If there

23          is -- he's asking questions you know.   So if

24          you answer on the record, he's going to

25          presume you know the answer.   So if you're

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

```
                                                        Page 11
 1        going to guess, as you did, tell him it's a
 2        guess --
 3        A.   It's a guess.
 4             MR. VILMOS:   -- but I would prefer you
 5        don't guess.
 6             THE WITNESS:   Okay.
 7   BY MR. BONNER:
 8        Q.   But an estimate would be around 200,
 9   give or take 50?
10        A.   Again, I don't know.
11        Q.   Okay.  Were they all auto liability
12   claims?
13        A.   No.
14        Q.   What other types of claims were you
15   handling?
16        A.   I had two counties, Lake County and
17   Alachua County, that I handled first-party property
18   and casualty claims for.
19        Q.   Any other types of claims that you were
20   handling?
21        A.   Not in addition to the ones that I was
22   handling in general.  I'm not -- I don't understand
23   the question.
24        Q.   I'm sorry.
25             Apart from first-party casualty claims
```

```
                                              Page 12
 1    and auto liability claims, were you handling any
 2    other types of claims in 2014?
 3          A.   Directors and officers claims for
 4    homeowners associations, employment practice
 5    liability claims.  I can't think of any others.
 6          Q.   Approximately what portion of your
 7    claims in 2014 involved auto liability?
 8          A.   I don't know the answer to that.
 9          Q.   There's a way to find out, I assume.
10          A.   Yes.
11          Q.   And how would you go about finding out?
12          A.   I believe that you can request a report
13    from somebody in home office that will print out
14    all of the claims that were open at any given one
15    time, and it's broken down by coverage type.
16          Q.   Prior to 2014, approximately what
17    percentage of the claims have you been handling
18    over your career were auto liability claims?
19          A.   I don't know the answer to that.
20          Q.   Was it more than 50 percent?
21          A.   I don't know the answer to that.
22          Q.   Okay.  Throughout your tenure at
23    Auto-Owners from '98 to 2014, was there ever a time
24    where you were handling only auto liability claims?
25          A.   No.
```

```
                                                Page 13
 1         Q.    Okay.  So you've always been handling
 2    multiple different lines of insurance?
 3         A.    Well, no.  You said auto liability.
 4         Q.    Yes.
 5         A.    There's also auto first-party
 6    comprehensive claims.  I handled those when I first
 7    came to Auto-Owners.
 8         Q.    Was there ever a time when you were not
 9    handling auto liability claims for Auto-Owners?
10         A.    No.
11              MR. VILMOS:  Are you still in that time
12         frame up through 2014?
13    BY MR. BONNER:
14         Q.    Yeah, 1998 through 2014.
15              As assistant manager, have your job
16    duties changed?
17         A.    Yes.
18         Q.    Okay.  Please tell me what your current
19    job duties are.
20         A.    The supervision of the claim
21    representatives assigned to our office, training
22    assistants, basically managing the office.
23         Q.    Okay.  Is there anyone who supervises
24    you?
25         A.    Yes.
```

Page 14

 1        Q.    Who?

 2        A.    Jim Jordan is the regional manager for

 3   the State of Florida.

 4        Q.    And back in 2014, who was your

 5   supervisor?

 6        A.    Stan Smith.

 7        Q.    Did he retire?

 8        A.    No.

 9        Q.    Is he still employed at Auto-Owners?

10        A.    Yes.

11        Q.    You didn't take his position, though,

12   did you?

13        A.    Yes.

14        Q.    Okay.  What is he doing now?

15        A.    He's a claim coordinator.

16        Q.    And when did you take over Mr. Smith's

17   position?

18        A.    I believe it was September of -- it will

19   be two years ago this September.  So

20   September 2015.

21        Q.    And Stan, when he was your supervisor,

22   his supervisor was still Jim Jordan?

23        A.    Yes.

24        Q.    Okay.  How many adjusters work in the

25   Ocala office?

Page 15

1    A.    Nine, currently, with one --

2    Q.    And in 2014 --

3         MR. VILMOS:  I'm sorry.  Were you

4    finished with your answer?

5    A.    I was going to say with one open

6    position.

7    BY MR. BONNER:

8    Q.    Okay.  And in 2014, was it also nine?

9    A.    No.  I believe eight.

10    Q.    Okay.  How do adjusters typically

11    interact with their supervisors?  Is it in person?

12    By email?

13    A.    Both.

14         MR. VILMOS:  Object to the form.

15    Compound.

16    BY MR. BONNER:

17    Q.    Sorry.

18         And what does a supervisor do to

19    supervise an adjuster handling claims?

20    A.    They come to me with questions.  I help

21    them work through coverage issues.  I help them

22    review medical claims, any other general insurance

23    questions they may have.

24    Q.    Do you ever audit any of the claims that

25    the adjusters in your office are handling?

Page 16

1          A.    Yes.

2          Q.    Did that happen when you were an

3     adjuster?

4          A.    I'm not sure if Stan did or not.

5          Q.    Okay.  And when you do an audit, what do

6     you do?

7          A.    I request a computer random selection of

8     files in preparation for their performance review.

9          Q.    Okay.  And as part of a performance

10    review, what are you looking for in their files?

11         A.    That they adhere to the claims handling

12    guide as often as possible, that they're providing

13    good customer service, and that there aren't any

14    consistent coverage mistakes, that sort of thing.

15         Q.    In order to make sure that they're

16    providing good customer service, do you look for

17    communications being documented in the file?

18         A.    Not necessarily.  It's more timeliness,

19    responding to agent and insured inquiries in a

20    timely manner, and that sort of thing.

21         Q.    And how do you determine if they're

22    timely?  Is there some documentation or...

23         A.    There would be -- there would be a

24    request, and then there would be an email or -- if

25    it were a phone call, usually there's a note about

Page 17

1  speaking with whoever it was asking whatever it was

2  they were asking.

3       Q.   Okay.  And when you refer to a note, you

4  mean an entry in the claims diary, like what we're

5  looking at in Exhibit 2?

6       A.   Yes, but there's not always a note.

7       Q.   Okay.  But that's the type of stuff that

8  you're looking for when you're evaluating the

9  timeliness of the communications?

10           MR. VILMOS:  Object to the form.

11      A.   Are you asking me if I'm only looking

12  for claim notes?  I don't understand the question.

13  BY MR. BONNER:

14      Q.   No.

15           You're looking for claims notes, you're

16  looking for emails, you're looking for

17  communications; those are the sorts of things you

18  look for to identify the communication that's been

19  timely met?

20           MR. VILMOS:  Object to the form.

21      A.   Yes.

22  BY MR. BONNER:

23      Q.   Do you happen to know if the

24  Ledford-Cawthorn claim was ever audited by anyone?

25      A.   It wouldn't have been, no.

Page 18

1      Q.    Why do you say it wouldn't have been?

2      A.    Audited files tend to be closed files.

3      Q.    Okay.  Tend to be.  Are they always

4  closed files?

5      A.    On a formal audit, yes.

6      Q.    What about do you happen to know if the

7  Cawthorn-Ledford claim was ever informally audited?

8      A.    I don't know the answer to that.

9      Q.    Who would?  Stan Smith?

10      A.    No.  He would not have audited that file

11  for any reason, so... I don't -- I'm sorry.  I

12  don't know what the answer is.

13      Q.    Okay.  Back in 2014, did you have a

14  specific level of settlement authority for auto

15  liability claims?

16      A.    Settlement authority is always a

17  confusing term because settlement authority is a

18  number arrived at upon consultation sometimes with

19  others, taking into account all of the facts of the

20  accident.  I did need to consult with someone else

21  if I felt the potential for the claim was in excess

22  of $50,000.

23      Q.    So you had discretion to make a

24  settlement offer in an auto liability claim up to

25  $50,000 without consulting anyone else?

Page 19

1        A.    That's correct.

2        Q.    Okay.  But if you wanted to make a

3    settlement offer in excess of $50,000, that

4    required approval from someone?

5        A.    It didn't require it, but it is strongly

6    recommended.

7        Q.    Okay.  Who would be approving a

8    settlement offer in excess of $50,000?

9        A.    I would be consulting with Melinda

10   Pitman in our legal department.

11       Q.    Would there be anyone else who would be

12   consulted for that decision?

13       A.    I don't know what their level of

14   consultation is.  I don't know.

15       Q.    The only person from whom you would seek

16   consent to make a settlement offer in excess of

17   $50,000 is Ms. Pitman?

18       A.    That's correct.

19       Q.    Okay.  Mr. Smith would not be involved?

20       A.    No.

21       Q.    And neither would Mr. Jordan?

22       A.    No.

23       Q.    For a settlement of a claim with a

24   policy limits of $3 million, Mr. Smith wouldn't be

25   involved in that decision to extend a $3 million

```
                                                    Page  20
 1    settlement  offer?
 2         A.    No.
 3         Q.    And  the  same  question  for  Mr.  Jordan,  he
 4    also  would  not  be  involved  in  a  decision  to  extend
 5    the  $3  million  settlement  offer?
 6         A.    No.
 7         Q.    Okay.  It  appeared,  based  on  one  of  the
 8    answers  you  gave  a  moment  ago,  that  there  would  be
 9    circumstances  in  which  you  could  extend  a
10    settlement  offer  in  excess  of  $50,000  without
11    Ms.  Pitman's  consent;  is  that  true?
12         A.    Yes.
13         Q.    Can  you  describe  for  me  those
14    circumstances?
15         A.    Being  presented  with  facts  that
16    justified  an  offer  in  that  amount,  being  unable  to
17    get  in  touch  with  them  at  that  point  often  at
18    mediation  that  extends  late,  that  sort  of  thing.
19         Q.    When  you  said  unable  to  get  in  touch
20    with  them,  do  you  mean  Ms.  Pitman?
21         A.    Yes.
22         Q.    So  one  example  of  when  you  might  extend
23    a  $50,000  settlement  offer  without  Ms.  Pitman's
24    consent  is  when  she  was  unavailable?
25         A.    No.  I  could  extend  a  $50,000  settlement
```

Page  21

1    without anyone's being available.

2         Q.    Okay.  Without anyone -- anyone being

3    without any person in the legal department?

4         A.    You said --

5              MR. VILMOS:  Object to the form.

6         A.    You said $50,000.  I could make that

7    decision without consultation with anyone.

8    BY MR. BONNER:

9         Q.    My apologies.  I was not trying to be

10   tricky.  I meant to say in excess of $50,000.  So

11   let me see if I can get the question right --

12        A.    Okay.

13        Q.    -- and then I'll get the answer I'm

14   looking for.

15             My question is:  One example of an

16   occasion where you might extend a settlement offer

17   in excess of $50,000 is when Ms. Pitman were

18   unavailable for a consultation?

19             MR. VILMOS:  Objection.  Leading.

20             You can answer the question.

21        A.    Yes, but that's only if there wasn't

22   anybody else available either.  You can always ask

23   to speak to someone else and have them discuss the

24   situation with you.

25

Page 22

1    BY MR. BONNER:

2         Q.   So, as a general matter, you would not

3    extend an offer in excess of $50,000 without first

4    trying to reach either Ms. Pitman or someone else

5    in her department?

6         A.   That's correct, unless it were after

7    hours.

8         Q.   And if it were after hours, would you go

9    forward with the settlement offer or you would wait

10   until the next day?

11        A.   I would go forwarded with the offer.

12        Q.   And apart from Ms. Pitman or another

13   representative in the legal department being

14   unavailable, are there any other circumstances in

15   which you might extend an offer in excess of

16   $50,000 without Ms. Pitman's consent?

17        A.   When provided irrefutable facts of the

18   value of the claim, I think it's my good faith duty

19   to do that.

20        Q.   Back in 2014, was there anyone else,

21   other than Ms. Pitman, who worked on the

22   Ledford-Cawthorn matter with you?

23        A.   I don't believe so.

24        Q.   And you suggested that as a senior

25   claims representative, you handled more serious

Page 23

1    cases?

2         A.    That's correct.

3         Q.    And in 2014, the Cawthorn-Ledford matter

4    was assigned to you because it was identified early

5    on to be a serious case?

6         A.    Yes.

7         Q.    I understand that it was transferred to

8    the Ocala office from the South Carolina office?

9         A.    That's correct.

10        Q.    Do you know if it had been identified as

11   a serious claim before it was transferred to you?

12        A.    No.

13        Q.    Who identified it as a serious claim?

14        A.    I believe that I did.

15        Q.    Were you the first person in the Ocala

16   office to review the claim?

17        A.    Yes, other than support staff setting it

18   up and assigning it.

19        Q.    Okay.  In 2014, when you were assigned

20   an auto liability claim, did you have any

21   particular protocols that you tried to follow in

22   every case?

23        A.    We typically try to get in touch with

24   the insured to determine the facts of the accident.

25        Q.    Okay.  Anything else?

Page 24

1        A.    Again, the investigative process and,

2   you know, accumulate incident reports, police

3   reports, try to contact parties via mail that you

4   don't have phone numbers for, that sort of thing.

5        Q.    What specifically about the

6   Cawthorn-Ledford claim when you first received it

7   led you to identify it as a serious claim, if you

8   recall?

9        A.    I believe it was because Madison had

10  been airlifted from the scene.

11       Q.    And that information -- I suspect you

12  recall this -- is on the police report; correct?

13       A.    Yes.

14       Q.    We'll get to it in a minute.  It's not a

15  memory test, but I also recall that information too

16  specifically being there.

17             Do you recall the date that you

18  identified the Ledford-Cawthorn claim as being a

19  serious claim?

20       A.    I can refer to these notes to give you

21  the specific date.

22       Q.    Okay.  Let the record reflect that the

23  witness is looking at the claims diary marked as

24  Exhibit 2.

25       A.    I believe that would have been on

Page 25

1    April 17th of 2014.

2         Q.    April 17th?

3         A.    Yeah.

4         Q.    In a case where a settlement offer is

5    extended in excess of $50,000, I believe you said

6    that the decision to determine the amount is, for

7    lack of a better word, collaborative?

8              MR. VILMOS:   Object to the form.

9         A.    Answer or don't answer?

10   BY MR. BONNER:

11        Q.    Oh, you can answer the question if you

12   understand it.

13             MR. VILMOS:   You can answer.

14        A.    Under most circumstances, yes.

15   BY MR. BONNER:

16        Q.    Okay.  And when I use the word

17   "collaborative," what I mean is it's a joint

18   decision between more than one person.

19        A.    Yes, under most circumstances.

20        Q.    And in the claims you were handling, in

21   most circumstances it was a joint decision between

22   you and Ms. Pitman?

23        A.    Can you repeat that question?

24        Q.    Sure.

25             And in most cases where you ultimately

Page 26

1    extended an offer in excess of $50,000, was the

2    decision a joint one between you and Ms. Pitman, or

3    was it a decision by you primarily, or was it

4    primarily a decision by Ms. Pitman?

5         A.   When offers were made in excess of

6    $50,000, yes, generally it was collaborative with

7    Ms. Pitman.

8         Q.   Okay.  Were there ever times where

9    Ms. Pitman wanted to extend an offer that you

10   disagreed with?

11        A.   I don't recall.

12        Q.   And what about the opposite situation

13   where you wanted to extend an offer and Ms. Pitman

14   disagreed with that?

15        A.   I could -- I have made recommendations

16   before that she didn't agree with, but we usually

17   talked about the situation and got on the same page

18   with input from her that I may not have considered

19   or vice versus.

20        Q.   In the cases where there's a

21   disagreement between what amount to make in a

22   settlement offer between you and Ms. Pitman --

23             MR. VILMOS:  Object to the form.  It's

24        not the word she used.

25

```
                                                   Page 27
  1   BY MR. BONNER:

  2         Q.    All right.  Well, that's fine.

  3               In the event there's a disagreement

  4   between you and Ms. Pitman regarding the amount of

  5   the settlement offer to make, does Ms. Pitman's

  6   decision trump yours?

  7               MR. VILMOS:  Object to the form.

  8         A.    We don't end up in disagreement.  I may

  9   disagree at the beginning; but after further

 10   consultation between the two of us, we are on the

 11   same page.

 12   BY MR. BONNER:

 13         Q.    Okay.  That notwithstanding, in 2014,

 14   did you have authority to disregard Ms. Pitman if

 15   she disagreed with you about extending a settlement

 16   offer?

 17               MR. VILMOS:  Objection to the form.

 18               You can answer, if you understand the

 19         question.

 20         A.    No.

 21   BY MR. BONNER:

 22         Q.    You did not have authority to do that?

 23         A.    To disregard her --

 24         Q.    Right.

 25         A.    -- evaluation, no.
```

```
                                                    Page 28
 1          Q.   I'll rephrase the question, just in case
 2     there was any ambiguity.
 3               In 2014, you did not have authority to
 4     disregard Ms. Pitman if she disagreed with you
 5     about extending a settlement offer?
 6               MR. VILMOS:  Objection to the form.  Are
 7          you asking a hypothetical?  Because she
 8          testified that they were on the same page.
 9     BY MR. BONNER:
10          Q.   Do you understand the question?
11          A.   Not specifically, no.
12               MR. BONNER:  Okay.  Can you reread the
13          question?
14               (The last question was read back by the
15          court reporter.)
16               MR. VILMOS:  Objection to the form.  It
17          misstates the prior testimony.
18     BY MR. BONNER:
19          Q.   That's fine.
20               If you understand, you can answer.
21          A.   I can't think of a single circumstance
22     where I would need to disregard her opinion.  And
23     if it ever came to that level, then we would bring
24     in a third party to all be on the same page.
25          Q.   I hear you.
```

```
                                               Page 29
 1              There is a claims handling manual that
 2    Auto-Owners adjusters use?
 3         A.   That's correct.
 4         Q.   And it sets forth specific standards,
 5    protocols for proper claims handling?
 6         A.   That's correct.
 7         Q.   And according to that claims manual, an
 8    adjuster cannot make a settlement offer in excess
 9    of $50,000 without receiving consent from home
10    office legal; true?
11         A.   I don't specifically recollect that
12    passage.
13              MR. BONNER:  Let's go ahead and mark
14         this as Exhibit 56.
15              MR. MARTINEZ:  That's already marked.
16              MR. BONNER:  I --
17              (Plaintiff's Exhibit 56 was marked for
18         identification.)
19    BY MR. BONNER:
20         Q.   I'm going to mark this as Exhibit 56.
21              All right.  I'm going to show you
22    page 25.  And this might not be the correct
23    section.  And if it's not the correct section that
24    governs when or under what circumstances an
25    adjuster would have authority to extend an offer
```

Page 30

1    over $50,000, please tell me.

2              MR. VILMOS:   Mr. Bonner, do you have a

3         copy of that for us?

4              MR. BONNER:   Oh, yeah, sure, here.

5              MR. VILMOS:   Page 25 you said?

6              MR. BONNER:   25.

7    BY MR. BONNER:

8         Q.   First of all, is that the appropriate

9    section that would govern extending a settlement

10   offer in excess of $50,000?

11        A.   This doesn't govern settlement offers.

12   It's reporting requirements.

13        Q.   Okay.  Could you do me a favor?  Because

14   I've been told that this manual is not complete.

15   Could you confirm for me that it's not a complete

16   claims manual?

17        A.   Yes.

18        Q.   Can you leaf through it and tell me if

19   there's a section that governs when you have

20   authority to make a settlement offer in excess of

21   $50,000?  And if so, is that missing from the

22   production I've been given?

23             MR. VILMOS:   Object to the form to the

24        extent it asks about the production.

25             I'm not sure that she is the attorney in

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 31

1          this case that was responsible for the

2          production; otherwise, you can answer.

3                    MR. BONNER:  It's a fact question.

4                    MR. VILMOS:  It assumes facts not in

5          evidence.  The same objection.

6                    You can look through and answer.

7          A.    I don't believe that there is a section

8     specifically with regard to settlement authority.

9     BY MR. BONNER:

10         Q.    Okay.  You don't believe there's a

11    section in the claims handling manual?

12         A.    No, which was why I answered previously.

13         Q.    Okay.  So let me ask a related question.

14                    Is there a section in the claims

15    handling manual that governs communications to home

16    office legal in which you would make a request for

17    authorization to extend a settlement in excess of

18    $50,000?

19         A.    There's a section that addresses what

20    should be contained in a settlement authority

21    request, but it doesn't have a dollar amount

22    attached to it in that section.

23         Q.    Is that in the Exhibit 56 that I've

24    provided to you?

25         A.    Yes.

Page 32

1      Q.   Can you point to me the page number?

2      A.   On -- I don't see a page number -- oh,

3  I'm sorry.  The -- 19.

4           MR. VILMOS:  Just for the record, when

5       you say page number, it appears that there

6       are no page numbers on these documents, but

7       you're referring to the Bates stamp label at

8       the left corner?

9           MR. BONNER:  I think the witness is

10      referring to -- and you can confirm if I've

11      got this wrong -- the five numeral number in

12      the lower right-hand page.

13          THE WITNESS:  That's correct.

14          MR. VILMOS:  That's actually more about

15      your question.  When you're referring to page

16      numbers, is that what you were referring to?

17  BY MR. BONNER:

18      Q.   Okay.  So it says, "Requests should be

19  presented well in advance of mediation settlement

20  conferences or trial."

21          Correct?  This would be in the third

22  paragraph.

23      A.   Yes.

24      Q.   Okay.  It also says, in the second

25  paragraph, "Home office should be advised of

Page  33

1    current reserves on files and all changes."

2              Correct?

3         A.    Yes.

4         Q.    Okay.  So when you make a request to

5    home office legal -- well, sorry.  Strike that.

6              This provision governs what should be

7    contained in a request for settlement authority

8    that's made to home office legal; correct?

9         A.    Yes.

10        Q.    But it does not say the circumstances

11   when a request should be made to home office legal?

12        A.    That's correct.

13        Q.    Are there rules and protocols that

14   govern when a request should be made to home office

15   legal?

16        A.    No.

17        Q.    There are none?

18        A.    No.

19        Q.    All right.  You are familiar with the

20   Auto-Owners' standard and protocols for proper

21   claims handling; correct?

22        A.    Yes.

23        Q.    You've been at Auto-Owners since 1998;

24   so you've been there 19 years?

25        A.    Correct.

David Madison Cawthorn v. Auto-Owners Insurance Company                Pamela McLean | 5/11/2017

Page 34

1    Q.   Over the 19 years you've been at

2    Auto-Owners, you've received training on the

3    covenant of good faith as it applies here in

4    Florida?

5    A.   We review the Unfair Claims Practices

6    Act yearly.

7    Q.   Okay.  Have you received any other

8    training in addition to reviewing the Unfair Claims

9    Practices Act with regards to the covenant of good

10   faith as it applies in Florida?

11   A.   There aren't any formal -- isn't any

12   formal training I've had at Auto-Owners.  I've

13   attended seminars and that sort of thing.

14   Q.   Over the 19 years of working for

15   Auto-Owners, you've become familiar with the

16   standards and practices that are consistent with

17   the obligation of good faith in Florida?

18   A.   Yes.

19   Q.   Okay.  With respect to the

20   Ledford-Cawthorn matter, do you contend that you

21   followed proper standards and protocols?

22   A.   Yes.

23   Q.   To your knowledge, was any part of the

24   Ledford-Cawthorn matter handled improperly?

25   A.   No.

Page 35

1          Q.   If you had it to do all over again,

2    would you do anything differently with respect to

3    the Ledford-Cawthorn matter?

4          A.   No.

5          Q.   An insurance company has a duty of good

6    faith to protect a policyholder's best interest;

7    true?

8          A.   Yes.

9          Q.   It also has the duty of good faith to be

10   honest with its policyholder; true?

11         A.   Yes.

12         Q.   An insurer must not misrepresent

13   material information to its policyholder?

14         A.   Yes.

15         Q.   If an insurance company receives notice

16   that an accident has occurred, an insurance company

17   should interview its policyholder with regards to

18   the accident; true?

19         A.   If that's a possibility, yes.

20         Q.   If the insurance company is able to

21   interview its policyholder, that interview should

22   be well documented in the insurance company's file;

23   true?

24         A.   Not necessarily.

25         Q.   Should it be recorded?

David Madison Cawthorn v. Auto-Owners Insurance Company                 Pamela McLean | 5/11/2017

Page 36

1          A.    Not necessarily.

2          Q.    If there are more than one insureds,

3     then all insureds should be interviewed following

4     the accident, if possible; true?

5          A.    It depends on a number of factors.

6          Q.    So they should not be interviewed?

7                MR. VILMOS:   Object to the form.   It

8          misstates the --

9     BY MR. BONNER:

10         Q.    Do you understand the question?

11         A.    You said, I believe, that all insureds

12    should be interviewed on every claim, and I said

13    that it depends on the nature of the claim.

14         Q.    Okay.  And in what circumstances should

15    you not interview an insured?

16         A.    Husbands and wives are often listed as

17    co-insureds on a policy, and I don't believe it's

18    necessary to speak with all parties when one of

19    them can tell you the facts.

20         Q.    Okay.  Apart from situations where you

21    have a married couple as co-insureds, are there

22    other situations where an insurance company should

23    not interview an insured following an accident?

24         A.    I don't believe that there are

25    circumstances where they should not be interviewed.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

```
                                                    Page 37
   1    I'm saying that it's not necessary that they always
   2    be contacted.
   3         Q.   Okay.  You'd agree with me, though --
   4    and if you don't, just tell me -- that best claims
   5    handling practices include attempting to contact
   6    and interview any insurer involved in an accident?
   7         A.   No.
   8              MR. VILMOS:  Object to the form.
   9              You can answer.
  10    BY MR. BONNER:
  11         Q.   Okay.  Outside of a case where a
  12    coinsured is a spouse of a person involved in an
  13    accident, what other circumstances are there in
  14    which it is proper claims handling practices to not
  15    interview an insured?
  16              MR. VILMOS:  Object to the form.
  17         A.   I could sit here all day and try to
  18    figure out circumstances.  I mean if you want to
  19    ask me about one specifically, then I can say yes
  20    or no, but I can't --
  21    BY MR. BONNER:
  22         Q.   Well, let's do this.  Following an auto
  23    liability accident, do you agree with me that best
  24    claims handling practices require that the
  25    insurance company should interview the driver of
```

Page  38

1    that accident?

2         A.   Under most circumstances, yes.

3         Q.   Can you name for me any circumstances

4    other than death in which you should not interview

5    the driver involved in an accident?

6         A.   When the facts about the accident are

7    clear, such as in this case, and when the person

8    who was driving is emotionally broken from the

9    results of the accident.

10        Q.   Okay.  Let's move on.  Let's go to

11   whether or not you should investigate a claim.

12             You agree with me that after an

13   accident, an insurance company should investigate a

14   claim; correct?

15        A.   Of course.

16        Q.   And after an accident investigate the

17   circumstances of an accident; true?

18        A.   Of course.

19        Q.   And to do that, an insurance company

20   must identify witnesses who might have relevant

21   information; true?

22        A.   Yes.

23        Q.   And once identifying witnesses who have

24   relevant information, it should attempt to

25   interview those witnesses to find out what

Page  39

1    information they have?

2              MR. VILMOS:   Object to the form.

3         Argumentative.

4              You can answer.

5         A.   I don't believe that interviewing any

6    witnesses would have changed my initial evaluation

7    of this case.

8    BY MR. BONNER:

9         Q.   I understand that.

10             I'm talking about as a general practice,

11   when you handle a claims investigation, you agree

12   with me that you must identify the key witnesses

13   who have relevant information; true?

14        A.   I believe that the identification of the

15   witnesses is important but not necessarily the

16   contact of those witnesses.

17        Q.   And the reason identifying a witness

18   with relevant information is important is because

19   you weren't there for the accident; correct?

20   You're not there for the accident; so you don't

21   know what happened unless you investigate it?

22             MR. VILMOS:   Objection.   Compound.

23        Form.

24        A.   That's correct, but a witness isn't

25   always necessary to confirm facts that you may have

Page 40

1    obtained otherwise.

2    BY MR. BONNER:

3         Q.   Okay.  Without having been at the

4    accident, you have to collect evidence to determine

5    what happened; true?

6         A.   Yes.

7         Q.   Okay.  Part of determining what happened

8    involves collecting -- analyzing a situation and

9    finding out what evidence exists; correct?

10              MR. VILMOS:   Form.

11        A.    I don't believe that you have to talk to

12   every single person in an accident when you come to

13   a conclusion prior to talking to those people that

14   leads you to believe that their information would

15   not affect your evaluation.

16   BY MR. BONNER:

17        Q.   But when you first get a claim, you have

18   to evaluate the claim to see what evidence there is

19   before you do anything else; correct?

20        A.   No.  You review coverage under the

21   policy and then you investigate liability and then

22   you investigate damages.

23        Q.   Okay.  But to investigate liability, you

24   have to first identify what evidence of liability

25   there is; true?

Page 41

1       A.   Yes, but I believe that you're trying to

2  get me to say that you should interview every

3  witness on every claim, and that is not necessary.

4       Q.   That wasn't my question.

5            My question was simply you must identify

6  the evidence that's relevant to the issue of

7  liability, and that much I think you agree with?

8       A.   Yes.

9       Q.   And I think you said coverage was

10 another one.  So you have to identify the evidence

11 that might be relevant to coverage; true?

12      A.   Yes.

13      Q.   Okay.  And once you identify that

14 evidence, then you can make decisions about what

15 you do next in your investigation?

16      A.   Yes.

17      Q.   You can make a decision about whether

18 you think that a particular piece of evidence is

19 important or unimportant; true?

20      A.   Yes.

21      Q.   And if it's unimportant, I believe what

22 you're telling me is you don't have to follow up

23 that piece of evidence?

24           MR. VILMOS:  Object.

25      A.   Not always.  It depends.

```
                                                Page 42
  1    BY MR. BONNER:
  2         Q.    It depends.
  3               And what I'm saying is that if you
  4    identify a piece of evidence as being not
  5    particularly important, your testimony is that you
  6    don't always have to follow up that piece of
  7    evidence?
  8               MR. VILMOS:  Form.  Argumentative.
  9               You can answer.
 10         A.    Can you repeat the question again?
 11               MR. BONNER:  Can you read it back?
 12               MR. VILMOS:  Please.
 13               (The last question was read back by the
 14         court reporter.)
 15         A.    I don't think that I would characterize
 16    it as necessarily unimportant but not integral to
 17    the evaluation of the claim.
 18    BY MR. BONNER:
 19         Q.    When you identify the evidence, you
 20    probably have certain evidence that you give
 21    priority to?  I mean certain components of your
 22    future investigation that are given priority.
 23               MR. VILMOS:  Form.  Compound.
 24         A.    I don't -- I don't -- I didn't hear a
 25    question.
```

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 43

1    BY MR. BONNER:

2         Q.    Okay.  When you identify all of the

3    evidence that's available in a claim, I believe you

4    said that you don't have to, for example, interview

5    every witness; correct?

6         A.    Yes.

7         Q.    Okay.  So what informs that decision?

8    You must evaluate the evidence and decide what

9    pieces of evidence you should give priority to

10   following up as opposed to ones that might have a

11   lesser priority?

12             MR. VILMOS:  Form.  Compound.

13        A.    In this case and in others like it, when

14   you have enough -- when you have enough information

15   already to make a liability decision, then whether

16   or not a witness is important or not doesn't have

17   anything to do with the follow-up.  You already

18   have enough information.

19   BY MR. BONNER:

20        Q.    Okay.  And it's because you've

21   identified the most important information, and

22   you've given weight to it; correct?

23        A.    I wouldn't characterize it as the most

24   important.  I had the information necessary to make

25   what I felt was an informed liability opinion.

Page 44

1      Q.   And when you say you had the information

2   necessary, when you're first introduced to a case,

3   you don't have any information?

4      A.   That's correct.

5      Q.   So then you gather the information;

6   true?

7      A.   Yes.

8      Q.   Okay.  And part of gathering the

9   information is you identify what's out there?  You

10  identify if there's a police report, for example?

11     A.   Yes.

12     Q.   You identify if there are any

13  eyewitnesses, for example?

14     A.   Yes.

15     Q.   Okay.  You identify whether or not your

16  insured is incapacitated?

17     A.   Yes.

18     Q.   Okay.  And if he's not incapacitated,

19  you observe that fact; true?

20     A.   Yes.

21     Q.   You might see if there's any video

22  cameras that took a videotape of the accident;

23  true?

24     A.   I wouldn't seek that information unless

25  I didn't have enough information to make a

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 45

1   decision --

2          Q.    Sure.

3          A.    -- and especially if it wasn't

4   referenced on the police report.

5          Q.    So once you had the police report, once

6   you've identified who the witnesses are and once

7   you've identified whether or not your insured is

8   capacitated, your investigation isn't done then, is

9   it?

10         A.    If that information provides you with

11  enough information to make a liability decision,

12  then yes.

13         Q.    Okay.  And if it does not provide you

14  with enough information, you continue to

15  investigate; true?

16         A.    That's correct.

17         Q.    Okay.  And part of that investigation

18  can entail interviewing witnesses?

19         A.    Of course.

20         Q.    Okay.  Some of that information or that

21  follow-up can entail interviewing your insured;

22  correct?

23         A.    Yes.

24         Q.    Okay.  And it can involve taking

25  pictures of the accident scene; true?

Page 46

1      A.    Yes.

2      Q.    And it can involve taking pictures of

3  the accident vehicle?

4      A.    Yes.

5      Q.    It can involve following up with the

6  trooper who investigated the scene to find out if

7  the trooper had any evidence or any information

8  relevant to your inquiry; true?

9      A.    Yes.

10     Q.    Okay.  You might also request 9-1-1

11  tapes, if they were relevant to your inquiry?

12     A.    I might, yes.

13     Q.    Okay.  Do you agree with me that an

14  insurance company has a duty to investigate whether

15  or not its policyholder is liable for an accident?

16     A.    Yes.

17     Q.    Okay.  And its investigation of the

18  accident should be impartial --

19     A.    Yes.

20     Q.    -- true?

21           And its investigation of the accident

22  should be prompt; true?

23     A.    Yes.

24     Q.    And its investigation of the accident

25  should be thorough; true?

Page 47

1        A.    Yes.

2        Q.    Its investigation of the accident should

3   be well documented in the file; true?

4        A.    Yes.

5        Q.    As part of an insurance company's

6   investigation, it should investigate whether the

7   policyholder is at fault for the damages being

8   claimed; true?

9        A.    It depends.

10       Q.    It should also investigate whether other

11  parties might be at fault for the damages being

12  claimed?

13       A.    Not in every case.  It depends.

14       Q.    If a claim is made against an insured,

15  the insurance company's duty to investigate

16  includes investigating whether or not the insured

17  is at fault?

18       A.    Yes.

19       Q.    And if a claim is made against an

20  insured, an insurance company's duty to investigate

21  involves looking into whether other parties, not

22  your insured, might be at fault for the accident?

23       A.    Not necessarily.  It depends.

24       Q.    You agree with me that when you defend

25  an insured, the insured gives over the right to

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 48

1    control his own defense?

2         A.    No.

3         Q.    The insurance policy includes what's

4    called a duty and a right to defend; correct?

5         A.    Yes.

6         Q.    Okay.  And under that duty and right to

7    defend, Auto-Owners has an obligation to defend its

8    insured; correct --

9              MR. VILMOS:  Object to the extent it

10        calls for a legal conclusion.

11   BY MR. BONNER:

12        Q.    -- based on your 19 years of experience

13   at Auto-Owners?

14        A.    Yes.

15        Q.    Okay.  An insured, who is being defended

16   by an insurance company, is not allowed to settle

17   his own claim without the insurance company's

18   consent; true --

19              MR. VILMOS:  The same objection.

20   BY MR. BONNER:

21        Q.    -- based on your 19 years of experience?

22        A.    That depends.

23        Q.    Okay.  The insurance company's duty to

24   defend means that it pays for the lawyer defending

25   the insured; correct?

Page 49

1          A.    That's correct.

2          Q.    And as part of an insurance company's

3    duty to defend its insured, the insurance company

4    must look into whether or not the insured is

5    actually at fault for the damages being claimed?

6                MR. VILMOS:   Object to the form.

7          Argumentative.

8          A.    As part of the duty to defend?

9    BY MR. BONNER:

10         Q.    Mm-hmm.

11         A.    I don't -- I don't know the answer to

12   that.  I'm sorry.

13         Q.    And as part of its obligation to defend

14   the insured against suits against him, an insurance

15   company has a duty to look into whether another

16   party might be potentially at fault for the damages

17   being claimed?

18               MR. VILMOS:   Object to the form.

19         A.    Isn't that the same question?

20   BY MR. BONNER:

21         Q.    No, no.  I asked whether or not it had a

22   duty to investigate the liability of the insured

23   and also, a follow-up, whether or not it had a duty

24   to investigate whether other parties might be

25   liable for some or all of the damages.

```
                                                    Page 50
  1         A.    I don't know whether or not that falls
  2    under the duty to defend.
  3         Q.    Okay.  Do you agree with me that if
  4    relevant to the insurance company's investigation,
  5    an insurance company should identify any physical
  6    evidence that might be relevant to the ultimate
  7    outcome of a claim against its insured?
  8         A.    I believe the key word is relevant, but
  9    yes.
 10         Q.    True.
 11            And an insurance investigation should
 12    identify any witnesses who may have relevant
 13    knowledge that would be ultimately -- sorry.
 14    Strike that.
 15            And as part of the insurance company's
 16    duty to investigate, it should also identify any
 17    witnesses who would have relevant information to
 18    whether or not the insured is ultimately liable?
 19            MR. VILMOS:  Asked and answered.
 20            You can answer again.
 21         A.    If it's relevant.  But, again, I don't
 22    know that taking a statement from a witness, when
 23    you have enough information to determine liability,
 24    is required.
 25
```

Page 51

1    BY MR. BONNER:

2          Q.    Okay.   Not my question.

3               My question was simply:   Do you agree

4    that the insurance company's duty is to identify a

5    witness who may have relevant information to an

6    insured's liability?

7               MR. VILMOS:   Asked and answered.

8    BY MR. BONNER:

9          Q.    True?

10         A.    Yes.

11         Q.    If appropriate, physical evidence should

12   be collected in investigation of a claim?

13         A.    If appropriate, yes.

14         Q.    And if appropriate, the vehicle involved

15   in an accident should be investigated; true?

16              MR. VILMOS:   Object to the form.

17         A.    If you are able to.

18   BY MR. BONNER:

19         Q.    If you are able to.

20              And if appropriate, an insurance company

21   should collect evidence regarding an injured

22   party's claims?

23         A.    Yes.

24         Q.    Okay.   If photographs are available of

25   the injured party's claims, an insurance company

Page 52

1    should collect them --

2              MR. VILMOS:  Objection to form.

3    BY MR. BONNER:

4         Q.    -- true?

5         A.    If you still need additional information

6    to make a decision, then yes.

7         Q.    So if you do not need photographs to

8    make a decision as to whether or not to extend the

9    settlement offer to a claimant, you do not need to

10   seek those photographs?

11        A.    I don't believe so, no.

12        Q.    Okay.  Based on an insurance company's

13   investigation, an insurance company should

14   determine as promptly as possible whether the

15   policyholder is liable for the damages being

16   claimed against him?

17        A.    Yes.

18        Q.    It should notify the policyholder of its

19   determination regarding liability promptly?

20        A.    Yes.

21        Q.    An insurance company should advise the

22   insured that the probable outcome of any litigation

23   filed against him or her?

24        A.    That depends on the circumstances.

25        Q.    Okay.  And if the potential damages are

David Madison Cawthorn v. Auto-Owners Insurance Company                      Pamela McLean | 5/11/2017

                                                              Page 53

 1    likely to exceed the insured's policy limits, the

 2    insurance company should promptly advise the

 3    insured of his potential liability above his policy

 4    limits?

 5          A.   Yes.

 6          Q.   An insurance company should advise the

 7    insured of any steps that he or she might take to

 8    avoid having to pay damages in excess of his or her

 9    policy limits?

10          A.   Yes.

11          Q.   An insurance company should advise its

12    insured of his right to contribute personal assets

13    towards any potential settlement; true?

14               MR. VILMOS:   Repeat the question back.

15          Lance.

16               (The last question was read back by the

17          court reporter.)

18

19          A.   That depends.  I --

20    BY MR. BONNER:

21          Q.   Let me change the question.

22               In a situation where the insured is

23    facing exposure to liability above his policy

24    limits, it is a duty in Florida for the insurance

25    company to advise the insured of his right to

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 54

1   contribute his personal assets towards a settlement

2   of his claim?

3           MR. VILMOS:   Objection to the form.

4       A.   I am unaware if -- of that specific

5   requirement, but we would suggest that they seek

6   legal advice, not advise them any further than

7   that.

8   BY MR. BONNER:

9       Q.   Okay.

10          MR. VILMOS:   Allen, we've been going for

11          about an hour.  Maybe it's a good time to

12          take --

13          MR. BONNER:   I've got six more

14          questions, and then I'm at a great stopping

15          point.  Can we do that?

16          MR. VILMOS:   Are you okay that?

17          THE WITNESS:   Mm-hmm.

18          MR. BONNER:   I mean if you need it, just

19          tell me and you can have it.

20          THE WITNESS:   No, I'm good.

21  BY MR. BONNER:

22      Q.   An insurance company should settle, if

23  possible, where a reasonably prudent person faced

24  with the prospect of paying a total recovery would

25  do so?

Page 55

1      A.   Yes.

2      Q.   And where prudent, an insurance company

3   should offer its policy limits in settlement to

4   avoid exposing an insured to excess liability?

5      A.   That depends.

6      Q.   If it is prudent to do so, an insurance

7   company should offer its policy limits in

8   settlement to avoid exposing its insured to excess

9   liability?

10          MR. VILMOS:   Object to the form.   Asked

11      and answered.

12      A.   It depends.

13  BY MR. BONNER:

14      Q.   In other words, where an insurer reaches

15  a point where it concludes that the potential

16  liability for a claimant's injuries would exceed

17  its policyholder's limits, it should settle for the

18  policyholder's limits, if possible?

19      A.   If you have reached the point where you

20  know that it exceeds the limits, then yes.

21      Q.   And an insurance company should treat

22  the interests of its policyholder as at least equal

23  to the interests of the insurance company's?

24      A.   I believe they should be higher than the

25  interest of the company.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                           Page 56

 1          Q.    You anticipated my very next question.

 2    Thank you very much.

 3                And the last question I have before we

 4    break is:  And you agree that the policyholder's

 5    interest is paramount to the financial interest of

 6    the insurance company?

 7                MR. VILMOS:  Object to the form.  Asked

 8          and answered, and it misstates her testimony.

 9    BY MR. BONNER:

10          Q.    If you understand the question --

11                MR. VILMOS:  You can answer.

12          A.    I'm sorry.  Ask it again.

13                MR. VILMOS:  Lance, can you read it

14          back.

15                MR. BONNER:  I'll rephrase it.

16    BY MR. BONNER:

17          Q.    The policyholder's interests are more

18    important than the financial interests of the

19    insurance company?

20          A.    Yes.

21                MR. BONNER:  Okay.  We can go off the

22          record.

23                THE VIDEOGRAPHER:  We're off the record

24          at 10:33.

25                (Break from 10:33 a.m. to 11:12 a.m.)

Page 57

1          THE VIDEOGRAPHER:  We're back on the

2      record at 11:12.

3   BY MR. BONNER:

4      Q.   Ms. McLean, do you have Exhibit 56 in

5   front of you?

6      A.   Yes.

7      Q.   Just confirm for me -- I think you

8   already have.  That's not the complete claims

9   handling manual, but it is excerpts of the claims

10  handling manual that was applicable in 2014?

11     A.   Yes.

12     Q.   Okay.  I think you looked through it

13  earlier.  Are there any specific sections that

14  pertain to auto liability claims in Florida that

15  are not reflected in that document?

16          MR. VILMOS:  Object to the form.

17  BY MR. BONNER:

18     Q.   If you can just review the document and

19  tell me, because I don't know what the complete

20  manual has.  So I'm trying to ask a person who

21  might know whether there are any sections

22  applicable to auto liability claims that are

23  missing.

24          MR. VILMOS:  Are you asking her to look

25      through Exhibit 56 and see what's not in

Page 58

1          there?

2                  MR. BONNER:  Just if there is a section

3          that she's aware of that deals with auto

4          liability claims that has been omitted.

5                  MR. VILMOS:  Omitted.

6                  You may answer the question.

7          A.    I mean not that I'm aware of.  I don't

8    have a catalog.

9    BY MR. BONNER:

10         Q.    Yeah.

11                And are you aware of a section specific

12   to Florida bad faith that exists in the claim

13   manual that's not reflected there?

14                MR. VILMOS:  Object to the form.

15         A.    No.

16   BY MR. BONNER:

17         Q.    If you turn to page 0003 of Exhibit 56,

18   the second bullet point refers to the special

19   investigation unit.  What is the special

20   investigating unit?

21         A.    It's a unit that investigates fraud

22   or -- well, fraud.

23         Q.    Okay.  All right.  So it wouldn't be

24   applicable to this claim, the Cawthorn-Ledford

25   matter?

Page 59

1          A.    No, not at all.

2          Q.    Do adjusters in Ocala have access to

3    investigators?

4          A.    Yes.

5          Q.    And what would an adjuster in Ocala use

6    an investigator to do?  Can you give me an example?

7          A.    Social media, EUOs, you know, that sort

8    of thing.

9          Q.    So an investigator would actually take

10   the examination under oath?

11         A.    Under certain circumstances, yes.

12         Q.    Sorry.  You said social media.  So the

13   investigator might look up information available on

14   social media?

15         A.    Yes, that's correct.

16         Q.    Would an investigator ever interview a

17   witness that was not an examination under oath?

18         A.    Yes.

19         Q.    Could you dispatch an investigator to

20   take photographs?

21         A.    Yes.

22         Q.    And could you dispatch an investigator

23   to collect evidence, if you knew where the evidence

24   was?

25               MR. VILMOS:  Objection.  Relevance.

Page 60

1          A.    I can't think of a circumstance where we

2    would need for them to get something for us.

3    BY MR. BONNER:

4          Q.    For example, if there were records that

5    you wanted to pick up at a location outside of

6    Ocala, might you use an investigator to pick up the

7    records?

8          A.    We would do that ourselves.

9          Q.    Are there any circumstances where you'd

10   use an investigator to do something like that, pick

11   up a police report?

12              MR. VILMOS:  Object to the form.

13              Are you talking about a special

14        investigation unit that you just said was not

15        relevant to this claim?

16              MR. BONNER:  Can you reread the

17        question?

18              (The last question was read back by the

19        court reporter.)

20         A.    No, we would do that ourselves.

21   BY MR. BONNER:

22         Q.    Turn to page 13 of Exhibit 56.

23              This is Bates number AO-CHG00013.  Are

24   you on that page?

25         A.    Yes.

Page 61

1    Q.   Okay.  There's a heading that says

2    "Florida Liability Claims"; true?

3         A.   Yes.

4         Q.   The second paragraph starts with,

5    "Florida's unique exposures benefit from associates

6    accustomed to dealing with Florida issues."

7              Do you see that?

8         A.   Yes.

9         Q.   Is there anywhere in the claims manual

10   that explains what the phrase "Florida's unique

11   exposures" means?

12        A.   Not that I'm aware of.

13        Q.   Do you have an understanding what

14   "Florida's unique exposures" means?

15        A.   No.

16        Q.   In your experience, 19 years, working at

17   Auto-Owners, have you come to learn whether or not

18   there's any aspects of Florida's claims handling

19   that's different from claims handling in other

20   states?

21        A.   No.

22        Q.   Okay.  Further down there's a line that

23   includes the remark that a Florida claim should be

24   resolved without delay.  Let me see if I can help

25   get you there.

Page 62

1       If you look at the fourth bullet point.

2   The last sentence of that paragraph says, "If

3   retained, such claim should be resolved without

4   delay, with a manager's markover to assure delay is

5   avoided."

6       Please take a moment to read that whole

7   paragraph, and look up when you've read it.

8       A.   Okay.

9       Q.   Okay.  So this provision is discussing a

10  claim that's transferred to a Florida office;

11  correct?

12      A.   Correct.

13      Q.   Okay.  And in the context of the claims

14  transferred to a Florida office, it states that

15  those claims should be resolved without delay?

16      A.   Yes.

17      Q.   Okay.  And if you go to the fifth bullet

18  point, it says, "Any file transfer should be

19  handled with sufficient priority that there is no

20  delay in the contact or follow-up of the parties

21  involved."

22      Do you see that?

23      A.   Yes.

24      Q.   It's true that when handling auto

25  liability claims in Florida it's important to avoid

Page 63

1    delays?

2         A.    Yes.

3         Q.    Going back to that fourth bullet point,

4    you'll see that that sentence that I read to you,

5    "If retained, such claims should be resolved

6    without delay."

7              Do you agree with me that it is

8    important to resolve a claim without delay?

9         A.    Yes.

10        Q.    Okay.   In your experience and training,

11   do you agree that a delay can adversely impact the

12   insured?

13        A.    Yes.

14        Q.    Specifically, a delay can affect whether

15   or not a claimant is willing to settle a claim;

16   true?

17        A.    Yes.

18             MR. VILMOS:   Object to the form.

19   BY MR. BONNER:

20        Q.    And that's one of --

21             MR. VILMOS:   I'm sorry.   Could you have

22        that question and answer read back?

23             (The last question and answer were read

24        back by the court reporter.)

25

Page 64

1    BY MR. BONNER:

2         Q.    And that's one of the reasons why

3    Florida adjusters are supposed to, quote, resolve,

4    end quote, claims without a delay?

5         A.    I think you may be reading that sentence

6    wrong.   The sentence is "if retained," which would,

7    in my opinion, mean if a branch outside of Florida

8    keeps the file.

9         Q.    Okay.   And if a branch outside keeps a

10   file, you agree with me that a delay could

11   adversely affect the outcome of that claim?

12        A.    Yes.

13        Q.    Okay.   Now, I see that this section

14   applies -- this section being the Florida liability

15   claims section on page 13 of document 56 applies to

16   Florida liability claims.

17             Once again, I don't have the whole

18   claims manual.   I'm asking you, based on your

19   personal knowledge, if you know there are any other

20   provisions of the claims manual that particularly

21   apply to Florida liability claims that exists that

22   I don't have?

23        A.    No, I do not think so.

24             MR. VILMOS:   I also just want to make

25        sure the record is clear that on page 12,

David Madison Cawthorn v. Auto-Owners Insurance Company                Pamela McLean | 5/11/2017

Page 65

```
 1        00012, the heading under which you are
 2        referring to page 13 is under claims outside
 3        of the branch territory.
 4             MR. BONNER:  All right.
 5             MR. VILMOS:  That is the majority of
 6        claim of which this is a subsection, which is
 7        what the witness was referring to.
 8             MR. BONNER:  Ms. McLean, will you step
 9        outside.
10             (The witness exited the conference
11        room.)
12             MR. BONNER:  You get a direct or you get
13        a cross.  You can go back and clarify.  I
14        don't want you to clarify them on the record
15        in the middle of my interrogation.
16             MR. VILMOS:  I'm going to ask you,
17        again, not to intentionally mislead the
18        witness by putting her in the middle of a
19        section of a document without giving her any
20        opportunity to reference the beginning of the
21        document or where she is reading from.
22             MR. BONNER:  The witness has had this in
23        front of her for three hours.
24             MR. VILMOS:  You directed her to page 13
25        and said look at bullet point four.
```

David Madison Cawthorn v. Auto-Owners Insurance Company          Pamela McLean | 5/11/2017

Page 66

1           MR. BONNER:  That's correct, I did, and
2      she read it, and she has the document in
3      front of her.
4           MR. VILMOS:  And then she corrected you
5      and said --
6           MR. BONNER:  And you have an opportunity
7      to clarify whatever you want on your
8      examination.
9           MR. VILMOS:  That's fine.  I will take
10     that opportunity, but you have a professional
11     obligation not to intentionally put her in a
12     place where she is going to give a confusing
13     answer.
14          MR. BONNER:  I don't think she gave a
15     confusing answer.
16          MR. VILMOS:  I think she corrected
17     herself when she realized what she was
18     reading.
19          MR. BONNER:  All right.  Bob, will you
20     go get Ms. McLean?
21          MR. MARTINEZ:  Sure.
22          MR. BONNER:  My suggestion would be
23     excuse the witness before you give a
24     statement that might affect her testimony.
25          If you have something that you want to

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 67

```
 1        ask me to ask or rephrase, I'm happy to
 2        address it, but you know the context of an
 3        objection in front of a witness can change
 4        the testimony.
 5             MR. VILMOS:   I'm happy to make that
 6        accommodation.
 7             (The witness re-entered the conference
 8        room.)
 9   BY MR. BONNER:
10        Q.   All right.   Thank you, Ms. McLean, for
11   coming back.   Let me know when you're ready.
12        A.   I'm ready.
13        Q.   All right.   Let's go to page 22 of
14   Exhibit 56.
15             Okay.   Confirm with me that the title of
16   this page is Reserved/File Report Thresholds?
17        A.   Yes.
18        Q.   As part of your duties as an adjuster in
19   2014, you had a duty to set reserves on the claims
20   you handled; true?
21        A.   Yes.
22        Q.   And "a reserve" means an estimate of the
23   total cost Auto-Owners might pay on a claim?
24        A.   Yes.
25        Q.   A reserve is supposed to reflect
```

Page 68

1   Auto-Owners' estimate of the damages based on the

2   information it has at the time it sets the reserve?

3         A.   Yes.

4         Q.   Okay.  Reserves can be changed; true?

5         A.   Absolutely.

6         Q.   And if an adjuster becomes aware of

7   information that justifies changing a reserve, he

8   or she can make that change without seeking any

9   additional authority?

10        A.   Yes.

11        Q.   Okay.  If you turn to page 23 of

12  Exhibit 56, I'll just draw your attention to the

13  last sentence.  It says, "Attention to detail on

14  reserving affects the financial stability of

15  Auto-Owners."

16             Correct?

17        A.   Yes.

18        Q.   Are you training to be as accurate as

19  you can with respect to setting your reserves?

20        A.   Yes.

21        Q.   Okay.  Just real quick, there's an

22  acronym -- and I can find it, if you'd like me

23  to -- but really, I just don't know what it means,

24  and maybe you know off the top of your head.

25  LEE -- I'm sorry.  "LAE consideration" means what?

Page 69

1          A.    Loss adjustment expense.

2          Q.    What is "loss adjustment expense"?

3          A.    The costs for investigating or defending

4    the insured.

5          Q.    I see.

6                And so you can include those

7    accompanying costs in addition to potential

8    liability exposure in setting a reserve?

9          A.    No, I don't --

10         Q.    Oh, no.  Okay.

11         A.    No.

12         Q.    So you exclude loss adjustment expenses

13   from the reserve that you set?

14         A.    The reserve is set based on what you

15   think the value of the injured party or damaged

16   properties claim value is.

17         Q.    So in the context of a liability claim,

18   the reserve is set based on what you believe the

19   claimant's liability damages are?

20         A.    Could be.

21         Q.    Could be.  Excuse me.

22               And there's a mention on here -- again,

23   I'll find it for you, if you'd like, but maybe you

24   can just tell me what it is.

25               What is a "liability captioned report"?

```
                                             Page 70
  1        A.   It's just the title of a report that you
  2  send to the legal department when you notify them
  3  of a file that you'd like for them to follow.
  4        Q.   And is there a particular form that has
  5  to be used when you prepare a liability captions
  6  report?
  7        A.   No.
  8        Q.   It can just be an email?
  9        A.   Yes.
 10        Q.   Does it have specific information that
 11  must be included in the report?
 12        A.   There's information that's requested to
 13  be included, but it's not required.
 14        Q.   Okay.  Is there nothing that's required
 15  to be in the report, specifically?
 16        A.   Not that I'm aware of.
 17        Q.   Okay.  For example, the report does not
 18  require the adjuster to send a plan of action to
 19  the legal department?
 20        A.   No.
 21        Q.   All right.  If you'll turn to page 27.
 22  It's a section that says "third-party liability,"
 23  subheading, "liability investigation
 24  documentation."
 25             Do you see that section?
```

Page 71

1          A.    Yes.

2          Q.    Okay.  The very first statement is

3    "Documenting and preserving the facts and evidence

4    in a liability investigation are important."

5               You agree with that statement; correct?

6          A.    Yes.

7          Q.    Okay.  And would you agree that one of

8    Auto-Owners' standard protocols for adjusters

9    handling liability claims is to document and

10   preserve facts and evidence?

11         A.    Yes.

12         Q.    The first paragraph continues with the

13   second sentence that says, "Many tools are

14   available to accomplish this documentation.

15   Telephone contacts, recorded written interviews,

16   ISO claims search, letters, scene inspections,

17   photographs, measurements, and diagrams are a few."

18               Do you see that?

19         A.    Yes.

20         Q.    Do you agree with me that one of

21   Auto-Owners' standard protocols for adjusters

22   handling liability claims is to utilize telephone

23   contacts, recorded written interviews, ISO claims

24   searches, letters, scene inspections, photographs,

25   measurements, diagrams, and where appropriate to

Page 72

1    use those to investigate a claim?

2         A.   This is a guide.  It's not a checklist

3    that you have to complete in order to successfully

4    investigate a claim.  I mean this is a claims

5    handling guide.

6         Q.   Then let me rephrase my question.

7              Do you agree that as part of

8    Auto-Owners' standard protocols for adjusters

9    handling liability claims, they should consider

10   using the following investigation tools:

11             Telephone contacts; true?

12        A.   Depending on the circumstances of the

13   claim that you're investigating.

14             MR. VILMOS:  Object to the form.

15   BY MR. BONNER:

16        Q.   And my question is not saying that it's

17   required.  I'm saying that Auto-Owners' protocols

18   suggest that the following tools may be used.

19             So using that format, do you agree that

20   Auto-Owners' protocols suggest to adjusters that

21   one of the investigative tools they may use is

22   recorded in written interviews?

23        A.   Yes.

24        Q.   And do you agree that Auto-Owners'

25   protocols suggest to adjusters in liability claims

Page 73

 1   that other investigative tools that they might use

 2   include ISO claims searches, letters, scene

 3   inspections, photographs, measurements, and

 4   diagrams?

 5             MR. VILMOS:  Object to the form.

 6        A.   Yes, they may be used.

 7   BY MR. BONNER:

 8        Q.   Okay.  And it is up to the adjuster's

 9   discretion to decide when appropriate to use those

10   investigative tools?

11        A.   Unless it's a file being followed by

12   legal and they make additional suggestions.

13        Q.   Okay.  So I'll rephrase the question.

14             It is within the discretion of the

15   adjuster and, if referred to home office legal, the

16   person in home office legal also working on the

17   claim to decide whether or not to use any of these

18   investigative tools in a given case?

19        A.   Yes.

20        Q.   Okay.  If you go to paragraph 4 and if

21   you read the first sentence, the statement says,

22   "The claim associate should consider defenses or

23   reasons why the insured may not be legally liable."

24             Do you agree that one of Auto-Owners'

25   standard protocols for adjusters handling liability

Page 74

1   claims is that it should investigate defenses or

2   reasons why an insured might not be liable for an

3   accident?

4        A.   Again, this is a guide that this is a

5   suggestion on how to proceed.

6        Q.   Okay.  So do you agree with me that one

7   of Auto-Owners' standard protocols for adjusters

8   handling claims is to suggest that a claims

9   associate should consider defenses or reasons why

10  the insured may not be legally liable?

11            MR. VILMOS:  Object to the form.

12       A.   It depends on the case.

13  BY MR. BONNER:

14       Q.   Okay.  Look to paragraph 6.

15            It states, "Investigation and

16  documentation of the damages sustained as

17  necessary."

18            True?

19       A.   Yes.

20       Q.   It goes on to state that, at the very

21  last sentence, "Investigation and communication

22  with claimants are important in working towards a

23  prompt resolution."

24            Do you see that statement?

25       A.   Yes.

Page 75

```
 1          Q.    Do you agree that one of Auto-Owners'
 2    standard protocols for adjusters handling claims is
 3    that adjusters should consider communicating with
 4    claimants because doing so is important to working
 5    toward a prompt resolution of a claim?
 6          A.    Again, it depends on the nature of the
 7    claim.
 8          Q.    Do you agree that the protocol suggests
 9    to investors to consider that option, depending on
10    the circumstances of the claim?
11              MR. MARTINEZ:  Excuse me a second.
12              MR. VILMOS:  Object to the form.
13              MR. MARTINEZ:  Let me have that read
14        back.
15              (The last question was read back by the
16        court reporter.)
17              MR. VILMOS:  Object to the form.
18    BY MR. BONNER:
19          Q.    Let me rephrase.
20              Do you agree with me that Auto-Owners'
21    standard protocols suggests to adjusters that
22    communicating with claimants is important because
23    doing so can facilitate working to a prompt
24    resolution of the claim?
25              MR. VILMOS:  Object to the form.  I'm
```

Page 76

1              sorry to interrupt the end of the question.

2                   Can you please read the question back?

3                   (The last question was read back by the

4         court reporter.)

5                   MR. VILMOS:  Object to the form.

6         A.   I wouldn't use the word "protocol."  I

7    believe that it's suggested in the claim handling

8    guide that contact with the claimant is important.

9    BY MR. BONNER:

10        Q.   Okay.  And back in 2014, you were

11   familiar with all of these provisions in the claims

12   manual?

13        A.   Yes.

14        Q.   The last paragraph reads, "A release

15   should be obtained when settling a liability

16   claim."

17                  Do you agree with me that one of

18   Auto-Owners' standard protocols for adjusters

19   handling liability claims is to request a release

20   in connection with making a settlement offer?

21                  MR. VILMOS:  Object to the form.

22        A.   That depends on the nature of the claim.

23   BY MR. BONNER:

24        Q.   Okay.  So it's not a standard protocol?

25                  MR. VILMOS:  Object to the form.

```
                                              Page 77
 1        A.   I, again, don't like the
 2   characterization "protocol."  This is a guide.
 3   BY MR. BONNER:
 4        Q.   Okay.  It's not a guideline of
 5   Auto-Owners that adjusters should request a release
 6   in connection with making a settlement offer on a
 7   claim?
 8        A.   It depends on the claim.
 9        Q.   So it is not a guideline?
10        A.   No.
11        Q.   You've done insurance claims for 19
12   years.  I've done some insurance stuff.  I have an
13   idea what an ISO claim is, but I'd like to ask you
14   to tell me, for the record, what is a ISO claims
15   search.
16             MR. VILMOS:  Object to the form, but you
17        can answer the last part.
18        A.   It's a company that some insurers
19   subscribe to that collects information that
20   indicates prior injuries, concurrent claims.
21   BY MR. BONNER:
22        Q.   Okay.  Would you characterize an ISO
23   claim search as something you could perform on an
24   individual once you have his or her name?
25        A.   Yes.
```

Page 78

1      Q.   And when you perform an ISO claim

2  search, I believe there's one in the claims file,

3  which you can see if you'd like; but it generally

4  generates, if there's a match, information like an

5  address?

6      A.   Yes.

7      Q.   Sometimes, but not always, it might have

8  a telephone number associated with the person being

9  searched?

10     A.   Sometimes.

11     Q.   Okay.  If you look at paragraph, I

12  believe, 2 under the ISO claims search -- and I'm

13  going to paraphrase.  You're welcome to correct my

14  paraphrasing.

15          Essentially this guideline suggests to

16  adjusters that if they perform an ISO search on a

17  file and discard it, they should note that in their

18  file?

19          MR. VILMOS:  Object to the form.

20  BY MR. BONNER:

21     Q.   Do you understand the question?

22     A.   Yes.  Can you repeat it, though?

23     Q.   According to page 28 of Exhibit 56, it

24  is an Auto-Owners' guideline that if an adjuster

25  performs an ISO search but disregards it or

Page 79

1   discards it, that should be noted in its claims

2   file?

3           A.   Yes.

4           Q.   Okay.  Not all the questions are hard.

5           A.   I just want to make sure I'm reading it

6   first.

7           Q.   Now, I guess I'm just going to ask you

8   this.

9                Is there a particular part of the claims

10  manual that would deal with catastrophic claims,

11  such as paralysis or wrongful death?

12          A.   Not to my knowledge, not specifically.

13          Q.   And you are not aware of any specific

14  guidelines that would apply to catastrophic claims

15  such as those involving paralysis or wrongful

16  death?

17          A.   No.

18          Q.   According to Auto-Owners' guidelines,

19  whether it's a catastrophic claim or a less severe

20  claim, they're both to be handled in the same

21  fashion?

22          A.   Yes.

23          Q.   Which is diligently, of course?

24          A.   Yes.

25          Q.   Does Auto-Owners have a specific

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                              Page 80

1    guideline for adjusters working on claims to set

2    diaries, for example, to mark when something should

3    be followed up?

4         A.    No.

5         Q.    Okay.  Whether or not to set a diary to

6    remind an adjuster to follow up on a particular

7    event is within the discretion of the individual

8    adjuster?

9         A.    Yes.

10        Q.    In 2014, did you have a practice of

11   making diaries to remind you to follow up on tasks?

12        A.    Yes.

13        Q.    Okay.  What system did you use?

14        A.    It was totally relevant to the claim

15   involved.  There wasn't any set number for any

16   specific circumstances.

17        Q.    Okay.  And the reason I ask is just was

18   it -- you know, if it's on Outlook, there might be

19   an Outlook record.

20        A.    No, it's within our -- our claim noting

21   system.

22        Q.    Okay.  So when you made diaries, you

23   would have made the diary in your claims notes?

24        A.    No, it's in a program called CICS.

25   You -- I don't know anything -- I'm not a technical

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                            Page 81

1    person.

2          Q.    CICS is what?  It's a --

3          A.    It's a computer system.  I don't --

4          Q.    Does it include something that has a

5    calendar?

6          A.    No.

7          Q.    How would you go about making a diary in

8    the CICS system?

9          A.    I would ask the support staff to do it

10   for me.

11         Q.    And, again, I'm just trying to --

12   because I don't know how it works.

13               When you ask your support staff to set a

14   diary, do you know how that diary then prompts the

15   support staff to notify you that a deadline has

16   passed, for example?

17         A.    They don't.  When you have your diary

18   day come up, it automatically shows up on your

19   to-do list.

20         Q.    Okay.  And so where does the to-do list

21   come from?

22         A.    I have no idea.

23         Q.    It's generated in the CSCI program?

24         A.    Or Image.Right.

25         Q.    Okay.  In Image.Right.  And you get a

Page 82

1    to-do list every day you go into work?

2         A.    Yes.

3         Q.    Okay.  So if you had a particular diary

4    follow-up entered for a particular day, that would

5    come up on the day it was supposed to be performed?

6         A.    Yes.

7         Q.    Okay.  Are you still using the same

8    system in 2017 as you were using in 2014?

9         A.    No.  We have a different computer system

10   now.

11        Q.    Okay.  Is the diary system the same?

12        A.    No.

13        Q.    So at some point between 2014 and 2017

14   you changed the way the diaries are done?

15        A.    Yes, but we still do use the Image.Right

16   system that was in effect for 2014 for claims that

17   have not concluded that originated in that system.

18        Q.    So the Image.Right system still exists?

19        A.    Yes.

20        Q.    I'm sure you could not do this yourself,

21   but do you know if a IT person would be able to

22   pull your diaries for a particular day back in

23   2014?

24             MR. VILMOS:  Object to the form.

25        A.    I have no idea.

Page 83

1    BY MR. BONNER:

2         Q.    Okay.  Do you have any reason to believe

3    that an IT person could not do that?

4              MR. VILMOS:  Object to the form.

5         A.    I have no idea.

6    BY MR. BONNER:

7         Q.    Do you recall making any diary notes to

8    yourself in the Image.Right system for the

9    Cawthorn-Ledford claim?

10        A.    I would have set diaries.

11        Q.    Have you ever received a performance

12   review or an annual review which discussed your

13   work on the Cawthorn-Ledford matter?

14        A.    No.

15        Q.    Did you ever have an informal

16   performance review that discussed your handling of

17   the Cawthorn-Ledford matter?

18        A.    No.

19        Q.    Do you have an annual review?

20        A.    Yes.

21        Q.    To your knowledge, is the

22   Cawthorn-Ledford matter addressed in your personnel

23   file at all?

24        A.    No.

25        Q.    Does your annual review include

```
                                                    Page 84
 1    information regarding how much has been paid out by
 2    Auto-Owners in a given year on liability claims
 3    that you've handled?
 4         A.    No.
 5         Q.    This should be an easy question for you.
 6               What were the circumstances of your
 7    promotion?
 8               MR. VILMOS:   Object to the form.
 9               You can answer.
10    BY MR. BONNER:
11         Q.    I would just like to know how it was
12    that you came to be promoted.
13         A.    Stan chose to take another position, and
14    I would like to think that I was the logical
15    choice.
16         Q.    Were you interviewed for it?
17         A.    Yes.
18         Q.    Did you have to apply for it?
19         A.    No.
20         Q.    Ms. Pitman was not involved in the
21    interview process in any way?
22         A.    No.
23         Q.    Who was?  And it's --
24         A.    My regional manager, Jim Jordan, and
25    then I flew to Lansing and met with four officers.
```

Page 85

1      Q.   Okay.  Let's turn to -- you can actually

2   give me back Exhibit 56.  We should be done with

3   that.

4           And now let's go ahead and -- you have

5   Exhibit 2 in front of you; correct?

6      A.   Yes.

7           (Plaintiff's Exhibit 57 was marked for

8           identification.)

9   BY MR. BONNER:

10      Q.   Let me go ahead and mark Exhibit 57 as

11   the one-page diary note printout that was provided

12   to me today by counsel, time stamped 135117, marked

13   6/20/17.

14           Do you guys have an extra copy?  Because

15   I would like to be able show the witness this --

16   oh, you've got one.  All right.  May I have your

17   copy?

18      A.   (Handing).

19      Q.   Before you is Exhibit 2 and Exhibit 57.

20           These are not all of the diary notes

21   that exist for the Ledford-Cawthorn matter;

22   correct?  If you look at --

23      A.   I don't know about your characterization

24   of diary notes, but these are all of the formal

25   claims notes that exist.

Page 86

1          Q.    I wasn't trying to be tricky.  I'll use
2     your terminology, formal claims notes.
3               I ask this because if you look at
4     Exhibit 2 -- and what other exhibit do you have in
5     front of you there?
6          A.    Two copies of 2.
7          Q.    May I have one of your copies of the
8     two?
9          A.    Sure.
10         Q.    Thank you.
11              If you look at Exhibit 2, you'll see
12    that the last formal claims note on the first page
13    is April 29, 2015?
14         A.    Yes.
15         Q.    Is that the last formal claims note that
16    was entered on the Ledford-Cawthorn claim?
17         A.    Yes.
18         Q.    Okay.  And in addition, you have
19    Exhibit 57?
20         A.    Yes.
21         Q.    And 57 are claims notes that were opened
22    for the umbrella policy?
23         A.    Yes.
24         Q.    And that is an umbrella policy that was
25    also applicable to Mr. Cawthorn's claim against Bob

Page 87

1   Ledford RV & Marine?

2        A.   Yes.

3        Q.   Are there any other claims notes

4   associated with that open umbrella claim other than

5   what I've represented here in Exhibit 57?

6        A.   No.

7        Q.   Apart from what we have in Exhibit 2 and

8   Exhibit 57, are these all of the formal claims

9   notes that were generated by Auto-Owners with

10  respect to the Cawthorn claim against Bob Ledford

11  RV & Marine and Bradley Ledford?

12       A.   Yes.

13       Q.   Are there informal notes taken?

14       A.   No.

15       Q.   And from your work as the adjuster, were

16  there any other notations other than these notes in

17  Exhibit 2 and Exhibit 57 and the correspondence

18  reflected in the claims file that you created in

19  connection with the Cawthorn-Ledford claim?

20       A.   There are no other notes.

21       Q.   Okay.  There's not like a personal diary

22  where this would come up or something like that?

23       A.   No.

24       Q.   And I didn't think so, but you

25  understand the purpose here is for me to figure out

Page 88

1    what the world of the evidence is and then narrow

2    it down.

3              A.    Absolutely.

4              Q.    And so having received the claims, all

5    the correspondence that's in the claims file and

6    Exhibit 2 and Exhibit 57, that should be all the

7    information that Auto-Owners has with respect to

8    the Cawthorn-Ledford claim, excepting privilege

9    logs and documents generated after November 10th of

10   2014, which I represent to you have not been given

11   to me?

12             A.    That's all in a claim file, yes.

13             Q.    Can you edit a claims note such as those

14   that appear in Exhibit 2 after one is entered?

15             A.    I believe you can, but the system will

16   show you that it had been removed.  You can't

17   remove it completely.

18             Q.    Okay.  Would that removal show up on the

19   printout that I have as reflected in Exhibit 2?

20             A.    Yes.

21             Q.    Okay.  How would it appear?

22             A.    I'm not sure.

23             Q.    Part of your responsibilities as an

24   adjuster working on the claim is to make the claims

25   notes?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 89

1          A.    Yes.

2          Q.    Okay.  And any adjuster who happens to

3    work on the claim, for example, Reggie Anderson,

4    they equally have a duty to document their efforts

5    in the claims notes?

6               MR. VILMOS:   Object to the form.

7          A.    I don't believe that there's a duty to

8    document every effort that you make on a claim in

9    the claim notes by anyone.

10   BY MR. BONNER:

11         Q.    I'll try to use a different word.

12              Is it a guideline used by Auto-Owners

13   that adjusters should document important matters in

14   the claims notes?

15         A.    I'm not aware of any guideline.

16         Q.    Okay.  Are there no guidelines that

17   apply to when an adjuster should make an entry in

18   the claims notes?

19         A.    I'd have to review the handling guide,

20   but not that I'm aware of, no.

21         Q.    For right now, I just want to know when

22   you were writing these claims notes in 2014, for

23   example, you were not doing so with any particular

24   guideline governing how you did that in mind?

25         A.    That's correct.

Page 90

1        Q.    Okay.  So whatever the guidelines might

2    say, whatever the written ones might say, in 2014,

3    when you wrote these claims notes that are

4    represented in Exhibit 2, it was discretionary when

5    you entered them?

6             MR. VILMOS:   Object to the form.

7        A.    I wouldn't describe it as discretionary.

8    I may have taken phone calls while out of the

9    office or simply allowed a document in the file to

10   complement the notes.  It wasn't a discretion that

11   I necessarily used.

12   BY MR. BONNER:

13       Q.    So what considerations did you take into

14   account when you decided to make a claims note in

15   the Ledford-Cawthorn matter?

16       A.    None specifically.

17       Q.    Okay.  And when I use the word

18   "discretion," I'll admit to you that's kind of what

19   I was getting at.  It was your own choice when to

20   enter a claims note in the Ledford-Cawthorn matter?

21            MR. VILMOS:   Object to the form.

22       A.    I would say yes but with the caveat that

23   I don't know that a specific choice was made

24   anytime I saw the file to note or not note the

25   activity at the time.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 91

1    BY MR. BONNER:

2         Q.   Okay.   Your general practice was to note

3    important activity in the claims file?

4         A.   No.

5         Q.   Okay.   Is it fair to say you didn't have

6    a general practice with respect to when you noted

7    something in the claims file and when you did not?

8         A.   Yes.

9         Q.   Now, the claims file can be reviewed by

10   a supervisor?

11        A.   Yes.

12        Q.   Is that generally how a supervisor knows

13   what's taken place on a claim?

14             MR. VILMOS:   Object to the form.

15        A.   No.   They look at the entire file.

16   BY MR. BONNER:

17        Q.   But it's part of what they look at to

18   see what's happened on a claim?

19        A.   It's a piece of information, yes.

20        Q.   And the other information they would

21   look at would be the remainder of the claims file?

22        A.   That's correct.

23        Q.   So the claims file would include the

24   communications that were sent or received in

25   connection to a matter; correct?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 92

1        A.    Yes.

2        Q.    It would include these claims notes?

3        A.    Yes.

4        Q.    Okay.  And I suppose it would include

5   reports or other evidence that's been collected in

6   a case?

7        A.    That's correct.

8        Q.    And then based on that world of

9   material, then the supervisor would be able to find

10  out what you've done on a claim?

11       A.    That's correct.

12       Q.    Okay.  So the claims notes are at least

13  a component part of how a supervisor knows what's

14  happened on a claim; true?

15       A.    Yes.  Again, a part.

16       Q.    A component part.

17             So insofar as something has happened on

18  a claim that's not documented in an email or a

19  letter or in a police report, the claims notes are

20  the only other place it would be documented?

21             MR. VILMOS:  Object to the form.

22       A.    The only other place it would be

23  documented, but I mean people are human.  I'm sure

24  some things happen that don't get noted.

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 93

1   BY MR. BONNER:

2        Q.   The goal is to have everything

3   documented between the emails, the reports, and the

4   claims notes?

5        A.   Yes.

6        Q.   Okay.  And do you agree with me that

7   between the reports, the claims notes, and the

8   correspondence, Auto-Owners has a guideline that

9   everything important should be included in that

10  world of things?

11            MR. VILMOS:  Object to the form.

12       A.   I'm not aware of a guideline.

13  BY MR. BONNER:

14       Q.   Okay.  In your 19 years working at

15  Auto-Owners, the expectation is that you get

16  everything important included in the claims file?

17            MR. VILMOS:  Object to the form.

18       A.   Everything important to that claim, yes.

19  BY MR. BONNER:

20       Q.   Yes, right.  Whether it's a

21  communication, a copy of an email or a claims note,

22  that particular part doesn't matter.  It just needs

23  to be documented somewhere in the claims file?

24            MR. VILMOS:  Object to the form.

25       A.   Yes.  But, again, it doesn't negate

Page 94

1    other activities that may have been forgotten to be

2    documented.  I mean nobody's --

3    BY MR. BONNER:

4         Q.   Nobody's perfect?

5         A.   Exactly.

6         Q.   And it's okay to be not perfect.

7              All right.  Let's look at the -- I think

8    the last page.  It's Bates-numbered AO 655 of

9    Exhibit 2.

10             We've got two claims notes on 4/7/2014;

11   true?

12        A.   Yes.

13        Q.   The bottom claims note appears to

14   memorialize when Auto-Owners first received notice

15   of this claim?

16        A.   Yes.

17        Q.   It appears that the claim was first

18   assigned to Reggie Anderson?

19        A.   Yes.

20        Q.   Do you know if Reggie Anderson is a male

21   or a female?

22        A.   I believe it's a male.

23        Q.   Okay.  For purposes of my questions,

24   I'll refer to him as "Mr. Anderson."

25             Mr. Anderson's entry states that he

Page 95

1    called the listed number for the insured and spoke

2    to Amber.  Do you see that?

3           A.    Yes.

4           Q.    Okay.  Upon taking over this file later

5    in April, did you come to learn who Amber was?

6           A.    She's an employee at Bob Ledford's RV.

7           Q.    Did you ever speak to Amber?

8           A.    Not that I recall.

9           Q.    I believe Mr. Anderson's claims note

10   also mentions Charles Wilson?

11          A.    Yes.

12          Q.    Is he also an employee at Bob Ledford

13   RV & Marine?

14          A.    Yes.

15          Q.    Did you ever speak to Mr. Wilson?

16          A.    I believe so.

17          Q.    Do you know when you spoke to

18   Mr. Wilson?

19                And let the record reflect the witness

20   is reviewing Exhibit 2.

21          A.    April 21st.

22          Q.    Was April 21st the only time you would

23   have spoken to Mr. Wilson?

24          A.    To my recollection.

25          Q.    Okay.  Is there anything that would

Page 96

1    refresh your recollection?

2         A.   No.

3         Q.   Okay.  There's also a note from

4    Mr. Anderson stating that he received a call from

5    David Ledford; correct?  It's on the page 655 --

6         A.   Yes.

7         Q.   Mr. Anderson reports that he was not

8    able to speak to Mr. Ledford?

9         A.   Yes.

10        Q.   Do you know if Mr. Anderson ever spoke

11   to Mr. Ledford?

12        A.   No.

13        Q.   You do not know, or no, he did not?

14        A.   I do not know.

15        Q.   If you turn to page 654 of Exhibit 2,

16   you'll see a claims note dated April 8, 2014.

17             The note is written by Mr. Anderson, and

18   it indicates that he attempted to follow up with

19   Mr. Ledford on April 8, 2014; true -- strike that.

20   I'm rereading it, and I've misread it.

21        A.   I don't believe so.

22        Q.   It says on April 8, 2014, Mr. Anderson

23   reported that he had still not heard from

24   Mr. Ledford; is that true?

25        A.   Yes.

Page 97

1      Q.   The note written by Mr. Anderson

2   indicates that he spoke to Mr. Ledford's insurance

3   agent; true?

4      A.   Yes.

5      Q.   Okay.  It also reports the agent was

6   forwarding a copy of the investigative report;

7   true?

8      A.   An investigative report.  I don't know

9   that it was an entire report or if it was an

10  exchange.  I don't know exactly what it was.

11     Q.   It indicates that a report of some sort

12  is being forwarded --

13     A.   Yes.

14     Q.   -- to Mr. Anderson?

15          And appropriate thing for Mr. Anderson

16  to do with that report would be to upload it into

17  the claims file?

18          MR. VILMOS:  Object to the form.  It's

19     not a question.

20  BY MR. BONNER:

21     Q.   Question mark --

22     A.   Yes.

23     Q.   Okay.  But because the claim was located

24  in Florida and not South Carolina, Mr. Anderson's

25  note concludes by saying he was transferring it to

```
                                          Page 98
 1   the Ocala's office?

 2              MR. VILMOS:  Object to the form.

 3        A.   Yes.

 4   BY MR. BONNER:

 5        Q.   And that's, in fact, what happened?  It

 6   was transferred to the Ocala office, and you were

 7   the first adjuster to review it?

 8        A.   Correct.

 9        Q.   And it was assigned to you, given the

10   severity of the claim?

11              MR. VILMOS:  Object to the form.

12        A.   Yes.

13              MR. BONNER:  Let's look at a couple

14        documents here.  We're going to mark these

15        up.

16              (Plaintiff's Exhibit 58 was marked for

17        identification.)

18   BY MR. BONNER:

19        Q.   Okay.  Ms. McLean, I'm handing you an

20   exhibit marked as 58.  It is an email to Reggie

21   Anderson from Holly Caldwell.

22              During the course of your handling of

23   the claim, did you come to learn who Holly Caldwell

24   was?

25        A.   Yes.
```

Page 99

1      Q.   She's the agent who represented Bob

2   Ledford RV & Marine?

3           MR. VILMOS:   Object to the form.

4      A.   She's not the agent.   She just works at

5   the agency.

6   BY MR. BONNER:

7      Q.   Okay.  She was somebody, though, at the

8   agency who handled certain aspects of the

9   Cawthorn-Ledford claim, to your understanding?

10     A.   Yes.  She certainly sent this email.

11     Q.   Okay.  Did you receive a copy of that

12  email when the file was transferred to you?

13     A.   I believe so.

14          (Plaintiff's Exhibit 59 was marked for

15          identification.)

16  BY MR. BONNER:

17     Q.   Okay.  And I'm also showing you

18  Exhibit 59.  You can see that exhibit in front of

19  you for now.

20          Exhibit 59 is an Accord loss form?

21     A.   Yes.

22     Q.   These are standard forms in the

23  insurance industry?

24     A.   Yes.

25     Q.   Okay.  Are they generally filled out by

Page 100

1    an agent and then forwarded to an insurance company

2    when there's a claim?

3             A.    Yes.

4                   (Plaintiff's Exhibit 60 was marked for

5             identification.)

6    BY MR. BONNER:

7             Q.    I'm showing you what's marked as

8    Exhibit 60.  Can you identify that document for me?

9             A.    It's an email from Reggie Anderson to

10   the Ocala office.

11            Q.    And would you have received that email

12   from Mr. Anderson?

13            A.    No.

14            Q.    Would you have seen it when you took

15   over the file?

16            A.    Yes.

17            Q.    And the email in front of you is dated

18   April 8 of 2014?

19            A.    Yes.

20                  MR. VILMOS:  Just let the record reflect

21            that Exhibit 59 is entitled General Liability

22            Notice of Occurrence/Claim, and it is Bates

23            labeled AO 00289 through AO 00291.

24   BY MR. BONNER:

25            Q.    Okay.  Looking at Exhibits 58, 59, and

Page 101

1    60, can you confirm that you would have had all

2    three of those documents upon taking over the

3    claim?

4         A.   Yes.

5         Q.   I'm going to show you a document that's

6    previously been marked as Exhibit 7.

7              This is an email between Mr. Anderson

8    and Holly Caldwell, dated April 9, 2014 --

9              MR. VILMOS:  Object to the form.

10   BY MR. BONNER:

11        Q.   -- correct?

12        A.   I'm sorry.  Repeat that.  I was reading

13   it.

14        Q.   Sure, sure.

15             Exhibit 7 is an email between

16   Mr. Anderson and Holly Caldwell, dated April 9th,

17   2014?

18        A.   Yes.

19        Q.   Did Mr. Anderson forward this email

20   between him and Ms. Caldwell to you?

21        A.   I don't recollect seeing this before.

22        Q.   Would this have been available to you in

23   the claims file?

24        A.   No.

25        Q.   Why would it not have been available in

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 102

1    the claims file?

2         A.   You would have to specifically save it

3    to the claims file.  It doesn't automatically just

4    drop in.

5         Q.   Do you know, one way or the other,

6    whether this was saved to the claims file?

7         A.   No, I do not.

8         Q.   Is it possible it was saved to the

9    claims file?

10        A.   I've reviewed the file, and I've never

11   seen this email before.

12        Q.   Okay.

13             MR. MARTINEZ:  What number is that,

14        Allen?

15             MR. BONNER:  That's Exhibit 7.

16             MR. MARTINEZ:  Thank you.

17   BY MR. BONNER:

18        Q.   Did Mr. Anderson contact either you or

19   the Ocala office following his email exchange with

20   Holly Caldwell?

21        A.   Not that I'm aware of.

22        Q.   You did not personally speak to

23   Mr. Anderson on or about April 9th, 2014?

24        A.   Not on that date, no.

25        Q.   Well, just because of the way you

Page 103

1   answered it, what date did you speak to

2   Mr. Anderson?

3          A.   I don't know specifically, but I did

4   tell Mr. Anderson that we weren't going to be able

5   to inspect the vehicle because it was insured with

6   someone else.

7          Q.   When did you have that conversation?

8          A.   I don't know.  It was early on.

9          Q.   Okay.  Is it reflected in Exhibit 2?

10         A.   No.

11         Q.   Is there an email communication

12   memorializing that conversation?

13         A.   No.

14         Q.   Is there any note in the claims file

15   memorializing that conversation?

16         A.   No.

17         Q.   Do you know what else you discussed with

18   Mr. Anderson during that conversation?

19         A.   Likely, nothing else.

20         Q.   So it was likely a short conversation?

21         A.   Very.

22         Q.   How did Mr. Anderson respond to what you

23   told him during that conversation?

24         A.   I believe it was along the lines of I

25   didn't realize there wasn't a dealer blanket

Page 104

1    endorsement on there.

2         Q.    What is a deal blanket endorsement?

3         A.    It's an endorsement to a garage

4    liability policy that provides first-party coverage

5    for dealer-owned vehicles.

6         Q.    And I think you said that you told

7    Mr. Anderson you could not inspect the vehicle?

8         A.    No.  I told him that we wouldn't be

9    inspecting the vehicle, because it was insured by

10   someone else.

11        Q.    And the reason you would inspect the

12   vehicle is if it was insured with Auto-Owners,

13   there would be some sort of casualty insurance?

14             MR. VILMOS:  Object to the form.

15        A.    There might be first-party coverage for

16   the loss of the automobile, yes.

17   BY MR. BONNER:

18        Q.    I mean that's why you mentioned the

19   endorsement.  The endorsement would provide

20   first-party coverage?

21        A.    That's correct.

22        Q.    Okay.  And without first-party coverage,

23   you said you would not investigate or examine the

24   vehicle?

25        A.    Because it was my understanding it was

Page 105

1    insured by someone else who would perform that

2    function.

3           Q.   Okay.   And if another insurance company

4    investigated the vehicle, it would be to pay out

5    the casualty claim; correct?

6                MR. VILMOS:   Object to the form.

7           A.   It would be to pay for the actual

8    vehicle itself.

9    BY MR. BONNER:

10          Q.   Okay.   And so that's what you discussed

11   with Mr. Anderson is the fact that another

12   insurance company would be liable for paying for

13   the damage to the car?

14          A.   I very briefly spoke to Mr. Anderson to

15   let him know:   Hey, there's first-party coverage

16   with somebody else.   We're not inspecting the

17   vehicle.

18          Q.   Okay.   When there's first-party coverage

19   with another insurance company, does that

20   insurance -- that insurance company -- strike that.

21               The vehicle in question was owned by Bob

22   Ledford RV & Marine?

23          A.   According to the police report, yes.

24          Q.   Did you ever come across any information

25   that was contrary to that?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 106

1      A.    No.

2      Q.    You did speak to David Ledford after

3  taking over the file; correct?

4      A.    Yes.

5      Q.    Did you ask David Ledford for permission

6  to investigate the vehicle?

7      A.    No.

8      Q.    Did you speak to Mr. Anderson any other

9  times apart from that conversation?

10      A.    Not that I recall.

11      Q.    And reviewing Exhibit 2, there are no

12  additional conversations between you and

13  Mr. Anderson documented in Exhibit 2?

14      A.    Correct.

15      Q.    And there are no additional

16  conversations between you and Mr. Anderson

17  documented in the claims file that you reviewed in

18  preparation for testifying today?

19      A.    I don't -- let me look.  It's possible

20  that I called him to ask him to email anything that

21  he had after suit had been filed to defense

22  counsel --

23      Q.    Sure.  That's the --

24      A.    -- but other than that -- I mean --

25      Q.    Does Exhibit 2 reflect that you had that

Page 107

1    conversation?

2         A.    Yes.

3         Q.    Okay.  And when did you have that

4    conversation?

5         A.    August 11th.

6               MR. VILMOS:   What year, ma'am?

7               THE WITNESS:   2014.

8    BY MR. BONNER:

9         Q.    Let's see here.  Did Mr. Anderson call

10   you or did you call Mr. Anderson during that first

11   phone call?

12        A.    I would have called him.

13        Q.    And for what purpose would you have

14   called him?

15        A.    To keep him in the loop should he talk

16   to the agent or the insured about the vehicle,

17   again, for some reason that there wasn't

18   first-party coverage.

19        Q.    And what prompted you to call

20   Mr. Anderson to discuss first-party coverage on

21   Mr. Ledford's vehicle?

22        A.    My review of the coverage aspects of the

23   claim.

24        Q.    And why did Mr. Anderson need to know

25   the case had been transferred?

Page 108

1          A.    Again, to keep him in the loop.  Many

2     times agents call the claims offices that they're

3     the most comfortable with to ask questions.

4          Q.    Did Mr. Anderson ever ask you to inspect

5     the insured's vehicle?

6          A.    No.

7          Q.    Did he ever tell you to inspect the

8     insured's vehicle?

9          A.    No.

10         Q.    Going back to Exhibit 10, there's an

11    entry dated April 10th, 2014.  Do you see that

12    entry?

13         A.    I don't have an Exhibit 10.

14         Q.    I mean I said 10, but I meant 2.

15              MR. VILMOS:  Let's just go off the

16         record for just a second.

17              MR. BONNER:  Sure.

18              THE VIDEOGRAPHER:  We're off the record

19         at 12:08.

20              (Break from 12:08 p.m. to 12:10 p.m.)

21              THE VIDEOGRAPHER:  We're back on the

22         record at 12:10.

23    BY MR. BONNER:

24         Q.    There's something I neglected to ask you

25    with respect to Exhibit 57.

Page 109

1           None of the claims notes on Exhibit 57
2    are authored by you; correct?
3           A.   That's correct.
4           Q.   When did you first learn that those
5    claims notes had been entered by Mr. King or
6    Ms. Hagedon?
7           A.   It would have been very soon after
8    May 5th, but I don't recall the exact date.
9           Q.   Did Mr. King alert you to these claims
10   notes or did they automatically appear in your
11   claims file?
12          A.   No.  Actually, Mr. King used to sit next
13   to me, and I heard him speaking with Mr. Ledford at
14   which point I said, "Mike, is that Mr. Ledford with
15   regard to an accident in Florida?"
16          Q.   Did you take over the call at that
17   point?
18          A.   No.  He had finished speaking with him.
19   I didn't interrupt him while he was on the phone.
20          Q.   So when you say shortly, probably the
21   day of or the day after these claims notes were
22   entered you were aware of them?
23          MR. VILMOS:  Objection to form.
24          A.   Yes.
25

Page 110

1    BY MR. BONNER:

2         Q.   And then Mr. King had no further

3    involvement?

4         A.   No.

5         Q.   And there's this entry by Ms. Hagedon on

6    2/24/15.  Who is Ms. Hagedon?

7         A.   I don't know specifically, but that's

8    with regard to an accounting -- a check that had

9    not been cashed after a specific period of time.

10        Q.   You never spoke to Ms. Hagedon about

11   this case, did you?

12        A.   No.

13        Q.   And with respect to your conversation

14   with Mr. King, did Mr. King tell you any

15   information about his conversation with David

16   Ledford that is not reflected in his entry of 5514

17   on Exhibit 57?

18        A.   Not that I recall.

19        Q.   Did he tell you anything about the claim

20   that is not reflected on Exhibit 57?

21        A.   We may have casually discussed it when I

22   realized he had a claim that was the companion to

23   mine, but I can't recall anything specific.

24        Q.   And there's nothing that will refresh

25   your recollection?

Page 111

1        A.    No.

2        Q.    Let's see if I can get use out of the

3   last three minutes of this tape.

4              Okay.  On April 10, 2014, referencing

5   Exhibit 2, you spoke to David Ledford, owner of the

6   Bob Ledford RV & Marine?

7        A.    No.  His voice mail was full.

8        Q.    Oh, I'm sorry.  You attempted to contact

9   Mr. Ledford?

10       A.    Yes.

11       Q.    Okay.  Did you also attempt to contact

12  Holly Caldwell on April 10th, 2014?

13       A.    Not that I recall.

14       Q.    And there's no entry reflecting that you

15  attempted to call Holly Caldwell on April 10, 2014,

16  on Exhibit 2?

17       A.    That's correct.

18       Q.    There's nothing else that would refresh

19  your recollection on this issue?

20       A.    No.

21       Q.    Your note of April 10, 2014, states that

22  you are ordering the police report; is that

23  correct?  Did you order the police report?

24       A.    Yes.

25       Q.    How did you do that?

Page 112

1        A.    I would have either manually entered it

2   myself or sent a request to the support staff to

3   order it.

4        Q.    And it's just an online form?

5        A.    Yes.

6        Q.    Did you use a particular person during

7   the Cawthorn-Ledford claim as your support?

8        A.    No.

9        Q.    The police report referred to in the

10  April 10th, 2014, entry is different than the

11  investigative or the report that's referred to in

12  Mr. Anderson's entry of 4/8/14; correct?

13            MR. VILMOS:  Object to the form.

14       A.    Yes.

15            MR. BONNER:  We're done?

16            THE VIDEOGRAPHER:  Yes, sir.

17            MR. BONNER:  All right.  We can go off

18       the record.

19            THE VIDEOGRAPHER:  This is the end of

20       disk No. 1 in the deposition of Pamela McLean

21       to be continued on disk No. 2.  We're off the

22       record at 12:14 p.m.

23            (Lunch break from 12:14 p.m. to

24       12:53 p.m.)

25            (Continued in Volume II.)

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 113

1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
2
                   CASE NO. 6:16-CV-2240-Orl-28GHK
3

4

5    DAVID MADISON CAWTHORN,

6         Plaintiff,

7    vs.

8    AUTO-OWNERS INSURANCE COMPANY,

9         Defendant.
     _____/
10

11                    VIDEOTAPED DEPOSITION OF

12                     PAMELA TORRES MCLEAN

13                  Volume II (Pages 113 - 293)

14              Taken on Behalf of the Plaintiff

15             DATE TAKEN:  May 11, 2017

16             TIME:        9:35 a.m. - 4:53 p.m.

17             PLACE:       Burr Forman
                            200 South Orange Avenue
18                          Orlando, Florida

19

20        Examination of the witness taken before:

21          Lance W. Steinbeisser, RPR CSR FPR
                   Certified Stenographer
22

23

24

25

Page 114

1          (Proceedings continued from Volume I.)

2          THE VIDEOGRAPHER:  This is the beginning

3     of disk No. 2 in the deposition of Pam

4     McLean.  We're back on the record at 12:53.

5          DIRECT EXAMINATION (continued)

6  BY MR. BONNER:

7     Q.   Okay.  Ms. McLean, thank you.  I hope

8  you had a nice lunch.

9          I'm going to show you what's been

10 previously marked as Exhibit 6.  When we left off

11 in Exhibit 2, I believe you just testified that

12 there was an entry memorializing that you had

13 ordered the police report -- and this would be on

14 page 654, the entry dated 4/10/14.

15     A.   Yes.

16     Q.   Okay.  I believe you said earlier today

17 that you received the report on the 17th of April

18 2014?

19     A.   Yes.

20     Q.   And is that reflected on Exhibit 2?

21     A.   No.

22     Q.   How do you know that you received the

23 police report on April 17, 2014?

24     A.   I'm assuming it was noted in the file --

25 or I mean that it was in the file with the

Page 115

 1    April 17th date on it.  Is there a --

 2         Q.   All right.  So it was something you

 3    reviewed in preparation for today.  You saw a

 4    document that was dated 4/17/14?

 5         A.   Right.  It would have been the police

 6    report, though, not an additional document.

 7         Q.   Okay.  Is this not the police report?

 8         A.   Yes.

 9         Q.   This is the police report?  This is the

10    Florida Traffic Crash Report --

11         A.   This is a copy of the police report,

12    yes.

13         Q.   All right.  And is this the document

14    that you received on April 17, 2014?

15         A.   Yes.

16         Q.   Okay.

17              MR. VILMOS:  I'm sorry.  Can you go back

18         two or three questions about the Exhibit 2

19         reference?

20    BY THE REPORTER:

21              "QUESTION:  And is that reflected on

22         Exhibit 2?

23              "ANSWER:  No."

24    BY MR. BONNER:

25         Q.   Is the receipt of the police report

Page 116

1   reflected on Exhibit 2?

2          A.    No.

3          Q.    That's what I had understood as well.

4                Okay.  If you look at --

5          A.    Hold on just a second.  Did you ask me

6   if Exhibit 6 was the police report?

7          Q.    I did.

8          A.    Because I don't believe that 1305 and

9   1306 would have come with that.

10         Q.    Okay.  So did you receive either 1305 or

11  1306 in connection with your request for a police

12  report?

13         A.    I don't believe so, no.

14         Q.    Did you receive pages 1302, 1303, and

15  1304 in connection with your request for the police

16  report?

17         A.    Yes.

18         Q.    Okay.  Did you receive any additional

19  pages to the police report in response to your

20  request?

21         A.    It doesn't appear so.  I can't say for

22  sure.

23         Q.    Now, the document that appears in

24  Exhibit 6 as 1305, I believe that document is

25  attached to Exhibit 58.  I'm going to show you the

Page 117

1   second page of Exhibit 58.

2       A.   Yes.

3       Q.   Okay.  And this Exhibit 58 was an email

4   from Holly Caldwell to Reggie Anderson, and I

5   believe you testified that you would have received

6   Exhibit 58 when you received the file?

7       A.   Can I see that again?

8       Q.   Sure.

9       A.   From Holly to Reggie, yes.  I'm sorry.

10  Yes, you are correct.

11      Q.   Do you still want to see it?

12      A.   No.

13      Q.   So you would have had --

14           MR. VILMOS:  I'm sorry.  For the record,

15      do you have Exhibit 2 in front of you?

16           THE WITNESS:  Yes.

17  BY MR. BONNER:

18      Q.   So page 1305 you would have received on

19  or before April 17, 2014; correct?

20      A.   Yes.

21      Q.   Let's go to page 1306 of Exhibit 6.

22  This is a Florida Highway Patrol Vehicle Tow slip.

23  Have you seen one of these that's not completed

24  before?

25           MR. VILMOS:  Object to the form.

Page 118

1          A.    I don't believe so.  I don't know.

2     BY MR. BONNER:

3          Q.    Okay.  Let me rephrase the question.

4                Have you ever seen a Florida Highway

5     Patrol Vehicle Tow slip in the 19 years that you've

6     handled auto liability claims in Florida?

7          A.    Yes.

8          Q.    And the Florida Highway Patrol has a

9     standard form, and this is it for vehicle tows?

10         A.    I have no idea if that's their only

11    form.

12               MR. VILMOS:  Object to the form.

13    BY MR. BONNER:

14         Q.    But this is a form that you've seen

15    before?

16         A.    Yes.

17         Q.    And have you acquired documents like

18    page 1306 of Exhibit 6 in the course of handling

19    other claims?

20         A.    Yes, but not with a police report

21    request.

22         Q.    Okay --

23               MR. VILMOS:  I just want to make a

24         standing objection to Exhibit 6 to the extent

25         that the witness said it was two documents

Page 119

1           seemingly put together as one.

2    BY MR. BONNER:

3           Q.   Well, it's been authenticated already,

4    so...

5                Let's go back to page 1306, because I

6    don't think there's any question that you're saying

7    that you did not receive 1306 in connection with

8    your police report request; correct?

9           A.   I don't believe so, no.

10          Q.   Okay.  Do you know how to request a

11   Florida Highway Patrol Vehicle Tow slip?

12          A.   No.

13          Q.   Have you ever requested a Florida

14   Highway Patrol Vehicle Tow slip in connection with

15   investigating any of your auto liability cases?

16          A.   No.

17          Q.   How is it that you've come to receive

18   these in past cases?

19          A.   They would have been submitted by the

20   insured or the agent or some other party.

21          Q.   But you're aware that these exist?

22          A.   Yes.

23          Q.   Okay.  And they're typically filled out

24   when a vehicle is towed --

25                MR. VILMOS:  Object to the form.

Page 120

1    BY MR. BONNER:

2         Q.    -- from the scene?

3         A.    I have no idea what their protocol is.

4         Q.    In the cases where you have seen these

5    before, they've all involved automobiles that have

6    been incapacitated because of an accident?

7         A.    Well, it's a vehicle tow report.

8         Q.    Right.  So yes?

9         A.    Yes.

10        Q.    When you make a request for the Florida

11   Traffic Crash Report, you do that through the

12   Department of Highway Safety and Motor Vehicles?

13        A.    No.

14        Q.    Where do you do that from?

15        A.    LexisNexis.

16        Q.    Have you ever attempted to obtain a

17   vehicle tow slip through LexisNexis?

18        A.    No.

19        Q.    Have you ever had to contact the Florida

20   Highway Patrol in the 19 years that you've

21   investigated auto liability claims in Florida?

22        A.    Yes.

23        Q.    So you know how to do that?  Yes?

24        A.    Yes.

25        Q.    Now, let's see.  I believe if you turn

Page 121

1    to Exhibit 2, you have an entry that continues from

2    page 653 to 654, dated 4/17/14.  It says "received

3    police report."  So actually, this does say that

4    you received a police report on that day; correct?

5          A.    Yes.

6          Q.    Okay.  And "confirming facts as

7    reported.  Insured appears liable."

8                The facts that had been reported to you

9    at that point were what?

10         A.    That Bradley had fallen asleep and

11   driven off the road and hit a concrete barrier.

12         Q.    And who had provided those facts to you

13   prior to 4/17/14?

14         A.    David Ledford.

15         Q.    And when had you spoken to David

16   Ledford?

17         A.    I don't recollect from this exhibit, but

18   there's an email that I sent to our legal

19   department memorializing that conversation.  That

20   be would the date.

21         Q.    You sent an email to the legal

22   department prior to 4/17/2014 --

23         A.    I don't know the date.

24         Q.    Okay.  I believe you did send an email

25   to the legal department on Monday, April 28th,

Page 122

1    2014.  This is a little ahead of where I am, but I

2    think this might clarify.  This is Exhibit 8 that

3    I'm showing the witness.

4              Have you seen this email before?

5         A.   Yes.

6         Q.   When you referred to a moment ago an

7    email that memorialized a conversation you had with

8    Mr. Ledford, is Exhibit 8 that email?

9         A.   Yes.

10        Q.   May I have Exhibit 8 back.

11             Okay.  So prior to 4/17/14, where did

12   the information regarding what had happened -- the

13   information that was confirmed by the police

14   report, where did that information come from?

15             MR. VILMOS:  Object to the form.

16        A.   From the notes that Mike made in the

17   umbrella file, and I also had a conversation with

18   Mr. Ledford that is not noted in the claim notes.

19   BY MR. BONNER:

20        Q.   Okay.  The notes from Mike King are

21   Exhibit 57, and I don't see any claims notes here

22   that are dated before April 17, 2014 --

23        A.   You're right.  I didn't hear you ask me

24   before 4/17.

25        Q.   That's fine.  I'm going to reask it

Page 123

1    again, and it's not to be redundant.  I just want

2    to see if I can understand your testimony.

3              Prior to 4/17/2014, from where had you

4    received information about the accident?

5         A.   The loss notice, and I guess that's

6    about it.

7         Q.   Okay.  So just to make sure the record's

8    clear.  Prior to April 17, 2014, you had not spoken

9    to David Ledford; correct?

10        A.   I feel -- yes, I did.

11        Q.   Oh, okay.

12        A.   Like I said before, it just isn't noted

13   in the file.

14        Q.   So during that conversation with

15   Mr. Ledford, did you talk about the facts of the

16   accident?

17        A.   Not that I recall.

18        Q.   Okay.  The conversation with Mr. Ledford

19   that would have taken place before 4/17/14, it's

20   not noted in the claims diary in Exhibit 2;

21   correct?

22        A.   That's correct.

23        Q.   If you can, tell me everything you can

24   recall about that conversation.

25        A.   I don't have a specific recollection of

Page 124

the content.

2    Q.   And is it fair to say that nothing would
3  refresh your recollection?

4    A.   That's correct.

5    Q.   You do not think that you spoke about
6  the facts of the accident?

7    A.   No.

8    Q.   Is there a reason why you say that?

9    A.   I believe it was a quick call, he didn't
10  have time to talk, or something along those lines.

11    Q.   Did he call you or did you call him?

12    A.   My recollection is that I called him.

13    Q.   Okay.  And you've said that there's no
14  claim notes specifically referencing that
15  conversation with Mr. Ledford.

16       Is there any documentation anywhere that
17  you're aware of that memorializes that conversation
18  with Mr. Ledford?

19    A.   Nothing other than my telling you that
20  it happened.

21    Q.   That's fine.  If there were a document,
22  I would ask your lawyer for it.  All right.  Thank
23  you very much.

24       You're confident that the date is before
25  April 17, 2014?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 125

1           A.    I couldn't say with a hundred percent

2    certainty, but I feel, yes, that it was.

3           Q.    Okay.  And part of the reason you can't

4    say with certainty is there's no document that

5    memorializes the date?

6           A.    That's correct.

7           Q.    So looking at your claims note from

8    4/17/14 on Exhibit 2, where you said, "insured

9    appears liable," that assessment never changed;

10   correct?

11          A.    Yes.

12          Q.    Yes, it did change, or...

13          A.    You said it never changed, and I said

14   never changed.

15          Q.    Okay.  Thank you.

16                And by "insured," you meant both Bradley

17   Ledford and Bob Ledford RV & Marine?

18          A.    No.  The only insured here is Bob

19   Ledford's RV & Marine.

20          Q.    But Bradley Ledford is an additional

21   insured; correct?

22          A.    No.

23          Q.    What is he?

24          A.    He's a permissive user.

25          Q.    Okay.  He's a permissive user.

David Madison Cawthorn v. Auto-Owners Insurance Company                Pamela McLean | 5/11/2017

Page 126

1          He is insured under the garage policy;

2     correct?

3          A.   No.

4          Q.   Okay.  So --

5          A.   He used an insured vehicle with

6     permission, and we provided coverage to him, but he

7     is not an insured.

8          Q.   Okay.  Is that like an omnibus insured

9     then?

10         A.   I'm sorry.  I'm not familiar with that

11    term.

12         Q.   But when you say you provide coverage

13    for him, you provided him with a defense; correct?

14         A.   For the circumstances in this accident,

15    but he's not an insured under the policy.

16         Q.   Okay.  Let me backpack out.

17              You provided coverage to Bradley

18    Ledford; correct?

19         A.   For this accident, yes.

20         Q.   Yes.

21              And you provided a defense for Bradley

22    Ledford; correct?

23         A.   Yes.

24         Q.   And I believe there are documents that

25    acknowledge Bradley Ledford as being protected as

Page 127

1    an insured?

2        A.   I don't know if it's characterized as an

3    insured.

4        Q.   Okay.  So it's your position that this

5    was a volunteer defense?

6             MR. VILMOS:  Object to the form.

7        A.   He qualified for coverage under our

8    policy; so we defended him --

9    BY MR. BONNER:

10       Q.   Okay.

11       A.   -- but he is not a named insured.

12       Q.   I never said "named insured."

13       A.   He's not an insured in any way.

14       Q.   Okay.  But if he's covered by the

15   policy, how is that different than being an insured

16   by the policy?

17       A.   If he had been driving a vehicle that

18   was not owned by Bob Ledford's RV, we wouldn't have

19   provided any coverage or defense to Bradley

20   Ledford.

21       Q.   But because he was provided coverage --

22       A.   Correct, as a permissive user.

23       Q.   And the policy terms provide coverage

24   for permissive uses?

25       A.   Yes.

Page 128

1      Q.   And perhaps we're just getting hung up
2  on terms here.  But when you provide coverage to a
3  permissive user because that's covered by the
4  policy, that renders the permissive user what?
5      A.   A covered party.  It doesn't give them
6  insured status.
7      Q.   Okay.  So what is "insured status"?
8      A.   The first named insured in the policy
9  and if a person who's resident spouse.
10      Q.   But there can be other people who are
11  covered by a policy who are not the named insured
12  or the covered spouse?
13           MR. VILMOS:  Asked and answered.
14      A.   That's correct.
15  BY MR. BONNER:
16      Q.   And for purposes of my questions --
17  because I -- terminology is not going to matter.
18  For purposes of my questions, when I refer to
19  Bradley Ledford as an insured, I'm not referring to
20  him as the named insured, and I'm not referring to
21  him as the spouse.  I'm simply referring to the
22  fact that coverage was provided to him under the
23  terms of the policy.  Okay?
24      A.   Okay.
25      Q.   All right.  So using that terminology,

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 129

1    when you write here that it appears that the

2    insured appears liable, did you mean to exclude

3    Bradley Ledford from that?

4         A.   No.

5         Q.   Okay.  So when you are saying that the

6    insured appears liable, did that mean both Bradley

7    Ledford and Bob Ledford RV & Marine?

8         A.   No.  It meant the insured Bob Ledford's

9    RV & Marine appeared liable.

10        Q.   Okay.  And if Bradley Ledford appeared

11   liable, would Auto-Owners still have to cover that

12   claim?

13        A.   I can't think of a circumstance where he

14   would be liable and Bob Ledford's wouldn't.

15        Q.   Okay.  That might be true, but my

16   question still remains the same.

17             If Brad Ledford was found liable,

18   wouldn't Auto-Owners have to provide coverage to

19   Bradley Ledford?

20             MR. VILMOS:  Form.

21        A.   Yes.

22   BY MR. BONNER:

23        Q.   Okay.  And it's not Bob Ledford that

24   fell asleep at the wheel; correct -- Bob Ledford RV

25   & Marine -- it's Bradley Ledford?

Page 130

1          A.    I'm assuming that's a rhetorical

2    question.

3          Q.    Right.

4                Bradley Ledford fell asleep at the

5    wheel?

6          A.    That is correct.

7          Q.    And it's because Bradley Ledford fell

8    asleep at the wheel that you concluded that Bob

9    Ledford RV & Marine was liable?

10         A.    No.   It's because the owner of a vehicle

11   is responsible for its use no matter who's driving

12   it in Florida, and that made the insured liable.

13         Q.    Okay.   And because Bradley Ledford was

14   driving the vehicle and caused an injury to Madison

15   Cawthorn, you concluded that Bob Ledford RV &

16   Marine was liable?

17               MR. VILMOS:   Object to the form.

18         A.    Yes.

19   BY MR. BONNER:

20         Q.    And after April 17, 2014, you did not

21   investigate the liability of Bob Ledford RV &

22   Marine further; true?

23         A.    I don't specifically remember that, no.

24         Q.    Okay.   Because this police report, if

25   you go to the second page of the police report

Page 131

1    Bates numbered 1303, you'll see three witnesses

2    identified:  John Wandeck, Chuck Medovich, and

3    Robert Northrop; true?

4          A.   Yes.

5          Q.   And you did not investigate or interview

6    any of those witnesses; correct?

7          A.   No.

8          Q.   And you'll see here under Madison

9    Cawthorn, David Madison Cawthorn is identified as

10   the passenger in Bob Ledford RV & Marine's vehicle;

11   true?

12         A.   Yes.

13         Q.   It notes his injury severity as

14   incapacitated; correct?

15         A.   Yes.

16         Q.   And it states under "airbags deployed,"

17   two not deployed; true?

18         A.   Yes.

19         Q.   And you did no investigation of whether

20   or not the airbags deployed in Bob Ledford RV &

21   Marine's vehicle; true?

22         A.   No.

23         Q.   That means you did no investigation;

24   correct?

25         A.   I did not.

Page 132

1       Q.    In this report at the bottom lists

2    Trooper KM Ruede; correct?

3       A.    Yes.

4       Q.    Okay.  Florida Highway Patrol, Badge

5    No. 3401; correct?

6       A.    Yes.

7       Q.    Okay.  And you did not call and

8    interview Trooper Ruede?

9       A.    No, because I believe that I had

10   gathered the information to confirm liability was

11   adverse to the insured already.

12      Q.    That's exactly my point.

13            As of April 17, 2014, you had concluded

14   on the basis of this police report that Bob Ledford

15   RV & Marine was liable for the injuries sustained

16   by Madison Cawthorn; correct?

17      A.    Because it confirmed the loss notice

18   submitted by the agent after speaking with the

19   insured that Bradley nodded off, causing the

20   accident.

21      Q.    Okay.  So as of April 17, 2014, you

22   believe you had sufficient information to conclude

23   that Bob Ledford RV & Marine was liable for this

24   accident?

25      A.    Yes.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 133

1      Q.    Okay.  And because you had sufficient

2   information that Bob Ledford RV & Marine was liable

3   for this accident, you did not perform any

4   additional investigation into liability of this

5   accident?

6      A.    I did not believe it was necessary.

7      Q.    Okay.  The police report on page 2 says

8   that Madison Cawthorn was transported to Halifax

9   Hospital by helicopter due to life-threatening

10  injuries; correct?  This is in the narrative --

11     A.    Yes.

12     Q.    -- the last sentence --

13     A.    Yes.

14     Q.    -- in very, very small print.

15           But you agree that's what it says;

16  correct?

17     A.    Yes.

18     Q.    Okay.  Let's go back to Exhibit 2, the

19  claims notes.

20           There is a note from 4/17/14 that says

21  disclosure to Progressive.  Do you see that note?

22     A.    Yes.

23     Q.    Is that a typo?

24     A.    Yes.

25     Q.    Okay.  Did you intend to say USAA?

Page 134

1          A.    Yes.

2                (Plaintiff's Exhibit 61 was marked for

3          identification.)

4    BY MR. BONNER:

5          Q.    And I'm going to show you an exhibit

6    that I'm going to mark as Exhibit 61.

7                Ms. McLean, I just remembered that your

8    pronunciation is different than the way I want to

9    say it as it's spelled, which is throwing me off.

10               Ms. McLean, can you confirm that you

11   received Exhibit 61?

12         A.    Yes.

13         Q.    And you received this on or about

14   April 17, 2014?

15         A.    Yeah, it looks like it was faxed to us

16   on April 9th.

17         Q.    I was referencing your disclosure

18   letter.  Do you know if you saw this before

19   April 17, 2014?

20         A.    I have no idea.

21         Q.    But in response to receiving Exhibit 61,

22   you did prepare an insurance disclosure for USAA?

23         A.    Yes.

24         Q.    And USAA was the auto insurer for

25   Timothy R. Cawthorn?

Page 135

1          A.   Yes.

2          Q.   You later identified Timothy R. Cawthorn

3     was one and the same with Roger Cawthorn, Madison's

4     father?

5          A.   I don't specifically remember.

6          Q.   I'm going to get a little ahead of

7     myself.

8               You did have a conversation with

9     Madison's father at some point?

10         A.   Yes.

11         Q.   And he identified himself as Roger

12    Cawthorn?

13         A.   I'm not sure.

14         Q.   Do you have any reason to believe that

15    Timothy R. Cawthorn is not the same person as

16    Madison's father?

17         A.   No.

18         Q.   In fact, you believe that to be the

19    case?

20         A.   Yes.

21         Q.   There's no particular date in Exhibit 2

22    that corresponds to the date of April 9th, 2014,

23    the date that Exhibit 61 would have been faxed?

24         A.   No, there's not.

25         Q.   Okay.  This is a disclosure with regards

Page 136

1    to Timothy Cawthorn, but it states that the injured

2    party is David Madison Cawthorn.

3              When you received that, did you

4    interpret that as meaning that David and Timothy

5    Cawthorn were related?

6         A.   I don't know that I ever entertained any

7    thought about that at all.

8         Q.   Okay.  Did you notice that the

9    policyholder was not the same as the injured party?

10        A.   Yes.

11        Q.   And did you attach any significance to

12   that --

13        A.   No.

14        Q.   -- maybe these were related people or

15   something like that?

16        A.   No.

17        Q.   If you turn back -- I'll take that

18   exhibit back, because I think that's all the

19   questions I have for it.

20              If you turn back to Exhibit 2, there's

21   another claims note dated 4/17/14.  It says,

22   "Sending BI package to claimant."  Correct?

23        A.   Yes.

24        Q.   The claimant was not Timothy Cawthorn;

25   it was Madison Cawthorn; correct?

Page 137

1          A.    Yes, known to me as "David" at the time.

2          Q.    Known to you as "David."  I'm not trying

3    to be tricky.  David Madison Cawthorn?

4          A.    Yes.

5                (Plaintiff's Exhibit 62 was marked for

6          identification.)

7    BY MR. BONNER:

8          Q.    I'm showing you what we'll mark as

9    Exhibit 62.  I'm going to bury you in paper.  Here

10   is 62.

11               Ms. McLean, can you confirm for me that

12   Exhibit 62 corresponds to the BI package that's

13   noted on Exhibit 2 with the entry dated 4/17/14?

14         A.    That's correct.

15         Q.    And it's complete?

16         A.    It would have included a self -- or a

17   postage-paid envelope, but the correspondence is

18   complete.

19         Q.    Okay.  Did you take the body of this

20   letter from a pre-existing template?

21         A.    Yes.  I use this letter often.

22         Q.    Okay.  Would you characterize this

23   Exhibit 62 as a form letter?

24         A.    No.  I often change sentences here or

25   there.

David Madison Cawthorn v. Auto-Owners Insurance Company                  Pamela McLean | 5/11/2017

Page 138

1      Q.   Did you change any sentences with
2  respect to the template you used when drafting
3  Exhibit 62?  And you can disregard the addressee
4  and the address information.
5      A.   Honestly, I don't know.  It saves every
6  time I open it; so it may have had language that I
7  had changed for another one, but not significantly.
8      Q.   Is there any language here that you
9  noted as being specifically tailored to the
10  Cawthorn-Ledford claim?  And, once again, you can
11  disregard the addressee and the address
12  information.
13      A.   Other than needing specifically
14  Mr. Cawthorn's medical records, which it does
15  reference, it's not any different than the one that
16  I would normally send.
17      Q.   The date you drafted this letter
18  April 17, 2014, you had reviewed that Accord loss
19  notice that I showed you earlier today; correct?
20  That was Exhibit 59.  I'm showing the witness.
21      A.   Yes, I had seen that before.
22      Q.   Okay.  Before April 17, 2014?
23      A.   Yes.
24      Q.   Okay.  I'll take that back.
25           And you had also reviewed the police

Page 139

1    report that I showed you or at least the three

2    pages, which you confirmed receiving, that was

3    Exhibit 6?

4          A.    Yes.

5          Q.    And based on those two documents, you

6    know that Mr. Cawthorn had been transported to

7    Halifax Hospital at the time of the accident due to

8    life-threatening injuries; true?

9          A.    Yes.

10         Q.    And you also knew that Mr. Cawthorn was

11   in critical condition based on what was noted on

12   the Accord notice; true?

13               MR. VILMOS:   Object to the form.

14         A.    I know that he was on April 4th when it

15   was reported.

16   BY MR. BONNER:

17         Q.    That's right.  So you knew on April 17th

18   that as of April 4th Mr. Cawthorn was in critical

19   condition; correct?

20         A.    Yes, but I didn't know that he still

21   was.

22         Q.    And as of April 17, 2014, you had not

23   performed an ISO search for Timothy Cawthorn, the

24   individual named on USAA's letter of April 9th of

25   2014?

Page 140

1        A.    I'm not certain.  I know there's an ISO

2   in the file, but I don't know the timing of it.

3        Q.    We'll go ahead and mark the ISO in the

4   file, which I have received from opposing counsel

5   as Exhibit 3.  You'll note that the date on this is

6   April 28, 2014.

7            Is April 28, 2014, the date you

8   performed this ISO search?

9        A.    I did not perform this ISO search.

10       Q.    Who performed this ISO search?

11       A.    It's a system generated match report.

12       Q.    Okay.  Was it generated on April 28,

13   2014?

14       A.    Yes.

15            (Plaintiff's Exhibit 63 was marked for

16            identification.)

17   BY MR. BONNER:

18       Q.    Okay.  You're not aware of any other ISO

19   report that's in the claims file for the

20   Cawthorn-Ledford matter other than Exhibit 63?

21       A.    Correct.

22       Q.    Okay.  So as of April 17, 2014, you had

23   not performed an ISO search of Timothy Cawthorn,

24   the individual listed in USAA's letter of

25   April 9th, 2014?

Page 141

1          A.    That's correct.

2          Q.    And you had not performed an ISO search

3    of Madison David Cawthorn --

4                MR. VILMOS:   Object to the form.

5    BY MR. BONNER:

6          Q.    -- as of April 17 of 2014?

7          A.    No.

8                MR. VILMOS:   Object to the form.

9    BY MR. BONNER:

10         Q.    And, of course, if you look at

11   Exhibit 2, Exhibit 2 reflects that no ISO searches

12   had been performed prior to April 17 of 2014?

13         A.    That's correct.

14         Q.    In looking at Exhibit 2, there's no

15   entry reflecting that you contacted Ms. Caldwell,

16   the person working at Bob Ledford RV & Marine's

17   insurance agency, to inquire whether she had

18   information regarding the location of the injured

19   claimant, Madison Cawthorn?

20         A.    No.

21         Q.    Sticking with Exhibit 2, there's no

22   entry on Exhibit 2 reflecting that prior to

23   April 17, 2014, you contacted USAA to inquire if it

24   knew the location of Mr. Cawthorn?

25         A.    I don't know the date that -- there's

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 142

1   reference in the file somewhere that I spoke with

2   USAA, and they wouldn't give me the Cawthorns'

3   personal information, address or phone number.  I

4   don't know where that is, and I don't know what the

5   date of that was.

6        Q.   Okay.  I'm going to show you what's

7   previously been marked as Exhibit 8.  I showed this

8   to you a little bit ago.

9             This is the email that you had testified

10  memorialized a conversation you had had between

11  David Ledford and yourself.  I believe this is the

12  document that states that you contacted USAA.

13       A.   It doesn't reference any date at all.

14  It's just got the information about USAA in it.

15       Q.   Nothing in Exhibit 8 -- you can keep

16  this in front of you for this question.

17            Nothing in Exhibit 8 reflects that you

18  had contacted USAA prior to April 17, 2014, to

19  learn of the whereabouts of Madison Cawthorn?

20       A.   It doesn't reference a date in any way.

21       Q.   Okay.  So if it doesn't reference a date

22  in any way, it doesn't state that you contacted

23  USAA before April 17, 2014?

24            MR. VILMOS:  Objection to form.

25       A.   It doesn't state that I didn't either.

David Madison Cawthorn v. Auto-Owners Insurance Company                Pamela McLean | 5/11/2017

Page 143

1    It doesn't state it at all.

2    BY MR. BONNER:

3        Q.    Okay.   The information does not appear

4    on Exhibit 8?

5        A.    Either way.

6        Q.    Right.

7              And if you look at Exhibit 2, there's no

8    entry on Exhibit 2 that would tell you, one way or

9    the other, whether you contacted USAA before

10   April 17 to inquire of the whereabouts of Madison

11   Cawthorn; true?

12       A.    That's correct.

13       Q.    In other words, the date that you

14   contacted USAA is not documented in the file?

15       A.    That is correct.

16       Q.    And standing here today, you don't know

17   if you contacted USAA prior to April 17 of 2014?

18       A.    That's correct.

19       Q.    If you look at Exhibit 2, there's no

20   entry memorializing that you contacted Halifax

21   Hospital to find out whether Mr. Cawthorn was a

22   patient there or if he was dead; true?

23             MR. VILMOS:   Object to the form.

24             You can answer.

25       A.    I would not have done so, because in

Page 144

1    prior claims they won't release that information.

2    I knew they would not give it to me.

3    BY MR. BONNER:

4         Q.   So you agree that prior to April 17,

5    2014, you had not contacted Halifax Hospital?

6         A.   Yes.  But, again, like I told you, they

7    won't give you that information over the phone.

8         Q.   And prior to April 17, 2014, you had not

9    contacted Halifax Hospital to inquire whether you

10   could speak to Timothy Cawthorn, the person

11   identified on the USAA letter of April 9th, 2014?

12        A.   No, I did not.

13        Q.   Do you still have Exhibit 61 in front of

14   you?  And I'll take back the ISO search.

15        A.   I don't have 61.

16        Q.   May I have the document?  May I have the

17   police report?

18             Okay.  Is 61 not the right-hand

19   document?  I'm sorry.  What document is that?

20        A.   62.

21        Q.   62.  My apologies.

22             Looking at the letter of April 17, 2014,

23   Exhibit 62, it is addressed to Madison Cawthorn's

24   home address in Flat Rock, North Carolina; correct?

25             MR. VILMOS:  Object to the form.

Page 145

1          A.    Yes.

2     BY MR. BONNER:

3          Q.    That's the address that corresponds to

4     the address listed in Exhibit 6 on the police

5     report?

6          A.    That's correct.

7          Q.    Just looking at Exhibit 62, it lists the

8     insured as Bob Ledford RV & Marine, and states,

9     "It's my understanding that you were injured in an

10    accident with the above-mentioned insured."

11              Correct, that's what it says?

12         A.    Yes.

13         Q.    Madison Cawthorn was involved in an

14    accident with Bradley Ledford; correct?

15         A.    Yes.

16         Q.    Okay.  If you'll turn to the page on

17    Exhibit 62 that's numbered 00450.  Do you see that

18    page?

19         A.    Yes.

20         Q.    Okay.  This is a form called an

21    Authorization for Release of Medical and Employment

22    Information; correct?

23         A.    Yes.

24         Q.    Your letter of April 17, 2014, asked

25    Mr. Cawthorn to sign this form?

Page 146

1         A.    Yes.

2         Q.    If you'll look back at Exhibit 2.

3               There is an entry dated 4/21/14 that

4    reads, "S/W Charlie," which I interpret that to be

5    "spoke with Charlie."  Is that the correct

6    interpretation?

7         A.    Yes.

8         Q.    Charlie is the gentleman who worked for

9    Bob Ledford RV & Marine?

10        A.    Yes.

11        Q.    What was the purpose of your calling

12   Charlie on April 21, 2014?

13        A.    Just making sure that Madison was not an

14   employee and then subject to a coverage exclusion.

15        Q.    Okay.  I think I can take back some

16   paper that's in front of you.  I'll take that

17   Exhibit 62.  And if you need to reference it again,

18   you can ask.

19               Where did you obtain Charlie's contact

20   information?

21        A.    I believe from Mike's notes or was it

22   the -- an agency notice.  I don't know.

23        Q.    Okay.  But, as you said, the purpose was

24   to find out if an exclusion to the policy applied?

25        A.    Correct.

Page 147

1      Q.   Had the exclusion applied, there would

2  be no coverage for Bob Ledford RV & Marine or

3  Bradley Ledford under either the garage or umbrella

4  policies?

5      A.   I'm not certain about the umbrella, but

6  certainly the garage.

7      Q.   All right.  So, in other words, the

8  exclusion would have prevented coverage for Bradley

9  Ledford and Bob Ledford RV on the garage policy for

10  certain?

11      A.   Yes.

12      Q.   As of April 21, 2014, other than the

13  brief conversation that's not reflected on

14  Exhibit 2, had you had any other conversations with

15  David Ledford about this accident?

16      A.   Ask me the beginning part of the

17  question again.

18      Q.   Sure.

19           As of April 21, 2014, had you had any

20  communications with David Ledford other than the

21  brief conversation that's not documented in

22  Exhibit 2?

23      A.   Not that I recall.

24      Q.   And you had not had a conversation with

25  David Ledford regarding the circumstances of the

Page 148

1    accident; correct?

2              MR. VILMOS:   Object to the form.

3         A.   Correct.

4    BY MR. BONNER:

5         Q.   And as of April 21, 2014, you had not

6    spoken to David Ledford regarding Madison

7    Cawthorn's injuries; correct?

8         A.   Correct.

9         Q.   And as of April 21, 2014, you had not

10   spoken to David Ledford regarding whether Madison

11   Cawthorn was still hospitalized; correct?

12        A.   That's correct.

13        Q.   And as of April 21, 2014, you had not

14   spoken to Bradley Ledford; correct?

15        A.   That is correct.

16        Q.   And as of April 21, 2014, you had not

17   spoken to Roger Cawthorn, Timothy Roger Cawthorn,

18   the individual identified on the USAA letter of

19   April 9th, 2014?

20        A.   That's correct.

21        Q.   And as of April 21, 2014, you had not

22   spoken to Mr. Cawthorn, the injured claimant?

23        A.   No.

24        Q.   But as of April 21, 2014, you had

25   investigated whether Auto-Owners had a defense to

Page 149

1    coverage under the garage policy; correct?

2         A.   Yes.

3         Q.   The next entry on Exhibit 2 is dated --

4    I think it's also dated April 21st, 2014, by

5    Stephanie Krauss.  Do you see that entry?

6         A.   Yes.

7         Q.   She's the adjuster that was listed on

8    USAA's letter of April 9th, 2014; correct?

9         A.   I didn't realize that.

10        Q.   Oh, and I might not be accurate.  So

11   let's see.  It's not.  It is Amber Morgan.  Here it

12   is, Exhibit 61.

13             Do you know -- let's see here...

14        A.   Amber Morgan is the sender, and it is

15   addressed to me.

16        Q.   Okay.  Who is Stephanie Krauss?

17        A.   She's another claim person in our

18   office.

19        Q.   And it says, "Claimant carrier is Amber

20   at USAA."  It has Amber's telephone number.

21             But Amber is the person who addressed

22   the Exhibit 61; correct?

23        A.   Yes.

24        Q.   All right.  And do you have any specific

25   recollection of why Ms. Krauss would have entered

Page 150

1   this information?

2        A.    She must have taken a call for me when I

3   was unavailable and noted the information in the

4   file.

5        Q.    Did you ever have a conversation about

6   the substance of that communication?

7        A.    No.

8        Q.    Is there any other record or notes about

9   that communication other than what is reflected in

10  Exhibit 2?

11       A.    No.

12       Q.    I'll take 61 back.

13             The next entry on Exhibit 2 is dated

14  April 7th of 2014, and I just want to note

15  there's -- okay.  So you have an entry from 4/21

16  and then an entry on April 7th, 2014; correct?

17             MR. VILMOS:  Object to the form.

18       A.    It's May 7th, actually.

19  BY MR. BONNER:

20       Q.    May 7th.  Excuse me.  I misspoke.

21             I'm going to show you what's been

22  previously marked as Exhibit 5.

23             Ms. McLean, do you recognize Exhibit 5?

24       A.    Yes.

25       Q.    This is a report you authored on

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                        Page 151

1    April 21, 2014?

2         A.    Yes.

3         Q.    And it was sent to legal?

4         A.    Yes.

5         Q.    Did you know it was going to Ms. Pitman?

6         A.    Yes.

7         Q.    Did you have a conversation with

8    Ms. Pitman on or about the time that you sent this

9    report?

10        A.    Not that I recall.

11        Q.    And there are no notes in Exhibit 2 that

12   document that a conversation between you and

13   Ms. Pitman took place; correct?

14        A.    Correct.

15        Q.    Why was it that you referred this claim

16   to legal?

17        A.    Because I was changing the reserve or

18   opening the reserve -- I'm not sure when the change

19   occurred -- at more than $50,000.

20        Q.    Is there a guideline applicable to

21   adjusters handling auto liability claims that

22   anytime a claim is opened with a reserve over

23   $50,000 that the claim be referred to home office

24   legal?

25              MR. VILMOS:   Object to the form.

Page 152

1          A.   It needs to be reported to legal, and

2     it's in the file reporting guidelines in the claim

3     handling guide we previously discussed.

4     BY MR. BONNER:

5          Q.   So it's a standard thing that you have

6     to do in any case where you open a reserve in

7     excess of $50,000; correct?

8          A.   That's correct.

9          Q.   Do you know why it's a standard

10    practice?

11         A.   No.

12         Q.   Okay.  You said that you set an

13    estimated reserve of $250,000 as of April 21st,

14    2014; correct?

15         A.   Yes.

16         Q.   That was based on the information that

17    was in the police report and the Accord loss form

18    with regards to Mr. Cawthorn's injuries?

19         A.   Yes.

20         Q.   Outside of the information that's

21    contained in Exhibit 5, was there any other

22    information that you were relying upon to set the

23    reserve at $250,000?

24         A.   Yes.  I was relying on the loss notice

25    that said that he was in critical condition -- oh,

Page 153

1    no.  I'm sorry.  That is in the report.

2         Q.   Well, that's in the report, but as you

3    point out, it's also in the Accord loss form;

4    correct?

5         A.   Yes.

6         Q.   So is it fair to say that the

7    information that you included in Exhibit 5 was

8    information you took from the police report and the

9    Accord loss form?

10        A.   Yes.

11        Q.   And it was based on the information in

12   those two documents that you set a $250,000

13   reserve?

14        A.   Yes, and the fact that we had confirmed

15   that there were no coverage issues.

16        Q.   Okay.  You can give me Exhibit 5 back,

17   if you'd like.

18             We looked at the Exhibit No. 8 that

19   reflected the phone call between you and David

20   Ledford.  Do you recall that?

21        A.   I'd like to see it again.

22        Q.   Yeah, of course.  Don't worry.  It is

23   not a test.  I'm showing the witness Exhibit 8.

24             Now, comparing Exhibit 8 to Exhibit 2,

25   you agree with me that there is no claim note in

Page 154

1    Exhibit 2 that corresponds to a telephone call you

2    had with Ms. Canterbury, who was David Ledford's

3    fiancée, and Mr. Ledford on or about April 28,

4    2014?

5          A.    That's correct.

6          Q.    Was the conversation on April 28, 2014?

7          A.    I believe so, yes.

8          Q.    The conversation of April 28, 2014, was

9    the first time you had spoken to Ms. Canterbury;

10   correct?

11         A.    I believe so.

12         Q.    And it was the second time you had

13   spoken to David Ledford; correct?

14         A.    I believe so.

15         Q.    But it was the first time that either

16   Ms. Canterbury or Mr. Ledford described to you the

17   accident and Mr. Cawthorn's injuries?

18         A.    Yes.

19         Q.    You did not speak to Bradley Ledford

20   during the conversation of April 28, 2014; true?

21         A.    I don't believe so.

22         Q.    This document, document 8, states that

23   this is a follow-up to my -- well, "me" -- a

24   typo -- preliminary report, but would it be

25   appropriate for me to call this a follow-up report?

Page 155

1        A.    Yes.

2        Q.    Okay.   The follow-up report is marked

3    "importance high"; correct?

4        A.    Yes.

5        Q.    You wanted Ms. Pitman to look at this

6    report with some degree of urgency?

7              MR. VILMOS:   Object to the form.

8        A.    Yes.

9    BY MR. BONNER:

10       Q.    Okay.

11       A.    So that she would know the reserves were

12   being increased to a level that would alert people

13   that would ask her about it.

14       Q.    Okay.   And you also have more

15   information to share with her in addition to the

16   information you had had on April 21, 2014?

17       A.    Yes.

18       Q.    And this was information that you

19   thought was important to the ongoing investigation

20   of the claim?

21       A.    Well, any new information is important,

22   but the reason I marked this with high importance

23   was so that she would be alerted to the reserve

24   before somebody came to her and said, hey, there's

25   $3 million.   What is this?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 156

1          Q.    "What's happening in the claim, can you

2     justify it, Ms. Pitman, in other words."  Right?

3          A.    Yes.

4          Q.    Okay.  And this explained your

5     justifications for raising the reserves to

6     $3 million; correct?

7          A.    Yes.

8          Q.    And by giving your justifications to

9     Ms. Pitman, she could then communicate those to

10    anyone who asked her what was going on with the

11    claim?

12         A.    Correct.

13         Q.    During Mr. Ledford and Ms. Canterbury's

14    conversation with you on April 28, 2014, they

15    reported to you that Madison was, quote, paralyzed

16    with a spinal cord compromise at T11, end quote.

17              True?

18         A.    Yes.

19         Q.    Mr. Ledford and Ms. Canterbury reported

20    to you that Mr. Cawthorn had sustained a fractured

21    pelvis; correct?

22         A.    Yes.

23         Q.    They reported to you that Mr. Cawthorn

24    had two broken ankles?

25         A.    Yes.

Page 157

1      Q.    They reported to you that Mr. Cawthorn

2   had lost a kidney?

3      A.    Yes.

4      Q.    And they reported to you that

5   Mr. Cawthorn had been on a respirator at some

6   point?

7      A.    Yes.

8      Q.    They reported to you that he was still

9   hospitalized?

10      A.    Yes.

11      Q.    That he was still at Halifax Hospital?

12      A.    Yes.

13      Q.    They described his condition as

14   incredibly serious; correct?

15           MR. VILMOS:   Object to the form.

16      A.    I'm not sure they said that, but it

17   certainly appears so from the description.

18   BY MR. BONNER:

19      Q.    Mr. Ledford and Ms. Canterbury told you

20   that Mr. Cawthorn had almost died?

21      A.    I don't know if they used those specific

22   words.

23      Q.    Apart from what information is contained

24   in Exhibit 8, do you have any recollection of any

25   additional information that Ms. Canterbury or

Page 158

1    Mr. Ledford provided to you during the conversation

2    of April 28, 2014?

3          A.    No.

4          Q.    Your recollection of the conversation is

5    solely drawn from the information that you've

6    memorialized in Exhibit 8?

7          A.    Yes.

8          Q.    Okay.  Mr. Ledford and Ms. Canterbury

9    have both been deposed in this case.

10               Will you affirm or deny that you told

11   them that you would handle this claim?

12               MR. VILMOS:  Object to the form.

13         A.    I don't know if I said exactly those

14   words, but I've represented myself as the person

15   handling the claim.

16   BY MR. BONNER:

17         Q.    Can you affirm or deny that you told

18   Mr. Ledford and Ms. Canterbury that Auto-Owners

19   would be tendering their limits to settle this

20   claim?

21               MR. VILMOS:  Object to the form.

22         A.    I would only have said, "Upon receipt of

23   confirmation of the significance of the injuries."

24   BY MR. BONNER:

25         Q.    Can you confirm or deny that Mr. Ledford

Page 159

1    and Ms. Canterbury told you that Mr. Cawthorn had

2    nearly died multiple times while at Halifax?

3         A.   I do not recollect those specific

4    statements, no.

5         Q.   Did you tell Mr. Ledford and

6    Ms. Canterbury that Auto-Owners would be offering

7    less than its policy limits to settle the claim

8    with Mr. Cawthorn?

9         A.   No.

10        Q.   Did you instruct Mr. Ledford or

11   Ms. Canterbury to assist you in obtaining medical

12   records from Mr. Cawthorn?

13        A.   No.

14        Q.   Did you ask them to assist you in any

15   way in providing you with additional information

16   with respect to the accident or Mr. Cawthorn's

17   injuries?

18        A.   They couldn't get me another person's

19   medical records.  I wouldn't think to ask that.

20        Q.   So you did not in fact ask that?

21        A.   No, because, as I said, there would be

22   no purpose in doing so.

23        Q.   Do you have a recollection of how long

24   the telephone call lasted?

25        A.   No.

Page 160

1       Q.    Did Mr. Ledford call you?

2       A.    I don't recall.

3       Q.    Turning back to Exhibit 8.  According

4   your report, you tell Ms. Pitman that you've

5   increased the reserve in the garage policy to a

6   million dollars; correct?

7       A.    Yes.

8       Q.    A million dollars is equal to the policy

9   limits on that policy; correct?

10      A.    Yes.

11      Q.    You also state in your report,

12  representing Exhibit 8, that the insured has a

13  2 million umbrella policy that is being, quote,

14  opened at the per current limit.

15            Can you confirm that that means that you

16  were setting a $2 million reserve on the umbrella

17  policy as well?

18      A.    Yes.

19      Q.    So in aggregate, you had set a reserve

20  of $3 million on the Cawthorn-Ledford claim?

21      A.    That's correct.

22      Q.    And $3 million was the maximum reserve

23  you could set on that claim?

24      A.    Yes.

25      Q.    And it was equal to the Ledfords'

Page 161

1    complete policy limits; correct?

2         A.   Yes.

3         Q.   And on 4/28/14, when you set that

4    reserve, it reflected your best estimate of

5    Mr. Cawthorn's damages based on the information you

6    had on April 28, 2014?

7              MR. VILMOS:   Object to the form.

8         A.   It was the anticipation of a payment

9    upon receipt of confirmation that those were, in

10   fact, the injuries.

11   BY MR. BONNER:

12        Q.   As of April 28, 2014, you still believed

13   that Bradley Ledford was at fault for causing this

14   accident?

15        A.   Yes.

16        Q.   The letter also references a

17   conversation between you and the USAA adjuster.  I

18   think we talked about that before.

19        A.   Yes.

20        Q.   And the report states that USAA declined

21   to give you Roger Cawthorn's number; correct?

22        A.   Yes.

23        Q.   But do you agree with me that the report

24   does not state that you asked Mr. Ledford or

25   Ms. Canterbury for Roger Cawthorn's number and that

Page 162

1    they declined to give you that information?

2         A.    It does not.

3         Q.    Okay.  And, in fact, you did not ask

4    Mr. Ledford or Ms. Canterbury for the telephone

5    number of Mr. Cawthorn?

6              MR. VILMOS:  Object to the form.  Asked

7         and answered.

8         A.    I appreciate what you're trying to

9    accomplish, but I also, as a parent, didn't want to

10   intrude on these people when they had the

11   information to contact me.  I mean their son was in

12   critical condition.  I wasn't going to stalk them

13   out when I knew they had the information to contact

14   me.

15   BY MR. BONNER:

16        Q.    Auto-Owners represents who?

17             MR. VILMOS:  Object to the form.

18   BY MR. BONNER:

19        Q.    Bob Ledford RV & Marine; correct?

20        A.    Yes, that is correct.

21        Q.    And to the extent they were defending

22   Bradley, they represented Bradley Ledford as well;

23   correct?

24             MR. VILMOS:  Object to the form

25        "represents."

Page 163

1              You can answer that question.

2         A.    That is correct.

3   BY MR. BONNER:

4         Q.    Looking at your report, in addition to

5   the statement regarding USAA, the report also

6   doesn't state that you searched for Roger

7   Cawthorn's contact information via an ISO search or

8   were unable to locate any information for him;

9   correct?

10        A.    No, it does not.

11        Q.    In your report of April 28, 2014, it

12  also doesn't state that you tried to locate Roger

13  Cawthorn's contact information by asking his

14  employer Edward Jones; correct?

15              MR. VILMOS:   Object to the form.

16        A.    I didn't even know he worked for Edward

17  Jones, but my report does state that his insurance

18  adjuster, who had spoken with him previously, would

19  give him my contact information.   It wasn't because

20  I wasn't trying to get in touch with him.   I

21  thought he was going to be contacting me.

22  BY MR. BONNER:

23        Q.    Your report also doesn't reflect that

24  you performed any internet searches to try and

25  identify contact information for Roger Cawthorn;

Page 164

1    correct?

2         A.    That is correct.

3         Q.    Your report continues, quote, please let

4    me know if you want to get defense counsel involved

5    on the front side in order to get this matter

6    concluded without any possibility of excess

7    exposure, end quote; correct?

8         A.    Yes.

9         Q.    You recognize that this was a very

10   serious claim as of April 28, 2014?

11            MR. VILMOS:   Object to the form.

12        A.    Yeah, if the evidence supported what I

13   had been told, yes.

14   BY MR. BONNER:

15        Q.    Based on the evidence you had as of

16   April 28, 2014, and with no additional evidence,

17   you recognized that this was a very serious claim;

18   true?

19        A.    I recognized it was a serious claim, but

20   I didn't have any evidence other than evidence of

21   liability.

22        Q.    When you say you didn't have any

23   evidence, you had spoken to Mr. Ledford; correct?

24        A.    I understand that, but you can't just

25   take what somebody tells you without verifying that

David Madison Cawthorn v. Auto-Owners Insurance Company                        Pamela McLean | 5/11/2017

Page 165

1    it is, in fact, the truth.

2         Q.    And you had also spoken to

3    Ms. Canterbury too; correct?

4         A.    The same goes.

5         Q.    Okay.  And if you look at the bottom of

6    your report, you mention a Facebook page called

7    "Prayers for Madison 2014"; correct?

8         A.    Yes.

9         Q.    And in fact, as of April 28, 2014, you

10   had reviewed the "Prayers for Madison 2014"

11   Facebook page?

12        A.    Yes, I did.

13        Q.    And I assume, because you're diligent at

14   your job, you read the whole thing?

15        A.    Yes, I did.

16        Q.    Okay.  So when I asked you you knew that

17   this was a serious claim as of April 28, 2014, you

18   knew it was a serious claim based on the

19   information you had reviewed; correct?

20        A.    Yes.  But, again, you can't believe

21   everything on Facebook.  I had to have some

22   independent verification of the extent of the

23   injuries before writing a check for $3 million.

24        Q.    There are pictures on Facebook; correct?

25        A.    Yes, but people recover all the time.

Page 166

1       Q.    And there are pictures on Facebook of

2   Mr. Cawthorn specifically?

3             MR. VILMOS:   Object to the form.

4       A.    Which Mr. Cawthorn?

5   BY MR. BONNER:

6       Q.    Madison Cawthorn.

7       A.    Yes.

8       Q.    There are pictures that depicted his

9   injuries; correct?

10      A.    I'm not sure which injuries that you're

11  talking about.

12      Q.    Okay.  And you continued to review the

13  Facebook page even after April 28, 2014; correct?

14      A.    I did.  I had an unbelievable amount of

15  empathy for that family.  I wanted to know what was

16  happening.

17      Q.    And I suspect that you kept yourself, if

18  not daily, up to date, and very regularly; correct?

19            MR. VILMOS:   Object to the form.

20      A.    I don't know that I would say "very

21  regularly."  I don't know.

22  BY MR. BONNER:

23      Q.    Did you check it again before June 11th,

24  2014?

25      A.    Most likely, yes.

Page 167

1      Q.    Okay.  Did you check it after June 11,

2    2014?

3      A.    Most likely.

4            (Plaintiff's Exhibit 64 was marked for

5      identification.)

6  BY MR. BONNER:

7      Q.    I'm showing you an exhibit I'm marking

8    as Exhibit 64.  Here's your copy.

9            MR. VILMOS:  You said 64?

10           MR. BONNER:  Yes, 64.

11           MR. VILMOS:  You wrote 65.

12 BY MR. BONNER:

13     Q.    64.

14           This is a selection of screen captures

15   taken from the "Prayers for Madison 2014" Facebook

16   page, dated from April 4th, 2014, to June 11, 2014.

17           Between the dates of April 4th, 2014 and

18   June 11, 2014, the Facebook page "Prayers for

19   Madison" disclosed that Mr. Madison Cawthorn had

20   had surgery to remove a kidney; true?

21     A.    Yes.

22     Q.    The "Prayers for Madison 2014" Facebook

23   page disclosed that the kidney removal was followed

24   by complications; correct?

25     A.    Yes.

Page 168

1    Q.   The "Prayers for Madison" Facebook page

2 also disclosed that he had a punctured lung; true?

3    A.   I don't know.  I'm looking.

4    Q.   If you go to page 1321, 1324, or 1326.

5         MR. VILMOS:  Can you repeat that last

6    question, Lance?

7 BY MR. BONNER:

8    Q.   The "Prayers for Madison" Facebook page

9 disclosed that Madison had had a punctured lung;

10 correct?

11   A.   First mention is on April 8 on

12 page 1326.

13   Q.   Okay.  Do you agree with me that between

14 April 4th, 2014, and June 11th, 2014, the Facebook

15 page "Prayers for Madison" disclosed that Madison

16 Cawthorn had had a punctured lung?

17   A.   I see mention of it on April 8th.

18   Q.   Okay.  The Facebook page also disclosed

19 that Mr. Cawthorn, Madison Cawthorn, had had a

20 damaged diaphram?

21   A.   Can you reference the page?

22   Q.   1351.

23        MR. VILMOS:  Objection.  Relevance.

24   A.   And what was your question, again?

25

Page 169

1    BY MR. BONNER:

2         Q.    The Facebook page "Prayers for Madison"

3    between April 4th, 2014, and June 11, 2014,

4    disclosed that Mr. Cawthorn had suffered a damaged

5    diaphram?

6         A.    Yes.

7         Q.    Between those same dates, the Facebook

8    page disclosed that Mr. Cawthorn had suffered from

9    a bout of pneumonia while in the hospital; true?

10        A.    What page?

11        Q.    1328.

12        A.    Yes.

13             MR. VILMOS:   The same objection.

14   BY MR. BONNER:

15        Q.    And in between April 4th, 2014, and

16   June 11, 2014, the "Prayers for Madison 2014"

17   Facebook page disclosed that the pneumonia that

18   Madison Cawthorn suffered required him to be placed

19   on a ventilator?

20        A.    Again, page?

21        Q.    1329.

22             MR. VILMOS:   The same objection.

23        A.    It references that he's off the

24   ventilator.

25

Page 170

1   BY MR. BONNER:

2        Q.   Do you agree with me that the Facebook

3   page indicates that he was once on a ventilator?

4        A.   Yes.

5             MR. VILMOS:   Object to the form.

6   BY MR. BONNER:

7        Q.   Between April 4th, 2014, and June 11,

8   2014, the "Prayers for Madison" Facebook page

9   reflects that Madison Cawthorn had had a

10  tracheostomy tube inserted into his throat?

11       A.   Page?

12       Q.   1350 and 1355.

13       A.   Yes.

14       Q.   If you look at page 1350, it indicates

15  that Madison Cawthorn was unable to breathe on his

16  own?

17       A.   Yes.

18            MR. VILMOS:   The same objection.

19  BY MR. BONNER:

20       Q.   If you'll look at page 1354, you can

21  confirm that between April 4th, 2014, and June 11,

22  2014, the Facebook page disclosed Madison Cawthorn

23  had to have his lungs drained?

24            MR. VILMOS:   The same objection.

25       Relevance.

Page 171

1        A.    Mr. Bonner, I agree that the Facebook

2    page has all kinds of information about the

3    terrible injuries that this boy sustained.  Do we

4    have to go through every page this way?

5        Q.    Can you confirm with me that the

6    information that you reviewed between April 4th,

7    2014, and June 11, 2014, on the "Prayers for

8    Madison" Facebook page indicated that Madison

9    Cawthorn had to have his lungs drained?

10            If you would like a specific page

11   number, you can look at 1354.

12       A.    Yes.

13       Q.    Okay.  And the Facebook page disclosed

14   that Madison Cawthorn had had a broken pelvis;

15   true?

16       A.    Yes.

17       Q.    And it disclosed between the dates of

18   April 4th, 2011 [sic], and June 4th, 2011 [sic],

19   that Madison Cawthorn's broken pelvis required

20   surgery; true?

21            MR. VILMOS:  The same relevance

22       objection.

23       A.    Yes.

24            MR. MARTINEZ:  Excuse me for one second.

25       Excuse me for one second.  Let me talk to

Page 172

1       you.

2              MR. BONNER:  Would you like to take a

3       break?

4              THE WITNESS:  No.

5              MR. MARTINEZ:  I would, please.  I would

6       like to go to the restroom.

7              THE VIDEOGRAPHER:  We're off the record

8       at 1:58.

9              (Break from 1:58 p.m. to 2:07 p.m.)

10             THE VIDEOGRAPHER:  We're back on the

11      record at 2:07 p.m.

12  BY MR. BONNER:

13        Q.   Ms. McLean, I realize that these

14  questions about what was on the Facebook page go

15  into some very difficult issues.  I'm here asking

16  these questions because I represent Madison

17  Cawthorn.  I'm not going to ask you all of the ones

18  I have here, but there are a few more that I want

19  to ask you about, specifically because they're

20  important to my case and my client's case.

21             So with respect to the injuries that

22  were depicted on Mr. Cawthorn's "Prayers for

23  Madison" Facebook page between April 4th, 2014, and

24  June 11th, 2014, do you agree with me that the

25  Facebook page disclosed that he had had both of his

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 173

1    ankles broken and that he had had surgery to repair

2    one of his ankles?

3              MR. VILMOS:   Object to the preamble to

4         the question.  Generally, you can answer the

5         question about the ankles.

6         A.   If you can tell me the page.

7    BY MR. BONNER:

8         Q.   Direct your attention to 1326 and 1327

9    and I believe also 1342.

10        A.   Yes.

11        Q.   Okay.  At one point between April 4th,

12   2014, and June 11th, 2014, Mr. Cawthorn's colon

13   became so critically inflated that it necessitated

14   surgical intervention to deflate?

15             MR. VILMOS:   Object to the form.

16        A.   I believe you.

17   BY MR. BONNER:

18        Q.   And that's reflected on page 1345.

19             And according to the information on the

20   "Prayers for Madison" Facebook page between

21   April 4th, 2014, and June 11, 2014, Mr. Cawthorn

22   had a crushed vertebrae in his back, could not

23   control his bowels, and was not able to walk?

24             MR. VILMOS:   The same objection.

25        Relevance.

Page 174

1          A.    I believe that it's in there.

2    BY MR. BONNER:

3          Q.    Now, getting back to your report to

4    Ms. Pitman on April 28, 2014.  There's a

5    statement --

6                MR. VILMOS:   It's Exhibit 8.

7    BY MR. BONNER:

8          Q.    Do you have the email in front of you?

9          A.    Yes.

10         Q.    What's the exhibit number?

11               MR. VILMOS:   It's Exhibit 8.

12   BY MR. BONNER:

13         Q.    You have the statement I pointed out to

14   you before:  "Please let me know if you want me to

15   get defense involved on the front side in order to

16   get this matter concluded without any possibility

17   of excess exposure."

18               Correct?

19         A.    Yes, that is in there.

20         Q.    Now, when you made that statement, you

21   made it with the benefit of the information you had

22   learned in your investigation to that point, which

23   included the review of certain Facebook pages

24   between April 4th, 2014, and the date of your

25   report, April 28, 2014?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 175

1          A.    Yes.

2          Q.    And if I interpret this statement

3    correctly, what you're suggesting is that

4    Ms. Pitman and you discussed making a settlement

5    offer to Madison Cawthorn through defense counsel?

6               MR. VILMOS:   Object to the form.

7          A.    No.

8    BY MR. BONNER:

9          Q.    And the reason I mention that is because

10   if you can settle a case within policy limits, you

11   can, quote, conclude it without any possibility of

12   excess exposure, end quote; correct?

13         A.    Yes.

14         Q.    So one way to interpret this is that

15   you're suggesting to Ms. Pitman that you can avoid

16   an exposure to the Ledfords by doing something, by

17   involving defense counsel, I suppose?

18               MR. VILMOS:   Object to the form.

19         A.    I understand the statement you just

20   made, but you asked me if I said that in

21   anticipation of making a settlement offer, and

22   that's not correct.

23   BY MR. BONNER:

24         Q.    Was it in connection with possibly

25   making a settlement offer?

Page 176

1           MR. VILMOS:   Object to the form.

2      A.   Yes.

3  BY MR. BONNER:

4      Q.   In other words, this was broaching to

5  Ms. Pitman whether or not it was the correct time

6  to get defense counsel involved to discuss whether

7  or not to make a settlement offer?

8           MR. VILMOS:   Objection.

9      A.   No.

10          MR. VILMOS:   It speaks for itself.

11          You can answer the question.

12     A.   No.  We would have required additional

13 information still.  A Facebook page, author

14 unknown, though I believed it, still needs some

15 independent verification.

16 BY MR. BONNER:

17     Q.   But just hiring a defense counsel won't

18 prevent an excess exposure to the Ledfords;

19 correct?

20     A.   I have no idea.

21     Q.   But you understand an excess exposure,

22 because when you wrote it, you were referring to

23 the Ledfords having to pay out of pocket above

24 their limits; correct?

25     A.   I know what an excess exposure is, yes.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 177

1        Q.    And what you were hoping to achieve in

2   sending this report is avoiding the Ledfords facing

3   an excess exposure?

4        A.    Yes.

5        Q.    At least in part that was the purpose of

6   your letter?

7        A.    Yes.

8        Q.    And when you mentioned the Facebook page

9   down at the bottom of your report to Ms. Pitman,

10   you suggest to her that she might want to review

11   it; correct?

12        A.    Yes.

13        Q.    And it wasn't because the information

14   was irrelevant.  It was because you thought

15   Ms. Pitman might find some relevance to that

16   information?

17             MR. VILMOS:  Object to the form.

18        A.    It was mostly because I wanted her to

19   get an overall picture of the claimant.  I was

20   telling her what I was being told about the

21   injuries.  She didn't need to review it for that.

22   I wanted her to see a picture of Madison.

23   BY MR. BONNER:

24        Q.    But you certainly suggested to her to

25   look at the "Prayers for Madison" website and the

Page 178

1    information that was on it?

2         A.    Not for confirmation of injuries, just

3    for an overall picture of the claimant.

4         Q.    Okay.  Ms. Pitman never looked at the

5    "Prayers for Madison" Facebook page.

6              MR. VILMOS:  Object to the form of the

7         question.

8    BY MR. BONNER:

9         Q.    Did you know that?

10             MR. VILMOS:  That's a question at this

11        point.

12        A.    I don't know.

13   BY MR. BONNER:

14        Q.    In response to your report, I believe

15   she sent you what I'm showing you is Exhibit 9.

16             Can you confirm that this is the

17   response that Ms. Pitman sent you following her

18   receipt of your report?

19        A.    Yes.

20        Q.    And it's dated May 8, 2014; correct?

21        A.    Yes.

22        Q.    And in response to your question to

23   Ms. Pitman, "Do you want me to get defense counsel

24   involved on the front side in order to get this

25   matter concluded without any possibility of excess

Page 179

1    exposure," Ms. Pitman does not directly respond to

2    that question; correct?

3         A.   That's correct.

4         Q.   In other words, nothing on Exhibit 9

5    discusses the suggestion to get defense counsel

6    involved; correct?

7         A.   Correct.

8         Q.   And nothing in Exhibit 9 discusses

9    whether or not there's even a possibility of excess

10   exposure to the Ledfords?

11        A.   No.

12        Q.   Her response on May 8, 2014, to your

13   follow-up report of April 28, 2014, does not give

14   you settlement authority to make a settlement offer

15   to Madison Cawthorn in the amount of $3 million;

16   true?

17             MR. VILMOS:   You can answer that

18        question.

19        A.   Correct.

20   BY MR. BONNER:

21        Q.   And, in fact, Ms. Pitman did not give

22   you settlement authority to make a settlement offer

23   to Mr. Cawthorn for $3 million in the entire month

24   of May 2014; true?

25        A.   I don't remember the exact date; though,

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 180

1    the number of references to June 11th would lead me

2    to believe that was the date.

3           Q.   Well, I'll show you a document marked

4    from August 6th.  Let's see if this refreshes your

5    recollection.

6                This is Plaintiff's Exhibit 20.  It's an

7    email from Ms. Pitman to you, dated August 6, 2014.

8                Do you recall receiving this letter?

9           A.   I do.  That was in response to my

10   sending her a copy of a health insurance lien that

11   we finally received with a dollar number on it.

12          Q.   Are you aware of any other document in

13   the claims file that memorializes Ms. Pitman

14   extending you settlement authority to make a

15   $3 million settlement offer to Mr. Cawthorn in

16   exchange for his release of his claims against the

17   Ledfords?

18          A.   We had not received confirmation of the

19   injuries before that date.

20          Q.   Okay.  So, in other words, the document

21   before you as Exhibit 20 is the first time

22   Ms. Pitman extended you settlement authority to

23   make a settlement offer to Mr. Cawthorn for

24   $3 million in exchange for a release of his claims

25   against the Ledfords?

```
                                              Page 181
 1        A.   It's the first time she had the
 2   information necessary to do so.
 3        Q.   But it's also the first time she gave
 4   you authority to do so; correct?
 5        A.   Because she received independent
 6   confirmation justifying the payment of the
 7   $3 million.
 8        Q.   Did she authorize at any time before
 9   August 6, 2014, a settlement offer to Madison
10   Cawthorn in the amount of $3 million in exchange
11   for a release of his claims against the Ledfords?
12        A.   She couldn't have without independent
13   confirmation of the injuries.
14        Q.   And, of course, my question wasn't could
15   she have.  My question was factual.  It was:  Did
16   she?
17        A.   No.
18        Q.   Let's see.  You've got Exhibit 20 in
19   front of you.
20             Can you confirm to me that Ms. Pitman's
21   authority to make a settlement offer in the amount
22   of $3 million to Mr. Cawthorn is equal to the
23   amount for which you set a reserve on the
24   Cawthorn-Ledford matter on April 28, 2014?
25        A.   Yes.
```

Page 182

1      Q.   Can we go back to Exhibit 9?  And, here,

2  I'll collect some documents from you.  Give me the

3  Facebook pages.

4           Okay.  Let's stick to Exhibit 9.

5  Exhibit 9, once again, is Ms. Pitman's response to

6  your follow-up report of April 28, 2014, and she

7  asks, "Is Madison Cawthorn's spinal injury

8  correctable and whether or not the paralysis will

9  resolve."

10          Correct?

11     A.   Yes.

12     Q.   Okay.  If Madison's spinal injury were

13 correctable, that would be information that would

14 be relevant to the amount of a settlement offer

15 that Auto-Owners might make to Mr. Cawthorn in

16 exchange for releasing his claims against the

17 Ledfords?

18          MR. VILMOS:  Object to the form.  It's

19     not a question.

20 BY MR. BONNER:

21     Q.   True?

22     A.   By itself, yes.  But the medical records

23 in their entirety might not affect the settlement

24 offer.

25     Q.   I understand.

Page 183

1          So it's possible that upon receipt of

2    the medical records, Auto-Owners would decide to

3    make a settlement offer in the amount of $3 million

4    to Mr. Cawthorn; correct?

5          A.    I'm sorry.  Ask the question again.

6                MR. VILMOS:  Lance, can you read that

7          back.

8                MR. BONNER:  Actually, you know what?

9          Strike the question.  I'll just move on.

10   BY MR. BONNER:

11         Q.    Specifically with respect to

12   Ms. Pitman's inquiries about whether the spinal

13   injury is correctable and whether the paralysis

14   will resolve.  In Ms. Pitman's view or in your

15   view, that was material to the amount of a

16   settlement offer that Auto-Owners might extend to

17   Mr. Cawthorn?

18               MR. VILMOS:  Object to the form.

19         A.    Certainly, if the information was that

20   it wasn't correctable.

21   BY MR. BONNER:

22         Q.    In the event that the information was

23   that the paralysis was not permanent, it's possible

24   that Auto-Owners would judge the damages as being

25   less than $3 million?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 184

1          A.    It's impossible to say without knowing

2     the extent of the other injuries and whether or not

3     they were permanent in nature.

4          Q.    All I'm asking is is it a possibility?

5          A.    A possibility, yes.

6          Q.    Okay.  And if Auto-Owners extended a

7     $3 million settlement offer to Mr. Cawthorn and it

8     turned out that his injuries were less severe than

9     what had been reported, there's a risk that

10    Auto-Owners would have exhausted the policy limits

11    unnecessarily?

12         A.    I wouldn't consider that a risk.

13         Q.    You wouldn't consider that a risk?

14         A.    No.

15         Q.    Okay.  Ms. Pitman's letter of May 8,

16    2014 is not reflected in Exhibit 2; correct?  It's

17    not memorialized in Exhibit 2.

18         A.    Correct.

19         Q.    Okay.  I apologize.  I'm trying to

20    locate a letter that I do not have properly written

21    down in my notes.

22              This is a document that was previously

23    marked as Exhibit 10.  It's an email from you to

24    Ms. Pitman on April 9th, 2014.

25              This is an accurate copy of an email

Page 185

1    that you sent to Ms. Pitman on April 9, 2014;

2    correct?

3         A.   Yes.

4         Q.   It attaches, I believe, four printouts

5    of the "Prayers for Madison 2014" Facebook page.

6              Did you select those printouts for

7    Ms. Pitman's review?

8         A.   I believe they're the -- I didn't select

9    them from a bunch.  They were the only ones that

10   were in my file.

11        Q.   Well, I guess I was asking who printed

12   them.

13        A.   Oh, I did.

14        Q.   And these are, I guess, posts that you

15   decided or selected to print?

16        A.   Yes.

17        Q.   When you sent Ms. Pitman this, were you

18   aware that Ms. Pitman was not going to

19   independently review the Facebook page "Prayers for

20   Madison 2014" on her own?

21             MR. VILMOS:  Object to the form.

22        A.   I have no idea what she would have done.

23   BY MR. BONNER:

24        Q.   In other words, you didn't have a

25   conversation in which she expressed her intention

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                              Page 186

1   not to review the "Prayers for Madison 2014"

2   Facebook page?

3         A.    No.

4               MR. VILMOS:   Form.

5   BY MR. BONNER:

6         Q.    Between April 28, 2014, and May 9th,

7   2014, did you have any oral conversations with

8   Ms. Pitman about this claim?

9         A.    Not that I recollect specifically.

10        Q.    I understand it's been three years.

11  Confirm for me that there are no oral

12  communications between you and Ms. Pitman reflected

13  in Exhibit 2, the claims notes.

14        A.    No.

15        Q.    Okay.  And you have no independent

16  recollection of a conversation taking place between

17  you two?

18        A.    No.

19        Q.    Okay.  So your sole recollection of your

20  discussions with Ms. Pitman regarding the

21  Cawthorn-Ledford claim between April 28, 2014, and

22  May 9th, 2014, are the emails that I just showed

23  you?

24        A.    Yes.

25        Q.    I previously showed you this ISO search.

Page 187

1    You can give me back that exhibit, and I believe

2    you can give me back the other exhibit.

3              This was an exhibit we previously marked

4    as 63.  This is the ISO report.

5              Sorry.  I've forgotten.  Did you testify

6    that you did not perform this report?

7         A.   That's correct.

8         Q.   Who did?

9         A.   The computer generates it somehow.

10        Q.   Is it automatically generated?

11        A.   Yes.  When a claim gets set up and you

12   enter someone's name, a match -- it doesn't

13   anymore, but at the time a match report would come

14   to you.

15        Q.   Back in 2014, who did the system

16   automatically generate reports for, just the name

17   of insured or would it also have generated one for

18   Bradley Ledford?

19        A.   It would generate one for anybody who

20   had been entered in the system as a party to a

21   claim.

22        Q.   I believe this ISO reflects only Bob

23   Ledford RV & Marine, but please confirm that for

24   me, if you can.

25        A.   Yes, that's correct.

Page 188

1        Q.    Here, I'll have it back.

2              The ISO search reflected in Exhibit 63,

3    it's not reflected on Exhibit 2; correct?

4        A.    No.

5        Q.    But if you look at Exhibit 2, the next

6    activity is on May 7th, 2014; correct?

7        A.    Yes.

8        Q.    And it states that you had received

9    signed medical authorizations from Mr. Cawthorn;

10   correct?

11       A.    Yes.

12       Q.    And these were the authorizations that

13   were attached to your letter of April 17, 2014?

14       A.    Yes.

15             (Plaintiff's Exhibit 65 was marked for

16             identification.)

17   BY MR. BONNER:

18       Q.    We'll mark this as Exhibit 65.

19             Ms. McLean, can you confirm that

20   Exhibit 65 reflects the medical authorizations that

21   you've noted here in Exhibit 2 with a note dated

22   May 7, 2014?

23       A.    Yes.

24       Q.    And this is everything you had received;

25   correct?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 189

1        A.    Yes.

2        Q.    Was there a cover letter or anything?

3        A.    No.

4        Q.    The documents in 65 are marked received

5   May 5th, 2014; correct?

6        A.    That's correct.

7        Q.    If you turn back to Exhibit 2 -- and you

8   may keep the authorizations in front of you as

9   well -- the claims note from May 7, 2014, states

10  that you called Halifax but that Halifax was unable

11  to provide you with records at that time; correct?

12       A.    They won't provide them while a patient

13  is still inpatient.

14       Q.    And that's the reason they explained to

15  you on May 7, 2014, that they could not provide you

16  with medical records at that time?

17       A.    Yes.

18       Q.    Prior to that time, were you aware that

19  Halifax had this requirement that a patient no

20  longer be hospitalized with them before it would

21  release medical records?

22             MR. VILMOS:  Objection to form.

23             You can answer.

24       A.    I didn't know one way or the other.

25

Page 190

1    BY MR. BONNER:

2          Q.    Is that a common, for lack of a better

3    word, obstacle that you encounter in cases

4    involving medical records?

5          A.    No.

6                MR. VILMOS:   Form.

7    BY MR. BONNER:

8          Q.    Is Halifax the only hospital that's ever

9    told you that?

10         A.    I don't recall.

11         Q.    But would you regard Halifax's protocol

12   as unusual?

13               MR. VILMOS:   Object to the form.

14         A.    It's the first time I recollect someone

15   telling me that.

16   BY MR. BONNER:

17         Q.    Okay.  Was May 7, 2014, the first time

18   that you had attempted to contact Halifax Hospital

19   in connection with the Ledford-Cawthorn claim?

20         A.    Yes.

21         Q.    Your transfer note on Exhibit 2, dated

22   May 7, 2014, continues that -- I'm sorry.  I said

23   transfer note.  Strike that.  Let me start over.

24               Your note of May 7, 2014, continues

25   that, "Per Facebook, it looks like he" -- he being

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 191

1    Madison Cawthorn -- "is being transferred to
2    Atlanta soon.  Will check back in seven days."
3             Correct?
4        A.   Yes.
5        Q.   We had this conversation about diary
6    entries earlier today.  Is this an example of
7    something you would have created a diary entry for?
8        A.   Yes.
9        Q.   Okay.  And this clears up my next
10   question, because I noted that the claims notes
11   don't have an entry for May 14.  That would be
12   seven days after May 7; correct?
13       A.   Right.
14       Q.   But I also notice that -- I believe
15   there's a facsimile in this case that memorializes
16   you sending something to Halifax on May 15th, 2014?
17       A.   Yes, I believe that to be true.
18       Q.   Okay.  We'll get to that in just one
19   second.
20            Okay.  If you look back at Exhibit 2,
21   there's another entry dated May 7, 2014, and I
22   believe it says, "fax for records request"?
23       A.   Yes.
24       Q.   Okay.  Can you explain that entry to me?
25       A.   Earlier, as I indicated, you can't alter

Page 192

1  notes after they've been entered.  And I had likely

2  written the fax number for the medical records

3  request on a sticky or something like that, and I

4  wanted to make sure that the information wasn't

5  lost when the time came.

6        Q.   So this is a notation to you of the

7  appropriate fax number to send the medical

8  authorizations to for Halifax?

9        A.   Yes.

10       Q.   Okay.  After May 7, 2014, on Exhibit 2,

11  the next entry is June 11, 2014; correct?

12       A.   Yes.

13       Q.   And that entry states that you spoke to

14  Madison's father.  Can you confirm that the person

15  you spoke to was Roger Cawthorn?

16       A.   He told me that he was.

17       Q.   Okay.  That's fine.

18            The person you spoke to on June 11 told

19  you that his name was Roger Cawthorn?

20       A.   I assume so, yes.

21       Q.   Okay.  And he called you?

22       A.   Yes.

23       Q.   The note dated June 11, 2014,

24  furthermore states that you were sending Madison's

25  father a letter via email that day in order to

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                          Page 193

1    obtain new medical authorizations; correct?

2         A.   Yes.

3              MR. VILMOS:   Object to the extent that

4         it's not exactly what it says, but otherwise

5         no objection.

6    BY MR. BONNER:

7         Q.   Was there anything factually inaccurate

8    about my previous question?

9         A.   Do you want to read it all back?

10        Q.   Let's strike it.  What I'll do is I'll

11   make it real simple.

12             Your entry states that, quote, sending

13   letter via email in order to obtain medical

14   authorizations for records; true?

15        A.   Yes.

16        Q.   And by that, you meant you were sending

17   new authorizations to Madison's father?

18        A.   I was resending a letter that I had

19   addressed to their home that he indicated he had

20   never received, and he asked for it to be sent via

21   email because he wasn't at home.

22        Q.   The letter you're referring to is a

23   letter dated May 27, 2014?

24        A.   Yes.

25        Q.   And there's no entry that corresponds to

Page 194

1    you sending that letter on May 27, 2014, on

2    Exhibit 2; correct?

3         A.   That's correct.

4         Q.   And I'm just going to show you your

5    letter of May 27, 2014.  Can you confirm that

6    Exhibit 12 is the letter of May 27, 2014, that you

7    sent to Roger and Priscilla Cawthorn?

8         A.   Yes.

9         Q.   Okay.  You can give it back.

10             The reason behind requesting new medical

11   records authorizations is because Halifax Hospital

12   had refused the first ones that you provided to it?

13        A.   Yes.

14             (Plaintiff's Exhibit 66 was marked for

15        identification.)

16   BY MR. BONNER:

17        Q.   Okay.  And we'll mark this facsimile as

18   Exhibit 66.

19             Ms. McLean, do you recognize Exhibit 66?

20        A.   Yes.

21        Q.   Can you tell me what Exhibit 66 is?

22        A.   It is a document we received in the mail

23   from Halifax Medical Center where they attached to

24   my fax request a check sheet about why the medical

25   authorization was not acceptable.

Page 195

1       Q.    Okay.  And the sheet Halifax attached is

2    numbered AO 00423; correct?

3       A.    Yes.

4       Q.    There is no entry in Exhibit 2 that

5    corresponds to either the facsimile date of 5/14 on

6    Exhibit 66 or the receipt date of 5/29 on

7    Exhibit 66; true?

8       A.    Yes.

9       Q.    If you look at the narrative in the

10   facsimile, it reads, "First, we are trying to get

11   this young man some help."  Well, the exhibit first

12   says that; correct?

13      A.    Yes.

14      Q.    And that you need the records as soon as

15   possible; correct?

16      A.    Yes.

17      Q.    It also states, quote, please let me

18   know when these records are ready so that I can

19   pick them up, end quote; correct?

20      A.    Correct.

21      Q.    So you were planning on driving to

22   Halifax Hospital to pick up the records when they

23   were ready?

24      A.    Yes.

25      Q.    And I think you said that you didn't use

Page 196

1    investigators to do something like that.  Adjusters

2    in your office typically do tasks like that

3    themselves?

4         A.   Yes.

5         Q.   If you had a case where you were

6    investigating a vehicle, I understand the vehicle

7    in this case was not investigated.  Is that

8    something that's typically done by adjusters?

9              MR. VILMOS:  Objection.  Compound.

10        A.   No.  We use outside appraisal firms.

11   BY MR. BONNER:

12        Q.   And if the inspection of the vehicle

13   does not have to do with the amount of damage but

14   is instead for purposes of establishing either

15   liability, the causation, do the adjusters do that

16   inspection?

17        A.   No.  We would have used an outside

18   engineering firm if we were investigating it for

19   that purpose.

20        Q.   But for purposes of picking up paperwork

21   from a hospital, you would make the drive yourself?

22        A.   Absolutely.

23        Q.   And how far of a drive is it from your

24   office to Halifax Hospital?

25        A.   Hour 15, hour 20.

Page 197

1      Q.   So it's drivable.  You don't have to

2   take a plane?

3      A.   Oh, no.

4      Q.   Between the date you were assigned the

5   claim on April 10, 2014, and -- well, you were

6   assigned the claim on April 10th, 2014?

7      A.   I believe it was April 9th, but I didn't

8   see it until April 10.

9      Q.   Between April 9th, 2014, and May 7,

10  2014, the date of your diary entry discussing

11  Madison's medical records on Exhibit 2, between

12  those two dates --

13     A.   I'm sorry.  Can you tell me the second

14  day, again?

15     Q.   Oh, May 7, 2014.  I'll start over.

16          So you started on the claim on

17  April 9th; correct?

18     A.   Yes.

19     Q.   On May 7, 2014, you have a claims note

20  that mentions your attempts to get medical records

21  from Halifax; correct?

22     A.   Yes.

23     Q.   Between April 9th, 2014, and May 7,

24  2014, you never visited Halifax Hospital to speak

25  with either Madison or his family; correct?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                              Page 198

1          A.    Absolutely.

2          Q.    You did?

3          A.    No.  After what I had seen on Facebook,

4    there's no way I would have gone over there when

5    they were dealing with that.

6          Q.    And between April 9th, 2014, and May 7,

7    2014, you never sent Madison or his family a

8    Facebook message via the "Prayers for Madison 2014"

9    Facebook page?

10         A.    I would never -- that Facebook page was

11   about praying for that child to get better.  I

12   wasn't going to turn it into a contact for an

13   insurance claim.

14         Q.    Okay.  And between April 9th, 2014, and

15   May 7, 2014, you never dispatched any person in

16   your stead to meet with Madison and ask him to

17   provide you with a medical records authorization?

18         A.    The hospital won't even tell me that

19   he's a patient there.  I mean we -- how do we even

20   get to him?

21         Q.    Well, between April 10th, 2014, and

22   May 7, 2014, the only time you had ever called

23   Halifax was in connection with sending the medical

24   records authorizations; correct?

25         A.    Yes.  But as I mentioned earlier, it's

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 199

1    because I knew from previous experience, Halifax

2    won't even confirm whether or not someone's a

3    patient.

4         Q.   You did know that he was at Halifax

5    Hospital based on your conversations with

6    Mr. Ledford and Ms. Canterbury; correct?

7         A.   Yes, that's correct.

8         Q.   And you also knew he was at Halifax

9    Hospital because it was reported that he was on his

10   Facebook page.

11        A.   Again, I hear what you're saying.  Those

12   parents, as you characterized earlier, were in

13   unbelievable emotional turmoil.  I was not going to

14   send someone there when I had contact information

15   and knew that his insurance company had given my

16   phone number to Mr. Cawthorn.

17        Q.   The Facebook compilation that I had

18   before -- Exhibit 62, there is an entry that

19   corresponds to May 7, 2014, which talks about his

20   move to Shepherd's, and I believe you saw it

21   because of the entry you've written here about him

22   being transferred to Shepherd's in Exhibit 2.

23             Do you recall the -- I'll show it to you

24   here.  It's Exhibit 62, marked 1363.  Do you recall

25   seeing that Facebook page on or about May 7th?

Page 200

1          A.    I don't know if I saw that -- I don't

2    know why I would have written a note that said I'll

3    check back in seven days if I knew it was tomorrow.

4    So I'm pretty sure the note I might have seen was

5    May 6 --

6          Q.    Okay.

7          A.    -- where it says he's being flown on

8    Thursday.  I can't -- I can't swear that I saw that

9    on or before May 7.

10         Q.    You continued to check the Facebook page

11   after your May 7th, 2014, entry; correct?

12         A.    Occasionally, but I have no

13   recollection.

14         Q.    You agree that Mr. Cawthorn's contact

15   information at Shepherd's was available on the

16   "Prayers for Madison" Facebook page as of May 7,

17   2014?

18         A.    His contact information?

19         Q.    Well, it has his room number -- oh, this

20   one doesn't.  This one just says he's at Shepherd's

21   Rehab.  This just says his address.

22              MR. VILMOS:   Object to the form.

23   BY MR. BONNER:

24         Q.    If you look at the page 1366 on

25   Exhibit 64, there is a Facebook page dated May 14,

Page 201

1    2014.  Do you see this?

2         A.   Yes.

3         Q.   And can you confirm with me that the

4    address on this Facebook page has Madison

5    Cawthorn's room number?

6         A.   Yes, but I don't know if I saw that

7    page.

8         Q.   Any reason to believe that this was not

9    on the "Prayers for Madison 2014" Facebook page as

10   of May 14th, 2014?

11        A.   No.  I believe that that was posted.  I

12   just don't know that I saw it.  I don't know when

13   the last date was that I went on Facebook, and I

14   don't know that I would have needed to continue

15   doing it after I found out that he was being

16   transferred, and I had an avenue to get the

17   records.

18        Q.   And I wasn't asking whether you saw it.

19   I was asking if you had any reason to believe that

20   this information wasn't on the Facebook page?

21             MR. VILMOS:  Object to the form of the

22        question.

23   BY MR. BONNER:

24        Q.   And if I am to understand you, your

25   answer was you have no reason to disbelieve that

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                            Page 202

1    this was on Madison's Facebook page?

2              MR. VILMOS:  The same objection.  If you

3        know the answer, you can answer.  If you

4        don't, don't guess.

5        A.    I don't remember my actual answer to

6    your question; but, yes, I believe it was on the

7    Facebook page.

8    BY MR. BONNER:

9        Q.    Okay.  Between May 7, 2014, and June 11,

10   2014, you did not personally go to Shepherd's

11   Hospital to visit with Madison?

12       A.    No, I did not.

13       Q.    Between May 7, 2014, and June 11, 2014,

14   you did not call Shepherd's Hospital and ask to

15   speak to Madison personally?

16       A.    No, I did not.

17       Q.    And between May 7, 2014, and June 11,

18   2014, you did not call Shepherd's Hospital to speak

19   to either Roger or Priscilla Cawthorn?

20             MR. VILMOS:  Form.

21       A.    No, I did not.

22   BY MR. BONNER:

23       Q.    And between May 7, 2014 and June 11,

24   2014, you did not send a representative to

25   Shepherd's to ask Madison Cawthorn to execute a new

Page 203

1    medical records authorization; correct?

2        A.    No, I did not send an insurance

3    representative to a spinal rehab facility to get an

4    insurance signature.  No, I did not.

5        Q.    And between May 7, 2014, and June 11,

6    2014, you did not reach out to Madison through his

7    Facebook page to tell him that you needed new

8    medical records authorizations?

9        A.    I answered that question previously.  I

10   would never have done that.

11       Q.    Between April 3, the date of the

12   accident, and June 11, 2014, you had not performed

13   any investigation with respect to Mr. Ledford's

14   car; correct?

15       A.    Correct.

16       Q.    Between April 3rd, 2014, and June 11,

17   2014, you had not spoken to Bradley Ledford;

18   correct?

19       A.    Not that I recall.

20       Q.    And if you'll look on Exhibit 2, there's

21   no entry between April 3rd, 2014, and June 11,

22   2014, that reflects that you spoke to Bradley

23   Ledford; correct?

24       A.    That's correct.

25       Q.    And between April 3, 2014, and June 11,

Page 204

1   2014, neither you or anyone from Auto-Owners had

2   visited the scene of the accident; correct?

3               MR. VILMOS:   Object to the form.

4        A.   That's correct.

5   BY MR. BONNER:

6        Q.   Between April 3rd, 2014, and June 11,

7   2014, neither you or anyone at Auto-Owners

8   attempted to locate Mr. Ledford's vehicle; correct?

9               MR. VILMOS:   Object to the form.

10       A.   No.

11  BY MR. BONNER:

12       Q.   No, it's not correct?

13       A.   I'm sorry.  You ask a negative question

14  sometimes.  I don't mean negative as in bad.  It

15  was in kind of double negative.  Anyway, ask me

16  again, please.

17       Q.   You might view them as bad.

18       A.   No, no, not at all.  Just --

19       Q.   I'm sorry.

20       A.   -- sometimes yes means no, the way you

21  ask your questions.

22       Q.   And if that means we need to take a

23  break --

24       A.   No, no, no, I'm good.

25       Q.   Between April 3, 2014, and June 11,

Page 205

1    2014, neither you or anyone at Auto-Owners had

2    attempted to locate the vehicle that had been

3    involved in this accident?

4              MR. VILMOS:  Object to the form.

5         A.   No, because it was insured by another

6    party, and Mr. Ledford was aware of that.

7    BY MR. BONNER:

8         Q.   And because it was insured by another

9    party, you determined that it was not something

10   that you needed to investigate?

11        A.   Correct.

12        Q.   And between April 3, 2014, and June 11,

13   2014, neither you or anyone at Auto-Owners had

14   investigated the information on the police report

15   stating that Mr. Cawthorn's airbag had failed to

16   deploy?

17        A.   No.

18        Q.   If you'll look at Exhibit 2.  Between

19   April 29, 2014, and June 11, 2014, there are no

20   entries reflecting that you communicated with David

21   Ledford or Ms. Canterbury during that period; true?

22        A.   Yes.

23        Q.   Is it therefore accurate to say that you

24   did not have any communications with Mr. Ledford

25   and Ms. Canterbury during that period?

Page 206

```
 1         A.    No, it's not fair to say that.
 2         Q.    You did have a conversation or more with
 3    Mr. Ledford and Ms. Canterbury during that period?
 4         A.    Yes.
 5         Q.    Okay.  Approximately how many?
 6         A.    I don't know.
 7         Q.    Do you have a specific recollection of
 8    any of the communications?
 9         A.    When they were on speakerphone in their
10    office, yes.
11         Q.    Well, there you go.  Do you know the
12    approximate date of -- sorry.
13               They were on speakerphone in their
14    office speaking to you?
15         A.    Yes.
16         Q.    Do you know the approximate date of that
17    telephone call?
18         A.    No, but it had to have been just before
19    the email that I sent to Melinda with the second
20    update, whatever date that was --
21         Q.    Oh, well, I'm sorry.  I chose the time
22    frame 4/29 to 6/11 because the date of your
23    follow-up email was April 28th.  And I can refresh
24    your recollection as to that date, if you'd like.
25               So what I'm asking is following your
```

Page 207

1    conversation with Ms. Canterbury and Mr. Ledford on

2    April 28, 2014, from that time until your

3    conversation with Roger Cawthorn on June 11, 2014,

4    in that space of time, did you have any additional

5    communications with either Mr. Ledford or

6    Ms. Canterbury?

7            A.    Not that I recall.

8            Q.    And that's why I asked you, because

9    there were none documented on Exhibit No. 2 during

10   that time frame --

11           A.    But the other call wasn't documented

12   either, which was the reason for my confusion.

13           Q.    Well, exactly.  I'm just trying to

14   identify if one had happened and if you had a

15   recollection.

16               So prior to June 11, 2014, you recall

17   only having the brief conversation with Mr. Ledford

18   early in April and the conversation with

19   Mr. Ledford and Ms. Canterbury jointly on or about

20   April 28, 2014; correct?

21               MR. VILMOS:  Objection.  Compound.

22           A.    Up until what date?

23   BY MR. BONNER:

24           Q.    June 11.

25           A.    Yes.

Page 208

1        Q.    After June 11, 2014, and until

2   July 18th, 2014, which I'll represent to you is a

3   date that Mr. Ledford and Ms. Canterbury recall

4   speaking to you, do you have a recollection of

5   communications between you and Mr. Ledford or you

6   and Ms. Canterbury?

7             MR. ORR:  Objection to the form.

8        A.    If that was when they called me after

9   the suit had been filed, then yes.

10  BY MR. BONNER:

11       Q.    It was after the suit was filed.

12            And so I'm not trying to be tricky.

13  Again, I wasn't there.  I need to find out how many

14  conversations you had, and then I'll ask you about

15  them.

16            So we've asked about all the

17  conversations before June 11, 2014, and now I'm

18  identifying this period of time between June 11,

19  2014, and July 18, 2014, which was after the suit

20  was filed.

21            In that space of time, did you have any

22  conversations with Ms. Canterbury or Mr. Ledford?

23       A.    One or both of them called me to let me

24  know that they had been served the lawsuit --

25       Q.    Okay.

Page 209

1          A.     -- but I don't recollect anything other

2    than what I would normally tell people:  We're

3    going to hire a lawyer on your behalf.  Then that

4    person will be in contact with you.

5          Q.    Well, we can go through the dates with

6    documents, if that would be helpful.  But if I

7    represent to you that July 14th, 2014, was the date

8    they received the lawsuit and that July 18th, 2014,

9    is the date they recall speaking with you, can you

10   tell me, do you recall there being more than the

11   one phone call about the lawsuit?

12         A.    I don't recall.

13         Q.    And there's nothing in the exhibit that

14   would refresh your recollection of Exhibit 2?

15         A.    That's correct.

16              MR. BONNER:  How much time do we have

17         left on the video?

18              THE VIDEOGRAPHER:  Seven minutes.

19   BY MR. BONNER:

20         Q.    Okay.  We'll finish up this video, and

21   then we'll take a break.  Okay?

22         A.    Sure.

23         Q.    Okay.  On June 11, 2014, you spoke to

24   Roger Cawthorn.  You've said that.  And I believe

25   you said he called you.

```
                                              Page  210
  1              On June 11, 2014, you discussed the
  2   letter that you sent to him and Priscilla on
  3   May 27, 2014; correct?
  4        A.   Yes.
  5        Q.   Okay.  Now, do you have a copy of that
  6   letter?
  7        A.   No.
  8        Q.   Because I have it right here, if you
  9   need it.
 10        A.   Please.
 11        Q.   May I have whatever -- not the claims
 12   notes but the other documents back.  And if at any
 13   time you would like to see these again, you're
 14   welcome to it.
 15              Okay.  I'm showing the witness
 16   Exhibit 12.
 17              And Mr. Cawthorn told you that he had
 18   not received Exhibit 12; correct?
 19        A.   Yes.
 20        Q.   And you told him that Auto-Owners needed
 21   new medical authorizations because the ones that
 22   had previously been signed had been signed by a
 23   parent?
 24        A.   Actually, wait.  Is it -- I think
 25   someone may have brought his mail to him, and he
```

Page 211

1   was calling me -- no, I don't know.  I'm sorry.

2         Q.   Well, why don't I do this.  Tell me what

3   you recollect of your conversation with Roger

4   Cawthorn on June 11, 2014.

5         A.   He called me to discuss his son's claim.

6   I explained to him that the hospital wouldn't

7   accept the records, that I sent him on May 27th

8   another authorization that Madison needed to sign

9   so that we could get the records, that I wanted to

10  close the insurance portion so they could move on.

11        I expressed happiness that his son

12  appeared to be making improvement.  I had told him

13  at some point he would -- he would need to get a

14  lawyer to help him -- I have a disabled child, and

15  I suggested a special needs trust of some kind and

16  that they could assist with medical lien reduction

17  and that sort of thing, and he asked that I email

18  the release to him along with the letter, and I did

19  so.

20        Q.   Okay.  Did he tell you any information?

21        A.   Not that I specifically recollect, no.

22        Q.   You have no recollection of any

23  questions he specifically posed to you?

24        A.   No, not in that conversation.

25        Q.   You're aware that Mr. Cawthorn, Roger

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 212

1   Cawthorn, testified in 2016 with respect to, well,

2   really of all of his involvement in the case in

3   2014?

4        A.   I'm aware that he testified, but I have

5   not seen his deposition.

6        Q.   That was my next question.  Very good,

7   anticipated my second question.

8             So you've never seen what he said?

9        A.   No, I have not.

10       Q.   As of the time of your call to

11  Mr. Cawthorn on June 11, 2014, Roger had not seen

12  your letter of May 27, 2014; correct?

13            MR. VILMOS:  Objection.  I think that

14       misstates the testimony.

15       A.   I can't state for certain.  I can't.

16  I'm sorry.

17  BY MR. BONNER:

18       Q.   You agree with me that under good faith

19  claims handling practices, an adjuster should never

20  advise an unrepresented claimant not to hire an

21  attorney?

22       A.   I wholeheartedly agree.

23       Q.   To advise a claimant who is

24  unrepresented not to hire an attorney would be

25  unethical?

Page 213

1           MR. VILMOS:  Objection to the -- well, I
2      withdraw the objection.  I'm sorry.
3      A.   I think I mentioned to you before the
4 deposition started, my father was a lawyer, my
5 husband's lawyer.  I would never tell someone not
6 to seek legal advice.
7 BY MR. BONNER:
8      Q.   Now, Roger Cawthorn has testified that
9 when he spoke to you on June 11, 2014, you told him
10 not to hire a lawyer.  Do you deny saying that?
11     A.   I told him he would need a lawyer with
12 regard to the special needs trust I just mentioned,
13 a reduction in medical liens.  No.
14     Q.   So he also recalls or has testified that
15 you told him that if he hired a lawyer, the lawyer
16 would just take some of the settlement money.  Do
17 you deny saying that?
18     A.   I have no recollection of that
19 whatsoever.
20     Q.   Do you deny telling Roger Cawthorn on
21 June 11, 2014, that it was not in his son's best
22 interest to hire a lawyer?
23     A.   I would never say that.
24     Q.   Did you discuss or do you deny
25 discussing with Mr. Cawthorn, Roger Cawthorn, the

Page 214

1    attorneys' fees that he would have to pay to hire a

2    lawyer?

3           A.   I don't recollect that, no.

4           Q.   Do you deny saying it?

5           A.   I don't recollect anything about

6    attorneys' fees.

7           Q.   Do you deny that Mr. Cawthorn asked you

8    for a specific amount of money that Auto-Owners

9    would be paying in exchange for his son releasing

10   his claims against the Ledfords?

11          A.   I don't believe he ever asked me that in

12   a conversation.

13          Q.   You deny he asked you for that

14   information three separate occasions during your

15   conversation of June 11, 2014?

16          A.   I would remember if he'd asked me three

17   times.  No.

18               THE VIDEOGRAPHER:  Two minutes.

19   BY MR. BONNER:

20          Q.   You stated earlier that -- you told

21   Mr. Cawthorn that you were hopeful that you'd get

22   the insurance portion of the suit resolved soon; is

23   that accurate?

24          A.   Yes.

25          Q.   Did you use those words?

Page 215

1        A.   I don't know the exact words.

2        Q.   Mr. Cawthorn says or has testified that

3   you never mentioned a specific dollar amount in his

4   conversation with you with regards to what

5   Auto-Owners was prepared to offer Madison Cawthorn

6   in exchange for a release of his claims against the

7   Ledfords; is that true?

8        A.   Yes.  We didn't have the information

9   necessary to put a dollar value on it at that

10  point.

11       Q.   And you never mentioned the figure of

12  $3 million to Roger Cawthorn during the

13  conversation of June 11, 2014, just the oral

14  conversation?

15            MR. VILMOS:  Asked and answered, but you

16       can answer again.

17       A.   I have no recollection of that.

18  BY MR. BONNER:

19       Q.   Before your testimony today, has anyone

20  told you what Roger Cawthorn testified in his

21  deposition about his conversations with you on

22  June 11, 2014?

23            MR. VILMOS:  So to the extent any of

24       your conversations with counsel come into

25       this answer, I'm instructing you not to

David Madison Cawthorn v. Auto-Owners Insurance Company                Pamela McLean | 5/11/2017

Page 216

1          answer on attorney-client privilege.  But to

2          the extent you can answer otherwise, you are

3          welcome to answer.

4          A.   No.

5    BY MR. BONNER:

6          Q.   You never disclosed to Roger Cawthorn

7    Auto-Owners' policy limits during a conversation

8    with him on June 11, 2014?

9               MR. VILMOS:  Asked and answered three

10         times, but you can answer a fourth time.

11         A.   I don't recall that specifically, no.

12              THE VIDEOGRAPHER:  This is the end of

13         disk No. 2 in the deposition of Pamela McLean

14         to be continued on disk No. 3.  We're off the

15         record at 3:00 p.m.

16              (Break from 3:00 p.m. to 3:11 p.m.)

17              THE VIDEOGRAPHER:  This is the beginning

18         of disk No. 3 in the deposition of Pamela

19         McLean.  We're back on the record at

20         3:11 p.m.

21   BY MR. BONNER:

22         Q.   Ms. McLean, do you still have Exhibit 12

23   in front of you?

24         A.   Yes.

25         Q.   And that's the letter of May 27, 2014,

Page  217

1    that you sent to Roger and Priscilla Cawthorn;

2    correct?

3           A.    That's correct.

4           Q.    The letter reads on the third paragraph:

5    "Mr. Ledford carries quite a bit of insurance

6    coverage that would no doubt benefit your family in

7    this very difficult time."

8                 That's what it reads; correct?

9           A.    Yes.

10          Q.    The letter does not mention $3 million

11   on it?

12          A.    No.

13          Q.    And, in fact, the letter does not

14   contain the phrase, quote, policy limits, end

15   quote, anywhere on it?

16                MR. VILMOS:  Is there a question

17          pending?

18   BY MR. BONNER:

19          Q.    Is that true?

20          A.    Yes.

21          Q.    And the letter of May 27, 2014, does not

22   extend a settlement offer to Madison Cawthorn in

23   the amount of $3 million in exchange for a release

24   of his claims against the Ledfords; correct?

25                MR. VILMOS:  Objection -- sorry.

Page 218

1          A.    That's correct.

2     BY MR. BONNER:

3          Q.    As of May 27, 2014, Ms. Pitman had not

4     authorized you to extend a $3 million settlement

5     offer to Madison Cawthorn in exchange for a release

6     of his claims against the Ledfords; correct?

7          A.    That is correct.

8          Q.    And moving forward to June 11, 2014,

9     Ms. Pitman had not extended you authority as of

10    June 11, 2014, to extend a settlement offer to

11    Madison Cawthorn in the amount of $3 million in

12    exchange for a release of his claims against the

13    Ledfords; true?

14         A.    Yes.

15         Q.    When you spoke to Roger Cawthorn on the

16    phone on June 11, 2014, you did not make a

17    settlement offer to him on behalf of Madison

18    Cawthorn to settle Madison Cawthorn's claims for

19    over $3 million in exchange for a release of the

20    Ledfords; correct?

21         A.    I did not.

22              (Plaintiff's Exhibit 67 was marked for

23         identification.)

24    BY MR. BONNER:

25         Q.    All right.  Let's go to another exhibit.

Page 219

1    I'll take those back, but in the event you need it

2    again, please let me know.

3              I'm now going to show you a series of

4    emails that we'll mark as Exhibit 67.

5              Ms. McLean, do you recognize the four

6    emails that are memorialized in Exhibit 67?

7         A.   Yes.

8         Q.   These are four emails exchanged between

9    you and Roger Cawthorn on June 11 of 2014; correct?

10        A.   Yes.

11             (Plaintiff's Exhibit 68 was marked for

12             identification.)

13   BY MR. BONNER:

14        Q.   I actually want to show you one more

15   document.  We'll mark this one as Exhibit 68.  This

16   is an email dated June 30, 2014, from you to Roger

17   Cawthorn.  Can you confirm that's true?

18        A.   Yes.

19        Q.   You recall sending and receiving both

20   the emails reflected in Exhibit 67 and 68 --

21        A.   Yes.

22        Q.   -- correct?

23             MR. VILMOS:  Do you have a copy of 68

24        for me?

25

Page 220

1   BY MR. BONNER:

2        Q.    Apart from the emails that you see in

3   Exhibits 67 and 68, can you confirm that you had no

4   other email communications with Roger Cawthorn?

5        A.    Not that I recall, but I would like to

6   point out that I think that the attachment is with

7   the wrong exhibit.  June 30th had no attachment,

8   and June -- the original one on June 11th had the

9   letter attached --

10       Q.    The August?

11       A.    -- to what you have attached.

12       Q.    All right.  Let's correct the exhibit --

13       A.    Wait.

14       Q.    I agree.  This looks like a mistake.

15   They were printed in sequence.  Let's correct this.

16            Let the record reflect that Exhibit 67

17   is a one-page email --

18            MR. VILMOS:   68.

19   BY MR. BONNER:

20       Q.    -- 68 is one-page email, dated June 30,

21   between Ms. McLean and Roger Cawthorn; correct?

22       A.    Yes.

23       Q.    Let me restate the question, now that we

24   have the appropriate exhibits.

25            Can you confirm that the only email

Page 221

1    communications you had with Roger Cawthorn are the

2    emails reflected in Exhibit 67 and 68?

3           A.   I believe that's the case, yes.

4           Q.   If you refer to your claims notes,

5    Exhibit 2, you'll note that no emails to

6    Mr. Cawthorn are noted at all; correct?

7           A.   That's correct.

8           Q.   You said you don't recall there being

9    any other emails; right?

10          A.   That's correct.

11          Q.   Can you confirm that your telephone call

12   of June 11, 2014, was the only telephone

13   communication you ever had with either Roger

14   Cawthorn or Madison Cawthorn?

15          A.   Yes.

16          Q.   Looking at Exhibit 67, can you confirm

17   that your email dated June 11, 2014, at 2:17 p.m.

18   is the first time you told Mr. Cawthorn what

19   Mr. Ledford's limits were?

20          A.   Yes.

21          Q.   Okay.  Okay.  I think I can take that

22   back.  And if you look back at Exhibit 2 -- I'll

23   take back actually everything except your claims

24   notes -- you know, let's look back at Exhibit 2.

25               There is a diary note dated 6/30/14;

Page 222

1    correct?

2              MR. VILMOS:  Object to the form.

3         A.    There are two.

4    BY MR. BONNER:

5         Q.    Okay.  There are two.  There is one that

6    notes a health lien letter as being received;

7    correct?

8         A.    Yes.

9         Q.    And that was a health lien letter from

10   Optum; correct?

11        A.    Yes.

12        Q.    Who did you understand Optum to be?

13        A.    His health insurance carrier.

14        Q.    Madison Cawthorn's?

15        A.    Oh, I don't know.  The person

16   responsible for making payments through a health

17   plan for Madison.  I don't know who owned the

18   policy.

19              (Plaintiff's Exhibit 69 was marked for

20         identification.)

21   BY MR. BONNER:

22        Q.    Okay.  I'm going to show you Optum's

23   letter.  We'll mark it -- and I guess I'm going to

24   need a few more of exhibits -- we'll mark it as

25   Exhibit 69.

Page 223

1              Ms. McLean, do you recall receiving

2    Exhibit 69?

3         A.   Yes.

4         Q.   And is this the lien letter that's

5    reflected in Exhibit 2?

6         A.   Yes.

7         Q.   Do you agree that this letter puts

8    Auto-Owners on notice of a lien by Madison's health

9    care provider?

10        A.   Yes.

11        Q.   Okay.  And a lien represents an amount

12   of money that Madison's health care provider could

13   seek to collect from Auto-Owners to reimburse money

14   it's paid on behalf of Madison Cawthorn?

15        A.   Yes.

16        Q.   The letter includes a signature at the

17   bottom of page 110 for Sandy Harsh; correct?

18        A.   Yes.

19        Q.   And it also includes her email and

20   telephone number?

21        A.   Yes.

22        Q.   And if you refer to Exhibit 2, there's

23   no entry in Exhibit 2 that corresponds or -- sorry,

24   that memorializes that you ever called Ms. Harsh

25   after receiving this letter?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 224

```
 1         A.    I did not call her.

 2               (Plaintiff's Exhibit 70 was marked for

 3         identification.)

 4  BY MR. BONNER:

 5         Q.    All right.  That's all the questions I

 6  have for Exhibit 69.

 7               Okay.  So let's turn then to an exhibit

 8  that I'll mark as 70.

 9               Ms. McLean, do you recall receiving this

10  email and attachment, dated July 14th, 2014, from

11  Holly Caldwell?

12         A.    Yes.

13         Q.    And I think we identified Ms. Caldwell

14  earlier as someone who worked for Bob Ledford RV &

15  Marine's insurance agency?

16         A.    Yes.

17         Q.    And this letter states that the Ledfords

18  have been served with a lawsuit; correct?

19         A.    Yes.

20         Q.    If you refer to Exhibit 2, there's no

21  entry in your claims notes of Exhibit 2 that

22  corresponds to the date that this lawsuit was

23  received; true?

24         A.    That's correct.

25         Q.    Let's look at another exhibit.  Please
```

Page 225

1   keep that in front of you.

2           On July 14th, 2014, Ms. Caldwell writes

3   to Joni Canterbury, David Ledford's fiancée,

4   stating that she spoke to you.

5           Do you have any recollection of speaking

6   with Ms. Caldwell on July 14th of 2014?

7           MR. VILMOS:  Object to the form.

8   BY MR. BONNER:

9       Q.   And I'm going to show you this; so it's

10  not a trick question.

11      A.   She would have called me to let me know

12  she had received the lawsuit and that it was

13  coming.

14      Q.   Was there anything else discussed during

15  that conversation?

16      A.   Not that I recall.

17           (Plaintiff's Exhibit 71 was marked for

18           identification.)

19  BY MR. BONNER:

20      Q.   I'm going to show you what's been marked

21  Exhibit 71.  I doubt that you've ever seen this

22  before, but I'm going to ask you if you have.  Have

23  you?

24      A.   No.

25      Q.   Can you confirm that you told

Page 226

1    Ms. Caldwell that you advised her that

2    Ms. Canterbury and Mr. Ledford should notify their

3    lawyer that they have been served but that

4    Auto-Owners will handle it?

5              MR. VILMOS:   Object to the question and

6         the form.

7         A.   I wasn't a party to that.  I can see

8    that that's what it suggests, but I don't know.

9    BY MR. BONNER:

10        Q.   Well, what I'm asking you, I guess, is

11   giving you an opportunity to say that didn't

12   happen, or if you recall it did happen.

13        A.   Can you ask me again, please?

14        Q.   Sure.

15             MR. VILMOS:   Object to the form.

16   BY MR. BONNER:

17        Q.   There's a statement in here that says,

18   "In speaking with the adjuster, Pamela McLean, she

19   advised you to notify your lawyer that you have

20   been served but that Auto-Owners will be handling

21   it."

22             Do you deny making that statement to

23   Ms. Caldwell?

24        A.   No, I do not.

25        Q.   Can you confirm that you made it?

Page 227

1        A.   I can't recall, but I have no reason to

2    believe I wouldn't have.

3        Q.   Okay.   The letter continues,

4    "Mr. Ledford's lawyer needs to be advised that the

5    limit of $3 million will be exhausted, and they

6    will have to handle anything beyond the limit that

7    Auto-Owners will incur."

8             Was that information that you provided

9    to Ms. Caldwell?

10       A.   Absolutely not.

11            MR. BONNER:   What number is this again?

12       Was that 71?

13            MR. VILMOS:   That was 71.

14   BY MR. BONNER:

15       Q.   Looking at your claims diary, Exhibit 2,

16   I don't see any entry discussing a conversation

17   between you and Ms. Caldwell; correct?

18       A.   Yes.

19       Q.   Your recollection was it was a short

20   conversation?

21       A.   Yes.

22       Q.   All right.   In your 19 years of handling

23   claims for Auto-Owners, have you come to understand

24   what an excess letter is?

25       A.   Yes.

Page 228

1      Q.    What is an excess letter?

2      A.    It notifies the insured that the claim

3  has the potential for exceeding your policy limit.

4      Q.    And does Auto-Owners have guidelines for

5  when it instructs adjusters to send excess letters

6  in a given case?

7            MR. VILMOS:   Object to the form.

8      A.    There is no guideline.

9  BY MR. BONNER:

10     Q.    So it's up to your discretion as to

11  whether or not to send an excess letter in any

12  given case?

13     A.    That's correct.

14     Q.    With respect to Bradley Ledford's

15  involvement in the Cawthorn-Ledford claim, you

16  never sent an excess letter to Bradley Ledford;

17  correct?

18     A.    To Bradley, no.

19     Q.    Is that a no?

20     A.    Yes.

21     Q.    My terrible questions.  I don't think

22  the record caught that.  I'm sorry.

23     A.    That's fine.

24     Q.    Can you confirm that you never sent

25  Bradley Ledford an excess letter in this case?

Page 229

1          A.    That's correct.

2          Q.    And you never sent Bob Ledford RV &

3     Marine an excess letter in this case?

4          A.    No, but I knew that they already had a

5     lawyer that knew about this case and was advising

6     them.

7          Q.    So your answer is, no, you did not send

8     an excess letter, but you believed that their

9     lawyer, Michael Orr?

10         A.    No, their own personal lawyer.

11         Q.    So your answer is, no, you did not send

12    an excess letter; correct?

13              MR. VILMOS:   Object to the form.

14              MR. BONNER:   I'm breaking it into two

15         pieces.

16         A.    Yes.

17    BY MR. BONNER:

18         Q.    And that the reason you did not send an

19    excess letter is because John Holcomb, Bob Ledford

20    RV & Marine's personal lawyer, was already working

21    with them?

22         A.    No.  This was before that.

23         Q.    Okay.  Sorry.

24         A.    I didn't know it to be Mr. Holcomb or

25    Mr. Orr, but perhaps another party, their personal

Page 230

1  lawyer that handles their business stuff.  I don't

2  know.

3          Q.   I understand now.

4          So Mr. Ledford let you know at some

5  point that he had a personal lawyer?

6          A.   Yes.

7          Q.   Can you tell me when?

8          A.   I only talked to him twice; so I'm

9  assuming it's that.

10         Q.   Either the conversation in early April

11 or the conversation on April 28 of 2014?

12         A.   It would have been the April 28th

13 conversation with him and his girlfriend -- I don't

14 know --

15         Q.   Ms. Canterbury, his fiancée?

16         A.   Yes.

17         Q.   Okay.  So at that point in time,

18 Mr. Ledford advised you that he had talked to

19 personal counsel; correct?

20         A.   Yes.

21         Q.   Okay.  And because he had advised you

22 that he spoke to personal counsel, you never sent

23 Bob Ledford RV & Marine an excess letter in this

24 case?

25         A.   No, because that letter tells them that

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 231

1    they should seek advice from counsel.

2         Q.   Okay.  Got it.  So I showed you that

3    notice of the lawsuit on July 14th, 2014, and I

4    think I told you earlier that Mr. Ledford and

5    Ms. Canterbury recalled speaking to you after the

6    lawsuit was filed on or about July 18th, 2014?

7         A.   Okay.

8         Q.   Do you recall having that conversation?

9         A.   Yes.

10        Q.   Okay.  And that conversation is not

11   reflected on Exhibit 2; correct?

12        A.   That's correct.

13        Q.   And there's no documents or recordings

14   memorializing what was said during your

15   conversation with Mr. Ledford and Ms. Canterbury on

16   July 18, 2014; correct?

17        A.   That's correct.

18        Q.   Can you confirm or do you deny that

19   Ms. Canterbury asked you if a settlement offer had

20   been made?

21        A.   I don't recollect that specifically.

22        Q.   Can you confirm or do you deny that you

23   told Ms. Canterbury that none had been made up

24   until that time?

25             MR. VILMOS:  Object to the form.

Page 232

1          Compound.

2          A.    Again, I don't recall specifically, but

3    I would have told her that had she asked me that

4    question.

5    BY MR. BONNER:

6          Q.    Had Ms. Canterbury asked you if a

7    settlement offer had been made, you believed you

8    would have told her that none had been made?

9          A.    That is correct.

10         Q.    Can you tell me everything you recollect

11   regarding the telephone call that took place on

12   July 18, 2014?

13         A.    I'm not going to tell you specifically I

14   don't know.  I would have told them that we were

15   hiring defense counsel on their behalf, and that

16   person would be in contact with them in the next

17   couple of days and that we would be defending them

18   in this matter.  I would have answered any general

19   questions.  I don't have any other specific

20   recollection.

21         Q.    And, in fact, your recollection isn't

22   specific; right?  That's what you would have said

23   in the general course of --

24         A.    Every time when someone files another

25   lawsuit, yes.

Page 233

1          Q.    I don't want to put words in your mouth.

2     You tell me.

3              Is it true that you have no specific

4     recollection of that conversation of July 18, 2014?

5              MR. VILMOS:   Asked and answered.   It

6          misstates the testimony.

7          A.    Not of the specific words that were

8     spoken, no.

9     BY MR. BONNER:

10         Q.    After July 18, 2014, you had no further

11     telephone conversations with either David Ledford,

12     Bradley Ledford, or Joni Canterbury; correct?

13         A.    Yes, that's correct.

14         Q.    On or about July 18, 2014, you retained

15     Michael Orr to represent Bob Ledford RV & Marine?

16         A.    I don't know of the exact date.

17         Q.    Did you know Michael Orr previously?

18         A.    I knew of him.

19         Q.    Okay.   Had you worked with him on other

20     cases?

21         A.    No.   Only my office had worked with him

22     on other cases.   We don't handle Jacksonville

23     anymore, and a Jacksonville lawyer was hired.

24         Q.    Okay.   But you selected him?

25         A.    In collaboration with Melinda.

Page 234

1      Q.   Okay.  After the suit was filed, did you

2  have any conversations with Ms. Pitman on the

3  telephone?

4      A.   Yes.

5      Q.   Okay.

6           MR. VILMOS:  I'm sorry.  Relevant to

7      this case?

8  BY MR. BONNER:

9      Q.   Oh, yeah -- I mean yeah.

10          That's what you meant; right?  You

11 understood that?

12     A.   Yes.

13     Q.   Okay.  After suit was filed and before a

14 settlement offer was extended, do you recall how

15 many conversations you had with Ms. Pitman?

16     A.   Oh, no.

17     Q.   Okay.  Was it more than one?

18     A.   I don't -- I don't know.

19     Q.   Do you know if they were on the

20 telephone or just by email?

21     A.   It would have been on the --

22          MR. VILMOS:  Object to the form.

23          THE REPORTER:  I'm sorry?

24          MR. VILMOS:  Object to the form.

25     Compound.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 235

```
 1              THE REPORTER:  No, I heard you, but I
 2      didn't hear the witness.
 3         A.   Oh, I'm sorry.  It could have been both,
 4  but if the email is not in the file, it wasn't via
 5  email.  It was only via phone.
 6  BY MR. BONNER:
 7         Q.   And you have no specific recollection of
 8  any telephone conversation or the substance of any
 9  telephone conversation that you had with Ms. Pitman
10  between suit being filed and the settlement offer
11  being settled in August?
12         A.   No.  I believe I told you that Michael
13  Orr was chosen in collaboration with Melinda
14  Pitman.
15         Q.   Okay.  So you do remember the
16  conversation --
17         A.   Yes.
18         Q.   -- you had with Ms. Pitman about Michael
19  Orr?
20              Can you tell me what took place during
21  that conversation?
22         A.   Suit's been filed in the Cawthorn
23  matter.  Do you think we should get an Orlando
24  lawyer or a Jacksonville lawyer?  The venue is
25  Volusia County.  Any thoughts?
```

Page 236

1          Q.    Exciting stuff.

2          A.    Very exciting.

3          Q.    Okay.  I'm going to hand you a few

4    documents all at once.  If you'll hand me back --

5    you can keep the claims notes, but I need these

6    back.  Trust me.  It will be worth it once I get

7    them all out.  We'll save time.

8          A.    You are very organized.

9          Q.    It starts organized and then descends to

10   chaos, much like my home in the morning.

11               I'm going to show you some emails that

12   were exchanged between you and/or Ms. Pitman and

13   Mr. Orr.

14               So the first one I would like to show

15   you has previously been marked as Exhibit 13.  It's

16   dated July 18th, 2014.

17               Do you recall sending this email?

18         A.    Yes.

19         Q.    Okay.  And this is an email just sending

20   documents to Mr. Orr; correct?

21         A.    Yes, notifying him of the suit.

22         Q.    Okay.  And you say here, "The remainder

23   of the file is being sent to you via separate

24   email."

25               What do you mean by "the remainder of

Page 237

1   the file"?

2           A.   Frankly, I didn't know how to liquid

3   file, and so support stuff does that.  It's a big

4   document, and it can't all go at once.

5           Q.   What's a liquid file?

6           A.   Exactly.

7           Q.   You don't know what a liquid file is?

8           A.   I know that it's an email that's really

9   big that someone sends on my behalf.

10          Q.   Okay.  What is included in that email?

11          A.   The entire claims file.

12          Q.   Okay.  You later retained Jamie Moses to

13  represent Bradley Ledford; correct?

14          A.   That's correct.

15          Q.   Let's look at Exhibit 16 next.  You can

16  put the exhibit in front of you down and actually

17  just move it here.  I don't really have any more

18  questions for you on these.

19              Exhibit 16 is an email of July 18, 2014.

20  It's between you and Mr. Orr.  Will you just

21  confirm with me that this is an email that you sent

22  or you exchanged with Mr. Orr?

23          A.   Okay.

24          Q.   This is an email that you sent with

25  Mr. Orr; correct?

Page 238

1          A.    Yeah.

2          Q.    I have no questions about that.  You can

3    put that to the side.

4                Let's move on to Exhibit 15.  Low and

5    behold, Exhibit 15 is an email from Alicia Mosko to

6    Michael Orr, dated July 18, 2014, with a link to a

7    10-megabyte file.

8          A.    That would be the aforementioned liquid

9    file.

10         Q.    I assume as much.  First of all, can you

11   confirm with me that Exhibit 15 represents an email

12   that was sent to Mr. Orr at your direction?

13         A.    Yes.

14         Q.    Okay.  And it includes a link to the

15   entire claims file in the Ledford-Cawthorn matter;

16   correct?

17         A.    Yes.

18         Q.    So this memorializes that the entire

19   claims file was sent to Michael Orr on July 18,

20   2014?

21         A.    Yes.

22         Q.    Okay.  You can put that to the side.

23               Okay.  Now I'm showing you Exhibit 14.

24   This is an email you sent to Ms. Pitman on July 18,

25   2014?

Page 239

1          A.    Yes.

2          Q.    This appears to allude to the

3    conversation that I think you testified to earlier;

4    correct?

5          A.    I'm not sure what conversation you're

6    talking about.

7          Q.    I should be more specific.

8                The conversation that you recall having

9    had with Ms. Pitman regarding the selection of

10   Michael Orr, Exhibit 14 appears to refer to that

11   oral conversation that you had with Ms. Pitman?

12         A.    Yes.

13         Q.    Okay.  So it's safe to say that

14   conversation took place on July 18th; correct?

15         A.    Yes.

16         Q.    This letter states that you're

17   instructing Mr. Orr to seek medical records, quote,

18   so that we can go ahead and make our offer, end

19   quote.  Correct?

20         A.    Yes.

21         Q.    Prior to July 18th, 2014, Auto-Owners

22   had not extended a settlement offer to Madison

23   Cawthorn to settle his claims for $3 million in

24   exchange for a release of the Ledfords; correct?

25               MR. VILMOS:  Objection to the form.

Page  240

1          A.    For  the  same  reason  that  this  email

2     suggests.   I  asked  him  to  please  get  the  medical

3     documentation  through  discovery  or  whatever  other

4     recourse  he  had.   It  was  our  intention  to  pay  the

5     money  upon  receipt  of  the  documentation  from  the

6     getgo.

7     BY  MR.  BONNER:

8          Q.    Right.   And  not  to  disregard  any  of

9     that,  but  just  factually,  I  need  to  know  the  answer

10    that  before  July  18,  2014,  Auto-Owners  had  not

11    extended  a  settlement  offer  to  Madison  Cawthorn;

12    correct?

13         A.    That  is  correct.

14         Q.    And  then  our  last  exhibit  is  Exhibit  23.

15    This  is  a  letter  to  you  from  Michael  --  well,  from

16    Brooke  Weedon  on  behalf  of  Michael  Orr.

17              Can  you  confirm  that  you  received  that

18    document?

19         A.    Yes,  but  the  letter  is  actually  from

20    Michael.   It's  an  email  attaching  it  by  the  support

21    staff  that  is  by  Ms.  Weedon.

22         Q.    I  see.

23              But  you  can  confirm  that  you  received

24    both  the  email  and  the  attachment;  correct?

25         A.    Yes.

Page 241

1      Q.   And they're dated August 7, 2014;

2   correct?

3      A.   Yes.

4      Q.   And basically, his letter of August 7,

5   2014, confirms that he has received the claims

6   file; correct?

7      A.   Yes.

8           (Plaintiff's Exhibit 72 was marked for

9           identification.)

10   BY MR. BONNER:

11      Q.   Okay.  We're done with 23.  In fact,

12   we're done with all of them.

13           The next document I'm showing you is

14   going to be marked as Exhibit 72.  It's a letter

15   dated July 22, 2014.

16           This is a letter to Mr. Ledford, David

17   Ledford, from you; correct?

18      A.   Yes.

19      Q.   This one's not a signed letter, it's not

20   on letterhead, but can you confirm that a letter

21   such as this one or with the content of this one

22   was sent to David Ledford on or about July 22,

23   2014?

24      A.   It was.  I'm assuming the girls forgot

25   to scan in the letterhead piece.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 242

1    Q.   I can't explain it either.  I just want
2    to confirm that this was sent by you to David
3    Ledford; correct?
4    A.   Yes.
5    Q.   And this is the letter memorializing
6    that you have retained Jamie Moses to represent
7    David Ledford's son, the driver Bradley Ledford;
8    correct?
9    A.   Yes.
10    Q.   Okay.  We're done with that one.
11        Now, I'm showing you a health lien
12    letter from Optum that's been previously marked as
13    Exhibit 19.  The cover page is dated August 4,
14    2014.  The attached fax is dated July 31st, 2014.
15        Can you confirm that Exhibit 19 is a
16    letter and an attachment that you sent to
17    Ms. Pitman on August 4th, 2014?
18    A.   I sent it to the general legal
19    department email address, yes.
20    Q.   Was it your intention that Ms. Pitman
21    receive it?
22    A.   Yes.
23    Q.   Between Optum's last letter that I
24    showed you earlier that was dated June 27, 2014,
25    and the date of this letter, August 4, 2014, is it

Page 243

1  true that you had no communications with Optum's

2  Sandra Harsh?

3         A.   I didn't have a medical authorization.

4  She wouldn't give me any information without it.

5         Q.   When Optum sent you this lien letter,

6  you had not given them a medical authorization

7  letter; correct?

8         A.   Correct.

9         Q.   And they sent you this letter

10  unsolicited?

11         A.   Correct.

12         Q.   Is there --

13         A.   I mean for all I know, the Cawthorns

14  told them it was okay to tell her to send it.  I

15  don't know.

16         Q.   You never spoke to Ms. Harsh in

17  connection to either this letter or the earlier

18  letter; correct?

19         A.   There was no need to without a medical

20  authorization.

21         Q.   So it's true that you never asked her

22  prior to receiving the letter of July 31, 2014,

23  what the amount of Madison Cawthorn's medical bill

24  was; correct?

25         A.   I didn't ask her to violate HIPAA, no.

Page 244

1        Q.    Are you an expert on HIPAA?

2        A.    I wouldn't say expert.

3        Q.    Do you have certainty, one way or the

4    other, that the amount of the medical lien is

5    HIPAA-protected information?

6        A.    No.

7        Q.    So you don't, in fact, know that by

8    disclosing the lien amount, as Ms. Harsh did in

9    Exhibit 19, that that implicates HIPAA in any way?

10        A.    I can't imagine that it wouldn't, but I

11    haven't seen that part of the statute that says so.

12        Q.    Okay.

13        A.    If you just go and tell people that

14    someone's got $400,000 in medical bills, that's

15    telling people a lot.

16        Q.    Well, like you said, you don't know, one

17    way or the other, what HIPAA requires; correct --

18        A.    I understand -- no, that's not the case.

19        Q.    I'm sorry.

20        A.    But what I'm saying -- you've mentioned

21    many times before.  In my 19 years of experience,

22    health insurance companies don't give you what you

23    want them to without a medical authorization.

24        Q.    Okay.  Even when health organizations

25    are trying to collect money from Auto-Owners?

Page 245

1          A.    They put us on notice --

2                MR. VILMOS:   Object to the form.

3          A.    -- of a lien.

4                MR. VILMOS:   Argumentative.

5     BY MR. BONNER:

6          Q.    You stated earlier that Mr. Ledford had

7     notified you around April 28, 2014, that he had

8     spoken to personal counsel.

9                Were you aware that as of August 5th,

10    2014, Bob Ledford RV & Marine had retained John

11    Holcomb as personal counsel?

12         A.    I don't recollect the date that I knew

13    that.

14         Q.    Mr. Holcomb and Mr. Orr had several

15    communications.  Were you aware of that -- sorry --

16    several communications starting in August?

17                MR. MARTINEZ:   Rephrase it.

18    BY MR. BONNER:

19         Q.    Strike it.

20                Starting on August 5, 2014, John Holcomb

21    and Michael Orr had several conversations by email.

22    Were you aware of that?

23         A.    No.

24         Q.    Did Michael Orr ever forward you emails

25    that he received from John Holcomb?

Page 246

1          A.    Not that I recall.

2          Q.    And if he did, you would have saved them

3    in the claims file; correct?

4          A.    Yes.

5          Q.    Did Michael Orr commencing in

6    August 5th, 2014, tell you by telephone or

7    otherwise orally regarding his conversations with

8    John Holcomb?

9                MR. VILMOS:   Object to the form.

10         A.    Not that I recall.

11   BY MR. BONNER:

12         Q.    Okay.  And there's nothing in the claims

13   notes, Exhibit 2, that reflects that Michael Orr

14   ever spoke to you about his conversations with John

15   Holcomb?

16         A.    No.

17         Q.    John Holcomb on or about August 5th,

18   2014, makes a request to Michael Orr regarding

19   copies of settlement offer letters that Auto-Owners

20   may have made prior to that date, August 5th, 2014.

21               Were you aware of that request?

22         A.    Not that I recall.

23         Q.    So Mike Orr didn't contact you seeking

24   help to respond to John Holcomb's request?

25         A.    He had an entire copy of our claims

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 247

1   file.  He wouldn't have needed me.

2          Q.    Again --

3          A.    I'd have no specific recollection.

4          Q.    I'm not asking you to guess at what Mike

5   Orr may have been thinking.  What I really just

6   want to know is if he actually called you --

7          A.    And I don't know.

8          Q.    And there's nothing that would refresh

9   your recollection if he did?

10         A.    No.

11         Q.    Okay.  Part of the reason I mention that

12  is there are documents that have been withheld for

13  production from us on a claim of privilege, and I

14  was trying to ascertain if you were involved in any

15  of those emails.

16         A.    I don't recollect any of it.

17         Q.    With respect to John Holcomb's requests

18  for copies of some or all of the claims file,

19  you're not aware of any emails on which you were

20  copied that dealt with that subject matter?

21         A.    No.

22         Q.    Okay.  It saves me a lot of questions.

23  Thank you.  Let me ask the next one.

24              Mick Callahan, at a later point, is

25  hired to retain [sic] Bradley Ledford as personal

Page 248

1  counsel.  Were you aware of that?

2       A.   Yes.

3       Q.   Mr. Callahan also had communications

4  with both Michael Orr and Jamie Moses via email.

5  Are you aware of that?

6       A.   I have some of those communications, but

7  I don't know if it's the extent of it.

8       Q.   I think you are recalling, because Mick

9  Callahan also wrote you a couple of letters, I

10 believe, for which I would imagine you had copies?

11      A.   Yes.

12      Q.   And we'll get to them.  It's not a

13 memory test.

14           He also made requests for copies of the

15 claims file.  Were you aware of Mick Callahan's

16 requests?

17      A.   I don't specifically recall if it's in

18 his letter.  I'll be happy to review it.  I don't

19 know.

20      Q.   Okay.  We'll get to it.  These are

21 preliminary questions, because depending on your

22 answers, I may or may not ask other questions.  And

23 I will show you his letters.  Don't worry.

24           Let me just ask you this follow-up --

25           MR. VILMOS:  Object to the preface of

Page 249

1          the question.

2                   You can answer this question, if there

3          is one.

4    BY MR. BONNER:

5          Q.    Sometimes I just talk to facilitate the

6    next question.

7                   So Mick Callahan also made certain

8    requests regarding information related to the

9    Ledford vehicle.  Do you recall any of those

10   requests being made?

11         A.    Yes, and because he was making

12   allegations that the claim wasn't handled in good

13   faith, I forwarded that to Melinda, and I believe

14   she is the one that responded to his request.

15         Q.    And did you and Melinda have

16   conversations about that request?

17         A.    No.

18         Q.    In other words, you received the

19   communications from Mick Callahan, and you

20   forwarded them to Ms. Pitman with no cover letter

21   or anything like that?

22               MR. VILMOS:  Object to the form.

23         Compound.

24               You can answer the question.

25         A.    Not that I recall.

Page 250

1    BY MR. BONNER:

2         Q.   Once you received Mick Callahan's

3    letter, you gave it to Ms. Pitman.  You let her

4    handle it?

5         A.   Yes.

6         Q.   Other than conveying those letters, were

7    you involved in responding to them in any way?

8         A.   No.

9         Q.   Were you involved in any email

10   communications between Ms. Pitman and anyone else

11   discussing Mr. Callahan's requests with respect to

12   the Ledford vehicle?

13        A.   No.

14        Q.   Okay.  I'm showing you Exhibit 22.  This

15   is, I believe, a fax that you sent to Joseph

16   Kalbac, who was representing Madison Cawthorn;

17   correct?

18        A.   That's correct.

19        Q.   And is this an accurate copy of what you

20   sent Mr. Kalbac on August 7, 2014?

21        A.   Via fax the documents sent via mail had

22   the payment -- the checks attached to it.

23        Q.   I'll show you the checks.  Sure.

24             And those came -- and the reason I

25   mention that is those are dated August 8, 2014.

Page 251

1              Okay.  The letter that you've sent by

2      facsimile, which starts on page 372 --

3              MR. VILMOS:  For the record, it's

4          Bates-stamped AO 00372.

5      BY MR. BONNER:

6          Q.   Do you see that page, Ms. McLean?

7          A.   I do.

8          Q.   Do you agree with me that this letter

9      reflects an offer by Auto-Owners to Mr. Kalbac on

10     behalf of Madison Cawthorn to pay $3 million in

11     exchange for a release of his claims against the

12     Ledfords?

13             MR. VILMOS:  Object to the form.

14         A.   It was for a release of the named

15     insured and Bradley Ledford.

16     BY MR. BONNER:

17         Q.   Okay.  And this is the first time

18     Auto-Owners extended an offer to Madison Cawthorn

19     of $3 million in exchange for a release of his

20     claims against Bradley Ledford and Bob Ledford RV &

21     Marine?

22         A.   Yes.  It was exactly three days after we

23     finally got confirmation of the extent of the

24     injuries.

25         Q.   But this is the first time; correct?

Page 252

1          A.    Yes.

2          Q.    Okay.   And did anyone help you write

3    this letter?

4          A.    No.   Sorry.

5          Q.    I mean I'm sure you're more than capable

6    of writing a two-page letter, but what I'm really

7    driving at is did Ms. Pitman assist you in drafting

8    the words on this letter?

9          A.    No.

10         Q.    Did anyone else assist you -- your

11   supervisor -- in drafting the words on this letter?

12         A.    Just experience of past claims.

13         Q.    And where your letter states, quote,

14   while we have not yet received any medical records,

15   we did recently receive a notice of lien from

16   Mr. Cawthorn's health insurance carrier -- and

17   skipping to the next sentence -- after receiving

18   this notice, we do feel that we have the

19   documentation necessary to tender the insured's

20   coverage to your claim.

21             That was wording that you chose;

22   correct?

23         A.    Yes.

24         Q.    Okay.   And there's nothing inaccurate

25   about that wording?

Page 253

1          A.    No, unless you're trying to catch me in

2     a typo or something.

3          Q.    No.   What I'm trying to get at is you

4     stand by this statement; correct?

5          A.    Yes.

6               MR. VILMOS:   Which statement do you

7          refer to, sir?

8     BY MR. BONNER:

9          Q.    You stand by your statement that, quote,

10    while we have not yet received any medical records,

11    we did recently receive a notice of lien from

12    Mr. Cawthorn's health insurance carrier, and that

13    after receiving this notice, we do feel that we

14    have the documentation necessary to tender the

15    insured's coverage to your client; correct?

16         A.    Yes.

17              (Plaintiff's Exhibit 73 was marked for

18         identification.)

19    BY MR. BONNER:

20         Q.    I'm showing you what we'll mark as

21    Exhibit 73.   Can you tell me what Exhibit 73 is?

22         A.    No.   I've never seen anything like this

23    before.

24         Q.    Okay.   I think I know what it is, and I

25    need to find Ms. Pitman's letter to you authorizing

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 254

1    you to extend an offer; so if you'll just give me

2    one second.

3              Can we go off the record for 30 seconds

4    while we're --

5              THE VIDEOGRAPHER:  We're off the record

6        at 3:56.

7              (Break from 3:56 p.m. to 4:04 p.m.)

8              THE VIDEOGRAPHER:  We're back on the

9        record at 4:04.

10   BY MR. BONNER:

11        Q.   Ms. McLean, let's stick on Exhibit 73.

12             Having had a moment to look it over, can

13   you tell me what Exhibit 73 is?

14        A.   Yes.  It's a computer-generated document

15   that goes to legal when a check is issued that

16   requires a countersignature.

17        Q.   Okay.  Oh, a countersignature.  So in

18   this case, the countersignature was the endorsee to

19   whom the check was made; is that it?

20        A.   No.  I can only sign a check up to a

21   certain dollar amount without somebody else having

22   to sign it also.

23        Q.   Okay.

24        A.   It doesn't print out that way.  It's

25   through the electronic authorization process.

Page 255

1        Q.    I got it.

2              So you sign the check, it then goes to

3    legal, and then someone from legal has to sign the

4    check as well?

5        A.    Electronically, yes.

6        Q.    But that's almost like a secondary -- I

7    suppose if you didn't have authority to make a

8    $3 million settlement offer, that would alert

9    somebody in legal to talk to you about the claim?

10             MR. VILMOS:   Object to the form of the

11        question.

12        A.    Well, I could make a settlement offer of

13   $3 million that could bind Auto-Owners, but I

14   couldn't send out the check all by myself.

15   BY MR. BONNER:

16        Q.    So in order to actually tender the

17   checks, you have to get an electronic signature

18   from someone in legal; correct?

19        A.    For the checks to print, yes.

20        Q.    For the checks to print.

21             And in this case, was it Ms. Pitman who

22   co-signed the checks or countersigned the checks?

23        A.    I have no idea.

24        Q.    Okay.  And Exhibit 73 just seems to

25   reflect an umbrella policy payment.  Would there be

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                              Page 256

1    a similar page for the garage policy limits?

2         A.   Yes.

3         Q.   And the co-signature that is required or

4    countersignature that's required for legal, is that

5    for all checks over a certain amount?

6         A.   Yes, but I don't know what that amount

7    is.

8         Q.   It's not for all checks over $50,000, is

9    it?

10        A.   No, no.

11        Q.   Could it be that it's required only for

12   umbrella policy payments?

13        A.   No.

14        Q.   So you can confirm that it's a

15   requirement for both the garage policy and the

16   umbrella policy?

17        A.   Yes.  It's solely to do with check

18   amount.

19        Q.   Does the person in legal have to

20   manually approve the request for a

21   countersignature?

22             MR. VILMOS:  Object to the form.

23        A.   Well, logged on as themselves, they can

24   electronically approve it, but I don't know who it

25   takes to approve a check this size.

Page 257

1    BY MR. BONNER:

2         Q.    I guess what I'm talking about is they

3    have to see it and affirmatively process what

4    they're doing; right?

5         A.    Yes.

6              MR. VILMOS:   Object to the form.

7    BY MR. BONNER:

8         Q.    Let me just return to this Optum letter.

9    Do you still have that in front of you?   It's 19.

10        A.    Yes.

11        Q.    Okay.  It was on the strength of the

12   information contained in the Optum letter that

13   Auto-Owners extended its August 7, 2014, settlement

14   offer to Mr. Cawthorn; correct?

15        A.    That's correct.

16        Q.    Specifically, the Optum letter in

17   Exhibit 19 states that there is a lien in the

18   amount of $396,179.98; correct?

19        A.    Yes.

20        Q.    Nothing in this letter states that

21   Madison Cawthorn's spinal injury is either

22   permanent or can be treated; correct?

23        A.    Correct.

24        Q.    There's nothing in Exhibit 19 that

25   states whether or not Madison Cawthorn's paralysis

Page 258

1   is permanent; true?

2        A.   That's correct.

3        Q.   Okay.   There's nothing in Exhibit 19

4   that describes or confirms the existence of a

5   pelvis fracture; correct?

6        A.   The only thing it contains is an amount

7   paid of 396,000 and change.

8        Q.   And that amount doesn't confirm the

9   existence of any particular injury that

10  Mr. Cawthorn sustained; correct?

11       A.   No.

12       Q.   What it confirms is that he has received

13  treatment in the amount of $396,179.98 --

14            MR. VILMOS:   Object to the form.

15  BY MR. BONNER:

16       Q.   -- correct?

17       A.   No.   It actually confirms that the

18  treatment is probably much more than that.   That's

19  the amount that the health insurance carrier paid

20  on his behalf.

21       Q.   And what happens is the hospital

22  contracts with the health insurance carrier for

23  particular rates, particular types of treatment;

24  correct?

25       A.   Yes.

Page 259

1      Q.   So it has a billed rate that is one

2   number, but a rate that the insurance company pays

3   which is often a lower number; correct?

4      A.   Yes.

5      Q.   And when the insurance company pays that

6   lower number, the person receiving treatment is not

7   liable for the rest of the amount; correct?

8      A.   No, but the bill charges are the amount

9   that a plaintiff can tell a jury his economic

10  damages are.

11     Q.   And what I'm just getting at is when

12  this document says that $396,179.98 had been paid,

13  that reflects the amount the insurance company paid

14  for Mr. Cawthorn's treatment; correct?

15     A.   Yes.

16     Q.   It does not reflect a higher amount that

17  might appear on a hospital's billing records;

18  correct?

19     A.   This letter, no.  My 19 years of

20  experience, the bill was higher.

21     Q.   This letter states, "Please contact us

22  prior to settlement to obtain the total amount of

23  paid benefits."

24          Correct?

25     A.   Yes.

Page 260

1    Q.   It continues, "Also please include Optum

2    on the settlement draft at the time of settlement."

3         Correct?

4    A.   Yes.

5    Q.   It also says, "Please advise Optum of

6    the current status of this matter."

7         Correct?

8    A.   Yes.

9    Q.   Following the receipt of this letter,

10   you did not contact Sandra Harsh to advise her or

11   Optum of the current status of the matter; correct?

12   A.   That's correct.

13   Q.   If you'll look at Exhibit 69.  The last

14   line says, "Our client asserts a subrogation

15   right."

16        Correct?

17   A.   Yes.

18   Q.   And I believe it states, "Please direct

19   all future communication to my attention."

20        Correct?

21   A.   Yes.

22   Q.   You never directed any future

23   communication to Ms. Harsh upon receiving her

24   letter of June 27, 2014; correct?

25   A.   That's correct.

Page 261

1     Q.    This letter states in bold, "Please

2    contact us prior to settlement to obtain the total

3    amount of benefits paid."

4          Correct?

5     A.    Yes.

6     Q.    Does anything in this letter indicate

7    that Optum would not tell you, Auto-Owners, the

8    amount of the lien that it was pursuing for

9    reimbursement of the health provider provided

10   benefits to Mr. Cawthorn?

11    A.    Not in that letter.

12         MR. VILMOS:   Objection to form.

13   BY MR. BONNER:

14    Q.    This letter of Exhibit 69, dated

15   June 27, 2014, states that if there is an attorney

16   involved, please advise us of the attorney's

17   contact information.

18         Do you see that provision?

19    A.    Yes.

20    Q.    You never contacted Ms. Harsh to tell

21   her that Mike Orr was involved in this case;

22   correct?

23    A.    June 27th...

24    Q.    Let the record reflect that Ms. McLean

25   is looking at Exhibit 2.

Page 262

1          A.    I'm just trying to see when suit was

2      filed.  I don't know that Michael Orr was at that

3      point.  June 27th --

4          Q.   Mr. Orr was not retained until July 18th

5      of 2014 --

6          A.    Well, then no, I wouldn't have been able

7      to tell them that.

8          Q.    After Michael Orr was retained, did you

9      then go back and tell Ms. Harsh, pursuant to her

10     request in the letter marked as Exhibit 69, that

11     Michael Orr had been retained?

12         A.    No.

13         Q.    And after Jamie Moses was retained, did

14     you contact Ms. Harsh pursuant to her request in

15     the letter marked as Exhibit 69 that Ms. Moses had

16     been retained to represent Bradley Ledford?

17         A.    No, I did not.

18              (Plaintiff's Exhibit 74 was marked for

19              identification.)

20     BY MR. BONNER:

21         Q.    Okay.  Tab 9.  I told you I would show

22     you the checks, and we're going to mark the checks

23     that issued on August 8, 2014, as Exhibit 74.  I'm

24     going to try and do it so that it obscures the

25     account number.

Page 263

1            Okay.  Can you confirm for me that these

2    are accurate copies of the checks that Auto-Owners

3    issued on August 8, 2014, in connection with its

4    settlement offer to Madison Cawthorn?

5        A.   Yes.

6        Q.   Okay.  Exhibit 28 -- that's all I needed

7    on that.

8            I'm showing you what's previously been

9    marked as Exhibit 28.  It's an email from Ms. Moses

10   to you, dated August 18, 2014.  It informs you that

11   Auto-Owners' settlement offer of August 7, 2014, is

12   going to be rejected; correct?

13       A.   Yes.

14       Q.   Did you memorialize --

15            MR. VILMOS:  Object to the form of the

16       question.  It misstates the contents of the

17       email.

18   BY MR. BONNER:

19       Q.   Okay.  You understood by receiving this

20   email in Exhibit 28 that Mr. Cawthorn was not going

21   to accept Auto-Owners' settlement offer of

22   August 7, 2014; correct?

23       A.   Yes.

24       Q.   And when you received this letter, did

25   you memorialize it in the claims diary in

Page 264

1  Exhibit 2?

2       A.    No.

3       Q.    Did you speak to anyone upon receiving

4  this letter in connection to the Cawthorn-Ledford

5  matter?

6       A.    I would have either called her or sent

7  an email back saying, yes, go forward with your

8  plan.

9       Q.    By "her" you mean Ms. Moses?

10      A.    Yes.

11      Q.    Did you call Ms. Pitman and inform her

12  that the settlement offer was being rejected?

13      A.    I don't recall that.

14      Q.    And, in fact, there's no conversation

15  with Ms. Pitman reflected in Exhibit 2 documenting

16  that you communicated the information in Exhibit 28

17  to her?

18      A.    That's correct.

19      Q.    And did you call Bradley Ledford or

20  David Ledford on behalf of Bob Ledford RV & Marine

21  to inform them that the settlement offer of

22  August 7, 2014, had been rejected?

23      A.    I'm not allowed to contact someone who

24  has legal counsel without going through their

25  counsel first.

Page 265

1       Q.   All right.  That's fine.

2            So after Mr. Orr and Ms. Moses were

3    retained, you had no further email communications

4    with the Ledfords; correct?

5       A.   I do not believe so.

6       Q.   Did you contact Mr. Orr to inform him

7    the settlement offer was not being accepted?

8       A.   No --

9       Q.   Did you advise --

10      A.   -- not that I recall.  I don't know.

11      Q.   Did you advise Ms. Moses or Mr. Orr to

12   communicate the rejection to either Bradley

13   Ledford, in the case of Ms. Moses, or David

14   Ledford, in the case of Mr. Orr?

15      A.   I can't tell them how to be a lawyer.  I

16   mean they're the lawyers.

17      Q.   Okay.  So you did not; correct?

18      A.   No.

19      Q.   All right.  Let's look at Exhibit 29.

20           Exhibit 29 is an email from Mick

21   Callahan to you, dated August 21, 2014.  I'm going

22   to show it to you in conjunction with Exhibit 30,

23   which is a letter with attachments dated

24   September 10, 2014, from Mr. Callahan to you.

25           With respect to Exhibit 29, did you

Page 266

1  receive that letter?

2      A.   Yes.

3      Q.   And upon receiving the letter in

4  Exhibit 29, what did you do?

5      A.   I would have forwarded it to legal or I

6  would have called her and told her, please look at

7  page 20 whatever.

8      Q.   And do you have a specific recollection

9  of calling Ms. Pitman and talking to her about

10  Mr. Callahan's letter of August 21, 2014?

11      A.   I don't recollect specifically

12  discussing a letter of a specific date, but we did

13  discuss that she would be responding to

14  Mr. Callahan.

15      Q.   Do you know if that conversation with

16  Ms. Pitman took place after the letter of

17  September 10, 2014, that's marked as Exhibit 30?

18      A.   Oh, it would have been before that.

19      Q.   So sometime between August 21st and

20  September 10th, you and Ms. Pitman had a

21  conversation in which she confirmed that she would

22  respond to Mr. Callahan?

23      A.   Yes.

24      Q.   Was anything else discussed at that

25  conversation?

Page 267

 1          A.    Not that I recall.

 2          Q.    Did you explain to Ms. Pitman your

 3   reasons for not investigating the Ledfords'

 4   vehicle?

 5              MR. VILMOS:   Object to the form.   It

 6          misstates the testimony.

 7          A.    No.

 8   BY MR. BONNER:

 9          Q.    I'm just asking whether that was a topic

10   of conversation.

11          A.    No.

12          Q.    Did she ask you for any information

13   regarding the Ledford vehicle salvage?

14          A.    Not that I recall.

15          Q.    Your conversation with Ms. Pitman is not

16   reflected on Exhibit 2; correct?

17          A.    That's correct.

18          Q.    Is there any documentation that you're

19   aware of that would memorialize your conversation

20   with Ms. Pitman that took place between August 21,

21   2014, and September 10th, 2014?

22          A.    No.

23          Q.    Do you know if it was a long

24   conversation or if it was a brief conversation?

25              A.   I have no idea.   We often talk about

Page 268

1    multiple files in telephone calls.

2          Q.    I believe I asked you this question with

3    respect to the August 21st communication.  But with

4    respect to the September 10th communication marked

5    as Exhibit 30, can you confirm that there's no

6    entry in Exhibit 2, the claims notice, that

7    correspond to Exhibit 30?

8          A.    That's correct.

9          Q.    After speaking to Ms. Pitman, you

10   received the letter of September 10, 2014; correct?

11         A.    I'm sorry.  Ask me again.

12         Q.    After speaking to Ms. Pitman by

13   telephone, you then received at some point the

14   letter of September 10, 2014, in Exhibit 30?

15              MR. VILMOS:  Object to the form.

16              On what date is the phone conversation

17        to which you're referring?

18              MR. BONNER:  Ms. McLean didn't know the

19        date of the conversation.  It took place

20        between August 21 and September 10th, 2014, I

21        believe.

22   BY MR. BONNER:

23         Q.    So after that conversation, you received

24   the letter of September 10th, 2014?

25         A.    Yes.

David Madison Cawthorn v. Auto-Owners Insurance Company                  Pamela McLean | 5/11/2017

Page 269

1      Q.   And you did not respond to that letter;

2  correct?

3      A.   I would have forwarded it to legal.

4      Q.   You would have forwarded it to legal and

5  left it for legal to respond to it?

6      A.   That's correct.

7      Q.   At any point after receiving either the

8  letter in Exhibit 29 or the letter in Exhibit 30,

9  did you have a conversation with anyone with

10 respect to what happened to the Ledfords' vehicle?

11     A.   Not that I recall.

12     Q.   Okay.  And there's no conversation

13 reflected in the claims file; correct?

14     A.   That's correct.

15     Q.   Okay.  You can put those two documents

16 aside or give them back to me, I guess.

17          I'm going to show you what's marked as

18 Exhibit 44.  This is a letter from Michael Orr to

19 David Ledford, dated October 28, 2014.

20          If you turn to the last page -- sorry --

21 the second to last page, which is numbered

22 AO 00634.

23          Are you on that page?

24     A.   Yes.

25     Q.   First of all, can you confirm that you

Page 270

1    received a copy of Exhibit 44?

2          A.    Yes.

3          Q.    And, in fact, if you look on the last

4    page, I believe you're a carbon copy recipient?

5          A.    Yes.

6          Q.    So turning back to page 634.

7                Mr. Orr in his last paragraph states,

8    quote, we estimate that damages could be well in

9    excess of $10 million, end quote.

10               Do you recall being told that

11   information by Mr. Orr?

12         A.    I recall reading this letter.

13         Q.    Did you ever have an oral conversation

14   with Mr. Orr in which you discussed the potential

15   damages suffered by Madison Cawthorn?

16         A.    That's likely, but I don't have a

17   specific recollection.

18         Q.    All right.  Would that conversation be

19   documented in any way?

20         A.    No.

21         Q.    And I ask you that because I don't have

22   anything in the claims file after November 10th of

23   2014.  So if it were a document in an email, I

24   would not be able to show it to you.

25               But you're saying there are no documents

Page 271

1   corresponding to a conversation you had to Mr. Orr

2   discussing Madison Cawthorn's potential damages?

3          A.    No.

4          Q.    Okay.  The same question for Ms. Moses.

5                Did you have conversations with

6   Ms. Moses discussing Madison Cawthorn's damages?

7          A.    I don't believe so.

8          Q.    Okay.  Did Ms. Moses ever send you a

9   report estimating Mr. Cawthorn's potential damages

10  at trial?

11         A.    It's possible.  I can't recall without

12  looking at the file.

13         Q.    Now, I can't show you that.  I

14  apologize.  It's possible.  Would she have sent you

15  more than one?

16               MR. VILMOS:  Objection to the form.

17         A.    I don't know without --

18               MR. VILMOS:  The witness just testified

19         she doesn't know if she sent anything.

20  BY MR. BONNER:

21         Q.    I'm fact finding.  I'm just trying to

22  get some facts.

23               With respect to Mr. Orr, did he ever

24  send an additional report in which he estimated the

25  potential damages for Madison Cawthorn?

Page  272

1          A.    No.

2          Q.    This is the only one?

3          A.    Yes.

4          Q.    With respect to the oral conversations

5     you had with Mr. Holcomb, do you recall any

6     specific amounts that he discussed as being

7     potential damages for Madison Cawthorn?

8          A.    I don't recall a conversation with

9     Mr. Holcomb.

10         Q.    I'm so sorry.  I meant Mr. Orr.

11               With respect to Mr. Orr, do you recall

12    any specific amount being discussed with respect to

13    Madison Cawthorn's damages?

14         A.    No.

15         Q.    So you don't know if Mr. Orr ever

16    adjusted his appraisal from the appraisal reflected

17    in Exhibit 44?

18         A.    No.

19         Q.    After November 10th of 2014, did you

20    receive an additional appraisal of Madison

21    Cawthorn's injuries from any person, through the

22    end of the tort case?

23               MR. VILMOS:  Objection.  Compound.

24               You can answer.

25         A.    I don't recall.

Page 273

1    BY MR. BONNER:

2        Q.    If you did, it would be reflected in the

3    claims file --

4        A.    Yes.

5        Q.    -- correct?

6              And if Mr. Orr sent or Ms. Moses sent a

7    report that included an estimate of Mr. Cawthorn's

8    likely damages after November 10th, 2014, those

9    would be in the claims file; correct?

10       A.    Yes.

11       Q.    In 2015, Auto-Owners attempted to make a

12   med pay payment of $10,000.  Are you familiar with

13   that?

14       A.    Yes.

15       Q.    What prompted Auto-Owners to attempt to

16   make that payment?

17       A.    I don't recall specifically.

18       Q.    Was that your decision to extend the

19   payment?

20       A.    I don't -- I can't answer that.  I don't

21   know.

22       Q.    If you look at Exhibit 2, is there any

23   information in Exhibit 2 -- that's the oral report;

24   right?  Exhibit 2 is the claims notes?

25       A.    Yeah.

Page  274

1          Q.    If you look at Exhibit 2, is there

2     anything in Exhibit 2 --

3          A.    No.

4          Q.    -- that refreshes your recollection with

5     respect to whose decision it was to extend the med

6     pay payment?

7          A.    No.

8          Q.    You said you were involved.   How were

9     you involved?

10          A.    Involved in?

11          Q.    Making the med pay payment.

12          A.    I actually issued it.

13          Q.    Did somebody ask you to issue it?

14          A.    I don't know if that's specifically the

15     case or maybe someone called to my attention that

16     it should have been offered.   I don't know the

17     circumstances.   I physically issued it.   I didn't

18     need someone's permission to do so.   I don't recall

19     the circumstances.

20          Q.    I know you didn't need permission.   I'm

21     just trying to find out why the timing in 2015.

22          A.    I don't know.

23          Q.    Is there any information in the claims

24     file that would memorialize either who told you to

25     make the payment or the reasons why the payment was

Page 275

1    issued in 2015?

2         A.   No.

3         Q.   Did Mike Orr suggest to you to make the

4    payment?

5         A.   I said I don't know.

6         Q.   I thought if I dropped his name, maybe

7    it would mean something, but...

8              Should Auto-Owners have tendered the

9    $10,000 upon receipt of the Optum lien letter?

10        A.   Yes.

11        Q.   This case went to mediation in 2016;

12   correct?

13        A.   Yes.

14        Q.   Mr. Holcomb and Mr. Callahan both sent

15   letters to Auto-Owners requesting that a

16   representative with authority to make a payment

17   above Auto-Owners' policy limits attend mediation.

18             MR. VILMOS:  What happens at mediation

19        is confidential.  Conversations with your

20        counsel are confidential.  I'm not sure

21        there's a question pending yet.  But before

22        there's a question pending, before you

23        answer, I want to make sure you are aware of

24        those.

25

Page 276

1   BY MR. BONNER:

2        Q.   I'm not going to ask you about what took

3   place at mediation.  I agree; it's confidential.

4   But what took place before mediation, I am going to

5   ask you about.

6             So with respect to Mr. Callahan and

7   Mr. Holcomb, are you aware that they both made

8   requests to Auto-Owners that they send a

9   representative to mediation with authority above

10  $3 million?

11            MR. VILMOS:  To the extent the answer to

12       your question involves conversations with

13       counsel, I'm instructing you not to answer --

14       to identify that they involve conversations

15       with counsel and not to answer.  To the

16       extent they don't, then you can answer.

17  BY MR. BONNER:

18       Q.   Well, if there are conversations that

19  you had with counsel, don't tell me the contents of

20  them, but I am entitled to know that they took

21  place, between whom, and on what day.

22            MR. VILMOS:  I'm not sure that I agree

23       with that.

24            MR. BONNER:  Okay.  Well, you can

25       instruct her not to answer --

```
                                                   Page  277
 1              MR. VILMOS:  I'm going to instruct her
 2         not to answer --
 3              MR. BONNER:  -- figure it out.
 4              MR. VILMOS:  -- if that's what she's
 5         going to recall.
 6         A.   It is with counsel.
 7    BY MR. BONNER:
 8         Q.   Okay.
 9         A.   That would be my recollection.
10              MR. BONNER:  And you're going to assert
11         a privilege to the date of that conversation
12         and the people between whom?
13              MR. VILMOS:  I am, sir.
14    BY MR. BONNER:
15         Q.   Did you have a conversation with anyone
16    else with respect to Mr. Callahan or Mr. Holcomb's
17    requests?
18         A.   It's likely I would have talked to
19    Melinda --
20         Q.   Okay.
21         A.   -- but I don't know that for certain.
22         Q.   Okay --
23              MR. VILMOS:  I'm asking you again.  If
24         you know the answer, please answer fully and
25         truthfully.  If you don't, don't guess.
```

Page 278

1    BY MR. BONNER:

2         Q.    Okay.  With Ms. Pitman, do you have a

3    specific recollection about a conversation with her

4    about Mr. Holcomb and Mr. Callahan's requests?

5         A.    Not a specific recollection, no.

6         Q.    And you didn't speak to a supervisor or

7    anyone else with respect to these requests?

8         A.    No.

9         Q.    I want to show you Exhibit 51.

10             This is a letter by Joe Kalbac with a

11   settlement agreement in the amount of $33 million

12   that he sent to John Holcomb and Mick Callahan.

13             At some point did you receive a copy of

14   this?

15        A.    I believe so.

16        Q.    Have you seen it before?

17        A.    I believe so.

18        Q.    I'm going to show you Exhibit 52, which

19   is a letter from you to Mr. Callahan, dated

20   September 3, 2016.  The contents of this letter

21   imply to me that Mr. Callahan contacted you with

22   respect to the settlement offer made in Exhibit 51;

23   is that true?

24        A.    Yes.

25        Q.    And specifically, if you'll look at

Page 279

1    Exhibit 51, the proposal says, "This offer is

2    contingent upon acceptance by both defendants and

3    approval by their insurer and the terms set forth

4    in the settlement agreement."

5              At the time you wrote your letter on

6    September 3, 2016, you had read Mr. Kalbac's

7    letter; correct?

8         A.   Yes.

9         Q.   With respect to your letter of

10   September 3, 2016, did anyone assist you in writing

11   this letter?

12        A.   No.

13        Q.   Did anyone proof it before you sent it

14   out, other than you?

15        A.   No.

16        Q.   And did you need any person's authority

17   before you sent out this letter?

18        A.   I would have talked to Melinda.

19        Q.   Ms. Pitman?

20        A.   Yes.

21        Q.   And you would have talked to Ms. Pitman

22   how many times before sending out this letter?

23             MR. VILMOS:  Object to the question --

24        object to the form.

25        A.   Probably just once.

Page 280

1    BY MR. BONNER:

2         Q.   Okay.  Do you know if Ms. Pitman told

3    you to write a letter back?

4         A.   We agreed on what our response was going

5    to be.

6         Q.   Okay.  Well, let me ask you this.  With

7    respect to conversation you had with Ms. Pitman,

8    can you tell me what you recall of that

9    conversation?

10        A.   I recall discussing the proposed

11   release, that they were asking for Auto-Owners to

12   be a signatore to it.  What do you think about

13   that, Melinda?  We discussed it, and her thoughts

14   were, combined with my input, that you can sign

15   whatever release that you want to, but we're not

16   going to sign it, but that also we would continue

17   defending Bradley, should a settlement or a consent

18   judgment not be reached.

19        Q.   Okay.  And did you talk about the

20   settlement proposal with anyone else other than

21   Ms. Pitman?

22        A.   No.

23        Q.   I guess at the time you were your

24   supervisor?

25        A.   That's true.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 281

1          Q.    But you didn't speak to anyone else at

2     your office branch with respect to this settlement

3     proposal; correct?

4          A.    No.

5          Q.    With respect to --

6          A.    You just did that again, as a matter of

7     fact.  I want to correct that.

8          Q.    What did I do?

9          A.    You said you didn't speak with anybody

10    else, and I said, no, and then you said, correct,

11    which would mean yes.

12         Q.    Oh, goodness.  My terrible record.  It's

13    my record.

14         A.    I'm sorry.

15         Q.    Okay.  So --

16         A.    No, I didn't speak with anyone else.

17         Q.    -- you didn't speak with anyone else.

18    Okay.

19              Do you agree with me that your letter of

20    September 3, 2016, does not object to a settlement

21    of Mr. Cawthorn's claim against Bob Ledford RV &

22    Marine for $3 million?

23         A.    That's correct.

24         Q.    And do you agree that your letter does

25    not object to the entry of a consent judgment

Page 282

1    against Bradley Ledford; correct?

2         A.    Yes.

3         Q.    And it, in fact, says that whether or

4    not to enter a future consent judgment will be

5    solely up to him, Mr. Callahan, and Ms. Moses;

6    correct?

7         A.    Yes.

8         Q.    Your letter does not object to anything

9    contained in Mr. Kalbac's proposal, as reflected in

10   Exhibit 51; correct?

11        A.    Yes.  We didn't want to sign our

12   signature line that's a part of the agreement.

13        Q.    Okay.  So apart from not wanting to be a

14   party to the agreement, there are no other

15   objections that you registered to Mr. Kalbac's

16   settlement proposal in your letter of September 3,

17   2016?

18             MR. VILMOS:   Objection.  It misstates

19        the testimony.

20        A.    I'm not sure that an objection to a

21   document that we weren't a party to would have been

22   appropriate.

23   BY MR. BONNER:

24        Q.    Okay.  But factually, there's no

25   objection to the settlement proposal, other than

Page 283

1    Auto-Owners being a signatory, that is reflected in

2    your letter of September 3rd, 2016?

3              MR. VILMOS:  Objection.  It misstates

4         the testimony.

5         A.   The decision not to sign the document

6    that was provided to us ended any discussion of the

7    contents of that document.

8    BY MR. BONNER:

9         Q.   Okay.  So your letter of September 3,

10   2016, does not comment upon the substance of

11   Mr. Kalbac's proposal in any way?

12        A.   That's correct.

13             Oh, my God.  That's the last page?

14        Q.   Are you aware of anyone, other than

15   Mr. Orr with respect to the report that we looked

16   at, dated October 28, 2014 -- anyone other than

17   Mr. Orr ever analyze the potential damages suffered

18   by Mr. Cawthorn for Auto-Owners in this case?

19             MR. VILMOS:  Asked and answered.

20             You can answer again.

21        A.   Ms. Moses probably did, but I don't

22   recall ever seeing anything formal from her.

23   BY MR. BONNER:

24        Q.   If she had done it, if she had estimated

25   damages, is it your belief she would have done that

Page 284

 1   orally?

 2        A.    No.

 3        Q.    So it's possible somewhere in the claims

 4   file there's a written estimate by Ms. Moses;

 5   correct?

 6        A.    I don't believe there is one.

 7        Q.    Okay.  Do you think maybe she created an

 8   estimate and didn't share it with Auto-Owners?

 9        A.    Well --

10             MR. VILMOS:  Object to the form.  It

11        calls for speculation.

12        A.    That's true -- but I can't imagine that

13   she wouldn't in the course of defending.

14   BY MR. BONNER:

15        Q.    There was never an expert witness, to

16   your knowledge, that was retained by Auto-Owners to

17   evaluate Madison Cawthorn's injuries; correct?

18             MR. VILMOS:  Asked and answered.

19        A.    I don't know -- nobody was ever retained

20   by Auto-Owners.  I'm sorry.  I do specifically know

21   the answer to that.

22             MR. BONNER:  We have some outstanding

23        discovery disputes.  I think that me and

24        Mr. Latta mentioned these at the last

25        deposition.  And before we took your

Page 285

1       deposition, Mr. Latta and I discussed our

2       differences, and I told him that we might be

3       challenging those certain discovery issues

4       between us.

5             And depending on the outcome of those

6       discovery issues, we may ask to talk to you

7       some more; but if we lose, I probably won't

8       be able to.  That notwithstanding, I'm

9       prepared to adjourn this deposition, pending

10      any questions you have.

11            MR. VILMOS:  Let's take a few minutes.

12            MR. BONNER:  Sure.

13            THE VIDEOGRAPHER:  We're off the record

14      at 4:41.

15            (Break from 4:41 p.m. to 4:48 p.m.)

16            THE VIDEOGRAPHER:  We're back on the

17      record at 4:48.

18                  CROSS-EXAMINATION

19  BY MR. VILMOS:

20      Q.   Good afternoon, Ms. McLean.  I'm going

21  to show you what's previously been marked as

22  Exhibit 2 in this deposition.

23            Do you see that?

24      A.   Yes.

25            THE VIDEOGRAPHER:  We're off the record

Page 286

1          at 4:48.

2                  (Discussion off the record.)

3                  THE VIDEOGRAPHER:  We're back on the

4          record at 4:49.

5     BY MR. VILMOS:

6          Q.    Ms. McLean, I'm going to ask you to look

7     at the front page of Exhibit No. 2.  It's stamped

8     AO 00651.  Do you see that page?

9          A.    Yes.

10         Q.    And the top entry, can you explain that

11    entry to me?

12         A.    Issuing payment under med pay?

13         Q.    Yes.

14         A.    No.

15         Q.    What is the date on that?

16         A.    4/29/15.

17         Q.    And who is Kevin J. Goode?

18         A.    I have no idea.

19         Q.    Is Kevin J. Goode someone in your office

20    in Ocala?

21         A.    No.

22                MR. BONNER:  Objection.  Form.

23    BY MR. VILMOS:

24         Q.    You don't know Kevin J. Goode?

25         A.    No.

David Madison Cawthorn v. Auto-Owners Insurance Company                Pamela McLean | 5/11/2017

Page 287

1          MR. BONNER:  Objection.  Asked and

2      answered.

3  BY MR. VILMOS:

4          Q.   Ma'am?

5          A.   No.

6          Q.   Did Kevin J. Goode consult with you

7  before issuing a payment under med pay?

8          MR. BONNER:  Objection.

9          A.   No.

10  BY MR. VILMOS:

11         Q.   Was the lawsuit filed as of April 29,

12  2015?

13         A.   Yes.

14         Q.   Does the filing of the lawsuit in any

15  way impact payments under an insurance policy?

16         A.   Not necessarily.

17         Q.   Does the med pay payment from Mr. Good

18  in the note indicate that it related to the

19  Cawthorn claim?

20         A.   No.

21         Q.   Did your prior testimony indicate that

22  you issued the payment under med pay?

23         MR. BONNER:  Objection to the form of

24      the question.

25         A.   I thought that I must have.

Page 288

1   BY MR. VILMOS:

2        Q.    I'm just trying to understand what

3   happened.

4        A.    And looking at that note, I don't

5   understand what happened.

6        Q.    Okay.  Do you recall issuing a payment

7   under med pay on April 29, 2015?

8        A.    No.

9             MR. VILMOS:  Let's go off the record

10        briefly.

11             THE VIDEOGRAPHER:  We're off the record

12        at 4:52.

13             (Discussion held off the record.)

14             THE VIDEOGRAPHER:  We're back on the

15        record at 4:52.

16             MR. VILMOS:  Ms. McLean, thank you for

17        your testimony today.  I appreciate the

18        length of time it took and the commitment for

19        you to be here.

20             When this deposition is transcribed, we

21        will have you read it for errors.  If there

22        are any errors, you will fill out what's

23        called an errata sheet, and that will give

24        you an opportunity to make sure that your

25        answers were properly transcribed and that

Page 289

1          the answers you gave were accurate in the

2          transcription.

3                MR. BONNER:  And we, once again, renew

4          our statement that we are adjourning, subject

5          to previous statements on the record.  Thank

6          you.

7                THE VIDEOGRAPHER:  This is the end of

8          disk No. 3 and adjourns the deposition of

9          Pamela McLean taken on 11 May 2017.  We're

10         off the record at 4:53 p.m.

11               (The reading and signing of this

12         deposition was not waived.)

13               (At 4:53 p.m. this deposition was

14         adjourned sine die.)

15

16

17

18

19

20

21

22

23

24

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

                                                               Page 290

1

2                    CERTIFICATE OF OATH

3

4     STATE OF FLORIDA       :

5                            :SS.

6     COUNTY OF MIAMI-DADE :

7

8              I, Lance W. Steinbeisser, Registered

9        Professional Reporter, Notary Public, State

10       of Florida, certify that PAMELA TORRES MCLEAN

11       personally appeared before me on the 11th of

12       May, 2017.

13

14             Signed this 14th day of May, 2017.

15

16

17

18

19       _____

20       LANCE W. STEINBEISSER, RPR CSR FPR
         Notary Public, State of Florida at Large
21       My Commission Number:  GG064258
         Expires:  May 4, 2021

22

23

24

25

Page 291

1        REPORTER'S DEPOSITION CERTIFICATE

2

3            I, Lance W. Steinbeisser, Registered

4     Professional Reporter, do hereby certify that

5     I was authorized to and did stenographically

6     report the deposition of PAMELA TORRES

7     MCLEAN; that a review of the transcript was

8     requested; and that the transcript, pages 1

9     through 289, is a true record of my

10    stenographic notes.

11            I FURTHER CERTIFY that I am not a

12    relative, employee, attorney, or counsel of

13    any of the parties, nor am I a relative or

14    employee of any of the parties' attorney or

15    counsel connected with the action, nor am I

16    financially interested in the action.

17

18            Dated this 14th day of May, 2017, at

19    Miami, Florida.

20

21

22

23    _____
      LANCE W. STEINBEISSER, RPR CSR FPR
24    Certified Court Reporter

25

Page 292

1                          ERRATA SHEET

2          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

3    RE          :     CAWTHORN VS. AUTO-OWNERS
     DEPONENT    :     PAMELA TORRES MCLEAN
4    TAKEN       :     MAY 11, 2017

5    Page #      Line #          Change            Reason

6    _____    _____

7    _____    _____

8    _____    _____

9    _____    _____

10   _____    _____

11   _____    _____

12   _____    _____

13   _____    _____

14   _____    _____

15   _____    _____

16   _____    _____

17   _____    _____

18   _____    _____

19   _____    _____

20   _____    _____

21

     Under penalties of perjury, I declare that I have
22   read the foregoing document, and that the facts
     stated in it are true.
23

24        _____   _____
                   Signature                Date
25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Pamela McLean | 5/11/2017

Page 293

1                    STEINOTYPE, INC.
                   Stenographic Services
2                  1140 Northeast 86 Street
                    Miami, Florida 33138
3                      (305)632-4464

4    May 14, 2017

5    Pamela McLean
     c/o Peter C. Vilmos, Esquire
6
     RE:  CAWTHORN VS. AUTO-OWNERS
7    DEPO OF:  PAMELA TORRES MCLEAN
     TAKEN:  May 11, 2017
8

9    Dear Ms. McLean:

10        This letter is to advise that the transcript
     of your deposition has been completed and is
11   available for review.  Please contact our office at
     (305)632-4464 to make arrangements for reading and
12   signing.

13        It is suggested that the review of this
     transcript be completed within 30 days of your
14   receipt of this letter.

15

16        In the event other arrangements are made,
     please send us a list of any and all corrections
17   and/or changes, noting page and line numbers, and
     the reason for such changes, so that we can furnish
18   respective counsel with a copy.

19        The original of this transcript has been
     forwarded to the ordering party, and your errata,
20   once received, will be forwarded to all ordering
     parties for the inclusion in the transcript.

21

22                   Sincerely,

23

                     Lance W. Steinbeisser, RPR FPR CSR
24                   Steinotype, Inc.

25   cc:  (Copy to all counsel)