# Exhibit E
Deposition of
Melinda Anne Pitman

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 6:16-CV-2240-Orl-28GHK


DAVID MADISON CAWTHORN,

        Plaintiff,

vs.

AUTO-OWNERS INSURANCE COMPANY,

        Defendant.
_____/


VIDEOTAPED DEPOSITION OF

MELINDA ANNE PITMAN

Volume I (Pages 1 - 205)

Taken on Behalf of the Plaintiff

DATE TAKEN:  May 9, 2017

TIME:        8:55 a.m. - 3:53 p.m.

PLACE:       Courtyard by Marriott
             3205 Boardwalk Drive
             Ann Arbor, Michigan


Examination of the witness taken before:

Lance W. Steinbeisser, RPR CSR FPR
Certified Stenographer

Page 2

APPEARANCES FOR THE PLAINTIFF

William A. Bonner, Esquire
Roberto Martinez, Esquire
   COLSON HICKS EIDSON
    255 Alhambra Circle
         Penthouse
Coral Gables, Florida 33134
     (305) 476-7400
   abonner@colson.com
     bob@colson.com


APPEARANCES FOR THE DEFENDANT

S. Greg Burge, Esquire
   BURR & FORMAN LLP
420 North 20th Street, Suite 3400
   Birmingham, Alabama 35203
      (205)458-5101
     gburge@burr.com


APPEARANCES FOR THE DEFENDANT

Forrest S. Latta, Esquire
   BURR & FORMAN LLP
11 North Water Street, Suite 22200
   Mobile, Alabama 35203-5201
      (251)345-8212
     flatta@burr.com


ALSO PRESENT

Steve Alfonsi, videographer

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 3

1                          I N D E X
2     WITNESS                                          PAGE
3     MELINDA ANNE PITMAN
      Direct Exam By Mr. Bonner                          5
4
5     PLAINTIFF'S EXHIBITS                    MARKED FOR ID
6        1      Claims Handling Guide              23
         2      K notes                            39
7        3      Privilege Log                      46
         4      NAMIC Claims Conference            58
8        5      email, 4/21/14                     60
         6      Traffic Crash Report               94
9        7      email, 4/9/14                     105
         8      email, 4/28/14                    106
10       9      email, 5/8/14                     132
        10      email, 5/9/14                     162
11      11      Facebook printout                149
        12      letter, 5/27/14                  170
12      13      email, 7/18/14                   184
        14      email, 7/18/14                   188
13      15      email, 7/18/14                   191
        16      email, 7/18/14                   192
14      17      email, 7/21/14                   193
        18      fax on 7/22/14                   194
15      19      email, 8/4/14                    195
        20      email, 8/6/14                    199
16      21      email, 8/5/14                    202
        22      fax, 8/7/14                      208
17      23      email, 8/8/14                    214
        24      email, 8/8/14                    215
18      25      email, 8/14/14                   217
        26      email, 8/15/14                   219
19      27      email, 8/15/14                   221
        28      email, 8/18/14                   229
20      29      email, 8/21/14                   231
        30      letter, 9/10/14                  232
21      31      email, 9/10/14                   233
        32      email, 9/16/14                   234
22      33      email, 9/24/14                   241
        34      email, 9/24/14                   244
23      35      email, 9/26/14                   245
        36      letter, 9/26/14                  247
24      37      email, 9/30/14                   256
        38      email, 10/16/14                  257
25      39      email, 10/16/14                  261

Page 4

```
 1    41      email, 10/21/14                      264
      42      letter, 10/22/14                     266
 2    43      email, 10/24/14                      269
      44      letter, 10/28/14                     269
 3    45      email, 10/29/14                      270
      46      letter, 11/4/14                      272
 4    47      letter, 5/3/16                       278
      48      letter, 5/12/16                      281
 5    49      letter, 5/16/16                      282
      50      email, 5/12/16                       283
 6    51      letter, 8/3/16                       284
      52      letter, 9/3/16                       285
 7    53      letter, 9/6/16                       289
      54      email, 9/7/16                        290
 8    55      Answer                               293

 9    (Exhibits attached hereto.)

10    Certificate of Oath .....................Page 299
      Reporter's Deposition Certificate .......Page 300
11    Errata Sheet ............................Page 301
      Read Letter .............................Page 302
```

```
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 5

1                    THE VIDEOGRAPHER:  We're now on the
2           record.  This is the videotaped deposition of
3           Melinda Pitman, being taken in Ann Arbor,
4           Michigan.  Today is May 9, 2017, and the time
5           is 8:55 a.m.
6                    Will the attorneys please identify
7           themselves, and the court reporter please
8           swear in the witness.
9                    MR. BONNER:  This is Allen Bonner and
10          Bob Martinez for the Plaintiff, Madison
11          Cawthorn.
12                   MR. BURGE:  Greg Burge and Forrest Latta
13          for the Defendant, Auto-Owners Insurance
14          Company.
15   Thereupon--
16                       MELINDA ANNE PITMAN
17   was duly administered the oath:  Do you swear or
18   affirm that the testimony you are about to give in
19   this cause will be the truth, the whole truth and
20   nothing but the truth?
21                   THE WITNESS:  I do.
22                       DIRECT EXAMINATION
23   BY MR. BONNER:
24        Q.   Ms. Pitman, thank you for being here
25   today.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 6

1          Would you please state your full name
2     for the record.
3          A.    Sure.   It's Melinda Anne, A-N-N-E,
4     Pitman, P-I-T-M-A-N.
5          Q.    Okay.   And where do you work?
6          A.    Auto-Owners Insurance Company.
7          Q.    And give me your office address.
8          A.    6101 Anacapri Boulevard, Lansing,
9     Michigan, 489 -- I think it's 10.
10         Q.    Okay.   And I know you've given -- I know
11    you've taken a deposition before.   Have you ever
12    sat in a witness's chair for a deposition?
13         A.    I've never been a deponent before.
14         Q.    Okay.   What about a trial witness?   Have
15    you ever testified in trial?
16         A.    I have.   When I was in law school, I did
17    work for a -- a clinic at the -- in the law school,
18    and we served people over the age of 60, doing
19    wills and powers of attorney and stuff like that.
20    So I had to serve -- after someone passed away, I
21    was called as a witness to a will that I had
22    drafted.
23         Q.    Okay.   Never been a witness, then, in an
24    insurance-related or a bad faith case?
25         A.    No.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 7

1       Q.    What did you do to prepare for your

2    deposition today?

3       A.    I reviewed the claim file.

4       Q.    What does the claims file -- what is

5    that comprised of?

6       A.    It's comprised of all of the information

7    that the claims representative assigned to that

8    claim has gathered and placed in their file.

9       Q.    Is there a separate home office legal

10   file?

11      A.    There is.

12      Q.    Did you review that as well?

13      A.    I did.

14      Q.    Okay.  What is the home office legal

15   file comprised of?

16      A.    I pull documents out of the claim file

17   and -- that are pertinent to me or to the legal

18   issues, and those are placed -- so it's -- it's --

19   there's nothing -- there's less in the legal file

20   than in the claim file.

21      Q.    Is there anything in the legal file that

22   doesn't exist in the claims file?

23      A.    Not in -- not in the legal file, no.

24      Q.    Are there any files outside the legal

25   file in the claims file that are related to this

Page 8

1    case?

2         A.   Not that I'm aware of.  Underwriting, I

3    don't know if they -- I don't think they have a

4    file --

5         Q.   You can set aside underwriting.

6         A.   Yeah.

7         Q.   With respect to emails discussing

8    matters in -- in this case, are those placed either

9    in the claims file or in the legal file?

10        A.   Yes.  They, hopefully, have both, if

11   they're -- well, depending on who the parties to

12   the email are.

13        Q.   Are there ever any emails related to

14   this case that are not placed in one file or the

15   other?

16        A.   There shouldn't be.

17        Q.   Okay.  In this case, have you actually

18   checked to see if all of your emails, either emails

19   you've sent or received, were in either the claims

20   file or the legal file?

21        A.   Not recently, but, yes, I had in the

22   past.

23        Q.   Okay.  And, in fact, all of your emails

24   are in the claims file and the legals file, to the

25   best of your knowledge?

Page 9

1        A.    Yes, to the best of my knowledge.

2        Q.    Okay.  Did you refresh your recollection

3    by reading any of the materials in either the

4    claims file or the legal file?

5            MR. BURGE:  Object to the form.

6            You may answer it.

7        A.    For the deposition today, I reviewed the

8    files, yes.

9    BY MR. BONNER:

10       Q.    Okay.  Did they refresh your

11    recollection?

12            MR. BURGE:  Object to the form.

13            You can answer.

14       A.    Refresh my recollection of what?

15    BY MR. BONNER:

16       Q.    Of the events that transpired in 2014,

17    in particular with respect to this claim.

18       A.    Yes.

19       Q.    Okay.  Is there any -- just background

20    silly questions.

21            Is there any reason why you can't give

22    full and complete answers today?

23       A.    No.

24       Q.    And you're not taking any medications I

25    should know about or anything?

Page 10

1       A.    No.

2       Q.    How long have you been at Auto-Owners?

3       A.    Five years.

4       Q.    Okay.  Do you have a written job

5    description?

6       A.    I am sure there is one.  I have not seen

7    it.

8       Q.    It's not, like, something that's

9    available online?

10       A.    Not that I'm aware of, no.

11       Q.    Have you worked for any other insurance

12    companies other than Auto-Owners?

13       A.    No.

14       Q.    Prior to coming to Auto-Owners, where

15    did you work?

16       A.    I was in private practice.

17       Q.    What kind of cases did you handle?

18       A.    Primarily insurance defense.

19       Q.    By "insurance defense," were you

20    insurance appointed defense counsel in tort claims,

21    or were you handling coverage cases in that?

22       A.    Primarily defense.  We -- I did some

23    coverage, but it was primarily defense.

24       Q.    Were there any particular insurers that

25    you worked for?

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

Page 11

1      A.   Yes.  And I was an associate, so they

2  were clients of the partners at the firm.  To the

3  best of my recollection, we did work for the

4  Hartford, CNA -- there's more -- XL Insurance

5  Company.

6      Q.   Did any of the cases that you handled

7  while you were in private practice involve matters

8  that originated in Florida?

9      A.   Not that I recall.

10     Q.   Is there anything that would refresh

11  your recollection?

12     A.   No.

13     Q.   I'm not trying to be tricky.  I just --

14     A.   No, I -- the -- the partners might know.

15  I -- I -- I'm not sure that they would recall

16  either, but...

17     Q.   Okay.  You were barred in the State of

18  Michigan?

19     A.   Yes.

20     Q.   Anywhere else?

21     A.   No.

22     Q.   Do you pro hac vice anywhere?

23     A.   No.

24     Q.   Are you a member of any legal

25  organizations other than your bar membership?

```
                                              Page 12

 1          A.    No.

 2          Q.    Have you ever given any talks, spoken at

 3    any seminars with respect to either Florida claims

 4    or bad faith?

 5          A.    No.

 6          Q.    Have you attended any seminars that

 7    covered either Florida claims or bad faith?

 8          A.    Florida claims, yes.

 9          Q.    Can you describe for me that seminar, or

10    was it more than one?

11          A.    I have been to -- I'm trying to recall

12    if there was more than one.  I -- last fall I was

13    at a construction defect seminar.

14          Q.    And that concerned Florida claims?

15          A.    Yes.  Not --

16          Q.    It was here in Michigan?

17          A.    No.  It was in Fort Lauderdale.  It was

18    a -- it actually covered a national issue, but

19    there were some very specific Florida talks.

20          Q.    Do you know who administered that

21    program?

22          A.    Do you want to know the conference

23    company or the law firm that was, sort of, the host

24    or --

25          Q.    Please, both, I mean, if you recall.
```

Page 13

1        A.    Okay.  It was a Perrin, P-E-R-R-I-N,

2   Conference, and Gary Baumann --

3        Q.    Mm-hmm.

4        A.    -- was the host or facilitator that put

5   the conference together.

6        Q.    Apart from this conference from last

7   year, have you attended any other classes or

8   seminars dealing with Florida claims that you can

9   recall?

10        A.    I -- I believe that was the only one

11   that -- I've been to other coverage conferences,

12   but they were not specific to Florida.

13        Q.    Okay.  Now, since coming to Auto-Owners

14   five years ago, have any of your -- well, tell me

15   what your job duties are at Auto-Owners.  Have they

16   changed over the last five years?

17        A.    Yes.

18        Q.    Well start -- where did you start at

19   Auto-Owners?

20        A.    Well, my title is the same.  That has

21   not changed.  I'm -- I'm an attorney.

22        Q.    Yes.

23        A.    But in the beginning, they start you out

24   working on other people's files, helping other

25   people.  Usually, you start out closing files, and

```
                                              Page 14
 1   you -- you look at what happened.  You -- why --
 2   why it's ready to be closed and that sort of thing.
 3   And then once you've completed your training, then
 4   you're assigned specific claims offices that you
 5   would work with.
 6        Q.   Okay.  So when you first came on, you
 7   were working with another lawyer.  Is that --
 8        A.   Well, it was -- we -- we have
 9   approximately 30 in-house attorneys.  So it was the
10   other in-house attorney.  It was their files.
11        Q.   Okay.  And all of the in-house
12   attorneys, they're all physically located in the
13   same place?
14        A.   Yes.
15        Q.   Okay.  And that's all in Lansing?
16        A.   Yes.
17        Q.   In the same office for which you gave
18   the address earlier?
19        A.   Yes.
20        Q.   Approximately how long were you doing
21   this preliminary stage of assisting other
22   attorneys?
23        A.   I believe it was two to three months.
24        Q.   And after two to three months, you then
25   were given cases for which you had primary
```

Page 15

1    responsibility?

2          A.    Yes.

3          Q.    Okay.   And has that been consistently

4    your job duty since completing that initial phase?

5          A.    I've been assigned different offices

6    that I worked with throughout the last five years,

7    but primarily, yes.

8          Q.    What offices have you been assigned to?

9          A.    Initially, I worked with Traverse City,

10   Michigan; Dayton, Ohio; Indianapolis, Indiana.   I

11   think those were the first three that I had in the

12   beginning.

13              And then I was given -- so Dayton and

14   Indianapolis were given to someone else.   And I was

15   given the Tallahassee, Florida, office and then the

16   Ocala, Florida, office approximately a year after

17   that.

18         Q.    How many offices are there in Florida

19   that Auto-Owners administers?

20         A.    Seven.

21         Q.    Seven.

22              And are you still assigned to the

23   Tallahassee and Ocala offices?

24         A.    I am.

25         Q.    And approximately how many years have

Page 16

1   you been working on claims originating from those

2   two offices?

3           A.   I've had Tallahassee since 2013.  And --

4   I can't recall if -- if I got Ocala at the end of

5   2013 or the beginning of 2014.

6           Q.   Okay.

7           A.   Somewhere in there.

8           Q.   What are your job responsibilities?

9           A.   So I -- I call it litigation management.

10  I don't know if that's technically what the job

11  description says.  I help the claims adjusters with

12  issue spotting, sometimes it's coverage questions,

13  and not with every file -- not with every file that

14  the claims adjuster has.

15          Q.   Are you senior to the adjuster on the

16  file?  In other words, do you have oversight or

17  management over the adjuster?

18          A.   Well, it -- it remains considered their

19  file.  I am more like a -- a resource, more like

20  their attorney on the file.  I'm not sure -- I'm

21  not sure if it's considered more of a lateral -- I

22  assist them.

23          Q.   You assist them with legal issues?

24          A.   Mm-hmm.

25          Q.   And you assist them with understanding

Page 17

1    how the law is as it applies to the individual

2    facts of any claim?

3            A.    Sometimes.

4            Q.    Well, if I've misstated it, correct me.

5            A.    Well, there are -- there are certain

6    times where maybe we have a question, and we

7    would -- and -- and I would say we need to seek

8    outside counsel on this particular issue.   So

9    sometimes I don't have the answer that we need, but

10   I can help identify the answers that we're looking

11   for.

12           Q.    Okay.   When an adjuster has either a

13   claim that involves umbrella coverage or a claim

14   that has an exposure over $40,000, my understanding

15   is that the adjuster must come to home office legal

16   to obtain a settlement authority.

17               Is that true?

18           A.    Yes.

19           Q.    Okay.   Now, is that consistent across

20   all claims originating out of Ocala and

21   Tallahassee?

22           A.    There are different dollar values that

23   they have to seek authority for, depending on the

24   line of business.

25           Q.    Oh, right.

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

                                                      Page 18

1          A.    So it's different for a property claim

2     than a bodily injury claim.

3          Q.    We're talking about bodily injury here.

4     To the extent my questions indicate property

5     damage, please understand that the only coverage

6     I'm interested in is the bodily injury.

7               You agree that this is a bodily injury

8     claim?

9          A.    Yes.

10         Q.    Okay.  With respect to authority to

11    settle a bodily injury claim, is it true that an

12    adjuster operating out of Florida must seek home

13    office legal's authority before it can settle a

14    claim that is valued greater than $40,000?

15         A.    It's -- my understanding is it's greater

16    than 50.

17         Q.    Okay.

18         A.    They have authority up to 50,000.

19         Q.    Any claim for which a settlement over

20    $50,000 is necessary requires home office legal's

21    consent?

22         A.    Yes.

23         Q.    Okay.  And specifically, since you

24    manage the claims that arise out of Tallahassee and

25    Ocala, you're the person that would give that

Page 19

1    authority to the adjuster?

2         A.   I would be their first line of contact

3    for authority, and then there are above certain

4    levels where I have to go to my officers --

5         Q.   Okay.

6         A.   -- to get authority.

7         Q.   In 2014, what was your settlement

8    authority?

9         A.   Mine was $100,000.

10        Q.   Okay.  Above $100,000, who would you go

11   to to obtain settlement authority?

12        A.   One of the legal officers; generally,

13   Tom Froman.

14        Q.   Was Tom Froman assigned to the

15   Ledford-Cawthorn matter?

16        A.   I wouldn't say "assigned."  He is the

17   person I spoke to to get settlement authority.

18        Q.   And what is Mr. Froman's settlement

19   authority?

20        A.   I don't know.  You would have to ask him

21   that.

22        Q.   This case involved a total of $3 million

23   in coverage.  Do you agree?

24        A.   Yes.

25        Q.   Okay.  Did Mr. Froman have settlement

Page 20

1   authority to issue a settlement in that amount?

2        A.   Ultimately, he is the one that put the

3   settlement, so I don't -- I guess the answer would

4   be yes, he did, since he did it.  I don't know what

5   his settlement authority is.

6        Q.   Okay.  Let me back up a little bit.

7             Approximately what percentage of the

8   claims that you are involved with involve bodily

9   injury -- injury claims?

10       A.   This is just a guess --

11       Q.   Mm-hmm.

12       A.   -- because we don't track that.  But we

13  write very little property in Florida, so I

14  would -- I would guess 85 --

15       Q.   Okay.

16       A.   -- percent.

17       Q.   And are those all auto liability claims?

18       A.   No.

19       Q.   Okay.

20       A.   There may be premises liability,

21  slip-and-fall, workplace injury accidents.

22  There -- there are other types of bodily injury.

23       Q.   What percentage of the claims that you

24  handle involve auto liability policies?

25       A.   Again, this is just a guess:

Page 21

1   60 percent, maybe.

2       Q.   And is that figure -- which is,

3   understandably, a guess -- is that roughly the same

4   figure that you have -- that would apply to the

5   claims you've handled since 2013?

6       A.   I honestly -- there's probably someone

7   at the insurance company that tracks claims in

8   different lines of business that could answer that

9   better.  I'm not sure that I'm qualified.  But to

10   guess, I -- I would say it probably stays pretty

11   consistent.

12       Q.   And how many of the claims that you

13   handle involve umbrella coverage?

14       A.   It's -- it's a small amount.  I don't

15   know percentagewise.

16       Q.   Okay.  Have you received any training on

17   the covenant of good faith as it replies in

18   Florida?

19       A.   Any training on the covenant of good

20   faith?  I'm not sure how to answer that.  We

21   have -- not specific -- I've never specifically had

22   training on that issue alone.

23       Q.   Would you say that your understanding of

24   the covenant of good faith, then, comes from your

25   own practical experience, which can include legal

Page 22

1    research?

2          A.    There's probably more to -- yes.  But

3    also, we, from time to time, maybe have department

4    meetings or interoffice training where it's

5    mentioned.  But I -- I don't know that there's been

6    specifically trainings on good faith.

7          Q.    So fair to say you don't specifically

8    recall receiving, at a departmental meeting, for

9    example, any training on the covenant of good faith

10   as it applies in Florida?

11         A.    We've had -- I'm trying to recall all of

12   the different webinars and things that I -- that

13   I've watched over the last five years.  I'm sure

14   that there have been mentions of the duty of good

15   faith.  I do not recall if I've specifically had --

16         Q.    Okay.  And there's nothing that would

17   refresh your recollection; correct, with respect to

18   that question?

19         A.    No.

20         Q.    I have a copy of the claims handling

21   guide or selections of it that was provided to me

22   by counsel for Auto-Owners.

23              This is not a guide that you would refer

24   to; correct?  Because this applies to adjusters.

25         A.    That's correct.

David Madison Cawthorn v. Auto-Owners Insurance Company                     Melinda Pitman | 5/9/2017

```
                                                        Page  23

 1          Q.    Okay.   Have you ever seen the claims

 2     handling guide?

 3          A.    Yes.

 4          Q.    Okay.   Have you ever reviewed the

 5     sections that apply particularly to Florida?

 6          A.    No.

 7          Q.    Okay.   I'm going to ask you a few

 8     questions.   If you don't know the answer -- I'm not

 9     trying to be tricky -- just tell me if you know or

10     you don't know.

11              There's references in this claims

12     manual, specifically on page AOCHG-0013 -- well --

13     well, would you like to see this?

14              MR. BONNER:   Can I have an exhibit

15         number?

16              (Plaintiff's Exhibit 1 was marked for

17         identification.)

18     BY MR. BONNER:

19          Q.    There.   I'm showing Ms. Pitman a copy of

20     the claims manual that was provided to us in

21     discovery.   This is excerpts only.

22              Just, if you will, flip to page 13.

23              First of all, have you ever seen -- this

24     is -- can you verify that this is the -- the claims

25     handling guide?
```

```
                                              Page  24
  1         A.   It appears to be the claims handling

  2    guide.

  3         Q.   Okay.  If you go to page 13 -- do you

  4    have that in front of you?

  5         A.   Yes.

  6         Q.   Okay.  There is a reference to Florida's

  7    unique exposures.

  8              Do you see that on the second paragraph?

  9         A.   Yes.

 10         Q.   Can you explain to me, what are the

 11    unique exposures in Florida this document refers

 12    to?

 13         A.   I don't know.

 14         Q.   Okay.  Go down a little bit farther.

 15              The manual also states that a bodily

 16    injury claim in Florida, quote, should be resolved

 17    without delay with the manager's markover to assure

 18    delay is avoided.

 19         A.   Can you -- where -- where are you

 20    reading at?

 21         Q.   We're looking at the fourth bullet

 22    point.

 23         A.   Okay.

 24         Q.   And I'll indicate for you.  Somewhere

 25    around here.
```

David Madison Cawthorn v. Auto-Owners Insurance Company                Melinda Pitman | 5/9/2017

Page 25

1          A.    Okay.

2          Q.    There.  I think it's actually

3    highlighted.  "If retained, such claim should be

4    resolved without delay with the manager's markover

5    to assure delay is avoided."

6                Why is it important to avoid delays when

7    resolving bodily injury claims in Florida?

8          A.    I think it's important to avoid delays

9    in any claim in any state.

10         Q.    I agree with that proposition.

11               Why did Auto-Owners, if you know,

12   specifically call out Florida in delays in Florida,

13   if you know?

14         A.    I don't know.  And without having all

15   of -- if there's other references to other states,

16   I don't know if this is the same language in all of

17   them or not.  I don't know.

18         Q.    If you turn to the page before it,

19   you'll see that this section that I'm reading from

20   is from a section called "Branch Office Claims

21   Handling."

22               Can you verify that?

23         A.    Yes.

24         Q.    And you see at the top, it says in the

25   right-hand corner, "All states"?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 26

1      A.    Yes.

2      Q.    Okay.  So I didn't prepare this.  I

3   interpret this two-page section as applying to all

4   states, but I think it's a specific call-out to

5   Florida liability.

6           Do you have any knowledge to either

7   affirm or deny that statement?

8      A.    I do not.

9      Q.    Okay.  You agree with me that it does

10  have a "all states" on the first page and a

11  call-out specifically to Florida liability claims

12  on the second page?

13     A.    Yes.

14     Q.    Okay.  Can you explain why Auto-Owners

15  made that distinction?

16     A.    I cannot.

17     Q.    Okay.

18     A.    And as I mentioned -- I don't know if

19  this is the entire claims handling guide.  There

20  may be other states that are also particularly

21  identified.  I don't know.

22     Q.    If you'll return to page 13 --

23     A.    Yes.

24     Q.    -- and you look at the fifth bullet

25  point, also highlighted.  The manual continues to

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 27

1    say that Florida bodily injury claims should be

2    given, quote, sufficient priority, end quote, so

3    that, quote, there is no delay in the contact or

4    follow-up with the parties involved.

5               What is the reason behind that protocol?

6          A.   I don't -- I don't know why this

7    language was chosen.  And it's talking about

8    transferred files.  But I -- I was not party to the

9    drafting of this language, so I'm not sure what the

10   intent was behind it.

11         Q.   And based on your five years of

12   experience at Auto-Owners, you have not been

13   trained to handle claims that originate out of

14   Florida any differently than claims that arise out

15   of any other state?

16              MR. BURGE:  Object to the form.

17              You can answer it.

18         A.   There are specific nuances, like the

19   civil remedy notice in Florida, that we have

20   training on to be aware of statutory differences.

21   I've had webinars and trainings on Florida-specific

22   issues such as that.  I don't know if that answers

23   your question.

24   BY MR. BONNER:

25         Q.   Well, let me drill down specifically on

Page 28

1    this issue of delay.

2              Based on your training and experience at

3    Auto-Owners over the five years you've been there,

4    you have not been trained to handle delays that

5    take place on Florida claims any differently than

6    delays that occur or arise on a claim originating

7    out of a different state?

8         A.   Well, there's -- there's no specific

9    training on delay, as you're wording it.  I mean

10   we're all trained to handle them -- any claim in

11   any state promptly and efficiently and correctly.

12        Q.   So the duty to handle a claim promptly

13   in Florida is no different than the duty to handle

14   a claim promptly if that claim originates out of a

15   different state?

16             A.   I -- I would --

17             MR. BURGE:  Let me object to the form to

18        the extent that calls for a legal conclusion.

19             You can answer the question.

20        A.   I would not characterize it in -- in the

21   way that you worded it, because there are things

22   like the civil remedy notice where you have, you

23   know, 60 days after that's filed to cure.  So -- so

24   there are differences in the way that things are

25   handled --

Page 29

1    BY MR. BONNER:

2         Q.   That's fair.

3              Apart from the civil remedies notice

4    statute, are there any special protocols that

5    Auto-Owners employs with respect to Florida bodily

6    injury liability claims?

7         A.   You're ask -- I'm trying -- I'm trying

8    to understand what you're asking.  You're asking me

9    if there's specific protocols on Florida bodily

10   injury claims?

11        Q.   And let me -- let me back out, just

12   so -- I -- I was given this -- I'm showing you what

13   I have.

14        A.   Right.

15        Q.   I -- I see this document that has a

16   specific call-out on Florida liability claims.  I

17   don't know -- this is not a complete document.  I

18   know it's not.  There's no dispute that it's not.

19              So to the extent that there's

20   Florida-specific protocols, this is all I have.

21   And so what I'm trying to get at is, are there

22   other protocols that apply to Florida bodily injury

23   claims that you're aware of?  Now, you might not be

24   aware of any, and that's fine.  I'm not trying to

25   be tricky.  I'm just trying to let you know where

```
                                              Page 30

 1    I'm coming from.  Because right now I have these.

 2    So when I refer to these -- and my question will

 3    start here:  On page 13 of this claims handling

 4    manual, I see some specific Florida protocols.

 5    Apart from these protocols that appear on page 13

 6    of Exhibit 1, are you aware of any other

 7    Florida-specific protocols that apply to bodily

 8    injury claims?

 9         A.   I am not aware of any specific

10    protocols.  The claims representatives may be, or

11    the claims managers in Florida may -- and this is

12    really intended for them more than for the legal

13    department.  So that may be a better person --

14         Q.   Sure.

15         A.   -- to ask that question.

16         Q.   And within the legal department, there's

17    not any particular protocols that you, in your

18    capacity -- in your job capacity, are trained or

19    are supposed to apply to Florida-based claims that

20    don't apply to the other states?

21         A.   Well, there are with respect to Florida

22    law; otherwise, I would say no.

23         Q.   Have you ever been involved in a bad

24    faith failure to settle lawsuit involving a Florida

25    claim?
```

Page 31

1      A.    No.

2      Q.    Have you ever had to research Florida

3  bad faith failure to settle cases?

4      A.    Research --

5      Q.    You know what, strike that.  That's

6  okay.

7      A.    That's okay.

8      Q.    This is the first Florida bad faith case

9  that you've been involved in?

10      A.    Yes.

11      Q.    Okay.  All right.  With respect to this

12  claim, the Cawthorn-Ledford claim, was your job

13  performance evaluated with respect to your handling

14  of this claim?

15      A.    I don't know the answer to that

16  question.

17      Q.    Who would know?

18      A.    Tom Froman.

19      Q.    Has the legal department's role in this

20  claim been audited by any party, to your knowledge?

21      A.    Not to my knowledge.

22      Q.    Has it been reviewed by any outside

23  party, to your knowledge?

24      A.    Not to my knowledge.

25      Q.    Has it been reviewed by any customer

Page 32

1  care control branch of Auto-Owners?

2       A.   Not to my knowledge.

3       Q.   Okay.  Your supervisor, with respect to

4  Ledford-Cawthorn claim, was Mr. Froman?

5       A.   Any of the legal officers, I would say,

6  are my supervisors.

7       Q.   With respect to this claim, though, who

8  supervised your handling or your role in it, if

9  anyone?

10       A.   We don't -- yeah.  We don't -- they're

11  not specific -- the officers aren't specifically

12  assigned to particular claims.  So I -- I would say

13  any -- any of the legal officers.

14       Q.   How many legal officers are there?

15       A.   There are four.

16       Q.   Can you give me their names?

17       A.   Sure.  Tom Froman, Melinda Carlson,

18  Kathleen Lopilato --

19       Q.   Mm-hmm.

20       A.   -- and Bill Woodbury -- or William

21  Woodbury.

22       Q.   To your knowledge, who among those four

23  were involved in the Ledford-Cawthorn claim?

24       A.   Tom Froman.

25       Q.   The other three were not involved, to

Page 33

1    your knowledge?

2         A.    To my knowledge, no.

3         Q.    Do you know if Auto-Owners tracks

4    components such as reserve ratio or claims-made

5    ratios?

6         A.    They do.

7         Q.    Okay.  Do you get a performance

8    evaluation at the end of the year?

9         A.    We have a performance evaluation on the

10   anniversary of our hiring date each year.

11        Q.    What was your hiring date?

12        A.    May -- I think it was -- 29, 2012.

13        Q.    I would not be able to answer that

14   question if I were asked, so thank you.

15              Okay.  When you receive that -- that

16   annual review, is it written?

17        A.    There is a -- yes.  Yes.  There is a

18   written form that they fill out.

19        Q.    Approximately how long is it?

20        A.    The form?

21        Q.    Mm-hmm.

22        A.    I believe it's a one-page, front

23   backside.

24        Q.    Is there room for a narrative?

25        A.    Yes.  And you can attach -- if you

Page 34

1    wanted to attach documents, I'm sure you could

2    write longer.

3         Q.    Do you receive it in a meeting with

4    someone?

5         A.    Yes.

6         Q.    Okay.  In 2015, who did you meet with to

7    receive your annual performance review?

8         A.    Melinda Carlson.

9         Q.    Okay.  Did the Ledford-Cawthorn matter,

10   was it spoken about during that annual performance

11   review?

12        A.    No.

13        Q.    What about in 2016, was the

14   Ledford-Cawthorn matter discussed with whoever it

15   was that gave you your annual performance review?

16        A.    Not -- not that I recall, no.

17        Q.    Are there written criteria that govern

18   whether or not you are eligible for a bonus?

19        A.    Me specifically, or --

20        Q.    You specifically.  No one else.  I'm

21   only interested about you.

22        A.    I'm going to say no, because bonuses are

23   given companywide when they are given.

24        Q.    Okay.  Do you know what criteria apply

25   to whether or not Auto-Owners gives a bonus in any

Page 35

1   given year?

2        A.   There -- yes.  There is -- and -- and

3   I'm not going to remember specifically the formula.

4   But it -- there's a formula based on how

5   Auto-Owners' loss ratio is and how it compares to

6   the industry.  And there's -- there's some sort of

7   formula that I don't recall at the present time how

8   they figure that out.

9        Q.   And just for the benefit of anyone who

10  doesn't know, what is a loss ratio?

11       A.   I'm probably not qualified to answer

12  that.  In -- in my understanding, it's a number

13  that reflects the losses that we've paid out at any

14  given time.

15       Q.   It's a ratio of the losses paid,

16  indemnity paid, over premiums collected; correct?

17            MR. BURGE:  Object to the form.

18            You may answer it, if you know.

19       A.   I don't -- I don't know.

20  BY MR. BONNER:

21       Q.   Lost ratio, though, does gauge or at

22  least gives a measure of companywide profitability;

23  true?

24            MR. BURGE:  Object to the form.

25            You may answer it.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 36

1          A.   I'm not sure if it's a measure of

2     profitability or not.  I -- I know it's a measure

3     of the losses that we've had over any given period.

4     BY MR. BONNER:

5          Q.   Compared to what?

6          A.   That, I'm not sure.

7          Q.   Okay.  With respect to reserves, it's

8     Auto-Owners' policy to set a reserve on all bodily

9     injury liability cases or claims that arise;

10    correct?

11         A.   Yes.  If there's a bodily injury claim,

12    we have to set a -- a reserve.

13         Q.   And the reserve is an estimate of the

14    total cost Auto-Owners might pay on a claim?

15              MR. BURGE:  Object to the form.

16              You may answer it.

17         A.   I would say it is the -- the reserve is

18    what we believe the potential exposure could be.

19    BY MR. BONNER:

20         Q.   The potential exposure to the insured?

21         A.   No.  For the value of the claim.

22         Q.   Okay.  Do you ever reserve over policy

23    limits?

24         A.   No.

25         Q.   Okay.  So it's a -- a reserve is an

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                            Page 37

1    estimate of the potential value of the claim up to

2    policy limits?

3          A.    Yes.

4          Q.    Okay.  It's supposed to reflect

5    Auto-Owners' best estimate based on the information

6    it has for the potential value of the claim?

7                MR. BURGE:  Object to the form.

8                You may answer it.

9          A.    Reserves are set based on the

10   information that we have available at the time that

11   they are set.  There are -- if additional

12   information is discovered, they may be raised or

13   lowered.

14   BY MR. BONNER:

15         Q.    It's a best estimate based upon the

16   information Auto-Owners has when it's being made?

17         A.    Yes.

18         Q.    Okay.  Improper reserving can affect the

19   financial stability of Auto-Owners?

20               MR. BURGE:  Object to the form.

21               You may answer it.

22         A.    Well, is that a question?

23   BY MR. BONNER:

24         Q.    Yeah, that is.  Can you confirm or deny

25   that?

```
                                                    Page 38
  1              MR. BURGE:  Same objection.
  2              You can answer it.
  3         A.   I -- I don't know if that's accurate or
  4    not.
  5    BY MR. BONNER:
  6         Q.   If you'll turn to 23 of Exhibit 1 in
  7    front of you.
  8         A.   23?
  9         Q.   Yes.  Just the -- the highlighted
 10    portion at the bottom says, "Attention to detail on
 11    reserving affects the financial stability of
 12    Auto-Owners."
 13              Does that statement comport with your
 14    experience and training at Auto-Owners over the
 15    last five years?
 16              MR. BURGE:  Object to the form.
 17              You may answer it.
 18         A.   We -- yeah.  We are trained that we need
 19    to -- well, I don't set reserves.  The claims
 20    representatives set reserves.  But it's my
 21    understanding that they are trained that they need
 22    to be very careful in setting those reserves.
 23    BY MR. BONNER:
 24         Q.   Do you have an understanding as to why
 25    they need to be very careful in setting the
```

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 39

1    reserves?

2         A.   I'm not sure that I'm qualified -- my

3    understanding would be that it -- there can be --

4    there can be consequences for over-reserving and --

5    according to this, it affects the financial

6    stability.

7         Q.   What are the consequences of

8    over-reserving?

9              MR. BURGE:   Object to the form.

10             You may answer it.

11        A.   Yeah.  I'm -- I'm -- I'm not qualified,

12   really.  I -- I know that we get audited from the

13   financial -- or the insurance offices in every

14   state that we do business in.  I don't work in --

15   with those particular audits; so I'm not sure what

16   those consequence -- I just know that there are --

17   there could be consequences.

18   BY MR. BONNER:

19        Q.   Fair enough.  Fair enough.  We'll move

20   on.  Thank you for that.  I wasn't trying to -- you

21   know, if you don't know, you don't know.

22             All right.  I'm going to show you what

23   we'll mark as Exhibit 2.

24             (Plaintiff's Exhibit 2 was marked for

25        identification.)

Page 40

1    BY MR. BONNER:

2         Q.   Ms. Pitman, do you recognize this

3    document?

4         A.   It appears to be a printout of the --

5    what we call K notes or the -- the claim notes --

6         Q.   Okay.

7         A.   -- from this particular claim.

8         Q.   Now, you'll recognize that the last

9    claims note on any of these five pages is dated

10   April 29, 2015; is that accurate?  It's on the

11   first page.

12        A.   That does look like the last note.

13        Q.   Okay.  Have you ever seen the -- the

14   K notes for the Ledford-Cawthorn claim?

15        A.   Probably, at some point in time, I

16   accessed them.  I have not recently.  It's --

17   again, it's a system that, typically, the claims

18   people use --

19        Q.   I'm just -- okay.  Can you tell me if

20   this is an accurate copy of the K notes that were

21   entered in the Cawthorn-Ledford matter?

22        A.   I cannot.

23        Q.   Okay.  We'll keep going.

24             When you handle a case, you do not enter

25   any notes into the K notes -- can I call it the

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 41

1    claims diary?

2           A.    You can call it the claims diary.

3           Q.    You understand what I'm talking about if

4    I use the word "claims diary"?

5           A.    Yes.  Yes.

6           Q.    In the claims diary, do you as a lawyer

7    working for Auto-Owners ever enter notes in the

8    claims diary?

9           A.    No.

10          Q.    Okay.  You might review the claims diary

11   in the course of your assisting on a claim?

12          A.    Sometimes, yes.

13          Q.    Sometimes.

14                You do not recall if you reviewed the

15   claims diary with respect to the Cawthorn-Ledford

16   matter?

17          A.    I do not.

18          Q.    Okay.  Did you review it yesterday, or

19   whenever it was that you reviewed the claims file,

20   in connection with preparing for today's

21   deposition?

22          A.    Yes.

23          Q.    Okay.  Based on your review of the

24   claims file, is this an accurate copy of what you

25   reviewed?

```
                                                     Page 42
 1        A.    It appears to be.  I did not

 2   particularly pay attention to the dates, so I can't

 3   confirm.  But it -- but it appears to be what I saw

 4   in the file.

 5        Q.    Are there diary entries that go beyond

 6   4/29/15?

 7        A.    On this exhibit, no, there are not.

 8        Q.    What about with respect to the claims

 9   diary that you reviewed?

10        A.    I -- I don't recall if there was

11   anything dated after that.

12        Q.    Okay.  Do you make any personal notes

13   when you handle a claim?

14        A.    I do.

15        Q.    Did you make personal notes with respect

16   to the Cawthorn-Ledford claim?

17        A.    Yes.

18        Q.    Where are those notes located?

19        A.    Those are kept in something we call a

20   lit card.

21        Q.    A lit card.

22              Is that a separate computer program?

23        A.    No.

24        Q.    Tell me what a lit card is.

25        A.    It's -- it's -- well, maybe you would
```

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

Page 43

1   call it a separate computer -- it's a Word document

2   where we enter our mental impressions of the claim.

3          Q.   Okay.  Do you have a lit card for the

4   Cawthorn-Ledford matter?

5          A.   Yes.

6          Q.   Approximately how long is it?

7          A.   I -- there would be one for the umbrella

8   file, and there would be one for the underlying

9   file.  Because part of what I do is -- is look at

10  the coverage available for -- for each policy.

11          So there would be two.  And I -- I

12  honestly don't know how long the -- the garage, the

13  underlying policy, would have a longer lit card

14  than the umbrella, I believe; maybe -- maybe two,

15  three pages.

16          Q.   Okay.  For the garage policy?

17          A.   Yes.

18          Q.   Okay.  And a shorter lit card for the

19  umbrella policy?

20          A.   Yes.

21          Q.   This is just a Word document?

22          A.   Yes.

23          Q.   Okay.  Do you actually type it in Word?

24          A.   I dictate it, and my support staff type

25  it up into Word.

Page 44

1    Q.   And it's a running log?  And when I say

2    "running," you -- you enter these notes as

3    important events happen on the file?

4    A.   It -- it's a running log.  It may not

5    necessarily be -- sometimes it's, you know, I'm

6    checking in to see if any -- sometimes -- not maybe

7    with this particular case, but sometimes maybe

8    nothing has happened since my -- my last review.

9    Q.   When was the last time you updated your

10   lit card for the Cawthorn-Ledford matter?

11   A.   I do not specifically recall, but I

12   believe it was after the settlement was reached.  I

13   would have -- I would have made a note that we paid

14   out the policy limits and reached a settlement.  So

15   that was, I believe, at the end of 2016.

16   Q.   Did you review your lit cards for the

17   Cawthorn-Ledford matter in preparation for

18   testifying today?

19         MR. BURGE:  Object to the form.

20         You may answer it.

21   A.   Yes, and no.  I mean, they were --

22   they -- I did not read them.  I saw -- I saw them

23   in looking through the legal file, but I -- I did

24   not read the entries.

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 45

1   BY MR. BONNER:

2        Q.   Okay.  Do you have an accurate

3   reflection or recollection of what you wrote in

4   your lit card file?

5             MR. BURGE:  Object to the form.  It's a

6        privileged log.  It's a privileged log.  I'm

7        not going to let her answer that.

8   BY MR. BONNER:

9        Q.   When did you first start writing your

10  lit card in this case?

11       A.   To the best of my recollection, it was

12  early May 2014.

13       Q.   Would it be approximately May 9th --

14  May 8th or May 9th?

15       A.   That sounds accurate.

16       Q.   And the reason I bring up those dates

17  is -- and we'll get to them -- there were some

18  emails that were sent to Ms. McLean on May 8th and

19  May 9th.

20       A.   I -- I typically do that

21  contemporaneously with when I dictate my -- my

22  opening for the lit card.

23       Q.   Okay.  And you would have continued to

24  revise or add to the lit card as the case

25  progressed?  I think you answered this.  I'm just

Page 46

1   getting clarification.

2         A.   Yes.

3         Q.   Okay.  In connection with your review of

4   the -- well, did you rely on the lit card to

5   refresh your recollection in any way in preparation

6   for your testimony today?

7              MR. BURGE:  Object to the form.

8              You may answer it.

9         A.   No.

10             MR. BONNER:  Let me just get a copy of

11        the privilege log.  Let's mark this as 3.

12             (Plaintiff's Exhibit 3 was marked for

13        identification.)

14  BY MR. BONNER:

15        Q.   All right.  We're going to have to share

16  this Exhibit 3, Ms. Pitman.

17        A.   Okay.

18        Q.   Will you look at the first entry on this

19  log.  I believe it's dated May 9th of 2014.

20        A.   Yes.

21        Q.   Counsel's objection a moment ago

22  referred to a document, the lit card, being on the

23  privilege log.

24             If you know, is the first entry on this

25  privilege log, does that correspond to the lit

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 47

1   file?

2        A.   It appears to.  My -- my guess in

3   looking at this is that the first two, one would be

4   the lit card for the garage policy, and one would

5   be the lit card for the umbrella policy.

6        Q.   Excellent.  Thank you so much.

7             Now, there's a mention here about this

8   document referring to Auto-Owners' exposure for the

9   underlying claim.

10            Part of your job at Auto-Owners is to

11  estimate the exposure for the claims that you

12  handle?

13            MR. BURGE:  Object to the form.

14            You may answer it.

15       A.   Really, that's the claim

16  representative's job.  I review their analysis in

17  how they've arrived of what they estimate the

18  exposure to be.  And I may make suggestions or ask

19  them to look for something else that I think will

20  assist.

21  BY MR. BONNER:

22       Q.   So, as a general matter, once you review

23  the adjuster's reserve, are you saying that you

24  might make suggestions to the adjuster about

25  changing the reserve?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

```
                                              Page 48
 1        A.    Sometimes that happens.
 2        Q.    When we were speaking about exposure a
 3   moment ago, is that different than reserve?
 4             MR. BURGE:  Object to the form.
 5             You can answer it.
 6        A.    Maybe.
 7   BY MR. BONNER:
 8        Q.    Okay.  So let's -- maybe it will be
 9   easier if we just -- if I ask you with respect to
10   this case.
11             With respect to this case, Ms. McLean
12   gave you a report -- we'll see it in a minute --
13   with respect to the Ledford-Cawthorn claim;
14   correct?
15        A.    Yes.
16        Q.    Okay.  In connection with that report,
17   she set a reserve --
18        A.    Yes.
19        Q.    -- true?
20             When you, then, wrote notes regarding
21   the exposure, was that with respect to the reserve
22   that was set, or is it something different?
23             MR. BURGE:  Object to the form.
24        A.    I'm -- I'm not sure what you're
25   referring to when I wrote notes about the exposure.
```

Page 49

1   BY MR. BONNER:

2        Q.   I wish I could show you.  I'm trying to

3   drill down --

4        A.   Are you talking about in the lit card?

5        Q.   Yeah.  And I'm trying to do it in a way

6   that allows me to understand what it is.  And we're

7   all lawyers here.  You know, I -- I'm going to try

8   and test -- you know, and part of what I do is to

9   try and find out what the facts are regarding this

10  entry, the facts that are discoverable.

11       A.   Sure.

12       Q.   And then I can evaluate whether or not

13  it's something that, you know, we agree with the

14  privilege asserted, or it's something we're going

15  to have to take up to the Court.  And I'm not

16  trying to trick you.  That's where we're getting

17  at.

18            And so I'm trying to understand, is this

19  entry -- you said a moment before that you might

20  make suggestions to an adjuster.

21            Do you recall that?

22       A.   Yes.

23       Q.   Okay.  And what I'm trying to understand

24  is with respect to whatever happened in this case,

25  were there suggestions made to Ms. McLean with

Page 50

1   respect to the exposure?

2        A.   So I guess that's where I'm -- I'm

3   getting hung up on the word "exposure."  There were

4   suggestions made to Pamela that we needed to see

5   medical records to confirm the injuries being

6   claimed.

7             Typically, when we talk about

8   exposure -- I want to go back to that -- we're

9   talking about the coverage on a policy.  So one of

10  the things that I do when any claim comes in, I'll

11  say, okay, this is a garage policy.  What coverage,

12  based on the policy language, is available?  And we

13  call that the -- the exposure.  And we confirm that

14  there is coverage.

15       Q.   I understand.  The exposure can mean the

16  policy limits on the one hand?

17       A.   It could.

18       Q.   Or perhaps it could also mean the

19  reserve?

20       A.   Maybe.

21       Q.   Okay.  And perhaps it could also mean

22  the total value of the claim?

23       A.   Maybe.

24       Q.   Okay.

25       A.   And it could also be a reference to the

Page 51

1    line of coverage available.  Sometimes they call

2    that the exposure.

3         Q.    Okay.  Did you evaluate the reserve that

4    Ms. McLean set on this case initially?

5         A.    I wouldn't say that I evaluated it.  She

6    told me that she had put the reserves at the policy

7    limit based on what her understanding was of the

8    injury being claimed; and I reviewed it, and I did

9    not disagree with.

10        Q.    So you did not make any suggestions to

11   Ms. McLean with respect to the reserve she set,

12   other than get medical records?

13        A.    That's correct.

14        Q.    Okay.  So as part of your general duties

15   at Auto-Owners, do you ever evaluate potential

16   exposure to the insured on a given claim?

17              MR. BURGE:  Object to the form.

18              You may answer it.

19        A.    In the sense that we try to determine if

20   we believe that there may be an -- a -- a judgment,

21   or if the value may be in excess of the policy

22   limits, we -- "we," meaning the claims

23   representative -- should make sure that they're

24   made aware that there could be an excess exposure.

25

```
                                               Page 52
 1   BY MR. BONNER:
 2        Q.   Okay.  We, the claims representative.
 3   That's not you.  That's Ms. McLean in this case;
 4   right?
 5        A.   Yes.  And there may be times, though,
 6   where I ask, you know, if they sent an excess
 7   letter.
 8        Q.   Right.  Well, let me back up.  I just
 9   want to talk about not Auto-Owners generally.  I
10   want to talk about your job duties specifically.
11             As part of your general job duties, do
12   you ever estimate the exposure to the insured on a
13   given claim?
14             MR. BURGE:  Object to the form.
15             You can answer it.
16        A.   No.
17   BY MR. BONNER:
18        Q.   Okay.  That's solely the responsibility
19   of the claims handler?
20             Well, I'm just saying -- because you
21   said -- you said before, the claims handler would
22   have that responsibility and would have the
23   responsibility to send an excess letter if it was
24   appropriate.
25        A.   Right.
```

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 53

1      Q.    Okay.

2           A.    If -- if we believe there's a potential

3    that the value could exceed the policy limits, and

4    that could be -- I mean, you might have a $10,000

5    policy limit.  And then it can be very clear

6    sometimes that this is going to exceed that

7    $10,000.

8           Q.    Okay.  But since you said before that

9    you don't estimate the potential exposure to the

10   insured, who at Auto-Owners does?  I guess that's

11   what I'm trying to -- who would I ask if I wanted

12   to ask that question?

13          A.    I'm not sure that we -- I'm not sure

14   that we necessarily evaluate the exposure to the --

15   to the insure -- we try to evaluate what we believe

16   the value of the claim is and if it exceeds the

17   limits.

18          Q.    And who does that?

19          A.    It would be the claims person.

20          Q.    In this case, Ms. McLean?

21          A.    Yes.

22          Q.    Okay.  And she would potentially

23   evaluate that number and then ask you for your

24   input?

25          A.    She would -- it -- it -- it may depend.

Page 54

1    It may be in the preliminary report.  It depends on

2    what information we have and when we have it.

3            Q.   In this case, did Ms. McLean estimate

4    potential exposure to the insured?

5            A.   I don't know the answer to that.

6            Q.   Okay.  And you don't recall whether or

7    not she ever spoke to you about the potential

8    exposure to the insured?

9            A.   I do not recall -- I believe she --

10   there may have been an indication that she believed

11   it was, you know, a policy limit.  Now, whether --

12   I'm not sure she ever phrased it that -- as the

13   exposure to the insured, other than it might exceed

14   the policy limits.

15           Q.   On the Ledford-Cawthorn claim, who

16   ultimately makes the decision on whether or not to

17   extend the settlement offer involving umbrella

18   coverage?  Who made that decision?

19           A.   Well --

20           Q.   Mr. Froman?

21           A.   Yes.

22           Q.   Was it based on suggestions or comments

23   made by either you or Ms. McLean?

24           A.   It would first come in a request from

25   the claims representative to, in this case, me, and

Page 55

```
 1   then I would have gone to Mr. Froman.

 2          Q.   Would that request be written or oral?

 3          A.   It could be -- it could be either.  I

 4   don't -- I don't recall -- in this particular -- I

 5   don't recall if she made a written request once we

 6   got the lien information.

 7          Q.   She's not required to make a written

 8   request, is she, Ms. McLean?

 9          A.   Typically, they do.  I don't know that

10   it's required.  Typically, it comes in a written

11   format.

12          Q.   And then you would make a request of

13   Mr. -- in this case -- Forman?

14          A.   Froman.

15          Q.   Froman.  Excuse me.

16               True?

17          A.   Yes.  And that's -- that's in person, I

18   did.

19          Q.   Apart from your lit card, any other

20   notes that you made with respect to the

21   Cawthorn-Ledford matter?

22          A.   No.

23          Q.   With respect to emails that you drafted

24   that touch on the Cawthorn-Ledford matter, are

25   those all included within the home office legal
```

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

```
                                              Page 56
 1    file?
 2         A.    They should be either in the claim file
 3    or in the home office legal file.
 4         Q.    Have you verified that they are all in
 5    one or the other file in this case?
 6              MR. BURGE:  Object to the form.  You've
 7         already asked that question.
 8              MR. BONNER:  Oh, that's right.
 9              MR. BURGE:  You can ask her again.
10              MR. BONNER:  No, no.
11    BY MR. BONNER:
12         Q.    And you said they were.  You said, to
13    the best of your knowledge, they were.
14              Okay.  Let's keep going.
15              Any other documents, apart from the lit
16    card, the home office legal file, or the claims
17    file that you would have created that are related
18    to the Cawthorn-Ledford matter?
19         A.    No.
20         Q.    In other words, if I were to have a copy
21    of the lit card -- I understand there's been a
22    privilege asserted -- the claims file, and the home
23    office legal file, that would be the entire world
24    of documents that you would have generated in
25    connection to this claim?
```

Page 57

```
 1        A.   It should be, yes.
 2        Q.   Okay.  Should be.
 3             Is there anything else you can think of
 4   that might exist out there?
 5        A.   There may be underwriting information
 6   that underwriting holds, but...
 7        Q.   Okay.  Apart from underwriting
 8   information, any other information --
 9             MR. BURGE:  I think he's asking that you
10        created.
11             MR. BONNER:  Mm-hmm.
12             MR. BURGE:  Unless you gave them
13        something -- would you give the underwriting
14        people anything?
15             THE WITNESS:  No.
16             MR. BURGE:  Isn't that your question,
17        what she created, Allen?
18             MR. BONNER:  Yeah.  Yeah.  Yeah.
19   BY MR. BONNER:
20        Q.   What about Mr. Froman, would he have any
21   notes related to this claim?
22        A.   I don't believe so.
23        Q.   Is there any requirement that he put in
24   writing an authorization to offer, say, coverage
25   within an umbrella policy and settlement?
```

Page 58

1    A.   The only -- the only requirement in

2  writing would be, once we're actually issuing the

3  check, it would require him to initial the check at

4  the time he's releasing it.

5    Q.   Are you aware of any documents that

6  Mr. Froman offered in connection with the

7  Ledford-Cawthorn claim?

8    A.   I am not aware of any.

9         (Plaintiff's Exhibit 4 was marked for

10        identification.)

11  BY MR. BONNER:

12    Q.   I have a quick question with respect to

13  something I'm going to mark as Exhibit 4.

14         This is a document that I found online.

15  I don't expect you to have seen it before.  And I

16  have a very specific question about something that

17  appears towards the end of the document.

18         I'm going to go ahead and flip to the

19  page, because I don't think it's numbered.

20         Okay.  I'm showing this page.  It's

21  February 2012.  It's the second-to-last page, I

22  think -- third-to-last page.

23         My question to you is --

24         MR. BURGE:  Just for the record, why

25      don't you identify what this is and where it

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

Page 59

1          came from, so we'll have that.

2               MR. BONNER:   Yeah, sure.

3   BY MR. BONNER:

4          Q.   This is a document that was called the

5   "NAMIC Claims Conference Measuring and Managing

6   Claim Leakage and Quality."

7               You'll see there that there's an

8   Auto-Owners VP that's listed on the lower

9   right-hand side.  I think it says Mary Pierce.

10              My question is -- this is not a document

11  you authored.  I know you didn't author it.

12              My question is very simple:  With

13  respect to the third-to-last page, you'll see that

14  this has, basically, two, I think, screen captures

15  of something that includes reviewer comments.

16              Do you agree with me on that?

17         A.   It -- it appears, yes, that that's what

18  it is.  I -- I've never seen a screen like this.

19         Q.   That's my question.  My question -- I

20  don't know, and I don't know if this is

21  Auto-Owners' screen or it's a sample that the

22  producer put together.

23              So my question for you is very simple.

24  Have you ever seen anything that looks likes that

25  in your time at Auto-Owners?

```
                                                   Page 60
 1          A.   I have not.
 2          Q.   Okay.  Thank you.
 3               Okay.  I think we said before that you
 4     believe that your -- well, your lit card -- you
 5     started your lit card on May 9th, 2014; is that
 6     fair to say?
 7          A.   Yes.
 8          Q.   Okay.  And if I flip ahead, I think I
 9     can show you a document which would be the first
10     time that Ms. McLean sent a report to you on this
11     case, and you'll see it's dated April 21st, 2014.
12     Okay.
13               (Plaintiff's Exhibit 5 was marked for
14               identification.)
15     BY MR. BONNER:
16          Q.   Okay.  I'm showing you what's been
17     marked as Exhibit 5.
18               Do you recognize this document?
19          A.   Yes.
20          Q.   Okay.  Tell me what it is.
21          A.   It is the preliminary report prepared by
22     Pam McLean with respect to the garage policy.
23          Q.   Okay.  Would you have received this
24     document when Ms. McLean uploaded it?
25          A.   It goes to the address on here
```

Page 61

1   Legal.ImageRight.Files.  That's sort of a -- it

2   goes to our -- our support staff, who then go in --

3   all of the communication from the branches would go

4   to this address.  And then our support staff goes

5   in and puts them into our legal file with a task

6   assigned to the attorney.

7        Q.   Would this document have ended up in

8   your hands?

9        A.   Yes.

10       Q.   Okay.  You don't know exactly when,

11  though?

12       A.   Correct.

13       Q.   Okay.  The earliest you could have been

14  involved in this claim is April 21st, 2014?

15       A.   It's possible.  It usually takes a

16  couple of days for it to actually get routed to me.

17       Q.   You would not have been involved in this

18  claim prior to Ms. McLean's authorship of this

19  email?

20       A.   That's correct.

21       Q.   Okay.  And, just for the record, this is

22  preliminary report?

23       A.   Yes.

24       Q.   And it involves the -- or concerns the

25  Cawthorn-Ledford matter?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 62

1          A.    That's correct.

2          Q.    Okay.  To your knowledge, was any part

3    of the Cawthorn-Ledford matter handled improperly?

4          A.    To my knowledge, no.

5          Q.    Okay.  If you had to do it all over

6    again, would you handle this claim in the same

7    manner?

8          A.    Yes.

9          Q.    There's nothing you would change?

10          A.    I -- I -- I'm not sure -- I'm not sure

11    that there was anything we could have done

12    differently.  I know that, at some point, there was

13    an issue with the salvage.  I think that maybe that

14    could have been documented better in the beginning.

15    But we didn't -- we didn't have coverage for the

16    car, so -- perhaps that, but...

17          Q.    Sorry.  You say that perhaps the salvage

18    could have been documented differently?

19          A.    Something -- yeah.  I don't -- I don't

20    know -- we didn't -- I don't think that we -- it's

21    really probably a better question for Pamela.  But

22    I don't think we kept records or documented her

23    conversations or what happened when she was

24    discussing -- if she even discussed -- I'm rambling

25    about something I really don't know much about.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 63

1      Q.    Well, you mentioned an issue about the

2   vehicle preservation in this case?

3      A.    Yes.

4      Q.    Okay.  Do you agree with me that in an

5   auto accident case, a vehicle is normally inspected

6   by an insurance company?

7            MR. BURGE:  Object to the form.

8            You may answer.

9      A.    Frequently.  I'm -- I'm not sure if,

10  normally -- I mean -- yes.  Yes, frequently there's

11  an inspection.

12  BY MR. BONNER:

13     Q.    Agree with me that, when there's an auto

14  accident, oftentimes you must look to the cause of

15  that accident?

16     A.    Yes.

17     Q.    Oftentimes the vehicle is a piece of

18  evidence which may have information that is

19  relevant to the issue of who or what caused the

20  accident?

21            MR. BURGE:  Object to the form.

22     A.    Yes.

23  BY MR. BONNER:

24     Q.    Okay.  In a case where an airbag didn't

25  deploy, the vehicle would contain, or should

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 64

1    contain, physical evidence on whether or not --

2    well, if that is true, if the airbag had deployed;

3    correct?

4              MR. BURGE:  Object to the form.

5              MR. BONNER:  I'll restate the

6         question --

7              MR. BURGE:  I don't understand that.

8         Read it back --

9              MR. BONNER:  Yeah.  I'll strike it.

10        I'll strike that.

11   BY MR. BONNER:

12        Q.   With respect to issues like the black

13   box, the vehicle inspection would enable a person

14   to download the data on a black box; true?

15             MR. BURGE:  Object to the form.

16        A.   Ideally.

17   BY MR. BONNER:

18        Q.   Right.  Right.

19        A.   Now, all cars have them, and sometimes

20   it's corrupt.  But ideally, yes.

21        Q.   And information in the black box could

22   be relevant to what caused the accident?

23        A.   Yes.

24        Q.   Okay.  And it would contain information

25   such as whether or not the airbags deployed?

Page 65

1          A.   I -- I believe that's part of the data

2     that can be pulled.

3          Q.   So if there was a factual issue with

4     respect to whether or not there's a defect in an

5     airbag, the data on the black box might corroborate

6     or cast light on that issue?

7               MR. BURGE:  Object to the form.

8               You can answer, if you know.

9          A.   Perhaps.

10    BY MR. BONNER:

11         Q.   Okay.  It's possible?

12         A.   I believe so.

13         Q.   Okay.  And you might also take

14    photographs of the vehicle; true?

15         A.   Yes.

16         Q.   All right.  So with respect to the

17    vehicle in this case --

18         A.   Yes.

19         Q.   -- it was never inspected; true?

20              MR. BURGE:  Object to the form.

21         A.   I don't know, because we -- we didn't

22    have the collision coverage.  We, Auto-Owners,

23    didn't have the collision coverage on the vehicle.

24    That was with another carrier.

25

David Madison Cawthorn v. Auto-Owners Insurance Company                        Melinda Pitman | 5/9/2017

Page 66

1    BY MR. BONNER:

2         Q.    Perhaps I should be more specific with

3    my question.

4               Auto-Owners never inspected the vehicle

5    in question?

6         A.    To my knowledge, no.

7         Q.    Okay.  And there's nothing in the claims

8    file or the litigation file or any of the materials

9    that you reviewed that suggests that Auto-Owners

10   inspected the Ledford's vehicle?

11        A.    That's correct.

12        Q.    Okay.  And when you said a moment ago

13   that you think that one thing that might have been

14   done differently in this case is Ms. McLean's

15   handling of the salvage?

16             MR. BURGE:  Object to that.  She said

17        the documentation of the salvage.

18   BY MR. BONNER:

19        Q.    Well, let me ask you.  Because I went

20   through this colloquy to, sort of, freshen up what

21   had happened with respect to the underlying

22   vehicle.

23             Now, you tell me in your own words what

24   you think could have been done differently with

25   respect to that vehicle.

Page 67

1       A.   I'm not -- with respect to the vehicle.

2   I -- I think what I was inferring that could have

3   been done differently was I think that Pamela could

4   have made better notes of her conversations that

5   she had as to why we did or didn't look at the

6   vehicle and what happened with -- with -- I --

7   yeah.

8       Q.   Okay.  You're not suggesting that

9   Auto-Owners should have investigated the vehicle?

10      A.   I am not suggesting that, no.

11      Q.   Okay.  Based on your five years at

12  Auto-Owners, you're familiar with Auto-Owners'

13  standards and practices for handling auto liability

14  claims?

15      A.   Yes.

16      Q.   Okay.  You are familiar with

17  Auto-Owners' protocols for proper claims handling?

18          MR. BURGE:  Object to the form.

19          You may answer it.

20      A.   Well, that's not -- yeah -- in general,

21  yes.  I am not a claims representative.

22  BY MR. BONNER:

23      Q.   Based on your experience at Auto-Owners,

24  it's your belief that the proper protocols and

25  standards were followed in the Ledford-Cawthorn

```
                                                   Page 68
 1   claim?
 2        A.   Yes.
 3        Q.   I'm about to go through a long colloquy,
 4   just letting you know.  Okay?
 5        A.   Okay.
 6            MR. MARTINEZ:  Excuse me for one second.
 7            Can we just take a break?
 8            MR. BURGE:  Yeah, why don't we take a
 9        break.
10            MR. BONNER:  It's a good time.
11            THE VIDEOGRAPHER:  We're going off the
12        record.  The time is 10:05 a.m.
13            (Break from 10:05 a.m. to 10:15 a.m.)
14            THE VIDEOGRAPHER:  We're back on the
15        record.  The time is 10:15 a.m.
16   BY MR. BONNER:
17        Q.   Okay.  Thank you.
18            A couple of follow-ups to some of the
19   matters we discussed a few minutes ago.
20            I forgot to ask you, did Ms. McLean --
21   who did she report to?
22        A.   At -- in 2014?
23        Q.   Yes.
24        A.   At that time, she -- her manager was
25   Stan Smith.
```

Page 69

1      Q.    Okay.  Do you know if Mr. Smith was

2   involved in the Ledford-Cawthorn claim?

3      A.    I do not know.

4      Q.    What is Mr. Froman's job title?

5      A.    He is assistant vice president of the

6   legal division or department.  I'm not sure what

7   it's called.

8      Q.    Who does he report to?

9      A.    Bill Woodbury.

10     Q.    And who is Bill Woodbury?

11     A.    He is general counsel and, I believe,

12  senior -- it's either senior vice president or

13  senior executive vice president.

14     Q.    Do you know if Mr. Woodbury was involved

15  in any way, shape, or form with the

16  Ledford-Cawthorn matter?

17     A.    Not to my knowledge.

18     Q.    And has the Ledford-Cawthorn matter been

19  addressed to you at any of your performance reviews

20  at any date taken?

21     A.    No.

22     Q.    I had, just a moment ago, asked you

23  whether you believed that the Ledford-Cawthorn

24  claim was handled appropriately.

25          Do you recall that question?

Page 70

1        A.    Yes.

2        Q.    And you said, yes, it was?

3        A.    Yes.

4        Q.    Okay.  And it was handled in a

5   consistent fashion with the other claims that you

6   have worked on in your five years at Auto-Owners?

7             MR. BURGE:  Object to the form.

8             You may answer it.

9        A.    Well, every claim, I would say, is

10  slightly different.

11  BY MR. BONNER:

12       Q.    I'll restate the question.

13             It was handled in the line with

14  Auto-Owners' standards and protocols?

15       A.    I believe that's accurate.

16       Q.    And you agree that Auto-Owners'

17  standards and protocols are consistent with the

18  covenant of good faith that applies to every

19  insurer?

20       A.    Yes.

21       Q.    Okay.  And you agree that those

22  obligations require an insurance company to be

23  honest to its policyholder?

24       A.    To be honest?

25       Q.    Yes.

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

Page 71

1          A.    Yes.

2          Q.    An insurance company should look after

3    the best interests of its insured?

4          A.    Yes.

5          Q.    An insurance company should investigate

6    an auto liability claim when an accident occurs?

7          A.    Yes.

8          Q.    Its investigation should be prompt?

9          A.    That's correct.

10         Q.    An insurance company's investigation

11   should be fair and impartial?

12         A.    Yes.

13         Q.    An insurance's company's investigation

14   of an auto liability claim should be thorough?

15         A.    Yes.

16         Q.    An insurance company's investigation of

17   an auto accident should be well documented?

18         A.    Yes.

19         Q.    An insurance company should identify

20   witnesses who might have potential information

21   relevant to an investigation of an automobile

22   accident?

23         A.    If they can, yes.

24         Q.    If witnesses are interviewed in

25   connection to an automobile accident, those

Page 72

1    conversations should be documented somewhere within

2    the insurance company's claims file?

3                    MR. BURGE:  Object to the form.

4                    You can answer it.

5    BY MR. BONNER:

6         Q.    I'll rephrase.

7                    If a witness is interviewed, those

8    interviews should be documented?

9         A.    Usually they're recorded.  So to the

10   extent that that's a document, yes.

11        Q.    Okay.  I'll rephrase the question.

12                    If witnesses are interviewed, they

13   should be either documented or recorded?

14        A.    Yes.

15        Q.    During an insurance company's

16   investigation of an auto accident claim, important

17   evidence should be identified in the file?

18                    MR. BURGE:  Object to the form.

19                    You may answer the question.

20        A.    What do you mean by "identified in the

21   file"?

22   BY MR. BONNER:

23        Q.    I'll rephrase the question.

24                    As part of an insurance company's

25   investigation of an auto accident claim, it should

Page 73

1    look for important evidence?

2          A.    Yes.

3          Q.    And by "important evidence," I mean

4    evidence that is relevant to any material issue in

5    a given claim?

6                MR. BURGE:  Object to the form.

7                You may answer it.

8          A.    Yes.

9    BY MR. BONNER:

10         Q.    If photographs are taken, copies should

11   be retained?

12         A.    Yes.

13         Q.    And in fact, photographs should be taken

14   of any important evidence identified in a given

15   claim?

16                MR. BURGE:  Object to the form.

17                You may answer.

18         A.    I'm not sure that they always take

19   photographs in every claim.  But if -- if the

20   situation calls for photographs and photographs are

21   taken, it should be in the file.

22   BY MR. BONNER:

23         Q.    Okay.  Where photographs are

24   appropriate, photographs should be taken?

25         A.    Yes.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 74

1      Q.    Okay.  If an investigator or a special

2   investigative unit person is used in a given claim,

3   that information should be documented?

4      A.    Yes.

5      Q.    If there are 9-1-1 tapes relevant to an

6   automobile accident, those should be ordered?

7           MR. BURGE:   Object to the form of the

8           question.

9           You may answer it.

10     A.    That, I don't know the answer to.  I --

11   I have not seen that we collect those.

12   BY MR. BONNER:

13     Q.    Okay.  If there are reports that are

14   issued in a given accident, for example, police

15   reports, the insurance company should endeavor to

16   collect those reports?

17     A.    Yes.

18     Q.    If the scene is investigated, that

19   investigation should be recorded or documented by

20   an insurance company?

21     A.    Yes.

22     Q.    If the claimant is interviewed, that

23   interview should either be recorded or documented?

24     A.    Yes.

25     Q.    If the insured is interviewed, that

Page 75

1    interview should either be recorded or documented?

2         A.   Yes.

3         Q.   And just to dot all i's:  In this case,

4    Bradley Ledford, the driver of the car, was an

5    additional insured?

6         A.   I believe that's correct.

7         Q.   If the additional insured is

8    interviewed, that interview should either be

9    recorded or documented?

10             MR. BURGE:  Object to the form.

11             You can answer it.

12        A.   Yes.

13   BY MR. BONNER:

14        Q.   Do you agree that all major events that

15   occur during the lifetime of a claim should be

16   documented?

17             MR. BURGE:  Object to the form.

18             You may answer.

19        A.   I'm not sure what you mean by "major

20   events," but there should be any -- any relevant

21   information should be documented in the file.

22   BY MR. BONNER:

23        Q.   I'll use your words.

24             Agree with me that all relevant

25   information to a given claim should be documented

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 76

1   in a file?

2        A.   Yes.

3        Q.   A claims adjuster's notes should be

4   sufficiently detailed such that you can understand

5   what she has done if you become involved in a

6   claim?

7             MR. BURGE:   Object to the form.

8             You may answer it.

9        A.   Well, yeah, I'm not sure that the

10  purpose of her claim notes is for the reviewing

11  attorney.  I -- but it should -- they should be

12  detailed enough that any person that read them

13  could follow what she was saying.

14  BY MR. BONNER:

15       Q.   I'll use your words again.

16            An adjuster's notes should be

17  sufficiently detailed such that a person who is not

18  otherwise familiar with the claim can understand

19  what has happened or what the adjuster has done?

20       A.   I believe that's accurate, yes.

21       Q.   Based on an insurance company's

22  investigation, the insurance company should

23  determine as promptly as possible whether the

24  insured is liable for an automobile accident?

25       A.   We -- yes, we promptly trying to assess

Page 77

```
 1   liability.
 2          Q.    An insurance company, as part of its
 3   assessment for liability, should look for other
 4   potentially liable parties?
 5               MR. BURGE:  Object to the form of the
 6          question.
 7               You may answer it.
 8          A.    As part of our liability assessment, we
 9   try to determine, the best we can, with the
10   information we have available if there may be other
11   viable parties.
12   BY MR. BONNER:
13          Q.    An insurance company's investigation
14   should include efforts to identify other liable
15   parties?
16          A.    Yes.
17          Q.    Okay.  An insurance company's
18   investigation should also include efforts to
19   identify whether another party was comparatively
20   liable?
21          A.    Yes.
22          Q.    An insurance company's investigation of
23   an accident should also look for potential Fabre
24   defendants; true?
25               MR. BURGE:   Object to the form.
```

Page 78

```
 1        A.   Yes, the -- if -- there are not always
 2   Fabre defendants, but yes.
 3   BY MR. BONNER:
 4        Q.   And I used a term of art there.  I did
 5   not mean to be tricky.
 6             By "Fabre defendants," did you
 7   understand what I meant?  Can you tell me what a
 8   Fabre defendant is?
 9        A.    In my understanding, it is a person that
10   is not named as a party defendant that may share
11   some of the liability.
12        Q.   Okay.  So as part of an insurance
13   company's investigation of a claim, it should look
14   for other parties that may share some portion of
15   the liability for an auto accident?
16             MR. BURGE:  Object to the form of the
17        question.
18             You may answer it.
19        A.   That is something that we -- that we
20   evaluate, yes.
21   BY MR. BONNER:
22        Q.   And it's something that you should do as
23   part of your obligations to the insured?
24             MR. BURGE:  Object to the form of the
25        question.
```

Page 79

1             You may answer it.

2        A.    Yes.

3    BY MR. BONNER:

4        Q.    An insurance company should determine as

5    promptly as possible what the potential damages

6    are?

7        A.    Yes.

8        Q.    And if the potential damages facing a

9    policyholder exceed the policyholder's limits of

10   insurance, the insurance company should promptly

11   advise the policyholder that his excess -- I'm

12   sorry -- that his potential liability is in excess

13   of his policy limits?

14       A.    Yes.

15       Q.    It should do that as promptly as

16   possible?

17       A.    Yes.

18       Q.    An insurance company should advise the

19   policyholder of probable outcome of litigation?

20       A.    I'm not sure what you mean by

21   "probable," but yeah, the potential possibilities

22   of the outcome of litigation, yes.

23       Q.    If litigation commences, an insurance

24   company should discuss what the potential outcome

25   is of that litigation might be for the

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 80

1    policyholder?

2         A.    Yes.

3         Q.    And that includes a potential outcome

4    that the policyholder could be liable in excess of

5    the insurance policy that he has purchased?

6              MR. BURGE:  It's been asked and

7         answered.  Object to it.

8              You can answer.

9         A.    Yes.

10   BY MR. BONNER:

11        Q.    An insurance company should advise a

12   policyholder of his opportunity to contribute

13   personal assets towards potential settlement above

14   policy limits?

15             MR. BURGE:  Object to the form.

16             You can answer it.

17        A.    Are you -- are you asking if there's an

18   opportunity for the insured to contribute to -- to

19   make a settlement, we should --

20   BY MR. BONNER:

21        Q.    I'll rephrase.

22             In the event that an insured faces

23   potential liability in excess of his policy limits,

24   an insurance company should advise the insured that

25   he may, at his discretion, contribute his own

```
                                                  Page 81
 1   personal assets towards a potential settlement that

 2   exceeds his policy limits?

 3              MR. BURGE:  Object to the form.

 4              You may answer it.

 5              You are making an assumption, I assume,

 6         that the company knows that -- has knowledge

 7         of that?

 8              MR. BONNER:  Knowledge of his personal

 9         assets.

10              MR. BURGE:  No.  Has knowledge that

11         it -- it -- that it could be settled for an

12         amount above the policy limits.

13              MR. BONNER:  No, that's not my question,

14         exactly.

15   BY MR. BONNER:

16         Q.   My question is:  When the insurance

17   company has identified that a potential claim could

18   exceed the policy limits that an insured has

19   purchased, do you agree that Auto-Owners, in that

20   case, has the responsibility to the insured to

21   advise them, one thing you can do is contribute

22   your own personal assets towards making a

23   settlement offer?

24              MR. BURGE:  Object to the form.

25              You can answer it.
```

Page 82

1      A.   That could be something that Auto-Owners
2   would tell the insured.
3   BY MR. BONNER:
4      Q.   That could be something, but it's not an
5   obligation that the insurance company has?
6           MR. BURGE:  Object to the form.
7      A.   I don't know -- I don't know whether
8   it's an obligation or not.
9   BY MR. BONNER:
10     Q.   That's okay.
11          An insurance company should settle, if
12  possible, where a reasonably prudent person faced
13  with the prospect of paying the total recovery
14  would do so?
15          MR. BURGE:  Object to the form of the
16       question, to the extent you're asking her
17       about a concept and a statement of the law.
18          You can answer it.
19     A.   You asked if -- if we should settle
20  where a reasonably prudent person was?
21  BY MR. BONNER:
22     Q.   I'll -- I'll read it back to you.
23     A.   Okay.
24     Q.   An insurance company should settle, if
25  possible, where a reasonably prudent person faced

Page 83

1   with the prospect of paying the total recovery

2   would do so?

3                MR. BURGE:  The same objection.

4                You can answer it.

5        A.   Yes.

6   BY MR. BONNER:

7        Q.   Okay.  And where prudent, an insurance

8   company should offer its policy limits in a

9   settlement to a claimant in order to avoid exposing

10  its insured to a potential excess judgment?

11               MR. BURGE:  Object to the form of the

12          question.  It's a misstatement of the law.

13               You may answer it.

14       A.   You said "where prudent" that the

15  insurance company should pay its policy limits; is

16  that correct?

17  BY MR. BONNER:

18       Q.   My question is:  Where prudent, an

19  insurance company should offer its policy limits in

20  settlement to avoid exposing its insured to excess

21  liability?

22               MR. BURGE:  The same objection.

23               You may answer it.

24       A.   Not every claim would be valued at

25  policy limits.  But where -- where the -- that

Page 84

1    is -- where the claim is evaluated, yes.

2    BY MR. BONNER:

3          Q.    Okay.   I'll rephrase my question.

4                If a claim is evaluated having damages

5    that exceed policy limits, an insurance company

6    should offer its policy limits in settlement to

7    avoid exposing its insured to excess liability?

8          A.    The insurance company should initiate

9    settlement negotiations.   It -- it may or may not

10   be for policy limits, depending on the -- you said

11   if it exceeds the value of the policy.   It would

12   depend on if we had all of the confirmation that we

13   needed for that particular claim, and we were in a

14   position to make the -- make a settlement.

15         Q.    Okay.   So let me see if I got your

16   answer here correctly.

17               Where an insurance company values

18   damages facing a policyholder as exceeding

19   $3 million, it does not then have an obligation to

20   offer its policy limits in settlement in order to

21   avoid exposing its policyholder to an excess

22   judgment?

23               MR. BURGE:   Are you making the

24         assumption it's a $3 million policy, or are

25         you asking about this specifically, or what?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 85

1            MR. BONNER:  I'm asking her based on her

2        five years of experience handling claims

3        whether or not that's an obligation.

4            MR. BURGE:  Yeah, but you threw out

5        3 million, but you didn't say that was the

6        policy limits.  Are you asking her to assume

7        that there's 3 million in policy limits.

8            MR. BONNER:  I'll rephrase it.  I don't

9        think I said 3 million.  If I did, I

10       apologize.

11           MR. BURGE:  Why don't you read it back.

12       Why don't you read back his question.

13           MR. BONNER:  I can rephrase it.

14           MR. BURGE:  Okay.  Go ahead.

15   BY MR. BONNER:

16       Q.   When an insurance company has valued a

17   claim in excess of an insured's policy limits, is

18   it your testimony that it should not then offer its

19   policy limits in settlement to a claimant in order

20   to avoid exposing its insured to an excess

21   judgment?

22           MR. BURGE:  Object to the form.  That's

23       not what you said.

24           You can answer it.

25       A.   I -- I think the answer depends on what

Page 86

1   you mean by "value," because we -- we look for

2   confirmation.  There -- there's various phases that

3   we would go through in the investigation.  And we

4   may make -- for example, raise reserves based on

5   what we -- we know.  But we need to confirm what we

6   believe the case is before we would initiate

7   settlement.

8   BY MR. BONNER:

9        Q.   Let me ask you this:  When an insurance

10  company reaches a point where it concludes that the

11  potential liability for a claimant's injuries would

12  exceed its policyholder's limits, you agree that

13  then it should offer its policy limits to settle on

14  behalf of its insured?

15       A.   I would say that we should initiate

16  settlement with the injured party.

17       Q.   And by "initiate settlement," you mean

18  offer less than settlement limits?

19            MR. BURGE:  Object to the form.  That's

20       not what she said.

21       A.   Not necessarily.

22  BY MR. BONNER:

23       Q.   Okay.  So by "initiate settlement

24  discussions," what does that mean?  Strike that.

25            When you say that an insurance company

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 87

1    should initiate settlement discussions, that does

2    not mean that it should necessarily offer its

3    policy limits in settlement to a claim?

4        A.   It -- it -- it depends on the specific

5    claim.  If the claim is valued at the policy limits

6    and we've determined that it's valued at the policy

7    limits and confirmed that we have the information

8    that confirms that it's valued at the policy

9    limits, then an offer should be made.

10       Q.   Okay.  Okay.  An insurance company

11   should treat the interests of its policyholder as

12   at least equal to the interests of the insurance

13   company?

14            MR. BURGE:  Object to the form.

15            You can answer.

16       A.   At least equal, yes.

17   BY MR. BONNER:

18       Q.   Okay.  Would you say that a

19   policyholder's interests should be valued more so

20   than the insurance company's interest?

21       A.   Yes.

22       Q.   Okay.  And hand-in-hand with that:  The

23   policyholder's interests are more important than

24   the financial interests of the insurance company?

25       A.   Yes.

```
                                          Page 88
 1        Q.   All right.  I showed you, a moment ago,
 2   Exhibit 5, which was this letter of April 21st,
 3   2014.  Here's Exhibit 5, again.
 4             And you told me before that when an
 5   image is uploaded to the recipient of the email on
 6   page 1 -- which is Legal.ImageRight.Files -- it
 7   then goes to secretaries who then make sure it gets
 8   to the right person; correct?
 9        A.   That's correct.
10        Q.   Okay.  56-00723, is that a claim number?
11        A.   -14, after the 723.
12        Q.   -14?
13        A.   Yes.
14        Q.   Is that for the garage policy or for the
15   umbrella policy?
16        A.   That is for the garage policy.
17        Q.   Okay.  When Ms. McLean uploaded this
18   letter, other than the secretaries, did any other
19   lawyer in the legal department receive it?
20        A.   No.
21        Q.   You do not recall when you first
22   reviewed this letter; correct?
23        A.   I do not.
24        Q.   Would there be any notes that would
25   refresh your recollection?
```

```
                                                   Page 89
 1        A.   It would -- the lit card -- the lit card
 2   gets opened when I look at that.
 3        Q.   So you would assume that you would open
 4   a lit card upon whenever you first reviewed this
 5   preliminary report that is attached -- or shown to
 6   you as Exhibit 5?
 7        A.   That's correct.
 8        Q.   This claim was assigned to you, because
 9   you were handling Ocala-based Florida claims?
10        A.   That's correct.
11        Q.   And that's the only reason?
12        A.   Yes.
13        Q.   There were no other lawyers that were
14   also working on this contemporaneously with you?
15        A.   No, there were not.
16        Q.   When a claim is referred to you, you do
17   not take an active role in the investigation of
18   that claim?
19             MR. BURGE:   Object to the form.
20             You can answer it.
21        A.   An active role, no.  I may suggest
22   things that they should look for that they don't
23   already have.
24   BY MR. BONNER:
25        Q.   With respect to the investigation of the
```

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 90

1    claim only, your role is merely to make

2    suggestions, if at all, to Ms. McLean, who would

3    then perform the investigation?

4         A.    That's accurate.

5         Q.    So you don't interview claimants;

6    correct?

7         A.    That's correct.

8         Q.    You don't talk to the insured; correct?

9         A.    That's correct.

10        Q.    You don't interview witnesses?

11        A.    That's correct.

12        Q.    You do not send out investigators to

13   inspect the accident scene?

14        A.    Correct.

15        Q.    You do not collect physical evidence?

16        A.    That's correct.

17        Q.    You might suggest to Ms. McLean that she

18   do some of those things?

19        A.    Yes.

20        Q.    And you would suggest that if it were

21   appropriate, based on your review of the file?

22        A.    Correct.

23        Q.    Would she then have discretion to do

24   what you suggested?  In other words, could she

25   decide not to do something that you suggest?

Page 91

1      A.    She probably could.  Generally, that
2  doesn't happen.
3      Q.    In your practice, if you make a
4  suggestion to an adjuster handling the claim to
5  perform some type of investigation, that generally
6  happens?
7      A.    Yes.
8      Q.    The report before you indicates the
9  accident occurred on April 3rd, 2014; true?
10      A.    Yes.
11      Q.    Okay.  At the time of this note, which
12  was authored on April 21st, 2014, Ms. McLean had
13  not yet spoken to either of the insureds; correct?
14      A.    I do not know.
15      Q.    That's okay.
16            Is there any indication in the letter,
17  or in the report of April 21st, 2014, that
18  Ms. McLean had spoken to either of the insureds in
19  this case?
20      A.    In the summary, there's an inference,
21  the way I read it, that she had, because she says
22  she will advise if there's any updates, which would
23  lead me to conclude that she had previously spoken
24  with him and a further conversation would be an
25  update.  But...

Page 92

1    Q.    Okay.  Is there any indication in this

2    report that Ms. McLean had specifically spoken to

3    Bradley Ledford, the driver?

4    A.    It does not identify either Bradley

5    or -- or Mr. Ledford.

6    Q.    David Ledford, the owner of Bob Ledford

7    RV & Marine?

8    A.    Right.  Neither are identified.

9    Q.    Okay.  And you agree with me that both

10   Bradley Ledford and Bob Ledford RV & Marine were

11   insureds under both the garage policy and the

12   umbrella policy?

13   A.    That's correct.

14   Q.    Okay.  Upon receiving this initial

15   report, did you have a telephone conversation with

16   Ms. McLean?

17   A.    I don't recall.

18   Q.    Is there anything that would refresh

19   your recollection as to that fact?

20        MR. BURGE:  Object to the form.

21        You may answer it.

22   A.    No.

23   BY MR. BONNER:

24   Q.    Would it be included, for example, in

25   the lit file?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

```
                                                    Page 93
 1              MR. BURGE:  Object to the form.
 2              You may answer it.
 3         A.   No, it would not.
 4   BY MR. BONNER:
 5         Q.   Would there be any other notes or emails
 6   that would have documented whether or not you spoke
 7   to Ms. McLean upon receiving this report?
 8         A.   If there were, they would be in the
 9   file.
10         Q.   Either in the claims file, the home
11   office legal file?
12         A.   That's correct.
13         Q.   Okay.  Is this initial report deficient
14   in any way?
15         A.   No.
16         Q.   Did the report raise any red flags to
17   you with respect to Ms. McLean's preliminary
18   investigation?
19         A.   No.
20         Q.   Okay.  Did you make any suggestions to
21   Ms. McLean regarding additional investigation she
22   should undertake upon receiving that report?
23         A.   To the best of my recollection, I asked
24   her to try to get some confirmation of the claimed
25   injuries from a medical record.  But other than
```

Page 94

1    that, no.

2          Q.   When you say you asked her to obtain

3    medical documentation, did you do that by email or

4    by phone?

5          A.   I don't recall.

6          Q.   And do you know if you had that

7    conversation upon receiving this report, or was

8    that possibly a conversation you had at a later

9    point?

10         A.   It would have been -- I -- I don't know

11   the answer to that.  It would have been

12   contemporaneous to when I opened my file, I

13   believe.

14              (Plaintiff's Exhibit 6 was marked for

15         identification.)

16              MR. BONNER:  I want to put this here as

17         I mark this exhibit.

18              I don't have an extra copy of this.  Let

19         me just show it to you.  I'm just going to

20         ask her to authenticate Exhibit 6, which is

21         an email cover page with respect to the same

22         report.

23              MR. BURGE:  Isn't that what this is, the

24         same exhibit?

25              MR. BONNER:  You know what?  It is.  My

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

```
                                                   Page 95
  1        apologies.
  2   BY MR. BONNER:
  3        Q.   Can you confirm with me that, as of
  4   April 21st, 2014, that Ms. McLean's report confirms
  5   that she had reviewed the police report by that
  6   date?
  7        A.   Yes.
  8        Q.   Okay.  Did you receive a copy of the
  9   police report in connection with receiving this
 10   initial report?
 11        A.   It -- it would have been in her claim
 12   file.
 13        Q.   My question is, did you receive it?
 14        A.   I'm not sure what -- what you mean by
 15   "receive," because it -- it would be --
 16        Q.   Okay.  Well --
 17        A.   It's not sent to me.  I go in the claim
 18   file and look at it.
 19        Q.   There you go.  Did you review it?
 20        A.   When I -- when I opened my file, yes.
 21        Q.   Okay.  And, as you said before, you
 22   don't know exactly when you opened this file;
 23   correct?
 24        A.   Correct.
 25        Q.   But what you are saying is that when you
```

Page 96

1   opened the file, you would have reviewed the

2   Florida Traffic Crash Report; correct?

3         A.   Correct.

4         Q.   Here's a copy of the Florida Traffic

5   Crash Report.

6              Can you confirm that you've seen this

7   document before?

8         A.   I'm not sure about the last page.  The

9   rest of it, yes.  I don't recall seeing this last

10  page.

11        Q.   The last page being a Florida Highway

12  Patrol vehicle tow slip?

13        A.   Yes.

14        Q.   It's dated April 3rd, 2014?

15        A.   That's correct.  The rest of it, I -- I

16  recall.

17        Q.   Okay.  If you'll turn to page 2 of the

18  Florida Traffic Crash Report, you'll note that it

19  lists Madison Cawthorn as the passenger.  It's

20  dated Madison Cawthorn [sic]; true?

21        A.   Yes.

22        Q.   Under "airbag deployed," in the

23  description describing Mr. Cawthorn, it states "Not

24  deployed"; correct?

25        A.   Yes, it states that.

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

```
                                               Page 97

 1        Q.   And for Madison, under injury, it states

 2   "incapacitated"; correct?

 3        A.   Yes.

 4        Q.   And in the narrative, it reports -- this

 5   report states that Mr. Cawthorn had been

 6   transported to Halifax Hospital via helicopter due

 7   to life-threatening injuries; true?

 8        A.   Yes.

 9        Q.   The report lists FHP -- that's Florida

10   Highway Patrol -- Trooper K.M. Ruede as the

11   reporting officer?

12        A.   I'm not sure on the pronunciation of the

13   last name, but yes.

14        Q.   Okay.  Spelled R-U-E-D-E?

15        A.   Yes.

16        Q.   The report also lists three witnesses;

17   true?

18        A.   That's correct.

19        Q.   The first is Jon Sherry Wandeck; true?

20        A.   Yes.

21        Q.   The second, Chuck Medovich?

22        A.   Yes.

23        Q.   And the third is Robert Northrop; true?

24        A.   That's correct.

25        Q.   Okay.  If you turn to that tow slip for
```

```
                                                  Page 98
 1    a moment, please.  This is the last page of the

 2    Florida Traffic Crash Report.

 3               Have you seen a tow slip like this in

 4    other cases?  And when I say "like this," I mean a

 5    Florida Highway Patrol vehicle tow form.

 6         A.   I don't recall having seen one before.

 7         Q.   This document purports to be a

 8    preprinted form from the Florida Highway Patrol;

 9    true?

10               MR. BURGE:  Object to the form.

11               You can answer it.

12         A.   That's what it appears to be, yes.

13    BY MR. BONNER:

14         Q.   Okay.  Do you have any reason to believe

15    that this document could not be obtained from the

16    Florida Highway Patrol if requested?

17         A.   It probably could be, yes.

18         Q.   Okay.  This form lists the towing center

19    responsible for towing Mr. Ledford's car as Orange

20    City Collection -- collection is abbreviated as

21    C-O-L-L.  Do you agree?

22         A.   Yes.

23         Q.   There's a telephone number and address

24    for that location listed on this tow slip; true?

25         A.   Yes.
```

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

```
                                            Page 99
 1        Q.   The truck driver's name is on this tow
 2   slip; correct?
 3             And I'll direct you to the lower
 4   left-hand corner.
 5        A.   There is a -- a name, Randy, and a phone
 6   number.
 7        Q.   Oh, I'm sorry.  Above that, you'll see a
 8   line that says "Signature of tow truck driver."
 9        A.   Yes.
10        Q.   Okay.  And I'll represent that it states
11   either J. Hoyle or J. Moyle.
12             Does that look correct to you?
13        A.   Yes.
14        Q.   It also includes a telephone number for
15   Collision Specialties; true?
16        A.   Yes.
17        Q.   Okay.  All right.  And it includes this
18   designation for Randy, who does not have a last
19   name; true?
20        A.   Yes.
21        Q.   To the right, you'll see two numbers,
22   one that says 400, and one that says 512.80.
23             Do you see that?
24        A.   Yes.
25        Q.   Can you read the words that follow the
```

Page 100

1    number 400?

2         A.    It appears to say "With title."

3         Q.    And then the words that follow 512.80?

4         A.    I think that says "Without."

5         Q.    Okay.  Thank you.

6               If you'll turn back to Exhibit 5,

7    Ms. McLean's initial report.  Ms. McLean states

8    that the insured driver, named Bradley Ledford,

9    appears liable; correct?

10              This is under the section entitled

11   "Liability."

12        A.    That's what it says, yes.

13        Q.    Ms. McLean's letter continues, "No

14   authority to request at this time."

15              When an adjuster requests authority,

16   that is shorthand for asking you for permission to

17   make a settlement offer?

18              MR. BURGE:  Object to the form.

19              You may answer it.

20        A.    It is asking for permission to make a

21   settlement above their -- they have their own

22   authority up to the $50,000 that they don't have to

23   request any authority for.

24   BY MR. BONNER:

25        Q.    So when she states, "No authority to

David Madison Cawthorn v. Auto-Owners Insurance Company          Melinda Pitman | 5/9/2017

Page 101

1   request at this time," what she means is she's not

2   requesting authority from you to extend an offer

3   above $50,000?

4        A.    Yes.

5        Q.    Okay.  Ms. McLean set a reserve at

6   $250,000; true?

7        A.    It appears to be, yes.

8        Q.    Did she need your authority to set the

9   reserve at this amount?

10       A.    No.

11       Q.    So she could set the reserve at any

12  number up to the policy limit without your

13  authority?

14       A.    Yes.

15       Q.    And based on your understanding of

16  Auto-Owners' protocols for setting reserves,

17  Ms. McLean's $250,000 reserve represented her best

18  estimate of the likely monetary exposure facing the

19  Ledfords based on the information she had at that

20  time?

21       A.    That's correct.

22       Q.    You suggested earlier that you sometimes

23  make comments to adjusters with respect to the

24  reserves they set?

25       A.    Sometimes, yes.

Page 102

1    Q.    You did not make any comments to

2  Ms. McLean suggesting that she change her $250,000

3  reserve upon receiving her preliminary report?

4    A.    To the best of my recollection, when I

5  opened my file, by then it had already been moved

6  to the million-dollar policy limits.  So, no, I did

7  not make any suggestion.

8    Q.    And had you made a suggestion, would it

9  be documented somewhere?

10   A.    Yes.

11   Q.    Where?

12   A.    Generally, in an email.

13   Q.    Anywhere else?

14   A.    It may be recorded in the lit card that

15  I asked her to move the reserves.

16   Q.    Okay.  Thank you very much.  I think

17  we're good with these exhibits.

18         McLean's authority to extend a

19  settlement offer was up to $50,000; correct?

20   A.    Without additional authority, yes.

21   Q.    Okay.  But in terms of setting a

22  reserve, she could have set a reserve up to

23  $1 million?

24   A.    She could have, yes.

25   Q.    Because $1 million was the policy limit

Page 103

1   on the garage policy?

2         A.   That's correct.

3         Q.   And at the time of this report,

4   April 21st, she had not yet opened a claim under

5   the second umbrella policy?

6         A.   That's correct.

7         Q.   Auto-Owners had not yet identified the

8   umbrella policy as potentially covering this claim;

9   true, as of the date of that report?

10        A.   As of the date of this report.  I'm not

11  sure if -- I'm not sure if she did not yet know

12  there was an umbrella, or if it was determined that

13  we didn't think it would exceed the -- the garage

14  limits.  But for whatever reason, yes, the -- there

15  was not a claim opened under the umbrella at this

16  time.

17        Q.   Okay.  Thank you very much.  I'll

18  collect those.

19             Are you aware that this claim was

20  originally opened out of, I think, the

21  South Carolina office for Auto-Owners or a

22  South Carolina office for Auto-Owners?

23        A.    I -- if I recall correctly, I think the

24  claim actually came into Kentucky and then got sent

25  to South Carolina.

Page 104

1      Q.   And then, finally, made it to Ms. McLean
2  in Ocala?
3      A.   And then -- that's correct.
4      Q.   Ms. McLean is the only adjuster working
5  in Ocala?
6      A.   The only adjuster in that office?
7      Q.   Yes.
8      A.   No.
9      Q.   How many adjusters are there in that
10 office?
11     A.   Now or in 2014?
12     Q.   In 2014.
13          MR. BURGE:  Don't talk over each over.
14          MR. BONNER:  Sorry.  I apologize.
15          MR. BURGE:  Let her finish her answer,
16     please.
17     A.   I -- to the -- I'm going to estimate.
18 I'm not sure I recall exactly in 2014, but
19 approximately 9 or 10.
20 BY MR. BONNER:
21     Q.   Do you know why this claim went to
22 Ms. McLean?
23     A.   She was the senior claims representative
24 in that office.
25     Q.   Why would she, as senior claims

Page 105

1   representative, receive this claim?

2        A.    There would be a variety of reasons.

3   Her manager would be a better person to answer.

4   Sometimes, they just get dealt out as they come in.

5   You know, the next person in line gets it.   When

6   it's a more serious -- appears to be a more serious

7   injury, they would go to Pamela.

8        Q.    Okay.   Thank you very much.

9             (Plaintiff's Exhibit 7 was marked for

10        identification.)

11  BY MR. BONNER:

12        Q.    I'm showing you what's been marked as

13  Exhibit 7.   This is an email, dated April 9th,

14  2017, from Reggie Anderson to Holly Caldwell.

15             Ms. Pitman, have you seen this letter

16  before?

17        A.    Yes.

18        Q.    Okay.   When did you see it?

19        A.    When I reviewed the claim file, I saw

20  it.   I may have seen it in 2014, but I don't

21  recall.

22        Q.    Okay.   You'll simply agree with me that

23  this email memorializes the transfer of the claim

24  to the Ocala office?

25        A.    Yes.

Page 106

1      Q.    And it states specifically that the

2  Florida office is handling the bodily injury claim

3  and inspecting the insured's vehicle?

4      A.    That's what it states.

5           MR. BONNER:  Okay.  Thank you.  That's

6      all my questions for that.

7           (Plaintiff's Exhibit 8 was marked for

8      identification.)

9  BY MR. BONNER:

10     Q.    Okay.  My next exhibit is Exhibit 8.

11  This is an email from Ms. McLean to

12  Legal.ImageRight.Files, which, as you've said

13  before, is the email address from which you would

14  eventually receive these reports.  It's dated

15  April 28th of 2014.

16           Have you seen this letter before?

17     A.    Yes.

18     Q.    Is this an accurate copy of the letter

19  you received on or after April 28th of 2014?

20     A.    It appears to be, yes.

21     Q.    Do you recall when you received this

22  letter?

23     A.    Not specifically, but early May, most

24  likely when I opened my file, which was either

25  May 8th or May 9th.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 107

1        Q.    Would the date that you received this

2    follow-up to the preliminary report be reflected

3    anywhere?

4        A.    The date that I received it?

5        Q.    Or opened it.

6              MR. BURGE:  Object to the form.

7              You can answer.

8        A.    It may be in my -- when I opened my file

9    in the -- and the lit -- and made the lit card, it

10   would have been documented there.

11   BY MR. BONNER:

12       Q.    It's marked as "high importance"; true?

13       A.    Yes.

14       Q.    It states that Ms. McLean had spoken to

15   the claimant regarding Mr. Cawthorn's injury.  Who

16   does this mean?  Do you know?  It actually says the

17   father of the driver, so can I skip that question.

18             That means David Ledford; correct?

19       A.    That's correct.

20       Q.    All right.  So if I show you the claims

21   diary that we looked at earlier today -- this is

22   Exhibit 2 -- there's no corresponding entry in the

23   claims diary to a conversation between Ms. McLean

24   and Mr. Ledford.

25             Can you confirm that?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 108

1      A.   Corresponding, you mean around the same

2   date as this exhibit?  I -- there's no entry dated

3   April 28th.

4      Q.   Or any entry within several days of

5   April 28th; true?

6      A.   That's correct.

7      Q.   Okay.  Do you agree with me that a

8   conversation between Ms. McLean and Mr. Ledford

9   should have been documented in the claims diary?

10      A.   Yes.

11      Q.   And, in fact, earlier, you said that

12   conversations between the claimant and Ms. McLean

13   should either be documented or recorded; true?

14      A.   Yes.

15      Q.   Ms. McLean did not record her

16   conversation with Mr. Ledford, so far as you can

17   tell from your review of the file?

18      A.   That's correct.

19      Q.   A person unfamiliar with this claim,

20   looking at Ms. McLean's claims diary, would not

21   know that she spoke to Mr. Ledford on or about

22   April 28, 2014?

23      A.   If they were only looking at the claims

24   diary?  That's correct.

25      Q.   Okay.  There's no documentation that

Page 109

1   states how long Mr. Ledford's conversation with

2   Ms. McLean was; true?

3          A.   In the claims diary?

4          Q.   Anywhere in the claims file, so far as

5   you know.

6          A.   Did you ask how long the conversation

7   was?

8          Q.   (Nodding head)

9          A.   I have not seen anything that identifies

10  how long the conversation was.

11         Q.   Are you aware of any investigation that

12  took place between April 21st, 2014, the date of

13  Ms. McLean's first report, and April 28th, the date

14  of the supplemental report, other than the

15  conversation that seems to have taken place between

16  Ms. McLean and Mr. Ledford?

17         A.   I'm not sure what she did or -- in

18  between those dates.

19              MR. BONNER:  Mr. Reporter, how much time

20      do we have left?

21              Let's go ahead and take a pause here.

22              THE VIDEOGRAPHER:  Going off the record.

23      The time is 11:03 a.m.

24              (Break from 11:04 a.m. to 11:10 a.m.)

25              THE VIDEOGRAPHER:  We're back on the

Page 110

1        record.   The time is 11:10 a.m.

2   BY MR. BONNER:

3        Q.   Okay.  Referring back to both Exhibits 2

4   and Exhibits 8 that you have in front of you.

5             Reviewing those two exhibits, you cannot

6   determine whether Mr. Ledford called Ms. McLean or

7   Ms. McLean called Mr. Ledford; true?

8        A.   That's accurate.

9        Q.   All right.  Between those two exhibits,

10  you cannot determine whether Ms. McLean spoke to

11  Bradley Ledford during this conversation; true?

12       A.   Yes.

13       Q.   In fact, there's nothing in her report

14  that would indicate that she spoke to Bradley

15  Ledford; true?

16       A.   That's correct.

17       Q.   Okay.  Apart from the description of

18  Mr. Cawthorn's injuries, there is nothing between

19  those two documents that state what other topics

20  Ms. McLean discussed with Mr. Ledford on or about

21  April 28th?

22       A.   There is nothing else in -- in either of

23  these documents, that's correct.

24       Q.   There is no indication that she advised

25  him of the reserve that had been set; true?

Page 111

1       A.    That's true.

2       Q.    Okay.  There's no indication that she

3   advised him of what his potential liability could

4   be for the injuries sustained by Mr. Cawthorn?

5       A.    Your question was, there's no indication

6   in either of these?  That's -- that's true.

7       Q.    And there's no indication in either

8   Exhibit 2 or Exhibit 8 that Ms. McLean advised

9   Mr. Ledford that he could be facing liability in

10  excess of his limits; true?

11      A.    In these two documents, that's correct.

12      Q.    Okay.  Let me have Exhibit 2 back.

13            The follow-up report, dated April 28th,

14  2014, states that Madison Cawthorn is, quote,

15  paralyzed with a spinal cord compromise at T11;

16  true?

17      A.    It says that she received that

18  information from his father, yes.

19            MR. BURGE:  That was from the insured's

20      father, isn't it?

21  BY MR. BONNER:

22      Q.    From David Ledford?

23      A.    Yeah.  Yes.  From the -- from the father

24  of the driver.

25      Q.    The father of the driver, David Ledford,

Page 112

1    told Ms. McLean that Madison Cawthorn was, quote,

2    paralyzed with a spinal cord compromise at T11?

3         A.   That's what it says.

4         Q.   When you opened your claims file upon

5    receiving this document, you had no information to

6    contradict that statement; true?

7              MR. BURGE:  Object to the form of the

8         question.

9              You may answer it.

10        A.   At the time that I received that, I did

11   not have -- this was -- was the only information I

12   had of those injuries; nothing to confirm or deny

13   the claim.

14   BY MR. BONNER:

15        Q.   So at the time you received this

16   document, you had no information that contradicted

17   the statement that Madison Cawthorn was paralyzed

18   with a spinal compromise at T11?

19        A.   True.

20        Q.   Okay.  This report in front of you also

21   states that Mr. Cawthorn sustained a fractured

22   pelvis; true?

23        A.   That's what it states.

24        Q.   And upon receiving this report, you had

25   no information that contradicted that assertion;

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 113

1    true?

2          A.    When I -- I had no information that

3    confirmed or contradicted.

4          Q.    Okay.   The report also states that

5    Mr. Cawthorn suffered two broken ankles?

6          A.    Yes, it states that.

7          Q.    Okay.   And at the time that you received

8    this report, you had no information contradicting

9    that he had sustained two broken ankles?

10         A.    I had no information confirming or

11   contradicting.

12         Q.    Well, you say you had no information

13   confirming or contradicting.   You'll agree with me

14   that this exhibit that you have in front of you,

15   Exhibit 8, states that there's a Facebook page for

16   Madison Cawthorn; correct?

17         A.    Yes, it states that.

18         Q.    Lastly, there is a Facebook page for

19   this claimant called "Prayers for Madison 2014";

20   true?

21         A.    Yes.

22         Q.    And I assume that upon receiving this

23   document, you reviewed that Facebook page?

24         A.    I did not.

25         Q.    You did not look at that Facebook page?

Page 114

1        A.    I did not.

2        Q.    Why did you not look at it?

3        A.    Because for -- for what I -- two

4   reasons:  One, my computer at work does not allow

5   me to access Facebook.  But also, I would not have

6   considered that as confirmation.  I was -- for my

7   purposes, I was looking for objective documentation

8   of injuries, and the -- the Facebook page would not

9   have provided me that.

10       Q.    The Facebook page does not contain

11  objective information regarding Mr. Cawthorn's

12  injuries?

13       A.    It would not be from a -- a medical

14  doctor or facility.  Anybody could -- could post on

15  the Facebook page.

16       Q.    I understand that the -- your position

17  is that the Facebook page did not have medical

18  facility information.  Is that what you said?

19       A.    From the doctors.  It would be -- it's a

20  tool that -- that our claim reps can use to

21  investigate to help us figure out what additional

22  information we need to get.

23       Q.    Agree with me that the Facebook page

24  would contain some objective information regarding

25  Mr. Cawthorn's injuries?

Page 115

1              MR. BURGE:  Object to the form.

2        A.   I didn't look at it, so I don't know.

3   It may have.

4   BY MR. BONNER:

5        Q.   Okay.  You'd agree with me that

6   photographs could be objective evidence of

7   Mr. Cawthorn's injuries?

8        A.   Possibly.  I would not base a decision

9   based on a photograph alone.

10       Q.   That's not exactly my question.  My

11  question is:  Isn't a photograph objective evidence

12  of an injury?

13             MR. BURGE:  Object to the form.

14             You can answer it.

15       A.   It -- it can be.  On its own, I don't

16  know that I would -- would take it that way.

17  BY MR. BONNER:

18       Q.   Agree with me that newspaper reports can

19  be objective evidence of an injury?

20             MR. BURGE:  Object to the form.

21             You can answer it.

22       A.   Maybe.  Sometimes, the media gets things

23  wrong; so, again, I would not take that on its own.

24  BY MR. BONNER:

25       Q.   It's something you could consider?

Page 116

1            MR. BURGE:  Object to the form.

2       A.   I could.

3  BY MR. BONNER:

4       Q.   Okay.  The letter in front of you,

5  Exhibit 8, says that Mr. Cawthorn lost a kidney;

6  correct?

7       A.   Yes, it says that.

8       Q.   At the time you received this letter,

9  you had no information to contradict that assertion

10 that Mr. Cawthorn had lost a kidney as a result of

11 this accident?

12      A.   I had no information to confirm or

13 contradict.

14      Q.   Okay.  And you did not check Facebook to

15 see if there were any accounts on Facebook that

16 would confirm or contradict whether or not

17 Mr. Cawthorn had lost a kidney as had been reported

18 to you?

19      A.   I did not look at the Facebook page

20 myself.

21      Q.   You did not look at the Facebook page to

22 confirm whether that page contained any information

23 regarding Mr. Cawthorn's two broken ankles, which

24 would confirm what Mr. Ledford had told Ms. McLean?

25           MR. BURGE:  Object to the form.

Page 117

1          A.    I did not look at the Facebook page.

2    BY MR. BONNER:

3          Q.    Okay.   And you did not look at the

4    Facebook page to look to see if there was

5    information that would confirm what Mr. Ledford had

6    reported regarding Mr. Cawthorn's fractured pelvis?

7                MR. BURGE:   Object to the form.

8                You can answer it.

9          A.    Well, I'm not sure that I would consider

10   a Facebook page to confirm anything.   But, again, I

11   did not look at the Facebook page.

12   BY MR. BONNER:

13         Q.    Did you not look at the Facebook page to

14   confirm or to see if there was information relevant

15   to whether or not Mr. Cawthorn had a fractured

16   pelvis?

17               MR. BURGE:   You asked her three times.

18               I think she said she didn't look at the

19               Facebook page.

20               You can answer it.

21         A.    I did not look at the Facebook page.

22   BY MR. BONNER:

23         Q.    The document in front of you reports

24   that Mr. Cawthorn was on a respirator?

25         A.    It says he's currently off the

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 118

1    respirator.

2          Q.    Excuse me.   That's true.

3                Did you take that to mean that he was

4    once on a respirator?

5          A.    Yes.

6          Q.    Okay.   You did not review the Facebook

7    page to confirm -- or for confirmation whether or

8    not that statement was true?

9                MR. BURGE:   Object to the form.

10         A.    Again, I'm not sure Facebook would be

11   considered a confirmation, but I -- I did not check

12   the Facebook page.

13   BY MR. BONNER:

14         Q.    And at the time you received this

15   letter, you had no information to contradict that

16   Mr. Cawthorn had had to use a respirator during his

17   care at Halifax?

18         A.    I had no information to confirm or

19   contradict.

20         Q.    Okay.   The letter continues that

21   Ms. McLean increased her reserve to $1 million;

22   true?

23         A.    Yes.

24         Q.    Okay.   She did not need your authority

25   to increase that reserve?

Page 119

1        A.    That's correct.

2        Q.    It also states that she opened a claim

3   under the umbrella policy; true?

4        A.    It says she is having a claim opened

5   under the umbrella and will report that once it's

6   been opened.

7        Q.    Okay.  So she makes her request to open

8   the claim, and someone else opens it?

9        A.    I think her support staff physically

10  opens the file.  I -- I'm not sure.

11       Q.    At any rate, when you read this passage

12  concerning the umbrella policy, your understanding

13  was that the umbrella policy would soon have a

14  claim opened under it; true?

15       A.    That's accurate.

16       Q.    And it would be opened with a $2 million

17  reserve?

18       A.    That is not indicated in this document.

19       Q.    What I am referring to is the statement,

20  quote, I am having that claim opened at the limit.

21       A.    Oh, you're correct.  It does say "at the

22  limit."

23       Q.    So your understanding upon receiving

24  this document was that there would be a $2 million

25  reserve opened on the umbrella policy; true?

Page 120

1       A.    That's true.

2       Q.    Did Ms. McLean need any authority to

3   open a reserve at that amount?

4       A.    No.

5       Q.    She could do it on her own?

6       A.    Yes.

7       Q.    The aggregate reserve as of April 28th,

8   2014, or shortly thereafter was $3 million on the

9   Ledford-Cawthorn claim?

10      A.    Or shortly thereafter, yes.

11      Q.    Because there might have been a delay in

12  opening the umbrella claim?

13      A.    That's correct.

14      Q.    Based on the document in front of you,

15  there is no information contained in this document

16  suggesting that Ms. McLean had receded from her

17  position that Bradley Ledford, the driver, was

18  liable for this accident?

19      A.    She does not discuss liability in this

20  document, no.

21      Q.    She mentions a conversation with someone

22  from USAA; correct?

23      A.    Yes.

24      Q.    USAA, to your knowledge, is the insurer

25  for the driver -- I'm sorry -- for the injured

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 121

1    passenger, Madison Cawthorn?

2         A.    That's correct.

3         Q.    It states that Ms. McLean was unable to

4    obtain Mr. Cawthorn's telephone number from USAA?

5         A.    That's correct.

6         Q.    Based on what's reported in this

7    document, there is nothing within it to suggest

8    that Ms. McLean looked on Google for Roger

9    Cawthorn's contact information?

10        A.    This document does not suggest that.

11        Q.    I'm going to show you, again, the

12   Exhibit No.-- is it No. 2? -- the claims diary.

13   And there's nothing in the claims diary to suggest

14   that Ms. McLean conducted a Google search to locate

15   Mr. Cawthorn's contact information?

16        A.    There is no reference on here to a

17   Google search on Exhibit 2.

18        Q.    And between Exhibit 2 and Exhibit 8,

19   there is no indication showing that Ms. McLean

20   conducted an Internet search for Mr. Cawthorn's

21   contact information?

22        A.    Between these two documents -- I don't

23   know what else is in the file, but between these

24   two documents, there's no --

25        Q.    I'm only ask -- oh, sorry.  Excuse me.

Page 122

1    I apologize.  Didn't mean to interrupt you.

2              I'm only asking you with respect to

3    Exhibits 2, the claims diary, and Exhibit 8, the

4    follow-up report.

5         A.   Yeah.  Between Exhibits 2 and 8, there

6    is no indication that she did an Internet or Google

7    search.

8         Q.   And there's no indication between either

9    the claims diary or the follow-up report that

10   Ms. McLean conducted an ISO search for Roger

11   Cawthorn's contact information?

12        A.   When she does an ISO search, it's just

13   put in the file.  I -- I - without looking at the

14   entire file, I don't know if there was one, but it

15   is not -- whether she did it or not is not

16   documented between Exhibit 2 and 8.

17        Q.   Agree with me that ISO searches

18   sometimes produce contact information for a person?

19        A.   Sometimes, yes.

20        Q.   And an ISO search is a search related to

21   insurance claims?  You don't --

22        A.   I don't know what else you could do with

23   them, but yes.

24        Q.   Okay.  It's a tool that insurance

25   companies sometimes use to help them discover

Page 123

1    information about past claims?

2         A.    That's accurate.

3         Q.    Okay.  And between the two documents in

4    front of you, there's no indication that Ms. McLean

5    performed an ISO search for Roger Cawthorn?

6         A.    Between these two documents, there is

7    not.

8         Q.    And there's also no indication that she

9    performed such a search for Madison Cawthorn?

10        A.    Not --

11             MR. BURGE:   Between those two documents.

12   BY MR. BONNER:

13        Q.    Between those two documents.

14        A.    There -- between these two documents,

15   there is no indication that she did a search for

16   Madison.

17        Q.    And if she performed a search for Roger

18   or Madison Cawthorn, that search should be

19   reflected within the claims file?

20        A.    Yes.

21        Q.    Okay.  And if there is no indication in

22   the claims file of an ISO search from either Roger

23   Cawthorn or Madison Cawthorn, that would be

24   consistent with her not having performed one?

25        A.    I believe that's accurate.

Page 124

1      Q.   There is no indication between either

2  Exhibit 2 or Exhibit 8 that Ms. McLean performed

3  any other research to uncover Mr. Cawthorn's

4  contact information other than making the request

5  of USAA?

6      A.   Between these two documents, I -- I

7  don't see any other search identified between these

8  two documents.

9      Q.   You mentioned earlier that you do not

10  have the ability to look up Facebook on your work

11  computer?

12      A.   That's correct.

13      Q.   But you did, in 2014, have the ability

14  to check Facebook via your own computer; true?

15          MR. BURGE:  What do you mean her own

16      computer?

17  BY MR. BONNER:

18      Q.   A personal computer that you use for

19  home use.

20      A.   I could, yes.

21      Q.   And do you have a smart phone?

22      A.   In 2014, I did not.

23      Q.   That's fine.

24          And Ms. McLean had the capability of

25  checking Facebook; correct?

Page 125

1    A.    She did, yes.

2    Q.    And, of course, you could have made a

3    request to her to look at Facebook and provide you

4    with information that's contained on that website?

5    A.    Based on this Exhibit 8, I -- she is

6    telling me that she had looked at Facebook.

7    Q.    And I'm simply saying that it's within

8    your discretion to ask her to look into information

9    that might be contained on a Facebook Web page that

10   you, yourself, could not access?

11   A.    It's possible, yes.

12   Q.    There's no indication anywhere in the

13   claims diary or in the report of April 28th, 2014,

14   from Ms. McLean that Ms. McLean had attempted to

15   contact either Madison Cawthorn or his family

16   through Facebook?

17   A.    I believe that -- I'm not the person to

18   answer how they are trained on the use of Facebook,

19   but there is no indication between these two

20   documents indicating that she tried to contact

21   anyone through Facebook.

22   Q.    And, to your personal knowledge, no one

23   at Auto-Owners ever tried to contact Madison

24   Cawthorn or his family through Facebook about this

25   claim?

Page 126

1          A.    To my knowledge, that's accurate.

2          Q.    If you look at -- and I'll take 2 back.

3          MR. BONNER:  Bob, please keep this

4      handy.

5   BY MR. BONNER:

6          Q.    With respect to the preliminary report,

7      you'll see the second-to-last paragraph reads,

8      "Please let me know if you want me to get defense

9      counsel involved on the front side in order to get

10     this matter concluded without any possibility of

11     excess exposure."

12              Did I read that correctly?

13         A.    That's what it says.

14         Q.    It continues, "Let me know as soon as

15     you get a chance"; correct?

16         A.    That's correct.

17         Q.    This is a request for authority to get a

18     defense lawyer involved to make a settlement offer

19     to Madison Cawthorn; correct?

20              MR. BURGE:  Object to the form.  That's

21         not what it says.

22              You can answer it.

23         A.    It is a request to get defense counsel

24     involved, in her words, to get the matter

25     concluded.

Page 127

```
 1   BY MR. BONNER:

 2       Q.   And do you see -- that's exactly what

 3   I'm getting at.  I know that the letter says what

 4   it says, but I need you to interpret it.  Because

 5   when you received it, I need to know what this

 6   statement meant to you.

 7            So let me ask you this:  When you read

 8   this statement, was this a request to retain

 9   defense counsel for the Ledfords?

10       A.   It was a question of whether I thought

11   we should get defense counsel for the Ledfords at

12   that time.

13       Q.   Okay.  So this statement was a request

14   from feedback -- from you regarding retaining

15   against counsel for the Ledfords; correct?

16       A.   Yes.

17       Q.   Okay.  It also says, "in order to get

18   this matter concluded without any possibility of

19   excess exposure"; correct?

20       A.   It says that, yes.

21       Q.   To a person reading this without any

22   knowledge of the claim, that would sound like a

23   settlement offer, to get the matter concluded

24   through settlement?

25            MR. BURGE:  Object to the form.
```

Page 128

1    BY MR. BONNER:

2         Q.    Is that how you interpreted this

3    request?

4         A.    I would interpret it to assist with

5    resolving the claim.

6         Q.    Okay.  There are two ways, essentially,

7    to resolve a claim against a liable policyholder.

8    One is by trial; correct?

9         A.    Yes.

10        Q.    Okay.  You go and you present the case

11   to a jury, and the jury decides the liability of

12   the insured and the judgment that the insured is

13   liable for; correct?

14        A.    That's correct.

15        Q.    Another way to resolve a matter is

16   through a settlement; correct?

17        A.    Yes.

18        Q.    Now, there are matters in between

19   settlement and trials, such as arbitration.  This

20   letter is not referring to arbitration; correct?

21        A.    That's correct.

22        Q.    Okay.  Essentially, the two ways to

23   resolve this claim as of April 28th, 2014, were

24   trial or settlement; correct?

25        A.    Yes.  I -- yes.

Page 129

1      Q.    Okay.  And a settlement would secure a

2    release of the Ledfords for liability for Madison

3    Cawthorn's injuries?

4      A.    If it were possible to be settled and

5    get a release, yes.

6      Q.    The goal would be to settle an exchange

7    for a release benefiting the Ledfords and

8    protecting them from a claim by Madison Cawthorn?

9      A.    The -- the goal would be to get a

10   release for both the driver, Bradley, and for

11   the -- Bob Ledford's RV & Marine.

12     Q.    Okay.  So when -- okay.  And when

13   Ms. McLean wrote this letter to you and stated,

14   "Let's get defense counsel involved to have the

15   matter concluded without any possibility of excess

16   exposure," she was not suggesting, let's get

17   defense counsel involved to try this case?

18     A.    Well, she was not saying let's get

19   defense counsel involved.  She was asking if we

20   should get defense counsel involved, but it would

21   be to move it towards settlement.

22     Q.    To move it towards settlement.  But the

23   goal of settling such that neither Bradley Ledford

24   or Bob Ledford RV & Marine would have to pay money

25   above their policy limits?

Page 130

1     A.    That would be the goal.

2     Q.    And that's what she means here when she

3  uses the word "excess exposure"?

4     A.    That the Ledfords would not have to pay

5  anything above their policy limits.

6     Q.    Right.  Because the people who are not

7  familiar in insurance, "excess exposure" means

8  money above the limits of insurance that a

9  policyholder has paid for?

10     A.    That's an accurate...

11     Q.    Okay.

12     A.    If I may, in reading more of this

13  letter, go back.

14          There is a -- a last line that says, "If

15  you Google 'Prayers for Madison,'" that would lead

16  me to believe that she had Googled.  You asked if

17  there was indication between the two documents, if

18  she had Googled anything.  That does lead me to

19  believe that she has used Google for something.

20     Q.    Mm-hmm.  Now, it's -- I -- I see the

21  statement that you say about, "If you Google

22  'Prayers for Madison,' it will be the first hit

23  that comes up."

24          Now, when -- this suggestion doesn't

25  reflect that she Googled -- well, strike that.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                            Page 131

1            She states before that, "You may wish to

2    review that information for some additional

3    information on the progress of his treatment as

4    well as an overall picture of the claimant."

5            Do you see that?

6        A.   Yes.

7        Q.   And then it continues, "If you Google

8    'Prayers for Madison 2014,' it will be the first

9    hit that comes up"?

10       A.   Yes.

11       Q.   Okay.  It appears to me that she's

12   suggesting to you, Ms. Pitman, how you could find

13   the 'Prayers for Madison 2014' Facebook page.

14       A.   Possibly.

15       Q.   Okay.  But regardless of what this says,

16   you did not Google "Madison 2014"?

17       A.   I do not recall if I did or didn't.  I

18   do know I did not look at the Facebook page.  I

19   don't recall if I used Google.

20       Q.   You have no notes that reflect that you

21   Googled "Madison 2014" after receiving this report?

22       A.   No.

23       Q.   Okay.  In fact, your recollection is

24   that you did not review Facebook at all in

25   connection with this claim?

Page 132

1        A.    That's correct.

2        Q.    When you received this report, did you

3   respond to Ms. McLean by telephone, or would your

4   response have been written?

5             MR. BURGE:   Object to the form.   You've

6        already asked it, and it's been answered.

7             You can answer it again.

8             MR. BONNER:   For this -- this one?

9             MR. BURGE:   For that one.

10  BY MR. BONNER:

11       Q.    Sorry.

12       A.    I may have called her.   I do not recall.

13  But -- but there -- there was a response that I

14  believe I sent via email.

15       Q.    Are there any notes that would reflect

16  one way or the other whether you had a call with

17  Ms. McLean after receiving the April 28th email?

18       A.    No.

19            (Plaintiff's Exhibit 9 was marked for

20       identification.)

21  BY MR. BONNER:

22       Q.    I'm now showing you an email -- I think

23  we're done with that one -- an email marked --

24  dated May 8th, 2014.   It's marked as Exhibit 9.

25            Can you confirm that that's an email

Page 133

1    that you authored?

2         A.    Yes, it is.

3         Q.    Between April 28th, 2014, and the date

4    of this email, May 8, 2014, did you have any

5    communications that you're aware of with

6    Ms. McLean?

7         A.    Regarding this claim?

8         Q.    Yes, regarding this claim.

9         A.    I don't recall.

10        Q.    You don't recall.

11              Is there anything that would refresh

12   your recollection?

13        A.    No.

14        Q.    If this is the first email in the claims

15   file authored from you to Ms. McLean, do you agree

16   that it's likely that this was your first response

17   to her, April 28th, 2014, follow-up report?

18        A.    It's my first written response.  We --

19   I -- I don't recall if we spoke on the phone or

20   not.

21        Q.    Okay.  But it's your first written

22   response?

23        A.    Yes.

24        Q.    In response to her suggestion to

25   Google -- no, sorry -- that you might find it

Page 134

1    helpful to review the Facebook page, "Prayers for

2    Madison," did you respond to that in this email?

3         A.   I did not address her mention of the

4    Facebook page, no.

5         Q.   Okay.  Did you orally address her

6    mention of the Facebook page?

7         A.   I don't recall.

8         Q.   And there's nothing that would refresh

9    your recollection?

10        A.   No.

11        Q.   So if there's no mention of you

12   discussing that with Ms. McLean in the claims file,

13   that's consistent with you not having an oral

14   conversation regarding the Facebook page?

15        A.   Not necessarily.  I -- I don't record --

16   I -- I don't document when I have phone

17   conversations with the claims representatives.

18        Q.   Okay.  With respect to her inquiry

19   regarding whether or not to involve defense counsel

20   to bring the matter to a conclusion without the

21   possibility of an excess exposure, how did you

22   respond that in this letter?

23        A.   I --

24             MR. BURGE:  You mean this email?

25

Page 135

```
 1   BY MR. BONNER:

 2        Q.    This email.

 3        A.    I asked if we know if the claimant has

 4   an attorney, in part to determine how we wanted to

 5   move forward with settlement.

 6        Q.    Is it true that you had not decided, one

 7   way or the other, whether or not to involve defense

 8   counsel at this time?

 9        A.    That's accurate.

10        Q.    By "this time," I mean May 8th, 2014.

11        A.    That's accurate, yes.

12        Q.    You ask McLean whether Mr. Cawthorn's

13   spinal injury is correctable or if the paralysis

14   will resolve; correct?

15        A.    I asked if there was any hope that it

16   was correctable or would resolve, yes.

17        Q.    So the purpose of seeking Mr. Cawthorn's

18   medical records through a medical release was to

19   investigate whether the paralysis was permanent?

20        A.    The purpose of the medical records is to

21   confirm the injuries, to confirm permanency,

22   severity, a -- a number of factors that we would

23   look at in the medical records.

24        Q.    As of May 8th, 2014 -- here, I'll show

25   you Exhibit 2, once again -- no one had interviewed
```

Page 136

1   Bradley Ledford regarding this claim; correct?

2           MR. BURGE:   Object to the form.

3           You may answer.

4       A.   Looking only at Exhibit 2, there's no

5   diary [sic] in the claims diary indicating, as of

6   May 8th, whether or not Pamela had talked to

7   Bradley.

8   BY MR. BONNER:

9       Q.   Based on your knowledge of the claim --

10  not the documents in front of you, but your

11  knowledge of the claim, as of May 8th, 2014,

12  Auto-Owners had not interviewed Bradley Ledford in

13  connection with the Cawthorn accident?

14      A.   I don't know the answer to that.

15      Q.   Okay.   I've shown you the two reports

16  that have been given to you and the claims diary.

17           Is there any other place you would go to

18  look for that information?

19      A.   In the entire -- I mean, the entire

20  claims file, but I -- I don't know -- I don't know

21  the answer to that.

22      Q.   Well, then we'll limit it to those

23  worlds of documents.

24           Based on the reports you received from

25  Ms. McLean and her entries in the claims diary,

Page 137

1    there is no indication that Auto-Owners had

2    interviewed Bradley Ledford regarding the Cawthorn

3    accident?

4         A.   Based on the two reports that you showed

5    me and these two documents, she did not identify

6    whether she had talked to Bradley or not.

7         Q.   Based on what you knew, Ms. Pitman, as

8    of May 8th, 2014, you had been given no information

9    that would lead you to believe that Auto-Owners had

10   personally visited Mr. Cawthorn in the hospital at

11   Halifax?

12        A.   I believe that's accurate.  You're

13   saying I did not know -- to my understanding that

14   Auto-Owners had not visited the hospital; is that

15   correct?

16        Q.   That's right, as of May 8th, 2014.

17        A.   That's correct.

18        Q.   As of May 8th, 2014, your understanding

19   was that no one from Auto-Owners had personally

20   observed Madison's injuries; true?

21        A.   That's true.

22        Q.   As of May 8th, 2014, based on your

23   understanding then, Auto-Owners had not sent an

24   investigator to visit Mr. Cawthorn at the hospital;

25   true?

Page 138

1      A.   Yeah.   To my understanding, we did not

2   send anyone to the hospital.

3      Q.   Auto-Owners has investigators that it

4   uses in Florida to investigate claims; correct?

5      A.   That's accurate.

6      Q.   It has a special investigative unit?

7      A.   Yes.

8      Q.   Acronym SIU?

9      A.   Yes.

10      Q.   Okay.   The investigators in that unit

11   are capable of carrying out Auto-Owners'

12   investigation?

13      A.   I -- I'm not the person to answer that.

14   I don't know specifically what SIU does.

15      Q.   Okay.   But you're aware that Auto-Owners

16   has investigators who interview witnesses?

17      A.   I don't know if that's what they do.

18      Q.   Regardless, you had nothing -- no

19   information as of May 8th, 2014, to lead you to

20   believe that Auto-Owners had dispatched an

21   investigator to speak to Madison Cawthorn or Roger

22   Cawthorn or Priscilla Cawthorn about the accident?

23      A.   That's not indicated in Pamela's

24   reports.

25      Q.   And what I'm asking is:   Based on the

Page 139

1    knowledge you would have had on May 8th, 2014,

2    there was nothing -- no information given to you

3    that would lead you to have believed that

4    Auto-Owners had dispatched an investigator to speak

5    to either Roger, Madison, or Priscilla Cawthorn;

6    true?

7          A.   I believe that's accurate.

8          Q.   And, as of May 8th, 2014, based on the

9    information you had been provided, no one had

10   spoken to Roger Cawthorn over the telephone to

11   discuss his son's injuries; true?  By "no one," I

12   mean no one at Auto-Owners.

13         A.   That, I do not know, because looking at

14   the claims diary as of May 7, Pamela had received

15   the medical authorization.  I don't know if she had

16   discussed that over the telephone with David

17   Cawthorn or not.

18         Q.   Okay.  Other than that entry discussing

19   the HIPAA release, there's no document that

20   memorializes a telephone conversation between

21   Ms. McLean and Roger Cawthorn as of May 8th, 2014?

22         A.   I would have to look through the entire

23   claim file to -- to answer that.  I don't know if

24   there is a document.

25         Q.   Based on your knowledge as of May 8th,

Page 140

1   2014, you had no specific information given to you

2   that identified a telephone conversation between

3   anyone at Auto-Owners and Roger Cawthorn?

4        A.   I did not have a document that

5   identified whether or not she had spoken with him

6   on the phone.  Is that what you're asking?

7        Q.   That's what I'm asking.

8        A.   I would have to look through the entire

9   claim file.  That may be correct.

10       Q.   If it's not in the claims file, you

11   would agree it didn't happen?

12            MR. BURGE:  Object to the form.

13            You may answer it.

14       A.   In terms of it being a document, I would

15   agree, yes.

16   BY MR. BONNER:

17       Q.   Okay.  If there was a conversation

18   between Ms. McLean and Roger Cawthorn regarding the

19   accident prior to May 8th, 2014, it should have

20   been documented in the claims file somewhere?

21       A.   I -- I don't know -- Pamela may have --

22   I don't know if she would document that as a

23   standard practice or not.

24       Q.   Based on the information provided to you

25   as of May 8th, 2014, there was no information given

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 141

1    to you to lead you to believe that Auto-Owners had

2    contacted Mr. Ledford requesting Roger Cawthorn's

3    telephone number?

4              MR. BURGE:  Can you read that back,

5         please, for me.

6              (The last question was read back by the

7         court reporter.)

8              MR. BURGE:  Okay.  You can answer.

9         A.   Information was not given to me from

10   Pamela as to what efforts she had made or didn't

11   make to contact him.

12   BY MR. BONNER:

13        Q.   Okay.  Based on the information provided

14   to you on May 8th, 2014, what efforts had

15   Ms. McLean informed you of in terms of her trying

16   to reach either Roger Cawthorn or Madison Cawthorn?

17        A.   Can I look at those reports again --

18   that would -- that would be the basis --

19        Q.   Sure.  Here you are.

20             MR. BONNER:  I'm showing the witness

21        Exhibit 5, the preliminary report.

22   BY MR. BONNER:

23        Q.   You now have in front of you the claims

24   diary, the preliminary report, and the follow-up

25   report --

Page 142

1        MR. BURGE:  Are you limiting the

2     request, Allen, to phone conversations or

3     written?

4        MR. BONNER:  I need to know what

5     information Ms. Pitman had in any form as of

6     May 8th, 2014, with respect to communications

7     between Mr. Cawthorn and Ms. McLean.

8     A.   Can I also see Exhibit 8, which is, I

9  believe, dated April 28th?

10  BY MR. BONNER:

11     Q.   Yes.  This is the follow-up report.

12        My apologies.  I meant to give that to

13  you.

14     A.   So as of -- I believe you were asking,

15  as of May 8th, what information I was given that

16  Pamela had taken -- what efforts she had taken to

17  contact Mr. Cawthorn; is that correct?

18        Okay.  She indicated on April 28th that

19  she had talked to the USAA adjuster, and they would

20  not give his phone number.  And she asked them to

21  have him call her.  I believe -- and it's -- it's

22  not reflected here, but I believe, in the -- or

23  actually, it is.  She said she sent a letter to the

24  claimant requesting a medical authorization.

25        Without looking at that letter, I'm not

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 143

1    sure what that -- what other information may be

2    contained there.  So in documentation, that's what

3    I have in front of me of her efforts.

4         Q.    Do you have any information to

5    supplement the documents in front of you with

6    respect to efforts Ms. McLean made as of May 8th,

7    2014, to contact the Cawthorn family?

8         A.    The letter that would have been sent

9    with the medical authorization may also contain

10   additional information.  I would have to look at it

11   to know.

12        Q.    Other than that letter, any additional

13   information?

14        A.    I would have to look at the claim file

15   to see if there was any other documentation in

16   there.

17        Q.    And what you'd be looking for is other

18   documents that would document a conversation

19   between Roger, Madison, or Priscilla, and

20   Ms. McLean?

21        A.    Well, I believe your --

22        Q.    You know what, strike that.  I'm going

23   to move on to something else.

24        A.    Okay.

25        Q.    Upon authoring the May 8th, 2014,

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 144

1   letter, you did not give instructions to Ms. McLean

2   to attempt to locate Mr. Cawthorn's number from his

3   employer; true?  These are your actions?

4          A.   I did not --

5          Q.   You did not advise Ms. McLean to contact

6   the Cawthorns through the Facebook "Prayers for

7   Madison" page?

8          A.   I did not.

9          Q.   You did not advise Ms. McLean to perform

10  an ISO search to try to locate either Madison or

11  Roger's contact information?

12         A.   There may have already been an ISO

13  search in the file.  I don't recall without looking

14  at the file.  If there was already one, there would

15  have been no need to tell her to do it.

16         Q.   Regardless, you did not advise her to

17  conduct an ISO search; correct?

18         A.   I don't generally tell them to do

19  something they've already done.

20         Q.   Okay.  Assuming she had not done it, you

21  did not advise her to perform one; correct?

22         A.   That's correct.

23         Q.   Okay.  You did not advise her to

24  dispatch an investigator to go to Halifax Hospital

25  to meet with Mr. Cawthorn or his parents?

Page 145

1          A.    I did not.

2          Q.    You did not advise Ms. McLean to go to

3    Halifax Hospital herself to communicate with the

4    Cawthorns personally?

5          A.    I did not.

6          Q.    The distance between the Ocala office

7    and Halifax Hospital, it's drivable, isn't it?

8          A.    I don't know.  I would have to -- to

9    look on the map or Google it or something.

10          Q.    Okay.  You did not advise Ms. McLean to

11    post anything on the "Prayers for Madison 2014"

12    website, "get well soon," or anything like that?

13          A.    I did not.

14          Q.    Okay.  You did not advise Ms. McLean to

15    capture any of the screen posts and provide those

16    to you with respect to whatever was being written

17    on the Facebook website?

18          A.    I did not.

19          Q.    Okay.  You did not advise Ms. McLean to

20    speak to Trooper K.M. Ruede, the trooper disclosed

21    on the traffic accident report?

22          A.    No, I did not.

23          Q.    You did not, as of May 8th, 2014, advise

24    Ms. McLean to speak to witness Chuck Medovich, also

25    disclosed on the traffic report?

Page 146

1        A.    Without looking at the claim report,

2   I -- I don't know if she had already made attempts

3   to contact witnesses or not.  But I did not direct

4   her to contact the witnesses.

5        Q.    And I'm limiting my questions strictly

6   to comments and directions you made to her.

7              You did not suggest to her to, as of

8   May 8th, 2014, to speak to witness Robert Northrop,

9   also listed on the traffic accident report?

10       A.    I did not.

11       Q.    You did not suggest to Ms. McLean to

12  contact Orange City Collection with respect to the

13  damaged vehicle; true?

14       A.    I don't believe I ever saw the tow slip

15  until today, so I would not have had that

16  information anyway, but I did not.

17       Q.    Okay.  And you did not advise her to

18  perform any investigation with respect to the

19  Ledford's vehicle; correct, as of May 8th, 2014?

20       A.    I did not.

21       Q.    And as of May 8th, 2014, you did not

22  advise her to attempt to download the data that may

23  have existed on a black box in the Ledfords'

24  vehicle; true?

25       A.    There is -- there is nothing in this

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 147

1   email that suggests that I did that.

2          Q.    And based on your own knowledge of what

3   you did up through May 8th, 2014, did you suggest

4   to Ms. McLean to download the data that may have

5   existed on the black box in the Ledfords' vehicle?

6          A.    I don't recall if we had any verbal

7   conversations about that, but I did not suggest

8   that in this -- in the email.

9          Q.    Is there anything that would refresh

10  your recollection with respect to oral

11  conversations on that issue?

12         A.    No.

13         Q.    And just so that everyone understands

14  and we're on the same page, the black box is a data

15  recording device that some cars have that records

16  data about what's going on while the vehicle is in

17  motion?

18              MR. BURGE:  Object to the form.

19              You can answer it.

20         A.    I believe that's accurate.

21  BY MR. BONNER:

22         Q.    You did not advise Ms. McLean to send an

23  investigator to photograph the damaged vehicle;

24  true?

25         A.    That's true.

Page 148

1        Q.   As of May 8th, 2014, you did not advise

2   Ms. McLean to obtain copies of the 9-1-1 tapes

3   related to this accident?

4        A.   Again, I don't know if she had already

5   done that, but I did not direct her to do so.

6        Q.   As of May 8th, 2014, you had read the

7   traffic incident report; correct?

8        A.   Yes.

9        Q.   Okay.  You had noted earlier that it

10  said that the airbag did not deploy; correct?

11       A.   That's correct.

12       Q.   You did not, as of May 8th, 2014, advise

13  Ms. McLean to conduct any investigation related to

14  the vehicle airbag in the Ledford's vehicle?

15       A.   I do not recall if I did on the

16  telephone; I did not in the email.

17       Q.   Is there anything that would refresh

18  your recollection with regards to this issue and

19  your telephone conversation with Ms. McLean?

20       A.   No.

21       Q.   Have you and Ms. McLean spoken about

22  this issue in the time that has passed since

23  May 8th, 2014?

24       A.   Which issue?

25       Q.   The airbag or the investigation of the

Page 149

1   airbag.

2         A.    No.

3         Q.    Okay.  As of May 8th, 2014, you had not

4   advised Ms. McLean to preserve or take actions to

5   preserve the Ledfords' vehicle for future

6   inspection?

7         A.    Again, I -- I don't recall if we

8   discussed that on the telephone, but I did not in

9   the email.

10        Q.    Okay.  And as of May 8th, 2014, no one

11  from Auto-Owners had inspected the Ledfords'

12  vehicle, to your knowledge?

13        A.    I don't know to -- I -- I don't know.

14        Q.    Okay.  You did not suggest to

15  Ms. McLean, as of May 8th, 2014, to collect pieces

16  of the vehicle for possible physical evidence in

17  the case?

18        A.    I do not recall if we discussed the

19  vehicle on the telephone.  I -- I did not put it in

20  the email.

21             (Plaintiff's Exhibit 11 was marked for

22        identification.)

23  BY MR. BONNER:

24        Q.    All right.  I'm going to show you an

25  exhibit that I'll mark as Exhibit 10 -- actually,

Page 150

1  back up.  I have one more question on Exhibit 9.

2  I'll take all the exhibits back but 9.

3             At the time you wrote this email of

4  May 8th, I believe you said that you had hoped that

5  the medical evidence might show that Madison

6  Cawthorn's paralysis was not permanent.  If I

7  misspeak, correct me.

8             MR. BURGE:  Object to the form.

9       A.   I didn't say I hope that.  I -- I asked

10  if there was hope that it was correctable or if the

11  paralysis would resolve.

12  BY MR. BONNER:

13       Q.   As of May 8th, 2014, you did not believe

14  that a settlement offer should be proactively made

15  to the Cawthorns in the amount of $3 million?

16             MR. BURGE:  Object to the form.

17             You can answer it.

18       A.   As of May 8, 2014, I did not have the

19  medical records to confirm the claimed injury or

20  the severity or permanency.

21  BY MR. BONNER:

22       Q.   Is there anything, other than medical

23  records, that would have enabled you to make a

24  decision about whether or not to settle or to make

25  a settlement offer for $3 million?

David Madison Cawthorn v. Auto-Owners Insurance Company            Melinda Pitman | 5/9/2017

Page 151

1        A.    There may have been, if it was something

2   that would have confirmed the injury and the

3   severity and the permanency.

4        Q.    What is sufficient to confirm the injury

5   and the severity?  Are photographs of the injury

6   sufficient to confirm the injury and the severity?

7        A.    No.

8        Q.    Is personal observation of Mr. Cawthorn,

9   would that have been sufficient to confirm the

10  severity of the injury, in your mind, such that you

11  could authorize $3 million in settlement?

12           MR. BURGE:  Personal observation of who?

13           MR. BONNER:  Of Mr. Cawthorn.

14           MR. BURGE:  By who?  Who are you talking

15       about for them to look at them?

16  BY MR. BONNER:

17       Q.    By anyone at Auto-Owners.  By anyone at

18  Auto-Owners.

19       A.    I'm going to say, no, looking at someone

20  isn't going to necessarily tell you what their

21  injury is or the severity of it.

22       Q.    You agree that oral communications with

23  the doctors is one way that Auto-Owners could have

24  corroborated the severity of Mr. Cawthorn's

25  injuries?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 152

1          A.    No.   I don't think HIPAA would allow us

2     to talk to the doctors.

3          Q.    If you are allowed to speak to the

4     doctors, you agree that speaking to the doctors

5     would have been sufficient to allow Auto-Owners to

6     assess this injury for policy limits.   Or --

7          A.    If -- if the doctors had -- would have

8     talked to us, possibly.   But I believe, in the

9     claims diary -- I think it says on May 7 -- they

10    wouldn't even send us the records while he was a

11    patient.

12         Q.    And what I'm getting at is, if the only

13    thing that was sufficient to corroborate the nature

14    and extent of the injury is the medical records.

15    That's your testimony, and that's -- I'm not going

16    to --

17              MR. BURGE:   That's not what she said.

18              MR. BONNER:   I know.   Hold on.   I'm

19         going to -- I'm trying to make sure the

20         witness understands my question.

21    BY MR. BONNER:

22         Q.    That's fine.   And if it's other things,

23    that's what I'm getting at.

24              So if there are alternatives to

25    confirming the nature and extent of the injuries --

Page 153

1    you're the person in charge of making this

2    decision -- tell me what the alternatives were as

3    of May 8th, 2014, if there were any.

4         A.   As of May 8th, I'm not sure that there

5    were any other ways that we could have confirmed

6    the injuries, the severity, and the permanency.

7    Generally, the medical records are the fastest,

8    easiest way that we can get confirmation of that.

9    And generally, we're able to get those relatively

10   quickly.

11        Q.   And if the medical records show that

12   this injury wasn't permanent, how would that --

13             MR. BURGE:  You said was or wasn't?

14   BY MR. BONNER:

15        Q.   -- was not permanent, how would that

16   have affected your settlement decisions moving

17   forward?

18             MR. BURGE:  Object to the form.  It's

19        evidence not in the record.

20             You can answer it.

21   BY MR. BONNER:

22        Q.   What did you expect the medical records

23   to show if they didn't corroborate Mr. Ledford's

24   account?

25             MR. BURGE:  Object to the form.

Page 154

1      A.   I didn't have an expectation of what

2  they would or wouldn't show.  I -- I wanted to see

3  what they did show.

4  BY MR. BONNER:

5      Q.   Okay.  If they confirmed that the

6  paralysis was permanent, you agree that you would

7  have had sufficient information to offer $3 million

8  in policy limits?

9      A.   Yes.

10     Q.   Okay.  And if they showed that the

11 injury was not permanent and that he was going to

12 recover, would you have then offered less than

13 $3 million?

14          MR. BURGE:  Object to the form.  Again,

15      evidence not in the record.  Didn't happen.

16     A.   Yeah.  I -- I -- I can't speculate on --

17 we would -- it's one of the things that we look at

18 in evaluating the -- the damages.  And may -- we

19 may have still concluded it was worth the policy

20 limits; we may not have.  It's highly speculative.

21 BY MR. BONNER:

22     Q.   Okay.  And if it didn't, you wouldn't

23 offer policy limits on a claim that you didn't

24 think justified $3 million in damages?

25          MR. BURGE:  Object to the form.

Page 155

 1          You can answer it.

 2      A.    In this specific -- I mean, with this

 3   specific facts -- every claim is different.  So

 4   some claims may very well get settled for -- for a

 5   variety of reasons settlements are made.

 6   BY MR. BONNER:

 7      Q.    Based on the information you had on

 8   May 8th, 2014, you did not have sufficient

 9   information to determine that this claim justified

10   a $3 million settlement?

11          MR. BURGE:  Object to the form.

12          You may answer.

13      A.    Based on what -- the information I had

14   on May 8th, I didn't have enough information to

15   offer the $3 million.  I had enough information to

16   know that -- that we needed something to confirm

17   the injuries.

18   BY MR. BONNER:

19      Q.    Okay.  And, as of May 27th, 2014, you

20   still hadn't received medical records; true?

21      A.    That's true.

22      Q.    So based on the information you had on

23   May 27th, 2014, you still lacked sufficient

24   information to offer $3 million to settle the

25   Cawthorns' claim; true?

Page 156

1          A.    On May 27th, we -- we still did not have

2     confirmation of the injuries to offer the -- the

3     $3 million.  Is that what you're asking?

4          Q.    That's what I'm asking.

5          A.    Umm --

6          Q.    And that's the reason why you didn't

7     offer $3 million on May 27th, 2014, to settle the

8     Cawthorns' claims against the Ledford family?

9          A.    That's correct.

10         Q.    Okay.  And, as of June 11th, 2014, you

11    still had not received medical records; correct,

12    for Madison Cawthorn?

13         A.    That's correct.

14         Q.    And so, as of June 11th, 2013 [sic], you

15    still didn't have sufficient information to offer

16    $3 million to the Cawthorns to settle their claims

17    against -- or sorry -- to Madison Cawthorn to

18    settle his claims against the Ledford family; true?

19         A.    As of June 11, we still had not received

20    the medical records to confirm and make the offer,

21    and that was what we were waiting on.

22         Q.    So, as of June 11th, 2013 --

23               MR. MARTINEZ:  Excuse me.  The date.  Do

24         it again, please.

25

Page 157

1   BY MR. BONNER:

2        Q.   As of June 11th, 2014, Auto-Owners did

3   not have sufficient information to offer $3 million

4   to Mr. Cawthorn to settle his claims against the

5   Ledfords; true?

6        A.   You're asking if we had sufficient

7   information to make the offer.  We did not have

8   sufficient information as of June 11, 2014, to make

9   the offer.

10       Q.   And, as of June 11th, 2014, Auto-Owners

11  did not offer $3 million to Mr. Cawthorn to settle

12  his claims against the Ledfords?

13       A.   We did not offer -- we had -- we were

14  discussing with him the available coverage, but we

15  had not made the offer to say we --

16       Q.   Let me rephrase the question.

17            As of June 11th, 2014, Auto-Owners did

18  not have sufficient information to offer $3 million

19  to the Cawthorns to settle their claims against the

20  Ledford family?

21            MR. BURGE:  That's asked and answered.

22            You can answer it again.

23       A.   As of June 11, we were still awaiting

24  confirmation of the injuries, the permanency and

25  the severity, in order to make the payment of

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 158

1   the -- of the policy limits.

2   BY MR. BONNER:

3       Q.   So it was Auto-Owners' position that as

4   of June 11th, 2014, it still needed more

5   information before it could authorize a settlement

6   offer to Mr. Cawthorn to settle his claims against

7   the Ledford family?

8       A.   We needed some sort of documentation to

9   confirm the claim.

10      Q.   And it's not just the documentation.

11  It's the information contained in the

12  documentation; correct?  You needed the information

13  and the documentation to confirm the extent and

14  severity of the injuries?

15      A.   We needed some indication -- there --

16  there could be a variety of things that we could

17  use.  I mean, just a blank piece of paper is not

18  going to do any good.  So, yes, I needed to see

19  something that indicates, in some fashion, the

20  severity.

21      Q.   And if the information did not

22  corroborate the severity, that would affect your

23  decision as to whether or not to offer $3 million

24  to Mr. Cawthorn to settle his claims against the

25  Ledford family?

Page 159

1          MR. BURGE:  Object to form.

2          And when you say "Mr. Cawthorn," tell us

3     whether you're talking about Madison or

4     who --

5          MR. BONNER:  Madison.

6  BY MR. BONNER:

7     Q.   By "Mr. Cawthorn," I mean Madison

8  Cawthorn.

9     A.   It may or it may not.  It would depend

10 on what was contained in whatever I received.

11    Q.   And that's -- that's the question.  The

12 information could have possibly affected your

13 decision as to whether or not you would offer

14 $3 million to the Cawthorns to settle their claim?

15    A.   It could have.  If -- if -- if the

16 documentation that we receive indicated that he

17 went to the ER and went home, we would not offer

18 $3 million.

19    Q.   You would offer less than $3 million;

20 true?

21         MR. BURGE:  Object to the form.

22         You may answer.

23    A.   If that.

24         MR. BURGE:  Assumes facts not in

25     evidence.

Page 160

1          You can answer it.

2          A.   If -- if that's what we -- what we

3   received, yes, we would not make an offer of the

4   policy limits.

5   BY MR. BONNER:

6          Q.   So in order to make an offer of policy

7   limits, the information contained in the medical

8   records had to justify that offer; correct?

9              MR. BURGE:   Object to the form.

10             You may answer.

11         A.   I'm not sure about the word "justify,"

12  but we have a fiduciary responsibility to the

13  policyholders to make sure that we confirm.

14  BY MR. BONNER:

15         Q.   Right.

16             The information contained in the medical

17  records would have to corroborate that the damages

18  met or exceeded $3 million before you were willing

19  to offer $3 million to Mr. Cawthorn to settle his

20  claims against the Ledfords?

21             MR. BURGE:   Object to the form, to the

22        extent you limit it to the medical records.

23        And she's already told you otherwise.

24             You may answer the question.

25         A.   We would be looking for information that

Page 161

1   would confirm, in some fashion, the injuries that

2   were being claimed.

3   BY MR. BONNER:

4        Q.   Okay.  And if the medical records did

5   not confirm the information being claimed and

6   instead showed that he just checked into the ER and

7   went home, Auto-Owners would not have offered

8   $3 million to Mr. Cawthorn to settle his claims

9   against the Ledford family?

10       A.   If that -- if that had been the case --

11       Q.   Okay.

12       A.   -- that's accurate.

13       Q.   So listen to this question very

14   carefully:  As of June 11th, 2014, it is possible,

15   or at least Auto-Owners kept open the possibility

16   of offering less than $3 million to Mr. Cawthorn to

17   settle his claims against the Ledfords?

18            MR. BURGE:  Object to the form.

19            You may answer.

20       A.   I'm going to -- I'm going to answer

21   that, yes, there's a possibility, if -- if the

22   injuries and severity were not confirmed, that

23   the -- the offer would not have been made.

24            MR. BONNER:  Okay.  Thank you.

25            All right.  I want to go to another

Page 162

1      document.

2             (Plaintiff's Exhibit 10 was marked for

3      identification.)

4   BY MR. BONNER:

5      Q.    This is going to be marked as

6   Plaintiff's Exhibit 10.

7             Can you confirm for me that you received

8   this email from Ms. McLean on May 9th, 2014?

9      A.    Yes.

10      Q.    Okay.  Upon receiving this email, did

11   you request -- did you, yourself, review any

12   additional Facebook printouts or Facebook posts

13   from the "Prayers for Madison" Facebook page?

14      A.    Aside from what's attached --

15      Q.    Mm-hmm.

16      A.    -- to this?  I did not look at the

17   Facebook page.

18      Q.    Did you ask Ms. McLean to provide you

19   with additional printouts of the Facebook page?

20      A.    I did not.

21      Q.    You stated before that you did not view

22   the Facebook pages as being objective evidence of

23   Mr. Cawthorn's injuries; correct?

24      A.    That's what I stated, yes.

25      Q.    So you did not consider the information

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 163

1    Ms. McLean provided you in connection to Exhibit 10

2    with any of your decisions on whether or not to

3    extend the settlement offer in this case?

4         A.   It -- it -- it was -- I think you said I

5    did not consider it.  It was a factor, so I would

6    say I -- I did consider it, but I did not find it

7    to be conclusive confirmation of an injury

8    sufficient to make an offer.

9         Q.   Now, since you considered it, you agree

10   with me that Auto-Owners should not only consider

11   the printouts that Ms. McLean offered, you should

12   probably consider all of the information that was

13   available on the Facebook page?

14             MR. BURGE:  Object to the form.

15        A.   Possibly.

16   BY MR. BONNER:

17        Q.   Let me put it this way.  It would not be

18   fair to the insured to only review printouts that

19   were favorable to -- well, strike that.

20             When reviewing these printouts, you

21   agree that Auto-Owners should have an objective

22   approach to the information it reviews on the

23   Facebook page?

24             MR. BURGE:  Object to the form.

25

Page 164

1    BY MR. BONNER:

2         Q.    It should not be screened for any

3    particular purpose?

4              MR. BURGE:  Object to the form.

5         A.    When -- this is -- this is really more

6    of a question for the claims people and -- and how

7    they utilize Facebook.

8    BY MR. BONNER:

9         Q.    Okay.  Well, let me just ask you this.

10   You said you considered the exhibits attached to

11   Exhibit 10, but they were not dispositive to any of

12   your actions on this claim; right?

13             MR. BURGE:  Object to the form.

14             You can answer.

15        A.    I was still waiting for medical -- some

16   sort of medical documentation.

17   BY MR. BONNER:

18        Q.    Okay.  Ms. Pitman [sic] did not send you

19   a printout from Facebook reporting that

20   Mr. Cawthorn had had his kidney removed; correct?

21        A.    Ms. -- Pam McLean.

22        Q.    Sorry.  McLean.

23        A.    In the attachment to this email, there

24   is no mention of the kidney.

25        Q.    Okay.  And Ms. McLean didn't inform you

Page 165

1   that the Facebook page contained information

2   reporting that Mr. Cawthorn had a punctured lung?

3            MR. BURGE:  Object to the form.

4            What's the question?  Are you asking her

5        does the Facebook say it, or does she put it

6        in the email that it said it?

7   BY MR. BONNER:

8        Q.   Did Ms. McLean --

9            MR. BONNER:  Because she said that

10       Ms. McLean had oral conversations with her as

11       well.

12   BY MR. BONNER:

13       Q.   Did Ms. McLean report to you,

14   Ms. Pitman, that the Facebook page contained

15   information reporting that Mr. Cawthorn had

16   suffered a punctured lung?

17       A.   I don't recall.  It -- it's not in this

18   email.  I mean, it's not in these attachments.  But

19   I don't recall if she told me that verbally.

20       Q.   You have no recollection of your

21   conversations with Ms. McLean regarding the

22   contents of Facebook pages, other than this email?

23       A.   I do not.

24       Q.   Okay.  So if it's not in that email, you

25   don't recall her having reported it; correct?

Page 166

1    A.   You're asking if I don't recall her

2  telling me that?  That's correct, I do not recall.

3    Q.   And there's nothing that's going to

4  refresh your recollection, not your lit card or

5  anything like that?

6    A.   No.

7    MR. BONNER:  Let's go ahead and take a

8    break.

9    THE VIDEOGRAPHER:  Going off the record.

10    The time is 12:17 p.m.

11    (Break from 12:18 p.m. to 12:28 p.m.)

12    THE VIDEOGRAPHER:  We're back on the

13    record.  The time is 12:28 p.m.

14  BY MR. BONNER:

15    Q.   All right.  Ms. Pitman, thank you for

16  bearing with us on this break.

17    I'm going to show you what's marked as

18  Exhibit 11.  You can keep the Exhibit 10 in front

19  of you.  Here's a copy for you.

20    All right.  I'm going to represent to

21  you that this is a selection of printouts from a

22  Facebook page.  You'll see the first page starts on

23  April 4th, 2014.  The last page is May 17th of

24  2014.

25    Let me know when you can confirm that.

Page 167

1      A.   The last page shows June 11th, 2014.

2      Q.   We can solve that.

3           MR. BONNER:  Here you go.  Your copy,

4      counsel, stops at May 17th?

5           MR. BURGE:  June 11th.

6           MR. BONNER:  I'm the only one that had a

7      deficient copy here.  I'm going to try to get

8      these all on the same page here.

9           Does everyone's copy conclude with

10     May 17th, 2014?

11          THE WITNESS:  Yes.

12  BY MR. BONNER:

13     Q.   Now, you can flip through those if you

14  like.  But you -- I'm just asking you to confirm.

15          You did not review Facebook

16  independently, and so to the extent that these are,

17  I'm going to represent to you, approximately 40

18  printouts from Facebook page, the only ones you

19  would have seen are the only ones that are included

20  in Exhibit 10 to your letter; true?

21     A.   As of a specific date and time --

22     Q.   Well, we'll start with May 8th, 2014.

23     A.   I -- I believe that -- that's true.

24     Q.   Is there a time at which you would have

25  reviewed more than just the exhibits that were

Page 168

1    represented in Exhibit 10?

2          A.   I don't know if the claims file contains

3    any other printouts.  If it does, whatever's in the

4    claims or the legal file.

5          Q.   And if the claims file and the legal

6    file do not include any additional printouts, other

7    than those that are included in Exhibit 10, you

8    would agree that Exhibit 10 are the only printouts

9    that you reviewed in connection with the

10   Cawthorn-Ledford matter?

11         A.   From the Facebook pages, that's correct.

12         Q.   From the Facebook pages.

13              So you would not have reviewed, to the

14   extent not included in Exhibit 10, those Facebook

15   pages included in Exhibit 11 in connection with

16   your review of the Cawthorn-Ledford matter?

17         A.   Yeah.  If -- if these pages are in

18   there, those would have been the only ones I would

19   have seen.  I would not have seen the rest of this.

20         Q.   Okay.  Thank you very much.

21              Okay.  I want to show you the claims

22   diary again.

23              MR. MARTINEZ:  It's No. 2.

24              MR. BONNER:  Thank you.

25

Page 169

1  BY MR. BONNER:

2      Q.   Between, I believe it's May 7th, 2014,

3  and May 27th, 2014, there are no events recorded in

4  the claims diary; correct?

5      A.   There are no -- that's correct.  There's

6  nothing dated in between those dates in the diary.

7      Q.   This is consistent with nothing

8  significant having happened on the claim during

9  that time; true?

10          MR. BURGE:  Object to the form.

11          You may answer it.

12      A.   Not necessarily.  There may be things in

13  the claims file itself.

14  BY MR. BONNER:

15      Q.   Did you do anything with respect to this

16  claim between May 7th, 2014, to May 27, 2014?

17      A.   I don't recall -- well, May 8th or 9th

18  was the date of the email you previously showed me,

19  so that would have been between those dates --

20      Q.   So let's use that date.  Between May --

21  I believe the date of your email -- well, the date

22  of Ms. McLean's email to you with the four Facebook

23  pages is dated May 9th, 2014.

24          So between May 9th, 2014, and May 27th,

25  2014, did you do anything with respect to this

Page 170

1   claim?

2        A.   I -- I don't recall without looking at

3   the entire claim file.  I -- I don't know.

4        Q.   Okay.  If there are no emails or other

5   documents in the claims file attributable to you,

6   do you agree that you did not perform any work on

7   this claim between May 9th, 2014, and May 27th,

8   2014?

9             MR. BURGE:  Object to the form.

10             You can answer it.

11        A.   If there's nothing in the claims or the

12   legal file, I would say that I -- I most likely did

13   not.

14   BY MR. BONNER:

15        Q.   The only other place that there would be

16   a record of you having done something on this claim

17   would be your lit card; correct?

18             MR. BURGE:  Object to the form.

19             You may answer.

20        A.   Possibly.

21   BY MR. BONNER:

22        Q.   Or possibly not, if nothing was done;

23   right?

24        A.   It's -- that's possible.

25             (Plaintiff's Exhibit 12 was marked for

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 171

1        identification.)

2   BY MR. BONNER:

3        Q.    Okay.  I'm going to show you what we'll

4   mark as Exhibit 12.  This is a letter from

5   Ms. McLean to Mr. and Mrs. Cawthorn in Flat Rock,

6   North Carolina.

7              Have you seen this letter before?

8        A.    Yes.

9        Q.    It's dated May 27th, 2014?

10       A.    Yes, I have seen the letter before.

11       Q.    And it's dated May 27th, 2014?

12       A.    That's correct.

13       Q.    Did you consult with Ms. McLean before

14   she sent this letter?

15       A.    I don't recall.

16       Q.    Did you review this letter before it was

17   sent out?

18       A.    No.

19       Q.    At the time of this letter, May 27th,

20   2014, I believe you stated Auto-Owners was not

21   prepared to make a settlement offer to Mr. Cawthorn

22   without first receiving his medical records?

23       A.    I believe what I said was something --

24   some sort of information to confirm the injuries,

25   the severity, and the permanency.

Page 172

1     Q.    Okay.   And you know, I asked you this,

2  and I'm not sure if I recall you telling me this.

3          Apart from the medical records, what

4  other evidence were you prepared to accept as of

5  May 27th, 2014, as sufficient proof of

6  Mr. Cawthorn's injuries?

7     A.    Something that would have given me the

8  information to show that there were severe -- the

9  severity, the permanency of his injuries.

10    Q.    If not medical records, can you give me

11 an example of what else you would have accepted?

12    A.    Well, every claim is different.   So some

13 claims, it's on the police report that there's a

14 fatality.   That -- that would be an acceptable

15 confirmation that -- that a person had passed away.

16 There may be medical bills.   Sometimes we get the

17 medical bills before we get the medical records.

18 Usually, the records come first.   There could be,

19 in any claim, any number of outside sources that

20 provide that information.

21    Q.    With respect to the Cawthorns' claims

22 against the Ledford family, other than medical

23 records and medical bills, what other proof would

24 have been sufficient to corroborate the nature and

25 extent of Mr. Cawthorn's injuries, such that you

Page 173

```
 1    could then authorize a settlement offer of
 2    $3 million?
 3         A.   If -- if I had received some sort of
 4    document that confirmed the injury, the severity,
 5    the permanency.
 6         Q.   So an affidavit?
 7              MR. BURGE:  From who?
 8    BY MR. BONNER:
 9         Q.   From Mr. Cawthorn?
10         A.   From his -- the father Cawthorn or from
11    Madison?
12         Q.   Well, let's start with Madison.  Would
13    an affidavit from Madison Cawthorn attesting to his
14    injuries have been sufficient evidence upon which
15    you could have determined or authorized a
16    $3 million settlement offer on this claim?
17         A.   I would say no.
18         Q.   Okay.  What about --
19              MR. BURGE:  You're talking about the
20         claimant?
21              MR. BONNER:  The claimant, right.
22    BY MR. BONNER:
23         Q.   What about with respect to Roger
24    Cawthorn or Priscilla Cawthorn, the same question.
25              Would an affidavit sworn to and
```

Page 174

1   attesting to their son's injuries have been

2   sufficient proof for you to have authorized a

3   settlement offer of $3 million?

4        A.   No.

5        Q.   What about a sworn statement from your

6   insureds, would that have been sufficient

7   information upon which you could have authorized a

8   settlement offer of $3 million to Mr. Cawthorn?

9        A.   I don't think so, no.

10        Q.   Okay.  And the reason I go through these

11   questions is, apart from medical bills and

12   treatment records, are there any other documents

13   that would have been sufficient proof upon which

14   Auto-Owners could have authorized a $3 million

15   settlement offer to Mr. Cawthorn?

16        A.   I -- I'm not -- there may have been, but

17   to guess in -- in my head at what documents could

18   have -- that come, I don't know -- but -- but there

19   may have been.  There could -- as long as it

20   confirmed those things, it -- it doesn't really

21   matter in what -- well, it does matter, because a

22   self-serving statement from the claimant would

23   probably not be considered confirmation.  But...

24        Q.   Sitting here today, the only examples of

25   sufficient proof upon which Auto-Owners would have

Page 175

1    been willing to extend a $3 million settlement

2    offer to Mr. Cawthorn as of May 27th, 2014, are

3    medical bills and treatment records.  Those are the

4    only exemplars?

5         A.    Possibly a police report.  There could

6    be other -- some sort of -- some -- something that

7    I could confirm and know that I could face the

8    officers of our company or our policyholders and

9    say, yes, I've confirmed the severity of these

10   injuries to warrant a $3 million payment.

11        Q.    Okay.  The traffic report in this case,

12   you had; correct?

13        A.    Yes.

14        Q.    And based on your review of it, it did

15   not warrant a $3 million settlement offer?

16        A.    That's correct.

17        Q.    Okay.  Let's put the police report to

18   the side.

19            Any other exemplars, other than medical

20   bills or treatment records, that would have been

21   sufficient for Auto-Owners to then authorize a

22   $3 million settlement offer to the Cawthorns as of

23   May 27th, 2014?

24        A.    There -- there may have been something

25   in existence.  We did not have it, if there was

Page 176

```
 1   something in existence.  It was not given to us,
 2   and -- and we were not able to secure something
 3   that would have satisfied.
 4        Q.   So those are the only two examples you
 5   can think of right now?
 6             MR. BURGE:  As of May 27th, is the date
 7        you're giving her?
 8             MR. BONNER:  Yes.
 9             MR. BURGE:  You can answer it.
10        A.   Those are the examples that -- that I
11   can think of right now.
12   BY MR. BONNER:
13        Q.   Okay.  This letter confirms that
14   Auto-Owners was seeking the medical records --
15             MR. MARTINEZ:  What exhibit number?
16   BY MR. BONNER:
17        Q.   Sorry.
18             Exhibit 12 confirms that Auto-Owners was
19   still seeking medical records; correct, from
20   Mr. Cawthorn?
21        A.   That's correct.
22        Q.   Auto-Owners was not prepared to extend
23   Mr. Cawthorn a $3 million settlement offer on
24   May 27th, 2014, because it did not have medical
25   records; correct?
```

Page 177

1          A.   As of May 27, we were still looking for

2     something to confirm the severity of the injuries.

3     It didn't necessarily have to be a medical record,

4     as long it confirmed.

5          Q.   Okay.

6          A.   But we -- but we were still seeking the

7     medical records at this time.

8          Q.   But when you say "something that

9     confirmed," Facebook pages weren't sufficient;

10    true?

11         A.   Correct.

12         Q.   By "something," you don't mean

13    affidavits of either the Ledfords or the Cawthorns;

14    correct?

15         A.   That's correct.

16         Q.   It was not going to be in the accident

17    report, the information you were seeking?

18         A.   That's correct.

19         Q.   Okay.  And the only documents that you

20    were aware of as of May 27th, 2014, that would have

21    been sufficient were medical records or bills, that

22    you were aware of?

23         A.   That I was aware of, yes.

24         Q.   And this is why Ms. McLean is seeking

25    copies of the medical treatment records?

David Madison Cawthorn v. Auto-Owners Insurance Company                  Melinda Pitman | 5/9/2017

Page 178

1      A.    Usually, that's what we were able to
2  obtain fastest and easiest.
3      Q.    And without medical records or bills,
4  Auto-Owners was not prepared to extend a $3 million
5  settlement offer to Mr. Cawthorn on May 27th, 2014?
6      A.    Without some sort of confirmation.  It
7  could have come in a -- in a different form.  If it
8  confirmed the severity of the injuries, we would
9  have likely made an offer.
10      Q.    But I guess where I keep coming back to
11  is, I understand that there might be something that
12  I'm not listing that neither you or I have thought
13  about that could have been confirmation to
14  Auto-Owners to the extent and severity of
15  Mr. Cawthorn's injuries.
16           But, sitting here today, the only
17  examples are medical bills and treating records,
18  that you're able to think of?
19      A.    As of May 27th, that -- that's correct.
20      Q.    Okay.  So notwithstanding the possible
21  existence of some other document that might have
22  sufficed, as of May 27th, 2014, Auto-Owners was not
23  willing to offer $3 million to Mr. Cawthorn without
24  at least having either his medical records or his
25  bills?

Page 179

1          MR. BURGE:  You asked that ten times

2      now, and you've got the same answer.  I

3      object to it.

4   BY MR. BONNER:

5          Q.   Well, I'm trying to drill down on it.

6   So --

7          A.   As of May 27, we were still looking for

8   something that would confirm the severity of the

9   injuries.  Sometimes documents will come in that I

10  have not thought of or I'm not actively seeking.

11  Had something come in that confirmed it, it would

12  have been a different scenario.

13         Q.   Okay.  Regardless, the information

14  Auto-Owners had on May 27th was not sufficient for

15  you to authorize a settlement offer of $3 million

16  to Mr. Cawthorn?

17         MR. BURGE:  Object to the form.  It's

18      been asked over and over.

19         You can answer it again.

20         A.   Yes.  As of May 27, we did not have

21  confirmation in order to offer the $3 million.

22  BY MR. BONNER:

23         Q.   Ms. McLean had not been given settlement

24  authority as of May 27th, 2014, to offer $3 million

25  to Mr. Cawthorn to settle his claims against the

Page 180

1   Ledfords?

2        A.   That's correct.

3        Q.   And she could not make a $3 million

4   offer to the -- Mr. Cawthorn to settle his claims

5   without first receiving authority from you to do

6   so?

7        A.   She's not supposed to.

8        Q.   And, to your knowledge, she never has

9   done that; right?  Ms. McLean?

10            MR. BURGE:  Object to the form.

11            You may answer it.

12        A.   In -- in this claim, or in any claim

13   that --

14   BY MR. BONNER:

15        Q.   In any claim.

16        A.   To my -- to my knowledge, she has not

17   made offers without authority.

18        Q.   Okay.  Agree with me that the May 27th,

19   2014, letter does not mention the amount of

20   $3 million anywhere on it?

21        A.   It does not.

22        Q.   Okay.  And it's true that Ms. McLean's

23   letter of 5/27/2014 does not use the words "policy

24   limits" anywhere on it?

25        A.   It does not use that phrase.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                              Page 181

1        Q.    And can you confirm that Ms. McLean's

2    letter of 5/27/14 does not mention the word

3    "settlement offer" -- or the phrase "settlement

4    offer" anywhere upon it?

5              MR. BURGE:   The letter speaks for

6         itself.

7              You can answer.

8        A.    Yeah.   The -- the letter does not use

9    that phrase "settlement offer."

10   BY MR. BONNER:

11       Q.    Okay.   And this letter does not include,

12   as any attachment, a proposed release?

13       A.    It does not attach a proposed release.

14   Well, it attaches a proposed release for medical

15   information, but it does not attach a proposed

16   release of the insureds.

17       Q.    Okay.   That's my question.

18             It does not include an attachment that

19   would release the insureds from Mr. Cawthorn's

20   claim?

21       A.    That's correct.

22       Q.    That would be an attachment that

23   Mr. Cawthorn could execute; correct?

24       A.    Yes.

25       Q.    And it does not include an attachment

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 182

1    that has settlement terms?

2         A.    That's correct.

3         Q.    A person, based on solely reading this

4    letter of May 27th, 2014, would not even know what

5    Auto-Owners' policy limits for this claim were?

6              MR. BURGE:  Object to the form.

7              You may answer it.

8         A.    The letter does not reference the policy

9    limits.

10   BY MR. BONNER:

11        Q.    So if a person's only knowledge was the

12   information provided in this letter, they would not

13   know what Auto-Owners' limits were?

14        A.    Yeah.  If they were only looking at this

15   letter and nothing else, the policy limits are not

16   identified.

17        Q.    Okay.  We mentioned the date, June 11th,

18   2014, a little bit earlier.

19              Do you recall that?

20        A.    Yes.

21        Q.    Okay.  Are you aware that there was a

22   conversation between Ms. McLean and Mr. Cawthorn on

23   that date?

24        A.    I've seen an email string.  I don't know

25   if that's what you're referring to.

Page 183

1      Q.   Well, let's start first with just the

2  telephone conversation.

3      A.   Okay.

4      Q.   Do you have any knowledge to confirm or

5  deny whether or not a telephone conversation took

6  place between Ms. McLean and Mr. Cawthorn on or

7  about June 11th, 2014?

8      A.   Independently, I don't -- I don't know.

9      Q.   Did Ms. McLean report to you about a

10  conversation that took place on or about June 11th,

11  2014?

12      A.   Not that I recall.

13      Q.   Okay.  And is there anything that would

14  refresh your recollection as to that fact?

15      A.   Only if there was something documented

16  in the claims or legal file, an email telling me

17  that, or a letter.

18      Q.   And if there were no email documenting

19  that conversation as being reported to you, you

20  have no recollection that it was, in fact, reported

21  to you?

22      A.   I don't -- that's correct.  I don't

23  recall if I was.

24      Q.   Okay.  What do you know about the

25  June 11th, 2014, conversation?

Page 184

1    A.    Only what I reviewed in the email string

2    that's contained in the claim file.

3         Q.    Okay.  And when did you review that?

4         A.    Today is Tuesday.  Monday and last

5    Friday.

6         Q.    I should have asked a better question.

7               When did you first review that?

8         A.    Oh, I don't recall.

9         Q.    Okay.  Possibly in 2014?

10        A.    Most likely, at some time, yes.

11        Q.    On June 11th, 2014, did you provide

12   Ms. McLean with authorization to offer the policy

13   limits of $3 million to Mr. Cawthorn in exchange

14   for a release of the Ledfords of his claim?

15        A.    I did not give her authorization at that

16   time.

17        Q.    As of June 11, 2014, did she have

18   authorization at all, Ms. McLean, to make a

19   $3 million settlement offer to Mr. Cawthorn?

20        A.    To make the 3 -- no, she did not.

21             (Plaintiff's Exhibit 13 was marked for

22        identification.)

23   BY MR. BONNER:

24        Q.    Okay.  I'm going to mark this exhibit,

25   Exhibit 13.

Page 185

1          I realize you're not a recipient of this

2    letter.  Have you ever seen it before?  This is a

3    letter dated July 18th, 2014.

4         A.   I don't independently recall, but most

5    likely.

6         Q.   It is between Ms. McLean and Mr. Michael

7    Orr.

8              Do you recognize Mr. Orr's name?

9         A.   Yes.

10        Q.   Who is he?

11        A.   He was defense counsel that was hired

12   for Bob Ledford's RV & Marine.

13        Q.   He was hired on July 18th, 2014?

14        A.   That's when she forwarded the loss

15   notice, the summons, and complaint -- I don't know

16   if she had talked to him prior to that or...

17        Q.   Now, as of July 18, 2014, did Ms. McLean

18   need to consult with you before hiring Mr. Orr?

19        A.   No.

20        Q.   Were you involved in the decision to

21   hire Mr. Orr?

22        A.   I don't recall.

23        Q.   Had you had any involvement on this case

24   between your email of May 9th, 2014, and this date,

25   July 18, 2014?

Page 186

1        A.   Without looking at the two files, I
2   don't recall.  I know she sent the Facebook pages
3   May 9th.  I don't -- I don't know if there was
4   anything between those two dates, or if we had
5   phone conversations.  I would suspect that I -- I
6   did probably have some sort of communication.
7        Q.   If there are no emails reflected in
8   either the claims file or the litigation file, is
9   it fair to say that you did not communicate via
10  email with Ms. McLean between May 9th, 2014, and
11  July 18th of 2014?
12       A.   It's fair to say that I -- if there are
13  no emails in there, then I did not communicate with
14  her by email between those dates.
15       Q.   With respect to oral conversations,
16  would there be a record of any oral conversations
17  you had between Ms. McLean and yourself between
18  May 9th and July 18th, 2014?
19       A.   There would not.
20       Q.   Not even in the cumulative -- the
21  litigation key -- litigation card?  Excuse me.
22       A.   No, there would not.
23       Q.   Okay.  Do you have any specific
24  recollection of a communication that took place
25  between you and Ms. McLean on May 9th -- between

Page 187

 1   May 9th, 2014, and July 18th, 2014?

 2        A.   I don't have any specific recollections.

 3        Q.   And there's nothing that would refresh

 4   your recollection?

 5        A.   There is not.

 6        Q.   So if you gave Ms. McLean any

 7   instructions between May 9th, 2014, and July 18th,

 8   2014, you have no recollection of what those

 9   instructions might have been?

10        A.   That's accurate.

11        Q.   And there's nothing that would refresh

12   your recollection?

13        A.   That's true.

14        Q.   And is it possible that you did not have

15   oral communications with Ms. McLean between

16   May 9th, 2014, and July 18 of 2014?  Possible.

17        A.   It's possible.  It's not likely, but

18   it's possible.

19        Q.   With respect to Exhibit 12 --

20        A.   13.

21        Q.   -- 13 -- excuse me -- is there anything

22   unusual about this notice being sent to Mr. Orr?

23        A.   To me, no, there -- there's nothing that

24   appears unusual.

25             MR. BONNER:  Okay.  All right.  I'll

Page 188

1          have that.

2                   (Plaintiff's Exhibit 14 was marked for

3          identification.)

4    BY MR. BONNER:

5          Q.    This exhibit is marked Plaintiff's

6    Exhibit 14.  It is an email from Ms. McLean to

7    Legal.ImageRight.Files, dated July 18th, 2014.

8                   Ms. Pitman, have you seen this email

9    before?

10         A.    I don't recall, but I would say, yes,

11   it -- it most likely made its way to me.

12         Q.    It says, "This confirms our conversation

13   regarding the suit filed against the insured and

14   the insured driver."

15                  Did you have a conversation with

16   Ms. McLean on July 18th, 2014?

17         A.    It -- it appears that we did.

18         Q.    How long was the conversation?

19         A.    I don't recall.

20         Q.    Do you know what was discussed?

21         A.    Based on this, it says that we had

22   received a suit.  She probably called and told me

23   that we had received the suit filed against the

24   insured and the insured driver, and we were going

25   to assign counsel.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 189

1    Q.    Did you give Ms. McLean any instructions

2    upon receiving that telephone call or receiving

3    this email on July 18th?

4    A.    I don't recall.

5    Q.    Is there anything that would refresh

6    your recollection?

7    A.    Only if there's documents in the claim

8    file or the legal file.

9    Q.    Would instructions be documented in the

10   lit card?

11   A.    No.

12   Q.    Upon having the conversation with

13   Ms. McLean and receiving notice of suit, did you

14   discuss the suit with anyone on --

15   A.    I --

16   Q.    -- July 18th, 2014?

17   A.    I don't recall.

18   Q.    Did you take any action upon receiving

19   notice of the suit?

20   A.    Other than making sure we had defense

21   counsel, I -- I don't know that I would have taken

22   any -- I -- I don't know.

23   Q.    Okay.  And upon your review of your

24   claims file a few days ago, you didn't see any

25   notation with respect to actions that you took on

Page 190

1    or about July 18th, 2014?

2           A.   I would have to look at the file.

3           Q.   If there's no actions reflected in the

4    file, no emails that you sent out, would that be

5    consistent with you having taken no action after

6    receiving notice of the suit?

7           A.   Well, according to this, we had a

8    conversation.  There may have been other phone

9    conversations.  I -- I don't recall.

10          Q.   How could I find out if there were more

11   phone conversations?

12          A.   I -- I don't know.

13          Q.   Would there be a record of that

14   anywhere?

15          A.   Not that I'm aware of.

16          Q.   Do you have a specific recollection of

17   other phone conversations?

18          A.   I -- I don't.

19          Q.   Okay.  So it's fair to say you have no

20   independent recollection of discussing the suit

21   with Ms. McLean?

22               MR. BURGE:  Object to the form.

23   BY MR. BONNER:

24          Q.   After it was -- well, after this

25   conversation was documented on July 18th?

Page 191

1            MR. BURGE:  Object to the form.  It's

2        been asked and answered.

3            You can answer it again.

4        A.   I don't have any specific recollections.

5    BY MR. BONNER:

6        Q.   I'm going to give you a document that

7    is -- I have no copies of.  My apologies.

8            MR. BONNER:  Will you look at this

9        first, Greg, and...

10   BY MR. BONNER:

11       Q.   Have you ever seen that document before?

12           MR. BURGE:  What's that number?

13           (Plaintiff's Exhibit 15 was marked for

14       identification.)

15   BY MR. BONNER:

16       Q.   This is Exhibit 15.  It's an email from

17   Alicia Mosko to Michael Orr.

18           Can you confirm that that's accurate?

19       A.   That's correct.

20       Q.   Have you seen this document before?

21       A.   I believe I have.

22       Q.   Okay.  There's an attachment associated

23   on this document; correct?

24       A.   Yes.

25       Q.   Okay.  What is that attachment?

Page 192

1        A.   It would be -- typically, it would -- it

2    would be the claims file information.   Alicia is

3    one of the support people in Ocala.   And generally

4    this is how they send the file to the defense

5    attorney.

6        Q.   Okay.   Can I see document 15?

7        A.   Yeah.

8        Q.   Will you confirm with me that this email

9    of July 18th, 2014, documents the delivery of the

10   claims file to Mr. Orr?

11       A.   It appears to -- that that's what that

12   is.

13       Q.   You have no information that would lead

14   you to believe otherwise?

15       A.   That's correct.

16            (Plaintiff's Exhibit 16 was marked for

17            identification.)

18   BY MR. BONNER:

19       Q.   Okay.   Now I'm showing you a document

20   that I'm going to mark as Exhibit 16.   This is an

21   email, dated July 18th, 2014, from Ms. McLean to

22   you; correct?

23       A.   Yes.

24       Q.   Did you receive this email?

25       A.   I would -- if it was in the file, then

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 193

1    yes.

2         Q.    Okay.   Did you do anything in response

3    to the information contained in this email?

4         A.    Without looking at the file, I don't

5    recall.

6         Q.    And if there are no emails or diary

7    entries reflecting anything that you did in

8    response to receiving this email, you have no

9    independent recollection one way or the other?

10        A.    That's true.

11              (Plaintiff's Exhibit 17 was marked for

12              identification.)

13   BY MR. BONNER:

14        Q.    Okay.   This is Exhibit 17.   This is an

15   email from you to Legal.ImageRight.Files.   So this

16   appears to be a note to file.   Can you confirm

17   that?

18        A.    Yes.   So because it was sent to my

19   personal email address and not that I was just

20   forwarding to the Legal.ImageRight for them to put

21   it in the file.

22        Q.    Okay.   And do you recall receiving this

23   email?

24        A.    I don't independently recall, but...

25        Q.    And did you do anything upon receiving

```
                                              Page 194
 1    this email?  Let me strike that, because I think I

 2    know your answer.

 3              Do you have an independent recollection

 4    of having done anything in response to receiving

 5    this email?

 6         A.   I -- I don't recall.

 7              (Plaintiff's Exhibit 18 was marked for

 8         identification.)

 9    BY MR. BONNER:

10         Q.   I'm going to show you what I've marked

11    now as Exhibit 18.  This is a fax sent to Joseph

12    Kalbac at the law firm of Colson Hicks Eidson that

13    has information related to Orange City Collision.

14    Here you go.

15              I wouldn't expect you to have seen the

16    first or second pages.  But if you'll turn to

17    page 3 and look at pages 3, 4, and 5.

18              Can you tell me if you've ever seen

19    pages 3, 4, and 5 before?

20         A.   I have not.

21         Q.   And Ms. McLean never forwarded you those

22    materials?  Strike that.  You've never seen that

23    before.

24              Did you ever ask Ms. McLean to

25    investigate what happened to the Ledfords' vehicle?
```

Page 195

1          MR. BURGE:  Object to the form.  It's

2     been asked four other times.

3          You can answer it again.

4     A.   I don't recall if we spoke about --

5     we -- I -- I don't recall.

6     BY MR. BONNER:

7     Q.   All right.  Did you ever confirm, during

8     the course of your handling of this claim, when the

9     vehicle, the Ledfords' vehicle, was destroyed?

10         A.   Me, personally, I -- I did not.  I -- I

11    do not know if anyone at Auto-Owners did.

12         Q.   Okay.  So you have no recollection of

13    anyone ever telling you what happened to the

14    Ledfords' vehicle?

15         A.   I have a vague recollection of

16    discussing with Pamela, at one point, there were

17    some questions about the vehicle.

18         MR. BONNER:  You know what?  We're going

19    to get to some of those, so I think we're

20    good.

21         (Plaintiff's Exhibit 19 was marked for

22    identification.)

23    BY MR. BONNER:

24    Q.   Okay.  I'm showing you what's going to

25    be marked as Exhibit 19.  This is a document from

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 196

1   Ms. McLean to Legal.ImageRight.Files.

2                MR. BURGE:   This is 19; right?

3                MR. BONNER:   19.

4   BY MR. BONNER:

5        Q.   Ms. Pitman, have you seen this document

6   before?

7        A.   I have.

8        Q.   What is it?

9        A.   It's a lien notice from the -- I believe

10  Optum would have been the -- I'm not sure if

11  "administer" is the correct word -- for the health

12  insurance carrier of the Cawthorns.

13       Q.   Okay.  And when did you receive this

14  letter?  Do you know?

15       A.   It was sent to Image.Right August 4.  I

16  would have received it shortly after that.  It -- I

17  don't recall the specific date.

18       Q.   What did you do upon receiving this

19  letter?

20       A.   I know there were conversations with

21  Mr. Froman about putting settlement authority on

22  the file.

23       Q.   Once you received this, did you

24  proactively go to Mr. Froman?

25       A.   Yes.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 197

1        Q.   And then you had discussions with him

2   about making a settlement offer to the Cawthorns?

3        A.   I believe that's correct.

4        Q.   Okay.  Can you tell me what you and

5   Mr. Froman discussed?  I don't have any information

6   about the conversation, so just -- whatever you

7   discussed, please tell me.

8        A.   To the best of my recollection, I would

9   have told him what our policy limits were, what

10  type of policies that we had, what the claimed

11  injuries were, that we had received this lien

12  notice indicating that, just from the first -- I

13  believe this would have been just from the first

14  facility's treatment, how much had been paid by

15  the -- by the health insurance carrier, which would

16  not have been the total amount of the medical

17  bills.  It would have been just the amount that the

18  carrier had paid -- and that it was my

19  recommendation that we put the $3 million in

20  settlement authority on the file.

21       Q.   Is that the first time you and

22  Mr. Froman discussed the Cawthorn-Ledford claim?

23       A.   To the best of my recollection, yes.

24       Q.   Did he immediately authorize a

25  settlement offer to Mr. Cawthorn of $3 million on

Page 198

1    the date you and he discussed the Optum letter?

2        A.   Yes.

3        Q.   On Exhibit 3, Auto-Owners' privilege

4    log, there's a document -- I'm sorry -- there's a

5    reference to August 6, 2014.

6            My question is simply:  Did you speak to

7    Mr. Froman before or after whatever the document is

8    that is logged on the privilege log was generated?

9            MR. BURGE:  Let me object to the form.

10           There's no indication that she's involved in

11           that.  Just to understand --

12           MR. BONNER:  Yeah.  I'm not asking for

13           her involvement.  I might have a question

14           about that, but I'm just trying to nail down

15           the date of her conversation with Mr. Froman.

16           MR. MARTINEZ:  I'm sorry.  Can I have

17           that question read back, please.

18           (The last question was read back by the

19           court reporter.)

20           MR. MARTINEZ:  For August 6.

21   BY MR. BONNER:

22       Q.   For August 6, yeah.

23       A.   I do not recall the sequence of when --

24   whether I talked to Mr. Froman or -- I don't

25   recall.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                          Page 199

1         Q.    Would the date that you spoke to

2    Mr. Froman be reflected anywhere, on a document

3    somewhere?

4         A.    I would have immediately, upon getting

5    authority, sent an email to Pamela extending the

6    settlement authority.  So I would say that the date

7    of that communication would be the day I talked to

8    Mr. Froman.

9              (Plaintiff's Exhibit 20 was marked for

10        identification.)

11   BY MR. BONNER:

12        Q.    I'm showing you what we'll mark as

13   Exhibit 21 [sic].  I believe this is your letter

14   giving Ms. McLean authority to extend the

15   $3 million settlement offer --

16             MR. BURGE:  Did we mark 20?

17             MR. BONNER:  20 is -- oh, goodness.  We

18        did in my head.

19             Exhibit 20, for the record, is the email

20        from Ms. Pitman to Ms. McLean, dated

21        August 6, 2014.

22             MR. BURGE:  Okay.  This is the new

23        exhibit we're looking at.

24             MR. BONNER:  Yeah, this is the actual

25        Exhibit 20.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                          Page 200

1   BY MR. BONNER:

2        Q.   Ms. McLean --

3             MR. BURGE:   Do you have a copy of that

4        or -- or not?

5             Thank you.

6   BY MR. BONNER:

7        Q.   Is this your letter?

8        A.   Yes.

9        Q.   Is this the first time you authorized a

10  $3 million settlement offer to the Cawthorns in

11  exchange for releasing their claim -- or

12  Mr. Cawthorn in exchange for releasing his claim

13  against the Ledfords?

14       A.   Yes.

15       Q.   The date of this email is August 6,

16  2014.  To the best of your recollection, that is

17  the date that you would have spoken to Mr. Froman,

18  requesting authority from him to make a settlement

19  offer in this case?

20       A.   That's correct.

21       Q.   It's a Wednesday.  Is it possible you

22  had a conversation with Mr. Froman on a Tuesday,

23  and then extended authority the following day?

24       A.   No.

25       Q.   Okay.  I see that Michael Orr is cc'd on

Page 201

1    this email.  Is that true?

2         A.   Yes.

3         Q.   Okay.  What communications had you had

4    with Mr. Orr with regards to this claim prior to

5    August 6, 2014?

6         A.   Only what would be reflected in the

7    file.

8         Q.   There are -- I'll represent to you,

9    there are no emails between you and Mr. Orr

10   reflected in the file between July 18th and

11   August 6th of 2014.

12              Would there have been any oral

13   communications between you and Mr. Orr during that

14   expanse of time?

15        A.   I don't recall having any oral

16   conversations with Mr. Orr during that time.

17        Q.   Would there be any record reflecting

18   whether or not you'd had conversations with

19   Mr. Orr?

20        A.   I don't know if Mr. Orr would -- would

21   have anything -- I -- there would not be in the

22   Auto-Owners' file.

23        Q.   Is that something you customarily do, or

24   would it be unusual for you to reach out directly

25   to defense counsel?

Page 202

1      A.   Every case is different.  Typically, the

2   majority of their communications are with the

3   claims representative.  In this case, I wanted him

4   to have the immediate authority.

5      Q.   Did Mr. Orr know you were working on the

6   case prior to this email of August 6, 2014?

7      A.   I'm sure he did, because I handle those

8   specific branches, and he would have -- would have

9   known that.

10           (Plaintiff's Exhibit 21 was marked for

11           identification.)

12   BY MR. BONNER:

13      Q.   I'm showing you an exhibit that's

14   Exhibit 21.  It's from Michael Orr to John Holcomb.

15   Obviously, you're not a recipient, as listed on

16   this letter.

17           My question for you is:  Have you ever

18   seen this document before?

19      A.   If it was in our claim file, I would say

20   I probably have.  It would not have -- it would not

21   have been sent -- I mean, it wasn't addressed to

22   me.

23      Q.   Okay.  Do you have any specific

24   recollection of being told on or about August 5th

25   that Mr. Holcomb was private counsel for

Page 203

1    Bob Ledford RV & Marine?

2         A.   I don't have a specific recollection of

3    being told that on August 5, no.

4         Q.   Were you alerted that Mr. Holcomb, on

5    behalf of Bob Ledford RV & Marine had requested

6    copies of correspondence from Auto-Owners to

7    Mr. Cawthorn showing the policy limits had been

8    offered?

9         A.   As of August 5?

10        Q.   Yes, as of August 5.

11        A.   I -- I do not believe I was aware of

12   that.

13        Q.   Okay.  With respect to the privilege

14   log -- this is Exhibit 3 -- I'll take Exhibit 21

15   back -- there's an entry dated August 16 -- okay.

16   There's an entry dated August 6, 2014.

17             Were you privy to that communication?

18             MR. BURGE:  Just a second.  Let me get

19        there.  What exhibit is that?

20             MR. BONNER:  Three.

21             MR. BURGE:  What's the date again?

22             MR. BONNER:  August 6, 2014.

23        A.   I don't independently recall.  It was my

24   legal file, so most likely.

25

Page 204

1   BY MR. BONNER:

2         Q.   Okay.  So you believe that you were a

3   party to that communication.

4              Who else would have been a party to that

5   communication?

6         A.   The -- well, the outside law firm was

7   counsel --

8         Q.   Mr. Latta and Mr. Burge?

9         A.   Yes.

10        Q.   Were they recipients of that email?

11             MR. BURGE:  What email?

12             MR. BONNER:  Well, the -- well, the

13        documents -- I assume it was an email, but

14        perhaps it was a correspondence.  The

15        document reflected on 8/16 -- sorry --

16        8/6/14.

17             MR. MARTINEZ:  Of the privilege log?

18             MR. BONNER:  Of the privilege log.

19        A.   Yes, I would have been communicating

20   with Mr. Latta and Mr. Burge.

21   BY MR. BONNER:

22        Q.   Other than you, Mr. Latta, and

23   Mr. Burge, any other addressees to that

24   communication?

25        A.   I don't -- without looking at it, I

Page 205

1   don't know the answer, but I -- I wouldn't think

2   so.

3          Q.    Would Mr. Orr or Ms. Moses have been

4   copied on that communication?

5          A.    Not likely, no.

6          Q.    Okay.  The notation on the entry, it

7   says, "A request by insured's private counsel for a

8   copy of Auto-Owners' claims file re: privilege";

9   correct?

10         A.    That's what it says, yes.

11              MR. BURGE:  What are you looking at

12         there?

13              MR. BONNER:  On the privilege log, the

14         entry dated 8/16 -- 8/6/14.

15   BY MR. BONNER:

16         Q.    I showed you Holcomb's letter earlier.

17              Are you aware of any other requests,

18   other than Mr. Holcomb's request, for copies of

19   Auto-Owners' correspondence to Mr. Cawthorn showing

20   a past policy limits, offer other than

21   Mr. Holcomb's?

22         A.    I'm not sure.  At some point -- and I --

23   and I know it was early August, I got a letter from

24   Mick Callahan, counsel for Brad -- private counsel

25   for Bradley, and I don't know if that is

Page 206

1   contemporaneous with this entry.

2        Q.   I'll represent to you that Mike Callahan

3   sent you a letter later in August, after

4   Mr. Holcomb's letter.  Mick Callahan sends a letter

5   to Mr. Orr on August 15, 2014.

6             Are you aware of any communications that

7   Mr. Callahan had with either Mr. Orr or yourself

8   prior to August 15th of 2014?

9        A.   Without looking at my file, I -- I don't

10  recall the date of the letter I got from Mick

11  Callahan.  I -- I just know he -- he did send me a

12  letter personally.

13            MR. MARTINEZ:  I think we need to take a

14       break.

15            MR. BONNER:  Yeah, we'll take a break.

16            THE VIDEOGRAPHER:  Going off the record.

17       The time is 1:21 p.m.

18            (Lunch break from 1:21 p.m. to

19       1:36 p.m.)

20            (Continued in Volume II.)

21

22

23

24

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                                          Page 207

1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2
                  CASE NO. 6:16-CV-2240-Orl-28GHK
3

4

5    DAVID MADISON CAWTHORN,

6         Plaintiff,

7    vs.

8    AUTO-OWNERS INSURANCE COMPANY,

9         Defendant.
     _____/
10

11                   VIDEOTAPED DEPOSITION OF

12                    MELINDA ANNE PITMAN

13                 Volume II (Pages 206 - 302)

14             Taken on Behalf of the Plaintiff

15             DATE TAKEN:  May 9, 2017

16             TIME:        8:55 a.m. - 3:53 p.m.

17             PLACE:       Courtyard by Marriott
                            3205 Boardwalk Drive
18                          Ann Arbor, Michigan

19

20        Examination of the witness taken before:

21          Lance W. Steinbeisser, RPR CSR FPR
                   Certified Stenographer
22

23

24

25

T: 305.632.4464                 Steinotype, Inc.              www.Steinotype.com

Page 208

1          (Proceedings continued from Volume I.)

2          THE VIDEOGRAPHER:  We're back on the

3     record.  The time is 1:36 p.m.

4  BY MR. BONNER:

5     Q.   Let me go back to your email of

6  August 6, 2014.  I'll take the privilege log here.

7  Just keep this out, if you would, Bob.

8          And this is the letter from you to

9  Ms. McLean authorizing a settlement in the amount

10  of policy limits to be extended to Mr. Cawthorn;

11  correct?

12     A.   Yes.

13     Q.   Did you participate in drafting the

14  offer letter to Mr. Cawthorn?

15     A.   No.

16     Q.   There's a suggestion about getting

17  Mr. Orr involved.  Do you know if he participated

18  in the drafting of that letter?

19     A.   I do not know.

20          (Plaintiff's Exhibit 22 was marked for

21          identification.)

22  BY MR. BONNER:

23     Q.   I'm going to show you what we'll mark as

24  Exhibit 22.  It's a fax transmission from

25  Auto-Owners, specifically from Ms. McLean to Colson

Page 209

1   Hicks Eidson.

2              Have you seen this document before?

3        A.   I have.

4        Q.   What is it?

5        A.   It is a letter from Pamela dated

6   August 7, 2014, to Joseph Kalbac, who was counsel

7   for David Madison Cawthorn, forwarding the checks

8   for a total of $3 million.

9        Q.   Is there anything within the letter

10  that's inaccurate?

11       A.   Did you say "inaccurate"?

12       Q.   "Inaccurate," yes.

13             MR. BURGE:  Take your time and read it

14       thoroughly.

15       A.   She references the date of the lien

16  notice as 2013.  That's not correct.

17  BY MR. BONNER:

18       Q.   Other than that typo, anything else

19  that's inaccurate?

20             MR. BURGE:  To her knowledge, you mean.

21             MR. BONNER:  Yes.

22       A.   To my knowledge, no.

23  BY MR. BONNER:

24       Q.   Okay.  The letter indicates that the

25  reason Auto-Owners is extending a settlement offer

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                              Page 210

1    to Mr. Cawthorn was because of the receipt of the

2    Optum lien letter; correct?

3           A.    That's correct.

4           Q.    That is the letter that I showed you

5    earlier in Exhibit 19 that showed a lien in the

6    amount of $396 -- sorry.  Strike that.  Let me

7    start over.

8                 The lien letter referred to in

9    Ms. McLean's offer letter to Mr. Cawthorn is the

10   lien letter reflected in Exhibit 19?

11          A.    That's correct.

12          Q.    And the amount of the lien is what?

13          A.    The amount of the lien is $396,179.98.

14          Q.    Okay.  Now, since Ms. McLean does not

15   have settlement authority above $50,000, the

16   statement that, "After receiving this notice, we do

17   feel that we have documentation necessary to tender

18   the insured's coverage to your client."

19                Was that information that you gave to

20   Ms. McLean to include in this letter?

21          A.    I don't believe I participated in the

22   drafting of the letter.

23          Q.    Okay.  But my point is, did you or

24   Mr. Froman advise Ms. McLean to include that

25   information, or did she draft that on her own?

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 211

1        A.   I don't recall that I advised her to

2   include that information.  Whether she had other

3   assistance, I do not know.

4        Q.   But it is true that on the strength of

5   the lien letter, you requested authority from

6   Mr. Froman to authorize a $3 million settlement

7   offer to Mr. Cawthorn?

8        A.   That's true.

9        Q.   The offer memorialized in Exhibit 22 is

10  the first time that Auto-Owners offered

11  Mr. Cawthorn $3 million to settle his claims

12  against the Ledfords; true?

13       A.   It is the first time that we sent the

14  checks, and depending on how the word "offer" is

15  defined.

16       Q.   The settlement offer extended in the

17  letter memorialized as Exhibit 22, that's the first

18  time Auto-Owners indicated any fixed amount that it

19  was prepared to pay in exchange for Mr. Cawthorn

20  releasing his claims against the Ledfords?

21            MR. BURGE:  Object to the form.

22            You may answer.

23       A.   You said "prepared to pay."  I think

24  that Pamela had previously indicated that if we can

25  get the medical records to confirm the injuries, we

Page 212

1    were prepared to pay the $3 million.

2    BY MR. BONNER:

3         Q.   You're referring to the communication of

4    June 11th, 2014, minutes; correct?

5         A.   Correct.

6         Q.   Ms. McLean did not have authority to

7    authorize a $3 million settlement offer to the

8    Cawthorns on June 11, 2014; true?

9         A.   That's correct.

10        Q.   As of June 11th, 2014, had the medical

11   records failed to corroborate the extent and

12   severity of Mr. Cawthorn's injuries, it was still

13   possible that Auto-Owners would not extend an offer

14   of $3 million?

15        A.   That's possible, yes.

16        Q.   Okay.  So you agree with me that the

17   email exchange that took place on June 11, 2014,

18   was not an offer of $3 million that Mr. Cawthorn

19   could accept that day without, at least, first

20   providing the medical authorization requested?

21        A.   It was not an offer of the $3 million.

22        Q.   It was -- right.

23             So on August 7, 2014, this is the first

24   time that Auto-Owners advised Mr. Cawthorn that

25   without anything additional, it was willing to pay

Page 213

1  $3 million to him in exchange for a release of his

2  claims against the insured?

3          MR. BURGE:  Let me object to the form.

4      When you say anything additional, you mean

5      since when?  June 11th?

6          MR. BONNER:  Could you read the question

7      back.

8          (The last question was read back by the

9      court reporter.)

10 BY MR. BONNER:

11     Q.   Do you understand the question?

12     A.   I believe I do.

13     Q.   Okay.

14     A.   Yes, as of August 7, 2014, that was the

15 first time that we said we have the information --

16 enough information to write you the checks for

17 $3 million.

18     Q.   Prior to August 7, 2014, it's

19 Auto-Owners' position that it did not have

20 sufficient information to extend a $3 million

21 settlement offer to Mr. Cawthorn?

22     A.   Prior to August -- well --

23     Q.   -- 7, 2014.

24     A.   I believe we -- I would say August 6th,

25 when I gave Pamela the authority, would have been

Page 214

1   when we had concluded that we had enough

2   information.

3        Q.    Sure.  Let me rephrase the question.

4             Prior to August 6, 2014, it was

5   Auto-Owners' position that it did not have

6   sufficient information to offer $3 million to

7   Mr. Cawthorn in exchange for a release of his

8   claims against the Ledfords?

9        A.    Yes.

10       Q.    Okay.  All right.  I just have one copy

11  of this one, so let me --

12            MR. BURGE:  So that will be what, 23?

13            (Plaintiff's Exhibit 23 was marked for

14       identification.)

15  BY MR. BONNER:

16       Q.    I'm showing you an email marked

17  Exhibit 23.  On the second page, there's an letter

18  from Mr. Orr to Ms. McLean.

19            Have you seen the letter on page 2

20  before?

21       A.    I believe I have.

22       Q.    Okay.  Did you receive that letter on or

23  around August 7, 2014?

24       A.    I don't know that I received it.  It

25  would have been in the claim file.

Page 215

1      Q.    Okay.  It confirms that Mr. Orr is

2   representing Bob Ledford RV & Marine; true?

3      A.    Correct.

4      Q.    Okay.  And it also reports that he has

5   received a copy of the claim file; true?

6      A.    Correct.

7      Q.    Is that a redacted copy of the claim

8   file?

9      A.    That Mr. Orr received?

10      Q.    Yes.

11      A.    I don't believe so.

12      Q.    Okay.  Is there anything that you have

13   reviewed in preparation for your deposition today

14   that would lead you to believe that Mr. Orr was

15   provided with a redacted version of the claims

16   file?

17      A.    No.

18            (Plaintiff's Exhibit 24 was marked for

19      identification.)

20   BY MR. BONNER:

21      Q.    I don't really have any questions with

22   respect to what I'm now marking as Exhibit 24.

23   There you are.

24            MR. BURGE:  What was the date of 23?

25      August 8th.

Page 216

1   BY MR. BONNER:

2        Q.   Okay.  This is a letter dated

3   August 11th, 2014, and it's a copy of the

4   settlement offer letter that Ms. McLean wrote to

5   Mr. Cawthorn on August 7, 2014; correct?

6             MR. BURGE:  You mean Mr. Kalbac.

7   BY MR. BONNER:

8        Q.   Mr. Kalbac on behalf of Mr. Cawthorn.

9             MR. MARTINEZ:  Just rephrase it.

10       A.   It's this, the same letter that was

11  on -- I don't remember if it was 23.  Pamela had

12  forwarded it to my personal email address, and I

13  forwarded it to the Legal.ImageRight.Files.

14       Q.   Okay.  And that was just to create a

15  record of the offer in the legal file; correct?

16            MR. BURGE:  Object to the form.

17            You may answer.

18       A.   I don't know why she sent it to me, but

19  anything that gets sent to me I then put in the

20  file.

21  BY MR. BONNER:

22       Q.   You can confirm you did receive

23  Exhibit 24 on or about August 11?

24       A.   I probably received it on the 8th.  I

25  just forwarded it to the file on August 11th.

Page 217

1              (Plaintiff's Exhibit 25 was marked for

2       identification.)

3  BY MR. BONNER:

4       Q.   Okay.  Thank you.

5            This is a document from Michael Orr to

6  John Holcomb marked as Exhibit 25.  It's dated

7  August 14th, 2014.

8            Have you seen that letter previously?

9       A.   It looks a lot like the other exhibit

10 that you showed me.

11      Q.   The former letter between Mr. Orr and

12 Mr. Holcomb?

13      A.   Yeah, it looked -- it looks a lot like

14 that, but no, I have not -- I don't believe I've

15 seen this before.

16      Q.   Okay.  And my question is:  Did Mr. Orr

17 tell you about this conversation he was having with

18 Mr. Holcomb?

19      A.   I don't know.

20      Q.   If Mr. Orr informed you about this

21 conversation he was having with Mr. Holcomb, would

22 it be documented somewhere?

23      A.   If he had forwarded it to me in an email

24 or a letter, yes.

25      Q.   You would have a copy of that email in

Page 218

1    the legal file; correct?

2        A.    Right.

3        Q.    And if there's no copy of that email in

4    the legal file, he probably didn't forward it to

5    you; correct?

6        A.    That's correct.

7        Q.    Do you have a specific recollection of

8    whether he spoke to you orally about this

9    conversation?

10       A.    I do not.

11       Q.    And would the existence of an oral

12   communication between you and Mr. Orr be documented

13   somewhere?

14       A.    No.

15       Q.    Okay.  Thank you.

16            Let me go back to that letter for a

17   second.  Mr. Orr mentioned something about there

18   being no presuit demand in this case.

19            My question for you:  Is that

20   information you provided to Mr. Orr?

21            MR. BURGE:  Let me object to the form of

22       the question.

23       A.    We would -- we sent him the file.  So to

24   the extent that it was contained in the file, he --

25   yes, we would have sent him that information, but I

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

```
                                                      Page 219
 1    don't think we specifically communicated that.
 2    BY MR. BONNER:
 3         Q.   I guess my question is:  Did you have a
 4    specific conversation in which you told him that
 5    there was no presuit demand?
 6         A.   No.
 7         Q.   You agree that a presuit demand is not
 8    necessary before Auto-Owners can extend a
 9    settlement offer of its own to the claimant?
10              MR. BURGE:  Object to the form.
11              You may answer.
12         A.   That's correct.
13              (Plaintiff's Exhibit 26 was marked for
14         identification.)
15    BY MR. BONNER:
16         Q.   I'm showing you what we'll mark as
17    Plaintiff's Exhibit 26.  This is an email between
18    Mr. Holcomb and Mr. Orr, dated August 15th, 2014.
19              If there is no record of this email in
20    your file, is it your belief that you and Mr. Orr
21    did not discuss Mr. Holcomb's email, as represented
22    in Exhibit 25?
23         A.   That's correct.
24         Q.   And you have no recollection of
25    discussing the contents of this email orally with
```

Page 220

1   Mr. Holcomb?

2          A.    With Mr. Orr?

3          Q.    With Mr. Orr.   Excuse me.

4          A.    I have no recollection of talking to

5   Mr. Orr about this.

6          Q.    As of August 15th, 2014, had anyone,

7   Ms. McLean, Mr. Holcomb or anyone else advised you

8   that Mr. Ledford was taking the position that

9   Auto-Owners should have tendered $3 million on --

10  or sorry, before August 7th of 2014?

11         A.    Well, we received the lawsuit in July.

12  And without looking at the language of the

13  complaint, I would -- I would rather that it's

14  essentially what the complaint meant.

15         Q.    Well, no, but I'm asking Mr. Ledford's

16  position.   So --

17         A.    Oh, the insured's.

18         Q.    So let me reask the question.

19               As of August 15th, 2014, which is the

20  date of the letter you have in front of you, had

21  anyone alerted you, Ms. Pitman, that David Ledford

22  was taking the position that Auto-Owners should

23  have offered $3 million to Mr. Cawthorn before

24  August 7th of 2014?

25         A.    No, no one alerted me to that.

Page 221

1             (Plaintiff's Exhibit 27 was marked for

2         identification.)

3    BY MR. BONNER:

4         Q.   Okay.  This is Exhibit 27.  Again, I

5    only have one copy.  This is a letter dated

6    August 15th, 2014, from Mr. Mick Callahan to

7    Michael Orr.

8             It's your understanding that

9    Mr. Callahan represented Bradley Ledford; true?

10        A.   Yes.

11        Q.   Earlier you referenced emails by

12   Mr. Callahan requesting a copy of the claims file

13   that were addressed to you?

14             MR. BURGE:  I think it was a letter.

15        A.   Yes.

16   BY MR. BONNER:

17        Q.   Okay.  Looking at Exhibit 27 before you,

18   that is not the document you were referring to in

19   your past question?

20        A.   That's correct, it is not.

21        Q.   Had you seen this document prior to

22   today?

23        A.   I don't believe so.

24        Q.   Okay.  This is the first letter that

25   I've been able to locate from Mr. Callahan to

Page 222

1    anyone in this case involving his representation.

2              Before August 15th, 2014, were you aware

3    or did you know whether or not Mr. Ledford, Bradley

4    Ledford, was represented by Mr. Callahan?

5         A.   I don't know.

6         Q.   And I'm going to circle back.  The

7    reason I ask this is I asked you earlier.  This is

8    Exhibit 3, the privilege log.  It's the entry

9    marked August 6, 2014.  It talks about a request

10   for the claims file by personal counsel.  And --

11             MR. BURGE:  This letter is not to her.

12   BY MR. BONNER:

13        Q.   This letter is not to her.

14             So my question is simply with respect to

15   August 6, 2014, was it Mr. Holcomb's request or was

16   it a different request?

17        A.   I don't know.

18        Q.   Okay.  You would know if you were able

19   to look at the privileged document; correct?

20             MR. BURGE:  Object to the form.

21             You may answer.

22        A.   Most likely.

23   BY MR. BONNER:

24        Q.   Okay.  If the only request that is in

25   Auto-Owners' file that is dated before August 6,

Page 223

1    2014, is Mr. Holcomb's request for the settlement

2    offers to Mr. Cawthorn that predate August 7, 2014,

3    would you assume that that is the request that's at

4    issue in the documents that have been withheld

5    under this entry, the August 6, 2014, entry?

6            MR. BURGE:  And you're talking about the

7        letter from Holcomb to Orr?

8            MR. BONNER:  Yes, that's dated August --

9            MR. BURGE:  Not to her.

10            MR. BONNER:  -- 5th, 2014.

11            MR. BURGE:  Not to her.

12        A.   I don't want to make an assumption

13    without -- without knowing what that is.

14    BY MR. BONNER:

15        Q.   Okay.  So you can't tell me, one way or

16    the other, whether the document that's been

17    withheld, dated August 6, 2014, concerned Mick

18    Callhan's request for the file or Mr. Holcomb's

19    request for the file?

20        A.   I don't know.

21        Q.   And you understand that Mr. Holcomb's

22    request is not for the complete claims file.  It

23    was for settlement offers to Mr. Cawthorn?

24        A.   I would have to look at that again.  If

25    that's what it says, then...

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 224

1     Q.   Okay.   And you agree with me that there

2   is no attorney-client privilege between Auto-Owners

3   and Mr. Cawthorn?

4     A.   Mr. Cawthorn, the --

5     Q.   The claimant.

6     A.   -- claimant.

7     Q.   Right.

8     A.   Yeah, there's no attorney-client

9   privilege.

10    Q.   In other words, a letter that is sent to

11  Mr. Cawthorn is not privileged?

12    A.   That's correct.

13    Q.   Can you confirm with me -- I showed you

14  a letter dated July 18th, 2014, that showed -- that

15  was from Ms. Mosko that had the attachment.   Do you

16  recall that letter?

17    A.   Yes.   Yes.

18    Q.   Can you confirm with me that as of

19  August 6, 2014, Auto-Owners had supplied the claims

20  file to Mr. Orr?

21    A.   Yes.

22    Q.   And Mr. Orr represented Bob Ledford RV &

23  Marine?

24    A.   That's correct.

25    Q.   Mr. Orr did not represent Auto-Owners?

Page 225

1      A.    That's correct.

2      Q.    Do you agree with me that Mr. Ledford,

3  David Ledford, was entitled to the information that

4  Mr. Orr had received from Auto-Owners with respect

5  to this claim?

6           MR. BURGE:   Object to the form.

7      A.    I don't know the answer to that.

8           MR. BURGE:   It calls for a legal

9      conclusion.

10  BY MR. BONNER:

11     Q.    How many emails are at issue with

12  respect to this August 6, 2014, entry?

13     A.    I don't know.

14     Q.    Turning to Mr. Callahan's letter --

15  which one is that?  Exhibit 27 -- and I'll take

16  this one back --

17          As of August 15th, 2014, had anyone

18  alerted you that Mr. Callahan was asking for

19  details relating to the Ledfords' vehicle?

20     A.    I don't -- I don't know.  I know at some

21  point that was pointed out to me, but I don't know

22  when.

23     Q.    And that's what I'm getting at.  I know

24  that at some point it was, and I got several more

25  documents I'll show you, and I am interested in

```
                                              Page 226
 1   knowing when you first became aware of that issue.
 2              So with respect to this email, this does
 3   not refresh your recollection or otherwise help you
 4   to establish the date at which you first became
 5   aware of Mr. Callahan's requests regarding
 6   Mr. Ledford's vehicle?
 7              MR. BURGE:  Allen, she's never seen the
 8         document.  She's said she hadn't seen it
 9         until today --
10              MR. BONNER:  I know.  I know she hasn't
11         seen it.  I mean --
12              MR. BURGE:  I don't know how you expect
13         her to refresh her recollection.
14              MR. BONNER:  Well, I mean you never
15         know.  And I'm trying to give her dates that
16         will help her establish.  And so this is one
17         date, August 15th.  If it doesn't help you,
18         you can so state.  I'm going to show you
19         other documents.
20         A.    Yeah, I don't know.  That's not
21   refreshing my recollection of the date.
22   BY MR. BONNER:
23         Q.    Okay.  As of August 15th, 2014,
24   Auto-Owners had not inspected Mr. Ledford's
25   vehicle; correct?
```

Page 227

1        A.    I don't know.   I don't know.

2        Q.    You had not made a request of anyone to

3   inspect Mr. Ledford's vehicle; correct, as of

4   August 15th?

5        A.    That's correct.

6        Q.    And as of August 15th, 2014, you had not

7   made a request of anyone to photograph

8   Mr. Ledford's vehicle; correct?

9             MR. BURGE:  Object to the form.  It's

10        been asked and answered previously.

11             MR. BONNER:  Not with respect to

12        August 15th, 2014 --

13             MR. BURGE:  Well, it's been answered for

14        all of memoriam --

15             MR. BONNER:  Okay.  As of August --

16             MR. BURGE:  -- I think is what her

17        answer was.

18   BY MR. BONNER:

19        Q.    So at no time did you ever request --

20   I'll say it.

21             At no time did you ever request anyone

22   to inspect Mr. Ledford's vehicle; true?

23        A.    That's correct.

24        Q.    And at no time did you request anyone to

25   photograph Mr. Ledford's vehicle?

Page 228

1       A.    That's correct.

2       Q.    And at no time did you request anyone to

3  preserve Mr. Ledford's vehicle?

4       A.    That's correct.

5       Q.    And when I say -- well, and that would

6  apply to anyone at Auto-Owners; correct?

7            MR. BURGE:   Object to the form.

8       A.    No.   That's with respect to me.   I don't

9  know if anyone else did.

10  BY MR. BONNER:

11       Q.    All right.   I want to direct your

12  attention to Exhibit 13, the next entry, which is

13  August 15th through September 11th of 2014.

14            With respect to those withheld

15  documents, were you an addressee on any of the

16  emails withheld?

17       A.    I don't know.

18       Q.    Do you know who the other recipients of

19  those emails might be?

20       A.    Not without looking at the documents,

21  no.

22       Q.    Does that entry involve you in any way,

23  that entry being the August 15th, 2014, through

24  September 11th, 2014, entry?

25       A.    I can't tell from this.   It may.

Page 229

```
 1        Q.   Do you know how many emails we're
 2   talking about with respect to that entry?
 3        A.   I do not.
 4        Q.   Okay.  Let's go to the next document.
 5   Okay.  This is an email from Jamie Moses, who was
 6   representing Bradley Ledford; correct?
 7        A.   That's correct.
 8             (Plaintiff's Exhibit 28 was marked for
 9        identification.)
10   BY MR. BONNER:
11        Q.   And this is email from Ms. Moses to
12   Ms. McLean, dated August 18th, 2014.  I'm marking
13   it as Exhibit 28.
14             MR. BURGE:  What was 27?  Is this one
15        you only had one copy of?
16             MR. BONNER:  There's a couple like that,
17        unfortunately, but I --
18             MR. BURGE:  If not, I've missed another
19        one, because this one -- what was 26?
20             MR. MARTINEZ:  I regret that.  Actually,
21        for the next deposition, on Thursday, I would
22        suggest that we bring our set that we've
23        accumulated so far, because I'm sure --
24             MR. BURGE:  So this number --
25             MR. BONNER:  It's 28.
```

```
                                        Page 230

 1              MR. BURGE:   28.

 2    BY MR. BONNER:

 3         Q.   With respect to Ms. Moses' letter to

 4    Ms. McLean, dated August 18, 2014, did you receive

 5    a copy of this email?

 6         A.   It was not sent to me, no.

 7         Q.   Okay.  Did Ms. McLean alert you to what

 8    Ms. Moses reports in this email, that Mr. Cawthorn

 9    was rejecting Auto-Owners' August 7th, 2014, offer?

10         A.   I don't recall without looking at my

11    file.  Most likely, she -- at some point I was

12    told.  I'm not sure when.

13         Q.   How would Ms. McLean have alerted you to

14    this information?

15         A.   She either would have forwarded this to

16    me, in which case it would be in the file.  She

17    would have emailed me, and it would be in the file,

18    or she may have called me on the telephone.

19         Q.   Okay.  And if there's no email, do you

20    know one way or the other that she did call you.

21         A.   I don't recall.

22         Q.   And if she called you around

23    August 18th, 2014, would it be reflected in your

24    lit card?

25         A.   No.
```

Page 231

1         MR. BURGE:  Object to the form.

2         (Plaintiff's Exhibit 29 was marked for

3     identification.)

4  BY MR. BONNER:

5         Q.   Okay.  I'm going to mark as Exhibit 29,

6  this is an email from Mick Callahan to Ms. McLean,

7  dated August 21st, 2014.

8         Have you see this document before?

9         A.   If it was in the claim file, yes.  I

10 don't recall specifically if I've seen it.

11        Q.   You don't recall the date you would have

12 received notice of this email?

13        A.   No.

14        Q.   Is there documentation somewhere that

15 would enable you to know when you first received

16 this email?

17        A.   If there is, it would be in the legal

18 file, again either forwarded by an email or an

19 email from Pamela.

20        Q.   And absent an email forwarding it to

21 either you or the legal file, you have no specific

22 recollection of when you were first alerted to the

23 information contained in Mick Callahan's letter?

24        A.   In this particular one to Pamela, that's

25 correct.

Page 232

1       Q.    Mick Callahan's letter of August 21st,

2    2014, memorializes requests that he's trying to

3    make to Auto-Owners?

4       A.    It appears, yes.

5       Q.    And do you know, one way or the other,

6    by August 21st, 2014, whether someone had alerted

7    you to Mr. Callahan's request as reflected in

8    Exhibit 29?

9       A.    I don't know.

10            (Plaintiff's Exhibit 30 was marked for

11         identification.)

12   BY MR. BONNER:

13      Q.    Okay.  Thank you.

14            The next document is a letter from Mick

15   Callahan to Ms. McLean, dated September 10th, 2014.

16            Have you seen this document before --

17   strike that.

18            When was the first time you saw this

19   document?

20            MR. BURGE:  Object to the form.  It

21         assumes she saw it.

22      A.    If it was in the claim file, I would

23   have seen it at some point.  I'm guessing this is

24   an envelope on the last page showing it's addressed

25   to me.  I'm not sure what that goes with.  I don't

Page 233

1   see a date stamp on it.

2   BY MR. BONNER:

3        Q.   Confirm with me that you have seen this

4   letter before.

5             MR. BURGE:   Object to the form.

6             You can answer.

7        A.   If it was in the claims file, I would

8   have seen it.  I don't specifically recall seeing

9   it.

10            (Plaintiff's Exhibit 31 was marked for

11       identification.)

12  BY MR. BONNER:

13       Q.   This is Exhibit 31.  It's dated

14  September 10, 2014.  Can you tell me what

15  Exhibit 31 is?

16       A.   This appears to be the email forwarding

17  the letter from Mr. Callahan to Pamela from -- I'm

18  guessing its his secretary or assistant -- to

19  Pamela, and then she forwarded it to me, and I

20  forwarded it to the Legal.ImageRight.Files to go

21  into the file.

22       Q.   So based on your review of the file, the

23  documents I've shown you up until now, do you know

24  if this was September 10th, 2014, was the first

25  notice you had been given of Mr. Callahan's

Page 234

1    requests regarding the file?

2         A.   I don't know if that was the first

3    request that I was made aware of that he wanted

4    information from the file.

5         Q.   Of all of the Callahan letters and

6    Holcomb letters that I've shown you during this

7    deposition, this exhibit is the first one that

8    actually shows one of those being forwarded to you;

9    correct?

10        A.   That's correct.

11        Q.   Do you have a specific recollection of

12   receiving notice of either Mr. Holcomb's request or

13   Mr. Callahan's requests prior to the date of the

14   exhibit before you, Exhibit 31?

15             MR. BURGE:   Object to the form.   She's

16        already answered two or three times.   She

17        doesn't remember when she first knew.

18        A.   I don't have a specific recollection.

19             (Plaintiff's Exhibit 32 was marked for

20        identification.)

21   BY MR. BONNER:

22        Q.   Okay.   This is Exhibit 32.   It's an

23   email dated September 16, 2014 --

24             MR. MARTINEZ:   Where is 29 -- I got it.

25

Page 235

1   BY MR. BONNER:

2        Q.   Mr. Orr in this letter is providing

3   Mr. Holcomb and Mr. Callahan with your contact

4   information.

5             My question for you is:  Between the

6   September 10th email that I showed you in the last

7   exhibit and September 16th, did Mr. Orr have a

8   conversation with you about either Mr. Holcomb or

9   Mr. Callahan's requests?

10       A.   I do recall Mike calling me and asking

11  me if he should give them my information or

12  Mr. Froman's information.  I don't recall when

13  exactly that was.  I don't remember exactly when

14  that was.

15       Q.   Did Mr. Orr communicate with you any

16  additional details about either Mr. Callahan's

17  requests or Mr. Holcomb's requests?

18       A.   I don't recall.

19       Q.   And up to September 16th, 2014, do you

20  have any idea how many conversations you had with

21  Mr. Orr regarding Mr. Holcomb or Mr. Callahan's

22  requests?

23       A.   To the best of my recollection, it was

24  just that one phone call when he asked whose name

25  he should give them.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 236

1       Q.   All right.   I'll take that back.   Thank

2   you.

3            The next question I want to ask you

4   about on Exhibit 3, the privilege log.   There's a

5   category of emails dated 9/18 through 9/19/2014.

6            Were you a party to any of those emails?

7       A.   I don't know.

8       Q.   The issue regards vehicle salvage.   Was

9   that an issue that Mr. Froman was involved in?

10      A.   I don't know without looking at the

11  documents.

12      Q.   Well, putting the documents aside, did

13  Mr. Froman become involved with the issue of

14  vehicle salvage in 2014?

15      A.   To my recollection, no.

16      Q.   Okay.   Was that something that you dealt

17  with?

18      A.   With respect to questions that came

19  about the salvage, I do recall getting questions

20  about the salvage, and we refer them to outside

21  counsel.

22      Q.   You do not handle any of the questions

23  yourself with respect to vehicle salvage?

24      A.   I believe that's an accurate statement.

25      Q.   And the questions regarding vehicle

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 237

1    salvage, these are the questions that Mr. Holcomb
2    and Mr. Callahan that they had raised in their
3    letters that you had seen previously?
4            A.    Yes.
5            Q.    And they were essentially what has
6    Auto-Owners done to preserve the vehicle?
7                  MR. BURGE:  Object to the form.
8                  You may answer it.
9            A.    Yeah, I would have to look back at the
10   specific requests, but I think that's a good
11   summary.
12   BY MR. BONNER:
13           Q.    Okay.  Why did you not answer
14   Mr. Callahan's or Mr. Holcomb's inquiries?
15                 MR. BURGE:  Object to the form.
16                 You can answer.
17           A.    I don't recall specifically what the
18   questions -- well, I don't recall if it was me
19   asking outside counsel, and I don't recall what the
20   specific questions were; so I can't answer that.
21   BY MR. BONNER:
22           Q.    Are there any protocols for when you
23   reach out to outside counsel for what circumstances
24   in which you should reach out to outside counsel?
25                 MR. BURGE:  Object to the form.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 238

1           You may answer it.

2       A.    Anytime where I'm looking for assistance

3   on something that I'm unclear of, I would contact

4   outside counsel.  If a lawsuit's filed, we would

5   have counsel.

6   BY MR. BONNER:

7       Q.    So if you're unclear on a legal issue,

8   you contact outside counsel to corroborate or look

9   into that issue?

10          MR. BURGE:  Object to the form.

11          You may answer.

12      A.    Yes.

13  BY MR. BONNER:

14      Q.    Do you have to seek anyone's authority

15  to make those inquiries to outside counsel?

16      A.    No.

17      Q.    And once you receive the legal answer to

18  your inquiry, you then give instructions to the

19  adjuster?

20          MR. BURGE:  Object to the form.

21      A.    Sometimes --

22          MR. BURGE:  You can answer.

23      A.    Sometimes, depending on who the question

24  came to, I may answer it myself.

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 239

1   BY MR. BONNER:

2        Q.   Let's take this case.  With respect to

3   Mr. Callahan and Mr. Holcomb's requests, there were

4   essentially two requests, one for the claims

5   file -- correct?

6        A.   Yes.

7        Q.   -- and another one regarding the

8   vehicle -- we'll call that salvage inquiry.

9   Correct?

10       A.   Yes.

11            MR. BURGE:  And the question is what?

12   BY MR. BONNER:

13       Q.   And the question is with respect to

14   those inquiries, did you then relay information to

15   Ms. McLean that she then acted upon?

16       A.   I don't recall, without looking at the

17   file.  I know -- I do recall when Mr. Callahan

18   reached out to me personally.  I wrote a response

19   back to him personally.

20       Q.   Did you do that with assistance of

21   outside counsel?

22            MR. BURGE:  Object to the form.

23            You may answer it.

24       A.   Yes.

25

Page 240

1    BY MR. BONNER:

2         Q.   Mr. Callahan writes a letter at one

3    point to Mr. Orr saying, "I left a message for

4    Ms. Pitman on her voice mail."

5              Do you have any recollection of that

6    voice message from Mr. Callahan?

7         A.   Do you have a date, a reference?

8         Q.   Yes.

9              Mr. Callahan writes to Mr. Orr on

10   September 23, 2014, that I called Ms. Pitman, left

11   a detailed message, and she has not returned my

12   call.

13             Is that account accurate?

14        A.   It may be.  I don't recall.

15        Q.   If you had received a voice message from

16   Mr. Callahan, would you have documented that

17   somewhere?

18        A.   No.

19        Q.   Would you have retained the voice

20   message?

21        A.   No.

22        Q.   And you have no specific recollection,

23   one way or the other, regarding whether you

24   received a voice message from Mr. Callahan?

25        A.   I don't recall receiving one.

Page 241

1          (Plaintiff's Exhibit 33 was marked for
2      identification.)
3   BY MR. BONNER:
4      Q.   I'm marking this exhibit as 33.
5           This is an email from you to Reggie
6   Anderson, dated September 24, 2014; correct?
7      A.   Yes.
8      Q.   Do you recall sending this letter?
9      A.   Vaguely, yes.
10     Q.   Is this an accurate copy of what you
11  sent Mr. Anderson --
12     A.   Yes.
13     Q.   -- on September 24th, 2014?  Yes?
14     A.   Yes.
15     Q.   What prompted you to write a note to
16  Reggie Anderson saying, "You were under the gun,"
17  regarding the vehicle salvage issue?
18     A.   I don't recall.  It would have been --
19  what was the date of the -- the date of the letter
20  was September 10th that Mr. Callahan sent; is that
21  correct?
22     Q.   That is correct.
23          And then his alleged voice mail was
24  September 23rd.
25     A.   And that may have -- I don't recall if

Page 242

1    that prompted this email or not.

2         Q.   And why were you contacting

3    Ms. Anderson?

4         A.   I'm not sure if Reggie is a male or a

5    female, but --

6         Q.   Oh, I apologize.

7         A.   That's okay.

8              Because that was the person in South

9    Carolina originally that got the claim and was the

10   first person who had done anything with the file at

11   that time.

12        Q.   You agree with me that the

13   responsibility for investigating the vehicle should

14   have fallen to Ms. McLean, not to Ms. Anderson,

15   given the location of the vehicle?

16             MR. BURGE:   Object to the form of the

17        question.

18             You may answer.

19        A.   I don't know the answer to that.

20   Sometimes we have people that are investigating

21   claims out of state.

22   BY MR. BONNER:

23        Q.   Fair to say, you did not contact

24   Ms. McLean regarding this issue because Ms. McLean

25   had done nothing with respect to the investigation

Page 243

1  of the vehicle?

2          MR. BURGE:  Object to the form.

3          You may answer.

4      A.   I did not contact Pamela about this

5  because I knew that she didn't have any information

6  about the salvage.

7  BY MR. BONNER:

8      Q.   How did you know that?

9      A.   And I can't recall now if that was

10  through emails or through telephone conversations.

11      Q.   Okay.  With respect to the entry on the

12  privilege log, Exhibit 3, dated 9/24/14, it says,

13  "Email communications between Auto-Owners' legal

14  department and outside counsel regarding vehicle

15  salvage."

16          Do you see that entry?

17      A.   Yes.

18      Q.   Were you a party to that email

19  communication?

20      A.   I don't recall, without looking at it.

21      Q.   Okay.  Do you know any of the parties

22  that were involved in that communication?

23      A.   I do not.

24      Q.   Okay.  Did you rely on advice of counsel

25  in responding to Mr. Callahan's inquiries regarding

Page 244

1    vehicle salvage?

2              MR. BURGE:  Object to the form of the

3         question.

4         A.   The response that was sent to

5    Mr. Callahan, yes, I had relied on the advice of

6    counsel.

7              (Plaintiff's Exhibit 34 was marked for

8         identification.)

9    BY MR. BONNER:

10        Q.   Let's go ahead and mark this one.  This

11   is Exhibit 34.  It's an email to file.  It's from

12   Reggie Anderson to you, Ms. Pitman.  I'll take

13   this.

14             Do you recall receiving this email?

15        A.   Yes.

16        Q.   Did you contact -- well, I asked you,

17   and you said you didn't recall if you were a party

18   to the conversations with outside counsel on

19   September 24th, 2014, but can you tell me were you

20   a party to any communications with outside counsel

21   with respect to this issue, vehicle salvage?

22        A.   I don't recall.

23        Q.   Okay.  Is there anything that would

24   refresh your recollection?  I assume the privilege

25   documents themselves.

Page 245

1          A.    The documents would, yes.

2                (Plaintiff's Exhibit 35 was marked for

3          identification.)

4     BY MR. BONNER:

5          Q.    I'm showing you what's being marked as

6     Exhibit 35.  This is additional correspondence from

7     Mr. Callahan addressed to you at Auto-Owners.

8                Can you confirm that you received this

9     correspondence that's marked as Exhibit 35?

10               MR. MARTINEZ:  What's the date on it?

11               MR. BONNER:  It's dated September 26,

12         2014.

13         A.    Yes, I did receive this.

14    BY MR. BONNER:

15         Q.    This letter says that he attaches emails

16    and letters previously sent to your undersigned

17    counsel and to Ms. McLean and that he had received

18    no response to either.

19               Can you confirm that that's an accurate

20    statement on Mr. Callahan's part?

21               MR. BURGE:  Where?

22               MR. BONNER:  That he received no

23         response --

24               MR. MARTINEZ:  Excuse me for one second.

25         Excuse me for one second.

Page 246

1   BY MR. BONNER:

2        Q.   All right.  Let me rephrase the

3   question.

4             The exhibit that's marked before you,

5   Exhibit 35, on the second paragraph refers to --

6             MR. BURGE:  The second paragraph, the

7        second page.

8   BY MR. BONNER:

9        Q.   Second paragraph, first page, has a

10  statement that reads, "I have attached the emails

11  and letters previously sent to your assigned

12  counsel and to Ms. McLean to whom they were

13  directed."

14            MR. BURGE:  Is that on the first page?

15            MR. BONNER:  The first page of the

16       letter and the second page of the document.

17            MR. BURGE:  The second page of the

18       document.

19  BY MR. BONNER:

20       Q.   Do you see that sentence?

21       A.   Yes.

22            MR. BURGE:  Hold.  Let me catch up.

23       Where are we?  The second paragraph?

24            MR. BONNER:  The second paragraph, the

25       first sentence.

Page 247

1            MR. BURGE:  The first sentence, okay.

2    BY MR. BONNER:

3        Q.   Mr. Callahan then writes, "I received no

4    response from either."

5            Do you have any information that

6    contradicts that statement?

7        A.   Well, it says, "I received no response

8    from her either" --

9        Q.   Oh, excuse me.

10       A.   -- but I don't have any independent

11   information whether that's accurate or not.

12       Q.   Okay.  On April 26, 2014, you wrote a

13   letter to Mr. Callahan; correct?

14           MR. BURGE:  April 26.

15           (Plaintiff's Exhibit 36 was marked for

16           identification.)

17   BY MR. BONNER:

18       Q.   September 26, 2014, you wrote a letter

19   to Mr. Callahan; correct?  I'm showing you the

20   letter as marked Exhibit 36.

21       A.   Yes, that's correct.

22       Q.   I believe you said that you wrote this

23   letter; correct?

24       A.   Yes.

25       Q.   That in writing this letter, you had

Page 248

1   relied on advice of counsel and the substance of

2   this letter?

3               MR. BURGE:  Object to the form.

4        A.   Yes.

5               MR. BURGE:  You may answer.

6   BY MR. BONNER:

7        Q.   Did anyone proofread this letter?  This

8   is Exhibit 36.

9               MR. BURGE:  Object to the form.

10        A.   Other than counsel -- working with

11   counsel to draft the letter, no.

12   BY MR. BONNER:

13        Q.   Okay.  With respect to the entry on the

14   privilege log dated August 6, 2014, which concerns,

15   "Private counsel's request for a copy of

16   Auto-Owners' claims file."

17               Between the date of August 6, 2014, and

18   September 26, 2014, you did not respond to either

19   Mr. Callahan or Mr. Holcomb's requests for the

20   claims file; correct?

21        A.   I'm not sure that I had those requests

22   at this -- at the August 6 date, but it is correct

23   that I did not respond to either Mr. Holcomb or

24   Mr. Callahan until September 26.

25        Q.   Okay.  You are aware of no response on

Page 249

1    behalf of Auto-Owners between August 6, 2014, and

2    September 6, 2014, with regard to Mr. Holcomb's

3    request for the claims file dated August 5th, 2014?

4         A.   I am not aware.

5         Q.   And you are not aware of any response

6    from anyone at Auto-Owners to Mr. Callahan's

7    request for the claims file, dated August 10th,

8    2014, and your response on September 26, 2014?

9         A.   I believe his request was dated

10   September 10, not August 10th; but between

11   September 10 and September 26, I'm not aware of

12   anyone else responding to Mr. Callahan.

13        Q.   I'm just going to show you Exhibit 27,

14   because I had my date wrong.

15             You are not aware of any response to

16   Mr. Callahan's letter to Mr. Orr, dated August 15,

17   2014, that was issued prior to your letter of

18   September 26, 2014?

19             MR. BURGE:  You're asking her if there's

20        a response from Auto-Owners from Callahan's

21        letter to Orr?

22             MR. BONNER:  Yes.

23             MR. BURGE:  Okay.

24        A.   I'm not aware of Auto-Owners responding

25   to the letter to Mr. Orr.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 250

1    BY MR. BONNER:

2        Q.   With respect to the request for

3    Auto-Owners' claims file, which is memorialized in

4    Exhibit 27 and dated August 15th, 2014, Auto-Owners

5    did not address this issue to Mr. Callahan until

6    your letter of September 26, 2014?

7        A.   I'm not sure that Auto-Owners got the

8    letter from Mr. Orr.

9        Q.   With respect to this issue, the request

10   for the claims file, September 26, 2014, is the

11   first response you're aware of addressing

12   Mr. Callahan's request for the claims file?

13       A.   That's correct.

14       Q.   I tried enough times.  You get the

15   question in one.

16            With respect to Exhibit 36, which you

17   have in front of you, you've written here, "In

18   regard to your request for our claim investigation

19   file, I believe your client, Bradley Ledford, and

20   his father, David Ledford, have copies of their

21   communications with Auto-Owners.  However, if they

22   did not retain copies, I will be glad to send

23   additional copies to you."

24            Correct?

25       A.   Yes.

Page 251

1      Q.   And what you mean by that is you will

2  provide your communications or Auto-Owners'

3  communications to the Ledfords to Mr. Callahan?

4      A.   That's correct.

5      Q.   You continue, "I am also enclosing

6  copies of our communications to Madison Cawthorn

7  and/or his representatives about the payment of

8  your client's policy limits."

9           Is that correct?

10     A.   That's what it says, yes.

11     Q.   And you mean by that that you will

12 provide copies of any settlement offers that you

13 made to the Cawthorns --

14     A.   I --

15     Q.   -- or does this mean all communications

16 to the Cawthorns?

17     A.   Well, this was copies of any written

18 communications.  I would not have been able to copy

19 if there had been phone communications.

20     Q.   Okay.  So what you are offering to

21 provide Mr. Callahan is copies of written

22 communications to the Cawthorns; correct?

23     A.   That's correct.

24     Q.   Okay.  You continue, "The rest of our

25 claims file is a confidential business record."

Page 252

1              Correct?

2         A.   Correct.

3         Q.   Is that your assessment or someone

4    else's?

5              MR. BURGE:  I'm going to object to the

6         form and predicate.  That's a statement of

7         law.  We're not going to argue about what the

8         law is.

9    BY MR. BONNER:

10        Q.   I want to know if you arrived at that

11   conclusion yourself.

12             MR. BURGE:  I'm not going to let her

13        answer that question.  That may involve

14        communications with lawyers, and you can take

15        that up with the judge.

16   BY MR. BONNER:

17        Q.   Okay.  As of September 26, 2014,

18   Auto-Owners had disclosed the claims file to

19   Mr. Orr; correct?

20        A.   Correct.

21        Q.   Okay.  And Mr. Orr had acknowledged his

22   receipt of the claims file?

23        A.   Correct.

24        Q.   And Mr. Orr represented Mr. Ledford of

25   Bob Ledford RV & Marine; correct?

Page 253

1        A.    That's correct.

2        Q.    Mr. Orr did not represent Auto-Owners;

3   correct?

4        A.    That's correct.

5        Q.    Okay.  So, as of September 26, 2014,

6   Auto-Owners did not have an objection to providing

7   the claims file to Mr. Orr; true?

8        A.    That's correct.

9        Q.    It, in fact, had done so?

10       A.    Yes.

11       Q.    But it was objecting to providing it to

12   Mr. Holcomb and Mr. Callahan; true?

13       A.    Yes.

14       Q.    And Mr. Holcomb represented Bob Ledford

15   RV & Marine as well; correct?

16       A.    Yes.

17       Q.    In your letter, you state that

18   destroying the vehicle would have been at the

19   owner's discretion; correct?

20       A.    It says, "The question of what to do

21   with the wrecked vehicle would have been at the

22   owner's discretion."

23       Q.    And it was within Auto-Owners'

24   discretion to decide whether or not to inspect the

25   vehicle; correct?

Page 254

1              MR. BURGE:   Object to the form.

2              You may answer it.

3         A.   Yes.

4  BY MR. BONNER:

5         Q.   It was also within Auto-Owners'

6  discretion to investigate whether Mr. Cawthorn's

7  injuries might be attributable to another party;

8  correct?

9              MR. BURGE:   Object to the form.

10             You've asked her five times.

11             You may answer it again.

12        A.   Yes.

13 BY MR. BONNER:

14        Q.   Okay.  Let's turn back to Exhibit 3.

15 There's an entry dated September 26, 2014.

16             Is it true that on September 26, 2014,

17 you communicated to Ms. McLean regarding the

18 Ledford vehicle salvage?

19        A.   I don't know without looking at that

20 email if that was me.

21        Q.   Do you recall if you ever had specific

22 conversations with Ms. McLean regarding the vehicle

23 salvage?

24        A.   Yes.

25        Q.   Okay.  Do you know if any of those

Page 255

1    conversations took place on September 26, 2014?

2          A.   I don't recall.

3          Q.   Do you know who any of the parties were

4    on the email that's been withheld, dated

5    September 26, 2014?

6          A.   Other than Pamela, I do not.

7          Q.   You don't know how many emails, total?

8          A.   This -- just based on the entry, this

9    one says "email communication."  It would imply

10   one.

11         Q.   Investigating the vehicle is something

12   that's customary -- you've said this before --

13   something that's customarily done in auto accident

14   claims; correct?

15             MR. BURGE:  Object to the form.  Asked

16        and answered.

17         A.   I believe so, yes.

18   BY MR. BONNER:

19         Q.   With respect to this communication, were

20   you advising Ms. McLean on her personal liability?

21             MR. BURGE:  Object to the form.  She

22        said she doesn't know what the communication

23        was.

24             You can answer.

25         A.   Yeah, I don't -- I don't recall.  I

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 256

1    don't -- I don't recall without looking at the

2    email what the advice was I was giving her.

3             MR. BONNER:  Greg, what is the privilege

4        that attaches to a communication between an

5        adjuster and --

6             MR. BURGE:  An in-house lawyer?

7             MR. BONNER:  Well --

8             MR. BURGE:  Attorney-client.

9             MR. BONNER:  So that's what you're

10       asserting?

11            MR. BURGE:  That what we're asserting,

12       yeah.

13            (Plaintiff's Exhibit 37 was marked for

14       identification.)

15            MR. BONNER:  All right.  We'll mark this

16       as Exhibit 37.

17            MR. BURGE:  I thought that was 37.

18            MR. MARTINEZ:  The letter dated

19       September 26, Greg, that's Exhibit 36, a

20       letter from Mick to --

21            MR. BURGE:  I don't know how I've gotten

22       the numbers so screwed up.

23            MR. MARTINEZ:  Lance is going to send a

24       copy to everybody.  He'll send it tomorrow.

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 257

1    BY MR. BONNER:

2         Q.    Here is Exhibit 37.  It's an email dated

3    September 30, 2014.  It's a letter to you that

4    attaches some correspondence.

5              Do you recall receiving this letter?

6         A.    Yes.

7         Q.    You responded to this letter on

8    October 16th, 2014.  I'll give you a copy of that

9    in a minute.

10             (Plaintiff's Exhibit 38 was marked for

11             identification.)

12   BY MR. BONNER:

13        Q.    We'll mark this one as 38.

14             And my question to you is why did it

15   take 16 days to respond to Mr. Callahan's letter of

16   September 30th?

17             MR. BURGE:  This is 37; right?

18             MR. BONNER:  I've got 37 and 38 in front

19        of her.

20        A.    So the response in Exhibit 38, dated

21   October 16th, would have also been prepared with

22   the advice and assistance of counsel.

23   BY MR. BONNER:

24        Q.    Is that why it took 16 days to respond

25   to Mr. Callahan's letter?

Page 258

1    A.   It may have been.  I don't specifically

2  recall why it took 16 days.

3    Q.   Okay.  Okay.  But with respect to the

4  entry on the privilege log, Exhibit 3, dated

5  October 1st through October 16th, 2014, do those

6  correspond to your communications with counsel in

7  preparation of drafting your October 16th letter?

8    A.   I would have to look at those specific

9  emails.  The dates line up.

10    Q.   Okay.  Anyone other than Mr. Latta and

11  Mr. Burge who would have been included on those

12  emails?

13    A.   Well, I'm not sure -- let's see this

14  entry -- that particular one, I'm not sure if that

15  went -- who that went to.

16    Q.   So Mr. Latta and Mr. Burge might not

17  have even been on those emails?

18    A.   They may; they may not.  I don't know

19  without looking at them.

20    Q.   With respect to any of these emails, do

21  you know if Mr. Froman was a party to any of them?

22    A.   I do not know.

23    Q.   Let's look at Exhibit 38.  The second

24  paragraph, "I would like to clarify that

25  Auto-Owners offered to pay Mr. Callahan (sic), who

Page 259

1   was Bradley's passenger, the full $3 million and

2   the policy limits available prior to August 7,

3   2014."

4            Correct?

5       A.   That's what it says.

6       Q.   Prior to August 7, 2014, Auto-Owners

7   never extended Mr. Cawthorn an offer to settle this

8   case for $3 million in exchange for a release of

9   his claims against Mr. Ledford?

10           MR. BURGE:  Objection to form.

11           You may answer.

12      A.   That's correct.

13  BY MR. BONNER:

14      Q.   You said that you relied on advice of

15  counsel in drafting this letter.  Can you tell me

16  did anyone proofread this letter, other than you?

17           MR. BURGE:  Object to the form.

18           You may answer.

19      A.   It would only have been myself and

20  outside counsel.

21  BY MR. BONNER:

22      Q.   Did you draft this letter?

23      A.   I don't specifically recall without

24  looking at the -- I wrote the letter.  I don't

25  recall how much of the language was my own and how

Page 260

1   much was with the assistance of counsel.

2        Q.   Was there any new information you

3   required between September 30th, 2014, the date of

4   Mr. Callahan's letter, and October 16, 2014, the

5   date of your letter, that was pertinent to your

6   response?

7        A.   Well, just the assistance of counsel.  I

8   don't believe there was anything else in the file

9   between those dates.

10        Q.   My question is limited only to factual

11   information.  Is there any new factual information

12   that came to light between September 30, 2014, and

13   October 16th of 2014?

14        A.   I would have to look at the claim file,

15   but I don't believe so.

16            MR. BONNER:  All right.  How much time

17        do you have on the tape?

18            THE VIDEOGRAPHER:  Just under 50

19        minutes.

20            MR. BONNER:  Let's take a break here.

21            THE VIDEOGRAPHER:  Going off the record.

22        The time is 2:49 p.m.

23            (Break from 2:49 p.m. to 2:58 p.m.)

24            THE VIDEOGRAPHER:  We're back on the

25        record.  The time is 2:58 p.m.

Page 261

1              (Plaintiff's Exhibit 39 was marked for

2         identification.)

3    BY MR. BONNER:

4         Q.    I'm showing you Exhibit 39, which is an

5    email from Ervin, Stacie to Mick Callahan.

6              Who is Ms. Stacie?

7         A.    Oh, Stacie Ervin.

8         Q.    Stacie Ervin, excuse me.

9         A.    She is one of our support staff.

10        Q.    This email from October 16, 2014,

11   contains a letter dated July 22, 2014; correct?

12        A.    Yes, that's attached.

13        Q.    Now, I'm going to show you Exhibit 36.

14   This is your letter of September 26, 2014, and I'm

15   showing you these exhibits in conjunction with one

16   another, because in Exhibit 36 you offer to produce

17   the Auto-Owners' communications with the Ledfords;

18   correct?

19        A.    Yes, if the Ledfords did not have them.

20        Q.    Okay.  And I believe that Exhibit 39 is

21   your effort to respond to that request; correct?

22             MR. BURGE:  Let me object to the form.

23        The letter says if they requested it.

24        A.    This is referencing back to the letter

25   of October 16th.

Page 262

1    BY MR. BONNER:

2         Q.    You're right.   If I show you the letter

3    of October 16th, read for me the first paragraph

4    there.

5         A.    "Thank you for your letter dated

6    September 30, 2014.  Per your request, enclosed

7    please find a copy of the letter dated July 22,

8    2014, between Auto-Owners and Mr. Ledford, which I

9    am sending in addition to the materials previously

10   forwarded."

11        Q.    And what materials had been previously

12   forwarded?

13        A.    Those were the written communications

14   with the Cawthorns.

15        Q.    Okay.  So and this gets me right back to

16   where I was going here.

17              The July 22 document was in response to

18   Mr. Cawthorn's request for communications between

19   Auto-Owners and the Ledfords?

20              MR. BURGE:   The Cawthorn request?

21   BY MR. BONNER:

22        Q.    -- Callahan's request for communications

23   between Auto-Owners and the Ledfords?

24        A.    I would have to look at his letter of

25   September -- I think it was 30 in between, but it

Page 263

1   appears that he had asked for something in that

2   letter.

3        Q.   Well, here, I'll make everybody's life

4   easier.

5             Other than the July 22, 2014,

6   correspondence that you have attached to your

7   Exhibit 39 in front of you, are aware of any other

8   written communications that Auto-Owners had sent to

9   the Ledfords with respect to this claim?

10       A.   I would have to look at the file.  I

11  don't independently recall.

12       Q.   And if the file reflects or contains no

13  written communications between the Ledfords and

14  Auto-Owners between the date of the accident and

15  October 16, 2014, other than the July 22 letter, it

16  would stand to reason that is the only written

17  communication that was sent to the Ledfords?

18       A.   Yes.

19            (Plaintiff's Exhibit 40 was marked for

20       identification.)

21  BY MR. BONNER:

22       Q.   I'm going to mark this as Exhibit 40.

23  This is a letter dated October 16th of 2014 -- I

24  think I marked the wrong copy there.  I did.

25  Excuse me.  Let me have that back -- both of these

Page 264

1   back.  That's not it.  This is the one I want to

2   give you.

3              Okay.  I'm showing you Exhibit 40.  This

4   is a letter from Ms. Ervin dated October 17, 2014.

5              This is an accurate copy of a letter

6   Ms. Ervin sent out on your behalf?

7       A.   Yes.

8       Q.   I don't think I have any questions with

9   respect to that one.  I just wanted you to identify

10  it for me.

11      A.   Do you want all of them?

12              (Plaintiff's Exhibit 41 was marked for

13           identification.)

14  BY MR. BONNER:

15      Q.   Yeah, I'll take that.

16              Okay.  I'm showing you what's marked as

17  Exhibit 41.  This is a letter from Mr. Callahan to

18  you, dated October 21, 2014.

19              Do you recall receiving this letter?

20      A.   I do.

21      Q.   This letter discusses Auto-Owners'

22  letter of May 27, 2014, to the Cawthorns; correct?

23      A.   Yes.

24      Q.   In this letter, Mr. Callahan states that

25  no specific amounts of coverage are identified or

Page 265

1    offered in Auto-Owners' letter of May 27, 2014;

2    correct?

3          A.    Correct.

4          Q.    And that statement is true?

5                MR. BURGE:   What statement?

6                MR. BONNER:   Mick Callahan's statement

7          that I just identified for the witness.

8          A.    Could I have that -- the May 27 letter?

9    BY MR. BONNER:

10         Q.    I'm showing the witness Exhibit 40.   It

11   has the May 27th letter attached.

12         A.    So you're asking if the statement, "No

13   specific amounts of coverage are identified or

14   offered in the letter," if that's true?

15         Q.    Yes.

16         A.    She does not reference a specific amount

17   of coverage in the May 27th letter.

18         Q.    So you agree that Mick Callahan's

19   statement that we read in the record earlier today

20   is true?

21         A.    This particular statement, "No specific

22   amounts of coverage are identified or offered in

23   the letter," yes.

24                MR. MARTINEZ:   And what exhibit is that,

25         ma'am?

Page 266

1           THE WITNESS:  This is 41.

2    BY MR. BONNER:

3        Q.   I want to look at the privilege log

4    again.  We finally made it to page 2 of the

5    privilege log.  There are entries dated

6    October 21st to October 24th.

7             Were you a party to any of these

8    communications?

9        A.   I don't recall without looking at them.

10           (Plaintiff's Exhibit 42 was marked for

11           identification.)

12   BY MR. BONNER:

13       Q.   May I see the entry there?

14           On October 22nd, 2014, Mr. Kalbac wrote

15   a letter to Mick Callahan with regards to

16   Auto-Owners.  I'm showing you what we'll mark as

17   42.

18           Can you tell me if you received a copy

19   of this letter?

20       A.   I don't specifically recall.  If it was

21   in the file, then I would say, yes, I saw it.

22       Q.   Do you know if you received it or do you

23   know the approximate date that you had been

24   notified of the contents of this letter?

25       A.   No, I don't know that I did see it.  And

Page 267

1    if I did, I would have to look at the claims file.

2         Q.   At some point you are made aware of the

3    allegation that the Cawthorns would have settled

4    for policy limits had they been offered earlier;

5    true?

6         A.   I don't know that that's accurate.

7         Q.   What, that you are made aware of that

8    position?

9         A.   Correct.

10        Q.   Okay.  Well, if you were not told of it,

11   that's -- I was just asking.  I didn't know one way

12   or the other.

13             So no one has ever spoken to you about

14   that particular allegation that the Cawthorns would

15   have accepted $3 million to settle their claims

16   against the Ledfords had the offer been extended

17   before August 7th, 2014?

18             MR. BURGE:  You're talking about --

19        okay.  He put a date on it.

20        A.   What was the date you said?

21   BY MR. BONNER:

22        Q.   August 7, 2014.

23        A.   Prior to that, is that what you --

24        Q.   I'll restate the question.

25             No one has ever alerted you of the

Page 268

1   allegation that Mr. Cawthorn would have settled his

2   case for $3 million had $3 million been offered to

3   him prior to August 7th, 2014?

4          MR. BURGE:  You mean prior to getting

5      sued in the bad faith case or what are you

6      talking about --

7   BY MR. BONNER:

8          Q.   Well, I don't know.  That's what I'm

9   asking you.  Were you ever told that by anyone --

10  about the allegations -- you know, let me rephrase

11  it.

12          While the underlying suit was ongoing,

13  were you ever made aware of the allegation that

14  Mr. Cawthorn would have settled his claim against

15  the Ledfords had Auto-Owners done something

16  differently?

17          A.   At some point I was made aware of that

18  allegation.  I don't recall if it was prior to the

19  suit being filed.

20          Q.   The bad faith suit being filed?

21          A.   Correct.

22          Q.   So it's possible that you were not aware

23  of that allegation until the bad faith suit was

24  filed; correct?

25          A.   That's possible.

Page 269

1          (Plaintiff's Exhibit 43 was marked for

2      identification.)

3   BY MR. BONNER:

4      Q.   I'm showing what you we'll mark as

5   Exhibit 43.  This is letter from Mr. Callahan to

6   you, dated October 24, 2014.

7          Can you confirm that you received that

8   letter?

9      A.   Yes.

10     Q.   And I suppose this letter notifies you

11  of Mr. Kalbac's statement.  We saw it earlier in

12  the October 22 letter, that the Cawthorns would

13  have accepted a policy limit settlement had it

14  been, quote, made timely.

15         So that's probably the first time you

16  were notified of that; correct?

17     A.   That would be a fair assessment.

18         (Plaintiff's Exhibit 44 was marked for

19      identification.)

20  BY MR. BONNER:

21     Q.   I'm showing you a document authored by

22  Michael Orr.  We'll mark this as exhibit

23  Exhibit 44.  This is dated October 20, 2014.

24         Have you seen this document before?

25     A.   Yes.

Page 270

1          (Plaintiff's Exhibit 45 was marked for

2      identification.)

3  BY MR. BONNER:

4      Q.   I'm showing you a document.  We'll mark

5  it as 45.  You can keep both of these in front of

6  you -- 44 and 45.  I believe 45 is an email dated

7  October 29 that confirms that it was part of that

8  report, reflected in Exhibit 44, was sent to you?

9      A.   Yes.

10      Q.   Okay.  This document 45 refers to the

11  first page of the report being marked for your

12  review, but did you receive the entire report?

13      A.   I don't receive it.  What she's

14  referencing when she says marks it is she puts like

15  a sticky note -- it's a digital file, but there's

16  like a paper flag.  So she flags it so I know where

17  it's at in the file, and then I go into the claim

18  file and look at it.

19      Q.   Okay.  If you turn to the page that's

20  Bates numbered 634 on Exhibit 44 --

21      A.   Okay.

22      Q.   -- there's a conclusion from Mr. Orr

23  that states, "We estimate that damages could be

24  well in excess of $10 million."

25          Correct?  Do you see that?

Page 271

1        A.    He does state that.

2        Q.    That's with regards to Mr. Cawthorn's

3    damages for which the Ledfords could be liable;

4    true?

5        A.    It's an estimate, yes.

6        Q.    Okay.  Did you receive other estimates

7    with regards to the Ledford's potential liability

8    after this one?

9        A.    I would have to look at the file.  I

10    don't know if there was also something from

11    Ms. Moses.  I don't know.

12        Q.    And the reason I ask is I don't have the

13    benefit of those documents.  So I'm trying to find

14    out if there's something I need to ask for.

15            Do you know, can you tell me -- and if

16    you can't, that's fine -- whether Ms. Moses or

17    Mr. Orr sent you any additional evaluations

18    estimating the Ledfords' potential liability, other

19    than the estimate that you have before you in

20    Exhibit 44?

21        A.    Anything that they would have sent would

22    be in the file.  So if there's no other estimates

23    in the file, then there would not have been any

24    other estimates.

25        Q.    And I don't have the remainder of the

Page 272

1   file, so I don't know.  So you don't know either, I

2   guess, is what you're saying; right?

3        A.   Not without looking at the file, I don't

4   know.

5        Q.   Did you personally make an estimate with

6   regards to the Ledfords' potential liability in

7   this case?

8        A.   No.

9        Q.   Do you know if Mr. Orr's estimate that's

10  reflected in Exhibit 44 ever changed while the

11  underlying suit was pending?

12       A.   I do not know.

13            (Plaintiff's Exhibit 46 was marked for

14            identification.)

15  BY MR. BONNER:

16       Q.   I'm showing you what I've marked as

17  Exhibit 46.  This is a letter from Mr. Kalbac

18  returning Auto-Owners' checks.

19            Do you recognize that document?

20       A.   Yes.

21       Q.   Okay.  Did you receive a copy of that

22  document?

23       A.   I don't recall without looking at the

24  file, no.  It would be documented in the file if

25  Pamela had notified me that we had received this.

Page 273

1      Q.   Are you aware that Auto-Owners in 2015

2  attempted to make a payment for $10,000 in med pay

3  on this case?

4      A.   I am aware of that.

5      Q.   Okay.  What involvement did you have

6  with the decision to offer $10,000 in med pay in

7  this case?

8      A.   I don't think I had -- I was aware that

9  it was being offered, but I wasn't involved in the

10  decision.

11      Q.   Who authorized that decision?

12      A.   That -- I'd have to look at the file.  I

13  don't know, but it's within the branch authority.

14      Q.   Okay.  You did not have to authorize

15  that payment?

16      A.   I did not.

17      Q.   And when you say you were aware of it,

18  were you asked to give an evaluation with respect

19  to the payment of med pay?

20      A.   No.

21      Q.   Can you describe for me what

22  involvement, if any, you had on the payment of

23  $10,000 being issued?

24      A.   I don't -- I'm not certain that I was

25  involved.  I would have to look at the claim file.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 274

1          Q.    Okay.  And should that med payment have

2     been made sooner than 2015?

3                MR. BURGE:  Object to the form.

4                You may answer it.

5          A.    To be honest, I would have to look at

6     the policy.  I'm not certain if the med pay

7     coverage -- I'd have to look at the policy to

8     confirm what the policy language says under med pay

9     about when it's paid.  It references the receipt of

10    medical bills.

11    BY MR. BONNER:

12         Q.    Does med pay cover bills for which

13    another insurance company has paid as primary?

14         A.    I'm not really qualified to answer that.

15    I don't handle the med pay provision.  Someone else

16    handles that.

17         Q.    You do agree that you had notice of an

18    Optum lien --

19         A.    Yes.

20         Q.    -- as of July 31, 2014; correct?

21         A.    Yes.

22         Q.    Do you know, one way or the other,

23    whether med pay was available to pay a portion of

24    that lien?

25         A.    There was med pay on the policy.

Page 275

1       Q.   Agree with me that if med pay was

2   available to pay a portion of that lien that

3   Auto-Owners had notice of that lien as of July 31,

4   2014?

5       A.   Yes.

6            MR. BURGE:   Object to the form.

7   BY MR. BONNER:

8       Q.   Were you aware that on or about June 26,

9   2015, Ms. Moses circulated a proposal wherein

10  Auto-Owners would offer $3 million to obtain a

11  release from Bradley Ledford, leaving Bob Ledford

12  the remaining defendant in Mr. Cawthorn's suit?

13      A.   You said in 2014 or --

14      Q.   June 26 -- around June 26, 2015.

15      A.   2015.  I would have to look at the claim

16  file.  I'm not sure if I received a copy of that or

17  not.

18      Q.   Okay.  And you might not have.  I don't

19  know.

20           I'm just asking if you have any

21  affirmative recollection of that proposal being

22  mentioned to you.

23      A.   I don't -- I don't recall.

24      Q.   Would it be reflected or documented

25  anywhere, other than in an email, if it had been

Page 276

1    circulated to you?

2         A.   No, it would be either in a letter or an

3    email in the file.

4         Q.   And absent a letter and an email, it

5    probably was not addressed to you; correct?

6         A.   The existence of the proposal?  I don't

7    know if I would have been notified by phone or not.

8         Q.   Okay.  You're aware that Mr. Roger

9    Cawthorn testified by deposition in the underlying

10   suit in 2016?

11        A.   Yes.

12        Q.   Did you ever read his testimony?

13        A.   No.

14        Q.   Has anyone ever told you what he

15   testified to with respect to his conversations with

16   Ms. McLean?

17        A.   I don't recall.

18        Q.   Do you agree that a representative from

19   Auto-Owners should never advise an unrepresented

20   claimant not to hire an attorney?

21        A.   Do I agree with that?

22        Q.   (Nods head)

23        A.   Yes, that --

24        Q.   In other words, advising an

25   unrepresented claimant or, in this case, the

Page 277

1   claimant's father not to hire an attorney would be

2   inappropriate?

3          A.   It's a violation of their ethical duties

4   under Florida -- I think it's administrative rules.

5          Q.   So an adjuster should not advise a

6   claimant or a claimant's father, in this case, not

7   to hire an attorney because that would violate

8   their ethical obligations?

9          A.   That's correct.

10         MR. BURGE:  Object to the form.  It's

11     the third time you ask it.

12 BY MR. BONNER:

13         Q.   So if Ms. McLean told Roger Cawthorn on

14  June 11th, 2014, not to hire an attorney, that

15  would have been wrong?

16         MR. BURGE:  Object to the form.

17     How many times are you going to ask it,

18     Allen?

19         MR. BONNER:  I haven't asked this

20     question before.

21         MR. BURGE:  That's why we've been here

22     forever.  You've asked the question at least

23     five times.  You've asked it three times in a

24     row.

25         A.   You asked if it would have been wrong.

Page 278

1    She should not, under her ethical obligations,

2    advise someone not to get an attorney.

3              (Plaintiff's Exhibit 47 was marked for

4         identification.)

5    BY MR. BONNER:

6         Q.   Okay.  I'm going to show you a letter

7    dated May 3, 2016, from Michael Callahan to you.

8              Do you recall receiving this letter?

9              MR. BURGE:  What's the exhibit number?

10             MR. BONNER:  47.

11        A.   Yes.

12   BY MR. BONNER:

13        Q.   Who did you speak to upon receiving this

14   letter?

15        A.   I don't recall.  I don't know that I

16   spoke to anyone.

17        Q.   Did you circulate this letter to anyone?

18        A.   I would have to look at the file.  I

19   don't recall.

20        Q.   Do you know if you circulated it to, for

21   example, Mr. Froman?

22        A.   I would have to look at the file.  I

23   don't know.

24        Q.   When you say look at the file, you mean

25   looking at either the claims file or the litigation

Page 279

1   file?

2       A.   Either the legal file or the claims

3   file.

4       Q.   Would it also be documented in your lit

5   card?

6            MR. BURGE:  Object to the form.

7            You may answer.

8       A.   It might.  I don't know.

9   BY MR. BONNER:

10      Q.   Did Auto-Owners roundtable any of the

11  issues that were discussed in this letter?

12           MR. BURGE:  Object to the form.

13           You may answer.

14      A.   What do you mean by roundtable?

15  BY MR. BONNER:

16      Q.   Did any person with settlement authority

17  above your level review this letter, and if so, did

18  they review it alone or with other people?

19      A.   I don't know if anyone else reviewed

20  this letter.

21      Q.   Do you agree with me that this letter

22  requests Auto-Owners to send a representative to

23  the mediation in the underlying suit?

24      A.   I have not read the entire letter, but

25  it does ask me to provide this to whomever would be

Page 280

1    at the mediation on behalf of Auto-Owners.

2         Q.   If you turn to page 8, the final

3    paragraph, it writes, "My client Bradley Ledford

4    urges Auto-Owners to either indemnify him against

5    any exposure in excess of the policy limits in

6    issue or to attend mediation with a representative

7    of the company with authority to resolve its

8    extra-contractual obligation to him."

9              Do you see that?

10        A.   Yes, I see that.

11        Q.   So did you interpret that as a request

12   to have somebody with authority above $3 million to

13   attend the tort mediation?

14             MR. BURGE:  Let me just object to the

15        question -- to asking questions about this.

16        This is after the case could not have been

17        settled.  The checks had been returned.  This

18        doesn't have anything to do with the

19        underlying tort case, and it only has to do

20        with the extra contractual claim, which is

21        the subject of this lawsuit.

22   BY MR. BONNER:

23        Q.   Do you agree --

24             MR. BURGE:  It's really irrelevant to

25        any of your claims.

Page 281

1          You can answer it.

2     A.    It does say what you read.

3          (Plaintiff's Exhibit 48 was marked for

4     identification.)

5  BY MR. BONNER:

6     Q.    Okay.  And on May 12, 2016 -- I'm

7  showing you a document that I'm going to mark as

8  Exhibit 48.

9          Can you confirm that you sent Exhibit 48

10 in response to Mr. Callahan's letter?

11    A.    Yes.

12    Q.    Okay.  Did you draft this letter?

13    A.    Yes.

14    Q.    Did anyone assist you in drafting this

15 letter?

16    A.    I'm sure I had the assistance of

17 counsel.

18    Q.    Did anyone proofread this letter?

19          MR. BURGE:  Object to the form.

20          You may answer.

21    A.    I would have drafted it with the

22 assistance of counsel, but they would not have

23 necessarily -- no one else would have proofread it.

24 BY MR. BONNER:

25    Q.    And by way of this letter, you're

Page 282

1    responding to Mr. Callahan that Auto-Owners would

2    not be sending a representative with settlement

3    authority above $3 million to the underlying court

4    mediation?

5         A.   That's correct.

6         Q.   Did anyone, other than outside counsel,

7    have to approve this letter before you sent it out?

8         A.   No.

9         Q.   Do you know if you addressed the

10   contents of your letter in Exhibit 48 with

11   Mr. Froman?

12        A.   I don't recall.

13             (Plaintiff's Exhibit 49 was marked for

14        identification.)

15   BY MR. BONNER:

16        Q.   Let me show you what we'll mark as

17   Exhibit 49.  This is a letter from Mr. Callahan to

18   you, dated May 16th, 2016.

19             Did you receive this letter from

20   Mr. Callahan?

21        A.   Yes.

22        Q.   If you look at the last paragraph, the

23   second sentence, Mr. Callahan writes, "You also

24   fail to consider that Bradley will need Auto-Owners

25   to address any proposal resolution of the case

Page 283

1    against him in excess of policy limits."

2              Do you see that?

3       A.    I see that, yes.

4       Q.    Okay.  The time you received this letter

5    on May 16th, 2016, did you believe that statement

6    to be true?

7              MR. BURGE:  Object to the form.

8              You may answer it.

9       A.    You're asking if I believe this was a

10   true statement?

11   BY MR. BONNER:

12      Q.    That Bradley would require Auto-Owners

13   to participate with respect to any proposed

14   resolution that was in excess of policy limits?

15             MR. BURGE:  The same objection.

16             You may answer.

17      A.    I don't know.

18             MR. BURGE:  The same objection we

19        objected to before in the previous exhibit.

20             (Plaintiff's Exhibit 50 was marked for

21        identification.)

22   BY MR. BONNER:

23      Q.    All right.  I'm showing you Exhibit 50.

24             If you turn to page 2, you'll see that's

25   a letter from Mr. Holcomb addressed to you,

Page 284

1   Ms. Pitman.

2              Did you receive that letter from

3   Mr. Holcomb, dated May 12, 2016?

4        A.   I don't recall ever seeing this letter.

5        Q.   If it's in your claims file, though, you

6   will agree that you received it?

7        A.   Yes.

8        Q.   Oh, with respect to Exhibit 50, can you

9   confirm that Mr. Holcomb in that letter of May 12th

10  requested a representative from Auto-Owners to

11  attend mediation who would have authority to

12  approve a settlement above policy limits?

13       A.   That is in there, but the cover letter

14  also says this letter he plans to send.  So I'm not

15  sure if it -- without looking at my file, I don't

16  know if it was sent or wasn't sent.

17       Q.   Thank you.

18            (Plaintiff's Exhibit 51 was marked for

19       identification.)

20  BY MR. BONNER:

21       Q.   Let me show you Exhibit 51.  This is a

22  letter from Joe Kalbac to Mick Callahan and John

23  Holcomb, dated August 3rd, 2016.  It attaches a

24  $33 million settlement offer to the Ledfords.

25            Have you seen this letter before?

Page 285

1        A.    I do believe it was forwarded to us at

2   some point in time.

3        Q.    Did you discuss this letter with anyone?

4        A.    It was discussed with counsel.

5        Q.    Mr. Latta and Mr. Burge?

6              MR. BURGE:   Object to the form.

7              You may answer.

8        A.    Yes.

9   BY MR. BONNER:

10       Q.    Okay.   The face of this letter states

11  that the proposal attached is contingent upon

12  Auto-Owners' approval; correct?

13       A.    That's what it says.

14             (Plaintiff's Exhibit 52 was marked for

15        identification.)

16  BY MR. BONNER:

17       Q.    Okay.   I'm showing you what we'll mark

18  as Exhibit 52.   This is a letter from Ms. McLean,

19  dated September 23, 2016.

20             Did you see this letter, which is

21  addressed to Mr. Callahan, before it was sent?

22       A.    You said "before it was sent"?

23       Q.    Before it was sent, did you consult with

24  her about this letter?

25       A.    I don't recall.   Without looking at the

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 286

1   file, I don't recall if she asked for assistance in

2   preparing this letter.

3        Q.   What you would be looking for in the

4   file is an email correspondence discussing this

5   letter?

6        A.   Mm-hmm.

7        Q.   Is that a yes?

8        A.   Yes.

9        Q.   Okay.  And you don't know if you gave

10  any input to Ms. McLean that was then incorporated

11  into Exhibit 52?

12       A.   I don't independently recall.

13       Q.   Okay.  And you don't recall whether you

14  reviewed or edited this letter before it was sent?

15       A.   Correct, I don't recall.

16       Q.   Okay.  This letter of September 3, 2016,

17  consents to settling Mr. Cawthorn's claim against

18  Bob Ledford RV & Marine for $3 million?

19       A.   I'm sorry.  Could you either read that

20  back or state that again?

21       Q.   Yes.

22            The letter of September 3, 2016,

23  consents to settling Mr. Cawthorn's claim against

24  Bob Ledford RV & Marine for $3 million?

25            MR. BURGE:  Object to the form.  Nothing

Page 287

1       in the letter says that.

2       A.    It says, We continue to be willing to

3   offer to pay the 3 million and continuing to defend

4   Mr. Ledford.

5   BY MR. BONNER:

6       Q.    So this letter states that Auto-Owners

7   was willing to settle Mr. Cawthorn's claim against

8   Bob Ledford RV & Marine for $3 million while also

9   defending Mr. Cawthorn's claim against Bradley

10  Ledford?

11          MR. BURGE:  The letter says what it

12      says.  She didn't write it.  She didn't see

13      it going before it went out.

14          You can answer, if you know.

15      A.    Yeah.  It says, "We continue to be

16  willing to pay the 3 million to Mr. Cawthorn and to

17  defend Mr. Ledford without reservation."

18  BY MR. BONNER:

19      Q.    Okay.  Did she need to get your

20  authority before agreeing to this?

21          MR. BURGE:  Object to the form.

22      A.    Before agreeing --

23          MR. BURGE:  To agreement.

24      A.    To what?

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 288

1   BY MR. BONNER:

2        Q.   Did Ms. McLean need to have authority

3   from you before she could state that Auto-Owners is

4   willing to settle the claim by Mr. Cawthorn against

5   Bob Ledford RV & Marine for $3 million?

6        A.   Well, at this time -- she needed the

7   authority.  When she was given the settlement

8   authority of $3 million in August 2014, that was

9   the authority that she needed, but she would not

10  have to come back and ask for additional --

11       Q.   My understanding was the authority that

12  was given in 2014 was to settle both -- on behalf

13  of both claimants; true?

14       A.   Well, it's to -- to offer the $3 million

15  with the goal of getting both insureds released.

16            Under Florida law, I believe that we

17  have an obligation -- if we can get one released

18  and not the other, I believe that we have that

19  obligation.  And she doesn't need my authority to

20  make -- if she can't get them both released, she

21  doesn't need my authority to get one released and

22  not the other.

23       Q.   So once she had authority in August 2014

24  to offer $3 million, that authority encompassed the

25  discretion to offer it solely to one or on behalf

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 289

1   of one or the other insureds, if appropriate to do

2   so?

3          A.   It gave her the ability -- at that point

4   we had counsel involved; so she would have been

5   working with defense counsel for the insured more

6   so than with me --

7          Q.   Regardless, there was no additional

8   authority that you gave with respect to this claim

9   after the authority that you gave in 2014?

10         A.   There may have been additional advice

11  and counsel, but additional authority, no.

12         Q.   Okay.  And there was not separate

13  authority given with respect to the contents of the

14  September 3, 2016, letter?

15         A.   Not to my recollection.  I would have to

16  see the file to see if I assisted.

17              (Plaintiff's Exhibit 53 was marked for

18         identification.)

19  BY MR. BONNER:

20         Q.   Exhibit 53 is a letter from Mick

21  Callahan to you, dated September 6, 2016.

22              Do you recall receiving this letter?

23         A.   Yes.

24         Q.   It discusses Mr. Kalbac's settlement

25  proposal that I showed you earlier?

Page 290

1       A.    Yes.

2             (Plaintiff's Exhibit 54 was marked for

3       identification.)

4  BY MR. BONNER:

5       Q.    What I'll mark now is Exhibit 54.  This

6  is a letter, dated September 7, 2016.  Please look

7  at page 3 of the exhibit.

8             And that letter, dated September 7,

9  2016, that's a letter that you drafted?

10      A.    Yes.

11      Q.    Okay.  Did you draft it with assistance

12  of counsel?

13            MR. BURGE:  Object to the form.

14            You may answer.

15      A.    I would have to look back at the file.

16  It's likely.

17  BY MR. BONNER:

18      Q.    Okay.  Your letter of September 7, 2016,

19  do you object on behalf of Auto-Owners to

20  Mr. Kalbac's proposal?

21            MR. BURGE:  Object to the form.  It's

22      for Mr. Callahan.

23  BY MR. BONNER:

24      Q.    Okay.  Well, I'll restate the question.

25            Is there an objection registered in your

Page 291

1  letter of September 7, 2016, with regard to

2  Mr. Kalbac's settlement proposal?

3              MR. BURGE:  Object to the form.

4              You may answer.

5       A.   I believe the letter indicates that --

6  it does not specifically object, and I don't have

7  Pamela's letter.

8  BY MR. BONNER:

9       Q.   Pamela's letter, Exhibit 52.  Do you

10  have 52 in front of you?

11      A.   I do not.

12      Q.   (Handing document).

13              With respect to Ms. McLean's letter, did

14  Ms. McLean on September 3, 2016, object to

15  Mr. Kalbac's settlement proposal?

16              MR. BURGE:  Object to the form.

17              MR. MARTINEZ:  You're referring to 52?

18  BY MR. BONNER:

19      Q.   Yes, this is a question with respect to

20  Exhibit 52.

21      A.   In Pamela's letter of September 3, 2016,

22  she indicates that it is up to Bradley, the

23  insured, to make that decision.

24      Q.   Okay.  So my question was with respect

25  to Exhibit 52, did Ms. McLean register an objection

Page 292

```
 1   to Mr. Kalbac's settlement offer?
 2              MR. BURGE:  Object to the form.
 3        A.    She does not use that phrasing.  She
 4   does not indicate that she's objecting.
 5   BY MR. BONNER:
 6        Q.    Okay.  With respect to your letter of
 7   September 6, did you need approval from Mr. Froman
 8   before sending that letter out?
 9        A.    No.
10        Q.    The only person that you recall
11   consulting with with respect to that letter was
12   either Mr. Burge or Mr. Latta or both?
13        A.    Correct.
14        Q.    Thank you.  No further questions on
15   this.
16              All right.  I just have something I want
17   to ask you about with respect to the answer and
18   affirmative defenses.  Okay.  Let's do this --
19              MR. BURGE:  She's not a 30(b)(6)
20         representative.
21              MR. BONNER:  I know.  I want to ask her
22         facts.
23              MR. BURGE:  Well, you can ask her some
24         facts, but she's not going to give any legal
25         basis for asserting affirmative defenses.
```

Page 293

1          (Plaintiff's Exhibit 55 was marked for
2      identification.)
3          MR. BONNER:  Don't worry.  I'm looking
4      for the factual basis for the affirmative
5      defenses.
6  BY MR. BONNER:
7      Q.   Turn to page -- okay.  I've shown you
8  the answer and affirmative defenses.  It's
9  Exhibit 55 --
10         MR. BURGE:  Do you have a copy of that
11     somewhere?
12 BY MR. BONNER:
13     Q.   If you go to Defense No. 3, which I
14 believe is on page 8.
15     A.   Eight is the certificate.
16     Q.   Oh, I'm sorry.  Page 5, Defense 3.
17         Do you have any facts which would
18 support the allegation in Defense No. 3 that the
19 consent judgment entered against Bradley Cawthorn
20 (sic) was not fair and reasonable?
21         MR. BURGE:  Are you going to read the
22     rest of that or just --
23         MR. BONNER:  Just that.
24         MR. BURGE:  That's all you're going to
25     read.

Page 294

1        A.   Do I have any facts?

2   BY MR. BONNER:

3        Q.   Yes.

4             MR. BURGE:   Personally do you know of

5        any facts?

6        A.   I'm going to say I don't know.

7   BY MR. BONNER:

8        Q.   It's true that you can neither confirm

9   or deny that the consent judgment amount was fair

10  and reasonable?

11       A.   It's fair to say that I can neither

12  confirm or deny.

13       Q.   And you did not discuss the amount of

14  the consent judgment with either Ms. Moses,

15  Mr. Orr, or Mr. Froman?

16       A.   I did not.

17       Q.   And I believe you said you never

18  actually analyzed the potential damages facing the

19  Ledfords in connection with this case; correct?

20       A.   That's correct.

21       Q.   If you look to Defense 4,

22  "Plaintiff's claim is subject to the terms and

23  limitations of the Ledford RV insurance policy."

24            Do you have any factual knowledge with

25  respect to whether or not there's been a violation

Page 295

1   of the insurance policy in this case?

2          A.    At any time?

3          Q.    At any time?

4          A.    In the underlying case or after -- in --

5          Q.    Up through the resolution of the

6   underlying case.

7          A.    I would have to look at the file, but I

8   don't -- I don't recall in the under-- I don't know

9   the answer to that.

10         Q.    Okay.  You're not aware of any facts

11  that would support the allegation that there's been

12  a violation of the insurance policy in this case?

13         A.    I am not personally aware.

14              MR. MARTINEZ:   Allen, let's just take a

15         break right now because he's only got a

16         minute left.

17              THE VIDEOGRAPHER:   Going off the record.

18         The time is 3:44 p.m.

19              (Break from 3:44 p.m. to 3:49 p.m.)

20              THE VIDEOGRAPHER:   We're back on the

21         record.  The time is 3:49 p.m.

22  BY MR. BONNER:

23         Q.    Okay.  If you'll look, again, at the

24  answer and affirmative defenses in front of you and

25  turn to Defense 10.

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

                                                        Page 296

1              Are you aware of any facts to support

2     that the policies, conditions regarding the duty to

3     cooperate and consent to settlement were breached

4     in the underlying case?

5         A.   I don't know the answer to that.  I

6     don't know the answer to that.

7         Q.   You never reported that any of those,

8     either the duty to cooperate or the consent to

9     settlement provisions, had been breached?

10             MR. BURGE:  According to who?

11             MR. BONNER:  To anyone.

12             MR. BURGE:  Object to the form.

13        A.   I did not.

14    BY MR. BONNER:

15        Q.   And you never informed the Ledfords that

16    the policy conditions regarding the duty to

17    cooperate for a consent to settlement had been

18    breached during the underlying claim?

19        A.   Me personally or Auto-Owners?

20        Q.   Let's ask you personally first.

21        A.   Me personally, no.

22        Q.   Did Auto-Owners ever inform the Ledfords

23    that the policy conditions regarding the duty to

24    cooperate and consent to settlement were breached?

25        A.   I would have to look at the file and --

Page 297

1    I don't know.

2         Q.   Okay.  With respect to Defense 11, do

3    you have any information concerning this allegation

4    of sophisted (phonetic) legal strategies?

5              MR. BURGE:  Sophisticated.

6    BY MR. BONNER:

7         Q.   Sophisticated.  Well, Defense 11 states,

8    "Auto-Owners is not liable for bad faith under

9    Florida law because the complaint presents

10   contrived and unsubstantiated bad faith claims that

11   are the product of sophisticated legal strategies

12   and not the product of actual bad faith."

13             Did I read that correctly?

14        A.   Yes.

15        Q.   Do you have any factual knowledge with

16   respect to the sophisticated legal strategies that

17   are alleged in this defense?

18        A.   I do not.

19             MR. BONNER:  Well, Mr. Burge, Mr. Latta,

20             there is some outgoing discovery disputes in

21             this case with respect to portions of the

22             claims file, also privileged documents that

23             are still outstanding that we haven't seen.

24             There might be a resolution of those.

25                  If there's a resolution of those

Page 298

1      favorably, obviously we have more questions

2      to ask.

3           At this time, we're prepared to adjourn,

4      subject to any cross-examination that you

5      have.

6           MR. BURGE:  We don't have anything.

7           MR. MARTINEZ:  Thank you.

8           MR. BURGE:  If you want to make your

9      motion --

10          THE VIDEOGRAPHER:  This concludes the

11     deposition.  The time is 3:53 p.m.

12          (The reading and signing of this

13     deposition was not waived.)

14          (At 3:53 p.m. this deposition was

15     adjourned sine die.)

16

17

18

19

20

21

22

23

24

25

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 299

1

2                    CERTIFICATE OF OATH

3

4     STATE OF FLORIDA        :

5                             :SS.

6     COUNTY OF MIAMI-DADE :

7

8              I, Lance W. Steinbeisser, Registered

9        Professional Reporter, Notary Public, State

10       of Florida, certify that MELINDA ANNE PITMAN

11       personally appeared before me on the 9th of

12       May, 2017.

13

14             Signed this 12th day of May, 2017.

15

16

17

18

19       _____

20       LANCE W. STEINBEISSER, RPR CSR FPR
         Notary Public, State of Florida at Large
21       My Commission Number:  GG064258
         Expires:  May 4, 2021

22

23

24

25

T: 305.632.4464                    Steinotype, Inc.                    www.Steinotype.com

David Madison Cawthorn v. Auto-Owners Insurance Company                    Melinda Pitman | 5/9/2017

Page 300

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3         I, Lance W. Steinbeisser, Registered

 4     Professional Reporter, do hereby certify that

 5     I was authorized to and did stenographically

 6     report the deposition of MELINDA ANNE PITMAN;

 7     that a review of the transcript was

 8     requested; and that the transcript, pages 1

 9     through 298, is a true record of my

10     stenographic notes.

11         I FURTHER CERTIFY that I am not a

12     relative, employee, attorney, or counsel of

13     any of the parties, nor am I a relative or

14     employee of any of the parties' attorney or

15     counsel connected with the action, nor am I

16     financially interested in the action.

17

18         Dated this 12th day of May, 2017, at

19     Miami, Florida.

20

21

22

23     _____
       LANCE W. STEINBEISSER, RPR CSR FPR
24     Certified Court Reporter

25
```