# Exhibit B
Deposition of
Madison D. Cawthorn

# In the Matter of:

## DAVID MADISON CAWTHORN

vs.

## AUTO-OWNERS INSURANCE

# MADISON CAWTHORN

*October 12, 2017*



www.OrangeLegal.com
800-275-7991

```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION

 3              CASE NO.: 6:16-cv-02240-JA-GJK

 4
    DAVID MADISON CAWTHORN,
 5
         Plaintiff,
 6
    -vs-
 7
    AUTO-OWNERS  INSURANCE
 8  COMPANY,

 9       Defendant.
    _____/
10                     CONFIDENTIAL

11        VIDEOTAPED DEPOSITION OF:  MADISON CAWTHORN

12     DATE:              Thursday, October 12, 2017

13     TIME:              9:00 a.m. - 2:42 p.m.

14
       PLACE:             COLSON, HICKS, EIDSON
15                        255 Alhambra Circle
                          Penthouse
16                        Coral Gables, Florida 33134

17

18     STENOGRAPHICALLY
       REPORTED BY:    VANESSA OBAS, RPR
19

20

21

22

23

24

25
```



```
 1              A P P E A R A N C E S:

 2


 3
    ROBERTO MARTINEZ, ESQUIRE
 4  WILLIAM ALLEN BONNER, ESQUIRE
    OF:  COLSON, HICKS, EIDSON
 5       255 Alhambra Circle
         Penthouse
 6       Coral Gables, Florida 33134
         bob@colson.com
 7       abonner@colson.com

 8  -and-

 9  STEPHEN A MARINO, JR., ESQUIRE
    OF:  VER PLOEG & LUMPKIN, P.A.
10       100 SE 2nd Street
         Suite 3000
11       Miami, Florida 33131
         Smarino@vpl-law.com
12       APPEARING ON BEHALF OF THE PLAINTIFF

13


14  STANLEY GREG BURGE, ESQUIRE
    OF:  BURR & FORMAN
15       420 North 20th Street
         Suite 3400
16       Birmingham, Alabama 35203
         gburge@burr.com
17       APPEARING ON BEHALF OF THE DEFENDANT

18
    ALSO PRESENT:
19

20       ANGELO RAMIREZ, VIDEOGRAPHER
         ROGER CAWTHORN
21

22                       -  -  -

23

24

25
```



1
                                I N D E X
2
                                                                PAGE
3  TESTIMONY OF MADISON CAWTHORN

4  DIRECT EXAMINATION BY MR. BURGE                          5
   CROSS-EXAMINATION BY MR. MARTINEZ                     154
5  REDIRECT EXAMINATION BY MR. BURGE                     156

6  CERTIFICATE OF OATH                                   161
   CERTIFICATE OF REPORTER                               162
7  ERRATA SHEET                                          163
   Read & Sign Letter to Witness                         164
8


9
                            E X H I B I T S
10

11                                       DESCRIPTION    PAGE

12 Defendant's Exhibit No. AA      Communication        141
                                      via text
13 Defendant's Exhibit No. BB      Correspondence       144
   Defendant's Exhibit No. CC      Additional           146
14                                 communication
                                      via text
15

16

17

18                      ------
                   S T I P U L A T I O N S
19

20      It is hereby stipulated and agreed by and between

21  the counsel for the respective parties and the deponent

22  that the reading and signing of the deposition

23  transcript be reserved.

24                      ------

25



**Orange Legal**
**800-275-7991**

```
 1                      P R O C E E D I N G S

 2                           * * * * * * * *

 3          THE VIDEOGRAPHER:  Here begins the videotaped

 4     deposition of Madison Cawthorn, taken in the matter

 5     of Case Number 6:16-cv-02240-JA-GJK, David Madison

 6     Cawthorn versus Auto-Owners Insurance, to be heard

 7     in the U.S. District Court, Middle District of

 8     Florida, Orlando Division.

 9          The deposition is being held at Colson, Hicks,

10     Eidson at 255 Alhambra Circle, Penthouse, Coral

11     Gables, Florida 33134.  Today's date is

12     October 12th, 2017, and the time is 10:27.

13          The Court Reporter is Vanessa Obas and the

14     video specialist is Angelo Ramirez on behalf of

15     Orange Legal.

16          Would counsel and all present please introduce

17     yourselves, after which the court reporter will

18     swear in the witness.

19          MR. MARTINEZ:  Good morning.  My name is Bob

20     Martinez.  I'm with the law firm of Colson, Hicks,

21     Eidson, and we represent the plaintiff, Madison

22     Cawthorn.  With me here today is my colleague Allen

23     Bonner, also as our co-counsel, Mr. Stephen Marino.

24          And let the record reflect that Madison's

25     father, Roger Cawthorn, is also in the room.
```



```
 1          MR. BURGE:  And I'm Greg Burge with the law

 2      firm of Burr & Forman, and I represent the

 3      defendant, Auto-Owners Insurance Company.

 4          COURT REPORTER:  Would you please raise your

 5      right hand?

 6          Do you solemnly swear or affirm that the

 7      testimony you're about to give will be the truth,

 8      the whole truth, and nothing but the truth?

 9          THE WITNESS:  I swear.

10  THEREUPON

11                  DAVID MADISON CAWTHORN,

12  was called as a witness and, having first been duly

13  sworn, testified as follows:

14                  DIRECT EXAMINATION

15  BY MR. BURGE:

16      Q.  Madison, good morning.  I'm Greg Burge.  I

17  represent Auto-Owners Insurance Company in this lawsuit

18  that you filed, and I've got some questions here for you

19  today.  I'm sure you understand that's why we're here?

20      A.  Yes, sir.

21      Q.  Okay.  And I know you've given a deposition

22  before in the previous lawsuit that you had filed.  Is

23  that accurate?

24      A.  Yes, sir.

25      Q.  Have you had a chance to read that deposition
```



1    in preparation for this deposition?

2        A.   I have.

3        Q.   Okay.  Good.  What else have you had an

4    opportunity to review in preparation for this

5    deposition?

6        A.   I also reviewed the deposition my father gave

7    in regards to this case.

8        Q.   Anything else that you reviewed?

9        A.   No, sir.

10       Q.   Let me ask you this:  Today, for this

11   deposition, are you taking any sort of medication that

12   would have any effect on your ability to understand my

13   questions and answer my questions?

14       A.   No, sir.

15       Q.   Okay.  Where do you currently -- well, give me

16   your first -- first of all, your full, complete name,

17   please?

18       A.   David Madison Cawthorn.

19       Q.   And how old are you?

20       A.   Twenty-two years old, sir.

21       Q.   And your date of birth is when?

22       A.   08/01/1995.

23       Q.   All right.  And where do you currently live?

24       A.   I live in Asheville, North Carolina.

25       Q.   What's that address?



```
 1      A.    5 Farleigh Street.

 2      Q.    Okay.  And who lives there with you?

 3      A.    My cousin Stephen Smith.

 4      Q.    And how is Stephen your cousin?

 5      A.    Through blood.

 6      Q.    What's the relationship there?

 7      A.    I believe he is the grandson of my

 8   grandmother's sister.

 9      Q.    All right.  Which would make y'all what,

10   second?

11      A.    Second or third.

12      Q.    Third cousins?

13      A.    Third, once removed, I think.

14      Q.    What does Stephen do?  Does he work?

15      A.    Yes, sir.  He works at Chick-fil-A as a

16   hospitality professional.

17      Q.    Okay.  And how long have you lived at 5

18   Farleigh Street?

19      A.    Not long.  Just about six weeks, sir.

20      Q.    And is that a house?

21      A.    It's an apartment.

22      Q.    And where did you live just prior to living at

23   5 Farleigh Street?

24      A.    In Washington D.C. -- or outside of Virginia.

25      Q.    And where in Virginia was that?
```



```
 1      A.   It was in Purcellville, Virginia.

 2      Q.   And what was the address you lived at?

 3      A.   548 Wordsworth, one word --

 4      Q.   Wordsworth?

 5      A.   -- Circle.

 6           Yes, sir.

 7      Q.   Circle?

 8      A.   Yes, sir.

 9      Q.   And was that a house?

10      A.   It was.

11      Q.   Did you own the house?

12      A.   I did, sir.

13      Q.   Do you still own it?

14      A.   It's under contract, but yes, sir, I still do.

15      Q.   And when did you buy that house?

16      A.   I believe in August of last year.

17      Q.   August of 2016?

18      A.   Yes, sir.

19      Q.   And at least in August of 2016, had you -- was

20   it your plan to permanently relocate to that area?

21      A.   Not permanently.  It was my plan to finish

22   school there.

23      Q.   Okay.

24      A.   Come back to --

25      Q.   So did you --
```



```
 1      A.    -- North Carolina.

 2      Q.    Did you buy the house when you started school

 3  there?

 4      A.    I did, sir.

 5      Q.    Okay.  When did you start there, the school

 6  there?

 7      A.    In August of 2016.

 8      Q.    And what was the school you were going to?

 9      A.    Patrick Henry College.

10      Q.    And what were you studying there?

11      A.    Political science.

12      Q.    And have you withdrawn from Patrick Henry?

13      A.    I have, sir.

14      Q.    Why did you withdraw from there?

15      A.    Heartbreak.

16      Q.    What was the heartbreak?

17      A.    My --

18      Q.    What's --

19      A.    My fiancée ran off with my best friend.

20      Q.    And who was your fiancée?

21      A.    Hailey Roberts.

22      Q.    And so you and Hailey Roberts were engaged to

23  be married?

24      A.    We were, sir.

25      Q.    And had the marriage been set?
```



```
 1      A.   It had.

 2      Q.   When was it scheduled for?

 3      A.   December 16th.

 4      Q.   Of this year?

 5      A.   Yes, sir.

 6      Q.   2017?  And how long had you dated Hailey

 7  Roberts?

 8      A.   Since October, sir.

 9      Q.   Since October of --

10      A.   Last year.

11      Q.   '16?

12      A.   Yes, sir.

13      Q.   And when did y'all get engaged?

14      A.   In May.

15      Q.   And who was it that she ran off with?

16      A.   I don't know if they're actually still dating,

17  but I know they were just hanging out.  Luke Shanahan.

18      Q.   And he was your best friend?

19      A.   He was one of them, yes, sir.

20      Q.   And does Luke Shanahan -- does he still live up

21  in the D.C. area?

22      A.   I believe he would say his address was in

23  Texas, but he does go to school in Virginia.

24      Q.   And does he go to school at Patrick Henry?

25      A.   Yes, sir.
```



 1      Q.   And as far as you know, is that where Hailey

 2   Roberts goes to school?

 3      A.   As far as I know, sir.

 4      Q.   Are you enrolled in school anywhere now?

 5      A.   I am not, sir.

 6      Q.   Do you have any plans to be enrolled and to

 7   continue your education?

 8      A.   I do, sir.  I plan on enrolling in Liberty

 9   University's online program in January.

10      Q.   And where is Liberty University?

11      A.   I believe it's in Virginia.

12      Q.   And what do you plan to study?

13      A.   Hopefully political science.

14      Q.   And you mentioned the online program.  Is that

15   -- have you already enrolled in that?  Been accepted in

16   that?  I mean --

17      A.   I have not, sir.  Just called and just found

18   out what the program's about and what it's like.

19      Q.   So as we sit here today, that's your intention

20   going forward, but you hadn't really put it into motion

21   yet?

22      A.   Yes, sir.

23      Q.   Now, are you still driving?

24      A.   I am, sir.

25      Q.   Okay.  What kind of vehicle are you driving



 1  now?

 2      A.    A Dodge Challenger.

 3      Q.    And that vehicle's been equipped so that you

 4  can operate it with --

 5      A.    It --

 6      Q.    -- your --

 7      A.    It is.

 8      Q.    -- hands?

 9      A.    Yes.  It's a good vehicle for me because it's

10  low to the ground, two doors, so larger doors to get my

11  wheelchair in.

12      Q.    Are you working anywhere now?

13      A.    I am not, sir.

14      Q.    Do you have any plans to work anywhere?

15      A.    Yes, sir, I do.  I don't know where yet,

16  though.

17      Q.    And when do you plan to start the online

18  program at Liberty?

19      A.    Hopefully in January.

20      Q.    Now, in -- back in June of this year, 2017,

21  where were you living at that time?

22      A.    I -- I would have said my address was still in

23  Virginia.

24      Q.    Were you living in Atlanta at any time

25  part-time?



 1      A.   I was, yes, sir.  Yeah, I was down there for

 2   rehab.

 3      Q.   And when were you in Atlanta for rehab?

 4      A.   I don't know the exact dates, but in the

 5   summertime.

 6      Q.   Where were you living while you were there?

 7      A.   We rented an apartment.

 8      Q.   And do you remember -- was it in Atlanta?

 9      A.   It was, sir.

10      Q.   Do you remember where in Atlanta it was or

11   whereabouts?

12      A.   In Buckhead, sir.

13      Q.   And how long were you -- how long was the --

14   did you stay for rehab?

15      A.   Yes, sir.

16      Q.   And what type of rehab were you undergoing?

17      A.   Physical and occupational.

18      Q.   And where were you doing that rehabilitation?

19      A.   The Shepherd Center, sir.

20      Q.   And did you complete whatever program that you

21   were on?

22      A.   I did.

23      Q.   Okay.  Was that in Atlanta where one of the

24   experts has been put up in this case named Tremp Robert

25   or Robert Tremp?  Do you remember meeting with him in



 1    Atlanta?

 2       A.    I do, sir.

 3       Q.    Do you remember where y'all met in Atlanta?

 4       A.    In the apartment I was living in.

 5       Q.    And what was the -- tell me what the purpose of

 6    that meeting is.  What went on at that meeting?

 7       A.    I believe it was to devise a life care plan.

 8       Q.    And how long was the meeting with him?

 9       A.    Several hours.

10       Q.    Was anyone else there at the meeting?

11       A.    No, sir.  I believe my mother may have been

12    there for the very beginning, but then she left.

13       Q.    The home that you bought in Virginia that you

14    said is under contract now, did you buy that house?

15       A.    I did, sir.

16       Q.    Okay.  Was there any mortgage on the property?

17       A.    No, sir.

18       Q.    You just paid cash for it?

19       A.    I did.

20       Q.    Did you have any roommates that lived there

21    with you?

22       A.    No, sir.  I did not.

23       Q.    How big a house was it?

24       A.    It was two bedrooms, sir.

25       Q.    And the -- were you on any sort of scholarship



 1   while you were going to Patrick Henry?

 2       A.   I was not, sir.

 3       Q.   And did you pay for your tuition to go to

 4   college there?

 5       A.   I did.

 6       Q.   How did you do in school there?

 7       A.   Not well.

 8       Q.   Put some flesh on that for me.  When you say

 9   not well, what do you mean?

10       A.   I would think probably my average grade in most

11   classes was a D.

12       Q.   Were you disappointed in that performance?

13       A.   I was, sir.

14       Q.   What was the reason for that, you think?

15       A.   It was definitely less than when I was able to

16   produce out of myself before my accident.  You know,

17   suffering from a brain injury after the accident

18   definitely -- I think it slowed my brain down a little

19   bit.  Made me less intelligent.  And then the pain also

20   made reading and studying very difficult.

21       Q.   Do -- but, I mean, you, as far as you know at

22   least the way you live now, you live with your -- with a

23   roommate, you conduct your own financial affairs, take

24   care of your financial obligations?

25            MR. MARTINEZ:  Object to the form of the



**Orange Legal**
**800-275-7991**

1      question.

2   BY MR. BURGE:

3      **Q.   Is that true?**

4      A.   I would not say I conduct my own financial

5   affairs.  I have people -- I rely on assistance and

6   advice from various mentors, family members.

7      **Q.   Well, there hadn't been a guardian appointed to**

8   **you, has there?**

9      A.   Not that I know of, sir.

10     **Q.   Does anybody have power of attorney on your**

11  **behalf?**

12     A.   I believe my father may, if I was to become

13  incapacitated.

14     **Q.   In the event that you would become**

15  **incapacitated?**

16     A.   Yes, sir.

17     **Q.   You don't consider yourself incapacitated, I**

18  **assume?**

19     A.   At this time?

20     **Q.   Yes.**

21     A.   No, sir.

22     **Q.   Tell me just sort of what you have been doing,**

23  **you know, on a daily basis since you got back to North**

24  **Carolina.**

25     A.   Well, sir, I think it's mainly just trying to



 1  figure out what I want to do with my life, what

 2  direction I want to take.  Just kind of refocus and

 3  recalibrating.  Heal my heartache, meet with various

 4  mentors about four times a week.  I try and help out at

 5  my church and then just spend time with my family.

 6          I've got two new little nieces I get to hang

 7  out with, so I'm enjoying them.  And then, like, try to

 8  stay physically fit, just as long as my shoulders will

 9  hold out.  And then I would say that conducts most of my

10  day.

11      **Q.   Are you undergoing any sort of counseling,**

12  **psychological or otherwise?**

13      A.   I'm setting up a meeting with a counselor soon.

14  I believe my -- it's a counselor my brother goes to.  He

15  recommended her very strongly.

16      **Q.   What type of counselor is she?**

17      A.   A Christian counselor.

18      **Q.   Is she a psychologist or psychiatrist or...**

19      A.   I can't answer that.  I'm not sure yet, sir.  I

20  haven't met her yet.

21      **Q.   But you say she was recommended by your**

22  **brother?**

23      A.   She was.

24      **Q.   And where is she located?**

25      A.   I don't know, sir.  In the Asheville area.



 1      Q.   Have you -- you said that you were -- you were

 2   majoring I think -- did you say political science at

 3   Patrick Henry?

 4      A.   Yes, sir.

 5      Q.   And I read -- maybe it was in your other

 6   deposition or somewhere where at some point you had some

 7   aspiration to go to law school?

 8      A.   Maybe it was a consideration.  But I don't plan

 9   on attending law school.

10      Q.   Any reason why you changed your mind on that?

11      A.   Worked with you guys too much.

12      Q.   You're a smart man, to tell you the truth.

13           If you finish your degree at some point in

14   political science, do you plan on going into politics?

15      A.   That's the plan, sir.  You know, politics is

16   always a changing game.  So I can't speak as to the

17   future, but that would be the plan.

18      Q.   Before you went and started at Patrick Henry,

19   did you -- were you still working for the congressman up

20   until that point?

21      A.   I was, sir, until about -- I believe about six

22   months before.

23      Q.   Six months before you went to Patrick Henry?

24      A.   Yes, sir.

25      Q.   When was the last time that you had any



```
 1   interaction at all with Bradley Ledford?

 2        A.    I would say about a month ago possibly.

 3        Q.    What sort of interaction did you have with him

 4   then?

 5        A.    It was a conversation via text message.

 6        Q.    And what was the -- what do you recall about

 7   the conversation?

 8        A.    I was just getting an update on his life, where

 9   he's living, what he's doing.  Talking about football.

10        Q.    And what did he -- what did you learn from

11   that?

12        A.    He's living in a garage right now in California

13   with a bunch of his buddies in a big house.  And then

14   he's playing football at a small school there.

15        Q.    And did you initiate that contact or did he?

16        A.    I don't recall, sir.

17        Q.    And prior to that, when was the last time you

18   had any sort of interaction with him?

19        A.    I don't recall.

20        Q.    The -- currently, as we sit here, do you have

21   any surgeries that are scheduled in the future?

22        A.    No, sir.

23        Q.    And when was the last time that you had any

24   sort of surgical procedure?

25        A.    In August.
```



1        Q.    What was that procedure, please?

2        A.    It was to install a neurostimulator on my spine

3   to help alleviate nerve pain from my legs.

4        Q.    And was that done at Shepherd's?

5        A.    No, sir.  It was done in Dallas, Texas.

6        Q.    And has the -- has the stimulator -- has it

7   given you any relief?

8        A.    I would say it's alleviated about 40 percent of

9   my pain.

10       Q.    What have the doctors told you about that

11  procedure and their expectations?

12       A.    They were hoping it would alleviate about

13  80 percent of my pain and that it should be very

14  successful, but...

15       Q.    And the pain that you're talking about, where

16  is the location of that pain?

17       A.    In -- where I feel it --

18       Q.    Yes.

19       A.    -- is below my left knee and mainly in the calf

20  region on the shin.  But in reality, it's just -- it

21  just originates from my spine going to my brain telling

22  me there was a problem there, but in reality it's

23  obviously not a problem there.

24       Q.    Is -- what about -- where do you stand

25  currently on any feeling in your legs at all, either one



 1  of them?

 2      A.   Very spotty, very limited.

 3      Q.   **Just give me an example.  Like, your right leg,**

 4  **do you have any feeling in the right leg?**

 5      A.   I feel intense pain.

 6      Q.   **Anything else?**

 7      A.   Sometimes I can feel the temperature of water.

 8      Q.   **Any movement at all in the right leg?**

 9      A.   A little, yes, sir.  I can -- I can lightly

10  flex my squad -- my quad.

11      Q.   **What about the left leg?**

12      A.   No, sir.

13      Q.   **No movement?**

14      A.   No, sir.

15      Q.   **Any -- any feeling in the left leg?**

16      A.   Just pain.

17      Q.   **And where do you generally feel the pain in the**

18  **left leg?**

19      A.   My previous answer.

20      Q.   **Same location?**

21      A.   Same location, yes, sir.

22      Q.   **Okay.  No other locations?**

23      A.   No.

24      Q.   **When you -- when you came back from -- let me**

25  **see if I can get the sequence right.**



```
 1              When you were in Atlanta for your rehab, did

 2   you go back to Virginia for a period of time before you

 3   moved back to where you are now?

 4        A.    No, sir.

 5        Q.    Did you go straight from Atlanta back to

 6   North -- North Carolina?

 7        A.    Yes, sir.  I believe I went out to Virginia

 8   just for a few days.

 9        Q.    Okay.

10        A.    Just to settle the affairs of my house.

11        Q.    Okay.  Did -- when you went back -- when you

12   came back -- I'm just going to say, when you came back

13   home, did you -- did you live with your parents for any

14   length of time?

15        A.    I did, sir.

16        Q.    How long were you with them?

17        A.    I'd say about three weeks, maybe more.

18        Q.    And did you go straight from there to the

19   apartment that you've told me about?

20        A.    I did, sir.

21        Q.    And is the apartment equipped so that you can

22   get around in it well?

23        A.    Yes, sir.  We had to make some modifications to

24   it like the showers, removing doors and stuff like that.

25   The main problem is that there's some pretty thick
```



1  carpeting in the bedrooms, so it's really hard to move

2  around there.  But for the most part, I can get around.

3         But the main reason for Stephen moving in with

4  me is that it's not as equipped as my house was.

5  Because I'm just renting it, I can't make a lot of

6  modifications to it.

7         So Stephen will be there to be able to help

8  assisting, like, taking out the trash, reaching higher

9  elevated things or sweeping the floors -- because it's

10 all hardwood so it's really hard to sweep.  And he's

11 mainly there just to assist me in day-to-day activities.

12     Q.   Do you have any plans to -- once you sell your

13 house in Virginia buying another home where you are now?

14     A.   I don't know my plans yet, sir.  Just figuring

15 that all out.

16     Q.   The -- let me ask you a few questions about

17 your -- your previous deposition.

18     A.   Yes, sir.

19     Q.   Back at the -- let me just go back a little bit

20 further than that.

21         Back at the time that this accident happened,

22 at least my understanding from seeing the deposition

23 that you gave as well as Bradley Ledford, the two of you

24 were best friends back at that time?

25     A.   Close and close, sir.



**Orange Legal**
**800-275-7991**

1       Q.   Do you still consider him one of your best

2   friends?

3       A.   I would consider him a brother, but we're not

4   very close anymore.

5       Q.   Why is that?

6       A.   Just because after -- I was given the tapes of

7   his deposition to watch and then just seeing that he

8   didn't take responsibility for the accident, he blamed

9   my injuries on me.  Just things like that really, you

10  know, struck a nerve, kind of made -- made future

11  relationships difficult.

12           But we're working to repair those, hopefully.

13  But we'll find out what happens.

14      Q.   I read in your deposition, your previous

15  deposition, I think you said -- made the statement that

16  you thought Bradley Ledford had lied under oath in his

17  deposition?

18      A.   I do, sir.

19      Q.   You still believe that?

20      A.   I do.

21      Q.   And I think you said you believed that he did

22  it because his lawyers got him to do it?

23      A.   Most likely.

24      Q.   Is that your belief?

25      A.   Yes, sir.



 1     Q.   You wouldn't lie if your lawyers told you to

 2  lie, would you?

 3     A.   Not even if they hurt me.

 4     Q.   You told me you all thought he lied because he

 5  was under a lot of pressure from his father?

 6     A.   Yes, sir.

 7     Q.   Why did you think he was under a lot of

 8  pressure from his father?

 9     A.   I just know his father's personality.  He's

10  very domineering.  He likes to take command.

11     Q.   I think you said something along the lines that

12  he was a -- he was a very demanding man, something along

13  those lines?

14     A.   I don't remember exactly what I said, sir.

15     Q.   Strong willed?

16     A.   Very.

17     Q.   Very persuasive?

18     A.   He is.

19     Q.   So you think that he -- Mr. Ledford had exerted

20  pressure on Bradley to say things that weren't true in

21  his deposition?

22     A.   He may have, sir.  I really can't speak to the

23  nature of that, but it's a possibility.

24     Q.   Do you remember also saying in your previous

25  deposition that from what you had seen that Bradley had



Case 6:16-cv-02240-JA-GJK   Document 81-2   Filed 12/11/17   Page 28 of 164 PageID 7353

DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE                    CONFIDENTIAL
CAWTHORN, MADISON                                                          26

1  said that he had pretty much kept the same consistent

2  story from the first time that he gave an account as to

3  what happened in the accident?

4      A.  I don't know, sir.  I have to see my

5  deposition, see exactly what we are talking about.

6      Q.  When did you last read it?

7      A.  My deposition?

8      Q.  Yes.

9      A.  I reviewed it yesterday, I believe.

10      Q.  Okay.  Did you read the whole thing?

11      A.  Not the whole thing, sir.

12      Q.  It was long --

13      A.  It was.

14      Q.  -- wasn't it?

15          400 and something pages?

16      A.  I -- I don't know.  Something like that.

17      Q.  Let me ask you about a couple of statements in

18  the deposition, but let me preface that question by

19  asking you:  Was there anything that you read in your

20  deposition when you looked at it yesterday that you read

21  and said, you know, I don't think that's right, I don't

22  think I answered that question right at the time I was

23  asked the question?

24      A.  Yes, sir.  I believe there was.

25      Q.  What was that, that you saw, that you recall?



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
27

 1      A.   It was after seeing what other colleges I had

 2   recalled being accepted to.  After further

 3   consideration, after my accident, I realized that I

 4   hadn't -- I hadn't actually applied to those schools.

 5   They were just listed on an NROTC scholarship --

 6   application to say these are the schools I may want to

 7   go to if I don't get my first choice.

 8      Q.   Okay.  So you're saying the -- the number of

 9   schools that you testified to that you had been accepted

10   at, that that was not accurate?

11      A.   That was not accurate, yes, sir.

12      Q.   Okay.  You're saying that there was some

13   schools that were listed on something, but you did not

14   actually apply and been accepted at those schools?

15      A.   Yes, sir.

16      Q.   Was there anything else that you saw that you

17   thought was inaccurate?

18      A.   I have to see all my deposition and know

19   exactly what -- if there are any more inaccuracies.

20      Q.   Okay.  That one came to your mind very quickly.

21   Was there anything -- any other ones that come to your

22   mind quickly, as you sit here?

23      A.   No, sir.

24      Q.   All right.  You said in that previous

25   deposition, and I want to confirm that, that after this



1   accident, you really had no memory from the Steak 'n

2   Shake until five weeks later when you were coherent and

3   remembered a conversation with Greg which was about the

4   last day that you were in Halifax; is that correct?

5       A.   Yes, sir.  I do have one shadow memory

6   basically from the day of the accident -- I believe it

7   was from the day of the accident -- of rolling in to the

8   hospital holding the nurse practitioner's hand.

9       Q.   But other than that, that's -- that's it?

10      A.   That's it, sir.

11      Q.   I think you also testified in that deposition

12  that it took you quite a while to get your -- these were

13  your words -- your executive reasoning skills back?

14      A.   I'd like to see where I said that in my

15  deposition, but it did take me a while to get those

16  back.

17      Q.   All right.  Do you remember telling Bradley or

18  you said you may have said to Bradley, I am only coming

19  after the insurance money, not you -- in the lawsuit you

20  filed against him?

21      A.   Did I say that at my deposition?

22      Q.   Yeah.  Page 169.

23      A.   Could I see it?

24      Q.   No, I'm just asking if you remember reading it.

25      A.   No.  I don't remember reading it, sir.



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
29

1    Q.   And I'll tell you it's on Page 169.  You can

2  look at it.  Did you tell him that?

3    A.   I did not.

4    Q.   Did not tell him that?

5    A.   No, sir.

6    Q.   So if you said you may have told him that in

7  that previous deposition, that's not accurate?

8    A.   I may have, sir.  It's a long time ago.  I

9  don't really have a memory of it.

10    Q.   Memory of saying it or memory of what the

11  deposition says?

12    A.   Both, sir.

13    Q.   The trip that you and Bradley were on at the

14  time of this event, you had been on trip with him in --

15  prior to that trip, hadn't you?

16    A.   Yes, sir.

17    Q.   I think y'all had been to California --

18    A.   We have.

19    Q.   -- for a period of time?

20    A.   Yes, sir.

21    Q.   Had you ridden in the car with Bradley a good

22  bit?

23    A.   I'd ridden with him before, yes, sir.

24    Q.   And the two of you drove down to Florida

25  from -- I guess the -- after you went to Mr. Ledford's



 1   either business or his house and y'all got your tires

 2   put on the vehicle, then y'all drove straight from there

 3   to Florida?

 4        A.   Yes, sir.

 5        Q.   And as I understand it from looking at your

 6   previous deposition, that you did some of the driving

 7   down?

 8        A.   I did.

 9        Q.   Okay.  And is it true that you and Bradley

10   changed positions in the vehicle while the vehicle was

11   moving down the roadway?

12        A.   We did, sir.

13        Q.   And how big were you back at that time?  How

14   tall?

15        A.   About 6 foot, 6 foot 1.

16        Q.   How much did you weigh?

17        A.   215 pounds.

18        Q.   And how big was Bradley?

19        A.   He was probably about 6 foot, 6 foot 1.

20        Q.   And this was a BMW X3?

21        A.   It was, sir.

22        Q.   While the car was moving down the highway, the

23   two of y'all traded positions between the driver seat

24   and the passenger seat?

25        A.   We did, sir.



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
31

```
 1       Q.   Did you think that was prudent?

 2       A.   You know, sir, at the time being 18 years old,

 3  thinking I was invincible, I didn't see any danger in

 4  it.  But now, looking back, obviously I see that there

 5  was some major problems with doing that.

 6       Q.   It wouldn't take much of a slip to cause a

 7  problem --

 8            MR. MARTINEZ:  Object to the form.

 9  BY MR. BURGE:

10       Q.   -- true?

11       A.   Well, sir, that's a hypothetical question.  I

12  don't know.

13       Q.   Well, as big as the two of you boys were,

14  swapping between the passenger's seat and the driver's

15  seat in that vehicle, I mean, there wasn't a lot of room

16  for y'all to move about next to each other, was there?

17       A.   I would say relatively, we were pretty

18  normal-size gentlemen.

19       Q.   No, but it was pretty tight in that car to be

20  able to do that, wasn't it?

21       A.   I don't think it was very tight, sir.

22       Q.   Why didn't y'all just pull off the road and do

23  it?

24       A.   Because it was to save time, I believe.

25       Q.   Because of what?
```



```
 1      A.   I believe it was to save time.

 2      Q.   To save time.  Because I think you also said in

 3  your deposition that y'all made it down to Florida a lot

 4  faster than you had anticipated?

 5      A.   I would have to see that in my deposition, but

 6  I believe we did make it down faster.

 7      Q.   All right.  You talked about in your deposition

 8  that you had -- at some point had planned to attend

 9  Harvard online's program.  Have you done that?

10      A.   We -- I did not, sir, no.

11      Q.   I believe you also said, I believe in the

12  deposition, that you could attend school there on campus

13  if you wanted to, is that accurate?

14      A.   I believe that -- in -- I thought that I was

15  able to.

16      Q.   Did you apply and were you accepted at Harvard?

17      A.   I was not, sir.  It was just future plans.

18      Q.   Okay.  So had you -- did you have to go through

19  some process to get accepted to take online courses

20  there?

21      A.   I don't believe I ever completed that process,

22  sir.

23      Q.   Now, in the car, my understanding when y'all

24  left to go down to Florida, that you had some bag with

25  you that was called your emergency bag.  Do you remember
```



 1  that?

 2      A.   I believe I would call it a "go bag," yes, sir.

 3      Q.   Go bag.  And looking at your deposition, I

 4  think the way you described it was there was -- there

 5  was something to camp and fish, something to fix a car,

 6  something to hunt, and something to fix somebody.  Do

 7  you remember saying that?

 8      A.   That's normally what I would have in one of

 9  those, yes, sir.

10      Q.   What was in that bag?

11      A.   I believe fire starters, water purification

12  tablets, probably an emergency saw, which is like a

13  small chain you can cut through a small -- like a sapling

14  tree.

15          A medical kit, you know, to put BAND-AIDS on

16  somebody or Neosporin to help keep infection out.  Most

17  likely a hatchet to help split wood.  Probably lighter

18  fluid to help start a fire if it was raining.

19          And then I can't -- I don't remember what all

20  would have been in that bag, but probably a change of

21  clothes.  Just average things that you might need.

22  Maybe Advil.

23      Q.   Was there a firearm in there?

24      A.   No, sir.

25      Q.   Was there any gun of any type that was in that



 1  bag?

 2      A.   No, sir.

 3      Q.   Did you own any guns?

 4      A.   I did, sir.

 5      Q.   What kind of guns did you own?

 6      A.   I owned a Mossberg 250 shotgun and a .22 long

 7  rifle.  The .22 long rifle was with us going down but

 8  was not in the bag.

 9      Q.   It was in the car, though?

10      A.   It was, sir.

11      Q.   And why did you have that with you?

12      A.   Because we were going to a ranch down there,

13  the Flying Ranch, and we're just two North Carolinian

14  boys from the South figuring we might be able to get a

15  little shooting in while we're down there.

16      Q.   Did Bradley have a weapon?

17      A.   I don't think he brought one.

18      Q.   Did he own any?

19      A.   I don't know, sir.  It may have been his

20  father's, but we had shot together before.

21      Q.   What are some of the things that you do now, if

22  you have any hobbies that you participate in?

23      A.   I'm really interested in getting into

24  blacksmithing.

25      Q.   Have you done anything to -- to move towards



1   that?

2      A.   No, sir.  Went to the Biltmore Estate and saw

3   their resident blacksmith and just kind of observed him

4   for the day.  Just -- it seems like a hobby I'm able to

5   do from a wheelchair because there's no -- nothing high

6   up.

7      Q.   Anything -- any other hobbies or activities

8   that you engage in that you hadn't told me about?

9      A.   I enjoy exercising.  I enjoy going out to eat

10  with friends.  I enjoy playing rummy, gin rummy

11  especially.  I enjoy Bananagrams.  Really hang out with

12  my nieces.  But anything I can do with my brother in the

13  free time he has.

14     Q.   And does your brother, does he live in the same

15  town that you live in?

16     A.   Not the same town, but just about 25 minutes

17  away.

18     Q.   Is your brother -- is he married?

19     A.   He is, sir.

20     Q.   And is it his children that you're mentioning?

21     A.   Yes, sir.

22     Q.   The -- one of the things that you mentioned in

23  your deposition, you talked about when you -- a

24  conversation that you remembered at Shepherd's when you

25  got there, an encounter that you had with a doctor there



1    that you described as an old white man, terrible doctor,

2    not take his role seriously, acted very

3    unprofessionally.  You know who I'm taking about?

4        A.   I do, sir.

5        Q.   Have you seen that doctor or has he been your

6    doctor at all since that time?

7        A.   No, sir.

8        Q.   Do you remember that doctor's name?

9        A.   Not -- it doesn't come right back to memory,

10   sir.

11       Q.   Now, was -- did I see somewhere that you were

12   dropped at Shepherd's?

13       A.   I was.

14       Q.   Did you have any injury from that?

15       A.   Possibly.  There's a speculation there may have

16   been an injury from that or may have been form the car

17   accident, but most likely the car accident.

18       Q.   How did the injury -- how did it happen at

19   Shepherd's?

20       A.   I was getting into a shower chair for the first

21   time doing a transfer.  I was uncomfortable with the

22   transfer, but they -- they thought that I may be able to

23   still go on.  And then, while I was making the transfer,

24   I fell.

25            I believe the therapist would define that as a



1   controlled fall, just -- a training exercise because in

2   a wheelchair everyone will fall once in a while, so...

3        Q.   **Was there any lawsuit brought by you over that**

4   **fall?**

5        A.   Well, no, sir.  Because, I mean, it's a

6   controlled fall.  The therapists were right there.

7        Q.   **So you didn't blame them for that?**

8        A.   I don't think I'd blame them, no, sir.  I was

9   the one doing the transfer.

10       Q.   **One of the things that you said in that**

11  **deposition -- and I want to try to get a clarification**

12  **of this -- is that you said that you talked to your dad**

13  **every day about the accident.**

14            **And the question didn't have a lot of context**

15  **to it, and so my question to you is:  If you did talk to**

16  **your dad every day about the accident, what was the time**

17  **frame that you were referencing?  Did you mean while you**

18  **were at Halifax?  Once you got to Shepherd's?  What were**

19  **you referring to?**

20       A.   Well, sir, I was definitely dealing with some

21  -- some deep depression that was trying to take hold of

22  me at the time.  That was a very dark time in my life at

23  that -- being there.

24            And sometimes just -- in that situation, you

25  just want to reflect and see where did I come from, how



1   did I get to this point, and how did my life just kind

2   of turn out so bad so quickly.  And so I believe my

3   father and I were just discussing that.

4       **Q.   But you -- but you're -- you're referencing**

5   **when you were actually hospitalized at Halifax.  Is**

6   **that --**

7       A.   I believe --

8       **Q.   -- the time frame --**

9       A.   -- so.

10      **Q.   -- we are talking about?**

11      A.   That's the time I don't have any memory from.

12  So if I was talking to my father, I was probably trying

13  to get a clarification of events that happened there.

14      **Q.   That's what I wanted to clarify because I**

15  **understood you didn't have any memory about that time**

16  **frame and yet you made the statement that you talked to**

17  **your dad every day about the accident.  So I was trying**

18  **to reconcile those two.**

19          **So are you saying it's your belief that you**

20  **talked to him or has he told you you talked to him or do**

21  **you really have some memory of talking to him?**

22          MR. MARTINEZ:  Object to the form.

23          THE WITNESS:  That's a pretty broad question,

24      sir.  Could you narrow it for me?

25



 1  BY MR. BURGE:

 2      Q.   I don't think I can ask it any better than

 3  that.

 4      A.   I don't know how to answer that.

 5      Q.   Okay.  Well, do you have any memory of talking

 6  to your dad every day while you were at Halifax?

 7      A.   At Halifax?

 8      Q.   Yes.

 9      A.   Oh, no, sir.

10      Q.   Okay.  Has your dad told you that you did talk

11  to him every day while you were at Halifax about the

12  accident?

13      A.   That would have been impossible.  I wasn't able

14  to speak for several days while I was there.

15      Q.   Do you remember talking with him every day

16  while you were at Shepherd's about the accident?

17      A.   I do.

18      Q.   Okay.  Was there anybody else that you talked

19  to at Shepherd's every day about the accident?

20      A.   Most likely my brother, my mother.  I don't

21  know if we would talk about it every single day, but I

22  may have brought it up.  It was the whole reason I was

23  there.

24          MR. MARTINEZ:  Greg, when you get a good point,

25      just take a little break.



 1                MR. BURGE:  We can do that now.

 2                THE VIDEOGRAPHER:  We are off the record at

 3        11:04 a.m.

 4        (Thereupon, a recess was taken in the deposition,

 5        after which the deposition continued as follows:)

 6                THE VIDEOGRAPHER:  We are on the record at

 7        11:17.

 8                Please proceed.

 9        BY MR. BURGE:

10        Q.    Madison, let me go back to your previous

11        deposition --

12        A.    Yes, sir.

13        Q.    -- on few other areas.

14                One of the things that you said in your

15        deposition is that -- I think you said that you didn't

16        have any memory of whether or not your feet were up on

17        the dash in the vehicle at the time of the wreck.  Is

18        that accurate?

19        A.    Do you have my deposition that I can see?  I

20        just --

21        Q.    I don't.  You read it yesterday.  Do you

22        remember seeing that?

23        A.    I don't remember reading that, but it's

24        possible.

25        Q.    Were your feet on the dash at the time of this



 1   wreck?

 2        A.   Sir, I have no memory from that.

 3        Q.   **Okay.  I thought that's what my question was.**

 4   **Did you previously say you had no memory of it and is**

 5   **that true?**

 6        A.   I have no memory of it, yeah.  No, sir.

 7        Q.   **Okay.  You don't know whether they were or not?**

 8        A.   I do not know, yes -- no, sir.

 9        Q.   **Okay.  But you had put your feet up on the dash**

10   **while riding in the vehicle before?**

11        A.   I'm sure I've done it at some point.  Even if

12   my feet were up on the dash during the accident, I

13   cannot imagine that they would have stayed there.  You

14   know, we went over several hundred feet of rumble

15   strips.

16             I've gone over those before just driving, and I

17   know what it does to my body, personally.  It really

18   jerks me to attention.  So even if I was asleep, I know

19   that would have brought me right back.

20             And then correct me if I'm wrong, but I believe

21   we ran right through an exit sign.  So if that doesn't

22   wake me up, there was something else wrong with me

23   rather than just the accident.

24             And so I know if that had happened, there's no

25   way my feet would have remained on the dash.



 1      Q.   Okay.  My question is, though:  You don't have

 2  any memory of it?

 3      A.   I don't.

 4      Q.   Okay.  Did you ever specifically ask any of the

 5  physicians that treated you what your resulting injuries

 6  might be if your feet were up on the dash?

 7      A.   I don't believe I did, sir.

 8      Q.   Did you ever hear any of them discussing that

 9  issue?

10      A.   No, sir.

11      Q.   Did you ever discuss that issue with anyone,

12  the fact that your feet might have been up on the dash

13  and that it may have contributed to your injuries?

14           Outside of your lawyers.  I don't want you to

15  tell me what you talked to --

16      A.   I'm sure we may have just had some speculative

17  conversations sitting around a bedside while I'm trying

18  not to die.  I'm not sure, sir.

19      Q.   Did you -- do you have a recollection of

20  speaking with your father about that?

21      A.   I don't have a clear recollection of that.

22      Q.   Or your mother?

23      A.   I don't have a clear recollection of that.

24      Q.   Now, Graceland Perry was your girlfriend back

25  then?



 1      A.   She sure was.

 2      Q.   **Right.  Do you remember speaking with her about**

 3  **it?**

 4      A.   Not that I remember, sir.

 5      Q.   **Did you attend her deposition when it was**

 6  **taken?**

 7      A.   I did not.

 8      Q.   **Have you ever read her deposition?**

 9      A.   I haven't.

10      Q.   **Have you ever been told what she said in the**

11  **deposition?**

12      A.   Just my attorney's impressions of her.  I don't

13  remember what she said.

14      Q.   **You were never informed by anyone that she said**

15  **that she had talked with you directly and that you had**

16  **told her that your feet were up on the dash?**

17      A.   I believe it's privileged.

18      Q.   **What's privileged?**

19           MR. MARTINEZ:  In other words, this is for

20      clarification.  Are you referring to conversations

21      with your lawyers?

22           THE WITNESS:  Yes.

23           MR. MARTINEZ:  He doesn't want you to reveal

24      any conversations with your lawyers.  So if he's

25      asking a question, the answer to which comes from a



**Orange Legal
800-275-7991**

```
 1        conversation with your lawyers, then, of course,

 2        you're instructed not to answer it.

 3  BY MR. BURGE:

 4        Q.   Okay.

 5        A.   Can you repeat the question, sir?

 6        Q.   Yeah.  The question is:  You had not learned

 7  from any other source except your lawyers -- I'm not

 8  asking you if you did hear from them -- but you have not

 9  learned from any other source excluding your lawyers

10  that she said that she had talked with you directly and

11  that you had told her that your feet had been on the

12  dash at the time of the wreck?

13        MR. MARTINEZ:  Objection.  Foundation.

14        THE WITNESS:  Sir, even if I had told her that,

15     there's no way I could possibly have known.  I have

16     no memory from the accident.

17  BY MR. BURGE:

18        Q.   Did you hear from any other source outside of

19  your lawyers that she had said that she had heard your

20  mother and your father discussing the fact that you had

21  been told by them on previous occasions not to put your

22  feet up on the dash?

23        A.   I don't know that, sir.

24        Q.   Don't know one way or the other?

25        A.   I don't.
```



```
 1        Q.    Why did you and Graceland Perry break up?

 2        A.    There's no reason other than reasons of the

 3   heart.  I can't really pin it down for you.

 4        Q.    Did you break up with her or did she break up

 5   with you?

 6        A.    She broke up with me.

 7        Q.    Did she tell you why?

 8        A.    No, sir.  I don't remember.

 9        Q.    The girl that you were engaged to, Hailey

10   Roberts, recently, did she break that off or did you

11   break it off?

12        A.    She did, sir.

13        Q.    Okay.  And did she tell you that it was just

14   because of this other gentleman?

15        A.    No, sir.  No, that was not the reason.  I

16   believe the reason was she just didn't really get along

17   with my mother very well.

18             And she's a very -- she's more reserved and she

19   likes to take her time with things, think things through

20   a lot.  And I'm much more passionate and I like to do

21   things quickly.

22             And so I guess after a while I think we were

23   both real attracted to each other because we were pretty

24   much opposites to one another.  But then I think the --

25   the novelty of that wore off, we realized that -- I
```



1    guess she realized that we just wouldn't work out in the

2    long run, I believe.

3        Q.   **What was the problem that her and your mother**

4    **had?**

5            MR. MARTINEZ:  Let me -- let me do this, Greg.

6        I've given a lot of leeway here, but I'm going to --

7        it's kind of an invasion of privacy.  That's not

8        really relevant.

9        So I don't know why this line of questioning is

10       significant.  That's my reasoning.

11          MR. BURGE:  Well, if y'all are dropping the

12       claim that he's -- you know, he doesn't have any

13       sexual dysfunction or --

14          MR. MARTINEZ:  You want to get into that?

15          MR. BURGE:  Well, if y'all aren't going to

16       claim it.  I mean, you've had experts testify about

17       it.  I mean...

18          MR. MARTINEZ:  You're going to get into that?

19          MR. BURGE:  You know?

20          MR. MARTINEZ:  If you want to get into that,

21       get into that.

22          THE WITNESS:  Let's dig down, brother.

23          MR. BURGE:  That's not the question I'm asking

24       him now.  I'm just trying to figure out here what --

25       you know, he said they broke up and he's -- he's the



```
 1      one that volunteered the statement about his mother.

 2      I'm just trying to find out what the -- what the

 3      issue was.

 4           MR. MARTINEZ:  So you want to know all the

 5      reasons why he broke up with his fiancé?

 6           MR. BURGE:  No, I just asked him what the

 7      problem with his mother -- that she had with his

 8      mom.  That's the question on the table now.  It may

 9      be the end of it.

10           MR. MARTINEZ:  Let's -- Madison, go ahead and

11      answer the question.

12           THE WITNESS:  As far as I understand, she just

13      didn't get along with her.

14 BY MR. BURGE:

15      Q.   Okay.  Well, were they -- were your parents

16 happy about the engagement?

17      A.   Oh, yeah.  We were real excited about it.

18      Q.   I mean, they were -- I would think they'd be

19 excited about it; right?

20      A.   Yes, sir.

21      Q.   As far as you knew, they were?

22      A.   As far as I know.

23      Q.   Okay.  Was it -- was it a surprise sort of

24 thing when she broke it off?

25      A.   Very.
```



 1      Q.   Now, the -- let me talk with you a few minutes

 2   about -- about your dad because you -- I know you read

 3   his testimony that he gave in this case; right?

 4      A.   I did.

 5      Q.   And you told me that you had spoken almost every

 6   day with your father when you were at Shepherd's about

 7   the accident; right?

 8      A.   We're very close.

 9      Q.   And that was my sense, that you and him are

10   very close.  And I assume you have been for -- since you

11   were born, really?

12      A.   Yes, sir.

13      Q.   And I -- I --

14           MR. MARTINEZ:  Excuse me, a second.  Mr. --

15      Mr. Cawthorn, can you tell us what you're doing just

16      so if somebody is watching can understand what's --

17      why you do that?

18           THE WITNESS:  This is called a weight shift.

19      I -- I do it just because involuntary muscle

20      movement in my bottom is impossible, so I can't

21      really move a muscle to allow new blood flow to get

22      to my butt.

23           And so if I -- if I don't do a weight shift,

24      you know, no new oxygen will get down there and my

25      muscles will begin to deteriorate and I'll form a



1    pressure sore and all kinds of bad stuff will

2    happen.

3        My mom will have to come help me out at my

4    house all the time for that, and it's just -- I

5    don't want to do that to her and I don't want a

6    pressure sore.

7        MR. MARTINEZ:  Thank you, sir.

8        Sorry to interrupt you.

9  BY MR. BURGE:

10       Q.   Going back to the line we were -- you've spent

11  a great deal of time with your dad before the accident,

12  even after the accident; right?

13       A.   Yes, sir.

14       Q.   And do you think your dad is a smart man?

15       A.   I would, sir.

16       Q.   I mean, he's a stockbroker; right?

17       A.   He's a financial advisor.

18       Q.   My understanding is, is he -- that he buys and

19  sells securities as part of his job?

20       A.   I don't really know what a security is, but

21  perhaps.

22       Q.   You don't know what a security is?

23       A.   I don't, sir.

24       Q.   I heard that he's testified that he advises

25  people on savings for college education and managing



1  college funds, he does that as part of his job?

2       A.   I would say my dad's primary objective with his

3  work is to make sure people can get to and through

4  retirement, retire with dignity, and pay for life events

5  such as college, maybe getting a new car, buying a boat

6  one day.  Who knows.

7       Q.   **He's told me that he advises people about**

8  **annuities and that he sold annuities in the past?**

9       A.   He may have said that, sir.  I'm not sure.

10      Q.   **He's an accredited asset management specialist?**

11 **Is that his title, as far as you know?**

12      A.   I know he's got lots of letters after his name,

13 but I'm not sure.

14      Q.   **What -- what do you -- what's your**

15 **understanding of what your dad does do at this job?**

16      A.   I believe my dad's primary objective is making

17 sure people can get to and through retirement and they

18 can retire with dignity, they can pay for life events

19 such as college, getting a boat, cars, anything like

20 that.

21      Q.   **And how does -- what does he do to do that?**

22      A.   What does my father do to do that?

23      Q.   **Yes.**

24      A.   You'd have to ask him, sir.

25      Q.   **You don't know?**



 1      A.   I mean, I have a -- I have a guess.

 2      **Q.   Well, have you -- have you ever sat down and**

 3   **talked to him about what he does on a daily basis?**

 4      A.   I have, sir.

 5      **Q.   And what does he tell you that he does?**

 6      A.   Talks people down from making impulse decisions

 7   on buying like a brand-new sports car rather than

 8   investing in something.

 9           Or he -- I would say my dad has -- my dad has

10   spoken to me that his -- his favorite part of his job is

11   when he has a -- maybe a daughter of someone he -- he

12   advises who comes and just gives him a hug and says, you

13   take all the pressure off my parents to -- you know, so

14   they can just live their life and be happy.

15      **Q.   The -- your dad -- we had asked him some**

16   **questions about your schooling in his deposition because**

17   **my understanding is that you were homeschooled your**

18   **whole life?**

19      A.   I was.

20      **Q.   Okay.  And was your dad, was he involved at all**

21   **in part of the educational process?  What I mean is, did**

22   **he teach you any of those courses or classes?  Or what**

23   **involvement did he have with that, if any?**

24      A.   My mom was the primary teacher.  My mother was.

25   But, you know, you learn so much from your father.  I



 1  wouldn't -- I would never say my dad wasn't a teacher.

 2  He was -- might not have taught me -- taught me how to

 3  do my multiplication tables, but he taught me how to

 4  catch a fish with no fishing line.

 5      Q.   Well, I'm kind of thinking about the schooling

 6  aspect of it now.  I mean, I know you learn a lot

 7  everyday sort of things from your father and being

 8  around him, but I'm -- I'm thinking specifically about

 9  the schooling aspect of it, if he was involved in any

10  aspect with you?

11      A.   That was primarily done by my mother.

12      Q.   Okay.  And was the -- when you got out of high

13  school or when you reached the point of graduation, tell

14  me how that works when you're homeschooled and you reach

15  the point of completing the curriculum through the 12th

16  grade.  Do you get a diploma or how does that work?

17      A.   You get a diploma, yes, sir.

18      Q.   Okay.  What does diploma have on it?

19      A.   Well, I believe that you have whatever your

20  school name was that you registered with the State --

21  and then just like a normal diploma.

22      Q.   And what does -- what school were you

23  registered with?

24      A.   I don't remember the name of it, sir.

25      Q.   Was it a local school?



 1     A.   No, sir.  It was just my homeschool.

 2     **Q.   Okay.  Tell me how that works.  I mean, was the**

 3     **schooling actually done at any place other than your**

 4     **home?**

 5     A.   I don't understand the relevance of it, but I

 6     would do -- I believe throughout the fifth grade, I did

 7     all my school at home.  Then after that, there's like

 8     co-ops where you can go and have classes with other

 9     homeschooled students.

10     **Q.   Okay.  And did you take all -- once you got to**

11     **being a senior, did you take all of the standard --**

12     **standardized tests that most seniors in high school**

13     **take?**

14     A.   I would assume so, sir.

15     **Q.   Well, do you remember taking -- what are they?**

16     **-- the ACT and the --**

17     A.   I took the SAT.

18     **Q.   -- SAT?**

19     A.   I took the SAT.

20     **Q.   What did you score on the SAT?**

21     A.   I believe I got a 590 on my math, roughly maybe

22     a 620 on reading, and then writing probably a 650.

23     Those are rough estimates, sir.

24     **Q.   What about the -- did you take the ACT?**

25     A.   I did not.



**Orange Legal**
**800-275-7991**

 1      Q.   Was the SAT the only one you took?

 2      A.   It was, sir.

 3      Q.   Have you taken any other standardized exams

 4  since then?

 5      A.   I don't believe so, sir.

 6      Q.   No other exams of any kind that you took as far

 7  as trying to be accepted at a college or anything else

 8  other than the SAT?

 9      A.   I don't believe so, sir.

10      Q.   Let me ask you, when was the -- let me get back

11  to something real quick here.

12           When was the last time that you actually saw in

13  person Bradley Ledford?

14      A.   Long ago, sir.

15      Q.   Was it -- has there been any occasions since

16  the mediation where you saw him in person?

17      A.   I don't think so, sir.  It's possible, but I

18  don't remember ever seeing him.

19      Q.   Okay.

20           MR. BURGE:  Have we just been keeping the same

21      number on these exhibits?

22           MR. BONNER:  We have kept our numbers --

23      Mr. Bonner, for the record.  We've kept our numbers,

24      but I do not know if Auto-Owners, for purposes of

25      your depositions, have them sequenced.  If they're



1      already stamped, yeah, I think you can just read

2      them.

3            MR. BURGE:  Yeah, I think that's -- I think

4      that's the easiest thing.  If we'd be re-doing them,

5      like, for instance, we're going -- I'm going to use

6      some that we've already marked in Roger's

7      deposition, so we're just going to use those

8      numbers?

9            MR. MARTINEZ:  Yes, sir.

10           MR. BURGE:  Stay -- stay with those?  Fine with

11     y'all?

12           MR. BONNER:  We've done the same thing.

13           MR. BURGE:  Okay.  Give y'all a copy of that.

14           THE WITNESS:  Would you like me to read this,

15     sir?

16   BY MR. BURGE:

17     Q.   Well, I just -- handed it to you.  I'm going to

18   ask you some questions about it.

19           MR. MARTINEZ:  Just leave it right there until

20     he asks you questions about it.

21           THE WITNESS:  Okay.

22   BY MR. BURGE:

23     Q.   What I've shown you is the Exhibit Number 4.

24   That was Exhibit 4 to your father's deposition.  If you

25   could take a look at it for me and just take your time

DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
56

1    and read -- read through it.

2              MR. MARTINEZ:  Go ahead and read it, Madison.

3              THE WITNESS:  Yes, sir.

4              All right, sir.

5    BY MR. BURGE:

6         Q.   Have you had a chance to read that letter?

7         A.   I just did.

8         Q.   Have you ever seen that letter before?

9              MR. MARTINEZ:  You're looking at me because you

10   want to know whether it was shown to you by your

11   lawyer?

12             THE WITNESS:  Yes, sir.

13             MR. MARTINEZ:  He's asking you apart from

14   seeing it from your lawyer.

15             THE WITNESS:  No, sir, I have not.

16   BY MR. BURGE:

17        Q.   Okay.  So you've never seen that letter at any

18   time except when it was presented to you by your lawyer?

19        A.   I believe so, sir.

20        Q.   Okay.  The date of this letter is May the 27th,

21   2014, and you would have been at Shepherd's in

22   Atlanta --

23        A.   I would have, sir.

24        Q.   -- by that time; right?

25        A.   Yes.



1       Q.    You went to Shepherd's on May the 8th?

2       A.    Yes, sir.

3       Q.    So you would have been there almost 20 days --

4       A.    I would have.

5       Q.    -- right?

6       A.    One moment, sir.

7             MR. MARTINEZ:  Maybe you can put it on your tie

8       like this.  That works.

9    BY MR. BURGE:

10      Q.    When you look down here on the second -- on the

11   third paragraph where it starts out:  I did receive the

12   medical authorization.

13            Do you see that?

14      A.    Yes, sir.

15      Q.    It says:  I did receive the medical

16   authorization that was forwarded and thank you for same;

17   unfortunately, the hospital's being difficult about

18   releasing the records.

19            First, they would not release them until your

20   son had been discharged, and now they object to the

21   authorization as it was signed as parent of the patient.

22   According to the records department, being that your son

23   is over 18, they need him to sign the authorization.  As

24   such, we have included one for his signature.

25            Mr. Ledford carries quite a bit of insurance



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
58

```
 1    coverage that would no doubt benefit your family in this

 2    very difficult time.  As soon as I am able to obtain the

 3    records, we will be able to bring the insurance portion

 4    of this matter to a conclusion.

 5         Have I read that correctly?

 6    A.   Yes, sir, you have.

 7    Q.   In and around May the 27th or thereafter, your

 8    father did never -- did not show you this letter?

 9         MR. MARTINEZ:  Object to the question.  Lack of

10         foundation.

11         THE WITNESS:  I don't remember, sir.

12  BY MR. BURGE:

13    Q.   You don't remember whether he showed it to you

14    or not?

15    A.   I don't, sir.  I was fighting for my life and

16    my ability to walk.

17    Q.   Okay.  So on May the 27th, you were fighting

18    for your life, inability to walk.  You don't remember

19    whether he showed it to you or not?

20    A.   Yes, sir.  I had other things more on my mind.

21    Q.   You previously stated you didn't think you had

22    ever seen it except through your lawyers.

23    A.   Sir, I may have seen it.  As I said, I don't

24    remember.

25    Q.   Well, May the 27th, I mean, you didn't --
```



 1   hadn't hired the lawyers yet as of May the 27th, had

 2   you?

 3      A.   I had not, sir.

 4      Q.   Did your -- did you father, did he ever say

 5   anything to you that he had gotten a letter from the

 6   insurance company?

 7      A.   I believe he --

 8           MR. MARTINEZ:   Time frame?   Objection to lack

 9      of time frame.

10   BY MR. BURGE:

11      Q.   Around May the 27th --

12      A.   I believe he may have --

13      Q.   -- or thereafter.

14      A.   -- expressed that he had some confusion about

15   it.

16           I would point you to the fourth paragraph where

17   it says:   "Mr. Ledford carries quite a bit of insurance

18   coverage that would no doubt benefit your family in this

19   very difficult time," which all makes a ton of sense.

20           Then she continues on that she wants to bring

21   the insurance portion of this matter to a conclusion,

22   but she absolutely says nothing about what the amount

23   would be.

24           And so I can see why my dad -- why we wouldn't

25   sign the -- the release right then because it's pretty



 1  confusing to me.  There's no -- it seems evasive.

 2      Q.   Okay.  That wasn't my question.

 3      A.   I'm sorry.

 4      Q.   I appreciate your answer, but that wasn't the

 5  question.

 6           The question was:  Did your father ever talk

 7  with you about the contents of the letter in and around

 8  May the 27th, 2014?

 9      A.   As I said, I don't remember completely.  But I

10  do believe he would have -- he expressed the confusion

11  about this letter.

12      Q.   Okay.  You think your dad was confused by the

13  letter?

14      A.   I think there were some things that were

15  unclear to him, yes.

16      Q.   Okay.  Is the letter unclear to you?

17      A.   It is.

18      Q.   What's unclear about it?

19      A.   I will direct you again to the fourth paragraph

20  where she says she'll bring the insurance portion of

21  this matter to conclusion but doesn't specify what that

22  means.

23      Q.   Well, what did you -- what do you think it

24  means?

25      A.   I believe around that time, I probably had, I

 1   don't know, maybe $400,000 worth of insurance bills.

 2   And so to me, that sounds like she would pay for those

 3   and then the insurance will be -- the insurance portion

 4   of it all will be done.

 5        Q.   Well, you had health insurance to pay for your

 6   medical bills, didn't you?

 7        A.   I may have, sir.  I believe I did.

 8        Q.   Wouldn't you know all your medical bills have

 9   been paid by the medical insurance company?

10        A.   I don't know that for a fact, sir.

11        Q.   Well, did you think this was the medical

12   insurance company that was paying your medical bills?

13             MR. MARTINEZ:  Object to the form.

14             THE WITNESS:  I'm not sure, sir.

15   BY MR. BURGE:

16        Q.   Did your father ever say anything -- did he

17   ever tell you specifically what, if any,

18   misunderstanding he had about this letter?

19        A.   Mr. Greg, I'm not trying to be disrespectful,

20   but I will repeat again.  In the hospital, I was going

21   through an extremely difficult time.  I was one of the

22   most injured patients they had ever seen.

23             And I was trying to heal myself internally.

24   Mentally, I had problems.  I had short-term memory loss.

25   I was dealing with excruciating pain that I can't even



**Orange Legal**
**800-275-7991**

```
 1   describe in proper words.

 2          So we may have gone over it.  I may have known

 3   they were being paid.  I really can't remember, sir.

 4   All's I remember was pain and suffering.

 5      Q.   Did your dad -- did he ever at any time ask you

 6   to sign a medical authorization form so that the

 7   insurance company could get a copy of your medical

 8   records?

 9      A.   If I was to put myself in my shoes back then,

10   even if my dad did ask me to sign this and I read this

11   letter, I wouldn't have done it because it's confusing,

12   as I said.

13      Q.   Okay.  So even if he had asked you to sign it

14   to get the medical authorization so that the insurance

15   company could get your records, you wouldn't have signed

16   it anyway?

17          MR. MARTINEZ:  Let me have that question read

18      back, please.

19      (Thereupon, the question was read back by the

20   reporter as above recorded.)

21          MR. MARTINEZ:  Objection.  Foundation.  Calls

22      for speculation.

23   BY MR. BURGE:

24      Q.   You can answer it.

25      A.   Sir, if this letter had expressly stated that,
```



 1   hey, we will give you the $3 million that's available in

 2   the coverage, I would have signed it and said yes, thank

 3   you.

 4        Q.   That's not my question.

 5        A.   I'm sorry.

 6        Q.   My question is:  If your dad had asked you to

 7   sign the medical authorization form so that the

 8   insurance company could get the medical records, would

 9   you have signed it or not?

10             MR. MARTINEZ:  Objection.  Foundation.  Calls

11        for speculation.

12   BY MR. BURGE:

13        Q.   You can answer the question.

14        A.   I don't believe I would have because, as I

15   said, this is a confusing letter.

16        Q.   You just don't understand that letter?

17        A.   Well, sir, I don't understand what she's saying

18   the -- bringing the insurance portion of the matter to

19   conclusion means.

20        Q.   Did your dad, did he ever tell you that he

21   didn't understood what that meant?

22        A.   As I said, I believe he expressed some

23   confusion.

24        Q.   Okay.  Let's take a look at Exhibit Number 5.

25   This was Number 5 to the deposition of Roger Cawthorn.



1     A.   Mr. Greg, after we finish with this one, do you

2   mind if I use the restroom after this?

3     Q.   **No, I don't mind at all.  You can use it**

4   **whenever you need to.**

5          MR. MARTINEZ:  Do you want to go now?

6          THE WITNESS:  Do you mind if I go now, sir?

7   BY MR. BURGE:

8     Q.   **I don't think it's -- this is going to take us**

9   **but just a second --**

10    A.   Okay.

11    Q.   **-- to ask about this.**

12         **Have you ever seen this document before?**

13    A.   No.

14    Q.   **Is this the first time you've seen it?**

15    A.   Aside from privilege, yes.

16    Q.   **Well, let me make sure -- usually your lawyer**

17  **throws out the privilege.  Let me just make sure I'm**

18  **correct.**

19         **You're saying other than being provided this at**

20  **some point by your lawyer, you've never seen it?**

21    A.   I believe that is correct, sir.

22    Q.   **Okay.**

23    A.   Oh, yeah, it was -- it was -- it was -- when

24  was it dated?  Yeah, it was on the 29th.  I was in -- I

25  was in, yeah, intensive care unit, so there's -- I



 1  wouldn't have been able to look at it if I wanted to.

 2      Q.   Do you recognize the signature at the bottom?

 3      A.   Looks like my father's handwriting.

 4      Q.   Okay.  And David N. Cawthorn, is that your name

 5  or his name?

 6      A.   That's my name, sir, but I -- I never -- I

 7  don't sign my name with David.

 8      Q.   Okay.  And then it's got circled "parent"

 9  there.  Do you see that?

10      A.   Okay.

11      Q.   Do you see where parent is circled?

12      A.   I do, sir.

13      Q.   When you go back to Exhibit Number 4, do you

14  see where the lady from the insurance company mentions

15  this authorization that your father has signed?

16      A.   I do, sir.

17      Q.   And that the hospital would not honor it?

18      A.   I do.

19      Q.   All right.  If you need to take a break, we can

20  take one.

21      A.   Okay.

22           THE VIDEOGRAPHER:  We are off the record at

23      11:43.

24      (Thereupon, a recess was taken in the deposition,

25  after which the deposition continued as follows:)



```
 1            THE VIDEOGRAPHER:  We are on the record at

 2      11:48 a.m.

 3            Please proceed.

 4            MR. MARTINEZ:  Lunch is going to be brought in

 5      at 1 o'clock.  Unfortunately, later than I thought.

 6            MR. BURGE:  It's all right.

 7  BY MR. BURGE:

 8      Q.   Again, so the record is clear, Madison, at no

 9  point in and around May the 27th did your dad ask you to

10  execute any medical authorization for him from the

11  insurance company?

12      A.   Not that I remember, sir.

13      Q.   All right.

14            All right.  Let me show you what we're going to

15  mark as -- we're not going to mark it because it's

16  already marked Exhibit Number 6 to your father's

17  deposition.  You could read that to yourself.

18      A.   Yes, sir.

19      Q.   Have you seen that exhibit before?

20      A.   No, sir.

21      Q.   Do you see on there the fact that that e-mail

22  is from Pamela McLain, and it's to an e-mail address.

23  Do you see the e-mail address it's sent to?

24      A.   I do, sir.

25      Q.   You recognize that address?
```



 1     A.   I do.

 2     Q.   Whose address is that?

 3     A.   My father's.

 4     Q.   And the date is June the 11th, 2014?

 5     A.   Yes, sir.

 6     Q.   Is this the first time you've read that e-mail?

 7     A.   I believe so.

 8     Q.   It says:  It was a pleasure speaking with you

 9   this morning regarding your son's accident.  Attached is

10   the letter we discussed with the medical authorization

11   included.

12          Upon receipt of the signed release, I will

13   obtain the records from the hospital so that we can

14   bring this matter to a conclusion.  As I said, please

15   call me with any questions.  My cell phone number is --

16   and the cell phone number is there.

17          Do you see that?

18     A.   I do, sir.

19     Q.   On June the 11th of 2014, did your father show

20   you this e-mail?

21     A.   I believe he may have discussed it with me.  I

22   don't know if I saw it.

23     Q.   Well, if you just read it for the first time,

24   as you told me a minute ago, how would you have seen it

25   back then?



**Orange Legal**
**800-275-7991**

```
 1      A.    That's a fair point.

 2      Q.    So did he show it to you or not?

 3      A.    I don't believe so, sir.

 4      Q.    Okay.  Do you know if he had any discussion

 5   with you about the telephone call that is referenced in

 6   this e-mail that Ms. McLain had with your father on June

 7   the 11th?

 8      A.    He did, sir.

 9      Q.    And did he speak with you on June the 11th

10   about that call?

11      A.    Yes, sir.

12      Q.    Okay.  What did he tell you on June the 11th

13   about the call?

14      A.    I believe the main point that we touched upon

15   was that she said don't get a lawyer.  And then that's

16   -- again, she was pretty evasive with her answers.

17      Q.    Tell me as best you can remember what your

18   father said to you, everything you remember he said

19   about the conversation.

20      A.    I believe they talked about the limit of how

21   much money there was available in the policy.  And then

22   that -- they had a conversation about signing -- sending

23   the medical releases so that we can bring the matter to

24   a conclusion, and not to hire a lawyer because then that

25   lawyer will take a chunk of the money.
```



1    Q.   Did the -- did your father tell you that at

2    that time that he already knew what the limits of the

3    insurance policy was?

4    A.   I believe we did know.

5    Q.   Had he already told you that?

6    A.   I believe so, sir.

7    Q.   When did he tell you that?

8    A.   I don't remember.

9    Q.   Okay.  Do you know if it was a week before?

10   A.   It was --

11   Q.   Was it while you were at Shepherd?  While it

12   was at Halifax?

13   A.   Before June 11th.

14   Q.   But you don't know how -- how much before?

15   A.   It would have been after Halifax, I believe.

16   Q.   Tell me how that -- how that issue came up.

17   A.   My father and I had a lot of discussions.  I --

18   we may have talked about the medical bills that were

19   rung up.  He may have said, talk with the insurance.

20   I'm not sure.

21   Q.   Well, you told me about the medical bills.

22   There's been a lot of discussion about that.  Was there

23   ever any -- any question that your health insurance

24   coverage was going to cover the medical bills?

25   A.   I believe our health insurance covers through



1  USAA.  And I believe that they were saying they weren't

2  going to pay the bills.

3      Q.   It's your belief that your health insurance was

4  with USAA?

5      A.   It is, sir.

6      Q.   Who told you that?

7      A.   Um, that's the insurance card I carry

8  around."

9      Q.   For health insurance?

10     A.   Yes, sir.

11     Q.   You're pretty sure about that?

12     A.   I'm positive.

13     Q.   Have you got that card with you today?

14     A.   I may.  I'm not sure, sir.

15     Q.   Could you look and see if you got the USAA

16 healthcare card?  I'd like to see it.

17     A.   I could.

18     Q.   Thank you.

19     A.   Ah.  UnitedHealthcare.

20     Q.   So it's not USAA, is it?

21     A.   It's not, sir.

22     Q.   Okay.  Was there ever any question you know of

23 that UnitedHealthcare was not going to pay any and all

24 of the medical bills that were incurred by you?

25     A.   I believe they were not going to pay it.



**Orange Legal**
**800-275-7991**

 1      Q.   They were not?  Who told you they weren't going

 2   to pay it?

 3      A.   I would suspect my father would have said that.

 4      Q.   Okay.  Well, do you know that they have,

 5   indeed, paid it?

 6      A.   I don't.  I know my medical bills have been

 7   paid.

 8      Q.   Did you know they were paid by that very health

 9   insurance carrier that you just showed us?

10      A.   I did not.

11      Q.   Okay.  Do you know why your dad would have told

12   you that they weren't going to pay the medical bills?

13           MR. MARTINEZ:  Objection.  Foundation.

14           THE WITNESS:  I don't, sir.

15   BY MR. BURGE:

16      Q.   But you hadn't learned since that conversation

17   that they, in fact, did pay them and there was never any

18   question that they were going to pay them?

19           MR. MARTINEZ:  Objection.

20           THE WITNESS:  I'm not sure about it, sir.

21   BY MR. BURGE:

22      Q.   You're not sure that you've learned that or

23   what are you unsure about?

24      A.   I'm not sure about when I understood they

25   weren't going to pay them.  I'm not sure about when I



 1    thought if I knew they were going to pay them.  I know

 2    they've been paid.

 3        Q.    Okay.  And you know that that's the group that

 4    paid them?

 5        A.    Well, I don't, sir.  I know I had to pay a

 6    lien.

 7        Q.    You mean, at the time you did your settlement?

 8        A.    Yes, sir.

 9        Q.    All right.  Let's take a look at Number 7,

10    previously marked Number 7 at the deposition of Roger

11    Cawthorn.

12            Have you had a chance to read it?

13        A.    I have, sir.

14        Q.    Okay.  And have you seen that e-mail before?

15        A.    Aside from with my lawyers, I don't believe so.

16        Q.    Okay.  Other than being outside of that

17    provided by the lawyers, you hadn't seen this before; is

18    that true?

19        A.    Yes, sir.

20        Q.    Do you recognize this as an e-mail between

21    Pamela McLain and your father on June the 11th of 2014?

22        A.    I do, sir.  The -- the e-mails were discussed

23    with me.

24        Q.    With your dad?

25        A.    Yes, sir.



1      Q.   Okay.  But he didn't show it to you?

2      A.   I don't believe I looked at it, sir.

3      Q.   Okay.  Let's look down here and see what this

4   says.

5           Your dad starts off the conversation at the

6   bottom at 11:58 and says:  I see that this letter states

7   we will be able to bring the insurance portion of this

8   matter to a conclusion.  Not sure what is meant by that.

9   My son will have bills --

10          MR. MARTINEZ:  Excuse me, Mr. Burge.  Could

11      you -- I apologize.  Can you read it again?  He was

12      going through a lot of pain.

13          THE WITNESS:  One moment.

14   BY MR. BURGE:

15      Q.   Do you need to take a break?

16      A.   No.

17      Q.   Just let me know when you're ready.

18      A.   It's all right, sir.  I'm ready now.

19      Q.   It says:  I see that this letter states we will

20   be able to bring the insurance portion of this matter to

21   a conclusion.  I'm not sure what is meant by that.  My

22   son will have bills from other places, doctors,

23   surgeons, therapists, others from Florida and here in

24   Georgia, also for his long-term care for years to come.

25   So I would think there will be a lot more bills to be



 1   paid.  Again, the conclusion part of what?  Thank you.

 2          Have I read that accurately?

 3      A.   Yes, sir.

 4      Q.   Then it says -- do you see her response at

 5   12:59?  She says:  The payment that we make would be in

 6   a lump sum for a release of our insured.  It would be

 7   for you to disperse.  Payment will be made to your son

 8   for use at his discretion.

 9          Have I read that accurately?

10      A.   You have, sir.

11      Q.   Okay.  Can you understand what that's saying

12   there?

13      A.   I do.

14      Q.   The -- up at the top, your father responds:

15   How much would the check be for?

16          And she responds:  There is 3 million in

17   coverage.

18          Have I read that correctly?

19      A.   You have, sir.

20      Q.   Okay.  And did you -- you said even though you

21   didn't see it, that you had a discussion with your

22   father about these e-mails?

23      A.   Yes, sir.

24      Q.   Okay.  What did he tell you about these

25   e-mails?



 1     A.   That she --

 2     Q.   **And I want to make sure we are clear.  I've**

 3  **asked you already about the phone conversation.  But now**

 4  **I'm asking you about what your dad said about these**

 5  **e-mails that he didn't show you.**

 6     A.   If you recall correctly, sir, I believe he --

 7  he told me -- basically read to me these e-mails but

 8  then we both harped upon the fact that she said there's

 9  $3 million in coverage, not how much the check would be

10  for.

11     Q.   **Well, how much were you expecting the check to**

12  **be for?**

13     A.   Well, I would hope it would be for $3 million.

14     Q.   **Well, I mean, you knew that's what the amount**

15  **of the coverage was.  You already knew that; right?**

16          MR. MARTINEZ:  Object to the form.

17          THE WITNESS:  I believe I knew that, yes, sir.

18  BY MR. BURGE:

19     Q.   **Okay.  So when your dad asked -- you know how**

20  **much the coverage is, $3 million.  Your dad asked the**

21  **question how much will the check be for, and she says**

22  **there's 3 million in coverage.  You didn't understood --**

23  **stand what that meant?**

24          MR. MARTINEZ:  Objection.  Asked and answered.

25          THE WITNESS:  Like I said, sir, I believe -- I



**Orange Legal**
**800-275-7991**

1     understand that as an evasive answer saying that --

2     she's not saying how much the check is for.  She's

3     simply saying there's $3 million in coverage.

4   BY MR. BURGE:

5     **Q.   Did you suggest to your dad, dad, we might want**

6   **to call her back and see if she's going to send me a**

7   **check?  She says it'll be a check made out for my use,**

8   **see if she's going to send us a check for $3 million?**

9           MR. MARTINEZ:  Object to the form.

10  BY MR. BURGE:

11    **Q.   Did you suggest that to your father?**

12    A.   I don't remember the exact conversation we had,

13  but I know I would have wanted some clarification on the

14  matter.

15    **Q.   Did -- did you suggest to your dad that perhaps**

16  **y'all -- to ask her, Ms. McLain, are you saying in your**

17  **e-mail you're going to send me a check for my use?  Are**

18  **you going to send me a check for $3 million?**

19          MR. MARTINEZ:  Object to the form of the

20          question.

21  BY MR. BURGE:

22    **Q.   Did you suggest that to your dad?**

23    A.   I don't remember if I expressly said you should

24  call her.  I just know I would have wanted some

25  clarification.



**Orange Legal
800-275-7991**

 1      Q.   Well, if you would have requested your dad to

 2   call her, you would have expected him to call her,

 3   wouldn't you?

 4      A.   Absolutely.

 5           MR. MARTINEZ:  Object to the form.

 6           Let me -- give me time to make some objections.

 7   BY MR. BURGE:

 8      Q.   Because it was your -- it was your claim;

 9   right?

10           MR. MARTINEZ:  Object to the form of the

11      question.

12           THE WITNESS:  Yes, sir.

13   BY MR. BURGE:

14      Q.   I mean, you were the one that was hurt; right?

15      A.   Yes, sir.

16      Q.   You were the one that had the authority to

17   settle the case or not; right?

18      A.   Yes, sir.

19      Q.   So if you had told your dad to clarify that

20   question, you would have expected him to call and

21   clarify it --

22           MR. MARTINEZ:  Objection.  Calls for

23      speculation.

24   BY MR. BURGE:

25      Q.   -- right?



**Orange Legal**
**800-275-7991**

1      A.   It's a speculative question, but yes.

2      Q.   I mean, you depend on your dad to do things for

3  you, don't you?

4      A.   I do.

5      Q.   And you would have thought that he would have

6  followed through if you had told him that, wouldn't you?

7      A.   Yes, sir.

8      Q.   Did he say anything to you like, no, I don't

9  think I'm going to call her back, maybe we shouldn't

10  call her back?  Did he ever say anything like that to

11  you?

12         MR. MARTINEZ:  Object to the form of the

13      question.

14         THE WITNESS:  I -- I don't have any

15      recollection of that, sir.

16         THE VIDEOGRAPHER:  Excuse me.  We have ten

17      minutes till the end of the tape.

18         MR. BURGE:  All right.

19  BY MR. BURGE:

20      Q.   Is there anything else your dad said to you

21  about this e-mail, that you recall?

22      A.   Not that I recall, sir.

23      Q.   On the 11th?

24      A.   Not that I recall.

25      Q.   Did your dad -- did he ever say anything to you



 1    like he thought that this e-mail was from the health

 2    insurance company?

 3        A.   I don't know about that, sir.

 4        Q.   Did you understand that he was talking about

 5    Mr. Ledford's insurance company?

 6        A.   I did, sir.

 7        Q.   And was there any question in your mind that

 8    your father knew that he was talking to Mr. Ledford's

 9    insurance company?

10        A.   No, sir.

11             To clarify, can you repeat your question one

12    more time.

13        Q.   Yeah.  You understood that the conversation

14    that you and your father were having about these e-mails

15    had to do with the insurance company of the Ledfords?

16        A.   Yes, sir.  I understood that.

17        Q.   And you understood that all the insurance that

18    the Ledfords had was $3 million under the policy?

19        A.   I did, sir.

20        Q.   And -- because you had been told by your father

21    of the $3 million policy limits prior to June the 11th?

22        A.   Yes, sir.

23        Q.   Okay.  And again, at no time did your father

24    ask you to execute a medical release so that Auto-Owners

25    could get the medical records; right?



```
 1              MR. MARTINEZ:  Objection.  Compound.  Asked and

 2      answered.

 3              THE WITNESS:  I don't remember, sir.

 4  BY MR. BURGE:

 5      Q.   You don't remember whether he asked you to sign

 6  a medical release?

 7              MR. MARTINEZ:  Same objection.

 8              THE WITNESS:  I don't remember, sir.

 9  BY MR. BURGE:

10      Q.   Have you ever -- have you ever seen a medical

11  release that you signed?

12      A.   I have seen many medical releases in my time,

13  sir.

14      Q.   Have you ever seen one that you signed for

15  Auto-Owners to get your medical records?

16      A.   I don't remember, sir.

17      Q.   Did you at any time ever request that

18  Auto-Owners pay you the $3 million in policy limits?

19      A.   I don't recall, sir.

20      Q.   You don't recall whether you did or not?

21      A.   Correct.

22      Q.   Well, have you ever seen -- have you seen

23  anything that indicates that you asked them to pay the

24  $3 million?

25      A.   I don't think I ever had any direct
```



 1   conversations with them.

 2       Q.   Well, I think that answers it then.  You never

 3   had any direct conversations with them; right?

 4            MR. MARTINEZ:  Objection.  Asked and answered.

 5       I'm sorry, do you --

 6   BY MR. BURGE:

 7       Q.   Yeah, the question is:  You never -- you never

 8   had any direct conversation with anybody from

 9   Auto-Owners?

10       A.   Yes, sir.  I mean, no one even came to see me.

11       Q.   And as far as you know, your dad never made any

12   demand on Auto-Owners to pay the $3 million, did he?

13       A.   I believe my dad was asking how much would they

14   pay.

15       Q.   So, you mean, you think he was negotiating with

16   them?

17       A.   Negotiating?  I don't know about that.  I don't

18   think he was negotiating.

19       Q.   Well, did he ask them how much -- how much --

20   he asked them how much the check would be; right?

21       A.   Correct.

22       Q.   So did your dad ever say --

23            THE VIDEOGRAPHER:  Mr. Burge?

24   BY MR. BURGE:

25       Q.   -- Auto-Owners, please give me a check for



  1  $3 million, that you know of?

  2      A.   Not that I know of, sir.

  3           MR. BURGE:  Okay.  We can change it.

  4           THE VIDEOGRAPHER:  We are off the record at

  5      12:05 p.m.

  6      (Thereupon, a recess was taken in the deposition,

  7  after which the deposition continued as follows:)

  8           THE VIDEOGRAPHER:  We are on the record at

  9      12:15 p.m.

 10           Please proceed.

 11  BY MR. BURGE:

 12      Q.   All right, Madison, let's take a look at

 13  Exhibit Number 8 previously marked at the deposition of

 14  Roger Cawthorn.  Have you had a chance to read that

 15  e-mail?

 16      A.   Yes, sir.

 17      Q.   Have you seen that e-mail before?

 18      A.   I have not.

 19      Q.   Do you recognize that as being from Ms. McLain

 20  to father?

 21      A.   I do, sir.

 22      Q.   Dated June the 30th of 2014?

 23      A.   Yes, sir.

 24      Q.   It says:  Just wanted to send you a quick note

 25  regarding the medical authorization that I sent to you.



1    As soon as I receive that, I'll be able to get the

2    medical records from Halifax Medical Center.  Hope your

3    son is doing well and continues to improve.

4              Have I read that accurately?

5         A.   You have, sir.

6         Q.   Did your father show you this e-mail when it

7    came in?

8         A.   He may have, sir.  I don't remember.

9         Q.   Did you have any discussion with him about this

10   e-mail?

11        A.   It was sent on June 30th.  If we had received

12   it, I would have sent it on to my lawyers.

13        Q.   My question is:  Did you have any discussion

14   with your father about it?

15        A.   I don't recall, sir.

16        Q.   But in any event, you would have sent it on to

17   your lawyers on the 30th?

18        A.   Yes -- yes, sir.

19        Q.   And do you think you did that?

20        A.   I do.

21        Q.   Okay.  Now, at some point in time, you met with

22   Mr. Kalbac in Atlanta at Shepherd's?

23        A.   Yes, sir.

24        Q.   And do you -- can you tell me when that was,

25   please.



```
 1      A.   I'd say approximately June 15th to the 20th.

 2      Q.   You're saying somewhere in that five-day range?

 3      A.   I believe so, sir.

 4      Q.   And where at Shepherd's did y'all meet?

 5      A.   I believe Room 409.

 6      Q.   Was that some sort of a conference room?

 7      A.   No, sir.  It was my -- my staying room.

 8      Q.   And at the time you met with Mr. Kalbac, who

 9   was in that meeting with you?

10      A.   I believe my mother and father were.

11      Q.   Anyone else?

12      A.   No, sir.

13      Q.   And the previous e-mails that are marked as

14   previous exhibits number 5, 6 -- or I guess 6, 7, was

15   that evidence provided to Mr. Kalbac?

16           MR. MARTINEZ:  Let me instruct you not to

17      answer any questions that deal with whatever

18      exchanges were had with your lawyer, either orally

19      or by virtue of any other gesture that indicates

20      some sort of a -- communications to Mr. Kalbac.

21           THE WITNESS:  Yes, sir.

22           MR. BURGE:  Bob, I don't think that's

23      privileged, if that's what you're raising.  I mean,

24      this is evidence in the case that they had before.

25      The fact of whether he provided it to his lawyers I
```



 1    don't think is privileged.

 2        MR. MARTINEZ:  If it was something that

 3    occurred at that meeting, we're going to take the

 4    position that whatever occurred at that meeting is

 5    privileged.

 6        MR. BURGE:  Okay.  Whether or not evidence that

 7    they had independent of meeting with the lawyer and

 8    whether that important evidence was given to their

 9    lawyer, you're saying that's privileged?

10        MR. MARTINEZ:  With regards to evidence

11    provided to the lawyers, yes, sir.

12        MR. BURGE:  Okay.

13        MR. MARTINEZ:  We're going to take the

14    position --

15        MR. BURGE:  Even though it's evidence in this

16    case now and it was in existence before they had a

17    lawyer?

18        MR. MARTINEZ:  Well, you can ask those

19    questions.  But with regards to what happened

20    between the Cawthorns and the lawyers, whatever is

21    exchanged in terms of communications orally or

22    evidence provided, yes, sir, we're taking the

23    position that's privileged.

24        MR. BURGE:  Anything else you want to say about

25    your privilege on the record before we move on?



**Orange Legal**
**800-275-7991**

 1          MR. MARTINEZ:  Let me confer with my

 2    co-counsel.

 3          MR. BURGE:  And then I --

 4          MR. MARTINEZ:  I don't want to represent --

 5          MR. BURGE:  Go ahead.

 6          MR. MARTINEZ:  Yep, that's it.

 7          MR. BURGE:  Okay.  And you're instructing him

 8    not to answer that question?

 9          MR. MARTINEZ:  Yes.

10          MR. BONNER:  Oh, there is one other thing.

11    There is a protective order in place covering these

12    exact communications.

13          MR. MARTINEZ:  But yes, to answer your

14    question, Mr. Burge --

15          MR. BURGE:  This is the communication --

16          MR. MARTINEZ:  Yes.  Our position is with

17    regards to things that occurred with Mr. Kalbac,

18    either in the form of oral communication or records,

19    evidence provided to his lawyer, yes, sir, we're

20    going to be instructing him not to -- not to answer

21    those questions.

22          MR. BURGE:  Okay.  We'll honor the privilege

23    and we'll take it up with the Court.

24          MR. MARTINEZ:  Thank you, sir.

25

 1  BY MR. BURGE:

 2      Q.   Did you -- did you employ Mr. Kalbac some time

 3  between June the 15th and 20th?

 4      A.   I did, sir.

 5      Q.   And did you sign a contract with him?

 6      A.   I don't know if we signed a contract right at

 7  that meeting.

 8      Q.   At some point, did you sign a contract with

 9  Mr. Kalbac?

10      A.   Yes, sir.

11      Q.   Did you review the contract?

12      A.   I did.

13      Q.   Did you ask anyone else to review it on your

14  behalf?

15      A.   My father, of course.

16      Q.   And did he review it?

17      A.   He did, sir.

18      Q.   Did he have any problem understanding it?

19      A.   No, sir.

20      Q.   Did you have any problem understanding it?

21      A.   I did not.

22      Q.   It was clear, you understood the terms and

23  everything about it?

24      A.   I did, sir.

25      Q.   Okay.  Was it a standard State of Florida



 1   contingency fee contract?

 2       A.   I'm not 100 percent sure, sir.

 3       Q.   **Well, was it a contingency fee contract?**

 4       A.   I don't know, sir.

 5       Q.   **Do you know what contingency fee means?**

 6       A.   I believe that -- would you mind explaining it

 7   to me?

 8       Q.   **Well, I -- I think you signed one and I think**

 9   **it would have said in the contract what it was.  Do you**

10   **remember what it said about it?**

11       A.   Probably that if they win the case, I'd have to

12   give them --

13            MR. MARTINEZ:  Wait.  Let me -- one second.

14       Let me instruct you not to answer that.  Again,

15       those deal with communications with counsel, and I

16       don't see the relevance of that to this case.

17            MR. BURGE:  Well, I'm asking what the contract

18       said, Bob.  Not what the client said.

19            MR. MARTINEZ:  Right.  And I think that the

20       contract is something that's between his lawyer and

21       him.  That's an attorney-client matter, so -- also

22       --

23            MR. BURGE:  Again, is there anything else you

24       want to put on there?  Because I think the -- the

25       contract of the lawyer in this case is directly at



**Orange Legal**
**800-275-7991**

```
1     issue.  And his lawyer is going to be a witness, has

2     got a financial interest in this case as well as the

3     other case.

4          And we know that there's a statutory

5     contingency fee contract in the State of -- I mean

6     in the State of Florida that is statutorily

7     mandated.

8          My question to him at this point is really only

9     what is his understanding of the contingency fee

10    contract.

11         MR. MARTINEZ:  Generally speaking?  As a

12    general proposition, I think he said he didn't know.

13    But we will -- so that it's clear, with regards to

14    the arrangement that he has with our law firm or

15    whatever he signed with Mr. Kalbac, we're taking the

16    position that's privileged, Greg.

17         MR. BURGE:  Anything you want to -- else you

18    want to say to preserve that privilege?

19         MR. MARTINEZ:  You know, we believe it's

20    privileged and also we don't see the relevance.  But

21    I understand your position, sir.

22         MR. BURGE:  Okay.

23 BY MR. BURGE:

24    Q.   Do you know what a contingency fee contract is?

25    A.   I have a guess, sir.
```



1     Q.   Okay.  What is it?

2     A.   I would believe that a contingency fee means

3   that if something happens, they get a fee.

4     **Q.   All right.  Were there some client rights that**

5   **you were provided with your contract?**

6     A.   Again, sir, I was going through a really hard

7   time in my life at that point.  I don't have a clear

8   recollection of everything at the time -- that time.

9     **Q.   So you just don't know whether or not you were**

10  **provided any client rights that have to be provided to**

11  **you under Florida law in association with a contingency**

12  **fee contract?**

13    A.   I would --

14         MR. MARTINEZ:  Let me just -- obviously, that

15         question assumes facts -- assumes -- lacks the

16         foundation.  I know you're trying to get into it in

17         the backdoor.  So I don't see the relevance of this.

18              It's the same objection that we had before.

19         Whatever documents were exchanged between

20         Mr. Cawthorn and our law firm, we are going to take

21         the position that's privileged.

22         MR. BURGE:  I'm not asking him what was

23         exchanged.  He's already said he signed a contract,

24         read it, and --

25         MR. MARTINEZ:  Right.



```
 1              MR. BURGE:  I'm asking if there's anything else

 2       that was with it.

 3              MR. MARTINEZ:  Right.  So I think we are going

 4       to be instructing -- we will be instructing him the

 5       same way.

 6              MR. BURGE:  Okay.  We'll take it up with the

 7       Court.

 8  BY MR. BURGE:

 9       Q.   But needless to say, you didn't have any

10  misunderstanding or inability to read and understand

11  whatever it was that you signed?

12       A.   I understood, sir.

13       Q.   Okay.  Now, did you see and review the lawsuit

14  that was filed against Bradley Ledford and his father

15  before it was filed?

16              MR. MARTINEZ:  You're talking about the

17       complaint?

18              MR. BURGE:  Yeah.

19              MR. MARTINEZ:  Hold on a second.

20              Can I have that question read back?

21       (Thereupon, the question was read back by the

22  reporter as above recorded.)

23              MR. MARTINEZ:  Objection to the form of the

24       question.  I think it misstates the evidence, sir.

25       You may want to rephrase that.
```

 1  BY MR. BURGE:

 2      Q.   Did you read the complaint that got filed in

 3  court against Bradley Ledford and his father's company

 4  before it was filed?

 5      A.   I believe I did, sir.

 6      Q.   Okay.  And you, therefore, authorized the

 7  filing of that lawsuit?

 8      A.   Yes, sir.

 9      Q.   Now, did you have any discussions at any time

10  with -- that you were a part of that someone on the

11  Ledford side of it, specifically John Holcomb or Mick

12  Callahan were a part of?

13           MR. MARTINEZ:  Do you understand the question,

14      sir?

15           Ma'am, let me have it read back.  I'm not sure

16      I understand the question.

17      (Thereupon, the question was read back by the

18  reporter as above recorded.)

19  BY MR. BURGE:

20      Q.   You can answer the question.

21      A.   I cannot?

22      Q.   You can.

23           MR. MARTINEZ:  It's excluding mediation.

24           MR. BURGE:  Yeah, it's excluding --

25           THE WITNESS:  Excluding -- not within



**Orange Legal**
**800-275-7991**

1      mediation?

2  BY MR. BURGE:

3      **Q.   Right.**

4      A.   I believe I had a conversation with the --

5  Mr. John about his shoes.

6      **Q.   Okay.**

7      A.   And I think -- I did shake Mr. Mick's hand.

8  Aside from that, I was not involved with any

9  conversation.

10      **Q.   What was your understanding of what John**

11  **Holcomb's role was in this case?**

12      A.   I believe he was there to defend de Moya or

13  the --

14      **Q.   And what was your understanding about Mick**

15  **Callahan's role?**

16      A.   He was there to defend Bradley Ledford.

17      **Q.   And what about Mike Lower?  What did you**

18  **understand his role was?**

19      A.   I believe his role was there to preserve the

20  interests of both the insurance company and -- he was

21  there on the behalf of the insurance company to defend

22  Mr. Ledford.

23      **Q.   And what about Jamie Moses?  What was her role,**

24  **to your knowledge?**

25      A.   I thought she was second in command.



1        Q.    Thought she was what?

2        A.    She was his second, his assistant there to

3   help.

4        Q.    You thought Jamie Moses was Michael Lower's

5   assistant?

6        A.    I knew she was a lawyer, but I thought they

7   worked together.

8        Q.    Did you think they represented the same client?

9        A.    I believe so, sir.

10       Q.    The -- going back to the 11th of June 2014,

11  it's my understanding that at least from your father's

12  testimony that that was the last day that you were

13  willing to accept the $3 million from Bradley Ledford

14  and his father that was being paid under their insurance

15  policy.  Is that accurate?

16            MR. MARTINEZ:  Object to the form.

17            THE WITNESS:  That is correct, sir.  I -- after

18       that day, I lost trust with the insurance company.

19  BY MR. BURGE:

20       Q.    Why wouldn't you have accepted it on June

21  the 12th?

22       A.    My father had a phone conversation with

23  Ms. Pamela McLain, I believe, and in that conversation

24  she was very evasive again about what -- what she was

25  willing to pay versus what the coverage was and what it



1  meant to bring things to a conclusion.

2          I think the thing that really perked our ears

3  up was that she said don't get a lawyer.  And that just

4  made us a little afraid and cautious of them.

5          I'm a firm believer in the Bible, also Sun

6  Tzu's "The Art of War."  Both of those always say to get

7  a lot of counsel before you move forward.  And so I felt

8  the best choice would be to get a lot of counsel, even

9  if it would cost money.

10      Q.   The Bible and what else did you say?

11      A.   Sun Tzu's "The Art of War."

12      Q.   I still didn't -- say it again.  I still did

13  not -- I can't quite understand what you're saying.

14      A.   It's a book by Sun Tzu.

15      Q.   Sun Tzu?  And who is Sun Tzu?

16      A.   He's an ancient writer from China, I believe.

17      Q.   And what does he say that has to do with you

18  not accepting the $3 million on June the 12th?

19      A.   I believe --

20          MR. MARTINEZ:  Object -- objection.  Object to

21      the form of the question.

22          THE WITNESS:  I believe he's talking about the

23      full -- wisdom from counselors.

24  BY MR. BURGE:

25      Q.   Okay.  So what does that -- what does that have



 1  to do with what we're talking about, in your mind?

 2      A.   It means --

 3           MR. MARTINEZ:  Object to the form of the

 4      question.

 5           THE WITNESS:  It means I wanted more

 6      counselor -- counsel before I move forward with the

 7      insurance company.

 8  BY MR. BURGE:

 9      Q.   Okay.  And then you saw counsel.  You hired

10  Mr. Kalbac?

11      A.   Yes.

12      Q.   Right?  You sought his counsel?

13      A.   Yes.

14      Q.   Okay.  So did the -- did -- between the time of

15  June the 11th when -- which was the last day that you

16  had -- would have accepted the $3 million, was there any

17  change in your financial circumstances between June

18  the 11th and, let's say, June the 15th?

19      A.   Yes, sir.  There definitely was.

20      Q.   What was that?

21      A.   Every single day that I didn't walk, somehow

22  miraculously get up out of my bed, the percentage of the

23  chance that I was going to walk ever continued to

24  decline and go down, down, down.

25           And because of that, my financial situation



 1  continued to get worse as it was -- I was more -- going

 2  to obviously have more medical bills to pay, more

 3  medical expenses, probably going to need in-home care.

 4  Just things that I was going to need in my life because

 5  of my newfound disability.

 6          Every single day that passed, I mean, if it was

 7  from June 11th to June 15th as you were saying, every

 8  single day that passed I started having to be like,

 9  well, I'm going to have to look at all of my options on

10  the table.

11      Q.   Yeah.  So really, you were convinced that

12  $3 million wasn't enough money your injuries?

13          MR. MARTINEZ:  Object to the form of the

14      question.

15  BY MR. BURGE:

16      Q.   Right?

17      A.   You know, it's --

18          MR. MARTINEZ:  Lack of -- lack of time frame

19      also.

20  BY MR. BURGE:

21      Q.   You can answer.

22      A.   The thing is, I -- I wanted the $3 million

23  because I thought it would take a lot of pressure off my

24  family and both me so I could focus on my recovery.

25          I was willing to accept that from the insurance



 1   company until -- I would say, up till June 11th.  But

 2   then after hearing this conversation where she was

 3   warning us not to get counselors and not to seek

 4   counsel, that -- that really scared me and made me think

 5   that, daggone, I might -- I might need to get some

 6   wisdom on this fact.

 7        And so I sought counsel.  And then after that,

 8   I lost trust with the insurance company.  So I wasn't --

 9   didn't want to make a move until I had counsel.

10        Q.   Well, why didn't you -- why didn't you take it

11   after you got counsel?

12        A.   Because I was deferring to my counsel.  I don't

13   believe it was offered.

14        Q.   Why didn't you take it -- you don't think it

15   was offered?

16        A.   I don't believe it was offered.

17        Q.   You don't -- you don't have any knowledge about

18   the check for $3 million being sent to your lawyer?

19        A.   When?

20        Q.   After you hired them in August.

21        A.   In August, the one sent on August 6th?

22        Q.   Yeah, August -- the one that came in August?

23        A.   I have knowledge of that, yes, sir.

24        Q.   Okay.  Why didn't you take the 3 million then?

25        A.   Because it was -- I was in litigation.  It was



1   in the hands of my lawyers and I was relying on their

2   counsel.

3        Q.   Okay.  So you just relied on your lawyer's

4   advice?

5        A.   Not totally.  I thought about it myself also.

6        Q.   Well, why didn't you take it in July?

7        A.   I don't -- sir, I may have taken it in July, I

8   may not have.  It wasn't offered in July.

9        Q.   Well, why didn't you take it in -- why wouldn't

10  you have taken it on June the 15th?

11       A.   May have taken it June 15th, may not have taken

12  it, but I don't believe it was offered.

13       Q.   So you didn't take it in August, just because

14  you were relying on your lawyer's advice?

15            MR. MARTINEZ:  Objection.  Asked and answered.

16  BY MR. BURGE:

17       Q.   Is that right?

18       A.   Yes, sir.

19       Q.   Okay.  But what changed?  What changed that

20  made you decide you were going to take it in 2016?

21            MR. MARTINEZ:  I'm sorry.  I'm sorry.  Could I

22       have the question read back, please?

23            MR. BURGE:  I don't think he --

24            MR. MARTINEZ:  I just want to make sure he

25       understands.



 1          MR. BURGE:  Bob, he didn't say he didn't

 2      understood.

 3          MR. MARTINEZ:  I didn't understand it.

 4          Please read back.

 5          MR. BURGE:  This is --

 6      (Thereupon, the question was read back by the

 7  reporter as above recorded.)

 8          MR. BURGE:  Were going to take it.  That's what

 9      the question is.

10  BY MR. BURGE:

11      **Q.   What changed so that you decided you would take**

12  **it in 2016, two years later?**

13      A.   Well, sir, the situation on the ground

14  continued to evolve and change.  And as I got closer to

15  the point, I realized I was -- I think I needed to take

16  it and move into mediation, I believe.  We had a

17  settlement agreement and we had a settlement.

18      **Q.   So what -- the same $3 million on behalf of the**

19  **Ledfords.  So what changed between that two-year period**

20  **that made you decide you didn't want it back in '14, but**

21  **you decided you would take it in '16?**

22          MR. MARTINEZ:  Objection.  Misstates the

23      record.

24  BY MR. BURGE:

25      **Q.   You can answer.**



```
 1          MR. MARTINEZ:  Lack of foundation.

 2          THE WITNESS:  Sir, as I understand, the deal

 3      was different.  There was more players in the game

 4      at that point and we had started to sort out through

 5      all of our options.

 6          As I said, as my health continued to -- I

 7      realized I wasn't going to just miraculously heal

 8      myself.  I realized that I need to search all of the

 9      -- everything that was on the table.  So, I guess,

10      in 2016, all of a sudden the tables were turned and

11      I realized that I was going to take that offer.

12  BY MR. BURGE:

13      Q.   And, of course, that included funds from

14  parties other than the Ledfords?

15          MR. MARTINEZ:  Objection to the form of the

16      question.

17  BY MR. BURGE:

18      Q.   Right?

19          THE WITNESS:  Can I answer that?

20          Yes, sir.

21  BY MR. BURGE:

22      Q.   You can answer that.

23          Do you have any indication that Auto-Owners

24  wasn't always willing and able to pay you the $3 million

25  at any time during that two-year period?
```

```
 1            MR. MARTINEZ:  Object to the form of the

 2       question.  Lacks foundation.  Compound.

 3  BY MR. BURGE:

 4       Q.   You can answer.

 5       A.   I believe that you're putting two things

 6  together.  You're saying willing and able.  I believe

 7  they were able.  I don't know if they were willing.

 8       Q.   Has anybody ever told you that Auto-Owners was

 9  unwilling to pay you the $3 million besides your --

10  besides your lawyers?

11            MR. MARTINEZ:  Objection.  Assumes facts not in

12       evidence.

13            THE WITNESS:  Sir, I was -- I never understood

14       from Auto-Owners until I, would say, on August 6th

15       when they actually wrote me out a check that they

16       were willing to offer it.

17  BY MR. BURGE:

18       Q.   Well, my question is:  Did anybody other than

19  your lawyer ever tell you that Auto-Owners was unwilling

20  to pay you the $3 million policy limits?

21       A.   I believe Pamela McLain never specified it, so

22  I think just by not specifying it, she said they weren't

23  willing.

24       Q.   Okay.  When did she say she was -- use those

25  words, Auto-Owners was unwilling to pay you the
```



 1  $3 million?

 2          MR. MARTINEZ:  Objection.  Asked and answered.

 3          THE WITNESS:  She did not use those words, sir.

 4  BY MR. BURGE:

 5      Q.   Okay.  Well, what did she say that makes you

 6  think she was unwilling to pay it?

 7      A.   She never specified the amount that she was

 8  willing to pay.

 9      Q.   Well, you knew there was 3 million in coverage;

10  right?  You knew that?

11      A.   Yes, sir.  I did know.

12      Q.   The question was:  How much will the check be?

13      A.   Yes, sir.

14      Q.   And her answer was there's 3 million in

15  coverage; right?

16      A.   Yes, sir.

17      Q.   Well, you weren't expecting her to write you a

18  check for more than 3 million, were you?

19          MR. MARTINEZ:  Objection.  Asked and answered.

20      Lack of time frame.

21          THE WITNESS:  No, sir.  I was not expecting her

22      to do so.

23  BY MR. BURGE:

24      Q.   Okay.  Well, so you didn't understand that she

25  was saying we will write you a check for $3 million if



 1  you get these medical authorizations for us?

 2          MR. MARTINEZ:  Let me have that read back,

 3     please.

 4          MR. BURGE:  This is getting to be a habit, Bob.

 5     I mean, you're interrupting my deposition here.

 6     (Thereupon, the question was read back by the

 7  reporter as above recorded.)

 8          MR. MARTINEZ:  Objection.  Lack of foundation.

 9     Compound.

10  BY MR. BURGE:

11     Q.   You can answer.

12          MR. MARTINEZ:  Assumes facts not evidence.

13  BY MR. BURGE:

14     Q.   You can answer.

15     A.   No, sir, I did not understand that.

16     Q.   All right.  So after June the 11th and the day

17  passed when you would no longer accept the 3 million --

18  let's take a look at what has been previously marked as

19  Exhibit Number 9 to Roger Cawthorn's deposition.

20          MR. MARTINEZ:  Thank you, sir.

21          THE WITNESS:  Yes, sir.

22  BY MR. BURGE:

23     Q.   Have you ever seen that document before?

24     A.   No, sir.

25     Q.   Never at all?  You've never seen that ever?



 1      A.    Aside from with my counselors.

 2      Q.    Okay.  So besides from your lawyers, this is

 3  the first time you've seen that?

 4      A.    Yes, sir.

 5      Q.    Your father has testified in his deposition

 6  that he never had any conversations with Blake Meadows

 7  about his communication with the insurance company.

 8           I say that to ask you, was it you that

 9  discussed with Blake Meadows any issues dealing with the

10  insurance company?

11      A.    I believe he used my mother as a surrogate and

12  she contacted Ms. Meadows who then contacted her son.

13      Q.    You used your mother as a surrogate -- you mean

14  on your behalf?

15      A.    Yes, sir.

16      Q.    To contact who?

17      A.    The mother of Blake Meadows.

18      Q.    Okay.  Did you ever personally speak with Blake

19  Meadows?

20      A.    I've spoken to him personally several times.

21      Q.    Okay.  I'm talking about this issue, the issue

22  that's involved in this e-mail.

23      A.    Not that I know of, sir.  I was pretty

24  indisposed at the time.

25      Q.    You were indisposed on June the 12th?



  1      A.   I just want to clarify what indisposed -- what

  2  I mean by indisposed.  I was -- I was quite busy.  I was

  3  -- I had a lot of medical problems at the time and I --

  4  I trusted my mom to contact Debbie Meadows, the mother,

  5  and so she did.  I didn't feel like I needed to contact

  6  Blake.  He's a capable young man.

  7      Q.   Well, did -- do you know if your mom spoke

  8  directly with Blake?

  9      A.   I do not believe she did.

 10      Q.   So is it your belief that this information

 11  that's included in this e-mail is information that

 12  Blake's mama told him after speaking with your mama?

 13      A.   I don't know, sir.  The information of my car

 14  accident and the -- what was going on with me was very

 15  well known.

 16      Q.   Well, I understand that.  But this is a pretty

 17  specific e-mail in here.  It's talking about various

 18  items and pretty specific details about the matter.

 19           Are you saying you never spoke with Blake at

 20  all about any of the details that are mentioned in the

 21  e-mail?

 22      A.   At this point?

 23      Q.   Yes.

 24      A.   No, sir.

 25      Q.   Okay.  So is the -- what is your belief as to



 1   how Blake Meadows came into having the knowledge that we

 2   see he has in this e-mail if you think it came from

 3   someone other than his mom?

 4           MR. MARTINEZ:  Objection.  Asked and answered.

 5           THE WITNESS:  Sir, we were in the same groups.

 6       Him and I have very -- very close friends who were

 7       the same people.  And I would be very surprised if I

 8       hadn't been discussed there.

 9           I know that there were prayer groups led in his

10       hometown which I know he attend.  There was also --

11       there was news coverage on the incident.  There

12       was -- it was -- my -- the details of my accident

13       were very well known.

14   BY MR. BURGE:

15       Q.  Well, let's look at what he says.  Let's go to

16   the second paragraph.

17           It says:  I also wanted to ask you for some

18   advice.  A close family friend was involved in a serious

19   car crash that nearly killed him.  He is uncertain if he

20   will ever walk again and, frankly, it's a miracle that

21   he even survived the crash.

22           The family is already starting to run into some

23   issues with the insurance balking on payments and are

24   interested in retaining an attorney to make sure that

25   their son gets the care he needs.



 1            Now, this issue he's talking about, insurance

 2    balking on payments, I mean, that -- was that something

 3    that was on Facebook or on the news or -- that you know

 4    of?

 5        A.   I don't know where he found out that

 6    information, sir.

 7        Q.   Well, had you talked with anyone out there

 8    about any issues with the insurance?

 9        A.   My mother, my girlfriend, my brother, my dad.

10        Q.   Other than them?

11        A.   I believe my close friend, Isaac.

12        Q.   Were they putting that out on social media in

13    any fashion?

14        A.   No, sir.

15        Q.   It goes on to say here:  The crash occurred in

16    Florida, the car insurance is based out of South

17    Carolina.  The family's health insurance is based out of

18    North Carolina.  He's being treated in Georgia.

19            Was that information that was on social media

20    anywhere that you know of?

21        A.   That our -- where our insurance were based?

22        Q.   Right.  Where your insurance was based?

23        A.   I highly doubt that, sir.

24        Q.   Okay.  Well, do you know where Blake may have

25    gotten that information?



1      A.   May have gotten that information from the

2   information passed from my mother to his mother.

3      Q.   Okay.  He goes on to say:  I'm not sure exactly

4   where that would place the case or if that impacts the

5   case whatsoever.  Is this the type of case your firm was

6   interested in or is there anybody you would refer them

7   to?  In either case, I'm sure they would appreciate your

8   advice.  Take care and God bless.

9           Now, was there -- did you make a request of

10  Blake Meadows or did your mother make a request of him

11  for him to contact Dean Colson about these issues?

12     A.   We didn't know Mr. Colson at the time, sir.  We

13  just asked for his advice.

14     Q.   My question is:  Did you or your mother ask

15  Blake Meadows to contact any lawyer, whether he's named

16  --

17     A.   Yes.

18     Q.   -- Dean Colson or whatever, about the matters

19  that are in this e-mail?

20     A.   I believe what we just asked him, if he knew

21  any lawyers he could recommend to us.

22     Q.   Okay.  And so is that how -- did he recommend

23  Dean Colson to you?

24     A.   He did.

25     Q.   Okay.  And was that a discussion that you had



 1   with him?  With Blake?

 2       A.   No, sir.

 3       Q.   Again, that was your mother talking to his

 4   mother?

 5       A.   I believe so, sir.

 6       Q.   Okay.  So your mom asked his mother if he knew

 7   of anybody -- any lawyers that could be recommended to

 8   you?

 9       A.   Yes, sir.

10       Q.   Okay.  Now, while you were in the first

11   hospital, did you or your father have contact with a

12   lawyer while you were in your first hospital?

13       A.   You're talking about Halifax, sir?

14       Q.   Yes.

15       A.   Not that I know of.

16       Q.   Do you remember if you were asked that question

17   in your previous deposition, by chance?

18       A.   I don't remember, sir.

19       Q.   You don't remember whether or not you were.

20   When you read the deposition, do you recall being asked

21   that?

22       A.   I do not remember being asked, sir.

23       Q.   On Page 346, do you remember saying you think

24   there was contact with an attorney while at Halifax?

25       A.   Sir, do you have my deposition I could look at?



1      Q.   No, I'm just telling you it's on Page 346.

2      A.   Sir, I --

3      Q.   Do you remember saying -- I'm just asking, do

4   you remember saying that?

5      A.   I don't remember.  I would need to see my

6   deposition.

7      Q.   Okay.  But you're saying today that you don't

8   think there was any contact with an attorney while you

9   were in Halifax?

10      A.   I do not believe we had any contact, no, sir.

11      Q.   Okay.  Now, do you -- do you know how long it

12   was after this June the 12th, 2014, e-mail, before you

13   had any contact with Mr. Kalbac or his firm?

14          MR. MARTINEZ:  Objection.  Asked and answered.

15          THE WITNESS:  I believe we already spoke about

16      this, sir.

17   BY MR. BURGE:

18      Q.   I think you told me you met with him some time

19   between June 15th and 20th.  My question's a little

20   different.

21          My question is:  Do you know how long after

22   June the 12th that you first had any contact of any kind

23   with anybody from his firm?

24      A.   I'm going to assume there was some kind of

25   contact between June the 12th and June 15th.



 1      Q.   Was there any contact other than in person?

 2      A.   To set up a meeting, I believe there would have

 3   to be.

 4      Q.   Okay.  And was that with you or was that with

 5   someone in your family?

 6      A.   I don't understand, sir.

 7      Q.   Well, was it made through your mother or your

 8   father or did they call you directly or...

 9      A.   I don't recall.

10      Q.   Was there anyone else from Mr. Kalbac's law

11   firm present with him at the meeting?

12      A.   No, sir.

13      Q.   Why don't we take a look at what has previously

14   been marked as defendant -- I mean, excuse me, as

15   Exhibit Number 10 to the deposition --

16           MR. MARTINEZ:  Excuse me.  Before you get to

17      that -- before you give him a document, I'm just

18      going to -- thank you, sir.

19   BY MR. BURGE:

20      Q.   I'll show you what we've marked -- what's

21   previously been marked as Exhibit 10 to the deposition

22   of --

23           MR. BURGE:  Y'all through?  Excuse me.  I'm...

24           THE WITNESS:  I apologize, sir.  We're done.

25

```
 1   BY MR. BURGE:

 2        Q.   -- previously marked as Exhibit Number 10 to

 3   the deposition of Roger Cawthorn.

 4             I assume that you've seen that document before?

 5        A.   I have, sir.

 6        Q.   And is that your signature on the --

 7        A.   Second.

 8        Q.   -- back page?

 9        A.   Yes, sir.

10        Q.   Which is Bates-stamped CAWTHORN 80101042 at the

11   bottom.

12        A.   Yes, sir.

13        Q.   Is that right?

14             MR. MARTINEZ:  Mr. Burge, it may not be

15        pertinent to your question, but it appears that the

16        copy that I have is missing Pages 4 and 5.  It may

17        not be pertinent to your record, but...

18             MR. BURGE:  Well, it may be.  I think -- let's

19        see if we can find them on the -- see if we got the

20        real copy with the right pages on it.

21             MR. MARTINEZ:  We can make a copy for you, sir.

22             MR. BURGE:  Maybe we --

23             MR. BONNER:  Mr. Burge, that's why I'm here.

24             MR. BURGE:  Maybe we got -- maybe they're all

25        on this one.  Let's see.  Yeah, we got one here.
```



 1              MR. MARTINEZ:  Greg, do you want me to make

 2      copies?  It can be done really quick.

 3              MR. BURGE:  Well, I got -- I think I got three.

 4              MR. MARTINEZ:  Okay.  Great.

 5              MR. BURGE:  I think I may.  It's got Exhibit 10

 6      on it.

 7              MR. MARTINEZ:  Okay.

 8              MR. BURGE:  I think it's 4 and 5 on there.  I

 9      believe.  Does that one have all the pages?

10              MR. MARTINEZ:  Yes, sir, it does.

11              MR. BURGE:  Okay.  I think his does as

12      well.

13    BY MR. BURGE:

14         Q.   And have you seen that document before?

15         A.   I have, sir.

16         Q.   Okay.  And is that your signature on the last

17    page?

18         A.   That is, sir.

19              MR. BONNER:  Is that -- throw away?

20              MR. BURGE:  I think that's the bad one.  Yeah,

21      we can get rid of that.

22    BY MR. BURGE:

23         Q.   Now, when you looked at this release of all

24    claims, this is an agreement that was entered into

25    between you and Bob Ledford's RV and Marine; is that

1  right?

2      A.   This was an agreement that was entered in to

3  both of us, yes, sir.

4      **Q.   And it was an agreement that $3 million, the**

5  **amount of the coverage for the Ledfords, was going to be**

6  **paid to you and you were going to sign this release and**

7  **accept it and let Ledford RV and Marine out of the**

8  **lawsuit; right?**

9          MR. MARTINEZ:  Objection.  Document speaks for

10      itself.

11          THE WITNESS:  To be clear, sir, I'm not a

12      lawyer, but as I understand this, yes.

13  BY MR. BURGE:

14      **Q.   Okay.  And then -- and you did get the**

15  **$3 million; right?**

16      A.   As far as I understand, yes, sir.

17      **Q.   Okay.  And I want to go back to my previous**

18  **question of what about this event, what occurred between**

19  **June the 11th, 2016, -- excuse me, June the 11th, 2014,**

20  **and November the 16th, 2016?**

21          **What changed besides hiring of a lawyer and a**

22  **lawsuit that you changed your mind and wanted to accept**

23  **the $3 million in insurance money?**

24          MR. MARTINEZ:  Objection.  Lack of foundation.

25      Asked and answered.



```
 1            THE WITNESS:  Well, sir, I had sought more

 2       counsel and it was in litigation and it was in my

 3       lawyer's hands.  And after counsel with them and

 4       deciding for myself, we decided it was the route to

 5       take.

 6  BY MR. BURGE:

 7       Q.   Okay.  So you could have had it back in August

 8  of 2014, but you waited until November of 2016 to accept

 9  it?

10            MR. MARTINEZ:  Objection.  Lack of foundation.

11       Asked and answered.

12  BY MR. BURGE:

13       Q.   Is that accurate?

14       A.   I believe so, sir.

15       Q.   Okay.  Well, was there -- was there -- was

16  there anything that had changed either factually that

17  made you reconsider your decision about accepting the

18  $3 million?

19            MR. MARTINEZ:  Objection.  Lack of foundation.

20            THE WITNESS:  Sir, two years had passed.  Lots

21       had changed.

22  BY MR. BURGE:

23       Q.   Right.  Two years had gone by.  You could have

24  had the $3 million in August of 2014.  And now two years

25  later, you're accepting the same amount that had been
```



 1  offered you in the insurance money back in '14.

 2          So was there something in your mind that caused

 3  you to change your mind about accepting it?

 4          MR. MARTINEZ:  Objection.  Lack of foundation.

 5      Asked and answered.  Mischaracterizes the evidence.

 6  BY MR. BURGE:

 7      Q.   You can answer.

 8      A.   Sir, I believe that two years had changed.  So,

 9  I mean, I can go into lots of details had changed.  I

10  mean, I -- that would be ridiculous to go through all of

11  those, but I believe that I had been relying on the

12  counsel of my lawyers.  I had thought about it deeply.

13  And at that point, that was the right decision to make.

14  But in August of 2014, it was not the right decision to

15  make.

16      Q.   Okay.  And it was not the right decision to

17  make for what reason?

18          MR. MARTINEZ:  Objection.  Asked and answered.

19          THE WITNESS:  I was still sorting out all the

20      options I had on the table, sir.

21  BY MR. BURGE:

22      Q.   All right.  Now, did the decision to accept the

23  3 million from Auto-Owners on behalf of Bob Ledford and

24  RV Marine, was that decision affected by the fact that

25  there was some additional third parties that Michael Orr



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
118

 1   **had brought into the lawsuit** ███████████

███████████████████████████████?

 3            MR. MARTINEZ:  Objection.  Lack of foundation

 4      and also misstates the record.

 5   BY MR. BURGE:

 6      **Q.   Was that a factor in your decision?**

 7            MR. MARTINEZ:  Same objection.

 8            THE WITNESS:  Well, obviously, I would have

 9      considered all factors and that is a factor.  So it

10      was a factor within my decision, yes, sir.  But I

11      don't know if that was the deciding factor.

12   BY MR. BURGE:

13      **Q.   Was one of the factors the fact that you had**

14   **some concern as to whether or not if you tried a case to**

15   **a jury that you would get the amount of money that was**

16   **being offered to you?**

17      A.   I --

18            MR. MARTINEZ:  Objection.  Lack of foundation.

19            THE WITNESS:  Are you asking do I think I would

20      have -- I had a concern that I would lose the case?

21   BY MR. BURGE:

22      **Q.   No, I'm asking if you thought that even if you**

23   **won the case, that you might get less money than what**

24   **was being offered to you?**

25            MR. MARTINEZ:  Objection.  Lack of foundation.



```
 1            THE WITNESS:  Sir, to be completely blunt, my
 2       best friend fell asleep at a wheel driving 70 miles
 3       an hour and rammed me head long into a concrete
 4       barrier.
 5            I had no doubt that I would win that case in
 6       trial, but I didn't want to take my -- drag my
 7       family, my friends, myself through the emotional
 8       turmoil of having to go through a trial.  So it was
 9       the best option at that point.
10  BY MR. BURGE:
11       Q.   Yeah.  That was my point.  Why in the world
12  didn't you try the case?
13       A.   Well, sir, I believe, as I just stated, it was
14  because I didn't want to drag my family and myself
15  through the emotional turmoil.
16       Q.   Well, I mean, you could have had people in the
17  jury listen, determine, could have rendered a verdict in
18  your favor if you won; right?
19            MR. MARTINEZ:  Objection.  Argumentative.
20       Asked and answered.
21            THE WITNESS:  Sir, that's a hypothetical
22       question.  I don't know.
23  BY MR. BURGE:
24       Q.   But you understand that, that you had the right
25  to do that, you had demanded a jury trial, and that you
```



 1    had a right to have a jury decide the case; right?

 2        A.   I had that right, yes, sir.

 3        Q.   Okay.  Now, there is another document which has

 4    been marked as Exhibit Number 11, I think, in Roger

 5    Cawthorn's deposition.  Let's make sure we've got all

 6    the pages.

 7             MR. MARTINEZ:  Do you have the entire

 8        settlement argument, Mr. Burge, that you can show

 9        Mr. Cawthorn?

10             MR. BURGE:  I think we do.

11             MR. MARTINEZ:  This is the entire settlement

12        agreement.

13             THE WITNESS:  Yes, sir.

14             MR. BURGE:  It's complete, as far as you know?

15             MR. MARTINEZ:  Let me just see if it's signed.

16             MR. BONNER:  I've got a boss.  He's going to --

17             MR. BURGE:  I think the last page is the

18        signature page.

19             MR. MARTINEZ:  Bradley's signature.  This one

20        doesn't have Madison's signature.

21             MR. BONNER:  At the very back?

22             MR. MARTINEZ:  It does, yeah.  It looks

23        complete.

24             Do you want to take a break?

25             THE WITNESS:  No, sir.

 1            MR. MARTINEZ:  Just take your time.

 2   BY MR. BURGE:

 3       Q.   Do you need to take break?

 4       A.   No, sir.  Good to go, Mr. Burge.

 5       Q.   Okay.  Take a look at that document.  I assume

 6   you've seen that document before.

 7       A.   I have, sir.

 8       Q.   And what is the title of that document?

 9       A.   Settlement and Assignment Agreement.

10       Q.   And is that your signature on the back of that

11   last page?

12       A.   On the last page, yes, sir.

13       Q.   And is that when you signed it on October

14   the 20th, 2016?

15       A.   Yes, sir.

16       Q.   And that's an agreement between you and Bradley

17   Ledford?

18       A.   Yes, sir.

19       Q.   What is your understanding as to what that

20   document does?

21       A.   Sir, I don't want to speculate as to what this

22   says.  I'm not a lawyer.  I rely on the counsel of my

23   lawyers for this -- that kind of thing.

24       Q.   Tell me what your understanding is on what the

25   document does.



1     A.    I understand what my lawyers tell me about it.

2     **Q.    So outside of your lawyers, you don't have an**

3  **independent understanding?**

4     A.    I feel as if that would be unwise to make an

5  understanding of it outside of my lawyers.

6     **Q.    But I know you sought the counsel of your**

7  **lawyers and obviously, I guess, you read this agreement**

8  **before you signed it?**

9     A.    I did, sir.

10    **Q.    Did you ask anybody to review it on your**

11 **behalf?**

12    A.    My lawyers, sir.

13    **Q.    Did you ask your father to review it?**

14    A.    I believe he read it.

15    **Q.    Did you and him have any discussions about the**

16 **agreement, what it meant?**

17    A.    No, sir.

18    **Q.    Did he say whether he had any questions about**

19 **it?**

20    A.    Did not express those to me if he did.

21    **Q.    As far as you know, did he -- at least to your**

22 **knowledge, he understood what the document was about?**

23    A.    I would assume he understood it, yes, sir.

24    **Q.    Now, why was -- you agreed to accept the**

25 **$3 million.  It was offered by Auto-Owners and released**



1  and let Mr. Ledford's company go.  Why didn't you agree

2  to let your best friend, Bradley Ledford, out of the

3  case?

4      A.   Sir, to be clear, I don't believe we were best

5  friends at the time.  But I don't think that really

6  played a role in it.

7           My understanding is that that was the advice of

8  my counsel to not release him also.

9      Q.   So you were just relying on advice of counsel?

10          MR. MARTINEZ:  Objection.  Misstates the record

11     and also the settlement agreement.

12          THE WITNESS:  Sir, could you repeat the

13     question, sir?

14 BY MR. BURGE:

15     Q.   Yeah.  So is the answer is the reason you

16 entered into it is because you were relying on advice of

17 counsel?

18     A.   And my own decisions, yes, sir.

19     Q.   What did you hope to get out of this agreement?

20     A.   Well, sir, I believe it's whatever the

21 agreement states is what I hoped to get out of it.

22     Q.   Which is what?  What does it say that you hoped

23 to get out of?

24     A.   Sir, I really don't want to try and interpret

25 this.  I know you have a whole lot of letters after your



 1  name, you did a lot of schooling, but I did not do that.

 2      Q.   Well, is there -- is there any expectation of

 3  yours that Bradley Ledford is ever going to have to pay

 4  you any money?

 5      A.   It's a possibility, sir.  I'm not sure.

 6      Q.   What is your understanding as to how that could

 7  ever happen?

 8      A.   I don't have an understanding of that, sir.

 9      Q.   Do you have any expectation that Bradley

10  Ledford was ever going to have to pay you any money?

11      A.   Now, Mr. Greg, you're making me feel dumb.  I

12  just don't know.

13      Q.   Well, you can look at the agreement and see

14  what this agreement is, see what the amount of money in

15  here is, can't you?

16           MR. MARTINEZ:  Asked and answered, Mr. Burge.

17      Objection.

18  BY MR. BURGE:

19      Q.   Go to Page 5 of 9, if you don't mind.

20      A.   Which paragraph would you like me to look at,

21  sir?

22      Q.   Paragraph Number C.

23      A.   Okay.  Would you like me to read it?

24      Q.   You can read it to yourself, if you want to.

25      A.   Done reading, sir.



```
 1       Q.    Okay.   Do you see the amount in there,

 2  $30 million?

 3       A.    I see the amount, sir.

 4       Q.    What input, if any, did you have as to that

 5  number?

 6       A.    What input do I have in that?

 7       Q.    What, if any, input did you have in arriving at

 8  the $30 million number to go in this agreement?

 9       A.    I would say a lot of input.   I mean, you can

10  just look at my bodily harm as an input of that.   You

11  can look at the Tremp report as an input of that as to

12  what my life care plan would probably look like.

13             And I believe that just the nature of who I am

14  was the input of that knowing the cost I was going to

15  procure throughout the remainder of my life.   And

16  $30 million seemed like the reasonable amount to put on

17  there as to what I was going to need.

18             MR. MARTINEZ:   Mr. Cawthorn, I'm going to

19        instruct you not to disclose any conversations you

20        may have had with counsel.

21             THE WITNESS:   Yes, sir.

22  BY MR. BURGE:

23       Q.    The -- of course, we've seen the reports from

24  the expert and that sort of thing.

25       A.    Okay.
```



1     Q.   The -- what my question really is, is that

2   outside of discussions with your lawyers, did you have

3   any discussions with anyone else about the figure and

4   your input into the figure of $30 million?

5     A.   Aside from my lawyers?

6     Q.   Right.

7     A.   No, sir.

8     Q.   Okay.  Did you have any expectation that you

9   were going to collect $30 million from Bradley Ledford?

10    A.   Did I have an expectation?

11    Q.   Yes.

12    A.   I believe it's written in Paragraph C where the

13  $30 million was to come from.

14    Q.   And what is your -- what is your understanding

15  of where it was to come from?

16         MR. MARTINEZ:  Objection.  Asked and answered.

17      The document speaks for itself.  He stated he's not

18      a lawyer and can't interpret the document.

19  BY MR. BURGE:

20    Q.   You can answer.

21    A.   Sir, I believe that it was asked and answered

22  and that the paragraph states it for itself.  I'm not a

23  lawyer and I don't want to interpret the answer.

24    Q.   Well, you're the one that brought it up.  You

25  said, I believe it says is in Paragraph C.  So what does



 1  it say?

 2          MR. MARTINEZ:  Objection.  Asked and answered.

 3          THE WITNESS:  It says:  In the total amount of

 4      $30,000 against Defendant Bradley Ledford in favor

 5      of plaintiff to bear interest at the legal rate from

 6      this date of entry.  It says we're going to enter

 7      into a consent judgment.

 8  BY MR. BURGE:

 9      Q.   Which was entered into --

10      A.   Okay.

11      Q.   -- right?

12      A.   I assume so.

13      Q.   And, of course, did you understand that this

14  letter, this judgment was not going to be recorded;

15  right?

16          MR. MARTINEZ:  Objection.  Asked and answered.

17      The document speaks for itself.

18  BY MR. BURGE:

19      Q.   I mean, what are the -- what are the chances

20  that you -- do you think that Bradley Ledford would ever

21  have $30 million to be able to pay you?

22      A.   Well, sir, I mean, you know, I was raised in

23  the South.  We don't like talking about money.  I would

24  -- I never tried to pry into what his financial

25  standings were in the world.

 1      Q.   Well, did you understand that his -- that his

 2   dad and his dad's company was certainly more well off

 3   than Bradley Ledford was?

 4      A.   Perhaps, sir.

 5      Q.   Well, I mean, you understood that Bradley

 6   Ledford's dad and company had assets?

 7      A.   I did understand that.

 8      Q.   They had vehicles?

 9      A.   I understood that.

10      Q.   It was a growing business?

11      A.   I understood that.

12      Q.   So why did you let them out?

13           MR. MARTINEZ:  Let me --

14   BY MR. BURGE:

15      Q.   And -- and where there was potential for

16   recovery beyond the insurance proceeds and you did not

17   do it as to Bradley Ledford?

18           MR. MARTINEZ:  Mr. Cawthorn, I'm going to

19        instruct you not to divulge any information if the

20        source of that information came from conversations

21        with your lawyer.

22           THE WITNESS:  It's going to be hard for me to

23        answer that one, sir.

24   BY MR. BURGE:

25      Q.   So you didn't have any information other than



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
129

1   what you got from your lawyers?

2       A.   Yes, sir.

3       Q.   You relied totally on them for whatever advice
4   they gave you in that regard?

5       A.   And in the faith of God, sir.  I'd never put
6   all my reliance on a man.

7       Q.   The -- have you had any discussions outside of
8   the mediation itself with Bradley Ledford about this
9   settlement and assignment agreement?

10      A.   No, sir.  We -- we -- I think it's an unspoken
11  rule between us that we don't speak about lawsuits.  I
12  know both of our -- I believe he was probably instructed
13  not to talk about it.  I don't want to talk -- bring
14  that up to him.

15      Q.   So the answer is no, you hadn't talked with him
16  about that?

17      A.   Correct.

18           MR. BURGE:  Y'all want to break for this now?

19           MR. BONNER:  It's up to you.

20           MR. BURGE:  Sure.

21           MR. MARTINEZ:  That's fine.

22           MR. BONNER:  I was trying not to interrupt you.
23  That's why I gave you a quick little note.

24           THE VIDEOGRAPHER:  We are off the record at
25      1:08.



1      (Thereupon, a recess was taken in the deposition,

2   after which the deposition continued as follows:)

3          THE VIDEOGRAPHER:   We are on the record at

4      1:48 p.m.

5          Please proceed.

6   BY MR. BURGE:

7      Q.   Okay.  We're back on the record here.

8          While I'm thinking about it, was there -- other

9   than the settlement that occurred in 2016 that's part of

10   the release and settlement agreement we looked at, have

11   you engaged in any other settlement with any other

12   parties as a result of this accident?

13      A.   Not that I know of, sir.

14      Q.   Was there ever any uninsured motorist claim

15   made by you in this case?

16      A.   Not that I understand, sir.

17      Q.   Your car insurance was with USAA at the time of

18   this event?

19      A.   I believe so.

20      Q.   Did you have uninsured motorist coverage with

21   USAA?

22      A.   I can't speak as to that, sir.

23      Q.   But as far as you know, no claim was ever made

24   for any uninsured motorist coverage that you may have

25   had?



 1    A.    I don't under -- I don't believe so, sir.

 2    **Q.    Okay.**

 3          MR. MARTINEZ:  Mr. Burge, I just want to -- I

 4    didn't want to interrupt.  But he didn't mention

 5    that there was payment, so...

 6          MR. BURGE:  Yeah, yeah, yeah, yeah.  I'm aware

 7    of that.  It's all part of this deal, the way I

 8    consider that.

 9          THE WITNESS:  Yes, sir.

10          MR. BURGE:  Do y'all know if there was any?

11          MR. BONNER:  On the record, there may have

12    been -- I believe there may have been PIP.  I

13    believe --

14          MR. BURGE:  PIP.

15          MR. BONNER:  -- there was PIP.  I don't know

16    the specifics of how it was paid out.  It would have

17    been through USAA.

18          MR. BURGE:  But no uninsured?

19          MR. BONNER:  I don't believe so.  Don't hold me

20    to it.  If you want to call me up at another time, I

21    will ask around and make sure.

22          MR. MARTINEZ:  We will get you that

23    information.

24          MR. BONNER:  I'm aware of PIP claim, and I

25    believe PIP benefits were distributed in some



 1      respect or maybe directly to the providers.

 2   BY MR. BURGE:

 3      Q.   Okay.  Let me get you to take a look at Page 5

 4   of 9 on the settlement and assignment agreement.

 5      A.   Yes, sir.

 6      Q.   If you look down under -- under D, about

 7   halfway down on the right, it starts out:  Upon

 8   completion.

 9           Do you see that?

10      A.   I'm reading right now, sir.

11           I got it.

12           MR. MARTINEZ:  Do you want me to point it out

13      to you?

14   BY MR. BURGE:

15      Q.   It says:  Upon completion of any and all legal

16   actions against Auto-Owners undertaken under this

17   agreement, agreement including appeals, if necessary,

18   and regardless of whether such actions and appeals are

19   successful, will result in a recovery against

20   Auto-Owners or upon the running of the statute of

21   limitations for said claim.

22           Whether suit is filed against Auto-Owners or

23   not, the plaintiff shall deliver to Ledford a full and

24   complete satisfaction of the consent judgment entered

25   pursuant to this agreement.



1              Have I read that correctly?

2      A.    You have, sir.

3      Q.    Do you know what that means?

4      A.    I can -- I understand all the words, sir, but I

5    do rely on the counsel of my lawyers for legal terms

6    such as this.

7      Q.    Well, do you -- when you read those words like

8    we just read, do you understand that that means that

9    regardless of what happens in this lawsuit you brought

10    against Auto-Owners, that you are obligated to provide a

11    satisfaction of the consent judgment that was entered

12    into with Bradley?

13              MR. MARTINEZ:  Objection.  Asked and answered.

14              THE WITNESS:  Again, sir, I -- I'm not

15         professionally trained in legal minutia, so I'm not

16         100 percent sure exactly of what that means.  I will

17         rely on the counsel of my lawyers.

18    BY MR. BURGE:

19      Q.    But you do understand that this agreement you

20    signed does impose certain obligations on to you as a

21    party to the agreement?

22      A.    I do understand that, sir.

23      Q.    Okay.  Now, the settlement that was paid, the

24    $3 million was paid on behalf of Ledford RV by

25    Auto-Owners, which was the insurance companies; right?



```
 1      A.   Yes, sir.

 2      Q.   ████████████████████████████████████

 3   █████████████████████████████████████████████

 4   ██████████████

 5           ████████████████████████████████████████

 6           ████████████████████████████.

 7   BY MR. BURGE:

 8      Q.   Okay.  ████████████████████████████

 9   ██████████████

10      ██████████████████
```

11      Q.   And Michael Orr, he was the lawyer that was

12   being paid by Auto-Owners to represent Bradley.  Is that

13   your understanding?

14      A.   That is my understanding.

15      Q.   Okay.  And I know there was a -- other than

16   legal fees and expenses associated with legal fees and

17   the lien that, I guess, was paid back on the health

18   care, were there any other disbursements out of that

19   settlement?

20      A.   Not that I understand, sir.

21      Q.   I asked that, your dad had said that he was

22   paid back some funds.

23      A.   Yes, sir.

24      Q.   Is that true?

25      A.   It is, sir.

1      Q.    What was he paid back for and how much?

2      A.    For providing for his son.  I would say -- I

3   don't know the exact numbers, but I know the majority of

4   the cost was for the change we had to make to the house.

5      Q.    Okay.  Which was money that had been spent when

6   you went back to the house?

7      A.    Yes, sir.

8      Q.    Is that accurate?

9      A.    Yes, sir.

10      Q.    Okay.  And currently, as we sit here today,

11   what are the sources of your income?

12      A.    I believe I receive disability once a month.

13      Q.    Okay.  And is that Social Security --

14      A.    Yes, sir.

15      Q.    -- disability?

16            And how much do you receive?

17      A.    $700 a month.

18      Q.    And is that -- is that straight disability or

19   is that -- is it some other program like SSI or...

20      A.    I'm not 100 percent sure which one it is, sir.

21      Q.    Okay.  Where -- besides working with the

22   Chick-fil-A and with the senator, where else have you

23   worked before?

24      A.    I believe that's about it, sir.

25      Q.    And the time that you were with the



 1   Chick-fil-A, what did you do for them?

 2       A.   Various jobs.  I was -- I ran the store for

 3   about two years.

 4       Q.   Were you the manager?

 5       A.   I was, sir.

 6       Q.   Okay.  And that would have been what years?

 7       A.   I believe 2012 to mid-2014 -- early 2014.

 8       Q.   Okay.  Are you doing any work at all for them

 9   anymore?

10       A.   I am not, sir.

11       Q.   And then when you were with the senator --

12       A.   Congressman.

13       Q.   Congressman, excuse me.  Just tell me sort of

14   what you did on a daily basis with him.

15       A.   I was a staff assistant, very normal job.  You

16   know, just took phone calls, took messages, was in

17   charge of making sure he was apprised of what was going

18   on in the news, so that would include just scouring news

19   sources and finding any mention of his name or things

20   that would regard to bills he was trying to pass, make

21   sure he was apprised of those.

22            I would send him an e-mail of that and then he

23   would normally call me at about 10 a.m. and we'd discuss

24   everything about that and if he needed anything

25   clarified.



```
 1      Q.   And physically where -- where did you work for

 2  him?

 3      A.   I was in the district, sir, in Hendersonville,

 4  North Carolina.

 5      Q.   Okay.

 6      A.   Hendersonville, North Carolina.

 7           THE WITNESS:  I'm sorry, I said that real fast,

 8      ma'am.

 9  BY MR. BURGE:

10      Q.   And that's where, I guess, he had a district

11  office that you worked out of?

12      A.   Yes, sir.

13      Q.   How many employees did he have in that district

14  office?

15      A.   I believe four.

16      Q.   Okay.  So the disability that you get, $700 a

17  month, is that the only source of income that you have?

18      A.   Yes, sir.

19      Q.   Okay.  You mentioned earlier, you said

20  something about money managers and other things.  Do you

21  have some -- either a portion or part of the settlement

22  proceeds that you have managed by someone?

23      A.   I do, sir.

24      Q.   Who manages those?

25      A.   Zachary Cawthorn.
```



 1      Q.   Is that your brother?

 2      A.   It is, sir.

 3      Q.   Who does Zachary work for?

 4      A.   Edward Jones Investments.

 5      Q.   Is that the same company your dad works for?

 6      A.   It is, sir.

 7           MR. MARTINEZ:  Mr. Burge, hold on for one

 8      second.

 9           Could you just speak a little slower.  Thank

10      you.

11   BY MR. BURGE:

12      Q.   Out of curiosity, why is your dad not managing

13   it for you?

14      A.   My brother and I are closer.

15      Q.   Is he as experienced as your dad?

16      A.   He is not.

17      Q.   You've been satisfied with his management?

18      A.   Very much, sir.

19      Q.   Any -- any other sources of income, any

20   disability policies outside of Social Security?

21   Anything like that?

22      A.   Not that I know of, sir.

23      Q.   Now, your -- the insurance that you have, the

24   health insurance, is that -- you're still under your

25   dad's policy, I guess?



**Orange Legal
800-275-7991**

 1      A.   I am, sir.

 2      Q.   And is it your understanding you can remain

 3   there until you're at least -- at least as it stands

 4   now, until you're 26 or 27?

 5      A.   Yes, sir.

 6      Q.   Okay.  And that's not affected by you not being

 7   a member of his household?

 8      A.   I don't believe it is.

 9      Q.   Okay.  Do you know if you -- are you still

10   considered a dependent of your dad?  Do you know?

11      A.   I don't know, sir.

12      Q.   But at least currently, you're not living under

13   his roof and no plans to go back there?

14      A.   Not currently, sir.

15                          * * *

16   BY MR. BURGE:

17      Q.   Let me show you something.  This is the only

18   copy I've got, but --

19           MR. MARTINEZ:  Would you like for us to make

20      copies of it?  We can do that.

21           MR. BURGE:  I don't know that I need a copy.

22      I'm just going to attach it.  I'm not -- I don't

23      plan on using it.  This is something that y'all

24      produced.

25           MR. MARTINEZ:  Yeah.  Does it have an exhibit



 1    sticker on there?

 2         MR. BURGE:  It doesn't.  We probably need to

 3    add one.  I actually think it was an exhibit in

 4    Bradley Ledford's deposition, but I don't remember

 5    the number, so why don't we just stick a sticker on

 6    it.

 7         THE COURT REPORTER:  Which number?  1?

 8         MR. BURGE:  Why don't we --

 9         Do you know what the last joint exhibit -- the

10    last number was?

11         MR. BONNER:  We haven't done joint exhibits.

12    My last exhibit for plaintiff was in the 120s.  You

13    guys have a different sequence and we haven't -- not

14    every deposition taken is in your sequence,

15    unfortunately.

16         MR. BURGE:  I understand.

17         MR. MARTINEZ:  Do you want me to find out right

18    now the last exhibit that we used?

19         MR. BURGE:  Number.

20         MR. MARTINEZ:  Just give me one second.  Let me

21    see if I can do it.  It may take me just a couple of

22    minutes.

23         MR. BURGE:  If not, I was going to say we can

24    mark it like AA or something.

25         MR. BONNER:  We can find out.



 1            (A discussion was held off the record.)

 2            MR. BURGE:  Why don't we just mark it AA.

 3            MR. MARTINEZ:  That's fine.

 4            THE COURT REPORTER:  Okay.

 5            MR. BURGE:  Which will be --

 6   BY MR. BURGE:

 7       Q.   Would you take a look at that --

 8            MR. BURGE:  Do you want to wait on Allen?

 9            MR. MARTINEZ:  Go -- go ahead.

10       (Defendant's Exhibit No. AA was marked for

11   Identification.)

12   BY MR. BURGE:

13       Q.   Just -- if you would just take a look at that

14   exhibit that's AA -- marked as AA, that was some

15   documents that were produced --

16            MR. MARTINEZ:  Is Angelo recording?

17            MR. BURGE:  I thought he is.

18            THE VIDEOGRAPHER:  Yes.

19   BY MR. BURGE:

20       Q.   They were produced by your lawyers in the case.

21            My real question is, is just to verify.  Is

22   that conversation between you and Bradley Ledford -- I

23   call it a conversation, but it's really -- it really

24   looks sort some of texting, it looks like, to me.  Is

25   that what that is?



```
 1      A.   Yes, sir.

 2      Q.   Okay.  Is that just texting back and forth on a

 3   --

 4      A.   iPhone.

 5      Q.   -- smartphone?

 6      A.   Yes, sir.

 7      Q.   Okay.  And as far as you can tell, is that --

 8   are those conversations that you and Bradley Ledford had

 9   at some point in time?

10      A.   It is, sir.

11      Q.   Okay.  I think that was in the calendar year

12   2015.  Do you know -- other than the one that Allen and

13   I discussed earlier which may be a short text, do you

14   know if there are any other texts out there between you

15   and Bradley that had not been produced in the case?

16      A.   Not that we haven't already discussed.  Just

17   maybe seven that haven't been -- since I produced these.

18      Q.   Okay.  And I think Allen is going to get us a

19   copy of those.

20           MR. MARTINEZ:  Do you want to ask Allen a

21      question?

22           MR. BONNER:  It was Exhibit 2 -- in the

23      deposition.

24           MR. BURGE:  Okay.  Well, we decided we'd just

25      mark it AAA.
```



1          MR. BONNER:  Okay.

2          MR. MARTINEZ:  AA.

3          MR. BURGE:  AA.

4          MR. BONNER:  Well, in your sequence would be, I

5     think, 40.

6          MR. MARTINEZ:  That's okay.

7          You wanted to ask Allen a question about the

8     text now that he's here about whether there were

9     others --

10         MR. BURGE:  Yeah, the ones that your -- you

11    said you'd get us, it's just a small number.  I was

12    asking him the question:  Other than that, is he

13    aware of any texting that's been going on since

14    these outside of those?  And I think his answer was

15    he was not aware of any.

16         MR. BONNER:  And we do need to get you those.

17    I'm sorry.  I didn't get them over the break.

18         MR. BURGE:  Is that something that will take a

19    while to get or is it --

20         MR. BONNER:  I think all I need to do is send

21    the screenshots of them to my e-mail address from

22    his phone and to print them.

23         MR. BURGE:  Okay.

24         MR. BONNER:  In fact --

25         THE WITNESS:  You can do that now.

1          MR. BONNER:  I can do it now.  When you pull up

2     the things and I'll screenshot them and then --

3          MR. BURGE:  Why don't we -- why don't we go off

4     the record for now.

5          Let's go off the record a minute.  Let's get

6     that --

7          MR. MARTINEZ:  Let's get that --

8          MR. BONNER:  Sure.

9          MR. BURGE:  Frankly, I'm not going to have all

10    that much more.

11         MR. MARTINEZ:  Okay.

12         MR. BONNER:  You had 40 in the sequence and

13    you're at --

14         THE VIDEOGRAPHER:  We are off the record at

15    2:05.

16    (Defendant's Exhibit No. BB was marked for

17    Identification.)

18    (Thereupon, a recess was taken in the deposition,

19    after which the deposition continued as follows:)

20         THE VIDEOGRAPHER:  We are on record at

21    2:17 p.m.

22         Please continue.

23    BY MR. BURGE:

24    **Q.   Please take a look at that exhibit that's**

25    **marked BB, I believe.  Yeah.**

1          Have you had a chance to read that?

2     A.   I have, sir.

3     Q.   Okay.  If you will hand it back to me.  I just

4   want to look at something and ask you.  What is this?

5     A.   It's a letter regarding my nomination to the

6   Naval Academy.

7     Q.   And this is from Mark Meadows.  And that was

8   the congressman that you worked for?

9     A.   Yes, sir.

10    Q.   And one of the things he says in here, he says:

11  Your nomination will be submitted to the academy under

12  the competitive method.

13         What does that mean?

14    A.   There are two methods that congressman can

15  invoke.  One's very rare.  It's called a -- I believe a

16  -- I don't remember the name of it, sir, but it's really

17  sent only one option up, and that option has to be

18  accepted regardless of what the academy wants.

19  Contingent upon that they are helping.

20    Q.   And did this congressman appoint somebody in

21  that -- on that track?

22    A.   No, sir.  You can only do one or the other.

23    Q.   Okay.  But my question is:  Other than you, did

24  he appoint someone on that specific track that you just

25  mentioned?



```
 1      A.   No, sir.  So -- no, sir, because -- it was

 2  impossible to do so.  He can only do one or the other.

 3  So if he's submitting some students in the competitive

 4  track, he can't do the track I spoke of.

 5      Q.   Okay.  But at some point in time, you were

 6  notified by the Naval Academy that you did not get in.

 7      A.   Yes, sir.

 8      Q.   Okay.  Do you know about when that was?

 9      A.   I don't, sir.

10      Q.   Was it -- it was before the accident?

11      A.   It was, sir.

12      Q.   Okay.  All right.  Take a look at exhibit -- is

13  that AA?

14      A.   Yes, sir.

15      Q.   No, we looked at AA.  What's that --

16           MR. MARTINEZ:  CC.

17           MR. BURGE:  CC.

18           THE WITNESS:  Yes, sir.

19      (Defendant's Exhibit No. CC was marked for

20  Identification.)

21  BY MR. BURGE:

22      Q.   Yeah, that's CC.  And is that the additional

23  texting that took place between you and Bradley?

24      A.   Yes, sir.

25      Q.   All right.  And it looks like that this was --
```



1  it's got the date on it close in time to when we took

2  his deposition.

3      A.   Yes, sir.  It's -- I just heard -- yes, sir.

4      Q.   Okay.  And since this texting, there hadn't

5  been any additional texting --

6      A.   No, sir.

7      Q.   -- with him?

8           Have you -- you hadn't talked with him any --

9      A.   I have not.

10     Q.   -- communicated with him since the date of

11 these?

12     A.   No, sir.

13     Q.   Okay.  Did you realize that only eight days

14 before this accident happened that Mr. Ledford had

15 purchased a $2 million additional umbrella policy for

16 his coverage?

17     A.   I did not know that.

18     Q.   So that eight days before this accident, he had

19 $1 million and then eight days before the accident, he

20 purchased additional 2 million that allowed there to be

21 $3 million in coverage?

22     A.   I was not aware of that, sir.

23     Q.   If the shoe had been on the other foot and you

24 had been driving in your car, how much insurance would

25 have been available to Bradley?



```
 1      A.   I'm not aware, sir.

 2      Q.   Do you know how much was on your vehicle?

 3      A.   I do not.

 4      Q.   Don't know what your dad carried?

 5      A.   No, sir.

 6      Q.   You think he carried as much as 3 million?

 7      A.   I don't know, sir.

 8      Q.   Did you have an understanding -- and again,

 9   don't tell me what your -- what your lawyers told you,

10   but did you have some understanding about the parties

11   that were brought into the lawsuit by Michael Orr as to

12   what the allegations that were being made by Mr. Orr

13   against them?

14      A.   No, sir.

15      Q.   Outside of your lawyers, did you have any other

16   understanding as to why they were in the case?

17      A.   No, sir.

18      Q.   Was the -- effectively all your knowledge about

19   it was, was that Mr. Orr had brought them into the case

20   and that ultimately they paid money to you?

21      A.   That's my understanding.

22           MR. MARTINEZ:  Objection.  Lack of foundation.

23           THE WITNESS:  That's my understanding, sir.

24   BY MR. BURGE:

25      Q.   Okay.  What is the -- medically speaking,
```



Orange Legal
800-275-7991

```
 1   what -- just sort of tell me where you stand medically.

 2   Is there -- are you still seeing someone at Shepherd's

 3   regularly?  Is there a doctor that you see regularly?

 4   Any sort of scheduled appointments that you're seeing

 5   somebody on a regular basis?

 6        A.   Yes, sir.

 7        Q.   Tell me what -- who that is.

 8        A.   I regularly have to see Dr. John Tobias Musser

 9   for pain management, just to help with -- for a

10   prescription of Lyrica, which is a nerve relaxant.

11        Q.   What -- what is his name?

12        A.   John Musser.

13        Q.   Where is he located?

14        A.   In Atlanta, Georgia.

15        Q.   Okay.  Is he associated with Shepherd's?

16        A.   Yes, sir.  He's a doctor there.

17        Q.   Okay.  How often do you see him?

18        A.   Usually about two -- about every two or

19   three months.

20        Q.   Okay.  You usually drive down there to see him

21   or do you fly or what?

22        A.   I usually ride with my mother.

23        Q.   Okay.  And the Lyrica is what he gives you?

24        A.   Yes, sir.

25        Q.   Are there any other prescriptions that you take
```



1   on a daily basis?

2       A.   Yes, sir.

3       Q.   What else do you take?

4       A.   I was taking felodipine.

5       Q.   What is that for?

6       A.   It's to make sure my blood pressure doesn't

7   kill me.

8       Q.   And what else?

9       A.   That's all I've been prescribed to take, sir.

10      Q.   Okay.  And you'd mentioned earlier about you

11  like to exercise, you do a good bit of exercise.  Sort

12  of what's your routine?  Where do you go and sort of

13  what do you do?

14      A.   I normally wake up in the morning.  I have to

15  be really slow in the morning because my shoulders are

16  starting to wear out.  They've got a time limit on them,

17  so I'm trying to be real careful about those.  So I have

18  to wake up in the morning, I'll start doing band works,

19  which is pretty painful just because you kind of have to

20  get the clunk out of the way in my shoulders.

21          And then once I do that, I'm kind of awake and

22  then I'll have coffee.  And then if I want to exercise,

23  I'll normally go for what I call push, which is like a

24  run.  And so I just -- I'll push my wheelchair around

25  for, you know, 10, 20 minutes.



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE
CAWTHORN, MADISON

CONFIDENTIAL
151

1           And then I will go to the gym and just do every

2    exercise I can.  There's -- I'm pretty limited in what

3    I'm able to do.  I can't do anything over the head or

4    any pull-ups or anything just because, again, out of

5    fear for my shoulders.

6           Once my shoulders go out, my capabilities in

7    life will be much more limited, and so I just -- I'm

8    real worried, though.  There's lots of stretching for my

9    shoulders.  Just lots of shoulder awareness exercises.

10   And then, you know, basic biceps curls.  Things like

11   that.

12       Q.   When you say at the gym, is that the Y or

13   they're a private gym or where do you go?

14       A.   It's the YMCA.

15       Q.   They're in your hometown?

16       A.   Yes, sir.

17       Q.   You got any buddies that you work out with?

18       A.   My brother, sir.

19       Q.   And how much older is your brother than you?

20       A.   He's four and a half years.

21           Sir, did you want me to finish going through

22   all the doctors I see regularly?

23       Q.   Yeah, I just like to know the ones that are --

24   I know sometimes something comes up, you may have to go

25   see a doctor, but I'm just really looking at the ones



DAVID MADISON CAWTHORN vs. AUTO-OWNERS INSURANCE                    CONFIDENTIAL
CAWTHORN, MADISON                                                                           152

```
 1   that are on the schedule --

 2       A.   Yes, sir.

 3       Q.   -- that you consistently see.

 4       A.   Right.

 5       Q.   Okay.  Who else besides Dr. -- is it Musser?

 6       A.   Yes, sir.

 7            I see ChiChi Berhane.

 8       Q.   ChiChi Berhane?

 9       A.   It's spelled like Berhane (phonetic).

10       Q.   Berhane.  Okay.  And what kind of doctor is he

11   or she?

12       A.   He.  He is a -- he's a plastic surgeon.

13       Q.   Okay.

14       A.   Specializing in wound care.

15       Q.   Okay.  Where is he located?

16       A.   At the Shepherd Center.

17       Q.   Okay.

18       A.   He -- he did two of the surgeries on my body,

19   so he has to regularly check my skin graft to make sure

20   it's okay.  And also try and figure out what's going on

21   with my left leg, why it's causing me so much pain.

22            And then in my ischial tuberosity, I've got a

23   chronic infection that always crops up there.  I'm

24   dealing with it right now as of today.  And so it'll --

25   it'll kind of swell up and then it'll be some just pus
```



1    in there because of a hematoma he had to cut out.

2          And so that's a major problem I always have to

3    worry about, especially on trips like this; flying,

4    sitting for that long.

5    **Q.   When are you scheduled to see him again?**

6    A.   Normally about every three months.

7    **Q.   And when did you last see him?**

8    A.   About two months ago.

9    **Q.   Okay.  Anyone else that's regularly scheduled?**

10   A.   Yes, sir, a urologist.

11   **Q.   And the urologist is where?**

12   A.   He's in Atlanta, Georgia.

13   **Q.   Is he associated with Shepherd's as well?**

14   A.   Uh-huh.

15   **Q.   What's his name?**

16   A.   I don't remember his name, sir.

17   **Q.   All right.  When are you next scheduled to see**

18   **him?**

19   A.   I see him twice a year.  So some time in this

20   quarter, I know.

21   **Q.   You've already seen him once this year?**

22   A.   Yes, sir.

23   **Q.   All right.  Any other regularly scheduled?**

24   A.   No, sir.

25   **Q.   All right.  Have you put in any job**



 1    applications anywhere to work that are pending or you

 2    hadn't heard back from at this point?

 3        A.    Not as of yet, sir, no.

 4            MR. BURGE:  Okay.  That's all the questions I

 5        have.  Thank you.

 6            MR. MARTINEZ:  Can we take a little break?

 7            MR. BURGE:  Sure.

 8            THE VIDEOGRAPHER:  Standby.  We are off the

 9        record at 2:28.

10    (Thereupon, a recess was taken in the deposition,

11    after which the deposition continued as follows:)

12            THE VIDEOGRAPHER:  We are on record at 2:39.

13                        CROSS-EXAMINATION

14    BY MR. MARTINEZ:

15        Q.    Madison, let me show you Defendant's

16    Exhibit 11.

17        A.    Yes, sir.

18        Q.    All right.  This is the settlement and

19    assignment agreement signed by you and Bradley Ledford.

20    And you signed it in October -- October 20th, 2016.  Do

21    you see that?

22        A.    Yes, sir.  I see it.

23        Q.    All right.  And can you look at Page 4 of 9.

24    In there, there is a reference to a $3 million to be

25    paid to you by Auto-Owners on behalf of RV --



 1     A.   Yes, sir.

 2     Q.   -- to release RV.  And then if you go to the

 3  next page, 5 of 9 under Section C, you'll see that

 4  there's also a reference to a $30 million consent

 5  judgment --

 6     A.   Yes, sir.

 7     Q.   -- in your favor against Bradley Ledford.  Do

 8  you see that?

 9     A.   (Witness nodding.)

10     Q.   Okay.  That was in 2016.  And Mr. Burge asked

11  you a question about the fact that in August of 2014,

12  Auto-Owners offered to send you a check for $3 million,

13  sent you check for $3 million in order to release both

14  Ledfords.  Do you remember that line of questioning?

15     A.   I do.

16     Q.   Okay.  So when you were asked by Mr. Burge why

17  was it that you settled -- agreed to settle in 2016 but

18  not in 2014, was it because the settlement in 2016 was

19  for an offer in the amount of $33 million that included

20  the $3 million check; whereas, in 2014, it only included

21  the $3 million check?

22          MR. BURGE:  Object to leading.

23  BY MR. MARTINEZ:

24     Q.   You can answer and explain if you'd like.

25     A.   Yes, sir.  As I understood, the check that was



 1   offered in August of 2014 was $3 million that would then

 2   release all of the Ledfords and all the parties involved

 3   and the case would be settled.

 4          But then in 2016, the $3 million that was

 5   offered was just to release the RV division of the

 6   Ledfords, and also with a consent judgment in my favor

 7   for, I think, $30 million.

 8          So that was a $33 million settlement agreement

 9   versus a $3 million agreement.  So -- and it was to only

10   release one of the Ledfords, which is a big difference,

11   I believe.

12          MR. MARTINEZ:  All right, sir.  Thank you.  I

13     have no further questions.

14          THE WITNESS:  Yes, sir.

15          MR. BURGE:  I have one quick follow-up on that.

16                  REDIRECT EXAMINATION

17   BY MR. BURGE:

18     **Q.  As we sit here today, you got the $3 million**

19   **from Auto-Owners; right?**

20     A.  Yes, sir.

21     Q.  ████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ███████████████████████████████████

24       ██████████████████

25       ██████████████████



```
 1            MR. MARTINEZ:  Object to the form of the

 2       question.

 3  BY MR. BURGE:

 4       ████████████████████████████████

 5       ████████████████████

 6       ████████████████████

 7            Of which you paid attorneys' fees and costs and

 8  other expenses out of that number --

 9       A.   Of course.

10       Q.   -- right?

11       A.   Yes, sir.

12       Q.   And that's what you got now; right?

13       A.   Yes, sir.

14       Q.   And then this 33 consent judgment, if you look

15  at the paragraph you and I talked about --

16       A.   C?

17       Q.   -- 5 of 9, D.

18       A.   Yes, sir.

19       Q.   Which requires you to, at the end of this case,

20  whatever happens, requires you to give Bradley Ledford a

21  complete and full satisfaction of that consent judgment?

22            MR. MARTINEZ:  Object to the form of the

23       question.  The document speaks for itself.

24            THE WITNESS:  Again, sir, I understand the

25       words, but I do rely on the legal counsel of my
```

 1      lawyers to explain the ramifications of these.

 2  BY MR. BURGE:

 3      **Q.   I understand.**

 4          MR. BURGE:  That's all I've got.

 5          MR. MARTINEZ:  Thank you, sir.  No further

 6      questions.

 7          We don't waive.

 8          THE COURT REPORTER:  Okay.

 9          MR. BURGE:  I'll order.  Regular delivery.  And

10      I would like it synched.

11          THE VIDEOGRAPHER:  We are off the record at

12      2:42.

13                                  * * *

14  BY MR. BURGE:

15      **Q.   Okay.  Were there any sort of a trust that was**

16  **set up after that settlement?  And what I mean by that,**

17  **was there any sort of special needs trust, anything like**

18  **that set up?**

19          MR. MARTINEZ:  When you say after the

20      settlement, you're referring to the settlement --

21          MR. BURGE:  The one -- right.  The one we're

22      talking about on the -- that has to do with the --

23  BY MR. BURGE:

24      **Q.   All the Auto-Owners money and the other money**

25  **that we've been discussing the last few minutes.**

1   ███████████████████████████████████

2 ███████████████████████████████████████████

3 ███████████████████████████████████████████

4 ██████████████████████

5   █████████████████████████████████

6    ████████████████████████

7     Q.   -- kind of thing?

8     A.   Yes, sir.

9        And then there is also, I believe, two trusts.

10 One trust is just a normal set-aside trust, and that's

11 for special needs as if I was -- any medical necessity

12 that I need and things of that nature. And the other

13 one is just a normal trust.

14     Q.   Okay. Is it your understanding on the special

15 needs, that that's the trust that was set up that would

16 allow you, if the need be down the road, to be entitled

17 to governmental benefits, health care, that sort of

18 thing?

19     A.   Sir, I'm not 100 percent -- again, just like

20 I'm not a lawyer, I'm not a trained financial advisor.

21 So I'm not sure.

22        MR. BONNER: Greg, can I interject on the

23      record, just with respect to de Moya, that was ██

24      confidential ████████. We have an agreement in

25      place, you're aware of it, just between our parties

 1  to treat it as confidential and -- so that section

 2  of the deposition should be treated as confidential.

 3     MR. BURGE:  We will.  I think we have that in

 4  the other deposition as well.

 5     MR. BONNER:  Yes, we do.

 6     MR. BURGE:  We have -- it's not a problem.

 7     MR. MARTINEZ:  Maybe you can just --

 8     Madam Court Reporter, maybe you can just take

 9  that page, put it at the end.

10     Thank you.

11     MR. BURGE:  Stamp it confidential if you want

12  as well.

13     MR. BONNER:  Get a Sharpie.

14                 * * *

15   (The deposition was concluded at 2:42 p.m.)

16

17

18

19

20

21

22

23

24

25



```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF MIAMI-DADE:

 5

 6       I, VANESSA OBAS, RPR, Notary Public, State of

 7   Florida, do hereby certify that MADISON CAWTHORN

 8   personally appeared before me on October 12, 2017 and

 9   was duly sworn and produced his driver's license as

10   identification.

11       Signed this 23rd day of October, 2017.

12

13

14

15

16       Vanessa Obas
         _____
         VANESSA OBAS, RPR
17       Notary Public, State of Florida
         My Commission No.:  FF 232853
18       Expires:  September 13, 2019

19

20

21

22

23

24

25
```



```
 1                    CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA:

 3   COUNTY OF MIAMI-DADE:

 4

 5       I, VANESSA OBAS, RPR, Notary Public, State of

 6   Florida, certify that I was authorized to and did

 7   stenographically report the deposition of MADISON

 8   CAWTHORN; that a review of the transcript was requested;

 9   and that the foregoing transcript, pages 5 through 160,

10   is a true and accurate record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16

17       DATED this 23rd day of October, 2017.

18

19

20       _Vanessa Obas_____
         VANESSA OBAS, RPR
21

22

23

24

25
```

