DAVID MADISON CAWTHORN,

      Plaintiff,

v.

                                  **Case No: 6:16-cv-2240-Orl-28GJK**

AUTO-OWNERS INSURANCE
COMPANY,

      Defendant.

## ORDER

David Madison Cawthorn (Cawthorn) filed a personal injury lawsuit in Florida circuit court[1] against his friend Bradley Ledford (Ledford) arising from Ledford's negligent operation of his automobile. Cawthorn settled his claim with Ledford. As a part of that settlement, Ledford assigned to Cawthorn his right to sue his insurance carrier—Auto-Owners Insurance Company—for failing to initiate timely settlement negotiations with Cawthorn. Cawthorn now sues Auto-Owners seeking damages, claiming Auto-Owners' failure constituted bad faith. Auto-Owners moved for Summary Judgment (Doc. 74) and Cawthorn filed a Response (Doc. 89).[2] The existence of an excess judgment or the functional equivalent thereof is an element essential to a third-party bad faith claim. Cunningham v. Standard Guar. Ins. Co., 630 So. 2d 179, 181 (Fla. 1994) ("[T]he essence

---

[1] Case number 2014-11310-CIDL in the Circuit Court of the Seventh Judicial Circuit, in and for Volusia County, Florida.

[2] Cawthorn also moved for partial summary judgment (Doc. 62) on all of Auto-Owners' affirmative defenses. Auto-Owners filed a response (Doc. 82). Because Auto-Owners' Motion for Summary Judgment must be granted, Cawthorn's Motion for Partial Summary Judgment must be denied as moot.

of a third-party bad faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment . . . ."). Because Cawthorn fails to present a cognizable third-party bad faith claim under Florida law, Auto-Owners' Motion for Summary Judgment must be granted.

## I. Facts

On April 3, 2014, Cawthorn and his friend were returning home to North Carolina from a spring break vacation in Florida. Ledford was driving on Interstate 4 near Daytona Beach, Florida, in a 2007 BMW X3 owned by his father's (Ledford Sr.) business, Bob Ledford's RV & Marine, Inc. ("Bob's RV"). In route, Ledford fell asleep and crashed the car into a concrete barrier. Ledford was not injured. But Cawthorn, who was asleep in the passenger seat with his feet on the dashboard, was not so fortunate. Emergency personnel airlifted Cawthorn from the scene of the accident to Halifax Hospital trauma center in Daytona Beach. (Ex. 6 to Pitman Dep., Doc. 56[3]). Cawthorn suffered serious injuries resulting in paralysis from the waist down. When the accident occurred, Cawthorn was 18 years old and Ledford was 17.

At the time, Auto-Owners insured Bob's RV with a $1 million Garage Liability Policy and a $2 million Commercial Umbrella Policy.[4] (Ex. 13 to Pitman Dep.). Ledford was a scheduled driver under the Garage Liability Policy. (Id.).

a. *Auto-Owners' Pre-Suit Contact with Ledford and Cawthorn*

---

[3] Many depositions were filed by both Plaintiff and Defendant. Record references in this Order are to depositions filed by Defendant. Depositions filed by Plaintiff, and referred to in this Order, can be found at: Froman Dep., Doc. 62-2; Moses Dep., Doc. 62-9; Cawthorn Dep., Doc. 81-2; Ledford Sr. Dep., Doc. 81-3; McLean Dep., Doc. 81-4; Cawthorn Sr. Dep., Doc. 81-5; Kalbac Dep., Doc. 81-7; Callahan Dep., Doc. 81-8; Pitman Dep., Doc. 81-11.

[4] The respective policy numbers: 48-901-965-00 and 48-901-965-01.

Auto-Owners received notice of the accident on April 4 in the company's South Carolina office, and on April 7 that office transferred the claim to Pamela McLean, the company's adjuster in Ocala, Florida. (Exs. 59 & 60 to McLean Dep., Doc. 57). The next day, McLean placed a telephone call to Ledford Sr. but got no answer, and because the phone mailbox was full, McLean could not leave a message. (Ex. 2 to Pitman Dep.).

On April 17, McLean sent a letter to Cawthorn requesting that he sign an enclosed form authorizing the release of his medical bills and records. (Doc. 81-24). The letter stated: "Please fill this form out and return it to our office in the enclosed envelope so we can retrieve any information we need to help process your claim. . . . We look forward to working with you toward an amicable conclusion." (Id.). That same day, McLean received a police report describing the accident, causing her to conclude that Bob's RV and Ledford were at fault for Cawthorn's injuries. (McLean Dep. at 132:9–25; Exs. 2 & 5 to Pitman Dep. at 31–35, 63–65). On April 21, McLean increased the reserve to $250,000. (McLean Dep. at 150:23–151:19).

McLean spoke to Ledford Sr. and his girlfriend by telephone on April 28. During that conversation, Ledford Sr. described some injuries to McLean. Ledford Sr. reported that Cawthorn was "paralyzed with a spinal cord compromise at T-11," had a fractured pelvis and two broken ankles, and had lost a kidney. (McLean Dep. at 156:13–157:12). Ledford Sr. told McLean there was a social media page called "Prayers for Madison 2014" that included updates on Cawthorn's condition. (Ledford Sr. Dep., Doc. 58, at 39:14–40:13; Doc. 62-12). That same day, McLean emailed Melinda Pitman at Auto-Owners' home office, reciting the details of her conversation with Ledford Sr. At that point, McLean opened

a reserve of $3 million, the policy limits. (Pitman Dep. at 106:10–20, 120:7–10; Doc. 62-12).

Cawthorn's father (Cawthorn Sr.) claims that he received McLean's April 17 letter with the enclosed consent form to release medical information on April 29. (Cawthorn Sr. Dep., Doc. 55, at 68:24–70:4; Ex. 65 to McLean Dep.). Cawthorn Sr. signed Cawthorn's name and indicated his relationship to Cawthorn as "parent" and returned it to McLean. McLean telephoned Halifax Hospital to request Cawthorn's medical records on May 7, 2014, but the hospital refused to release the records until Cawthorn was discharged. (McLean Dep. at 189:7–190:4). The next day—May 8—Halifax Hospital transferred Cawthorn to Shepherd Center in Atlanta, Georgia. (Cawthorn Sr. Dep. at 79:11–16). McLean again contacted Halifax Hospital on May 14, this time faxing the medical release signed by Cawthorn Sr. with a cover letter. (Ex. 66 to McLean Dep.). The cover letter stated:

> Please let me know when these records are ready so that I can pick them up. If we need to prepay, let me know so that we can bring a check with us. I appreciate your help. We are trying to get this young man some help and need the records as soon as possible to do so.

(Id.). McLean's plans to pick up the records were unsuccessful. On May 15, Halifax again told McLean it could not release Cawthorn's medical records, this time explaining that because Cawthorn was an adult, his father could not authorize consent on Cawthorn's behalf. (Ex. 66 to McLean Dep.; McLean Dep. at 194:14–195:3).

By May 27, 2014, McLean, having reason to believe that damages might exceed the $3 million policy limits, renewed her effort to obtain the medical records by writing a letter to Cawthorn's parents, again requesting that Cawthorn execute an attached consent to release medical records. (Ex. 12 to Pitman Dep.). She explained that her earlier efforts to get the records had been frustrated, and she assured them that:

Mr. Ledford carries quite a bit of insurance coverage that would no doubt benefit your family in this very difficult time. As soon as I am able to obtain the records, we will be able [to] bring the insurance portion of this matter to a conclusion.

(Id.).

Cawthorn Sr. telephoned McLean on June 11, 2014. During this conversation, McLean mentioned that on May 27 she had again sent a consent form for Cawthorn's signature. (Doc. 74 at 6; McLean Dep. at 211:2–19). She also told Cawthorn Sr. she would email him another consent form. (Id.). Cawthorn Sr. recalled that during the telephone conversation McLean gave him "the runaround" and never answered his questions as to the amount of the check he would receive. (Cawthorn Sr. Dep. at 82:23–24). Cawthorn Sr. did not describe any further requests or demands he made to McLean during this conversation that led him to conclude he had received "the runaround." (Cawthorn Sr. Dep. at 83:3–10; 86:18–87:22). According to Cawthorn Sr., McLean also told him not to hire an attorney because "they'll take most of it, or part of it, or half of it." (Id. 83:8–10, 83:21–22). But McLean denied that she suggested that Cawthorn Sr. not hire a lawyer, stating that she would never make such a statement to a claimant and offering that her husband and father were lawyers. (McLean Dep. at 213:3–6). McLean also denied that Cawthorn Sr. ever asked for the amount of money that Auto-Owners would pay in exchange for a release of the Ledfords, stating "I don't believe he ever asked me that in a conversation." (McLean Dep. at 214:7–17).

After the conversation ended, McLean emailed Cawthorn Sr. the new consent form with copies of the May 27 correspondence and her cell phone number. McLean added:

It was a pleasure speaking with you this morning regarding your son's accident. Attached is the letter we discussed with the medical authorization included.

> Upon receipt of the signed release, I will obtain the records from the hospital so that we can bring this matter to a conclusion.

(Ex. 67 to McLean Dep.). This message began a series of emails between Cawthorn Sr. and McLean the same day. Cawthorn Sr. wrote, asking questions and letting McLean know there would be more bills coming:

> I see that this letter states "we will be able to bring the insurance portion of this matter to a conclusion." Not sure what is meant by that. My son will have bills from other places, doctors, surgeons, therapist and others from Florida and here in Georgia. Also for his long term care for years to come.
>
> So I would think there will be a lot more bills to be paid.
>
> Again, the conclusion part of what?

(Id.). McLean answered, explaining: "The payment that we make would be in a lump sum for a release of our insured. It would be for you to disperse. The payment would be made to your son for use at his discretion." (Id.). Cawthorn Sr. then asked, "How much would the check be for?" and McLean replied, "There is $3 million in coverage." (Id.).

Cawthorn Sr. later testified in his deposition that based on this exchange with McLean, he believed that Auto-Owners intended to pay only the Halifax Health bills and nothing else. (Cawthorn Sr. Dep. at 82:1–87:22). He said, "It sounded like to me, she just wanted to pay the bills that were up to date, and then release her client, and Auto-Owners and the Ledfords would be free and clear." (Id. at 79:25–81:25). Cawthorn provides no details supporting this conclusion. Based on his interpretation of his father's conversation with McLean, Cawthorn decided that from that point on—June 11, 2014—he was not willing to settle for the policies' limits. (Cawthorn Dep., Doc. 63, at 94:10–98:9). And neither Cawthorn Sr. nor anyone else provided McLean or Auto-Owners with a properly executed authorization to release medical records.

On June 12, a Cawthorn family friend contacted a lawyer, Joseph Kalbac, on Cawthorn's behalf. Days later, Kalbac flew to Atlanta to meet Cawthorn, and Cawthorn hired Kalbac to represent him. Without submitting medical records, making a demand, or even providing notice to Auto-Owners that he had been retained, Kalbac sued Ledford and Bob's RV in Florida state court on June 26. (Kalbac Dep., Doc. 53, at 24:21–24; 26:120).

Meanwhile, McLean continued her pursuit of an executed medical release from Cawthorn. On June 27, Optum, Inc.—a health services company retained by Cawthorn's insurer to pursue recovery of medical benefits—provided Auto-Owners notice of a health care lien on any payment to Cawthorn but did not include the amount of the lien in the notice. (Doc. 81-27). On June 30, McLean sent Cawthorn Sr. an email reminding him that she still had not received a properly executed release from Cawthorn:

> Just wanted to send you a quick note regarding the medical authorization that I sent to you. As soon as I receive that I will be able to get the medical records from Halifax Medical Center.

(Ex. 68 to McLean Dep.). She again received no response. On July 14, 2014, Auto-Owners learned for the first time that Cawthorn was represented by a lawyer who had sued Ledford and Bob's RV.

On July 31, 2014, Auto-Owners received documentation of expenses incurred on behalf of Cawthorn. This notice came in the form of another notice of lien from Optum, stating that United Healthcare had paid $396,179.98 to Halifax Hospital for Cawthorn's treatment. (Ex. 19 to Pitman Dep.). On August 7, McLean tendered two checks to Kalbac totaling $3 million, along with a note. That note stated:

> While we have not yet received any medical records we did recently receive a notice of lien from Mr. Cawthorn's health insurance carrier. We have attached a copy of that notice that was sent to us via facsimile on July 31, 2013 [sic]. After receiving this notice, we do feel that we have the

documentation necessary to tender the insured's coverage to your client. That coverage is in the amount of $1 million under a garage liability policy and $2 million available under their umbrella.

(Ex. 22 to Pitman Dep.). Kalbac returned the checks to Auto-Owners, rejecting the tender.

### b. Underlying Litigation

The complaint Kalbac filed on June 26 in state circuit court alleged a single count of negligence against Ledford. To defend against the claim, Auto-Owners hired attorney Jamie Moses to represent Ledford and attorney Michael Orr to represent Bob's RV. Both Ledford and Ledford Sr. on behalf of Bob's RV also hired additional personal counsel: Ledford hired attorney Mick Callahan, and Ledford Sr. hired attorney John Holcomb.

Following mediation[5] in May 2016, settlement discussions began. (Doc. 81 at 6). On August 3, 2016, Kalbac sent a proposed settlement agreement—the third draft proposal—to Callahan and Holcomb. (Doc. 81 at 6). On August 8, Callahan sent Orr and Moses this proposed settlement, requesting that Auto-Owners "arrive at a judgment amount . . . and . . . propose an agreement to a judgment against Bradley Ledford which [Auto-Owners] considers fair and likely to occur if the case were tried." (Doc. 62-24; Doc. 62-18; Ex. B to Doc. 119; McLean Dep. at 278:18–24). The proposed settlement's terms required a $33 million consent judgment against Ledford, tender by Auto-Owners of the $3 million policy limits to settle claims against Bob's RV, and a covenant not to execute against Ledford. (Doc. 62-17). The proposed agreement included signature lines for Ledford, Bob's

---

[5] It appears that this was a court-ordered mediation. While no direct evidence is presented on whether Auto-Owners attended this mediation, Pitman indicated to Callahan that "if someone were to attend mediation on behalf of Auto-Owners it might only increase the demands made against your client by [] Cawthorn; which would not be in [Ledford's] best interest." (Ex. 48 to Pitman Dep.).

RV, Cawthorn, and Auto-Owners. (Id.) Kalbac stated that the proposed settlement was contingent upon the approval of Ledford, Bob's RV, and Auto-Owners. (Id. at 1).

In responding to Callahan's email regarding the August 3 proposal, Moses indicated that, while she could not "get involved in any potential disputes between Mr. Ledford and Auto-Owners" for ethical reasons, she believed that resolving the matter would be in Ledford's best interest and recommended Callahan and Holcomb contact Auto-Owners. (Ex. D to Doc. 119). Moses was reluctant to relay to Auto-Owners "what was presented . . . [because it] involved many scenarios . . . [with] other contingencies just based on what Mr. Callahan said." (Moses Dep. at 40:10–41:5). Moses and Orr both forwarded the proposed settlement to McLean. (Ex. C to Doc. 119; Orr Dep., Doc. 54, at 30:24–31:1). Moses mentioned her reservations about "getting involved in [the settlement] discussions" between Auto-Owners and Cawthorn; the appointed attorneys did not discuss the settlement offer terms further with Auto-Owners. (Ex. C to Doc. 119; Orr Dep. at 13:6–14).

On Moses's recommendation, Callahan contacted Auto-Owners directly, enclosing a copy of both his August 8 email to Moses and Orr and the proposed settlement agreement. (Doc. 62-23). McLean forwarded this information to Pitman. (Ex. E to Doc. 119). On September 3, 2016, McLean responded to Callahan referring to the proposal:

> In response to your message of August 8, 2016 about the terms of a proposed settlement, let me point back to our letter from September 26, 2014. As stated then, we continue to be willing to pay Mr. Cawthorn the full $3 million (the limits of the insurance policies) while continuing to provide defense to Mr. Ledford without reservation. This appears to be what you are suggesting, and you indicated that your client Bradley Ledford is agreeable to that.
>
> As for a future consent judgment against Bradley, that will be solely up to him, you and Ms. Moses. Knowing that the coverage limits under the policies will have been exhausted. However, the policies will continue to afford

9

Bradley's defense if he wishes to keep defending the Cawthorn claims against him.

(Doc. 62-18). In essence, this letter states: (1) Auto-Owners will pay its policy limits of $3 million, (2) Auto-Owners will continue to provide Ledford a defense in the underlying litigation, and (3) Auto-Owners will not be a party to an agreement for entry of a consent judgment.

After receiving McLean's letter, Callahan wrote to Pitman requesting that she "please get involved with this demand or see that someone at Auto-Owners with the authority to respond acts on it[.]" (Ex. 53 to Pitman Dep.). Pitman's response to Callahan reiterated that Auto-Owners would "continue to pay the full policy limits of $3,000,000 to Mr. Cawthorn and . . . continue to provide [Ledford] with a defense in the lawsuit if that is how he wishes to proceed." (Ex. 54 to Pitman Dep.).

Following this exchange, the Ledford parties and Cawthorn continued settlement negotiations, proposing multiple drafts and revisions. However, both Moses and Orr expressed reservations about participating in discussions to determine the amount of the consent judgment. (Ex. I to Doc. 119; Orr Dep. at 77:17–79:16). Moses reiterated that she wanted to ensure "whatever amount was agreed to . . . could never be collected against [Ledford]." (Ex. I to Doc. 119, at 4). Similarly, Orr wanted a release and no "public record of a recorded judgment" if Auto-Owners paid the policy limits for Bob's RV. (Orr Dep. at 81:9–16). As far as Ledford's interest, Callahan took the lead on settlement discussions, and Moses "played little-to-no-role in all of the settlement discussions."[6] (Kalbac Dep. at 50:17–22; Orr Dep. at 90:8–11; Moses Dep. at 12:1–13:11).

_____

[6] Moses ended her representation of Ledford on October 31, 2016, when she left her firm. (Moses Dep. at 29).

After Pitman's September 7 letter, Auto-Owners did not participate in settlement negotiations. Auto-Owners knew that Callahan continued discussions with Cawthorn's attorney regarding a settlement and consent judgement and voiced no objections. (Froman Dep., Doc. 60, at 72:20–25).

Ledford and Cawthorn executed the final settlement agreement (Ledford-Cawthorn agreement) on October 20, 2016.[7] (Doc. 62-22). In that agreement, Auto-Owners' signature line, which was included in the initially proposed settlement agreement, was removed. Auto-Owners did not sign the final settlement agreement, but McLean's September 3, 2016 letter was attached. Under the terms of the agreement, Ledford agreed to a $30 million consent judgment against him and that Auto-Owners would tender $3 million for a full release of Bob's RV. Cawthorn in turn agreed not to record the consent judgment against Ledford and to deliver Ledford a full and complete satisfaction of the consent judgment regardless of the outcome of a future bad faith suit. This settlement agreement was contingent on Cawthorn's release of Bob's RV, Bob's RV dismissing all third-party claims, and third parties not pursuing fees or costs. (Ex. 79 to Doc. 61; Froman Dep. at 85:23–87:4). On October 26, 2016, Auto-Owners again tendered the $3 million to Cawthorn to release Bob's RV. (Ex. 79 to Doc. 61, at 1–4), and Cawthorn accepted that tender.

On December 20, 2016, the state court entered a consent judgment in favor of Cawthorn and against Ledford in the amount of $30 million ("Consent Judgment"). Cawthorn then filed this bad faith action against Auto-Owners on December 29, 2016,

---

[7] There is no evidence that this final settlement agreement was shared with Auto-Owners.

under an assignment of Ledford's rights. Cawthorn now seeks to recover from Auto-Owners the amount of the Consent Judgment—$30 million—plus interest and attorneys' fees and costs. (Doc. 1 at 8). Auto-Owners moves for final summary judgment, while Cawthorn seeks a partial summary judgment on Auto-Owners' affirmative defenses.

## II. Summary Judgment Standard

To prevail on a motion for summary judgment, there must be "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 233 (1986). Assertions that facts are genuinely disputed must be supported by "particular parts of materials in the record . . . or showing that the materials cited to do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(a)–(b). The moving party must establish that no genuine issues of material fact remain. Catrett, 477 U.S. at 323.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'" Sawyer v. Sw. Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)). In this case, the Court is essentially asking "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party

must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251–52 (1986).

## III.    Review of Relevant Case Law

Florida protects its citizens from misconduct motivated by the bad faith of companies that insure them. This policy of protection recognizes the disparity of bargaining power between insurance companies and many of their customers. Under Florida common law, insurance companies have a fiduciary duty requiring the exercise of good faith in defending their insureds. <u>Fla. Farm Bureau Mut. Ins. Co. v. Rice</u>, 393 So. 2d 552, 555 (Fla. 1st DCA 1980). This duty requires insurance companies "'to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.'" <u>Perera v. Fid. & Guar. Co.</u>, 35 So. 3d 893, 898 (Fla. 2010) (quoting <u>Berges v. Infinity Ins. Co.</u>, 896 So. 2d 665, 668 (Fla. 2004)). Accordingly, insurers have an obligation to settle "'where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.'" <u>Id.</u> (quoting <u>Boston Old Colony Ins. Co. v. Gutierrez</u>, 386 So. 2d 783, 785 (Fla. 1980)). Breach of this duty that is willful or without reasonable cause may give rise to a cause of action for bad faith against the insurer for damages sustained as a result of the insurer's bad faith. <u>Gutierrez</u>, 386 So. 2d at 785; <u>Johnson v. Geico Gen. Ins. Co.</u>, 318 F. App'x 847, 851 (11th Cir. 2009). These damages may exceed the limits of insurance coverage. But the burden of showing bad faith is high—it is not enough that the insurer acted negligently. <u>Feijoo v. GEICO Gen. Ins. Co.</u>, 678 F. App'x 862, 863 (11th Cir. 2017).

Before 1994, third-party bad faith claims could not be maintained in Florida unless the injured party first obtained a judgment in excess of the policy limits. Florida courts found

that they could not entertain a bad faith claim because the insured had not suffered an injury, and there was no case or controversy. Markel Am. Ins. Co. v. Flugga, No. 5:11-cv-588-Oc-10PRL, 2013 WL 1289522, at *1 (M.D. Fla. Mar. 13, 2013); see also Cunningham, 630 So. 2d at 182; Dixie Ins. Co. v. Gaffney, 582 So. 2d 64 (Fla. 1st DCA 1991); State Farm Mut. Auto. Ins. Co. v. Marshall, 618 So. 2d 1377 (Fla. 5th DCA 1993). But, the rigid requirement of an excess judgment was sometimes inefficient. Resources were occasionally expended not knowing whether the insured would in the end suffer injury and whether a judgment would be recoverable.

In recognition of these impediments, Florida courts carved out certain exceptions to the requirement of an excess judgment in the underlying case. The Florida Supreme Court in Perera described four categories of cognizable bad faith claims, three of which replaced an excess judgment with its functional equivalent. 35 So. 3d at 893. The first category comprises the relatively straightforward bad faith claims discussed above. These are the classic bad faith claims where the insured suffered an excess judgment because the insurer breached its duty of good faith. See id. at 899. In describing this first category of bad faith claims, the court emphasized that "[a]n excess judgment is defined as the difference between all available insurance coverage and the amount of the verdict recovered by the injured party." Id. at 902 (quoting United Servs. Auto. Ass'n v. Jennings, 731 So. 2d 1258, 1259 n.2 (Fla. 1999)); see Verdict, Black's Law Dictionary (9th ed. 2004) (defining a verdict as "[a] jury's finding or decision on the factual issues of a case" or "[l]oosely, in a nonjury trial, a judge's resolution of the issues of a case").

Florida courts have determined that certain agreements constitute exceptions to the requirement of a verdict in excess of policy limits. This second class of bad faith claims

is based on stipulations referred to as Cunningham[8] agreements. These are agreements between insurance companies and injured third-party plaintiffs to try the bad faith claim first. Perera, 35 So. 3d at 900. The parties agree that if a jury finds no bad faith, they will settle for policy limits. Id. The third category embraces bad faith claims involving Coblentz[9] agreements. These agreements arise when the company fails to defend the insured. Id. Upon such a failure, the insured and the injured party may enter into a Coblentz agreement settling the claim and allowing the injured party to pursue a bad faith claim against the insurance company. The fourth category of bad faith claim—which is not pertinent here— involves claims by excess carriers against primary carriers. Thus, while an excess judgment is not always required, in each of the four categories there must be damages that result from the acts of the insurer. Id.

## IV. Discussion

The parties presented two issues in their arguments regarding Auto-Owners' pending motion for summary judgment. The first turns on whether Cawthorn may prosecute this bad faith claim without first obtaining an excess judgment or its functional equivalent against Auto-Owners, and the second is whether Auto-Owners is entitled to summary judgment because the facts do not establish bad faith as a matter of law. Both sides assert that the second issue is not dependent on the first. In other words, the parties urge that even if I decide that there is neither an excess verdict nor a recognized legal equivalent thereof, I should still decide whether Auto-Owners' conduct constitutes bad faith.[10] I

---

[8] Cunningham v. Standard Guar. Ins. Co, 630 So. 2d 179 (Fla. 1994).
[9] Coblentz v. Am. Surety Co. of N.Y., 416 F.2d 1059, 1063 (5th Cir. 1969); Steil v. Fla. Physicians' Ins. Reciprocal, 448 So. 2d 589, 591 (Fla. 2d DCA 2005).
[10] This Court considered whether this determination would affect its subject matter jurisdiction; a claim without a damages assessment may not be ripe for review. In response

disagree. Under the Florida rule, "an insured under a standard liability policy must suffer damages before pursuing a bad faith claim against its insurer." Gallina v. Commerce & Indus. Ins., 375 F. App'x 935, 936 (11th Cir. 2010) (citing Cunningham, 630 So. 2d at 181); Heaslip v. Gov. Emps. Ins. Co., No. 8:16-cv-555-MSS-TBM, 2017 WL 1968735, at *2 (M.D. Fla. Mar. 24, 2017) ("[A] common law bad faith claim accrues once there has been a determination of coverage and liability issues."). Thus, without a valid damages determination, this Court does not reach the issue of the insurer's bad faith.

a. *Excess Judgment and Its "Functional Equivalent"*

As discussed above, Florida courts have identified ways that a third party may establish the damages necessary to bring a bad faith claim. However, Cawthorn has failed to demonstrate that the facts of this case fall within any of these categories. It is undisputed that there was no trial at which a verdict determined the damages. Cawthorn argues that "[b]ecause a final judgment was entered against Bradley Ledford, this case resembles the 'classic bad-faith situation where an excess judgment is entered against the insured.'" (Doc. 119 at 2). However, as outlined by the Florida Supreme Court in Perera, such a classic bad faith scenario requires a verdict or the functional equivalent thereof, which is not present here. 35 So. 3d at 902. The consent judgment issued by the state Court is not an excess judgment for purposes of establishing causation in a third-party bad faith claim.

---

to this Court's questions regarding the survivability of Cawthorn's underlying cause of action, (Doc. 107), neither party addressed any jurisdictional impacts. Ultimately, after a *sua sponte* review of the record and relevant case law, this Court concluded the case is ripe for a ruling on the merits. The Eleventh Circuit Court upheld a similar grant of summary judgment when an insured "prematurely settl[ed] the case." Gallina, 375 F. App'x at 937. Additionally, the Florida Supreme Court described a failure to allege the existence of a judgment as, at most, a failure to state a cause of action. Cunningham, 630 So. 2d at 181–82.

Black's Law Dictionary defines a consent judgment as an "agreed judgment." *Consent Judgment*, Black's Law Dictionary (9th ed. 2004). And while a consent judgment binds the parties, "in effect an agreed judgment is merely a contract acknowledged in open court and ordered to be recorded." *Agreed Judgment*, Black's Law Dictionary (9th ed. 2004). Additionally, the parties agree that Auto-Owners did not neglect its duty to defend, and thus, the stipulation is not a Coblentz agreement.

Cawthorn's primary argument is that his settlement agreement with Ledford and the resulting consent judgment qualify as a Cunningham agreement binding Auto-Owners to the $30 million damages assessment. But in Cunningham agreements, the insurer contracts with the third party to try the bad faith issue *before* determining damages. Perera, 35 So. 3d at 900. Here, the $30 million in damages was stipulated to before this bad faith action was brought. The main problem, however, is not that Ledford and Cawthorn predetermined the damages, but instead that Auto-Owners was not a party to that $30 million settlement agreement, despite Cawthorn's insistence to the contrary. As Auto-Owners points out, Cawthorn attempts to turn its rejection into an acceptance.

Because this is a diversity action, this Court looks to Florida contract law to determine if a settlement agreement is enforceable. Miles v. N.W. Mut. Life Ins. Co., 677 F. Supp. 2d 1312, 1315 (M.D. Fla. 2009). While Florida law favors enforcement, "the evidence must clearly demonstrate that there was mutual agreement to the material settlement terms." Cheverie v. Geisser, 783 So. 2d 1115, 1118 (Fla. 4th DCA 2001). "Generally, the acceptance of an offer which results in a contract must be absolute and unconditional, identical with the terms of the offer, and in the mode, at the place, and within the time expressly or impliedly stated within the offer." Id. at 1119. A party's assent can be

"manifested through written or spoken words, or 'inferred in whole or in part from the parties' conduct.'" L & H Constr. Co., Inc. v. Circle Redmont, Inc., 55 So. 3d 630 (Fla. 5th DCA 2011) (quoting Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., 695 So. 2d 383, 385 (Fla. 4th DCA 1997)). The party seeking enforcement must show that the opposing party assented to the agreement. Carroll v. Carroll, 532 So. 2d 1109, 1109 (Fla. 4th DCA 1988). Here, Cawthorn has failed to show that Auto-Owners assented in any manner.

It is undisputed that Auto-Owners did not sign the final settlement agreement. Indeed, because Auto-Owners did not agree, the agreement was updated to remove Auto-Owners' signature line. Similarly, Auto-Owners did not agree to the stipulation's terms through McLean's September 3 letter as affirmed by Pitman. The agreement McLean addressed did not contain the same material terms—such as the damages amount—as the Ledford-Cawthorn agreement. Finally, there is no evidence that any of Auto-Owners' representatives orally authorized the final settlement. As such, it is clear that Auto-Owners did not agree to be bound by the settlement agreement, and no reasonable jury could find otherwise.

The only remaining question is whether Auto-Owners otherwise assented to the terms of the Ledford-Cawthorn agreement. Cawthorn contends that Auto-Owners "tacitly approved of Bradley Ledford entering" into any future multi-million-dollar settlement agreement without its further authorization. Cawthorn does not dispute that the insurance policy requires Auto-Owners' consent for Ledford to settle with a third party,[11] but he offers

---

[11] Among other provisions, the garage policy's consent-to-settle provision directed Ledford not to "voluntarily make a payment, assume any obligation, or incur any expense . . . without [Auto-Owners'] consent." (Doc. 62-20 at 42). Additionally, the duty-to-cooperate

McLean's September 3, 2016 letter to Callahan regarding a settlement proposal as proof. (Doc. 62-18). Because of this letter, according to Cawthorn, the settlement agreement acts as a <u>Cunningham</u> agreement upon which a bad faith claim may be based.

Viewing the plain language of the letter,[12] this Court finds that it unambiguously does not provide consent to Ledford settling on behalf of Auto-Owners. Merely saying a decision regarding any consent judgment is solely up to an insured and his attorneys differs from stating an insured may enter into a *specific* settlement agreement or consent judgment and thereby bind the insurer. The plain language does not authorize the proposed settlement, much less any future settlements, or represent that Auto-Owners agreed to the terms of any settlement between Ledford and Cawthorn. Instead, Auto-Owners makes clear that it is willing to pay the $3 million, highlights that its liability under the policy does not extend beyond $3 million, and says that despite the exhaustion of policy limits, it will continue defending Ledford without reservation through whatever proceedings may result. No reasonable jury could find otherwise.

---

provision stated: "[A]ny person seeking coverage under this policy must cooperate with [Auto-Owners] in the investigation, settlement or defense of any claim or suit." (<u>Id.</u> at 43). The umbrella policy additionally states:

> [Auto-Owners] may not be sued unless:
> 1. There is full compliance with all the terms of this policy; and
> 2. Until the obligation of an insured to pay is finally determined either by:
>     a. Judgment against the insured after actual trial; or
>     b. By written agreement of the insured, the claimant, and us.

(Doc. 62-25 at 23). "It has been held that this language requires the insured to obtain the insurer's consent before settling." <u>Zurich</u>, 509 F. Supp. 2d at 1310. While acknowledging these contractually binding provisions, this Court refrains from offering an opinion on whether Ledford's settlement constituted a breach of contract because the parties do not seek a declaratory judgment regarding the issues of coverage and liability.

[12] For the language of the letter, <u>see supra</u> at 9–10.

Cawthorn also argues that, by not objecting to the proposed settlement and later settlement negotiations, Auto-Owners bound itself to the final terms and damages assessment. Cawthorn points specifically to emails from Callahan requesting that Auto-Owners respond to terms of the proposed settlement offer, which it failed to do. In McLean's September 3 letter to Callahan, Auto-Owners clearly stated it was "willing to pay [Cawthorn] the full $3 million (the limits of the insurance policies) while continuing to provide a defense to Mr. Ledford without reservation. . . . As for a future consent judgment against [Ledford], that will be solely up to him, you and Ms. Moses. Knowing that the coverage limits under the policies will have been exhausted." (Doc. 62-18). The plain language makes clear that Auto-Owners was only willing to pay the policy limits. Any liability in excess of $3 million was left to Ledford and his attorneys; Auto-Owners would not be a party since coverage limits would be exhausted. Pitman also reiterated this position—that Auto-Owners was willing only "to pay the full policy limits of $3,000,000 to Mr. Cawthorn"—to Callahan in a letter sent on September 7. (Ex. 54 to Pitman Dep.).

Even if Auto-Owners' September 3 letter could not be read as an explicit rejection of the settlement agreement, its silence could not manifest assent. Florida law and Ledford Sr.'s insurance policy are clear that Auto-Owners had no duty to enter into a Cunningham agreement. Berges, 896 So. at 671 n.1; (Doc. 62-20 at 7) ("We may *at our discretion* . . . settle any claim or suit that may result." (emphasis added)). And, silence alone cannot demonstrate mutual assent. Long Term Mgmt., Inc. v. Univ. Nursing Care Ctr., Inc., 704 So. 2d 669, 675 (Fla. 1st DCA 1997). One who is not a party to a settlement agreement cannot be bound by its terms. Gallagher v. Dupont, 918 So. 2d 342, 348 (Fla. 5th DCA 2005).

Controlling an insured's defense without reservation of rights also cannot, in and of itself, bind an insurer to a settlement agreement. Cawthorn contends that, because Moses and Orr crafted, executed, and encouraged Ledford to sign the final settlement, it "is binding and enforceable as to the insurer as if the insurer was a party to the agreement." (Doc. 119 at 3). This proposition is contrary to Florida case law. "[T]he insurer has no obligation or right to supervise or control the professional conduct of [an appointed] attorney." Marlin v. State Farm Mut. Auto. Ins. Co., 761 So. 2d 380, 381 (Fla. 4th DCA 2000). And an insurer cannot be bound by the actions of an appointed attorney over which it had no control. Zurich v. Frankel Enters., Inc., 509 F. Supp. 2d 1303, 1313 (S.D. Fla. 2007) (holding that an insurer did not "'tacitly' authorize[] the settlement" that an appointed attorney advised insured to sign); Aetna Cas. & Sur. Co. v. Protective Nat'l Ins. Co. of Omaha, 631 So. 2d 305, 306–307 (Fla. 3d DCA 1993) ("[A]n insurance company is not vicariously liable for . . . the attorney it selects to defend the insured."). A clear and unequivocal indication of express authority to settle on behalf of another must be given to an attorney. Jorgensen v. Grand Union Co., 490 So. 2d 214, 215 (Fla. 4th DCA 1986).

Moses and Orr represented the insured, not the insurer. While both attorneys refused to discuss the reasonableness of the damages due to the possibility of a pending bad faith claim against Auto-Owners, Moses stated that Auto-Owners did not "control settlement decisions." (Moses Dep. at 21:21–22:16). Similarly, Orr said he communicated with Auto-Owners "more for asking for approval of experts, asking for payment of certain things. I gave [Auto-Owners] general status over the phone." (Orr Dep. at 13:20–14:3). Even Callahan acknowledged that Moses and Orr represented Ledford, not Auto-Owners.

(Callahan Dep. at 84:10–14). And Moses and Orr were in no way authorized to settle on behalf of Auto-Owners.

### b. *Cunningham*-Like Agreement

At oral argument on the summary judgment motions, Cawthorn argued that the Ledford-Cawthorn agreement was a "Cunningham-like" agreement and thus a sufficient predicate for his third-party bad faith claim. But the Ledford-Cawthorn agreement is very unlike the Cunningham predicate approved under Florida law. As noted, insurers are parties to Cunningham agreements. However, Cawthorn failed to demonstrate that Auto-Owners either expressly or impliedly agreed to the settlement terms. Thus, what Cawthorn is asking this Court to do is forge a completely new type of vehicle not recognized by Florida courts as a basis to bringing a third-party bad faith claim. Under this proposal, injured plaintiffs and insured tortfeasors could enter into agreements binding the insurers to pay bad faith damages, even when the insurers were fulfilling their obligation to defend the tortfeasors.

Perera does not foreclose the possibility that other alternatives may qualify as the functional equivalent of an excess judgment. But it is not likely that Florida courts would approve agreements like the one between Ledford and Cawthorn. The Florida Supreme Court "has looked with favor upon stipulations designed to simplify, shorten, or settle litigation and save costs to parties" when "entered into with good faith and not obtained by fraud, misrepresentation, or mistake, and not against public policy." Cunningham, 630 So. 2d at 182. But a settlement between the insured and third-party plaintiff "foreclose[s] a determination of whether [the insured] would be exposed to liability for damages in excess of the Policy, as contemplated by the Policy and Florida law." Gallina v. Commerce & Indus.

Ins., No. 8:06-cv-1529-T-27EAJ, 2008 WL 4491543, *9 (M.D. Fla. 2008), aff'd, 375 F. App'x 935 (11th Cir. 2010). Allowing such agreements without the insurer's authorization to provide a basis for a bad faith claim would remove safeguards promoted by Florida courts. Both excess judgments and Cunningham agreements ease the concern that "the settlement between the claimant and the insured may not actually represent an arm's length determination of the worth of the plaintiff's claim." Steil, 448 So. 2d at 591. Likewise, "an insurer cannot be bound by an unauthorized settlement when it has not refused to defend." Zurich, 509 F. Supp. 2d at 1312. Only Coblentz agreements allow the insured and third-party claimants to determine an insured's excess exposure independently. It is the company's refusal to defend, leaving the insured to his own devices to protect himself in the best way possible, that triggers the insured's right to settle without consent of the insurance company. Id.

  c. Waiver

  Finally, Cawthorn argues that Auto-Owners waived its rights under the terms of the policy to rely on the "consent to settle" provision. This implied waiver, he argues, parallels an insurer's wrongful breach of its duty to defend. He contends that this implied waiver resulted from Auto-Owners' failure to comply with its obligations under the policy, including failure to foster the Ledfords' cooperation, failure to exercise its right to settlement decision making, and failure to notify Ledford of potential coverage defenses. But these alleged breaches do not amount to a failure to defend. Ledford was never left "unprotected" or to his own devices during the underlying litigation. Auto-Owners defended Ledford "unconditionally [and] without a reservation of rights." (Doc. 62 at 7). And, as reiterated throughout McLean's correspondence, it was willing to settle for policy limits. Auto-Owners

is thus not precluded from relying on the "consent to settle" provision preventing Cawthorn from settling without Auto-Owners' authority.

Nor did payment of the policy limits to release Bob's RV constitute waiver of the Auto-Owners' right to require its consent to settle. Bob's RV and Ledford were separate entities under the policy, and there were separate claims against each. While the $3 million payment on behalf of Bob's RV was a condition precedent to the final settlement agreement, the payment of policy limits did not cover Ledford's liability. It only released Bob's RV, who was not a party to the final settlement agreement. This is not inconsistent with the policies' condition that Ledford receive Auto-Owners' approval before entering into a binding settlement since the released insured was a different entity. As such, Cawthorn fails to point to contractual rights that Auto-Owners waived. Rice, 393 So. 2d at 552.

## V.    Conclusion

On these matters, there is no issue of material fact: Auto-Owners defended Ledford without reservation; Ledford did not suffer an excess judgment; and the Ledford-Cawthorn agreement does not qualify as a Cunningham agreement. This Court finds no reason "to stray from the Florida rule that an insured under a standard-liability policy must suffer damages before pursuing a bad faith claim against its insurer." Gallina, 375 F. App'x at 936. Cawthorn has not presented evidence establishing an essential element—an excess judgment or the functional equivalent thereof—for a bad faith cause of action. Cunningham, 630 So. 2d at 181.

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Court, therefore, declines to rule on the issue of Auto-Owners' bad faith. It is hereby

**ORDERED** that:

1. Auto-Owners' Motion for Summary Judgment (Doc. 74) is **GRANTED.**

2. All other pending motions, including Plaintiff's Partial Motion for Summary Judgment (Doc. 62), are **DENIED as moot.**

3. The Clerk shall enter a final judgment in favor of Defendant in accordance with this Order. Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida, on April **27**th, 2018.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties