1

```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION

 3
     - - - - - - - - - - - - - - - - X
 4   DAVID MADISON CAWTHORN,         :
                                     :
 5          Plaintiff,               :  Case No.:
                                     :  6:16-cv-02240-JA-GJK
 6                                   :
     vs.                             :
 7                                   :  Orlando, Florida
                                     :  February 21, 2018
 8   AUTO-OWNERS INSURANCE           :  1:32 p.m.
     COMPANY,                        :
 9                                   :
            Defendant.               :
10                                   :
                                     :
11                                   :
     - - - - - - - - - - - - - - - - X
12
              TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
13           BEFORE THE HONORABLE JOHN ANTOON II
                  UNITED STATES DISTRICT JUDGE
14
15   APPEARANCES:

16    Counsel for Plaintiff:       Michal Meiler
                                    Stephen A. Marino, Jr.
17
      Counsel for Defendant:       Forrest S. Latta
18                                  Peter C. Vilmos
                                    S. Greg Burge
19                                  Baya W. Harrison IV

20

21   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
22

23   Court Reporter:  Heather Jewett, RPR, FCRR
                       Federal Official Court Reporter
24                     401 West Central Boulevard, Suite 4600
                       Orlando, Florida 32801
25                     e-mail: heatherjewett.focr@gmail.com
```

*2*

T A B L E   O F   C O N T E N T S

February 21, 2018

PROCEEDINGS

Argument by Mr. Marino                                   4

Argument by Mr. Burge                                   25

Rebuttal Argument by Mr. Marino                         35

Surrebuttal Argument by Mr. Burge                       43

Discussion re: Length of Trial                          47

Further Surrebuttal Argument by Mr. Burge               52

Further Surrebuttal Argument by Mr. Vilmos              54

Further Rebuttal Argument by Mr. Marino                 59

*3*

P R O C E E D I N G S

(Call to order of the court.)

1
2
3   THE COURTROOM DEPUTY:  This is in the matter of

4   David Madison Cawthorn v. Auto-Owners Insurance Company,

5   Case No. 6:16-civil-2240-Orlando-28GJK.

6       Will counsel please state your name for the record.

7       MR. MARINO:  Stephen Marino and Michal Meiler for

8   Plaintiffs.

9       MR. BURGE:  I'm Greg Burge here for the defendant,

10   Auto-Owners -- for the defendant, Auto-Owners.

11       MR. VILMOS:  Peter Vilmos on behalf of Defendant,

12   Auto-Owners Insurance Company.

13       MR. LATTA:  Forrest Latta, also additional counsel

14   for Auto-Owners.

15       MR. HARRISON:  Baya Harrison, also on behalf of the

16   defendant.

17       THE COURT:  Okay.  My name is John Antoon.  I don't

18   know if I've worked with all of you before.  I know I've

19   worked with one or two of you for sure.

20       This case comes to me this afternoon in a stage of

21   delinquency on my part.  I'm aware of that, and I apologize

22   for it.  But we need to figure out where to go from here.

23       I have pending a motion -- reciprocal motions for

24   summary judgment, some motions pertaining to discovery which

25   don't particularly bother me at this point.  I need to, I

*4*

1    guess, figure out whether we're going to have a trial and when

2    that's going to be, if we have it.

3           Now, I think the way I would like to begin the

4    proceedings this afternoon is to have each of you take no more

5    than ten minutes to tell me about your case and what you think

6    is important about it with regard to the pending summary

7    judgment motion.

8           And I'll help you along.  Justice Pariente, in an

9    earlier case, a few years ago talked about different kinds of

10   vehicles for these bad faith claims, because we're interested

11   in the third-party bad faith claim, and we're not talking

12   about fighting insurance companies.  So that simplifies it a

13   little bit.  Tell me -- start off by telling me which of these

14   types that she identified that you think this case falls

15   under.

16          MR. MARINO:  This is a somewhat unique case,

17   Your Honor.

18          THE COURT:  Yeah.

19          MR. MARINO:  And here's why:  You had a -- you have

20   an opportunity to settle.  The Court has talked about that in

21   a couple different orders, that -- the testimonies from the

22   April accident through June 11, the testimony undisputed has

23   been that the Cawthorns would have taken the $3 million policy

24   limits to settle.  There's a phone call, and the contents of

25   that is somewhat disputed, but the actions of Mr. Cawthorn

*5*

1   thereafter indicate that he had a phone call, the only time he

2   spoke with anyone from Auto-Owners.  Something about that

3   phone call, which he testified to his perception of it, made

4   him hire a lawyer and be no longer willing to settle the case.

5   He just didn't trust Auto-Owners.

6            THE COURT:  Now, did you bring that up -- and,

7   Mr. Marino, I don't mean to rapid-fire you and get you off

8   track, but since we're there, do you have any other cases like

9   this where we're really talking about roughly 60 days from the

10  time of the accident to the time that there was no possibility

11  of settling?

12           MR. MARINO:  Yes.  And we've cited them in our

13  papers.  The *Snowden* case was the earliest one that talked

14  about it being a question for the jury as to whether settling

15  a case, where the liability is clear and damages far exceed or

16  exceed the policy limits, the insurance company has an

17  obligation to go out and identify and negotiate with the

18  claimant.  Let me direct you where in our moving papers.

19  But --

20           THE COURT:  I've got it.  Don't worry about it.

21           MR. MARINO:  Okay.  Well, there is the *Snowden* case.

22  There's a more recent -- the *Bannon* case with Geico.  I think

23  those are both -- I think *Snowden* is a Northern District;

24  *Bannon* is a Middle District case.  And they collect cases

25  within there.

1          My recollection from about 20 years of doing this is

2     that the shortest time that was affirmed for a demand is 33 --

3     33 days after the --

4          THE COURT:  Go ahead.

5          MR. MARINO:  Okay.  Thirty-three days after the

6     accident, the demand expiring.

7          This is a *Powell*-type case of sorts.  *Powell* dealt

8     with a situation where there was communication but no actual

9     demand.  Here we have a claimant's -- whose father called the

10    insurance company and was asking questions.  This is his

11    testimony.  It's undisputed again.  And he's asking questions.

12    "We have these bills piling up.  How much is -- what can we do

13    to resolve this case?  How much are you going to pay me?

14    What's the number here?"  And he testified -- and it's --

15    again, the citations are in our papers -- that he made three

16    or four runs at this and got this evasive answer.

17          And finally the adjuster said, "Well, just don't

18    hire a lawyer because they'll just take your money.  We'll

19    work this all out."

20          At that point he's no longer -- he said, "I'm going

21    to hire a lawyer.  I'm going to file suit.  This is not

22    something I want to engage in anymore."

23          But to answer your question, there are several cases

24    in our papers that talk about 20 days, 20 days.  I think the

25    *Goheagan* case was less than 120 days.  I think it might have

1   been 58 or 52 or something like that, but we specify that in

2   the footnotes as to how many days are at issue in those cases.

3         THE COURT:  Okay.

4         MR. MARINO:  So -- but this is unique because this

5   is -- you have a bunch of moving parts in it, all of which, I

6   think, lend itself to a jury question except to the extent we

7   move for summary judgment on certain side issues to narrow the

8   issues.

9         After that point, there is a series of

10   communications that are initially on their face positive for

11   the insurance company and then later proven not to be true.

12   What happens is after June 11 Mr. Kalbac at the Colson Hicks

13   firm gets hired.  He files suit.  The defendants in the

14   underlying case get a -- an attorney, private counsel, and he

15   writes a letter to the adjuster and says, you know, "I -- my

16   clients are under the impression that a settlement offer was

17   made to the Cawthorns, but I don't see anything about that in

18   the correspondence.  Please send me the correspondence where

19   you made the offer."

20         And it's significant, that date, because the next

21   day the in-house counsel -- or the plaintiff home office

22   counsel -- the next day counsel authorizes, "Tender the policy

23   limits."  Now, they've -- they've framed it -- and I think

24   this is for the jury to decide, but they've framed it as

25   "Okay.  It's about 120-some-odd days post loss, but we had

1   gotten -- a week earlier we had gotten a -- a notification of

2   how much the underlying lien was, and that's what really

3   triggered our policy limits offer."

4           Either way there's no question the policy limits

5   wasn't offered until at least August 8th; yet there were

6   representations made to the insured that the offer had been

7   made prior to that and that the case was going to be settled

8   and they were going to be protected.  And so their

9   testimony -- and the insureds had testified that they felt

10  like they were kind of misled, and they felt they were left to

11  the wayside.

12          So now we have a claim that's being defended, and at

13  some point --

14          THE COURT:  Now, on January 11th, though, you said,

15  "I'm going to hire a lawyer"?

16          MR. MARINO:  June 11th.

17          THE COURT:  June 11th.

18          MR. MARINO:  Yes, sir.

19          THE COURT:  Okay.

20          MR. MARINO:  And, like I said, there are two --

21          THE COURT:  What communication was there between

22  counsel and -- and the insurance company between June 11 and

23  the filing of the lawsuit and the -- and later -- the later

24  date, the date that the plaintiff contends the offer was

25  finally made?

1          MR. MARINO:  Sure.  We have a nice, concise window

2    for the jury to look at.  April 3rd, the accident happens.

3    Terrible accident.  Young Mr. Cawthorn is paralyzed from the

4    waist down.  There is a Facebook page that goes up that is

5    memorializing all of the things that are happening, all his

6    progress, and all of the medical issues he's enduring.

7          By April 28th, according to the claim notes and

8    other communications, the adjuster reaches out to the same

9    lady -- the adjuster only has $50,000 in authority.  So, in

10   other words, to make a settlement offer, she has to go up to

11   the claim home office legal person, the home office person.

12   She reaches out and says, "Hey.  Should we get a lawyer

13   involved?  You know, I'm reserving this at -- at least a

14   million on the primary.  Should we get a lawyer involved to

15   kind of help us from going excess?"

16         The response a couple days later from the home

17   office person is not "Yes, you have authority," not "You

18   should tender," not anything like that.  The response is

19   "Well, are we sure the paralysis is going to be permanent?"

20         Time goes forward.  In their answer Auto-Owners

21   admits that by May 27, 2014, they knew largely from looking at

22   this online information -- and it's not unusual, Your Honor.

23   I'm sure you've seen cases where the adjusters -- when they

24   want to find out about what's going on, the adjusters will

25   look at local media, newspaper reports, online things to

1   gather information if they don't have someone on the spot

2   to -- to talk to.

3          So in their answer they admit that -- and somewhat

4   fortuitously, they volunteer that, as of May 27, 2014,

5   Auto-Owners knew that the claim was one of clear liability and

6   that the policy limits were going to be met or exceeded.

7          THE COURT:  I think my question had to do with what,

8   if any, communication there was after the -- after May 11th

9   between counsel for the plaintiff -- for the plaintiff and the

10  insurance company.

11         MR. MARINO:  June 11.  Okay.

12         THE COURT:  June 11th.

13         MR. MARINO:  I think the testimony, Your Honor, is

14  that after June 11 Mr. Cawthorn and young Mr. Cawthorn were no

15  longer willing to settle, and they wanted to file suit and

16  proceed.

17         THE COURT:  So the answer is none?

18         MR. MARINO:  That's my understanding.  The answer is

19  none.  They had --

20         THE COURT:  So they know -- at that time they're --

21  the company's advised they're going to hire an attorney, and

22  the attorney does not contact the insurance company before

23  they file suit; right?

24         MR. MARINO:  That is correct.

25         THE COURT:  Does the insurance company contact them

1    before the -- before August 5th?

2         MR. MARINO:  Contact whom, Your Honor?  The

3    claimant?

4         THE COURT:  The plaintiff.

5         MR. MARINO:  No, Your Honor.  As far as I know,

6    there's no contact -- after the June 11 phone call, there's no

7    contact anymore by Auto-Owners to Mr. Cawthorn.

8         THE COURT:  Okay.

9         MR. MARINO:  They are -- there is some issue of a --

10   there was some side issue of a medical authorization that was

11   requested, and it was filled out, but apparently it wasn't

12   effective, and they were going to need a new one.  But my

13   recollection is that once he hired an attorney --

14        THE COURT:  Well, that was -- that all happened in

15   May --

16        MR. MARINO:  April and May.

17        THE COURT:  -- April and May.  I just want to make

18   sure I understand this.  As of the time that Cawthorn, Sr. --

19   Mr. Cawthorn, Sr. -- and, by the way, I don't like using first

20   names, and I probably won't let you do it in trial, but I'm

21   going to do it in -- in some of my drafts I'm doing it, and

22   I'm going to do it here today because it's easier for me to

23   deal with Madison and Bradley and distinguish them from their

24   parents.

25        So Bradley's David Cawthorn's father.

*12*

1          MR. MARINO:  Father.  Had a phone call because he
2     was concerned.  His testimony is that he was concerned that
3     time was going by.  They hadn't received any significant
4     communication, and he called the adjuster.  And he had this
5     conversation where he is trying to find out are they going to
6     pay him money for his son?  Are they going to give him the
7     policy limits?  His deposition testimony, as cited in our
8     papers -- and it's very clear.  He went at it about three or
9     four different ways.

10         And, clearly, because the adjuster had no authority
11    to settle -- I mean, the claim notes reflect that she didn't
12    get authority until August 7th -- her answers were evasive and
13    ultimately culminated in "Just don't hire a lawyer."

14         And at that point he said, "Well, now I don't trust
15    you.  I don't feel comfortable with what's going on.  We need
16    a lawyer.  This is a catastrophic injury.  We need a lawyer."

17         And I'm not aware of -- and I'm sure counsel will
18    correct me if I'm misunderstanding the record, but I'm not
19    aware of a communication directly from Auto-Owners to
20    Mr. Cawthorn after June 11 until they receive notice of a
21    lawsuit in July, I believe.  And at that point, like I said,
22    counsel -- Bradley and his father get personal counsel, who
23    reaches out to the adjuster and says, "You've represented to
24    the insureds that you were taking care of that and that you
25    had made a policy limits offer.  I don't see that

1    communication.  Please give me that communication."  And

2    that's August 6, 2014.

3            The next day, August 7, is when you see a

4    communication internally in Auto-Owners saying, "Okay.  Now

5    you have my authority to offer the policy limits."

6            THE COURT:  Now back to my original question.  Which

7    one of these *Perera* categories does this case fall in?

8            MR. MARINO:  That's a hard question to answer

9    because the claim is defended until 2016.  In 2016, beginning

10   at mediation, they start talking about a tender of the policy

11   limits on behalf of one insured and a negotiated resolution on

12   behalf of the other.  And that's done all the time, where it

13   becomes obvious that the dispute is really between the

14   insurance company and the claimant as to whether the insurance

15   company failed to settle.  Let's reach an agreement that takes

16   out the claimant from this and protects them from a lawsuit

17   against them, and let's just have the real parties in interest

18   go at it.

19           So you have a series of communications by personal

20   counsel for the Ledfords saying to Auto-Owners:  "Look, these

21   guys are making us offers to resolve this.  Please respond."

22           And that's where you have all these waiver

23   arguments, because the response from Auto-Owners' adjuster is

24   "We'll go ahead and pay the limits, but it's up to you guys to

25   do as you see fit."

*14*

1          And throughout this process, the appointed defense

2     counsel for the Ledfords being paid by Auto-Owners is copied

3     on all these communications about trying to reach a resolution

4     that protects the Ledfords.  And, ultimately, with

5     Auto-Owners' knowledge, there is an agreement reached by which

6     a judgment is actually entered in the underlying case.  So

7     there's a pending judgment in the underlying case as against

8     Bradley.  It was a settlement as against the insured

9     corporation, and that was part and parcel of the agreement.

10    So Auto-Owners has -- this is a little bit of a hybrid because

11    Auto-Owners had knowledge of the settlement opportunities, was

12    asked by personal counsel to participate and -- and give their

13    two cents.

14          The adjuster wrote a letter -- it's in the record --

15    that said, "You guys do as you see fit.  That's between you

16    and your lawyers."  Never said, "You're violating the policy."

17    Never said, "We object."  Never said, "We have a problem with

18    what you're doing."  And, in fact, the agreement required the

19    entry of a judgment in the lawsuit that Auto-Owners was

20    controlling the defense of, and it required tender of the

21    policy on behalf of one of the defendants, the corporate

22    defendant, which Auto-Owners complied with.

23          And after this was consummated, Auto-Owners said in

24    writing, "We will continue to defend you.  We will continue to

25    go and operate under the contract."

*15*

1          So a pure *Coblentz* agreement is where the insurance

2     company from day one refuses to defend, and that goes back to

3     a 1969 Fifth Circuit case called *Coblentz*, which didn't

4     actually have an agreement that was part of it, but it talked

5     about what an insured can do if it is abandoned by the

6     insurance company.

7          THE COURT:  What this letter says is "As stated

8     then," referring to August 8th, "we continue to be willing to

9     pay Cawthorn," Madison, "the full 3 million, the limits of the

10    insurance policies, while continuing to provide a defense to

11    Mr. Ledford without reservation."  This appears to be what

12    you're suggesting, and you indicated that your client Bradley

13    is agreeable to that.

14          "As for a future consent against Bradley, that will

15    be solely up to him, you and Ms. Moses.  Knowing that the

16    coverage limits under the policies will have been exhausted.

17    However, the policies will continue to afford Bradley's

18    defense if he wishes to keep defending the Cawthorn claims

19    against him."

20          MR. MARINO:  That's correct.

21          I had a case in front of Judge Altonaga on very

22    similar circumstances, where it was a $300,000 limit and it

23    was tendered to one claimant, and the insurance company kept

24    defending.  And, ultimately, an agreement was reached to go to

25    mediation and resolve the remaining claims, and then what we

1    litigated was the insurance company brought an action saying

2    we didn't act in bad faith, and there was a counterclaim

3    saying we did act in bad faith.  And we had a trial that was

4    probably four days too long, but we had a nine-day trial, and

5    the jury was presented with a question of was -- did they fail

6    to settle when they could have and should have done so, which

7    is the standard jury instruction, and was the settlement

8    amount reasonable and made in good faith.

9            In that case the insurance company was a part of the

10   negotiating process.  In this case the insurance company was

11   aware of the negotiating process, was invited to participate

12   in the negotiating process, declined --

13           THE COURT:  So they had a choice of participating or

14   not participating.  Here they decided they were not going to

15   participate, saying, "We're not going to be" -- but if they

16   had participated, your argument would be stronger, wouldn't

17   it?

18           MR. MARINO:  If they had participated, we wouldn't

19   be having much of an argument.

20           THE COURT:  Yeah.

21           MR. MARINO:  But they said, "Nope.  It's up to you."

22   They never once -- because --

23           THE COURT:  Well, what was up to them?  Whether

24   Bradley and Cawthorn entered into an agreement?

25           MR. MARINO:  Whether Bradley and his counsel wanted

1    to entertain an agreement with the Cawthorns to protect

2    Bradley's interests.

3              THE COURT:  Now, Ms. Moses wasn't part of that, was

4    she?

5              MR. MARINO:  I think she was copied on all the

6    communications.

7              THE COURT:  But she -- she wasn't --

8              MR. MARINO:  Respectfully, Judge, if you go ahead

9    and enter that --

10             THE COURT:  Was she part of the -- did she agree to

11   that?

12             MR. MARINO:  My recollection is that Mr. Callahan

13   asked Mr. Orr and Ms. Moses, "What do you think?  What's the

14   value?  I'm trying to make sure we have the right numbers."

15   And he was communicating with them.

16             Remember, Mr. Callahan -- and I forget the other

17   gentleman's name.  I apologize.  But the private counsel for

18   the company.  They were communicating with appointed defense

19   counsel, saying, "This is what we're doing."  They were

20   communicating with them.  They were copying them on all the

21   e-mails.  And they were asking them, you know, "You've given a

22   valuation of the case.  Is this your valuation?  Tens of

23   millions of dollars' exposure?"  They were kept in the loop.

24             And, ultimately, Judge, a judgment was entered

25   pursuant to this agreement in the case that Ms. Moses and

1   Mr. Orr were defending, and at no time did either of them

2   object.  They didn't say, "We have a conflict.  Now we have to

3   withdraw."  They didn't object, and neither did the insurance

4   company.

5          And we talk about in terms of cooperation under the

6   policy that one of the significant issues the Court has to

7   look at is whether the insurance company made any effort to

8   gain its insured's cooperation once they're on notice --

9          THE COURT:  I'm just at a loss to figure out what

10  the company could have done at that point.  They're saying,

11  "We're not in this except, you know, we're going to pay the

12  3 million."  But what else could they do?  They certainly did

13  not -- would not have improved their situation by being there

14  and watching it --

15         MR. MARINO:  Well, let me tell you what normally

16  happens, Judge.

17         THE COURT:  They negotiated.  They were saying,

18  "That's not our deal; that's your deal."

19         MR. MARINO:  Let me tell you what normally happens.

20  What an insurance company does is they say, "Okay.  I get it.

21  We want to protect our insured.  The real issue here is

22  whether we failed to settle in a timely manner.  We're going

23  to reach an agreement on a number, and we'll go litigate

24  the -- the issue."

25         THE COURT:  Right.

 1              MR. MARINO:  That happens --

 2              THE COURT:  That's not this case, though.

 3              MR. MARINO:  Not really, no.  But *Cunningham* --

 4    *Cunningham* was a case that --

 5              THE COURT:  That's right.  It's a *Cunningham* case.

 6              MR. MARINO:  Sort of.  Because *Cunningham* said you

 7    try the bad faith case first, and then, if there's bad faith,

 8    you go try the tort case.  People stopped using pure

 9    *Cunningham* agreements a long time ago because, by the time you

10    finish the bad faith case, you're five years down the road and

11    your witness's are all gone.  Restarting the tort case five

12    years later doesn't make any sense.  So you modify the

13    *Cunningham* agreement, and you do what I'm explaining, which is

14    you say, "Okay.  Let's fix the number."  And insurance

15    companies like this because they get two bites at the apple.

16    "Let's negotiate a number here, and then let's litigate the

17    bad faith case.  And we're going to go to mediation in the bad

18    faith case, and then we'll renegotiate that number we

19    negotiated before and try to knock you down some more on

20    that."  But they control litigation.  They control the

21    process, and they get their insured protected.

22              Here that agreement, if it turns out the agreement

23    is invalidated, has express language that says, "If the Court

24    invalidates the agreement, then the parties go back to where

25    they were before," where Bradley is getting sued by

1   Mr. Cawthorn, and now he's in a position of insurance

2   company --

3            THE COURT:  Well, you -- does this all turn on

4   whether Auto-Owners authorized the settlement?  Is that the

5   issue?

6            MR. MARINO:  I don't believe it does because it

7   seems to me what they're saying is -- if they're saying, "You

8   went outside the agreement," well, then, they can't then go

9   down that road and say, "You owe me obligations under the

10  agreement," once the agreement's been breached.

11           If the Ledfords are saying, "You breached your duty

12  to us," then the case law is pretty clear that, once the

13  insurance company breaches its obligations, they can't then

14  hold the policy terms against the policyholder and say, "We

15  breached, but you still have to do your job."  It doesn't

16  necessarily turn on that one issue, Judge, because there's a

17  lot of transparency here.

18           THE COURT:  I think what I'm asking is something

19  different.

20           MR. MARINO:  Yes, sir.

21           THE COURT:  You're talking about whether they owe a

22  duty of cooperation after that point, I think; right?

23           MR. MARINO:  That's one of the issues --

24           THE COURT:  What I'm asking you is wouldn't --

25  doesn't this case turn on whether the -- the -- Auto-Owners

1  authorized or consented to the -- to this settlement between

2  Ledford and Cawthorn?

3        MR. MARINO:  I don't think it turns on their express

4  authorization.  I think that a factor for you to consider is

5  their behavior with knowledge of the -- the mediation and the

6  postmediation communications offering to resolve this case in

7  a way that protects the Ledfords and either their overt

8  statement to the insured and Mick Callahan, who has been doing

9  this quite a long time -- and I don't think he's inexperienced

10 in any way, but him receiving letters saying, "It's up to you

11 guys what you want to do."  He certainly went to them several

12 times and said, "Please participate."

13       So this isn't a case -- I mean, the *Chomat* case

14 talks about some of the things that makes something not

15 reasonable and not made in good faith.  And one of them is

16 carving out or excluding the insurance company.  Here we have

17 the opposite.  The insurance company and their appointed

18 defense counsel were included in the process and told, "We

19 want you to participate."

20       So they have two options.  They can either

21 participate -- well, three options.  They can either

22 participate; they can say, "No.  And you can't do this.  If

23 you do this, it'll be a breach of the policy, and we'll owe

24 you nothing"; or they can do what they did, and say, "Well,

25 we're not going to participate, but you can do what you got to

1    do."

2          What happens more often is the insurance company

3    says, "We want to control the process; so we'll participate,

4    and we'll put the real parties in interest against each other,

5    and we'll take the insured out of this," because the insured

6    paid a premium, and the insured bought a lot of coverage, and

7    the insured should have been protected, under Plaintiff's

8    theory.  And if the insured is right -- I'm sorry.  If the

9    claimant is right, then Auto-Owners needs to pay what the

10   resulting liability is.  If Auto-Owners is right that they did

11   what they're supposed to do and the jury comes back and says,

12   "You didn't act in bad faith," then the claimant gets the

13   $3 million, and that's all he gets.  But it takes the insured

14   out of the mix and puts the real parties in interest against

15   each other.

16         And that's sort of where the *Cunningham* agreement

17   came from.  And here we have a very high level of

18   inclusiveness, and we have personal counsel for the insureds

19   trying to facilitate some action by the insurance company to

20   protect their insured one way or the other.  And I think that

21   it's at least a jury question.  I actually don't think it's a

22   jury question.  I think it's pretty clear that, through their

23   actions and inactions -- well, Auto-Owners said, "You can do

24   what you have to do.  We're not going to get in your way,"

25   which carriers sometimes do.  And, certainly, if you look at

*23*

1    their obligations under Florida law --

2           THE COURT:  Well, you couldn't tell them they

3    couldn't talk.

4           MR. MARINO:  Sure, you can.  You can tell -- you

5    can --

6           THE COURT:  You couldn't settle maybe, but they can

7    tell them -- well, I don't know if they can tell them that.

8    They can just tell them --

9           MR. MARINO:  Actually, going by the *City of*

10   *Jacksonville* case, they can be told that "Hey, we're defending

11   you.  We don't want you entering into separate negotiations."

12   They can do that.  They can say, "We consider it a" -- and, in

13   fact, if you read the case law we talked about in our papers,

14   they have an obligation.  If they're -- if they're perceiving

15   a breach of the policy, they have a duty to obtain the

16   cooperation of the insured -- affirmatively obtain the

17   cooperation of the insured so they could insure it.

18         If their position now was their position then,

19   because I would suggest to Your Honor, as you read the whole

20   record, there seems to be a morphing of positions, and some of

21   the arguments made now are inconsistent with even the

22   testimony that was given in this case, let alone what was

23   being said back then.

24          THE COURT:  Okay.

25         MR. MARINO:  But if their position now is their

*24*

1   position then, what they could have and should have done is

2   say, "Mr. Callahan, we don't want you negotiating separately

3   with those people.  We're going to control the defense.  We're

4   going to negotiate, and we want this to go to a jury trial and

5   have a jury come back and give us what the number is.  Then

6   we'll deal with the consequences then."  That would have been

7   the other alternative, is a jury would have heard this and

8   come back with, as one of the appointed defense -- I think

9   Mr. Orr put it, tens of millions of dollars.  There is no

10  expert in this case from Auto-Owners' side saying that number

11  is unreasonable.

12          Typically, the way this works is the plaintiff, the

13  proponent of a consent judgment, has a prima facie -- has to

14  make a prima facie showing, usually through expert testimony,

15  that the settlement was reasonable and made in good faith, and

16  then the expert for the defense comes on and says it was

17  either not reasonable or not made in good faith.  There is no

18  disclosed defense expert, and at this point I'm not even

19  certain that the number itself is being challenged.  It's how

20  we got to that number that's sort of the subject of

21  Auto-Owners' argument.

22          So going back to what I said, the position now is

23  that was a breach of a duty to cooperate.  There's nothing

24  then that indicates to the Ledfords that that's the position

25  that they were ultimately going to take over Auto-Owners --

1    THE COURT:  Well, let me hear -- let me hear from

2    the defense, and we'll figure that out.

3    MR. BURGE:  Good afternoon, Your Honor.  I'm

4    Greg Burge here for Auto-Owners.  And I don't think I've had a

5    chance to be before you before, but I'm glad to be here.

6    Just to address, first, I guess, your sort of

7    open-ended question that you asked at the beginning:

8    Auto-Owners sees this case as strictly a *Powell* case, *Powell*

9    *v. Prudential*.  We think that in the complaint, when you look

10   at what they filed -- they filed a single common-law bad faith

11   third-party claim.  They say in their complaint, which is

12   Document 1, paragraph 13, that Auto-Owners knew that

13   Mr. Cawthorn's injuries were catastrophic, likely to exceed

14   the limits of the policy, and that we knew it no later than

15   July the 14th of 2014.

16   So we know now by their admissions that, once June

17   the 11th, 2014, passed, that Auto-Owners had no opportunity

18   beyond that point to try to get the case settled.  And that's

19   been their claim all along, and that's the claim that has --

20   we have been defending.  So the way we see the question is

21   whether or not Auto-Owners entered into settlement

22   negotiations in a timely fashion once they realized that the

23   injuries might exceed the policy limits, and we feel like they

24   did.

25   And when you look at the evidence that's in the

1    papers with the e-mails back and forth, the number of letters

2    that were sent to Mr. Cawthorn, saying, "Mr. Ledford has a lot

3    of insurance, and we can get these medical bills.  We can wrap

4    up this issue."  And, at least in our opinion, that was

5    clearly entering into settlement negotiation, as *Powell* says,

6    without reasonable delay or without any willful intent.

7            And just sort of as an aside, Ms. McLean, who is the

8    Florida adjuster, didn't get this case assigned to her until

9    April the 9th, and she immediately sent out a request for

10   medical records to Mr. Cawthorn.  And he actually got it, and

11   Mr. Cawthorn signed it, but he signed it as a parent would,

12   sent it back in.  She sent it to the hospital.  They would not

13   accept it.  In the meantime, the younger Cawthorn got moved to

14   Atlanta.

15           But the point I'm making is that -- and I believe

16   it's the *Snowden* case that basically, in essence, equates

17   third-party and first-party cases.  And in the state of

18   Florida by statute, in a first-party case where you have your

19   insured who you owe the duty to -- this case is a third-party

20   claimant case where there isn't a duty to them.  But in a

21   first-party case, the legislature in its wisdom has decided

22   that 60 days under that scenario under the Civil Remedies Act

23   is a fairly reasonable time frame in a first-party case to

24   remedy a complaint that an insured has.

25           THE COURT:  So your argument would be if it's

1   reasonable in the first-party case, it would have to be

2   reasonable in a third-party case?

3          MR. BURGE:  Judge, I don't know if I want to go that

4   far, but it's an analogy as to what the legislature has set as

5   a time frame.  I will make the argument that, in a case where

6   you don't owe a duty to a third-party claim, that 60 days

7   ought to be reasonable or something close to 60 days, anyway.

8          Then we get to the point where we know on June 11

9   they have this conversation.  They don't tell Auto-Owners that

10  it can't be settled after that time frame.  They hire

11  Mr. Kalbac.  He files the lawsuit, I believe, on the 26th of

12  June.  They do not let Auto-Owners know.  He does not

13  communicate at all with Auto-Owners.  And unbeknownst to

14  Auto-Owners, before they get served with the lawsuit -- you

15  asked whether or not they contacted the plaintiffs.  And,

16  actually, on June the 30th of 2014, Ms. McLean -- and this is

17  in our papers -- she e-mailed Mr. Cawthorn and said, "I just

18  wanted to send you a quick note regarding the medical

19  authorization that I sent to you.  As soon as I receive that,

20  I'll be able to get the medical records from the hospital.  I

21  hope your son is doing well and continues to improve."  And

22  also in the papers are the documents where she e-mailed with

23  the hospital, tried to get it from the hospital, couldn't get

24  the medical records from the -- from the hospital.  So --

25          THE COURT:  Well, she sent him to Halifax, and then

1    he was moved to Shepherd.

2           MR. BURGE:  He was sent to Shepherd May the 8th.

3    Yes, sir.  And then he met with Mr. Kalbac May the 18th, I

4    believe.  And the lawsuit was filed, I believe, on -- no, no.

5    Excuse me.  He met with Mr. -- Mr. Kalbac, I believe, on June

6    the 18th, and then the lawsuit was filed on June the 26th.

7    Just by way of the timeline, Auto-Owners got notice of the

8    suit on June the 14th of 2014.

9           MR. VILMOS:  July.

10          MR. BURGE:  Excuse me.  July the 14th.  And then,

11   when they got notice of the medical lien, which was the first

12   really objective third-party material as to the damages they

13   had, they -- they got that on July the 31st and immediately

14   sought authority from Mr. Froman, the supervisor in Lansing,

15   Michigan, to go ahead and pay the policy limits, which they

16   did, which were sent out on August the 6th.  And so I know

17   they claim that it had to do with -- something with

18   Mr. Callahan's letter, but in actuality, they moved right

19   after they got that lien information and -- which is, I think,

20   somewhat similar to one of the cases that I think you handled.

21   I think it's maybe the *Stalley* case, where a medical bill or

22   medical lien was fairly instrumental in that case, I believe,

23   in the Court's opinion, that -- because Allstate in that case

24   had gotten that information and then waited almost five months

25   before they moved on that information, in contrast to where we

1  are.  We got that information on July the 31st, and then the

2  checks were sent to Mr. Kalbac because we had been served, and

3  we then knew they had a lawyer, were sent to Mr. Kalbac on

4  August the 6th.  And then at some point in time in November

5  those checks were returned to us.

6          So our belief is -- is that really the actions need

7  to be judged during the time frame of when, by their own

8  admission, the -- the window closed for Auto-Owners on June

9  the 11th, 2014, and that -- the case is a fairly simple case

10 based on those parameters of -- of where we are.  I don't

11 think we even --

12         THE COURT:  Well, you know, I'm -- I'm not in the

13 business of seeing these cases every day.  Last time I did any

14 related work was over three decades ago.  So I'm sort of out

15 of the loop.

16         MR. BURGE:  All right, sir.

17         THE COURT:  To me it seems like a short period of

18 time between April and -- April 4th or whenever.  I guess she

19 got it on the 9th.

20         MR. BURGE:  Yes, sir.

21         THE COURT:  And June 11th.

22         MR. BURGE:  Yes, sir.

23         THE COURT:  But Mr. Marino tells me that there are

24 other cases where there are even shorter times where -- you

25 mentioned the *Snowden* case and I think the *Bannon* case that

1   said that there could be a bad faith claim when there was even

2   a shorter period of time than that.

3           MR. BURGE:  Judge, I don't dispute that at all, and

4   I think there are some cases out there that say that, and it

5   depends on the facts of the case.  To me -- in this case, like

6   the -- the *Powell* case, there was no offer in this case.

7   There was no demand from anyone.

8           THE COURT:  In those cases was there a demand?

9           MR. BURGE:  I'm not sure, to be honest with the

10  Court.  I'm not sure.  It's been a while since I looked at the

11  detailed facts of those, but I think the *Powell* case,

12  specifically, as I understand it, was the first case in

13  Florida that really established the obligation when there was

14  no demand in place that an insurance company, once they decide

15  that liability is clear and that the damages would likely

16  exceed the coverage, then they can't unreasonably delay

17  entering into settlement negotiations.  And we believe that's

18  what they pled in the case and that that's what the -- the

19  case is about.  And I think it's really undisputed.  This

20  isn't a *Coblentz* case, and it's not a *Cunningham* case.  Judge,

21  that's kind of the way we see it.

22          THE COURT:  What is -- -- what is the significance

23  of the argument that -- I think it's their argument.  I don't

24  know if I ever got a clear answer on it -- that Auto-Owners

25  either authorized it by the note that they sent -- Ms. McLean

1   sent or implicitly by not participating.

2          MR. BURGE:  Judge, I think the answer to that

3   question is, one, Auto-Owners did not consent to it, and these

4   lawyers have done a very good job of turning a rejection

5   letter into an acceptance letter.  But clearly -- I think the

6   distinction here is, clearly, they knew that the $3 million

7   was being paid, and that's all the coverage there was --

8          THE COURT:  If you prevail, I'm going to borrow that

9   line.

10          MR. BURGE:  All right, sir.

11          They knew that Auto-Owners was paying the coverage,

12   which is all they had, and Auto-Owners paid it out.  In the

13   letter, when you read it, I think the reasonable reading is,

14   is that the letter was saying, "Look, we paid the $3 million.

15   That's all the coverage that there is.  And if he wants to

16   enter into some settlement with the advice of his lawyers as

17   to him, then we can't stop you from that."  And certainly the

18   insurance company can't.

19          THE COURT:  Well, Mr. Marino says you could have

20   stopped it.

21          MR. BURGE:  I'm not sure that we could, Judge,

22   because we have paid the 3 million.

23          THE COURT:  Maybe you couldn't have physically

24   stopped him, but I think at that point -- well, you had

25   already paid the 3 million.

1        MR. BURGE:  Yes, sir.  We weren't withdrawing the

2   3 million, and what they're trying to equate is a situation

3   where -- let's say we were defending Mr. Ledford --

4        THE COURT:  I see.

5        MR. BURGE:  -- and the 3 million had never been

6   offered.

7        THE COURT:  So you're saying the only thing that you

8   could have done by telling him to stop is say, "Okay.  You're

9   not cooperating; therefore, you forfeit your coverage."  And

10  you didn't do that because you agreed that --

11       MR. BURGE:  Nobody -- nobody said anybody forfeited

12  coverage here.  The coverage was all paid.  They had all the

13  coverage.

14       THE COURT:  That's what I'm saying.

15       MR. BURGE:  Yes.

16       THE COURT:  But that would be the only leverage you

17  had to keep them from entering into an agreement.

18       MR. BURGE:  Yes.  And we certainly weren't doing

19  that because we already paid it.

20       THE COURT:  You know, when I looked at this case,

21  that seemed to me that that was really the focus, whether

22  there was an agreement or wasn't an agreement.

23       MR. BURGE:  Let me -- let me tell you why --

24       THE COURT:  That's my focus.  Do you agree?

25       MR. BURGE:  No, sir.  I can see why you focused on

1    that when you looked at it because there was a lot of briefing

2    about it, but I think the -- the point of it was that we don't

3    believe that there is a case of bad faith here under *Powell*,

4    which is what they're claiming.

5            But as part and parcel, let's just assume that there

6    was bad faith.  Let's just assume that a court made a finding

7    that there was bad faith.  One of the elements of bad faith is

8    that your insured has to have been exposed to an excess

9    judgment.  Ordinarily, that is you try the case per your

10   insured.  A jury comes back greater than the coverage.

11   They've now been exposed to an excess judgment.  Okay?  That

12   didn't happen in this case.

13           THE COURT:  Well, that's the essence of -- of a bad

14   faith claim.  And your position, I guess, is that it's a

15   derivative claim.  So they only get what -- they only get what

16   Bradley had.

17           MR. BURGE:  Yes, sir.  And we're saying that they

18   can't make out one element of the claim, which is an excess

19   judgment, because you either try the case to a jury and get an

20   excess judgment or you do a *Cunningham* agreement -- everybody

21   admits this is not a *Cunningham* case -- or you do a *Coblentz*

22   agreement.  Everybody admits it's not a *Coblentz* case.

23           THE COURT:  When I look at the *Perera* case, I --

24   that's what I did when I first read it, but I don't know that

25   that's an exclusive list.

1          MR. BURGE:  Well, I think the -- and it may not be,

2    Judge.  It may not be an exclusive list.  But I think at least

3    per Florida law -- the point is -- what *Coblentz* does is, when

4    the insurance company denies a defense, -- which we never did

5    in this case.  We did a good defense for this fellow.  But all

6    of the law that we cited in our brief -- *Coblentz* agreements

7    arise when the insurance company denies the defense and,

8    therefore, leaves the insured to his own devices to try to get

9    out of the mess that he's in.  So it allows him to negotiate

10   with the claimant to arrive at an amount to try to limit his

11   liability.  And the Florida courts say, "If you do a *Coblentz*

12   agreement, that can stand in the stead of a jury verdict of

13   excess judgment and serve as the excess judgment element of

14   the bad faith."  But we don't have that here.  What they're

15   trying to say is saying that we should have done something to

16   keep this from happening, and they almost say that we

17   acquiesced in it.

18          And we cited a case --

19          THE COURT:  No.  I think they're saying that.

20          MR. BURGE:  Yes.

21          THE COURT:  Not almost.  I think that's what they're

22   saying.

23          MR. BURGE:  That's what they're trying to say.

24          And we cited to you the *Sidman v. Travelers* case

25   from the 11th Circuit in 2016, which says that even if an

1  insurance company is aware of a settlement by their insured

2  and fails to object, that is not consent to the settlement and

3  that that settlement is not a valid settlement.  And so we

4  believe under *Sidman* that that settlement's not there.  But we

5  really think that the case turns on the fact that there wasn't

6  anything else we could do on the front end, that we did start

7  settlement negotiations, and at least we thought we made it

8  clear in the e-mails and the correspondence.  And so we don't

9  think the Court should reach that question.  But that's the

10  reason that was talked about a lot in the briefing.

11            THE COURT:  Okay.  Well, thank you.

12            MR. BURGE:  Thank you, Your Honor.

13            THE COURT:  Okay.  Hold on one second, Mr. Marino.

14            MR. MARINO:  Yes, sir.

15            THE COURT:  Okay.

16            MR. MARINO:  I apologize for not having as good a

17  grasp of the record as I should have to answer your earlier

18  question.

19            Exhibit 118, which is Bates No. FR 00401, is an

20  e-mail that includes -- it's from Mick Callahan to Michael Fox

21  Orr, who is one of appointed defense counsel, and includes

22  Jamie Moses, David Ledford, John Holcombe, and

23  Bradley Ledford.  And it references an e-mail from Mr. Orr to

24  Mr. Callahan talking about some changes he wants to make to

25  the proposed settlement agreement.

1       With regard to Ms. Moses, Exhibit No. 97,

2  Bates No. FR 00028, is her letter of August 11, 2016, to

3  Ms. McLean, the adjuster, copied to Mick Callahan and

4  John Holcombe.  Mr. Holcombe is the attorney who I forgot his

5  name.  He was personal counsel for the company.  And it talks

6  about the settlement discussions and Mr. Ledford's personal

7  counsel inviting her to participate, and she states, "As

8  retained defense counsel I believe a resolution is, of course,

9  in Bradley Ledford's best interest, but I cannot get involved

10  in the settlement discussions as they have been presented.  I

11  hope you understand my position."

12       So both appointed defense counsel were participating

13  or invited to participate.  Mr. Orr more so than Ms. Moses,

14  but she advised the defense counsel, "Hey, they asked me to

15  participate here, Ms. McLean.  I hope you understand I feel

16  uncomfortable as appointed defense counsel doing that."

17       We have an answer that says by May 27, 2014,

18  Auto-Owners knew that the liability was clear and the damages

19  were to exceed $14 million.

20       We have an undisputed record that says the

21  insured -- I'm sorry.  The claimant called on June 11, saying,

22  "I haven't heard from you really.  Are you going to offer me

23  any money?"

24       We have an undisputed record that says, "Yes, we

25  initially lied and said we did offer money, but, actually, we

1   really didn't until August 6th," the day after the August 5th

2   letter from personal counsel, saying, "The insureds have been

3   sued.  You told me you had tendered the money.  Show me the

4   communication where you actually tendered the money."  It's an

5   interesting quirk of the case where in deposition the

6   Auto-Owners people admitted that initially they took the

7   position that they had offered the money, but then they had to

8   recant that and say, "Actually, we never really did," and we

9   know they didn't have the authority to until at least

10  August 6th.

11          So when counsel talks about initiating settlement

12  negotiations, settlement negotiations, most people understand,

13  are an offer and attempt to get acceptance, things of that

14  nature, not "I need your medical records even though my claim

15  notes show that within four or five weeks of the accident we

16  knew that this paralyzed boy's liability and damages were

17  going to far exceed our available coverage."

18          So we keep having red herrings go out here about

19  "Well, we had to get this hospital lien."  Well, they didn't

20  ask for it until July.  They didn't ask for it early on.  "We

21  had to have this."  All that's contrary to their admissions

22  that by April 28th they had reserved the policy up.  They had

23  asked for a lawyer to get involved to help avoid this from

24  going excess.  And by May 27 they were certain, by their own

25  answer, their own pleading in this case, that the injuries

*38*

1    would exceed the available coverage.

2              I suggest the Court take a look at *Macola*.  *Macola*

3    is the last time the Supreme Court of Florida spoke in unison

4    on the issue of bad faith, and the interesting thing in *Macola*

5    was that a civil limine notice got filed in the middle of a

6    tort lawsuit by a third party.  It got filed by the

7    claimant -- I'm sorry.  By the insured.  And the insurance

8    company tried to give the money to the insured, saying, "Here.

9    You filed a bad faith notice.  Here's the money.  Go deal with

10   the claim."

11             And the Supreme Court of Florida said, "No.  Those

12   are two different things."

13             And what counsel doesn't realize is pretty much

14   every second or third or fourth year, the insurance industry

15   goes up to Tallahassee and tries to get the legislature to

16   make that 60-day window that applies specifically -- and

17   Florida is unique in this regard.  We have a form called the

18   "civil limine notice for first-party causes of action."  Those

19   didn't exist before 1982.  You only had the common law

20   third-party cause of action for bad faith.  It was created --

21             THE COURT:  Yeah.  I don't think they had a very

22   effective lobby.

23             MR. MARINO:  I think the legislature -- well,

24   there's some argument there, but the legislature has been

25   pretty clear about "No, we don't think that statutory

1  framework for first-party claims is going to be applied to

2  common law claims."

3          THE COURT:  Well, it's not by statute, that's for

4  sure.  I think he was just saying it makes sense that -- he

5  thinks it makes sense.

6          MR. MARINO:  With the exception of there's more than

7  60 days here anyway.  It's April 3rd to June 11, and the only

8  reason that June 11 was a cutoff date is because the gentleman

9  called and said, "My son's paralyzed.  Are you going to pay my

10 medical bills?"  And the lady didn't give him an answer.

11         THE COURT:  Well, that's one way to read it.  I

12 think another way to read it is maybe he's not interested in

13 the policy limits.  He's interested in "Are you going to

14 continue to pay?" because this is really catastrophic.

15         MR. MARINO:  Well, continue to pay, Judge -- they

16 hadn't paid anything yet.  They hadn't offered anything.

17         THE COURT:  But then he said, "The bills are

18 ongoing," and, "What do you mean" -- I don't have the

19 language.  You know what it is.

20         MR. MARINO:  His testimony was consistent --

21         THE COURT:  And it's not as clear as -- what he

22 meant is not that clear from reading the actual text of the --

23         MR. MARINO:  Respectfully, Your Honor, his testimony

24 and his son's are unequivocal:  "Called up to try to get them

25 to pay us the money because we had bills.  We didn't know

1    where they were going to go.  And she told us at the end,

2    'Don't hire a lawyer,' and that made me anxious."

3                THE COURT:  Well --

4                MR. MARINO:  So those are fact questions I made,

5    Your Honor.

6                And there's a distinction between "paid" versus

7    "offered."  That's why I said "paid" several times.

8                THE COURT:  Well, who knows why she said that?

9                MR. MARINO:  Well, the insured's also testified.

10               THE COURT:  There's some lawyers that, you know,

11   would write a letter and take a third of the money.  I mean,

12   it does happen.

13               MR. MARINO:  It does happen.  It doesn't mean

14   that -- I think Allstate got in trouble for having its

15   adjusters tell people they shouldn't hire lawyers.

16               THE COURT:  They shouldn't say that.  That's right.

17               MR. MARINO:  That's correct.

18               THE COURT:  Okay.

19               MR. MARINO:  So, Your Honor, I think we wind this up

20   with if counsel's position is that we look at the time in

21   which the claim was available to be settled, okay, but that's

22   a jury question.  There are things for a jury to look at

23   during that time period, and they're going to make their

24   arguments.  And the jury is going to hear Plaintiff's

25   arguments and defense arguments, and they're going to make a

*41*

1   decision based on the standard jury instruction.  Did the

2   insurance company fail to settle when it could and should have

3   done so?

4            THE COURT:  I guess that's one reason I get stuck on

5   that agreement is, is that a jury question?

6            MR. MARINO:  The agreement, the way it's framed by

7   the case law, is that the proponent of a consent judgment has

8   to make a prima facie showing that it was reasonable and made

9   in good faith.  The burden then shifts by the preponderance of

10  the evidence to the insurance company to prove that it was

11  either not reasonable in amount -- I mean, when -- when the

12  terms came out initially --

13           THE COURT:  I guess I'm picking up on your argument

14  more than theirs that somehow they consented to that.

15           MR. MARINO:  Oh, I don't think we've ever argued

16  that they -- that they're -- well, those are two different

17  questions, I think, Your Honor.  If they're challenging the

18  amount, then there's a framework in the case law, and I tried

19  those cases in the verdict, and the jury's asked either one of

20  two questions.  Different judges either have it be

21  "Reasonable?  Check yes or no.  Made in good faith?  Check yes

22  or no."  And some judges have it "Reasonable and made in good

23  faith?  Check yes or no."  It's a single box.

24           I think what you're asking me is in terms of the

25  overall effect of we entered a consent judgment rather than go

1   and have a jury determine the damages, because that's really

2   what we're talking about when we say this consent judgement,

3   is the parties said, "We want to control what happens.  We

4   don't want a jury to come back with 50-, 60-" -- you know, as

5   Mr. Orr put it, "tens of millions of dollars.  We don't want

6   that exposure out there.  Let's control it.  Let's enter an

7   agreement, and as part of the agreement, we'll leave

8   Mr. Ledford alone, and we'll just pursue it against

9   Auto-Owners.  And if Auto-Owners is right -- they didn't act

10  in bad faith -- then we have what we have.  If they're wrong,

11  then they're responsible for the damages."

12         And there are damages.  Bradley Ledford has a

13  $30 million judgment entered against him in the underlying

14  case.  To say there's not damages -- I don't know how you can

15  frame that in a legitimate argument.

16         THE COURT:  I don't think anybody's saying that, are

17  they?

18         MR. MARINO:  Well, I thought I heard counsel say

19  there's no damages, but -- but Mr. Ledford --

20         THE COURT:  Well, he's saying there's no damages

21  to -- to Bradley.

22         MR. MARINO:  But there are because, if you look at

23  the agreement -- and I encourage the Court to look at the

24  agreement -- it says, "If something happened and something --

25  the Court somehow invalidates this, the parties go back to

*43*

1   where they were before, and now Mr. Ledford is subject to the

2   same lawsuit he was subject to before."  And that's part of

3   the language that Mr. Orr was talking about in negotiating on

4   behalf of the Ledfords with Mr. Callahan in terms of

5   responding to Mr. Kalbac.

6            So we have articulated in our moving papers the

7   prejudice to the Ledfords caused by Auto-Owners' silence on

8   this.  They now want to take the position that "Hey, this is

9   your problem, not ours.  We're standing silent."  Well, we're

10  articulating there are several different ways in which the

11  Ledfords are prejudiced by that silence, and that's where the

12  estoppel and waiver argument come in.

13           Unless Your Honor has questions for me.

14           MR. BURGE:  Your Honor, would you give me just a

15  moment?  Thank you, Your Honor.

16           Your Honor, we'll -- real quick.  Auto-Owners, under

17  Florida law -- and it's in some of the cases that we've cited.

18  They have the right under Florida law to seek the medical

19  records to justify the amount of the claim that they're

20  paying, seek some verification of it.  And, clearly, that's

21  what they were doing and were trying to get that done when

22  this time limit was arbitrarily put out there.

23           But at the end of the day, the insurance policy

24  limits the exposure to $3 million.  And at the -- what

25  Mr. Stephen is saying is that -- he's trying to say that,

1    because the insurance company hired Mr. Orr or Ms. Moses to

2    represent their insured, who is their client, that anything

3    they may have been copied on somehow was Auto-Owners' consent

4    to this agreement, which we don't believe is the law.  And

5    under the *Sidman* case we cited, it's legally insufficient to

6    be any sort of a consent.

7         So there just isn't any breach of the contract by

8    Auto-Owners and is not, we don't believe, a breach of their

9    duty of good faith, because when you -- when you look at the

10   language of the *Powell* case, the *Powell* case says:  "Bad faith

11   may be inferred from a delay in settlement negotiations which

12   is willful and without reasonable cause.  Where liability is

13   clear, and injuries so serious that a judgment in excess of

14   the policy limits is likely, an insurer has an affirmative

15   duty to initiate settlement negotiations."  Not pay the policy

16   limits, but to initiate settlement negotiations; although, in

17   our opinion, when you read through the e-mails, especially

18   when Mr. Cawthorn testified he already knew there was

19   3 million in coverage -- that's what she was saying to him:

20   "If we could get some medical authorization here, we have a

21   check to write to your son.  There's $3 million in coverage."

22        So unless you have any questions, Your Honor, I know

23   I've said enough.  Thank you.

24        THE COURT:  So, Mr. Burge, why don't you think these

25   are questions of fact to be decided by the jury?

*45*

1          MR. BURGE:  Are you talking about both the 30-day

2    question and the -- well, in this case, Your Honor, the reason

3    that I don't think that it is, is that under Florida law an

4    insurance company has a right and a time to investigate a

5    claim and to seek confirmation of what the damages were, and

6    that's what they started doing.  Immediately, when they got

7    this claim, they sent a letter to the Cawthorns.  They say,

8    "Please give us this medical authorization form back."  He

9    signs it.  He sends it back.  They try to get the records from

10   the hospital.  The hospital wouldn't honor it.  So then they

11   send him --

12          THE COURT:  But there's no -- there's no statutory

13   requirement or statutory presumption as to what that time is.

14   So --

15          MR. BURGE:  No, sir, there's not.

16          THE COURT:  Then why isn't it a question of fact for

17   the jury to determine what "reasonable" is?

18          MR. BURGE:  Well, I think under the law the Florida

19   Supreme Court has said there are certain bad faith cases that

20   can be decided as a matter of law, where a jury couldn't

21   reasonably find that the insurance company under the *Powell*

22   standard unreasonably delayed settlement negotiations,

23   especially within, you know, 30 days of this event or close to

24   it, maybe 35 days.  There's a letter going out to the

25   Cawthorns saying:  "He has quite a bit of insurance that could

1   help your family.  If you could get us this medical

2   authorization, we can get these records.  We can bring this

3   insurance matter to a close."  And I think they were doing all

4   that they could do to try to -- to try to get the records, and

5   then they would have paid it.

6           And I think, candidly, the insurance adjuster said

7   in her deposition that by May the 27th, when she raised the --

8   the reserve to $3 million, that, if they could get some

9   verification of the injuries, it was their intention they were

10  going to pay the money.  And, you know, frankly, it's the rare

11  situation an insurance company has to fight people for medical

12  authorization forms.  Most of the time the lawyers call and

13  say, "Here's my client's medical bills," and we look at them,

14  and we send them a check.  And that's the way it works.  And

15  having to chase people around is really odd and unusual.

16          THE COURT:  But there's a reason for that.

17          MR. BURGE:  Yes, sir.  Yes, sir, there is.  But

18  that's why I think this is a case that -- it's not a jury

19  question.

20          THE COURT:  It's not a jury question because the

21  11th Circuit says sometimes it's not a jury question.

22          MR. BURGE:  I think that's right.  And under the

23  facts of the case, we believe they speak for themselves,

24  Your Honor, under the *Powell* standard.

25          THE COURT:  Okay.

*47*

 1              MR. BURGE:  Thank you, Your Honor.

 2              THE COURT:  Assuming we go to trial, how long will

 3    the trial take?

 4              MR. MARINO:  That depends on the case we're trying,

 5    Your Honor.

 6              THE COURT:  Okay.

 7              MR. MARINO:  I would think that, if we're trying the

 8    case that I have heard about today, which is focusing on --

 9    from the inception to the point at which suit was filed, and

10    there will be some testimony as to ancillary issues because

11    they relate back to state of mind and things like that -- but

12    if that is the window, if, basically, 2014 is the focus of the

13    case, then it shouldn't take more than four days.  It probably

14    will only take three days.  We're going to have some witness

15    coordination issues.  We may have to have some folks by depo.

16    Yes, we may have some depo readings.  But typically these

17    cases, for me, last about three or four days.

18              If we're going beyond that and trying other issues

19    that have been raised by some of the papers here, it may be --

20              THE COURT:  Well, what issues are you talking about?

21              MR. MARINO:  There was the "reasonable, made in good

22    faith" issue.  As I said earlier, I'm not sure that they're

23    contesting that $30 million is or is not a reasonable

24    resolution to the damages portion of it.  If they're not --

25              THE COURT:  Well, I don't think they are.  I didn't

1    hear that.

2          Are you?

3          MR. BURGE:  Judge, if the Court decides against us

4    and believes that this judgment has some legal sufficiency to

5    support the, quote, "excess judgment" they must have for bad

6    faith, then one of the burdens they have is to prove that it's

7    reasonable and not done in good faith, which we will challenge

8    that.

9          THE COURT:  Okay.  But those are two different

10   things -- reasonable and in good faith.

11         MR. BURGE:  Yes, sir.  Because -- without going into

12   all the evidence, I think it's one thing, the amount, and it's

13   another thing as to who participated in getting to the amount

14   and how they got there.  And so we contend to contest both of

15   those at this point.

16         MR. MARINO:  And that's what I'm confused about,

17   because the burden on the plaintiff would be to make a

18   prima facie showing through an expert.  And as the Courts,

19   like *Chomat*, for example, Third DCA, pointed out, that this is

20   typically done through expert testimony.  The burden then

21   shifts to -- to the opponent of the consent judgment to prove

22   by the greater weight of the evidence that it was either, A,

23   not reasonable or, B, not made in good faith.  There has been

24   no expert designated by defense counsel to opine on that

25   issue.

1          THE COURT:  Either issue?

2          MR. MARINO:  Either issue.  Thus my confusion.

3     Unless they're just going to concede the prima facie showing

4     on our part and attack, I guess, through witness testimony and

5     then make argument and --

6          THE COURT:  Well, is the law clear that that can be

7     done only through a witness?

8          MR. MARINO:  No.  The case says it's typically done

9     through expert testimony.

10          THE COURT:  Well, they can do it.

11          MR. MARINO:  Right.  And my -- I was dribbling out a

12     sentence.  I apologize.  The Court would then analyze the

13     sufficiency of their -- their proof, and if it goes to the

14     jury or if the Court says, "You haven't sufficiently met your

15     burden of dis- -- of proving he was either not reasonable or

16     not made in good faith."  But if the Court finds the evidence

17     they've adduced is sufficient, then the jury would decide

18     that.  Like I said, judges do it either way:  either two

19     separate questions or one combining question on the verdict

20     form.

21          THE COURT:  Okay.  So assuming that those are

22     issues --

23          MR. MARINO:  Five days maybe.

24          THE COURT:  Five days?

25          MR. MARINO:  I'm assuming Your Honor is consistent

1  with the other judges in the courthouse where we'll pick a

2  jury fairly expeditiously.

3          THE COURT:  Fairly, yeah.

4          MR. MARINO:  Then we'll do opening statements either

5  before or just after lunch on Day 1.

6          THE COURT:  And I appreciate your restraint in

7  describing it that way.

8          MR. MARINO:  That's been my experience here.

9  Judge Presnell in particular doesn't let things linger around.

10         So five days.  I mean, I would hope we can get it to

11  the jury by Friday.

12         THE COURT:  What I do is I don't -- I don't look at

13  trials as a physical endurance contest.  I start usually at

14  9:00, and I end by 5:00, and we take a lunch break every day.

15  It doesn't happen -- it does sometimes, but it's problematic

16  to work beyond 5:00 in federal courthouses these days for

17  security reasons.  And, you know, when I was a state judge, I

18  had a court reporter quit because I kept hours that were --

19  interfered with her personal life.  So I try not to do that.

20         MR. MARINO:  We have a number of motions in limine

21  pending.

22         THE COURT:  Yeah, I know.

23         MR. MARINO:  There's some challenges to testimony,

24  areas of inquiry.  So depending on what the Court decides is

25  relevant or not relevant, that could reduce the time frame

1   to -- close to four days again.  If Your Honor lets --

2          THE COURT:  I'm not going to rule on a lot of the

3   issues.  I will rule on the challenges to the witnesses

4   themselves, but some of the things -- I think you both are --

5   all of you are experienced counsel, and I don't need to do all

6   that stuff pre trial.  You know what's right and what's wrong,

7   and I'm not going to let you get away with anything that's

8   wrong.

9          And with regard to other categories of challenges,

10  some of those really do depend on what happens.  Relevance is

11  a question.  This is a break from what I normally do.  I see

12  Mr. Vilmos smiling because he probably knows that normally my

13  pretrial conferences are really tedious because I try to go

14  over every little thing I can, understanding it's all

15  contingent on what may transpire at the time that particular

16  evidence is offered.  But I'm not going to do that in this

17  case because I'm late and I still have the summary judgment

18  issue.  So I'm not going to do that.  I'm going to trust you

19  to be professional with one another on those kinds of things,

20  and if you're not --

21         The other thing about my day is I will always try to

22  make some time available in the morning and in the afternoon,

23  again, not keeping my people here too long, but maybe letting

24  the jury go so we can take care of things as we go, as you see

25  they come up.  Okay?

*52*

1          MR. BURGE:  Your Honor, can I say one last thing, if

2     you don't mind --

3          THE COURT:  Yes, sir.

4          MR. BURGE:  -- that had to do with the *Coblentz*

5     agreement issue?

6          He brought up about whether we're going to challenge

7     the amount and the reasonableness and whether it was done in

8     good faith.  I just want to point out to the Court that what

9     he's talking about is a *Coblentz* agreement, which is not what

10    we have here.  In a *Coblentz* agreement where the Court as a

11    matter of law has already decided that the *Coblentz* agreement

12    is legally sufficient to serve as an excess judgment is one of

13    the elements of the bad faith claim.  In that event, the jury

14    would determine that the -- the plaintiff has the obligation

15    to show that they entered into that agreement with -- in good

16    faith and that the amount was a reasonable amount.

17         But that's not what we're dealing with here.  This

18    is not a *Coblentz* agreement.  They are trying to force this

19    theory of, quote, "consent agreement," and use the elements

20    that are required in the *Coblentz* and bring them over under a

21    consent agreement, and I don't think that's the law.  Whether

22    or not this agreement is legally sufficient to stand in the

23    place of what would have been ordinarily an excess jury to

24    serve as the basis of the plaintiff's bad faith case, we

25    believe, is a question of law and not a question of fact for

1  any -- for any jury.

2      THE COURT:  What -- what status it has is the

3  question.

4      MR. BURGE:  Yes.

5      THE COURT:  I agree.

6      MR. BURGE:  And that status -- we believe under

7  *Sidman,* which says that an insurance company -- it may know

8  that somebody's entered -- entering into a consent judgment,

9  but if it doesn't sign on to it and doesn't agree to it and

10  doesn't consent to it, just because they're aware of it and

11  don't object, that is not -- they are not bound by that

12  agreement.  So -- and you had mentioned earlier about -- I

13  think you had asked the question if we think it was -- I think

14  you asked -- maybe it was Stephen -- if you thought the

15  decision about that was a matter of law.  We think it is the

16  legal sufficiency of that to be able to stand in as what an

17  ordinary excess jury verdict would do on the issue of bad

18  faith, because you got to have an excess verdict to support a

19  bad faith claim.

20      THE COURT:  So your position is that it's not an

21  excess verdict?

22      MR. BURGE:  Yes, sir.  That is --

23      THE COURT:  It's not a *Coblentz* agreement;

24  therefore, it's not --

25      MR. BURGE:  Therefore, we believe that is a question

*54*

1   of law for the Court.

2           MR. VILMOS:  And I would suggest to Your Honor -- I

3   apologize.  I didn't mean to speak out of turn, Your Honor.

4   That was me.

5           THE COURT:  Oh, I'm sorry.  Mr. Vilmos.

6           MR. VILMOS:  If I may?

7           THE COURT:  Uh-huh.

8           MR. VILMOS:  I would suggest a couple of things.

9   One, we know it's not a *Coblentz* agreement because Plaintiff's

10  pleadings --

11          THE COURT:  Yeah.  Document 81, pages 18, 19.

12  Right.

13          MR. VILMOS:  So it's not a *Coblentz* agreement.

14          THE COURT:  They agree.

15          MR. VILMOS:  It's not a *Cunningham* agreement.

16  *OneBeacon* and *Sidman* both say that -- we've cited them in our

17  papers, but it's -- *OneBeacon* is actually one word.  *OneBeacon*

18  *Insurance* is -- the more recent, I think, is *Sidman,* which I

19  think is also a 2015 or '16 case -- say that "We do not

20  consent by silence."

21          What we also have here, Your Honor, is an

22  acknowledgment in the letter that you brought up several times

23  with turning a rejection into an acceptance that there is a

24  policy limit -- and the critical part here is you couldn't

25  just without consent of the two different insureds -- right?

1   Because there's the corporate entity that owns the policy, but

2   we also have a duty to the driver, which is why Auto-Owners

3   hired two different counsel.  Okay?  So you couldn't just say,

4   "I'm going to resolve for one and then leave the other in the

5   dark."  In fact, you couldn't make that choice.

6           But when the son and his private counsel made the

7   choice and informed Auto-Owners that they would allow

8   Auto-Owners to pay the full $3 million limits on behalf of

9   Bob Ledford's RV, Auto-Owners wrote an acknowledgment letter,

10  and it's extremely clear and very short.  It says:  "You have

11  asked us to pay the 3 million on behalf of Bob Ledford's RV

12  knowing that that will exhaust the limits of the policy."  It

13  then goes on to say:  "We will continue to provide Bradley,

14  the other person for whom we have a responsibility, but no

15  more money -- Bradley, a complete defense, without

16  reservation."  That's essentially the end of the first

17  paragraph.

18          In the second paragraph, it says:  "Having just told

19  you that we will provide Bradley a complete defense, knowing

20  there is no more policy limit, whether you choose to enter

21  into a consent judgment knowing the defense exists is up to

22  you," Callahan, "Bradley, and Ms. Moses," whom Auto-Owners

23  hired to represent Bradley.

24          That's a -- that is a matter of law, Your Honor.

25  There is no fact question there.  There is no fact question

*56*

1   about the amount of the policy.  There is no fact question

2   about coverage or denial of coverage.  There's no fact

3   question that this is not a consent to enter into an amount

4   that they were unaware of at the time and could not have

5   consented to.  There is no issue of claims administration,

6   which was brought up recently, because there was no breach at

7   that moment.

8          Nobody had said, "We're doing this with or without

9   you."  It was "You've asked us to pay on behalf of

10  Bob Ledford's RV.  Knowing that that will exhaust the limits,

11  we will continue in good faith to provide a defense for

12  Bradley."  That's not something a jury should try when we have

13  clear language in a contract, a question asking them to follow

14  the contract:  "Please pay on behalf of them with our

15  consent," which is what the letter says, acknowledging their

16  consent to exhaust the limits, continuing to provide a defense

17  to the other.  I'm not sure what's left to try.

18         It's clearly a *Powell* claim because they've made a

19  *Powell* claim in a one-count complaint.  They've testified and

20  said before you today that June 11th was the cutoff date.  We

21  know under Florida law -- I think even *Stalley* says everybody

22  recognizes they have the right to get medical records.  In

23  *Stalley* there was an issue of why, when without medical

24  records alone came, it took so long.  In our case, undisputed

25  fact -- undisputed fact:  Medical lien with a number, $396,000

1    and change, came in within 24 hours, I believe.  It may have

2    been a weekend.  If it was 48, I apologize.  But within a

3    window of immediacy, as the law interprets the word, that

4    request came from Pamela McLean, the only adjuster involved,

5    immediately went to home office legal, and had to get rerouted

6    from home office legal to a higher authority because we have

7    $3 million of coverage, which is, of course, relevant because

8    in *Powell*, *Powell v. Prudential*, the 1991 case, there was

9    $10,000 of coverage.  So that's an issue where, if you know

10   somebody is never going to get enough coverage, *Powell* says

11   you have a duty not to willfully delay settlement

12   negotiations, not pay settlement negotiations.

13            There's a $3 million policy.  They have a right

14   under Florida law for medical records.  But even with that

15   right, within days, the entire limits were paid.  Days of

16   getting that first ever third-party acknowledgment -- neutral

17   party acknowledgment of monies paid.

18            So I would suggest to this Court, with apologies if

19   I step on counsel's toes, that there simply is no factual

20   issue remaining for the jury.  And to take the September

21   letter saying that "If you've asked me to pay Bob Ledford's

22   RV, we will" as consent to a judgment, the terms of which were

23   not worked out, the amount of which was unknown -- I would

24   suggest to Your Honor that's not what we're here to do.

25            THE COURT:  Ms. Meiler, would you like to be heard

1    so we can have a --

2            MS. MEILER:  I think Mr. Marino can handle it, but

3    thank you.

4            THE COURT:  Okay.

5            MR. MARINO:  July 31, 2014, is the fax from Optum.

6    August 5th is the letter from -- and that's Bates --

7            THE COURT:  You need to speak into the microphone

8    one way or the other.

9            MR. MARINO:  I haven't been told that I'm too soft.

10   So I apologize.

11           THE COURT:  It's not your fault.  It's this

12   courtroom.

13           I went down to see some Mayan ruins in Mexico years

14   ago, and they had this outdoor athletic court with walls on

15   both sides.  You've seen them or seen pictures of them, where

16   they had the little stone circle and they were somehow trying

17   to get the ball in that little circle.  You could stand at one

18   end and talk in a normal tone of voice, and way at the other

19   end, much greater distance than that back wall, you could hear

20   even though it was outside.

21           Here, we have all these wonderful engineers and

22   modern technology, and if you speak to me from counsel table

23   without a microphone, I can't hear you, and it's not my

24   hearing.  It's just bad acoustics.

25           MR. MARINO:  Not a problem.

1          THE COURT:  On the other hand, at the Fifth District

2   Court of Appeal in Daytona, you can stand in the corner and

3   whisper and the judges could hear you because the -- the

4   design of the room.

5          MR. MARINO:  It's like a whisper bench.

6          THE COURT:  Go ahead.  I can hear you now.

7          MR. MARINO:  So since we're rehashing the record

8   once again --

9          THE COURT:  Well, you know, it's an unusual case.

10          MR. MARINO:  It is.  It is.  It's unusual to have a

11   defendant gratuitously in their answer say, "We knew by May 27

12   that this was going to exceed the policy limits," and now,

13   later on in the case, say, "Well, we had to get other stuff."

14   Well, the other stuff came in on July 31st.  It's

15   Bates No. AO 00386.

16          And we have set this forth in our moving papers.

17   The actual chronology of events is this wasn't requested until

18   July, when it could have been requested in April, May, June.

19   Optum sends Ms. McLean on the 31st of July -- it's the -- the

20   lien.  Nothing happens on the 1st, the 2nd, the 3rd, the 4th.

21   On the 5th the Ledfords' lawyer writes a letter and says,

22   "Ms. McLean, you told the insureds that the limits had been

23   offered.  Where's that communication?"

24          Miraculously, on the 6th the authority is given to

25   offer the policy limits.  "Offer."  We keep using some words

1    very loosely.  "Offer" as opposed to "paid."  "Paid" means you

2    gave somebody money, and they accepted it, and it was

3    satisfied.  Just like "tender."  "Tender" means you actually

4    deliver the check, not you offer the money.  It was not paid

5    in August.  In fact, there were conversations in October.

6    Now, that's 2014.

7            The case is litigated, defended, gone through,

8    depositions taken, money spent for two more years.  This isn't

9    a bing, bang, boom.  We're using months very loosely without

10   years.  We get into 2016, and the parties go to mediation.  At

11   that point personal counsel and Auto-Owners and the claimants

12   start talking about how to resolve this without leaving it to

13   a jury, and the conversations continue thereafter, and no

14   one's excluded.

15           And I disagree -- I encourage the Court to review

16   the record.  I disagree that a skeleton was given to

17   Auto-Owners in September of 2016 in saying, "We're not going

18   to tell you what's really happening.  Just do this."  No.

19   That framework, as I told you -- I cited to you the e-mails in

20   which Mr. Orr is participating in the language of the

21   agreement.  There are letters floating back and forth.

22   Initially, it was 33 million demanded.  And there were

23   exchanges back and forth where Auto-Owners is being asked to

24   participate in calculating the number.

25           So I don't think Mr. Vilmos accurately remembered

1    the record when he said that Auto-Owners just had no idea

2    other than pay 3 million on behalf of the corporation and

3    Bradley's going to do what he's going to do.  By that point

4    everybody knew, but the record will be what it is.  And we've

5    all cited the deposition transcript, and we've all cited the

6    records.  Those will tell the actual chronology.

7            But these folks were collectively working toward a

8    specific agreement, and by September 21 Mr. Orr is discussing:

9    "Good afternoon.  David, John and I discussed one perceived

10   issue with the Settlement Assignment Agreement -- Settlement

11   and Assignment Agreement.  Page 6 of 8, Section G states in

12   pertinent part" -- and they're discussing an eight-page

13   document with very clear specifics.

14           So I think it's inaccurate to say that Auto-Owners

15   was in the dark and was not sure what they were consenting to

16   by omission or commission.  Okay?  Paying the $3 million on

17   behalf of Ledford RV was a condition of the agreement.  It was

18   part of the agreement the parties had reached in terms of how

19   to resolve this involving all the different players.

20   Auto-Owners knew about it.  They said, "You do what you want

21   to do.  We don't object."

22           We have given Your Honor the case law that very

23   clearly says an insurance company, if they think their insured

24   is not cooperating or doing something to breach the policy,

25   they have an affirmative duty to get the cooperation of their

1    insured.  Their witnesses have admitted, "We didn't do

2    anything to do that."  And counsel made closing reference to

3    Florida Statute 627.426, claims administration statute, which

4    very clearly under (2)(a) and (2)(b) says, "Within 30 days of

5    when you knew or should have known of a coverage defense, a

6    defense to coverage which otherwise exists, you have to do one

7    of three things, and if you don't, you waive that coverage

8    defense."

9         At some point -- even if you take their argument at

10   face value that in September they didn't know what Bradley was

11   going to actually do, which is not supported by the record --

12   they found out shortly thereafter -- and if we're talking

13   about the claims administration statute, they had 30 days from

14   the day when they knew or should have known about that to tell

15   the insured, "We have a problem."  And they have 60 days under

16   the statute to do one of three things -- (2)(a) is the

17   30 days; (2)(b) is the 60 days -- to fix or deny coverage.

18   One of those three options:  (2)(b)1., 2., and 3.  And if they

19   don't, the law is very clear.  *Doe v. Allstate* is another

20   Supreme Court case that say you waive that coverage defense.

21        So what we're hearing now is really that "We're not

22   going to treat this as the consent judgment that it is."  And

23   if we're not going to attack whether it's reasonable and made

24   in good faith, that shortens the trial.  If they're saying as

25   a matter of law you have to look at it and say, "Is it okay

1   for Auto-Owners to know what's going on? its lawyers --

2   everyone's involved in negotiating the terms.  To allow -- and

3   let's take a look at the whole body of law that says, "An

4   insurance company is in privity with its insured for purposes

5   of what happens in a case that the insurance company is

6   controlling the defense of."  There's a whole string of law

7   that says that.  So we're going to allow our insured to have a

8   $30 million judgment entered against him and say nothing and

9   do nothing, understanding the terms of the agreement are that

10  we're going to turn to Auto-Owners and say, "The real parties

11  in interest, Auto-Owners and the Cawthorns, are going to

12  litigate and resolve this issue."  If they're saying that's a

13  question of law, I think that's an easy question for you to

14  answer given the vast amount of law that puts the insurance

15  company and the insured in the same place for purposes of

16  these -- these considerations and the waiver arguments and

17  everything else we've cited in our papers.

18         I was being deferential in saying are they going to

19  challenge whether 30 million was reasonable or not reasonable.

20  I thought counsel said yes, but now I'm hearing that they're

21  talking about whether the amount was enforceable or not, which

22  is a different question.

23         THE COURT:  Well, you're making me feel better about

24  not being able to decide based on your papers, which I

25  appreciate the brevity of them, but I don't think -- I think

*64*

1    they scratch the surface.  I always encourage people to be

2    brief in their written argument.  Obviously, not so much in

3    oral argument, I guess.  But it makes me feel better about my

4    hesitation.  You-all have gotten into a lot of different

5    things.

6            Okay.  So I'm going to say five days.  We need to

7    find five days for you.

8            MR. MARINO:  Your Honor, if I may?

9            THE COURT:  Huh?

10           MR. MARINO:  The complication with the witnesses I

11   have are, apparently, the Ledfords are all going to be in

12   San Diego March 6th through 10th.

13           THE COURT:  I'm sorry?

14           MR. MARINO:  The Ledfords are going to be in

15   San Diego March 6th through 10th.

16           THE COURT:  Oh.

17           MR. MARINO:  And Mr. Kalbac's son is getting married

18   in Georgia March 21st through 26th.

19           THE COURT:  March what?

20           MR. MARINO:  21 through 26.

21           THE COURT:  That pretty much shoots March, doesn't

22   it?

23           MR. MARINO:  And the other thing I have to deal with

24   is that, on the 27th of February, a gentleman named Moreno out

25   of the Southern District is expecting me to show up for a

1    calendar call just like this.

2            THE COURT:  Oh, wow.  You better be careful of that.

3            MR. MARINO:  Pretty much exactly like this.

4            THE COURT:  I know him.  You better be careful.

5            MR. MARINO:  I got a lot of motions too.  But I want

6    to be able to tell him what your plan was in terms of -- since

7    your calendars were overlapping in March.

8            MR. VILMOS:  Your Honor, do you want more briefing

9    on summary judgment?

10           THE COURT:  I'll try to let you know in a couple

11   days.

12           MR. VILMOS:  I mean, I only ask because there was a

13   page limit, and I think both of us crept in on the last line

14   of the last page of the limit.

15           THE COURT:  Well, it must have been -- they must

16   have been well written because I didn't realize that.  They

17   seemed better than most.  It's just that this is a -- a

18   challenging case, and I may want you to brief one or two

19   issues, but I'll let you know.

20           What's your schedule in March?

21           MR. BURGE:  Judge, we -- honestly, we kind of

22   thought we'd be trying it sometime in March based on the order

23   from the Court.  So --

24           THE COURT:  Yeah.  You're entitled to that.

25           MR. BURGE:  So I kind of cleared the decks for it

1    just based on what the Court thinks, but we're not opposed to

2    moving it beyond March if the Court needs to.

3              THE COURT:  I had some -- I had some issues that

4    were personal that really have nothing to do with my

5    responsibilities here, but, nonetheless, I got pushback on my

6    schedule, and I'm just now getting caught up.  So --

7              MR. BURGE:  We're certainly not opposed to outside

8    of March.

9              THE COURT:  Okay.  Well, let me not take any more of

10   your time.  I've got these motions in limine here, and I know

11   about Mr. Doucette and Dr. Raffa and Justice Wells and all the

12   people you're talking about, and I've read them all.  And I

13   don't want you to think I'm uninformed.  I know the issues are

14   there.  I read the R&R.  It -- but rather than spend the time

15   on that, I think I need to focus on the motion for summary

16   judgment.

17             MR. BURGE:  All right, sir.

18             MR. VILMOS:  Are you -- are you, Your Honor, telling

19   us that we are not on the March docket, that we may be in

20   April?

21             THE COURT:  I'm telling you that, if you're not --

22   I'll let you know in a couple days, and if you're not on the

23   March docket, it's my fault and not yours.  And I will

24   accommodate your schedules as best I can.  I probably just ask

25   that you guys come up with a different -- a different time

1    period that is mutually agreeable.  If you can't do that, I'll

2    see what I can do.

3            Usually, it's the plaintiffs who are pounding at the

4    door, trying to get a trial, but Mr. Marino doesn't have any

5    time or his people don't have any time.

6            MR. MARINO:  I'm pounding.  I'm pounding at the

7    door.

8            THE COURT:  Okay.  Well --

9            MR. MARINO:  Don't get me wrong.

10           THE COURT:  So that really -- you weren't pounding

11   very loudly.

12           MR. MARINO:  Can I revisit that?

13           THE COURT:  No.  That's a circumstance I take into

14   account.

15           Okay.  Is there -- is there anything I can help you

16   with about the way I try cases?  I try to be formal.  I don't

17   like bench conferences, but I'm at your disposal before and

18   after witnesses and at lunch, as long as it doesn't interfere

19   with getting a bite to eat and relaxing a little bit.

20           We work from the back of the courtroom.  The

21   questions are from back there.

22           You probably are all familiar with our electronic

23   setup and how we no longer -- maybe -- maybe some of you never

24   experienced it, but, you know, we used to publish the exhibits

25   by handing it to Juror No. 1 and going all the way back.  Back

*68*

1   before DNA testing, I had a paternity case where Exhibit 1 was

2   the baby, and they asked to publish the exhibit.  And one of

3   the lawyers took the baby down the -- and let all the jurors

4   look to see how much the baby looked like the putative father,

5   who soon thereafter became the legal father.  So we're

6   advanced.

7           My staff is great.  I think you'll like working with

8   them.

9           Any questions?

10          MR. BURGE:  No, sir.  I think you've covered it.

11          THE COURT:  Yeah.  Well, this was very valuable to

12  me because my focus was not the same as counsel's.  So it was

13  a -- it was a good exercise for me.  So I thank you for your

14  help.

15          MR. MARINO:  Thank you, Your Honor.

16          THE COURT:  So I will get back with you no later

17  than Monday afternoon about timing.  Okay.

18          (Proceedings concluded at 3:06 p.m.)

19                          *   *   *

20                  CERTIFICATE OF REPORTER

21

22  I certify that the foregoing is a correct transcript of the
    record of proceedings in the above-entitled matter.

23

24   /s/ Heather Jewett_____          03/16/2018
     Heather Jewett, RPR, FCRR              Date
25   Official Court Reporter